# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF ILLINOIS

# EASTERN DIVISION

|  |  |
|---|---|
| TODD R. SNYDER, AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST,<br><br>          Plaintiff,<br><br>   v.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LTD., JUMP FINANCIAL, LLC, J DIGITAL 6 CAYMAN LTD., JCDP-7QP LLC, JUMP OPERATIONS, LLC, JUMP CAPITAL, LLC, KANAV KARIYA, WILLIAM DISOMMA,<br><br>          Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff Todd R. Snyder, as Plan Administrator for the jointly administered estates of Terraform Labs Pte. Ltd and Terraform Labs Limited and the Wind Down Trust established under the Second Amended Chapter 11 Plan of Liquidation entered in *In re Terraform Labs Pte. Ltd. et al.*, Case No. 24-10070 (Bankr. D. Del.) (the "Plaintiff"), and as assignee of claims from Luna Foundation Guard Ltd. ("LFG") and the individuals listed in Exhibit A (the "Individual Victims"), by and through his undersigned counsel, alleges as follows against Jump Trading, LLC, Jump Crypto Holdings, LLC, Jump Financial, LLC, J Digital 6 Cayman Ltd., JCDP-7QP LLC, Jump Operations, LLC, Jump Capital LLC, and Tai Mo Shan Ltd. (together, "Jump"); Kanav Kariya, and William DiSomma, (the "Individual Defendants," and together with Jump, the "Defendants").

## INTRODUCTION

1.     This case is about a secretive trading firm that defrauded investors and contributed to one of the largest cryptocurrency ("crypto") collapses in history, pocketing billions of dollars of profits in the process while escaping accountability all along. This lawsuit is how the estate of Terraform and the victims of Jump's wrongful conduct will finally hold Jump responsible.

2.     Due to Jump's fraudulent and manipulative actions, the market capitalization of the Terraform Ecosystem exceeded $45 billion by early May 2022. Within days, Terraform collapsed, its primary crypto tokens UST and Luna were worthless, and Jump had made off with billions of dollars for itself. For its part, Terraform and its founder, Do Kwon, have been held to account: The SEC charged both with securities fraud, a jury found them liable, and they agreed to pay $4.5 billion. Terraform filed for bankruptcy and wound up its business, and Kwon has now been sentenced to 15 years in prison in the U.S. and has similarly been indicted on criminal charges in South Korea. Jump, however, has gotten off scot-free so far, reaping billions while the Terraform estate and investors in UST and Luna are left with nothing. This case seeks to right that wrong.

3.      In or around 2019, Kwon and others launched Terraform with the goal of issuing crypto tokens that would maintain 1:1 exchange rates with various fiat currencies through an arbitrage mechanism tied to a companion token.  Terraform began issuing that companion token, Luna Classic (or Luna), in April 2019.  In September 2020, Terraform issued US Terra, or UST, as an algorithmic stablecoin that was pegged to the value of one U.S. Dollar.  UST was designed to maintain its peg to $1 through a "mint-burn" relationship with Luna: When UST fell below $1, a holder of UST could burn one UST and receive $1 of minted Luna, thereby decreasing the supply of UST in the market and driving its value back to $1; and when UST rose above $1, a holder of Luna could burn $1 of Luna in exchange for newly minted UST, thus increasing the supply of UST and driving its value back down to $1.

4.      Jump saw the Terra ecosystem, and its UST and Luna tokens, as a new cryptocurrency venture that had the ability to expand rapidly—and from which it could profit handsomely.  In a series of secret agreements in 2019 and 2020, Jump agreed to serve as a "market maker" for UST and Luna, providing liquidity and serving as a willing counterparty to trades involving those crypto tokens, in exchange for receiving substantial volumes of Luna at strike prices that, in 2021, were far below market value.  Jump and Terraform also entered into a so-called "Gentleman's Agreement" whereby Jump would help maintain UST's $1 peg in exchange for certain consideration from Terraform.  Despite their secret arrangement, Jump and its executives publicly touted the stability of UST, proclaiming that this algorithmic stablecoin would naturally maintain its $1 peg through the mint-burn relationship with Luna and thus avoid the typical price volatility of cryptocurrency.

5.      In May 2021, UST experienced its first significant depeg.  At the time, with Jump's assistance, UST had a market cap over $2 billion, and Luna's was roughly $6 billion.  A collapse

of this $8 billion ecosystem would have been bad enough. But Jump could not let that happen. If Terra collapsed and Luna rendered worthless, Jump's potential for substantial profits—from both its existing Luna holdings and its deeply-in-the-money Luna options that vested in the future— would vanish. So Jump agreed with Kwon that Jump would engage in a series of trades singularly designed to prop up the value of UST, purchasing substantial UST in the market in the hopes of artificially restoring the value of UST to its $1 peg. These trades were antithetical to any normal or legitimate market-making activities: Rather than engage in trades that would leave Jump neutral to the price of UST and with no net position, Jump took a substantial and intentional long position in UST. Jump's conflicted actions worked. Within days, UST's value returned to $1—due to Jump's efforts, not the Terra algorithm or UST's mint-burn relationship with Luna.

6.      But Jump was not done. It took affirmative steps to falsely convince the market that Terra's algorithm worked, that UST had naturally rebounded to its $1 peg due to the mint-burn relationship with Luna, and that, as a result, the Terra tokens were sounds investments— despite knowing all of that was definitively not true. Jump and Terraform hid from the public Jump's actions to prop up the price of UST, and instead falsely proclaimed that the algorithm— not Jump's covert trading activity—had restored UST to its $1 peg. Having been misled into believing the Terra algorithm worked as intended to stave off collapse, investors flooded to purchase Terraform's tokens. Just as Jump had hoped, Terraform's market cap grew substantially over the next year—UST grew over nine-fold, to more than $18.5 billion, and Luna skyrocketed to more than $26 billion. And with it, Jump's wrongful windfall ballooned too.

7.      Artificially maintaining the peg in May 2021 was not the only time Jump misled the market. In early 2022, Jump and Kwon coordinated to create Luna Foundation Guard, or LFG, a purportedly independent entity to hold reserves that could be used to defend UST's peg if

necessary.  Jump and Terraform trumpeted LFG, and its alleged independence, as a further basis for believing UST and the Terra ecosystem was stable.  But LFG was just another means of deceiving the public.  Kwon and Jump executives were on LFG's Governing Council.  They dominated and controlled LFG, using it and its vast resources for their own personal interests.  For Kwon, LFG provided a vehicle for Kwon to funnel Terraform assets, including hundreds of millions of dollars' worth of Luna, ostensibly beyond the reach of Terraform's creditors.  For Jump, LFG provided a source of funds that could be used to defend the peg, preserving the value of Jump's Luna positions—both any current holdings and its options that vested in the future— and ensuring Jump did not have to deploy its own capital to do so.  On information and belief, LFG also provided a source of profit for Jump directly, through market-making profits and self-dealing.

8.      In May 2022, another significant UST depeg occurred.  Kwon and Jump called on LFG and its reserves to attempt to restore the peg.  Defendant Kariya and Kwon directed LFG to provide Jump with more than one billion dollars' worth of Bitcoin (which LFG previously purchased with Luna it received from Terraform).  LFG received no consideration from Jump and had absolutely no oversight of how Jump used that Bitcoin in a purported effort to defend the peg.  Jump was supposed to use these assets to restore the peg.  It is not clear how Jump used that Bitcoin, and whether it did so in ways that further lined its own pockets.  Regardless, by this time, the Terra ecosystem was substantially larger than a year before—with a market cap over $45 billion—and all efforts to restore the peg, including any that Jump undertook, failed.

9.      The May 2022 depeg turned into a "death spiral" that decimated Terraform, rendered UST and Luna worthless, and left unwitting investors with nothing.  The SEC charged

Terraform and Kwon with securities fraud, Terraform filed for bankruptcy, Kwon pled guilty to two counts of criminal fraud, and they agreed to pay approximately $4.5 billion to the SEC.

10.     Jump and its executives, however, have escaped relatively unscathed.  While the SEC painted Jump as a conspirator in the fraudulent scheme and questioned Jump's executives—including Defendants Kariya and DiSomma who invoked their Fifth Amendment right hundreds of times and refused to answer any substantive questions—the SEC did not bring claims against Jump in that prosecution.  Instead, the SEC entered a settlement with Jump subsidiary Tai Mo Shan for a nominal amount—$123 million—in December 2024, leaving Jump with billions of dollars in wrongful profits from its role in defrauding the market.  Put simply, Jump and its executives have not been held accountable for their leading role in the collapse of Terraform or been required to return their ill-gotten gains.

11.     This case seeks to hold Jump and its executives accountable and to recoup for Terra's creditors—namely, the investors who lost everything in Terraform's collapse—the massive financial windfall Jump and its executives reaped from their wrongdoing.  The Plan Administrator was appointed by the Bankruptcy Court to pursue claims against those, like Jump and its traders and executives, who caused and profited from Terraform's ruin.

## **JURISDICTION AND VENUE**

12.     This Court has subject matter jurisdiction over Plaintiffs' claims under Sections 9, 10(b) and 20A of the Exchange Act (15 U.S.C. §§ 78i, 78j, 78t-1), Section 15 of the Securities Act (15 U.S.C. § 77o), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), Sections 6(c)(1), 9(a)(2), and 22 of the Commodity Exchange Act (7 U.S.C. §§ 9, 13(a)(2), 25), CFTC Rule 180.1 (17 CFR § 180.1), and the Bankruptcy Code under 28 U.S.C. § 1331 as they are based on federal laws.

13.     This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(a) because they arise out of the same case or controversy as Plaintiffs' claims based on federal law.

14.     This Court has exclusive jurisdiction over Plaintiffs' Commodities Exchange Act claims under to 7 U.S.C. § 25(c).

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a substantial portion of the events giving rise to these claims occurred in this judicial district.

## PARTIES TO THE ACTION

16.     Plaintiff Todd R. Snyder is a resident of New York.  He is the Plan Administrator for the Terraform Labs Wind Down Trust (the "Wind Down Trust").  He was appointed under the Second Amended Plan of Reorganization for Terraform Labs Pte, Ltd., *et al.* (the "Plan"), as confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 20, 2024, which also established the Wind Down Trust.  Under the Plan, all assets of Terraform Labs Pte. Ltd. and Terraform Labs Limited (together, "Terraform") were transferred to the Wind Down Trust, and from the effective date of the Plan on October 1, 2024, the Plan Administrator has the authority to carry out and implement all provisions of the Plan. This authority includes: (a) running the claims reconciliation process; (b) making distributions required by the Plan; (c) maximizing the value of the assets of the Wind Down Trust and Terraform, including by bringing litigation on account of any causes of action held by Terraform or the Wind Down Trust; and (d) reviewing and compelling turnover of the property of Terraform Debtors or the Wind Down Trust.  In short, Plaintiff was charged by the Bankruptcy Court and the Plan with monetizing any assets transferred to the Wind Down Trust and distributing such funds to creditors and has authority under the Plan to pursue compensation claims on behalf of injured creditors.

17.     One of the Plaintiff's principal responsibilities is to seek compensation on behalf of creditors who were harmed by the collapse of the Terraform ecosystem.  The Plaintiff is empowered by order of the Bankruptcy Court to pursue claims against actors like the Defendants who unlawfully profited from, and contributed to, the failure of Terraform.  The Plaintiff will use recoveries secured in litigation against these Defendants to fund the compensation dedicated to creditors under the Plan.[1]

18.     As part of the Plan, thousands of Individual Victims assigned to the Wind Down Trust their individual claims against third parties related to Terraform.  JTC (Cayman) Limited is a Cayman Island company and the Trustee of the Wind Down Trust.  Under the Plan, the terms of the assignments, and the Wind Down Trust Agreement, the Plan Administrator is authorized to pursue these claims.  The Individual Victims on whose behalf the Plan Administrator is pursuing claims in this action are listed on Exhibit A.

19.     On information and belief, the Individual Victims traded UST and/or Luna between May 23, 2021 and May 31, 2022.

20.     The Plaintiff also brings claims that LFG has assigned to the Wind Down Trust. LFG was established as a Singaporean Public Company limited by Guarantee in 2021 by Kwon in consultation with Jump.  Under Singaporean law, companies limited by guarantee are used to carry out non-profit making activities and activities of public interest.  LFG was created following the depeg in 2021 purportedly to serve as a reserve that could protect UST against a subsequent depeg. In reality, LFG served as a vehicle to hold assets outside the reach of Terraform's creditors and subsequently transferred billions of dollars' worth of such assets to Jump for no consideration.

---

[1]     The Plan establishes the priority of creditors in any funds recovered by the Plan Administrator.

21.     Defendant Jump Trading, LLC is a Delaware limited liability corporation with its principal place of business in Chicago, Illinois.  It touts itself as a "research driven, globally positioned, proprietary trading firm."  Its crypto efforts began in 2014 to engage directly with crypto projects and ecosystems, and it officially launched Jump Crypto in 2021.  On information and belief, the sole member of Jump Trading, LLC is Jump Trading Holdings, LLC.  Jump Trading Holdings, LLC is a Delaware limited liability corporation.  The members of Jump Trading Holdings, LLC are Jump Financial, LLC, Jump Traders, LLC, and JEIV Partners LLC.

22.     Defendant Jump Financial, LLC is a Delaware limited liability corporation with its principal place of business in Chicago, Illinois.  Jump Financial, LLC is a corporate parent of Jump Trading, LLC, and is a beneficial owner of Tai Mo Shan, Limited.

23.     Jump Crypto Holdings, LLC is a limited liability company incorporated in Delaware with its principal place of business in Chicago, Illinois.

24.     Defendant Tai Mo Shan Limited is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands.  Tai Mo Shan is a subsidiary of Jump Crypto Holdings LLC.

25.     Defendant J Digital 6 Cayman Ltd. is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands.  J Digital 6 Cayman Ltd. is a Jump entity that entered into a $330 million token sale agreement with LFG in January 2022.

26.     Defendant JCDP-7QP LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois.  JCDP-7QP LLC is a Jump entity that entered into a $20 million token sale agreement with LFG in January 2022.  JCDP-7QP LLC's members are DYSO TC, LLC and PXG, LLC.  DYSO TC, LLC is a Delaware limited liability company.  Its sole member is the William DiSomma Trust, of which William DiSomma, a citizen of Illinois, is

Trustee. PXG, LLC is a Delaware limited liability company. Its sole member is the Paul A. Gurinas Trust, of which Paul Gurinas, a citizen of Illinois, is Trustee.

27. Jump Operations, LLC is a Delaware corporation with its principal place of business in Chicago, Illinois. Jump Operations, LLC first explored a potential business relationship with Terraform in 2019.

28. Jump Capital, LLC is a Delaware corporation with its principal place of business in Chicago, Illinois. Jump Capital is a Jump entity that used LFG funds to attempt to restore the UST peg in May 2022.

29. Defendant Jump Trading, LLC has a unity of interest and ownership with Defendants J Digital 6 Cayman Ltd., JCDP-7QP LLC, Jump Operations, LLC, and Jump Capital, LLC.

30. Upon information and belief, Jump used these entities to commingle funds and assets across its business, shared corporate officers amongst them, failed to maintain arms-length relationships between them, and employed each one as a mere facade for Jump itself.

31. Individual Defendant Kanav Kariya ("Kariya") was the President of Jump Crypto. He also served as a member of the Governing Council of LFG. On information and belief, Kariya is domiciled in Illinois.

32. Individual Defendant William DiSomma ("DiSomma") is a co-founder of Jump Trading Group and a managing member of Jump Financial, LLC. On information and belief, Mr. DiSomma is domiciled in Illinois.

## FACTUAL ALLEGATIONS

### Cryptocurrency and the Use of the Blockchain

33.     Cryptocurrency is a digital form of currency that uses cryptographic principles (like coded algorithms) to secure transactions.  Most cryptocurrencies are maintained by a decentralized system, as opposed to a centralized authority like a bank.

34.      One challenge with digital currency is preventing duplication, which would render the currency valueless.  Traditional currencies employ anti-counterfeiting technologies like watermarks that make the currency difficult to duplicate, but cryptocurrency does not have ready analogues.  So cryptocurrencies rely on blockchain technology, a mechanism that allows for secure, traceable transfers of digital assets from one recipient to another.

35.     Bitcoin, the first prominent digital asset, secures transactions through use of the "blockchain," a digital ledger system that tracks the ownership and transfer of every Bitcoin in existence.  Bitcoin owners have a digital "address" where they receive Bitcoin.  The Bitcoin blockchain publicly lists every address and the number of Bitcoin transactions associated with that address.  As a result, anyone looking at the blockchain can see every Bitcoin transaction of each digital address.  This transparency has enabled the secure exchange of Bitcoin because the blockchain allows for the identification (and thus prevention) of any duplication or transfer of a Bitcoin token to multiple people.

36.     The blockchain is now a routine technology in cryptocurrency.  Most cryptocurrency platforms rely on the blockchain to ensure that transactions are secure, transparent, and non-duplicable.  A blockchain "protocol" is an algorithm that determines how a blockchain, or a specific feature of a blockchain, functions.  A blockchain protocol can record smart contracts, which automatically execute the terms of a contract when certain triggering conditions are met.

37.     Transferring cryptocurrency to another user is similar to transferring funds from one bank account to another. The owner transferring the crypto tokens must know the recipient's "public key," which creates an address akin to the account number of a conventional banking account. The transferor then has their own personal "private key" that acts as a PIN number, allowing them to access their funds and authorize a transfer.

38.     The addresses used in the transfer are then publicly recorded on the blockchain. However, the names of the individuals or entities that own those addresses are not listed publicly.

39.     Many cryptocurrency tokens can experience wide price fluctuations, causing volatility of the asset. Stablecoins are a type of cryptocurrency designed to combat such volatility. The key feature of a stablecoin is that it pegs its value to another asset, such as another coin or fiat currency like the U.S. dollar.

40.     There are two main types of stablecoins—reserve-backed stablecoins and algorithmic stablecoins. A company issuing a reserve-backed stablecoin backs the stablecoin with a reserve of assets (generally cash, highly liquid and safe assets such as U.S. Treasury securities, or other crypto tokens), which is designed to maintain the stablecoin's price peg and ensure that holders can redeem their stablecoin for its established value.

41.     A company issuing an algorithmic stablecoin, on the other hand, does not maintain reserves to back the value of the stablecoin. Rather, algorithmic stablecoins rely on an algorithm to maintain the price peg. The algorithms operate in various ways, either creating or burning tokens to maintain the peg, or offering various discounts for holders to burn the stablecoin in exchange for a secondary companion token.

**Terraform Creates and Markets UST as an Algorithmic Stablecoin**

42.     Terraform is an open-source software development company specializing in blockchain technology.

43.     Terraform's co-founder, Do Kwon, and others began developing the Terra network in 2018.  Kwon and Terraform proposed a novel approach to avoid the price volatility that can plague cryptocurrencies.  They detailed this approach in a whitepaper announcing the creation of the Terra Classic Blockchain and the Luna token.  Kwon et al., *Terra Money: Stability and Adoption,* White Paper, https://assets.website-files.com/611153e7af981472d8da199c/618b02d13e938ae1f8ad1e45_Terra_White_paper.pdf.

44.     On April 24, 2019, Terraform minted one billion Luna ("Luna") tokens, the native token of the Terra Classic Blockchain.  Terraform later issued TerraUSD ("UST"), a "stablecoin" whose value was intended to be equivalent—or pegged—to one U.S. dollar.  Under the Terra protocol, Luna tokens were tradable with UST.

45.     Despite UST and Luna being securities that were offered for sale to U.S. investors, they were never registered with the Securities & Exchange Commission.  No valid exemption from the registration requirements applied.

46.     As Terraform and its founders explained during UST's rollout to the market, the UST stablecoin was maintained by a computer algorithm.  To maintain the UST's "peg" to the dollar, Luna and UST were connected via a mint-burn protocol.  Under this protocol, a single UST could be exchanged and "burned" for one dollar's worth of Luna, and one dollar's worth of Luna could be exchanged to "mint" one UST.  These rules theoretically incentivized holders of Luna to arbitrage between the two currencies, in turn maintaining the value of UST.

47.     For example, in the event the price for UST rose above a dollar—*i.e.*, above its "peg"—holders would be incentivized to swap a dollar's worth of Luna to "mint" and receive one

UST, then valued above a dollar. With traders thus minting additional UST, supplies of UST would rise and accordingly create downward pressure on the price of UST, moving it toward its target value of one dollar. On the other hand, in the event the price of UST dropped below a dollar, a participant would be incentivized to "burn" one UST, then valued below a dollar, to receive a dollar's worth of Luna. This activity would inevitably lower the supply of UST resulting in the value of UST returning to its "peg" value of $1.

48. In March 2021, Terraform also launched what it called the Anchor Protocol ("Anchor"). Anchor was a way for investors to "deposit" UST and earn a flat 20% interest rate. Terraform could then use the UST deposited through Anchor to loan out to borrowers.

49. The Terra blockchain protocol, UST, Luna, Anchor, and associated tokens and platforms formed the decentralized network of the "Terraform Ecosystem."

**Terraform and Jump Begin their Relationship**

50. As part of its efforts to bolster its ecosystem, Terraform built relationships with crypto investment and trading firms. Jump was one such firm, and it ultimately reaped billions in profits in just over two years due to its close relationship with Kwon and Terraform.

51. In late 2019, as Jump Capital was exploring opportunities in the crypto space, it reached out to Terraform about a potential relationship. In October 2019, Tak Fujishima, a director at Jump Trading reached out to Kwon after meeting Kwon at a conference in Singapore. Fujishima mentioned that Jump "might be interested in partnering with you on Terra." He and Kwon set up a call with additional Jump team members Kariya and Jeff Bezaire about one week later.

52. The Jump team strategized about how to pitch their services to Kwon. Jump knew that Terra needed more liquidity in the Terra ecosystem, and they pitched themselves as able to provide that liquidity. After this meeting, Fujishima updated Defendant Bill DiSomma on the outcome of the call.

53.     Later that year, Jump and Terraform entered the first in a series of secret agreements.  For its part, Jump received the option to purchase Luna at strike prices far below market value.  In the first agreement, entered in November 2019, the strike prices ranged from $0.36 per token to $0.56 per token for a total of 30 million Luna tokens.  In 2020, the parties entered multiple additional agreements that gave Jump having the option to purchase up to 65 million Luna over time at strike prices fixed at forty cents per Luna.  As Jump's manipulative influence over Kwon increased, these option prices and execution terms became increasingly extortionate, ultimately permitting Jump to acquire millions of Luna tokens for $0.40 per token at a time when the market price ranged from under $40 to $116 per token, as shown below, resulting in billions of dollars in unjust gains.



54.     Jump, in turn, agreed to provide valuable market-making services to Terraform. The use of another entity to serve as a "market maker" for new crypto assets was relatively

common in the crypto space because market-making activities could provide substantial benefits for a new crypto token. A market maker could increase liquidity in a given token by standing ready to buy or sell in the market and could, through that increase in liquidity, assist the crypto token in gaining wider use and acceptance. Importantly, a true market maker would be largely agnostic on the price of the underlying asset: It would buy and sell the asset with the goal of keeping its holdings relatively neutral, making its profits from the volume of trades and the spread between a (higher) sales price and a (lower) purchase price rather than from taking a long or short position on the asset.

55.     Here, Jump agreed to provide many of these standard market-making services. Specifically, Jump agreed that it would take steps to increase liquidity in Luna markets and seek to "grow adoption of Terra stable coins." But the agreements did not end there.

56.     In a so-called "Gentleman's Agreement," Jump agreed to "help maintain" the 1:1 peg between UST and the U.S. dollar. This agreement did not prescribe how Jump would maintain the peg, only that it would do so—an agreement that took Jump's relationship far beyond typical market making activity.

57.     Kwon wanted to announce the Jump relationship publicly, believing that the backing of a reputable trading firm like Jump would only boost the nascent stablecoin. Jump refused, wanting to avoid any regulatory scrutiny. They insisted that the arrangement remain confidential. They knew they stood to gain more if the market believed their manipulation rather than understood the vulnerabilities of the Terra tokens. So Kwon and Terraform stayed silent.

58.     Through the Jump-Terra relationship, Kariya became very close to Kwon, with the two often speaking several times per week on matters related to both the continued potential growth of the Terraform ecosystem as well as Jump's involvement in various crypto projects.

16

Through these conversations, Kariya (and Jump) developed a relationship and trust with Kwon that they later abused, while also gathering important information about the Terraform ecosystem that was unavailable to other market participants.

<b>The May 2021 Depeg—Jump Pounces on Terra's Vulnerability,<br>Lines its Pockets, and Misleads Terra's Investors</b>

59.     In May 2021, UST experienced a significant depeg.  In the context of a stablecoin, a "depeg" occurs when the price of the stablecoin begins to vary materially from the price of the underlying asset to which the coin's price is pegged.  In the case of UST, a depeg would mean that one UST was no longer worth one U.S. dollar, and UST would no longer be "stable," which could lead to a complete collapse in value since UST's sole purpose was to maintain stable value.  For Terra, a sustained depeg posed a real-world test of Terraform's claim that its algorithm could support UST's peg even in a volatile environment.  The results would impact Terraform, investors, and, most importantly, Jump.  Indeed, Jump had already invested substantial time and capital into the Terraform ecosystem, it was the primary market maker for Terra's tokens, and it was sitting on substantial, highly profitable options for Luna that had not yet vested.  Jump—unlike a normal market maker—had a substantial self-interest in ensuring that UST maintained its peg and the Terra ecosystem survived, and thrived, long enough for Jump's Luna options to vest.

60.     On May 19, 2021, the value of UST began to dip below one dollar.  Kariya called Kwon at the start of the depeg, and the two were then in near constant communication throughout the depeg, speaking on the phone multiple times over the next 48 hours.  By May 23, 2021, UST had dropped to nearly $0.90, well below its peg.  That day, Kariya spoke to Kwon repeatedly, designing plans to secretly restore UST's $1 peg.  Describing those conversations, Terraform's then-head of business development told Terraform's then-head of communications that "Do

17

[Kwon] just randomly called me" to relay that Terraform was "speaking to Jump about a solution" to the depeg.

61.     During the conversations about addressing the depeg, Kariya made several proposals on behalf of Jump.  He suggested that Kwon give Jump access to Terraform's own funds so that Jump could trade on Terraform's behalf.  Kwon declined—this time.  After all, Jump already had an obligation under the Gentleman's Agreement to defend the peg.  But Jump would not do so without Kwon (and Terraform) agreeing to provide additional, substantial consideration. Kariya and Jump demanded that Terraform eliminate all vesting requirements in the parties' contracts.  Kwon agreed.

62.     Jump internally touted the concessions it had extracted.  During a May 23, 2021 "Always On" company-wide Zoom meeting—so called because Jump kept the meeting open and running twenty-four hours a day, seven days a week—Kariya told DiSomma and other Jump employees that he "spoke to Do [Kwon], he's going to vest us."  Other Jump employees understood the significance.  James Hunsaker, a Jump whistleblower, explained that now, "the previous vesting conditions no longer applied, and if Jump helped with the depeg, that the deal would be fulfilled."

63.     With the vesting conditions removed, Jump could borrow—and ultimately purchase at prices substantially below market value—millions of Luna with no performance requirements and for hundreds of millions of dollars in instant gains.  Having extracted these concessions, DiSomma, Kariya, and their colleagues jumped to action, taking steps to artificially restore the peg so Jump could make billions of dollars in profit.

64.     DiSomma began giving instructions to Jump traders on the Always On Zoom about how to trade and continued to give instructions over Slack in the following days.  Between 9:30

and 10:00 am CT on May 23, 2021, less than 30 minutes after a call between Kwon and a Jump executive, believed to be Kariya, Jump purchased 10 million UST in an effort to artificially restore the peg.

65.     Most of Jump's trading focused on several cryptocurrency exchanges that were completely outside the Terra blockchain and which did not leverage the Terra Protocol market stabilization model.  In one half-hour period on May 23, 2021, Jump's trading of Tether (a prominent reserve-backed stablecoin) and UST on one cryptocurrency exchange (KuCoin) accounted for nearly 45% of the average daily volume of the Tether/UST trading pair on that exchange.  Purchases that large were bound to have an effect on the price of UST—and they did.

66.     These actions were a sharp departure from the standard market-making activities Jump had been engaged in prior to the depeg.  Before the depeg, Jump had used simple market-making trading models for UST.  A market maker attempts to keep a flat position over a period of time, buying and selling roughly equal amounts of an asset, leaving the market-maker largely agnostic as to the price of the underlying asset.  When Terraform eliminated all vesting conditions on May 23, 2021, and Defendant DiSomma directed Jump traders to adjust their models.  Instead of routinely buying and selling UST as it had done in the past to take advantage of the built-in arbitrage between UST and Luna, Jump was buying and holding more and more UST.  In one half hour on May 23, 2021, Jump purchased more than twice as much UST in exchange for Tether than it typically purchased in an entire day.

67.     By May 27, 2021, UST's peg had been fully restored to $1.  Jump's actions—and not the Terra algorithm—restored UST to its $1 peg.  Without Jump's actions, the underlying vulnerabilities of the so-called algorithmic stablecoin UST and its counterpart Luna would have been revealed to the market.

68.     After the peg was restored, Defendant DiSomma told traders to carefully unwind Jump's UST position so as not to cause another depeg, which would jeopardize Jump's newly acquired incentives.

69.     After the price of UST returned to $1, neither Jump nor Terraform publicly disclosed Jump's role in reestablishing the peg.

70.     To the contrary, Jump falsely told the public—both explicitly and implicitly—that the algorithm worked, intentionally causing investors to believe that it was Terra's algorithm, and not Jump's surreptitious purchases—that restored UST to its $1 peg.

- On September 14, 2021, Kariya tweeted: "It's been a real pleasure working with [Kwon] and the Terra team over the last couple of years. A + folks."  That same day, Jump received 10 million Luna.  With a market price of approximately $35 and a strike price of $0.40, Jump made nearly $350 million of profits on that day alone.

- On October 11, 2021, Jump employees published an article entitled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market."  Jump's article suggested that algorithmically stabilized assets would be one of the stablecoin "winners" and touted Terra as the "most prominent example."  The article explicitly—and fraudulently— lead the market to believe UST was a sound, stable asset, stating: "We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin."

- On October 19, 2021, Kariya tweeted "It's here, it's here!!!" after a third party promoted a new collaboration with Terraform, touting the strength of the Terraform platform all the while knowing the core component of the ecosystem—Terra's algorithmic stablecoin—was a fraudulent scheme.

71.     Over the next year, Jump found other ways to mislead the public while reaping more profits and tightening its influence over Terraform.

**Jump and Kwon Recklessly Grow the Terraform Ecosystem**

72.     Jump's role in the 2021 depeg ultimately propped up the Terra ecosystem when that ecosystem otherwise would have failed.  Had Jump not intervened and defrauded investors, Terra would have collapsed in May 2021.  Instead, Jump's secretive intervention to restore the peg led investors to flock to Terraform, ensuring that the Terra ecosystem would continue to grow, Luna would continue to rise in value, and Jump would continue to profit handsomely.  And while this growth also ensured that the ecosystem would become so large that, when the next depeg occurred, Jump could no longer restore the peg itself, Jump merely wanted to keep the platform afloat long enough to receive all of its Luna—and the outsized, ill-gotten profits from its ludicrously low strike price.

73.     Following the first depeg in May 2021, Jump had enormous leverage over Kwon and Terraform.  Jump—and Jump alone—possessed insider, non-public knowledge that the Terra algorithm could not have reestablished the peg, that Jump's market actions did so, and that, when the next depeg event occurred, the algorithm again would be insufficient to salvage the ecosystem.  Jump's actions to restore the peg were so secretive that most Terraform employees did not know about them at the time.

74.     The material non-public information that Jump possessed after the May 2021 depeg necessarily informed its trading strategy for Luna, UST, and other cryptocurrency assets.

75.     In September and October 2021, Jump received large quantities of Luna at prices far below market value and free of any vesting conditions.  Even though the vesting conditions were eliminated and Jump was guaranteed to receive 65 million Luna from Terraform, Jump did not receive those tokens immediately.  Instead, Jump would receive 1.2 million Luna each month

until September 1, 2025. Jump of course could then trade these tokens for an immediate profit after receipt. The ongoing monthly deliveries of Luna incentivized Jump to keep the Terraform ecosystem alive until Jump had received all its Luna from Terraform.

76. Part and parcel of that effort, Jump continued to keep confidential its role in restoring UST's peg and staving off Terra's collapse in May 2021. Kariya specifically promoted Terra publicly, even though he personally knew that Jump's purchases (and not the algorithm) had restored the peg in May 2021. As just a few examples:

- On January 28, 2022, in a ten-part tweet series, Kariya continued to prop up Terra despite knowing that its stablecoin was a house of cards. He tweeted: "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."

- On April 7, 2022, Kariya again publicly celebrated the Terra ecosystem by tweeting, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win."

- On May 1, 2022, Kariya kept going. He tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space."

**Kwon and Jump Form Luna Foundation Guard to Further Mislead Investors**

77.     Following the first depeg in May 2021, Kwon and Jump recognized the instability of the Terra ecosystem and the need to consider alternative means to maintain UST's peg— something more than Jump's unilateral, surreptitious purchases, which may not be sufficient if Kwon and Jump could continue to grow Terra's market cap.

78.     During conversations, Kwon and Kariya (on behalf of Jump) agreed to establish a public-facing mechanism to help protect against future depegs.  LFG was the result of these conversations.  LFG, formally founded in late 2021, was publicly touted as an independent entity created to help defend the UST peg in the future.  In describing LFG to the public, Kwon represented that it would be controlled by the "Governing Council," which consisted of Kwon, Kariya, and several other individuals initially named to the Council.

79.     LFG was funded entirely through tokens that Terraform transferred to LFG. Between LFG's creation and May 2022, at Kwon's direction—and just as Jump wanted— Terraform transferred substantial assets to bolster LFG's reserves.  Terraform's transfers to LFG included at least the following:

    a.     On or around January 20, 2022, Terraform gave LFG 50,000,000 Luna.
            That day, Luna's market price was approximately $77, meaning the 50
            million Luna that Terraform transferred to LFG had a market value of nearly
            $4 billion.

    b.     On or around March 7, 2022, Terraform gave LFG 12,000,000 Luna.  That
            day, Luna's market price was nearly $78, so this transfer had a market value
            of more than $925 million.

      c.      On or around April 13, 2022, Terraform gave LFG 10,000,000 Luna and 10,000,000 UST. That day, Luna's market price was over $87 and UST was trading at is $1 peg—so this transfer had a value of nearly $900 million.

80.     Through these transfers, Terraform gifted to LFG Luna and UST tokens worth over $5.5 billion. Terraform received nothing—nothing—in return. They were done to further the perception that LFG, as an independent entity, had the resources to help stave off a collapse. But as Kwon, Kariya and Jump knew, Terraform was unable to maintain the peg and avoid a death spiral in a depeg event on its own—meaning Terraform was insolvent when it made these transfers to LFG.

81.     Kariya and Jump encouraged Kwon to make these transfers to LFG, and these transfers were for the direct benefit of Jump. As LFG grew its reserves through Terraform's contributions, Jump faced less risk that it would ever have to deploy its own assets to defend the peg in continuing to prop up the Terraform Ecosystem (as Jump did during the 2021 depeg).

82.     After receiving these transfers from Terraform, LFG—at the direction of Kwon and Kariya (on behalf of Jump)—took steps to sell its Luna in return for other crypto assets (such as Bitcoin) to purportedly hold for use in potentially defending the peg.

83.     At the direction of Kwon and Kariya, LFG sold some of the Luna it received from Terraform to entities specifically selected by Kariya and Jump. Indeed, Jump led the effort for LFG to sell these Luna tokens for other crypto assets. For example, LFG entered into a $330 million token sale agreement with J Digital 6 Cayman Ltd. and a $20 million token sale agreement with JCDP-7QP LLC, each Jump-controlled entities, in January 2022. An LFG board resolution from March 2022 states that LFG planned to purchase $250M worth of Bitcoin "through Jump Capital." Each entity that purchased these Luna from LFG received a 40% discount to market

value, with an agreement that the Luna would remain "locked" for a period of two years (with 25% of the Luna becoming unlocked every six months). Having designed the beneficial fundraising terms, Jump itself participated in this bonanza, purchasing several hundred million dollars' worth of heavily-discounted Luna.

84. Jump nonetheless did its part to mislead the market into believing that LFG existed as an independent entity and that the algorithm (combined with the LFG reserve) enhanced the stability of the Terra ecosystem. As one example, on February 22, 2022, a series of tweets from the account of "Jump Crypto" stated: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility."

85. In a press release accompanying the announcement, Kariya touted UST's supposed stability, stating that "[t]he UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin[,] UST," comparing the system to "how many central banks hold reserves of foreign currencies."

86. That same day, Kariya, well known in the crypto space at the time as the President of Jump Crypto, used his personal social media account @KanavKariya to respond to Jump's announcement and tweet: "$1B to absorb liquidity crunches[.] All contractions in the economy have caused reflexive movement (by design). Allowing for a big chunk of withdrawals in short span through different means can be really impactful[.] LFG has a broad mandate, and we're excited to support it."

87. Similarly, on March 1, 2022, Kariya and Kwon were guests on the podcast, "The Ship Show," where Kariya explained that "LFG holds a billion dollars of Bitcoin, which is an

extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

88.     Contrary to these public statements, Kwon, Kariya, and Jump were aware that LFG was, in fact, not an independent entity set up to allow independent protection against a depeg event. In fact, the assets of LFG were never put beyond the reach of Kwon and Jump.

89.     Kwon and Kariya (on behalf of Jump) collaborated to determine how LFG used its assets. In essence, Kwon and Kariya exercised de facto control over LFG, deciding when, how, and to whom LFG sold its Luna to convert into Bitcoin to build LFG's reserve.

90.     By setting up LFG and directing billions of dollars of Terraform's assets to LFG, and ultimately to Jump, Kwon sought to place those assets beyond the reach of Terraform's creditors, in a place that Kwon and Jump could unilaterally direct them. Indeed, Terraform itself could have simply held assets that could be used to defend the peg as needed. But LFG had other purposes, including to mislead the market and siphon assets out of the reach of Terraform's creditors.

### Jump's Role in the 2022 UST Depeg

91.     The second UST depeg began on May 7, 2022. That day, the price of UST dropped to $0.986 and bounced between that price and $1.

92.     By the morning of May 8, 2022, as the price of UST drifted further from $1, Kwon and Kariya determined that it was time to deploy the funds Terra had gifted to LFG in an effort to defend the peg. Kwon told LFG's Governing Council, including Kariya, "its time we need to deploy Bitcoin to defend UST peg." According to Kwon, "we don't want the depeg situation to persist during a time when markets are falling hard. Kanav [Kariya] and I discussed over the

phone, and we think its a good idea that we move a 500M clip of bitcoin to walk back the UST peg." Although Kwon informed the LFG Governing Council, he did not seek the Council's input or approval; Kwon and Kariya had already made the decision themselves.

93. LFG did not engage in trades itself. Instead, Kwon and Kariya had also decided that LFG would transfer the Bitcoin **to Jump** for Jump to trade ostensibly in defense of the peg.

94. Thus, at Jump and Kariya's and Kwon's direction, LFG sent Jump nearly 50,000 Bitcoin—with a market value of nearly $2 billion. Jump sent nothing—***no consideration***—to either LFG or Terraform in exchange for this Bitcoin. And Jump had no obligation or agreement governing how it would deploy the Bitcoin, including whether it could trade those Bitcoins to itself at the expense of other Terra investors, or whether it would send LFG or Terraform the proceeds of any Bitcoin sales.

95. Kariya was on both sides of the LFG-Jump transactions. As a member of LFG's Governing Council, Kanav owed LFG fiduciary duties to ensure LFG's assets were deployed in a manner best suited to serve the interests of LFG—*i.e.*, to maintain the peg and protect the Terraform ecosystem. At the same time, Kariya was the President of Jump Crypto and had every incentive to maximize Jump's profits, potentially at the expense of LFG and Terraform. Neither Kariya specifically nor Jump generally took any action to address this conflict of interest. Instead, Kwon and Kariya schemed to have LFG transfer substantial assets (which it received from Terraform) to Jump for no value in return.

96. Kwon's agreement to transfer nearly $2 billion of assets to Jump with no oversight confirms the extent to which Kwon and Jump were working hand-in-glove to fraudulently prop up the Terraform ecosystem by this point.

27

97.     By May 9, 2022, LFG had transferred 52,189 Bitcoin from its reserves to Jump for use in defense of the peg.  LFG transferred these Bitcoin to Jump so quickly and with such little oversight that the transfers were not approved by the LFG Governing Council.  In fact, it was not until the days after the Bitcoin transfers that even the main participants (*i.e.*, Terra, Jump, and LFG) could properly account for exactly where and how much Bitcoin had been transferred.

98.     LFG made these transfers to Jump at Jump's direction when both LFG and Terraform were insolvent.

99.     In the midst of the depeg, Kariya and other Jump executives had suggested other ideas to Kwon for defending the peg.  One was to marshal other trading firms involved in crypto to raise additional funds for Terraform.  Far from a price-agnostic market maker, Jump was doing everything possible to salvage this fraudulent scheme, hoping to keep Terraform alive long enough to make even more profits on the unwitting investing public.

100.    DiSomma spearheaded the outreach efforts, calling leaders at various other crypto-trading firms to seek bailout funding for Terra.  The goal was to raise further funds to purchase—and continue to artificially inflate the price of—UST, and to further the fraud Jump was already perpetuating on the market.

101.    These efforts only further harmed the Terraform ecosystem and worsened the depeg.  Certain firms that Jump and DiSomma contacted were themselves aggressive, quant-focused trading firms, which, on information and belief, turned around and used that information to trade against UST and Luna and hasten their downfall.

102.    Although UST temporarily rebounded to $0.95 on May 9, that recovery was short-lived.  UST eventually collapsed to $0.50.  Around this time, Jump ceased all efforts to defend the peg.

103. After their experience with the 2021 depeg, Kwon and Jump knew—or at minimum they should have known—that LFG had insufficient funds to re-establish the peg. The UST market cap had grown nearly nine times between the May 2021 and May 2022 depegs—due directly to Jump's and Kwon's actions—and therefore substantially more capital was needed to re-establish the peg. But Jump's efforts to restore the peg and preserve its fraudulent money-making scheme failed.

104. As a result, the Terraform ecosystem collapsed, and thousands of investors, including the Individual Victims, lost their entire investments in UST and Luna.

**Jump Continues to Lie to the Public About its Outsized Role in Terraform's Collapse**

105. Soon after Jump stopped defending the peg in May 2022, Jump and its executives went into damage-control mode, attempting to minimize—and conceal—their long-running relationship with Terraform and their leading role in propping up UST, defrauding the public, and destroying the Terra ecosystem.

106. Kariya, for his part, sent multiple Telegram chats to the LFG Governing Council, again trying to minimize Jump's role in the depeg. As one example, on May 15, 2022, Kariya proposed edits to statements about Jump's involvement to clarify that Jump was never acting "as an agent of [LFG]," but rather was trading over the counter with LFG. In other words, Jump tried to portray itself as nothing more than a counterparty to LFG making arms-length transactions, despite the central role that Kariya and Jump played in the decisions about when and how to deploy LFG's assets and the fact that Jump itself was actually utilizing LFG's assets during the second depeg.

107. On May 21, 2022, Kariya similarly revised a proposed public statement, stating: "Hey Do, we [Jump] did one OTC [over-the-counter] trade with the LFG trading BTC [Bitcoin]

for UST, we did not act as an agent for the LFG in executing any trades on its behalf." But that was exactly what Jump did. LFG transferred funds to Jump for the purpose of trading for LFG to try to restore the peg. Jump did not give anything back to LFG in exchange for this transfer of Bitcoin.

108. Through these and other public messages, Kariya and Jump purposefully lied to and misled the public to paint Jump as an innocent bystander. But far from it, Jump was a central figure in the fraud on the market and the collapse of the UST and Luna ecosystem.

**Terraform Has Faced Billions in Liabilities While Jump Has Largely Avoided Exposure**

109. While Jump tried to keep its involvement in Terra's collapse of the public eye, Terraform was singlehandedly dealing with the fallout. The SEC investigated and then sued Terraform and Kwon. A unanimous jury ultimately found Terraform and Kwon liable for various violations of securities laws. The threat of that judgment and astronomical legal spend forced Terraform to file for bankruptcy in January of 2024. Terraform and Kwon eventually settled with the SEC for over $4 billion.

110. Jump was referenced, but not named directly, in both the SEC's civil suit against Terraform and Kwon and the Justice Department's superseding indictment charging Kwon with nine counts of fraud, conspiracy, market manipulation, and money laundering. Both the indictment and the SEC civil complaint referenced an unnamed "Trading Firm" that participated in Kwon's fraud. That "Trading Firm" was later revealed to be Jump. And Kwon's own guilty plea and personal letter submitted in conjunction with his sentencing memorandum laid bare Jump's intimate involvement in this fraudulent scheme.

111. In connection with its investigation, the SEC deposed both Kariya and DiSomma— and both invoked the Fifth Amendment rights hundreds of times rather than answer a single substantive question posed by the SEC.

112.     Through its investigation, the SEC alleged that Defendant Tai Mo Shan, a Jump subsidiary, had acted as a statutory underwriter with respect to certain offers and sales of Luna, a crypto asset that Terraform offered and sold as a security.  Tai Mo Shan's conduct had thus violated Sections 5(a) and (c) of the Securities Act.  The SEC also alleged that Tai Mo Shan had also violated Section 17(a)(3) of the Securities Act, which makes it unlawful for any person to engage in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" in the offer or sale of a security.

113.     The SEC alleged that Tai Mo Shan began purchasing UST to support its price, ultimately entering into a formal agreement with Terraform on July 21, 2021, in exchange for monthly installments of unlocked Luna starting in September 2021.

114.     The SEC concluded that Tai Mo Shan engaged in a course of conduct that deceived investors about the efficacy of Terraform and Luna's arbitrage mechanism.  Although the investing public would have seen UST's price increasing, investors would not have been aware of the extent of UST demand coming specifically from Tai Mo Shan's purchases.

115.     Ultimately, in December 2024, Tai Mo Shan entered a $123 million settlement with the SEC, agreeing to pay over $74 million in disgorgement and $36 million in civil penalties.  The settlement made clear that Tai Mo Shan was privy to, and misused, significant internal information about Terraform that other investors lacked access to.

116.     While Terraform has faced billions in liabilities for its role in the cryptocurrency scheme involving UST and Luna, Tai Mo Shan's settlement with the SEC was a small fraction of the amount that Terraform faced for the same chain of events and a small fraction of Jump's total profits from its wrongdoing.  And the rest of the Jump entities and individuals involved in the fraudulent scheme have faced zero repercussions for their actions.

117.    At the end of the day, Jump has been able to walk away relatively unscathed after deceiving the market and taking advantage of its relationship with Terraform with predatory contract terms to the tune of potentially billions of dollars.  While Terraform is now in the process of winding down its estate and paying out its creditors, Jump has continued to operate and trade as usual, with the benefit of its huge returns from its role in the Terraform ecosystem.

## CAUSES OF ACTION

### COUNT ONE
**Claim for Contribution for Rule 10b-5 Liability**
**(Plan Administrator on behalf of Terraform)**
**(Against all Defendants)**

118.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

119.    The Plan Administrator brings this claim on behalf of Terraform.

120.    Section 10(b) of the Exchange Act makes it unlawful for "any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  And SEC Rule 10b-5 prohibits the making of an "untrue statement of a material fact or . . . [omission of] . . . a material fact necessary . . . to make the statements made . . . not misleading."  17 C.F.R. § 240.10b-5(b).

121.    A claim for contribution under SEC Rule 10b-5 allows a defendant who has been found liable under Rule 10b-5 to recover a portion of the damages awarded against them from another party that was not held liable for those damages but nevertheless played a part in causing the harm.  *See Musick, Peeler, & Garrett v. Emps. Ins. of Wassau*, 508 U.S. 286, 288 (1991).

122. In 2023, the SEC brought a civil suit against Terraform alleging various counts of securities fraud. The SEC's complaint leaned heavily on allegations about an "unnamed trading firm," which was later revealed to be Jump Crypto. Jump's actions during the 2021 depeg were front and center of the SEC's allegations that Terraform—and Jump—manipulated the market by maintaining the price of UST through large-scale trading and not through an algorithm and then misled investors by saying that the UST algorithm had worked.

123. A jury found Terraform liable for the SEC's claims. A court entered judgment against Terraform on these claims for $4.5 billion.

124. The Jump Defendants employed devices and schemes to defraud; made untrue statements of material fact; omitted material facts thus making statements made misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the public that resulted in artificially high market prices for UST and Luna, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

125. Jump had a duty to disclose its role in restoring the peg in May 2021. Jump knew that the investing public would rely on its statements promoting a cryptocurrency asset. Jump also stood to benefit financially from increased trading in UST and Luna and encouraged others to do so.

126. Specifically, in May 2021, Jump traded large blocks of UST to re-peg UST to its prior valuation of one U.S. dollar. Jump never disclosed this fact to the public, and in fact touted UST as a leading stablecoin.

127. Between May 2021 and May 2022, Jump assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of Luna outstanding. These actions made the peg and the Terraform ecosystem substantially more

unstable, and Jump was or should have been aware of this. Nonetheless, Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem without disclosing this increased risk.

128. Jump's trading in UST rendered it legally bound to disclose its participation in the scheme. But Jump improperly omitted the fact that human intervention, rather than an algorithm, caused the May 2021 restoration of the UST peg.

129. In fact, after Jump's intervention in the May 2021 depeg to restore the peg, Jump and Kariya made multiple public-facing statements about UST's algorithmic peg and the stability of the Terraform ecosystem to boost investor confidence in UST, making no mention of their role and actively misleading investors about the efficacy of the Terra algorithm. Jump stated—implicitly and explicitly—that the re-peg had occurred as a result of the algorithm and the arbitrage mechanism, when Jump in fact knew that its involvement had been necessary to maintain the peg.

130. On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." In other words, Kariya told the public that UST was stable even though he knew it wasn't.

> a. This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance. He used LUNA and its supposed success as a reminder to the investing public that

the Terra Ecosystem is not vulnerable to contractions of the economy—indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

131. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin...The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

a. This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

132. On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again

35

around the new prices, when there are extreme price movements, which do happen every sometime."

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

133. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    a.    This statement was false and misleading. Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    b.    Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform

ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

134.     On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows.  The governance layer across this is a very natural next step[.]  Excited to support a great team tackling this space." Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

          a.     This statement was misleading.  Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

135.     Jump's omissions about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and Jump's misrepresentations about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg, were each material.

136.     Jump acted with scienter.  It failed to disclose critical information about its role in defending the peg, all while knowing that its behavior would result in significant profits from selling hundreds of millions of dollars of Luna tokens.

137.     Due to Jump's publication of materially false information, and specifically, its omission of material facts, the price of UST and Luna were artificially inflated.

138.     Investors purchased UST based at least in part on their reliance on the algorithmic relationship between UST and Luna.  Jump's public statements and omissions of material fact allowed investors to continue to believe that UST was stable and the algorithmic relationship with Luna was sufficient to maintain the peg of UST to one US dollar.

139.     As a result of its improper conduct, Jump realized improper gains, and a $4.5 billion judgment was entered against Terraform.  Terraform is entitled to contribution from the Jump Defendants for their role in defrauding the public and their share of the damages that Terraform was found liable for.  Only Tai Mo Shan, one Jump subsidiary, has been required to pay any fine for its role in misleading the public.  The remaining Jump Defendants have not been held to account.  The Jump Defendants extracted far more than $123 million (the amount of the Tai Mo Shan SEC fine) from the Terraform ecosystem.

140.     WHEREFORE, the Plaintiff seeks a judgment in his favor and against Jump, holding that the Estate is entitled to contribution for Jump's own share of responsibility for the actions leading to Terraform's $4.5 billion SEC fine, plus all taxable costs, and any and all other relief this Court shall deem just and proper.

**COUNT TWO**
**Aiding and Abetting Breach of Fiduciary Duty**
**(Plan Administrator on Behalf of Terraform)**
**(Against all Defendants)**

141.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

142.     During the relevant period, Kwon was Terraform's co-founder and CEO.

143.     During the relevant period, Kwon had substantial control over Terraform.

144.     In this role, Kwon owed fiduciary duties to Terraform, and Defendants were aware of the existence of Kwon's fiduciary duties.  These duties included acting in the best interests of Terraform, acting with reasonable care and diligence, and avoiding conflicts of interest.

145.     During the relevant period, Kwon breached his fiduciary duties to Terraform through several actions.  Kwon directed funds away from Terraform to LFG, out of the control of

38

Terraform, for the ultimate benefit of himself and Jump, and to the detriment of Terraform and, ultimately, its creditors.

146.    Kwon also recklessly grew the amount of UST outstanding to an extent that predictably destabilized the Terraform ecosystem and increased the risk of a substantial depeg event.

147.    Kwon also failed to disclose to the public the role that Jump had played in re-establishing the peg in May 2021 and misrepresented the stability of the Terraform ecosystem—thereby exposing Terraform to substantial liability.

148.    Defendants substantially assisted Kwon's breaches of fiduciary duty to Terraform by carrying out his instructions to misappropriate LFG funds, by being the recipient of LFG funds thus carrying out the fraudulent scheme, by providing critical financing to Terraform to allow Kwon to perpetrate the fraudulent scheme, by joining Kwon in misrepresenting the stability of the Terraform ecosystem and Jump's role in re-establishing the peg in 2021, and in assisting in growing the amount of UST outstanding in a manner that destabilized the Terraform ecosystem.

149.    Defendants' actual knowledge came from: (a) its knowledge of and direct involvement in virtually every major decision made by Kwon in the operation of Terraform and LFG from May 2021 through May 2022; and (b) non-public information about the stability of Terraform's ecosystem.

150.    Despite such knowledge, Defendants knowingly participated in and provided substantial assistance to Kwon's breaches of fiduciary duties.

151.    As a direct and proximate result of the Jump entity Defendants' and Kariya's aiding and abetting in the breach of fiduciary duty, Terraform has been damaged and continues to suffer damages.

**COUNT THREE**
**Breach of Fiduciary Duty**
**(Plan Administrator on Behalf of LFG)**
**(Against Kariya)**

152.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

153.     During the relevant period, Defendant Kariya was a member of the Governing Council of LFG and, through his influence and interactions with Kwon, he had *de facto* operational control over LFG.

154.     As a result of his role and his *de facto* control over LFG, Kariya owed fiduciary duties to LFG, and Kariya was aware of the existence of his fiduciary duties.  These duties included, among other things, the duty to act in the best interests of LFG and to avoid conflicts of interest.

155.     During the relevant period, Kariya also served as an officer of Defendant Jump Crypto, which presented a substantial conflict of interest given the multiple transactions entered between LFG and Jump.  On information and belief, neither Kariya nor Jump put in place any safeguards to address the clear conflict of interest.

156.     Kariya breached his fiduciary duties to LFG through several actions.  Specifically, Kariya directed LFG to sell the Luna it received from Terraform to Jump and other parties at a substantial and unjustifiable discount to contemporaneous market prices.

157.     During the May 2022 depeg, Kwon and Kariya, acting together, directed that LFG transfer more than 50,000 BTC directly to Jump in return for no consideration.  Kariya did not cause LFG to receive from Jump any agreement that Jump would provide LFG with either the proceeds of its purchases of UST or any record of or visibility into the trading that Jump performed. On information and belief, Kariya did not permit any negotiation of terms between Jump and LFG

regarding the transfer of these assets and did not permit LFG to consider whether one or more other entities would be better placed (and less conflicted) to engage in the sale of those assets to defend the peg.

158. Kariya's failure to act in the best interests of LFG and to avoid conflicts of interest directly harmed LFG, as it caused LFG to expend substantially all of its assets while still failing to maintain the peg. In contrast, Kariya and Jump reaped substantial profits through their interactions with LFG.

159. In connection with both Jump's purchase of Luna tokens from LFG and LFG's transfer of assets to Jump during the May 2022 depeg, Kariya was a conflicted director and did not take any steps to address that conflict of interest.

160. As a direct and proximate result of Defendant Kariya's breaches of his fiduciary duty to LFG, LFG has been damaged and continues to suffer damages.

### COUNT FOUR
**Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, 740 ILCS § 160/5(a)(1) (Actual Fraudulent Transfer)**
**(Plan Administrator on behalf of Terraform)**
**(Against all Defendants)**

161. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

162. The Plan Administrator has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of Terraform funds that Kwon made to Defendant Jump Trading, with LFG as an intermediary. Kwon's transfers to LFG, and then ultimately to Jump Trading through LFG, were actual fraudulent transfers. 740 ILCS § 160/5(a)(1).

163. As a charitable entity, LFG's publicized purpose was to promote community stewardship and foster research and development of open-source software and applications

41

dedicated to providing greater economic sovereignty, security, and sustainability for the world's cryptocurrency communities.

164. But Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG, not to help maintain the stability of the Terra ecosystem but as a mechanism to put those funds beyond the reach of Terraform's creditors following the first depeg in May 2021.

165. LFG was never independent from Kwon and Terraform, and Kwon and Kariya controlled how LFG's assets were deployed.

166. Kwon, acting through his fraudulent domination, adverse interest in, and control of LFG, and at the direction of Defendant Kariya, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 9, 2022. Kwon directed this transfer with actual intent to hinder, delay, or defraud the creditors of Terraform.

167. At the time of the transfers, Jump knew that Terraform had amassed huge amounts of potential liability.

168. Jump Trading received the transfers without providing reasonably equivalent, or any, value in exchange for the transfers.

169. At the time Kwon made the transfers, Kwon—through LFG—removed and/or concealed assets of Terraform from the reach of Terraform creditors.

170. Thus, Kwon had the actual intent to delay, hinder, or defraud the creditors of Terraform, and made the transfers to delay, hinder, or defraud those creditors. Consequently, the transfers to Jump Trading were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

171.     Because the transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Plan Administrator may avoid the transfers, pursuant to Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

172.     As a direct and proximate result of the fraudulent transfers from Terraform to LFG and from LFG to Jump Trading, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, most notably, the claims of the investors who were defrauded by Kwon.

173.     Terraform filed for Chapter 11 Bankruptcy in January 2024.  These fraudulent transfers occurred less than two years before that time.

<u>**COUNT FIVE**</u>
**Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1) (Actual Fraudulent Transfer)**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

174.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

175.     The Plan Administrator acting on behalf and standing in the shoes of the Individual Victims has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of Terraform funds that Kwon made to Defendant Jump Trading, with LFG as an intermediary, under the actual fraud prong of the statute.  740 ILCS § 160/5(a)(1).

176.     As a not-for-profit entity, LFG's publicized purpose was to promote community stewardship and foster research and development of open-source software and applications dedicated to providing greater economic sovereignty, security, and sustainability for the world's cryptocurrency communities.

177.    But Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG, not to help maintain the stability of the Terra ecosystem but as a mechanism to put those funds beyond the reach of Terraform's creditors following the first depeg in May 2021.

178.    LFG was never independent from Kwon and Terraform, and Kwon and Kariya controlled how LFG's assets were deployed.

179.    Kwon, acting through his fraudulent domination, adverse interest in, and control of LFG, and at the direction of Defendant Kariya, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 10, 2022.  Kwon directed this transfer with actual intent to hinder, delay, or defraud the creditors of Terraform.

180.    At the time of the transfers, Jump knew that Terraform had amassed huge amounts of potential liability.

181.    Jump Trading received the transfers without providing reasonably equivalent, or any, value in exchange for the transfers.

182.    At the time Kwon made the transfers, Kwon—through LFG—removed and/or concealed assets of Terraform from the reach of Terraform creditors.

183.    LFG made the transfers at Kwon's direction, as a result of his fraudulent domination, adverse interest in, and control of LFG and as part of his continued breaches of fiduciary duties to Terraform.

184.    Thus, Kwon had the actual intent to delay, hinder, or defraud the creditors of Terraform, and made the transfers to delay, hinder, or defraud those creditors.  Consequently, the transfers to Jump Trading were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

185.     Because the transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Plan Administrator may avoid the transfers, under Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

186.     As a direct and proximate result of Kwon's fraudulent transfers from Terraform to LFG and then to Jump Trading, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, most notably, the claims of the investors who were defrauded by Kwon.

187.     Terraform filed for Chapter 11 Bankruptcy in January 2024.  These fraudulent transfers occurred less than two years before that time.

## COUNT SIX
### Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act
### 740 ILCS § 160/5(a)(1) (Actual Fraudulent Transfer)
### (Plan Administrator on Behalf of LFG)
### (Against all Defendants)

188.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

189.     The Plan Administrator acting on behalf and standing in the shoes of the LFG has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers to Defendant Jump Trading by LFG under the actual fraud prong of the statute. 740 ILCS § 160/5(a)(1).

190.     As a charitable entity, LFG's publicized purpose was to promote community stewardship and foster research and development of open-source software and applications dedicated to providing greater economic sovereignty, security, and sustainability for the world's cryptocurrency communities.

191. LFG was never independent from Kwon and Terraform, and Kwon and Kariya controlled how LFG's assets were deployed.

192. Kwon, acting at the direction of Kariya and through his fraudulent domination, adverse interest in, and control of LFG, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 10, 2022. Kwon and Kariya directed this transfer with actual intent to hinder, delay, or defraud the creditors of LFG.

193. Kwon and Kariya directed this transfer with actual intent to hinder, delay, or defraud the creditors of LFG.

194. At the time of the transfers from LFG to Jump, Jump knew that Terraform and LFG had amassed huge amounts of potential liability.

195. Jump Trading received the transfers without providing reasonably equivalent, or any, value in exchange for the transfers.

196. LFG made the transfers at Kwon's and Kariya's direction, as a result of their fraudulent domination, adverse interest in and control of LFG.

197. Thus, Kwon and Kariya had the actual intent to delay, hinder, or defraud creditors of Terraform and LFG, and made the transfers to delay, hinder, or defraud those creditors. Consequently, the transfers to Jump Trading were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act.

198. Because the transfers were fraudulent under Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act, the Plan Administrator may avoid the transfers, under Section 8(a) of the Illinois Uniform Fraudulent Transfer Act.

199. As a direct and proximate result of LFG's fraudulent transfers to Jump Trading, the assets of LFG, and, consequently, the Wind Down Trust, have been diminished by not less than

hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, most notably, the claims of the investors who were defrauded by Kwon.

200.    Terraform filed for Chapter 11 Bankruptcy in January 2024.  These fraudulent transfers occurred less than two years before that time.

<strong><u>COUNT SEVEN</u></strong><br>
<strong>Violation of Section 5(a)(2) of the Illinois Uniform Fraudulent Transfer Act<br>
740 ILCS § 160/5(a)(2) (Constructive Fraudulent Transfer)<br>
(Plan Administrator on behalf of Terraform)<br>
(Against all Defendants)</strong>

201.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

202.    The Plan Administrator has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of Terraform funds that Kwon made to LFG, and then ultimately to Defendant Jump Trading, under the constructive fraud prong of the statute.  740 ILCS § 160/5(a)(2).

203.    Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG.

204.    Kwon and Kariya then, acting through their fraudulent domination, adverse interest in, and control of LFG, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 10, 2022.

205.    The transfers to Defendant Jump Trading were made without Terraform receiving reasonably equivalent, or any, value in exchange for the transfers.

206.    Terraform was insolvent, or was rendered insolvent, at the time of these transfers.

207.    Also, the transfers occurred when Terraform's remaining assets were unreasonably small in relation to the business transaction(s) and when Terraform intended to incur or believed,

or reasonably should have believed, that Terraform would incur debts beyond its abilities to pay the Terraform creditors.

208. UST had already experienced a significant depeg event in May 2021. By May 2022, the value and size of UST holdings had grown exponentially. Kwon and Terraform reasonably should have believed that the May 2022 depeg would incur debts beyond Terraform's ability to pay.

**COUNT EIGHT**
**Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1) (Constructive Fraudulent Transfer)**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

209. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

210. The Plan Administrator acting on behalf of and standing in the shoes of the Individual Victims has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of Terraform funds that Kwon made to LFG and ultimately to Defendant Jump Trading, under the constructive fraud prong of the statute. 740 ILCS § 160/5(a)(2).

211. Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG.

212. Kwon and Kariya then, acting through their fraudulent domination, adverse interest in, and control of LFG, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 10, 2022.

213. The transfers to Defendant Jump Trading were made without Terraform receiving reasonably equivalent, or any, value in exchange for the transfers.

214. Terraform was insolvent, or was rendered insolvent, at the time of these transfers.

215.     Also, the transfers occurred when Terraform's remaining assets were unreasonably small in relation to the business transaction(s) and when Terraform intended to incur or believed, or reasonably should have believed, that Terraform would incur debts beyond its abilities to pay the Terraform creditors.

216.     UST had already experienced a significant depeg event in May 2021.  By May 2022, the value and size of UST holdings had grown exponentially.  Kwon and Terraform reasonably should have believed that the May 2022 depeg would incur debts beyond Terraform's ability to pay.

**COUNT NINE**
**Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 ILCS § 160/5(a)(1) (Constructive Fraudulent Transfer)**
**(Plan Administrator on Behalf of LFG)**
**(Against all Defendants)**

217.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

218.     The Plan Administrator acting on behalf of and standing in the shoes of LFG has standing within the meaning of the Illinois Uniform Fraudulent Transfer Act to seek the return of fraudulent transfers of funds that Kwon and Kariya transferred from LFG to Defendant Jump Trading, under the constructive fraud prong of the statute.  740 ILCS § 160/5(a)(2).

219.     Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG.

220.     Kwon and Kariya then, acting through their fraudulent domination, adverse interest in, and control of LFG, caused the transfer of 52,189 BTC to Jump Trading from LFG, on or about May 10, 2022.

221.     The transfers to Defendant Jump Trading were made without LFG receiving reasonably equivalent, or any, value in exchange for the transfers or obligations incurred.

222. Terraform and LFG were insolvent, or were rendered insolvent, at the time of these transfers.

223. Also, the transfers occurred when Terraform's and LFG's remaining assets were unreasonably small in relation to the business transaction(s) and when Terraform and LFG intended to incur or believed, or reasonably should have believed, that Terraform and LFG would incur debts beyond its abilities to pay the Terraform or LFG creditors.

224. UST had already experienced a significant depeg event in May 2021. By May 2022, the value and size of UST holdings had grown exponentially. Kwon and Terraform reasonably should have believed that the May 2022 depeg would incur debts beyond Terraform's or LFG's ability to pay.

**COUNT TEN**
**Violation of 11 U.S.C. 548(a)(1)(A)**
**(Plan Administrator on behalf of Terraform) (Actual Fraudulent Transfer)**
**(Against all Defendants)**

225. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

226. The Plan Administrator seeks the return of fraudulent transfers of Terraform funds that Kwon made to LFG and ultimately to Defendant Jump Trading and from any initial, immediate, and/or mediate transferees.

227. Each transfer of crypto assets from Terraform to LFG and from LFG to Jump was a "transfer" within the meaning of 11 U.S.C. § 101(54)(D).

228. Each fraudulent transfer occurred within two years of the Petition Date.

229. Each fraudulent transfer was a transfer of property, or of an interest in property, of Terraform to and/or for the benefit of LFG and/or Defendant Jump Trading.

230. The facts set forth herein demonstrate that Kwon caused Terraform to make the fraudulent transfers with the actual intent to hinder, delay, and/or defraud the Terraform creditors and in furtherance of the fraud being perpetrated by Kwon and Jump Trading.

231. First, Terraform's property was transferred to or for the benefit of Jump Trading.

232. Second, Kwon caused Terraform to remove assets by transferring them to LFG and then ultimately to Defendant Jump Trading through the fraudulent transfers. Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG. By May 9, 2022, Kwon caused LFG to transfer a total of 52,189 BTC from its reserves to Jump Trading for Jump to purchase UST.

233. Third, Jump did not contribute any consideration for these funds. Thus, the value of the consideration received by Terraform in exchange for its assets was less than reasonably equivalent value of the assets transferred.

234. Fourth, Terraform was insolvent when the transfers were made or became insolvent as a result of the transfers.

235. Accordingly, the fraudulent transfers constitute avoidable fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

236. As more particularly set forth above, Defendant Jump Trading was the initial transferee of the fraudulent transfers, or the entity for whose benefit the fraudulent transfers were made.

237. Alternatively, Jump Trading was the immediate or mediate transferee of the initial transferee, LFG.

238. Accordingly, the Plan Administrator is entitled to recover the fraudulent transfers or their value under section 550 of the Bankruptcy Code.

**COUNT ELEVEN**
**Violation of 11 U.S.C. 548(a)(1)(A)**
**(Plan Administrator on Behalf of Individual Victims) (Actual Fraudulent Transfer)**
**(Against all Defendants)**

239.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

240.     The Plan Administrator seeks the return of fraudulent transfers of Terraform funds that Kwon made to LFG and ultimately to Defendant Jump Trading, as well as from any initial, immediate, and/or mediate transferees.

241.     Each transfer of crypto assets from Terraform to LFG and from LFG to Jump was a "transfer" within the meaning of 11 U.S.C. § 101(54)(D)(i) or (ii).

242.     Each fraudulent transfer occurred within two years of the Petition Date.

243.     Each fraudulent transfer was a transfer of property, or of an interest in property, of Terraform to and/or for the benefit of Defendant Jump Trading.

244.     The facts set forth herein demonstrate that Kwon caused Terraform to make the fraudulent transfers with the actual intent to hinder, delay, and/or defraud the Terraform creditors and in furtherance of the fraud being perpetrated by Kwon and Jump Trading.

245.     First, Terraform's property was transferred to or for the benefit of Jump Trading.

246.     Second, Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG.  By May 9, 2022, Kwon caused LFG to transfer a total of 52,189 BTC from its reserves to Jump Trading for Jump to purchase UST.

247.     Third, Jump did not contribute any consideration for these funds.  Thus, the value of the consideration received by Terraform in exchange for its assets was less than reasonably equivalent value of the assets transferred.

248. Fourth, Terraform was insolvent when the transfers were made or became insolvent as a result of the transfers.

249. Accordingly, the fraudulent transfers constitute avoidable fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

250. As more particularly set forth above, Defendant Jump Trading was the initial transferee of the fraudulent transfers, or the entity for whose benefit the fraudulent transfers were made.

251. Alternatively, Jump Trading was the immediate or meditate transferee of the initial transferee, LFG.

252. Accordingly, the Plan Administrator is entitled to recover the fraudulent transfers or their value under section 550 of the Bankruptcy Code.

**COUNT TWELVE**
**Violation of 11 U.S.C. 548(A)(1)(A)**
**(Plan Administrator on Behalf of LFG) (Actual Fraudulent Transfer)**
**(Against all Defendants)**

253. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

254. The Plan Administrator seeks the return of fraudulent transfers of funds that LFG made to Jump.

255. Each fraudulent transfer was a "transfer" within the meaning of 11 U.S.C. § 101(54)(D)(i) or (ii).

256. Each fraudulent transfer occurred within two years of the Petition Date.

257. Each fraudulent transfer was a transfer of property, or of an interest in property, of Terraform to and/or for the benefit of Defendant Jump Trading.

258. The facts set forth herein demonstrate that Kwon caused LFG to make the fraudulent transfers with the actual intent to hinder, delay, and/or defraud the Terraform creditors and in furtherance of the fraud being perpetrated by Kwon and Jump Trading.

259. First, LFG's property was transferred to or for the benefit of Jump Trading.

260. Second, Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG. By May 9, 2022, Kwon caused LFG to transfer a total of 52,189 BTC from its reserves to Jump Trading for Jump to purchase UST.

261. Third, Jump did not contribute any consideration for these funds. Thus, the value of the consideration received by LFG in exchange for its assets was less than reasonably equivalent value of the assets transferred.

262. Fourth, LFG was insolvent when the transfers were made or became insolvent as a result of the transfers.

263. Accordingly, the fraudulent transfers constitute avoidable fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code.

264. As more particularly set forth above, Defendant Jump Trading was the initial transferee of the fraudulent transfers, or the entity for whose benefit the fraudulent transfers were made.

265. Accordingly, the Plan Administrator is entitled to recover the fraudulent transfers or their value under section 550 of the Bankruptcy Code.

## COUNT THIRTEEN
### Violation of 11 U.S.C. 548(A)(1)(B)
### (Plan Administrator on behalf of Terraform) (Constructive Fraudulent Transfer)
### (Against all Defendants)

266. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

267.    Kwon effectuated transfers of tens of millions of Luna tokens from Terraform to LFG as a mechanism to put those funds beyond the reach of Terraform's creditors following the first depeg in May 2021.  Kwon effectuated transfers of at least 72,000,000 Luna tokens and 10,000,000 UST to LFG between January and April 2022.

268.    During the May 2022 depeg of UST, Terraform and Jump Trading, through LFG, engaged in additional transfers of digital assets, including transfers from LFG to Jump Trading totaling 52,189 Bitcoin.

269.    These transfers were made within two years of the Petition Date.

270.    Jump did not contribute any consideration for these funds.  Thus, Terraform received less than reasonable equivalent value or did not receive fair consideration in exchange for the assets that Terraform transferred to Defendant Jump Trading, through LFG.

271.    Terraform was insolvent on the date of these transfers, or was rendered insolvent as a result thereof; was engaged or about to engage in a business or transaction for which the remaining assets of Terraform were unreasonably small as a result of the transfers to Defendant Jump Trading; or intended to incur, believed, or reasonably should have believed it would incur, debts beyond its ability to pay as such debts came due.

272.    Specifically, UST had already experienced a significant depeg event in May 2021, and Jump and Kwon were aware they had misled the market about how the peg was re-established in 2021 and the stability of the Terraform Ecosystem.  By May 2022, the value and size of UST holdings had grown exponentially, and so had the potential liabilities for Kwon and Jump's deception.

273.    Terraform and its creditors were thus harmed by these transfers.

274. By virtue of the foregoing, the transfer of tokens to Defendant Jump Trading were fraudulent transfers avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

275. The Plan Administrator is entitled to avoid the transfers.

276. Under section 550 of the Bankruptcy Code, if a transfer is avoided under Section 548 of the Bankruptcy Code, the Plan Administrator may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

277. Defendant Jump Trading is the initial transferee and/or the entity for whose benefit the transfers were made.

278. Therefore, the digital assets transferred from Terraform to LFG to Defendant Jump Trading, or the value of any such digital assets, are avoidable by the Plan Administrator under Section 548 of the Bankruptcy Code and recoverable by the Wind Down Trust under section 550 of the Bankruptcy Code.

**COUNT FOURTEEN**
**Violation of 11 U.S.C. 548(A)(1)(B)**
**(Plan Administrator on Behalf of Individual Victims) (Constructive Fraudulent Transfer)**
**(Against all Defendants)**

279. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

280. Kwon effectuated transfers of tens of millions of Luna tokens from Terraform to LFG as a mechanism to put those funds beyond the reach of Terraform's creditors following the first depeg in May 2021. Kwon effectuated transfers of a total of 72,000,000 Luna tokens and 10,000,000 UST to LFG between January and April 2022.

281.    During the May 2022 depeg of UST, Terraform and Jump, through LFG, engaged in additional transfers of digital assets, including transfers from LFG to Jump Trading totaling 52,189 Bitcoin.

282.    These transfers were made within two years of the Petition Date.

283.    Jump did not contribute any consideration for these funds.  Thus, Terraform received less than reasonable equivalent value or did not receive fair consideration in exchange for the assets that Terraform transferred to Defendant Jump Trading, through LFG.

284.    Terraform was insolvent on the date of these transfers, or was rendered insolvent as a result thereof; was engaged or about to engage in a business or transaction for which the remaining assets of Terraform were unreasonably small as a result of the transfers to Defendant Jump Trading; or intended to incur, believed, or reasonably should have believed it would incur, debts beyond its ability to pay as such debts came due.

285.    Specifically, UST had already experienced a significant depeg event in May 2021, and Jump and Kwon were aware they had misled the market about how the peg was re-established in 2021 and the stability of the Terraform Ecosystem.  By May 2022, the value and size of UST holdings had grown exponentially, and so had the potential liabilities for Kwon and Jump's deception.

286.    Terraform and its creditors were thus harmed by these transfers.

287.    By virtue of the foregoing, the transfer of tokens to Defendant Jump Trading were fraudulent transfers avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

288.    The Plan Administrator is entitled to avoid the transfers.

289.    Under section 550 of the Bankruptcy Code, if a transfer is avoided under Section 548 of the Bankruptcy Code, the Plan Administrator may recover the property or the value of the

property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

290.     Defendant Jump Trading was the initial transferee and/or the entity for whose benefit the transfers were made.

291.     Therefore, the digital assets transferred from Terraform to LFG to Defendant Jump Trading, or the value of any such digital assets, are avoidable by the Plan Administrator under Section 548 of the Bankruptcy Code and recoverable by the Wind Down Trust under section 550 of the Bankruptcy Code.

## COUNT FIFTEEN
### Violation 11 U.S.C. 548(A)(1)(B)
### (Plan Administrator on Behalf of LFG) (Constructive Fraudulent Transfer)
### (Against all Defendants)

292.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

293.     During the May 2022 depeg of UST, Terraform and Jump caused LFG to transfer 52,189 Bitcoin from LFG to Jump.

294.     These transfers were made within two years of the Petition Date.

295.     Jump did not contribute any consideration for these funds.  Thus, LFG received less than reasonable equivalent value or did not receive fair consideration in exchange for the assets that LFG transferred to Defendant Jump Trading.

296.     LFG was insolvent on the date of these transfers, or was rendered insolvent as a result thereof; was engaged or about to engage in a business or transaction for which the remaining assets of LFG were unreasonably small as a result of the transfers to Defendant Jump Trading; or intended to incur, believed, or reasonably should have believed it would incur, debts beyond its ability to pay as such debts came due.

297. LFG was thus harmed by these transfers.

298. By virtue of the foregoing, the transfer of tokens to Defendant Jump Trading were fraudulent transfers avoidable under Section 548(a)(1)(B) of the Bankruptcy Code.

299. The Plan Administrator is entitled to avoid the transfers.

300. Under section 550 of the Bankruptcy Code, if a transfer is avoided under Section 548 of the Bankruptcy Code, the Plan Administrator may recover the property or the value of the property transferred from the initial transferee, the entity for whose benefit the transfers were made, or any immediate or mediate transferee of the initial transferee.

301. Defendant Jump Trading is the initial transferee and/or the entity for whose benefit the transfers were made.

302. Therefore, the digital assets transferred from LFG to Defendant Jump Trading, or the value of any such digital assets, are avoidable by the Plan Administrator under Section 548 of the Bankruptcy Code and recoverable by the Wind Down Trust under section 550 of the Bankruptcy Code.

**COUNT SIXTEEN**
**Unjust Enrichment**
**(Plan Administrator on Behalf of Terraform and LFG)**
**(Against all Defendants)**

303. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

304. Defendant Jump Trading made hundreds of millions, if not billions, of dollars in profits from its business dealings with Terraform at the expense of Terraform and investors.

305. After the 2021 depeg, Jump Trading received discounted Luna worth millions of dollars to facilitate Jump manipulating the price of UST.

306.    Jump experienced an immediate profit from trading this discounted Luna on the open market.

307.    Jump also profited from the trades it made during the May 2021 depeg in its attempts to restore the peg.  During the May 2021 depeg, Jump bought 58.9 million UST and, on information and belief, profited over $1.5 million from selling that 58.9 million UST once the peg was restored.

308.    Terraform also paid Jump market-making fees for the trades Jump executed during the May 2021 depeg and after.  Those market-making fees were ill-gotten gains that Jump received only because it engaged in fraudulent conduct and market manipulation.

309.    After the May 2021 depeg event, investors had renewed confidence in the Terra ecosystem.  And Jump actively worked to continue to grow the Terra ecosystem.  Jump knew or should have known that such growth was unsustainable, but Jump continued to grow the system.  Jump earned market-making fees on all of these trades, and it was to Jump's benefit to grow the Terra ecosystem as much as possible.

310.    Additionally, Terraform conferred a benefit on Defendant Jump Trading when Kwon, through LFG, made transfers to it in the amount of 52,189 Bitcoin.

311.    Defendant Jump Trading had knowledge of the benefit it received from Terraform as a result of the transfers.

312.    Jump bears more fault than Terraform for these events.  Terra relied on Jump for their market-making expertise.  Jump benefitted extensively from its fraud, all while shielding its true role from the public.  And Jump walked away from the Terraform collapse relatively unscathed.

313.    Defendant Jump Trading voluntarily accepted and retained the benefit conferred.

314. It is inherently unfair and inequitable, violating fundamental principles of justice, equity, and good conscience, that the funds of Terraform creditors defrauded in this scheme are retained by and used to personally benefit Defendant Jump Trading (who knew or should have known of the fraudulent scheme), rather than being returned to the Wind Down Trust for the benefit of Terraform's creditors.

315. As a direct and proximate result of Defendant Jump Trading's retention of at least 50,000 Bitcoin that Kwon fraudulently transferred to it, the Wind Down Trust has been diminished, and, under the circumstances, equity dictates that Defendant Jump Trading should return the funds received from Terraform and turnover any assets it may have acquired with those funds to the Plan Administrator for the benefit of all of the Terraform creditors.

**COUNT SEVENTEEN**
**Section 10(b) and SEC Rule 10b-5**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

316. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

317. Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust. The Individual Victims invested in UST believing that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of one UST to one U.S. dollar.

318. Terraform brings this claim for violations of § 10(b) of the Exchange Act, 15 U.S.C. 15 U.S.C. §78j(b), and Rule 10b-5(b) promulgated thereunder, 17 C.F.R. § 240.10b-5(b).

319. Section 10(b) of the Exchange Act makes it unlawful for "any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] my prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  And SEC Rule 10b-5 prohibits the making of an "untrue statement of a material fact or ... [omission of] ... a material fact necessary ... to make the statements made ... not misleading."  17 C.F.R. § 240.10b-5(b).

320.    UST and Luna are securities within the meaning of the Securities Exchange Act, 15 U.S.C. §78c(10).  Jump promoted and sold these securities to the Individual Victims in 2021 and 2022.

321.    The Jump Defendants employed devices and schemes to defraud; made untrue statements of material fact; omitted material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Individual Victims that resulted in artificially high market prices for UST and Luna, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

322.    The Jump Defendants' true involvement with the 2021 depeg and Terraform's ultimate collapse was secret.  This claim was brought within two years of the discovery of the facts that constituted the violation.

323.    Jump had a duty to disclose its role in restoring the peg in May 2021.  Jump knew that the investing public would rely on its statements promoting a cryptocurrency asset.  Jump also stood to benefit financially from increased trading in UST and Luna and encouraged others to do so.

324.    Specifically, in May 2021, Jump traded large blocks of UST to re-peg UST to its prior valuation of one U.S. dollar.  Jump never disclosed this fact to the public.

325. Between May 2021 and May 2022, Jump assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of Luna outstanding. These actions made the peg and the Terraform ecosystem substantially more unstable, and Jump was or should have been aware of this. Nonetheless, Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem without disclosing this increased risk.

326. Jump's trading in UST rendered it legally bound to disclose its participation in the scheme. But Jump improperly omitted the fact that human intervention, rather than an algorithm, caused the May 2021 restoration of the UST peg.

327. In fact, after Jump's intervention in the May 2021 depeg to restore the peg, Jump and Kariya made multiple public-facing statements about UST's algorithmic peg and the stability of the Terraform ecosystem to boost investor confidence in UST, making no mention of their role and actively misleading investors about the efficacy of the Terra algorithm. Jump stated—implicitly and explicitly—that the re-peg had occurred as a result of the algorithm and the arbitrage mechanism, when Jump in fact knew that its involvement had been necessary to maintain the peg.

328. On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." In other words, Kariya told the public that UST was stable even though he knew it wasn't.

      a.     This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance. He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy— indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

329.    On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

      a.     This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

330.    On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size.  And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

      a.    This statement was false and misleading.  Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg.  But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

331.    On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG.  Win, win, win."  Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

      a.    This statement was false and misleading.  Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg.  But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

b. Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

332. On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

a. This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

333. Jump's omissions about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and it misrepresentations about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg, were each material.

334. Investors purchased UST based on their reliance on the algorithmic relationship between UST and Luna. Jump's public statements and omissions of material fact allowed investors to continue to believe that UST was stable and the algorithmic relationship with Luna was sufficient to maintain the peg of UST to one US dollar.

335. Jump acted with scienter. It failed to disclose critical information about its role in defending the peg, all while knowing its behavior would result in significant profits from selling hundreds of millions of dollars of Luna tokens.

336. Due to Jump's publication of materially false information, and specifically its omission of material facts, the price of UST and Luna were artificially inflated.

337. As a result of and in reliance on Jump's public statements and omissions, the Individual Victims suffered damages in connection with their purchases of UST and Luna. They were induced to purchase UST and Luna because Defendants' actions and statements led them to believe that UST was a functional algorithmic stablecoin. When the Terraform ecosystem crashed, investors lost significant amounts of their investments.

338. As a result of its improper conduct, Jump achieved improper gains. Defendants are liable to the Individual Victims for the damages from Defendants' misconduct.

## COUNT EIGHTEEN
### Control Person Liability under Section 20(a)
### (Plan Administrator on Behalf of Individual Victims)
### (Against DiSomma and Kariya)

339. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

340. Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust. The Individual Victims invested in UST believing that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of one UST to one U.S. dollar.

341. Section 20(a) of the Exchange Act imposes liability when there is a violation of the securities law by a "controlled person," the defendant controlled that primary violator, and the defendant was culpable in the controlled person's fraud. 15 U.S.C. § 78t(a)

342.    Here, the Jump Defendants violated Section 10(b) and Rule 10b-5.

343.    The Jump Defendants employed devices and schemes to defraud; made untrue statements of material fact; omitted material facts necessary to make the statements made not misleading; and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the Individual Victims that resulted in artificially high market prices for UST and Luna, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

344.    Specifically, in May 2021, Jump traded large blocks of UST to re-peg UST to its prior valuation of one U.S. dollar.  Jump never disclosed this fact to the public.

345.    DiSomma was directly responsible for instructing Jump traders on how to trade UST to restore the peg in May 2021.

346.    Between May 2021 and May 2022, Jump assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of Luna outstanding.  These actions made the peg and the Terraform ecosystem substantially more unstable, and Jump was or should have been aware of this.  Nonetheless, Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem without disclosing this increased risk.

347.    Jump's trading in UST rendered it legally bound to disclose its participation in the scheme.  Jump knew that the investing public would rely on its statements promoting a cryptocurrency asset.  Jump also stood to benefit financially from increased trading in UST and Luna and encouraged others to do so.

348.    But Jump improperly omitted the fact that human intervention, rather than an algorithm, caused the May 2021 restoration of the UST peg.

349.     In fact, after Jump's intervention in the May 2021 depeg to restore the peg, Jump and Kariya made multiple public-facing statements about UST's algorithmic peg and the stability of the Terraform ecosystem to boost investor confidence in UST, making no mention of their role and actively misleading investors about the efficacy of the Terra algorithm.   Jump stated—implicitly and explicitly—that the re-peg had occurred as a result of the algorithm and the arbitrage mechanism when Jump in fact knew that its involvement had been necessary to maintain the peg.

350.     On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation."  Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances.  In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.  Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."  In other words, Kariya told the public that UST was stable even though he knew it wasn't.

          a.     This statement was false and misleading.  Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance.  He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy—indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem.  Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a

relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

351. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

352. On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya

told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

353. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    a. This statement was false and misleading. Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    b. Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

354. On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space."

Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

           a.    This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

355. Jump's omissions about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and its misrepresentations about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg, were each material.

356. Investors purchased UST based on their reliance on the algorithmic relationship between UST and Luna. Jump's public statements and omissions of material fact allowed investors to continue to believe that UST was stable and the algorithmic relationship with Luna was sufficient to maintain the peg of UST to one US dollar.

357. Defendants DiSomma and Kariya had control of the primary violator—the Jump entity Defendants.

358. Kariya was the head of Jump Crypto and was directly responsible for making several false statements. Kariya directed the strategy for Jump Crypto. He negotiated with Kwon during the 2021 depeg and later formed LFG.

359. DiSomma directed traders at Jump on how to artificially inflate the price of UST during the May 2021 depeg and how to unwind Jump's position without causing another depeg.

360. As a result of DiSomma's and Kariya's control over the Jump entities, the Individual Victims suffered damages in connection with their purchases of UST and Luna.

361.     As a result of its improper conduct, Jump achieved improper gains.  Plaintiff, on behalf of the Individual Victims, is entitled to the disgorgement of Jump's ill-gotten gain from such misconduct.

**COUNT NINETEEN**
**Section 9 of the Exchange Act**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

362.     Plaintiff incorporates by reference each of paragraphs set forth above as fully alleged therein.

363.     Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust.  The Individual Victims invested in UST believing that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of one UST to one U.S. dollar.

364.     Terraform brings this claim for violations of Section 9 of the Securities Exchange Act., which is intended to deter manipulative tactics regarding the exchange of securities.  It prohibits the use of interstate commerce for manipulative conduct, including false or misleading statements in connection with the sale of securities.  Under the statute, it is unlawful to engage in a series of transactions that creates "actual or apparent active trading" or raises or lowers prices "for the purpose of inducing the purchase or sale of a security by others," knowingly creating "a false or misleading appearance of active trading" in a non-government security, or knowingly spreading false information about a security to raise or depress its price and thereby induce others to purchase the security.  Indeed, it is unlawful to purchase or sell a non-government security to peg, fix, or stabilize the price of the security in violation of the SEC's rules and regulations.  15 U.S.C. § 78i(a).

365.     Liability for a Section 9 violation attaches to anyone who willfully participates in a manipulation scheme or prohibited activity under the Act.

366.     Section 9(f) of the Securities Exchange Act of 1934 provides individuals with an express private right of action for securities price manipulation.

367.     UST and Luna are securities within the meaning of the Securities Exchange Act, 15 U.S.C. §78c(10).  Jump promoted and sold these securities to the Individual Victims in 2021 and 2022.

368.     The Jump Defendants' true involvement with the 2021 depeg and Terraform's ultimate collapse was secret.  This claim was brought within two years of the discovery of the facts that constituted the violation.

369.     The Jump Defendants created a false or misleading appearance regarding the active trading for UST and Luna, or a false or misleading appearance regarding the market for those securities.

370.     Specifically, in May 2021, Jump traded large blocks of UST to re-peg UST to its prior valuation of one U.S. dollar.  UST would not have regained its peg absent the Jump Defendants' intervention.  The Jump Defendants thus purchased or sold UST and Luna to peg, fix, or stabilize the price of the security, violating the SEC's rules and regulations. This series of transactions created actual or apparent trading regarding the relevant securities—and raised or depressed the market price.  Jump never disclosed this fact to the public.

371.     Moreover, the Jump Defendants made false or misleading statements regarding UST and Luna to induce the purchase and sale of UST and Luna.

372.     These actions occurred in violation of Section 9 of the Securities Exchange Act.

373.    Between May 2021 and May 2022, Jump assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of Luna outstanding.   These actions made the peg and the Terraform ecosystem substantially more unstable, and Jump was or should have been aware of this.   Nonetheless, Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem without disclosing this increased risk.   This conduct propelled the manipulation of related prices.

374.    Defendants knowingly engaged in the collusive scheme with the intent that others would purchase or sell UST and Luna and further raise or lower the price of UST and Luna to their benefit.

375.    The purchasing occurred through the means of interstate commerce.

376.    Jump's trading in UST rendered it legally bound to disclose its participation in the scheme.  But Jump improperly omitted the fact that human intervention, rather than an algorithm, caused the May 2021 restoration of the UST peg.

377.    In fact, after Jump's intervention in the May 2021 depeg to restore the peg, Jump and Kariya made multiple public-facing statements about UST's algorithmic peg and the stability of the Terraform ecosystem to boost investor confidence in UST, making no mention of their role and actively misleading investors about the efficacy of the Terra algorithm.   Jump stated— implicitly and explicitly—that the re-peg had occurred as a result of the algorithm and the arbitrage mechanism, when Jump in fact knew that its involvement had been necessary to maintain the peg and impact prices.

378.    On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation."  Kariya continued "It's difficult to

imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." In other words, Kariya told the public that UST was stable even though he knew it wasn't.

      a.      This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance. He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy—indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

379. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

      a.      This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary

growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

380. On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

381. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    a.    This statement was false and misleading. Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary

growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

b. Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

382. On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

a. This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

383. Jump's omissions about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and its misrepresentations about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg, were each material.

384.    Jump acted with scienter.  It failed to disclose critical information about their role in defending the peg and impacting security pricing, all while knowing its behavior would result in significant profits from selling hundreds of millions of dollars of Luna tokens.

385.    Due to Jump's publication of materially false information, and specifically its omission of material facts, the price of UST and Luna were artificially inflated.

386.    Investors purchased UST based on their reliance on the algorithmic relationship between UST and Luna.  Jump's public statements and omissions of material fact allowed investors to continue to believe that UST was stable and the algorithmic relationship with Luna was sufficient to maintain the peg of UST to one US dollar.

387.    As a result of and in reliance on Jump's public statements and omissions, the Individual Victims, suffered damages in connection with their purchases of UST and Luna.  The Individual Victims purchased securities via use of interstate commerce at market prices impacted by Section 9 violations.

388.    As a result of its improper conduct, Jump achieved improper gains.  Plaintiff, on behalf of the Individual Victims, is entitled to the disgorgement of Jump's ill-gotten gain from such misconduct.

## COUNT TWENTY
### Section 15 of the Securities Act of 1933
### (Plan Administrator on Behalf of Individual Victims)
### (Against DiSomma and Kariya)

389.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

390.    Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust.  The Individual Victims invested in UST believing that an

algorithm that linked UST and Luna was responsible for automatically stabilizing the value of one UST to one U.S. dollar.

391.    Section 15 of the Securities Act, 15 U.S.C. § 77o, allows private plaintiffs to file a suit against persons in control over primary violators of Section 12 of the Securities Act.  The "control person" can be held jointly and severally with, and to the same extent as, the controlled person.  Under Rule 405 of the Securities Act, 17 C.F.R. § 230.405, "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

392.    Here, the Jump Defendants violated Section 12(a)(1) of the Securities Act.  In fact, Tai Mo Shan, a Jump subsidiary, entered into a $123 million settlement with the SEC based, in part, on the registration requirements of the Securities Act.

393.    The Jump Defendants successfully solicited the purchase of unregistered securities through the use of interstate commerce, causing damages.  Jump did so to benefit its own financial interests.

394.    Between May 2021 and May 2022, Jump assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of Luna outstanding.  These actions made the peg and the Terraform ecosystem substantially more unstable, and Jump was or should have been aware of this.  Nonetheless, Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem without disclosing this increased risk.  Jump thus actively solicited investors through this deceptive conduct.

395.    Defendants knowingly engaged in the collusive scheme with the intent that others would purchase or sell UST and Luna to their benefit.

80

396.    Furthermore, after Jump's intervention in the May 2021 depeg to restore the peg, Jump and Kariya made multiple public-facing statements about UST's algorithmic peg and the stability of the Terraform ecosystem to boost investor confidence in UST, making no mention of their role and actively misleading investors about the efficacy of the Terra algorithm.  Jump stated—implicitly and explicitly—that the re-peg had occurred as a result of the algorithm and the arbitrage mechanism, when Jump in fact knew that its involvement had been necessary to maintain the peg and impact prices.

397.    On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today.  Hoping this thread can provide a clear unemotional take on the situation."  Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances.  In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.  Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."

398.    On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

399.    On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size.  And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again

around the new prices, when there are extreme price movements, which do happen every sometime."

400.    On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG.  Win, win, win."

401.    On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.]  Excited to support a great team tackling this space."

402.    In other words, through communications like these, Jump and Kariya promoted the purchasing of unregistered securities.

403.    Defendants DiSomma and Kariya had control of the primary violator—the Jump entity Defendants.

404.    Kariya was the head of Jump Crypto and was directly responsible for making several false statements.  Kariya directed the strategy for Jump Crypto.  He negotiated with Kwon during the 2021 depeg and later formed LFG.

405.    DiSomma directed traders at Jump on how to artificially inflate the price of UST during the May 2021 depeg and how to unwind Jump's position without causing another depeg.

406.    DiSomma was directly responsible for instructing Jump traders on how to trade UST to restore the peg in May 2021.  This conduct induced others to purchase unregistered securities.

407.    Both DiSomma and Kariya were culpable for Jump's conduct that induced individuals to purchase unregistered securities through interstate commerce.  They each had the

power and influence and exercised the same to cause the unlawful offer and sale of unregistered securities.

408. As a result of DiSomma and Kariya's control over the Jump entities, the Individual Victims suffered damages in connection with their purchases of UST and Luna.

409. As a result of their improper conduct, Jump achieved improper gains. Plaintiff, on behalf of the Individual Victims, is entitled to the disgorgement of Jump's ill-gotten gain from such misconduct.

**COUNT TWENTY-ONE**
**Market Manipulation**
**Under Commodity Exchange Act**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

410. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

411. Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust. The Individual Victims invested in UST believing that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of UST at a value of one U.S. dollar and that LFG would add stability to the Terra ecosystem.

412. As set forth above, UST and Luna are crypto asset securities, and they are governed by the Securities Act. Should the Court find that cryptocurrency is not a Security, Plaintiff pleads in the alternative that the Court should then determine that cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

413. The Commodity Futures Trading Commission ("CFTC") has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities and are therefore subject as a commodity to applicable provisions of the [CEA] and Regulations."

414.    Sections 6(c)(1), 9(a)(2), and 22 of the Commodity Exchange Act, 7 U.S.C. §§ 9, 13(a)(2), 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

415.    The CFTC promulgated Rule 180.1(a) which makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

416.    The Jump Defendants and individual Defendants Kariya and DiSomma employed a manipulative device, scheme, or artifice to defraud.

417.    During the May 2021 depeg event, Jump purchased significant amounts of UST to restore the peg to $1.  This artificially impacted the price of UST and was a manipulative device, scheme, or artifice to defraud.

418.    Jump was handsomely rewarded for its efforts in maintaining the peg and sold UST over the course of the next year to tune of hundreds of millions of dollars.

419.    Defendants acted intentionally or recklessly.  They bought and sold UST with the intention to manipulate the price of UST and restore its peg to one U.S. dollar.

420.    The Jump Defendants and individual Defendants Kariya and DiSomma also made untrue and misleading statements of material fact or, at the very least, omitted a material fact that was necessary to make the statements not untrue or misleading.

421.    Jump had a duty to disclose its role in restoring the peg in May 2021.  Jump knew that the investing public would rely on its statements promoting a cryptocurrency asset.  Jump also stood to benefit financially from increased trading in UST and Luna and encouraged others to do so.

422.    Defendants also engaged in a practice or course of business that operated as a fraud upon investors.

423.    Defendants knew that market participants thought that the UST price was pegged to one U.S. dollar based on an algorithmic relationship with Luna, and they knew or reasonably should have known that investors were relying on that understanding to purchase UST and Luna.

424.    Starting in May 2021, Jump purchased UST to maintain its peg to one U.S. dollar. In late 2021 and early 2022, Defendants were instrumental in forming LFG and touted that organization as a stabilizing mechanism for UST.  Defendants did all of this with full knowledge

that their own trading, and not an algorithm, had propped up the price of UST in 2021 and that LFG was not adequate to stabilize the Terra ecosystem.

425.    Defendants did not disclose their role in maintaining the peg in 2021 to the market. Rather, Defendants supported an artificially high price of UST, while simultaneously profiting from their large Luna holdings when the price continued to rise.  And Defendants actively mislead investors into believing that LFG was adequate to stabilize UST.  Defendants made the following public misleading statements, among others.

426.    On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation."  Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances.  In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price.  Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."  In other words, Kariya told the public that UST was stable even though he knew it wasn't.

      a.    This statement was false and misleading.  Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance.  He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy— indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem.  Kariya also omitted any mention of Jump's involvement in the May 2021 depeg,

which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

427. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

428. On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet,

much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

429. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

a. This statement was false and misleading. Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

b. Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

430. On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space."

Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

      a.    This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

431.    Jump's omissions about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and its misrepresentations about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg, were each material.

432.    Defendants further attempted to manipulate the price of UST during the May 2022 depeg, purchasing significant amounts of UST in an attempt to restore the peg.

433.    The Jump Defendants' true involvement with the 2021 depeg and Terraform's ultimate collapse was secret. This claim was brought within two years of the discovery of the facts that constituted the violation.

434.    General unsecured creditors of the Wind Down Trust were damaged by Defendants' market manipulation during the May 2021 depeg event, the time intervening the May 2021 depeg event, and May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

**COUNT TWENTY-TWO**
**Aiding and Abetting Market Manipulation**
**Commodity Exchange Act**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

435.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

436. Terraform brings this claim on behalf of the Individual Victims who have assigned their claims to the Wind Down Trust. The Individual Victims invested in UST believing that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of UST at a value of one U.S. dollar and that LFG would add stability to the Terra ecosystem.

437. As set forth above, UST and Luna are crypto asset securities, and they are governed by the Securities Act. Should the Court find that cryptocurrency is not a Security, Plaintiff pleads in the alternative that the Court should then determine that cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

438. The Commodity Futures Trading Commission (CFTC) has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities and are therefore subject as a commodity to applicable provisions of the [CEA] and Regulations."

439. Sections 13(a) makes "[a]ny person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the" CEA provisions liable to the same extent as a principle. 7 U.S.C. § 13(c)(a). As set forth above, CEA Sections 6(c)(1), 9(a)(2), and 22 of the CEA, 7 U.S.C. §§ 9, 13(a)(2), 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

440. The CFTC promulgated Rule 180.1(a) which makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

(1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;

(2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

(3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,

(4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

18 C.F.R. § 180.1(a).

441.     The Jump Defendants and individual Defendants Kariya and DiSomma willfully aided and abetted a manipulative device, scheme, or artifice to defraud.

442.     During the May 2021 depeg event, Jump purchased significant amounts of UST to restore the peg to $1. This artificially impacted the price of UST and was a manipulative device, scheme, or artifice to defraud.

443.     Jump was handsomely rewarded for its efforts in maintaining the peg and sold UST over the course of the next year to tune of hundreds of millions of dollars.

444.     Defendants acted intentionally or recklessly. They bought and sold UST with the intention to manipulate the price of UST and restore its peg to one U.S. dollar.

445.     The Jump Defendants and individual Defendants Kariya and DiSomma also made untrue and misleading statements of material fact or, at the very least, omitted a material fact that was necessary to make the statements not untrue or misleading.

446. Jump had a duty to disclose its role in restoring the peg in May 2021. Jump knew that the investing public would rely on its statements promoting a cryptocurrency asset. Jump also stood to benefit financially from increased trading in UST and Luna and encouraged others to do so.

447. Defendants also engaged in a practice or course of business that operated as a fraud upon investors.

448. Defendants knew that market participants thought that the UST price was pegged to one U.S. dollar based on an algorithmic relationship with Luna, and they knew or reasonably should have known that investors were relying on that understanding to purchase UST and Luna.

449. Starting in May 2021, Jump purchased UST to maintain its peg to one U.S. dollar. In late 2021 and early 2022, Defendants were instrumental in forming LFG and touted that organization as a stabilizing mechanism for UST. Defendants did all of this with full knowledge that their own trading, and not an algorithm, had propped up the price of UST in 2021 and that LFG was not adequate to stabilize the Terra ecosystem.

450. Defendants did not disclose their role in maintaining the peg in 2021 to the market. Rather, Defendants supported an artificially high price of UST, while simultaneously profiting from their large Luna holdings when the price continued to rise. And Defendants actively mislead investors into believing that LFG was adequate to stabilize UST. Defendants made the following public misleading statements, among others.

451. On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is

potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." In other words, Kariya told the public that UST was stable even though he knew it wasn't.

    a.    This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance. He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy— indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

452. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet,

much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

453. On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

    a.    This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

454. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

    a.    This statement was false and misleading. Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet,

much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

b.     Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

455.   On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

a.     This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

456.   Jump's omissions, about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and misrepresentations, about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg were each material.

457.   Defendants further attempted to manipulate the price of UST during the May 2022 depeg, purchasing significant amounts of UST in an attempt to restore the peg.

458.    The Jump Defendants' true involvement with the 2021 depeg and Terraform's ultimate collapse was secret.  This claim was brought within two years of the discovery of the facts that constituted the violation.

459.    General unsecured creditors of the Wind Down Trust were damaged by Defendants' market manipulation during the May 2021 depeg event, the time intervening the May 2021 depeg event, and May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

**COUNT TWENTY-THREE**
**Violation of Illinois Consumer Fraud Act**
**Under 815 Ill. Comp. Stat. 505/2**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against All Defendants)**

460.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

461.    The Illinois Consumer Fraud Act prohibits deceptive or unfair acts or practices, when the defendant intended that the plaintiff rely on the deceptive or unfair act or practice, and the unfair or deceptive act "occurred during a course of conduct involving trade or commerce." *Chandler v. Am. Gen. Fin., Inc.*, 768 N.E.2d 60, 65 (Ill. App. Ct. 2002).

462.    The Individual Victims are individual investors who purchased UST or Luna and were harmed by UST's collapse in May 2022.  The Individual Victims invested in UST believing (1) that an algorithm that linked UST and Luna was responsible for automatically stabilizing the value of UST at one U.S. dollar; and that (2) LFG was helping to stabilize the Terra ecosystem.

463.    Jump and its affiliates are headquartered in Chicago, Illinois.  Their personnel, strategy decisions, and investment actions, including its decisions to prop up UST in May 2021

and make public statements about the effectiveness and stability of the Terra algorithm substantially occurred within the State of Illinois.

464.    Defendants knew that the public, including the Individual Victims, valued UST as an algorithmic stablecoin and that a revelation that the algorithm could not maintain the value of UST at one dollar would negatively affect the value of UST and its desirability in the marketplace.

465.    Through its secret agreements with Terraform, Jump agreed to re-establish the peg of UST in May 2021. When UST became depegged from its one-dollar value in May 2021, Jump traded millions of dollars of UST and Luna to restore UST's value to one dollar, maintaining its peg.

466.    Jump knew that its involvement in restoring UST's peg had to remain secret so that the marketplace would continue to believe that the algorithm backing UST worked and investors would continue to trade in UST as an algorithm-based stablecoin.

467.    After its involvement restoring UST to its $1 peg in May 2021, Jump executives publicly promoted Terra and UST, furthering the perception that UST was a successful algorithm-backed stablecoin.

468.    On January 28, 2022, in a ten-part tweet series, Kariya, then the head of Jump Crypto, tweeted, "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." In other words, Kariya told the public that UST was stable even though he knew it wasn't.

a. This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not and that, in fact, that UST had regained its peg in May 2021 only because of Jump's assistance. He used LUNA and its supposed success as a reminder to the investing public that the Terra Ecosystem is not vulnerable to contractions of the economy— indeed that they will not have an impact on the "prospects of the project." This was obviously false given the events of the May 2021 depeg and Jump's involvement then to restore the very vulnerable Terra Ecosystem. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg, which, had Jump not been involved in infusing significant capital in a relatively short period of time, the "project" would have ended and the investing public would have been aware of the UST/Luna house of cards.

469. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating that: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

a. This statement was false and misleading. Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg. But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

470.    On March 1, 2022, Kariya appeared on "The Ship Show" podcast, where he explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size.  And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

        a.    This statement was false and misleading.  Jump knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg.  But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

471.    On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG.  Win, win, win."  Kariya thus told that public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

        a.    This statement was false and misleading.  Kariya knew what was needed to restore the UST peg in 2021 (substantial capital) and, given the extraordinary growth of the Terra Ecosystem from May 2021 to the date of this Tweet, much more capital would be necessary in the event of the depeg.  But Kariya told the public that LFG was stabilizing the Terra ecosystem, even though he knew LFG was undercapitalized.

      b.    Kariya also failed to disclose Jump's involvement in the May 2021 depeg, and how Jump's substantial infusion of money at that time was Terra's saving grace. Describing the "reserve asset in LFG" as a "win, win, win," when indeed that success is neither guaranteed nor realistic (as the Terraform ecosystem grows), gave the investing public false hope that—should UST de-peg in any way, LFG could successfully come to the rescue.

472.    On May 1, 2022, Kariya tweeted, "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." Once again, Kariya left out Jump's role in the May 2021 repeg and his insider knowledge that Terra's ecosystem was unstable.

      a.    This statement was misleading. Kariya, on behalf of the Jump entities, promoted Terra, knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

473.    Jump's omissions, about its own role in the May 2021 repeg and the creation and undercapitalization of LFG, and misrepresentations, about the stability of the UST/Luna algorithm, the strength of the Terraform ecosystem, and the ability of LFG to defend and maintain the peg were each material.

474.    Jump's work restoring the peg allowed Terraform executives to state publicly that the algorithm backing UST had worked. Jump knew, in fact, Jump demanded, that its role in restoring the peg be kept secret. In doing so, Jump ensured that to any outside observer it would look only like the algorithm Terra promised was working.

475.    As a result of Defendants' actions, UST holders collectively lost millions of dollars.

476.    The nature of Jump's activities were secret.  Given public statements from Jump and Terra executives, the Individual Victims had no reason to suspect that Jump was behind their losses.  This claim was brought within three years of the discovery of the facts that constituted the violation.

**COUNT TWENTY-FOUR**
**Unjust Enrichment**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

477.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

478.    Defendant Jump Trading made hundreds of millions, if not billions, of dollars in profits from its business dealings with Terraform at the expense of Terraform's investors.

479.    During the 2021 depeg, Jump Trading received discounted Luna worth millions of dollars to facilitate Jump manipulating the price of UST.  Through Jump's efforts, UST's peg to one U.S. dollar was restored.

480.    Investors purchased UST and Luna after the peg was restored in May 2021 on the belief that the UST-Luna algorithm had worked to restore the UST peg to one dollar.

481.    After the May 2021 depeg event, Jump actively worked to continue to grow the Terra ecosystem.  Jump knew or should have known that such growth was unsustainable.

482.    Jump Trading profited from the market making fees and profits from its own trades in UST and Luna during the May 2021 depeg until the price of UST collapsed in May 2022.

483.    Defendant Jump Trading voluntarily accepted and retained the benefit conferred by the individual victims.

484.    When UST collapsed in May 2022, UST investors lost their investment in UST. Jump, however, walked away with a profit.

485.     It is inherently unfair and inequitable, violating fundamental principles of justice, equity, and good conscience, that the funds of Terraform creditors defrauded in this scheme are retained by and used to personally benefit Defendant Jump Trading (who knew or should have known of the fraudulent scheme), rather than being returned to the Wind Down Trust for the benefit of Terraform's creditors.

**COUNT TWENTY-FIVE**
**Fraudulent Misrepresentation**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

486.     Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

487.     Terraform marketed the Terra ecosystem as a stable and algorithmically backed stablecoin.

488.     At or around May 2021 through May 2022, Defendants falsely and fraudulently represented to Terraform creditors the Terra ecosystem was stable and that the Terra algorithm was working correctly.

489.     Defendants made these representations to induce the Individual Victims to purchase UST and Luna tokens and to set aside woes related to the viability and strength of stablecoins.

490.     Defendants' representations to the Individual Victims were false and material.  At the time Defendants made these representations, they knew or should have known them to be false. Defendants knew that UST had maintained its peg in May 2021 because of Jump's intervention, not because of the supposedly stabilizing mechanisms built into the Terra ecosystem.  But Defendants kept their role in the May 2021 depeg secret and, in fact, continued to promote UST as a successful algorithmic stablecoin.

Case: 1:25-cv-15414 Document #: 1 Filed: 12/18/25 Page 103 of 105 PageID #:103

491.     Defendants made these representations with the intent of defrauding and deceiving the Individual Victims, such that they could encourage more people to invest in the Terra ecosystem.

492.     At the time Defendants made these representations, the Individual Victims were not aware that Defendants had received a substantial material benefit from promoting UST and Luna tokens, nor did they know that the Terra ecosystem would not have survived the May 2021 depeg event if not for Defendants' significant expenditure of resources to maintain the peg.

493.     As a direct and proximate cause of Defendants' conduct, the Individual Victims—also relying on Jump's long-standing reputation—relied on Defendants' advice and representations to the market about the Terra ecosystem's stability.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.     Enter a judgment in favor of Plaintiff on all counts of this Complaint;

b.     Enter a judgment holding Jump and the Individual Defendants liable for their violations;

a.     Award Plaintiff money damages from Defendants, including compensatory damages, exemplary damages, treble damages, punitive damages, lost profits, lost business value, disgorgement, and attorneys' fees and costs, in an amount to be proven at trial;

b.     Award Plaintiff pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

c.     Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated:  December 18, 2025

Respectfully submitted,

*/s/ Casey J. McGushin*
Michael F. Williams, P.C. (*pro hac forthcoming*)
Judson D. Brown, P.C. (*pro hac forthcoming*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
mwilliams@kirkland.com
jdbrown@kirkland.com

Casey J. McGushin
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
casey.mcgushin@kirkland.com

*Counsel for Todd R. Snyder, as Plan Administrator for the Terraform Labs Pte. Ltd., et al., each Post Effective-Date Debtor, and the Wind Down Trust*