**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| TODD R. SNYDER AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST,<br><br>         Plaintiff,<br><br>    vs.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LIMITED, JUMP FINANCIAL, LLC, J DIGITAL 6 CAYMAN LTD., JCDP-7 QP LLC, JUMP OPERATIONS, LLC, JUMP CAPITAL, LLC, KANAV KARIYA, WILLIAM DISOMMA,<br><br>         Defendants. | Case No. 1:25-cv-15414<br><br>District Judge Joan H. Lefkow |

## <u>JUMP DEFENDANTS' MOTION TO DISMISS</u>

Gary Feinerman (ARDC No. 6206906)
Sean M. Berkowitz (ARDC No. 6209701)
Jack McNeily (ARDC No. 6332140)
LATHAM & WATKINS LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: gary.feinerman@lw.com
     sean.berkowitz@lw.com
     jack.mcneily@lw.com

Richard Frohlichstein (*pro hac vice pending*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Email: richard.frohlichstein@lw.com

Christopher Harris (*pro hac vice pending*)
Elizabeth A. Morris (*pro hac vice pending*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: christopher.harris@lw.com
     elizabeth.morris@lw.com

**TABLE OF CONTENTS**

**Page**

Introduction .................................................................................................................1

Background ...............................................................................................................3

    I.     The Terra Ecosystem and the UST Stablecoin ...........................................3

    II.    Terraform Establishes LFG To Help Protect UST's Peg...........................4

    III.   Despite LFG's and the Jump Defendants' Efforts To Defend the Peg, UST Collapses .................................................................................................6

    IV.   The SEC and DOJ Charge Terraform and Kwon, But Not Any Defendant Here ...........................................................................................................6

Legal Standard ...........................................................................................................7

Argument ...................................................................................................................7

    I.     All Claims Against the Jump Defendants Should Be Dismissed on Group Pleading Grounds (1, 2, 4–17, 19, 21–25) ...............................................7

    II.    Plaintiff's Federal and State Statutory Claims Are Impermissibly Extraterritorial (4–15, 17, 19, 21–23) ...................................................10

          A.    The Federal Securities, Commodities, and Bankruptcy Statutes Do Not Apply to Transactions Outside the United States, and Plaintiff Does Not Allege Domestic Transactions (10–15, 17, 19, 21–22) .............11

              1.    Exchange Act and CEA Counts (17–22) ......................................11

              2.    Bankruptcy Code Fraudulent Transfer Counts (10–15).................12

          B.    The IUFTA and ICFA Do Not Apply to Transactions Outside of Illinois, and Plaintiff Does Not Allege Illinois Transactions (4–9, 23) ...........................................................................................................13

    III.   The Exchange Act, CEA, and ICFA Claims Are Untimely (17, 19, 21–23).........14

    IV.   Plaintiff Cannot Seek Contribution for Terraform's Liability to the SEC (1)...........................................................................................................16

          A.    There Is No Right of Action for Contribution for Defendants Found Liable in SEC Enforcement Actions..............................................16

B.     Even if a Contribution Claim Were Available, Plaintiff's Claim Still Fails ...................................................................................18

V.     The Exchange Act Claims Fail (17, 19)..................................................19

     A.     Federal Securities Laws Do Not Apply Because Plaintiff Does Not Allege an Investment Contract Involving UST or Luna ...........................19

     B.     In Any Event, Plaintiff Fails To Plead Section 10(b) Securities Fraud (17)..............................................................................21

          1.     Plaintiff Lacks Standing To State a Section 10(b) Claim ..............22

          2.     Plaintiff Does Not Plead Any False or Misleading Statement....................................................................................22

          3.     Plaintiff Fails To Allege Facts Showing That the Jump Defendants Acted with Scienter.......................................................28

          4.     Plaintiff Fails To Allege Facts Showing Reliance on the Jump Defendants' Statements.........................................................30

          5.     Plaintiff Fails To Plead Loss Causation.........................................30

     C.     Plaintiff Fails To Plead Section 9(a) Securities Manipulation (19)...........31

          1.     Plaintiff Fails To Plead Scienter ...................................................31

          2.     Plaintiff Fails To Plead Causation, Reliance, and Other Elements.......................................................................................32

VI.     Plaintiff Fails To State a CEA Claim (21, 22).......................................33

     A.     Plaintiff Fails To Allege Commodity Manipulation Under Section 9(a) ..........................................................................................34

          1.     Plaintiff Does Not Allege the Ability To Influence Price..............34

          2.     Plaintiff Does Not Allege an Artificial Price or That the Jump Defendants Caused an Artificial Price ................................34

          3.     Plaintiff Does Not Allege Intent To Cause an Artificial Price ......................................................................................35

     B.     Plaintiff Fails To Allege Manipulative Contrivance Under Section 6............................................................................................36

     C.     Plaintiff Fails To Allege Aiding and Abetting Market Manipulation Under Section 13.....................................................................36

VII.    Plaintiff's Fraudulent Transfer Claims Should Be Dismissed (4–15) ..................37

    A.    Plaintiff Lacks Standing To Bring Terraform-Based Claims on Behalf of the Crypto Loss Claimants and LFG-Based Claims (5, 6, 8, 9, 11, 12, 14, 15) .......................................................................38

        1.    Terraform-Based Claims on Behalf of the Crypto Loss Claimants (5, 8, 11, 14)..................................................39

        2.    LFG-Based Claims (6, 9, 12, 15)....................................39

    B.    Plaintiff Fails To State Any Constructive Fraudulent Transfer Claim (7–9, 13–15) .......................................................40

    C.    Plaintiff Fails To State Any Actual Fraudulent Transfer Claim (4–6, 10–12) ...................................................................43

        1.    The Complaint Does Not Allege Direct Evidence of Fraudulent Intent...................................................43

        2.    The Complaint Does Not Allege Circumstantial Evidence of Fraudulent Intent Through the Badges of Fraud ......44

    D.    Plaintiff's Bankruptcy Code Terraform-Based Claims Are Time-Barred (10, 11, 13, 14)..............................................47

VIII.    Plaintiff's State Law Fraud Claims Fail for the Same Reasons as the Fraud-Based Federal Securities Claims (23, 25) ....................................48

IX.    Plaintiff's Remaining Common Law Claims Fail (2, 16, 24)................................49

    A.    Aiding and Abetting Breach of Fiduciary Duty (2).................................49

    B.    Unjust Enrichment (16, 24)........................................................50

Conclusion ...............................................................................................50

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023)......................................................................................................11

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012).......................................................................................11, 12

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) .......................................................................................32

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan ex rel. Lyon v. Buth*,
99 F.4th 928 (7th Cir. 2024) .......................................................................................28

*Armada (Sing.) Pte. Ltd v. Amcol Int'l Corp.*,
244 F. Supp. 3d 750 (N.D. Ill. 2017) .....................................................................13, 14

*Asdar Grp. v. Pillsbury, Madison and Sutro*,
99 F.3d 289 (9th Cir. 1996) .........................................................................................19

*Ash v. PSP Distrib., LLC*,
226 N.E.3d 748 (Ill. App. 2023) ..................................................................................50

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................7

*Atkins v. Hasan*,
2015 WL 3862724 (N.D. Ill. June 22, 2015)................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................................32

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005)......................................................................................11, 13

*Babin v. Shchekin*,
2017 WL 403568 (N.D. Ill. Jan. 30, 2017)................................................................29

*Baldi v. Samuel Son & Co.*,
548 F.3d 579 (7th Cir. 2008) .......................................................................................41

*Ball v. Nationscredit Fin. Servs. Corp.*,
207 B.R. 869 (Bankr. N.D. Ill. 1997) ........................................................................39

*Bank of Am., N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ................................................................................8

*Bastian v. Petren Res. Corp.*,
    892 F.2d 680 (7th Cir. 1990) ..............................................................................31

*Borsellino v. Goldman Sachs Grp., Inc.*,
    477 F.3d 502 (7th Cir. 2007) ............................................................................7, 8

*Braman v. CME Grp., Inc.*,
    149 F. Supp. 3d 874 (N.D. Ill. 2015) ..............................................................35, 37

*Bridge v. New Holland Logansport, Inc.*,
    815 F.3d 356 (7th Cir. 2016) ................................................................................9

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ................................................................................5

*Castaneda v. Amazon.com, Inc.*,
    679 F. Supp. 3d 739 (N.D. Ill. 2023) ..................................................................48

*Cause of Action v. Chi. Transit Auth.*,
    815 F.3d 267 (7th Cir. 2016) ..............................................................................46

*CFTC v. Oystacher*,
    203 F. Supp. 3d 934 (N.D. Ill. 2016) ..................................................................36

*CFTC v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) ..............................................34, 35, 36

*Chandler v. Ulta Beauty, Inc.*,
    2022 WL 952441 (N.D. Ill. Mar. 30, 2022)..........................................................24

*Chemetron Corp. v. Bus. Funds, Inc.*,
    682 F.2d 1149 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007
    (1983)..............................................................................................................31, 32

*Chew v. Moneygram Int'l, Inc.*,
    2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) ..................................................24, 25

*Chi. Tchrs. Union, Local 1 v. Educators for Excellence, Inc.*,
    159 F.4th 524 (7th Cir. 2025) ..............................................................................17

*Cincinnati Life Ins. Co. v. Beyrer*,
    722 F.3d 939 (7th Cir. 2013) ..............................................................................22

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
    752 F.3d 173 (2d Cir. 2014)................................................................................12

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
 8 F.4th 592 (7th Cir. 2021) ...................................................................................29

*Cleary v. Philip Morris Inc.*,
 656 F.3d 511 (7th Cir. 2011) ................................................................................50

*Cohen v. Stevanovich*,
 722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................32, 33

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
 916 F.3d 589 (7th Cir. 2019) ...............................................................8, 9, 22, 28

*DAN JV III, L.P. v. Touris*,
 598 B.R. 430 (N.D. Ill. 2019) ..............................................................................45

*Delany v. Blunt, Ellis & Loewi*,
 631 F. Supp. 175 (N.D. Ill. 1986).........................................................................50

*DelCostello v. Int'l Bhd. of Teamsters*,
 462 U.S. 151 (1983)..............................................................................................19

*Desmond v. Tax Affiliation Servs. LLC*,
 344 F. Supp. 3d 915 (N.D. Ill. 2018) ...................................................................38

*Eagle Air Transp., Inc. v. Nat'l Aerotech Aviation Del., Inc.*,
 75 F. Supp. 3d 883 (N.D. Ill. 2014) .....................................................................10

*Falconbridge Ltd. v. Stark Trading & Shepherd Inv. Int'l, Ltd.*,
 2008 WL 153542 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir.
 2009) ....................................................................................................................32

*Friedman v. Salomon/Smith Barney, Inc.*,
 313 F.3d 796 (2d Cir. 2002)..................................................................................33

*Fry v. UAL Corp.*,
 84 F.3d 936 (7th Cir. 1996) ..................................................................................28

*Fryman v. Atlas Fin. Holdings, Inc.*,
 462 F. Supp. 3d 888 (N.D. Ill. 2020) ...................................................................23

*Fulton Cnty. Employees Ret. Sys. v. MGIC Inv. Corp.*,
 675 F.3d 1047 (7th Cir. 2012) ..............................................................................27

*Glob. Gaming Phil., LLC v. Razon*,
 2022 WL 836716 (S.D.N.Y. Mar. 21, 2022)...........................................................9

*In re VitaHEAT Med., LLC*,
 629 B.R. 250 (Bankr. N.D. Ill. 2021) ...................................................................41

*Grede v. UBS Sec., LLC*,
   303 F. Supp. 3d 638 (N.D. Ill. 2018) ...................................................................44

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009)............................................................................................18

*Guam v. United States*,
   593 U.S. 310 (2021)............................................................................................16

*Hefferman v. Bass*,
   467 F.3d 596 (7th Cir. 2006) .............................................................................49

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) .............................................................................27

*Horan v. Ford Motor Co.*,
   2026 WL 395630 (N.D. Ill. Feb. 12, 2026) .......................................................14

*In re Ampal-Am. Isr. Corp.*,
   562 B.R. 601 (Bankr. S.D.N.Y. 2017)................................................................12

*In re Archegos 20A Litig.*,
   156 F.4th 108 (2d Cir. 2025) .............................................................................28

*In re ATIF, Inc.*,
   160 F.4th 1124 (11th Cir. 2025) ........................................................................46

*In re CIL Ltd.*,
   582 B.R. 46 (Bankr. S.D.N.Y. 2018)..................................................................12

*In re Com. Loan Corp.*,
   396 B.R. 730 (N.D. Ill. 2008) ............................................................................45

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   801 F.3d 758 (7th Cir. 2015) .......................................................................34, 37

*In re Diplacido*,
   2008 WL 4831204 (C.F.T.C. Nov. 5, 2008).......................................................35

*In re Doctors Hosp. of Hyde Park, Inc.*,
   507 B.R. 558 (Bankr. N.D. Ill. 2013) ................................................................41

*In re Equip. Acquisition Res., Inc.*,
   481 B.R. 422 (Bankr. N.D. Ill. 2012) ...........................................................43, 45

*In re Fairgrieves*,
   426 B.R. 748 (Bankr. N.D. Ill. 2010) ................................................................44

*In re Gluth Bros. Constr., Inc.*,
  424 B.R. 368 (Bankr. N.D. Ill. 2009) ...................................................................44

*In re HH Liquidation, LLC*,
  590 B.R. 211 (Bankr. D. Del. 2018) ...................................................................40

*In re Joy Recovery Tech.*,
  286 B.R. 54 (Bankr. N.D. Ill. 2002) ...................................................................42

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)..................................................................29

*In re Life Fund 5.1 LLC*,
  2010 WL 2650024 (Bankr. N.D. Ill. June 30, 2010) .......................................38, 41

*In re Longview Aluminum, L.L.C.*,
  2005 WL 3021173 (Bankr. N.D. Ill. July 14, 2005)..............................................41

*In re Lyons*,
  130 B.R. 272 (Bankr. N.D. Ill. 1991) ...................................................................40

*In re Midway Games, Inc. Sec. Litig.*,
  332 F. Supp. 2d 1152 (N.D. Ill. 2004) ..................................................................25

*In re MortgageAmerica Corp.*,
  714 F.2d 1266 (5th Cir. 1983) ...............................................................................39

*In re Rough Rice Commodity Litig.*,
  2012 WL 473091 (N.D. Ill. Feb. 9, 2012) .......................................................34, 35

*In re Sandburg Mall Realty Mgmt. LLC*,
  563 B.R. 875 (Bankr. N.D. Ill. 2017) ...................................................................48

*In re Schimmelpenninck*,
  183 F.3d 347 (5th Cir. 1999) .................................................................................39

*In re SGK Ventures, LLC*,
  2017 WL 2683686 (N.D. Ill. June 20, 2017)........................................................42

*In re Tribune Co. Fraud. Conv. Litig.*,
  2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ..............................................................45

*In re VMS Sec. Litig.*,
  752 F. Supp. 1373 (N.D. Ill. 1990) .......................................................................30

*In re Zetta Jet USA, Inc.*,
  624 B.R. 461 (Bankr. C.D. Cal. 2020)..............................................................12, 13

viii

*In re Zohar III, Corp.*,
631 B.R. 133 (Bankr. D. Del. 2021) ................................................................38

*In re Zwirn*,
362 B.R. 536 (Bankr. S.D. Fla. 2007) .............................................................39

*Klingman v. Levinson*,
158 B.R. 109 (N.D. Ill. 1993) ...................................................................39, 40

*Landsberger v. Martek Biosciences Corp.*,
2010 WL 3038947 (D. Md. July 30, 2010)......................................................15

*Lematta v. Casper Sleep, Inc.*,
2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) .................................................24

*Lindholm v. Holtz*,
581 N.E.2d 860 (Ill. App. 1991) ......................................................................45

*LJM Partners, Ltd. v. Barclays Cap. Inc.*,
2023 WL 6311471 (N.D. Ill. Sept. 28, 2023), *aff'd*, 165 F.4th 552 (7th Cir.
2026) .................................................................................................................33

*LJM Partners, Ltd. v. Barclays Cap., Inc.*,
165 F.4th 552 (7th Cir. 2026) ..........................................................................14

*Loginovskaya v. Batrachenko*,
764 F.3d 266 (2d Cir. 2014)........................................................................11, 12

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)..........................................................................................27

*Mathews v. Serafin*,
744 N.E.2d 934 (Ill. App. 2001) ......................................................................41

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)..............................................................................41

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)..........................................................................................14

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
2010 WL 5550455 (Del. Ch. Dec. 30, 2010)...................................................10

*Mitsubishi Elec. Sales Am., Inc. v. Higgins*,
1988 WL 151580 (N.D. Ill. Nov. 10, 1988) ....................................................39

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)....................................................................................10, 11

*Musick, Peeler & Garrett v. Emp. Ins. of Wausau,*
    508 U.S. 286 (1993).................................................................16, 17, 19

*Nat'l Tax Credit Partners, L.P. v. Havlik,*
    20 F.3d 705 (7th Cir. 1994) ...............................................................39

*Northwest Airlines, Inc. v. Transport Workers Union of America,*
    451 U.S. 77 (1981)..............................................................................16, 17

*O'Gorman v. City of Chicago,*
    777 F.3d 885 (7th Cir. 2015) ...............................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
    575 U.S. 175 (2015).............................................................................24, 25

*Ostrolenk Faber LLP v. Genender Int'l Imps., Inc.,*
    2013 WL 1289130 (Ill. App. 2013) ....................................................49

*Pall v. KPMG, LLP,*
    2006 WL 2800064 (D. Conn. Sept. 29, 2006)...................................16

*Patterson v. Jump Trading LLC,*
    710 F. Supp. 3d 692 (N.D. Cal. 2024) ............................................ *passim*

*Perry v. Eastman Kodak Co.,*
    1991 WL 629728 (S.D. Ind. Apr. 22, 1991), *aff'd*, 1992 WL 103695 (7th Cir.
    1992) ....................................................................................................32

*Ploss v. Kraft Foods, Inc.,*
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ...............................................35, 36

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.,*
    679 F.3d 952 (7th Cir. 2012) ..............................................................28

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.,*
    2021 WL 1439680 (E.D. Va. Mar. 24, 2021).....................................24

*Praither v. Northbrook Bank & Tr. Co.,*
    192 N.E.3d 747 (Ill. App. 2021) .........................................................49

*Premier Cap. Mgmt., L.L.C. v. Cohen,*
    2003 WL 21960357 (N.D. Ill. Aug. 15, 2003) ...................................25

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.,*
    648 F.3d 533 (7th Cir. 2011) ..............................................................14

*PXP Producing Co. LLC v. MitEnergy Upstream LLC,*
    342 A.3d 402 (Del. Ch. 2025)..............................................................9

*Ray v. Citigroup Glob. Mkts., Inc.*,
  482 F.3d 991 (7th Cir. 2007) ...................................................................................30

*Roots P'ship v. Lands' End, Inc.*,
  965 F.2d 1411 (7th Cir. 1992) .................................................................................22

*Russello v. United States*,
  464 U.S. 16 (1983).................................................................................................17

*Searls v. Glasser*,
  64 F.3d 1061 (7th Cir. 1995) ..................................................................................26

*Sears v. Likens*,
  912 F.2d 889 (7th Cir. 1990) ....................................................................................9

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
  485 F. Supp. 3d 1113 (N.D. Cal. 2020) .............................................................26, 27

*SEC v. Binance Holdings Ltd.*,
  738 F. Supp. 3d 20 (D.D.C. 2024)........................................................................19, 20

*SEC v. Coinbase, Inc.*,
  726 F. Supp. 3d 260 (S.D.N.Y. 2024)........................................................................20

*SEC v. Ripple Labs, Inc.*,
  682 F. Supp. 3d 308 (S.D.N.Y. 2023)........................................................................20

*SEC v. Terraform Labs Pte. Ltd.*,
  708 F. Supp. 3d 450 (S.D.N.Y. 2023) (*Terraform II*)...............................................20

*SEC v. Terraform Labs*,
  684 F. Supp. 3d 170 (S.D.N.Y. 2023) (*Terraform I*)................................................21

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946)..............................................................................................19, 20

*SEC v. Wang*,
  944 F.2d 80 (2d Cir. 1991).........................................................................................18

*Soules v. Gen. Motors Corp.*,
  402 N.E.2d 599 (Ill. 1980).........................................................................................48

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
  552 U.S. 148 (2008).................................................................................................30

*Stoyas v. Toshiba Corp.*,
  896 F.3d 933 (9th Cir. 2018) ................................................................................11, 12

xi

*Stransky v. Cummins Engine Co.*,
  51 F.3d 1329 (7th Cir. 1995) ............................................................................26

*Sullivan & Long, Inc. v. Scattered Corp.*,
  47 F.3d 857 (7th Cir. 1995) .........................................................................31, 32

*Taylor v. McCament*,
  875 F.3d 849 (7th Cir. 2017) ..............................................................................7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)............................................................................................28

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
  451 U.S. 630 (1981)..............................................................................16, 17, 18

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979).............................................................................................17

*Tricontinental Indus., Ltd. v. PwC, LLP*,
  475 F.3d 824 (7th Cir. 2007) ............................................................................30

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023)............................................................................................37

*United States ex rel. John v. Hastert*,
  82 F. Supp. 3d 750 (N.D. Ill. 2015) .................................................................15

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
  836 F.3d 770 (7th Cir. 2016) ..............................................................................7

*United States ex rel. Suarez v. AbbVie, Inc.*,
  503 F. Supp. 3d 711 (N.D. Ill. 2020) ...............................................................46

*United States v. Am. Nat'l Bank & Tr. Co. of Chi.*,
  443 F. Supp. 167 (N.D. Ill. 1977) ....................................................................38

*Van Noppen v. InnerWorkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) ..........................................................24, 25

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
  20 F.3d 771 (7th Cir. 1994) ................................................................................8

*Weber v. E.D.&F. Man Int'l, Inc.*,
  1999 WL 35326 (N.D. Ill. Jan. 13, 1999).........................................................37

*Whiteford Plastics Co. v. Chase Nat'l Bank*,
  179 F.2d 582 (2d Cir. 1950)..............................................................................40

*Williamson v. Curran*,
   714 F.3d 432 (7th Cir. 2013) ........................................................................................7

*Zerger v. Midway Games, Inc.*,
   2009 WL 3380653 (N.D. Ill. Oct. 19, 2009)...............................................................22

## STATUTES

740 ILCS
   160/3(a).........................................................................................................................41
   160/3(b).........................................................................................................................41
   160/5(a)(1) ....................................................................................................................43
   160/5(a)(2) ....................................................................................................................41
   160/5(b).........................................................................................................................45

815 ILCS 505/10a(e)............................................................................................................14

7 U.S.C. § 25(c) ...................................................................................................................14

11 U.S.C.
   § 101(32)......................................................................................................................41
   § 103(a)........................................................................................................................40
   § 548(a)(1) ...................................................................................................................47
   § 548(a)(1)(A)..............................................................................................................43
   § 548(a)(1)(B)..............................................................................................................41
   § 548(a)(1)(B)(ii)(II)....................................................................................................41
   § 548(a)(1)(B)(ii)(III)...................................................................................................41

15 U.S.C.
   § 77b(a)(1) ...................................................................................................................19
   § 78i .............................................................................................................................17
   § 78i(a).........................................................................................................................33
   § 78i(a)(1).....................................................................................................................33
   § 78i(a)(2).....................................................................................................................33
   § 78i(a)(4).....................................................................................................................33
   § 78i(a)(5).....................................................................................................................33
   § 78i(a)(6).....................................................................................................................33
   § 78r ............................................................................................................................17
   § 78u-4(b)(2)(A) ..........................................................................................................28
   § 78u-4(e).....................................................................................................................18
   § 78u-4(f)(8)...........................................................................................................18, 19
   § 78u-4(f)(9).................................................................................................................19
   § 78u(d)(3) ...................................................................................................................17
   § 78u(d)(3)(A)..............................................................................................................18
   § 78u(d)(3)(A)(ii)..........................................................................................................18

28 U.S.C. § 1658(b)(1) ........................................................................................................14

42 U.S.C. § 9613(f)(1) ................................................................................................18

## OTHER AUTHORITIES

Alison Frankel, *Collapse of Stablecoin TerraUSD Sparks Bold Scheme Liability Suit*, Reuters (June 21, 2022), https://www.reuters.com/legal/transactional/collapse-stablecoin-terrausd-sparks-bold-scheme-liability-suit-2022-06-21/........................................................15

Paul Atkins, Chairman, SEC, *The SEC's Approach to Digital Assets: Inside "Project Crypto"*, (Nov. 12, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-111225-secs-approach-digital-assets-inside-project-crypto........................20

SEC & CFTC, *Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets*, Release Nos. 33-11412, 34-105020 at 23 (Mar. 17, 2026), https://www.sec.gov/files/rules/interp/2026/33-11412.pdf .....................................21

SEC Div. of Corp. Fin., *Statement on Stablecoins* (April 4, 2025), https://www.sec.gov/newsroom/speeches-statements/statement-stablecoins-040425................................................................................................................21

TMSL, Securities Act of 1933 Release No. 11349, SEC Administrative Proceeding File No. 3-22382 (Dec. 20, 2024) .............................................................6

**INTRODUCTION**

This lawsuit is a transparent attempt by Plaintiff Todd Snyder, administrator for the bankruptcy estate of Terraform Labs Pte. Ltd ("Terraform"), to shift the cost and blame for a multi-billion-dollar fraud committed by Terraform and its founder, Do Kwon. In June 2024, Terraform was assessed a $4.5 billion judgment following a trial in a Securities and Exchange Commission ("SEC") enforcement action arising from the collapse of its cryptocurrency ecosystem (the "Terra Ecosystem"). Kwon later was sentenced to fifteen years in federal prison for his role in the scheme.

Plaintiff brings this suit on behalf of the estate of the fraudster (Terraform), a related entity (the Luna Foundation Guard, "LFG"), and certain Terraform victims ("Crypto Loss Claimants") who are purported creditors of Terraform. Plaintiff concocts a host of claims designed to pass the buck of Terraform's liability to the SEC and Terraform's creditors from Terraform to Defendants.[1] Those claims wither as a matter of law upon even cursory review.

To start, Plaintiff sues eight distinct entities but defines them collectively as "Jump" and thereafter relies entirely on group pleading against "Jump" (or other collective terms he does not define, like "Jump Defendants," "Jump Crypto," and "Jump Trading"), failing to plead with particularity what any specific Defendant did. That baseline group-pleading failure is pervasive, warranting dismissal of all claims. *See* Section I. Moreover, the federal and Illinois statutory claims fail because the Complaint does not allege, respectively, domestic or Illinois-centered transactions reachable under the statutes he invokes. *See* Section II. And Plaintiff's contribution, Securities Exchange Act ("Exchange Act"), Commodity Exchange Act ("CEA"), and Illinois

---

[1] Defendants are Jump Trading, LLC ("JTLLC"); Jump Crypto Holdings LLC ("Jump Crypto Holdings"); Tai Mo Shan Limited ("TMSL"); Jump Financial, LLC ("Jump Financial"); J Digital 6 Cayman Ltd. ("JD6"); JDCP-7 QP LLC ("JDCP-7 QP"); Jump Operations, LLC ("Jump Operations"); and Jump Capital LLC ("Jump Capital") (collectively, the "Jump Defendants")—as well as Kanav Kariya (former President of Jump Crypto) and William DiSomma (co-founder of Jump Trading Group). ¶¶ 31–32. (¶ __ refers to the paragraphs in the Complaint, Dkt. 1).

Consumer Fraud Act ("ICFA") claims are untimely by months or even years. *See* Section III.

Beyond these cross-cutting flaws, Plaintiff's claims fail because the Complaint does not plead, and at times directly undermines, the requisite elements for each claim. Of Plaintiff's 25 causes of action, one (contribution for liability incurred in an SEC enforcement action) does not exist, while the rest fall far short of settled pleading requirements.

*First*, Plaintiff's claim on behalf of Terraform for contribution to offset the judgment imposed on it in the SEC enforcement action (Count 1) has never been recognized by any court presented with the issue. That is for good reason: It is at odds with the Exchange Act, foreclosed by governing precedent, and would undermine SEC enforcement by enabling fraudsters to recoup their ill-gotten gains. This Court should not be the first to recognize such a claim. *See* Section IV.

*Second*, as to Plaintiff's Exchange Act claims (Counts 17, 19), the Complaint does not adequately allege that the cryptocurrencies at issue, TerraUSD ("UST") and Luna, are securities. Even if he had, because Plaintiff does not allege the dates and prices of the Crypto Loss Claimants' purchases, he cannot satisfy the standing, reliance, or loss causation elements of those claims. Nor do Plaintiff's conclusory assertions that "Jump" acted with knowledge suffice to plead scienter under Rule 9(b) and the PSLRA. *See* Section V.

*Third*, like the Exchange Act claims, Plaintiff's CEA claims (Counts 21, 22) do not plead the requisite details of the relevant purchases. The CEA claims also fail because the Complaint does not plead with particularity any facts from which the Court could conclude that the Jump Defendants acted with manipulative intent or achieved a manipulated price, as opposed to simply doing what a good trader does: buying assets at prices below perceived value. *See* Section VI.

*Fourth*, Plaintiff's fraudulent conveyance claims on behalf of Terraform, the Crypto Loss Claimants, and LFG (Counts 4–15) under the Bankruptcy Code and the Illinois Uniform

2

Fraudulent Transfer Act ("IUFTA") fail. As an initial matter, Plaintiff lacks standing to bring most of those claims. In any event, the Complaint does not adequately allege insolvency for the constructive fraud claims, does not plead fraudulent intent for the actual fraud claims, and cannot square overlapping fraudulent transfer claims that are internally contradictory. *See* Section VII.

*Fifth*, Plaintiff's ICFA and common law claims on behalf of Terraform, LFG, and the Crypto Loss Claimants (Counts 2, 16, 23–25)—each sounding in fraud—are deficient for the same reasons as the federal claims, and further because the Complaint does not adequately plead facts showing additional elements specific to each of those claims. *See* Sections VIII–IX.

## **BACKGROUND**[2]

### I. THE TERRA ECOSYSTEM AND THE UST STABLECOIN

Plaintiff's claims concern the Terra Ecosystem, a decentralized cryptocurrency network developed by Terraform and Kwon. ¶¶ 43, 49. The Terra Ecosystem included the Terra blockchain and various digital assets, including UST and Luna. ¶¶ 44, 49.

In April 2019, Terraform created one billion units of Luna, the Terra blockchain's native token. ¶¶ 3, 44. In 2020, Terraform created UST as an algorithmic "stablecoin"—a digital asset designed to maintain the value of (or "peg" to) another asset. *Id.* Terraform intended UST's price to be pegged to $1, maintained by a "mint-burn" mechanism to control the supply of tokens by incentivizing market participants to "mint" or "burn" UST. ¶¶ 3, 40–41, 44.

The mechanism worked as follows. If UST was trading above $1, participants were incentivized to swap $1 worth of Luna to "mint" one UST, which they could then sell above $1 and profit from the difference. This would increase UST supply and put downward pressure on UST's price toward the $1 peg. ¶ 47. Conversely, if UST was trading below $1, market

---

[2] This motion, as it must, accepts as true the Complaint's well-pleaded factual allegations.

participants could profit by "burning" one UST in exchange for $1 worth of Luna and sell that Luna for $1, again profiting from the difference. This would reduce UST supply and put upward pressure on the price of UST toward the $1 peg. *Id.* This design contemplated that UST would deviate from the $1 peg and that, when it did, market participants would be incentivized to leverage the mint-burn mechanism in a manner that would drive UST back toward $1. ¶¶ 46–47.

To bolster its ecosystem, Terraform sought to increase Luna's liquidity and UST's use by engaging with trading firms, including the Jump Defendants, a common industry practice. ¶¶ 50, 54–55. In late 2019 and 2020, the Jump Defendants entered into agreements with Terraform under which they acquired Luna to trade and increase liquidity. ¶¶ 53–54.

Over a year later, UST experienced a "depeg," meaning it materially deviated from its peg. ¶ 59. On May 19, 2021, the price of UST declined, and by May 23, it dropped to nearly $0.90. ¶¶ 60, 67. The Jump Defendants took a long position, purchasing more UST than they sold in the expectation that the price would rise. ¶ 5. In all, the Jump Defendants purchased $58.9 million UST. ¶ 307. By May 27, UST returned to its peg, and the Jump Defendants profited $1.5 million from selling the UST they held. ¶¶ 60, 67, 307. UST did not depeg again until May 2022. ¶ 8.[3]

## II. TERRAFORM ESTABLISHES LFG TO HELP PROTECT UST'S PEG

After the May 2021 depeg, Terraform publicly sought to establish a reserve of assets to be deployed in the event of future depeg events. ¶¶ 77–78. Terraform, through Kwon, created LFG, an independent, non-profit Singaporean entity intended to oversee and administer the reserve, which could be deployed to stabilize UST during periods of market stress. ¶¶ 20, 78. LFG

---

[3] In this section, and throughout this motion, the Jump Defendants repeat Plaintiff's generalized allegations that all of the Jump Defendants engaged in the conduct described in the allegations, including market-making and entering into various agreements with Terraform, but the Jump Defendants dispute the characterizations and note the Complaint offers no well-pleaded facts to establish their truth.

publicized its purpose as promoting ecosystem resilience.  ¶¶ 163, 190.  Defendant Kariya, then-President of Jump Crypto, supported this effort, including by sitting on LFG's "Governing Council," which also included Kwon and others.  ¶¶ 31, 78.

From January–April 2022, Terraform funded LFG through a series of Luna and UST transfers to LFG.  ¶¶ 79–80.  LFG converted those holdings into other cryptocurrencies to create a diversified reserve that could be deployed to support UST during depeg events to advance LFG's stated purpose, including via separate sales of $330 million and $20 million worth of "locked" Luna to certain Jump Defendants, both in exchange for Bitcoin.  ¶¶ 82–83.[4]

The Jump Defendants and Kariya publicly supported LFG's reserve as a backstop to defend UST's peg when market participants' use of the "mint-burn" mechanism alone could not.  ¶ 84.  On February 22, 2022, the "Jump Crypto" X account posted: "The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility."  *Id*.  LFG's press release announcing the reserve quoted Kariya as stating, "UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin [UST]," and as comparing the reserve system to "how many central banks hold reserves of foreign currencies."[5]  From his own X account, Kariya reiterated: "$1B to absorb liquidity crunches … LFG has a broad mandate, and we're excited to support it."  ¶ 86.  He described LFG again on a podcast a week later: "LFG holds a billion dollars of Bitcoin … And it's basically meant to take out these extreme spikes and

---

[4] Where a digital token is "locked," it cannot immediately be sold.  Rather, the token can only be sold as it "unlocks" in set quantities over a specified period.  In the case of the "locked" Luna that LFG sold to the Jump Defendants and other third parties, the Luna "unlocked" over the course of several years.  ¶ 83.

[5] ¶ 85; Ex. 1, *Luna Foundation Guard (LFG) Raises $1 Billion for a Bitcoin-Denominated Forex Reserve for Terra's UST Stablecoin*, PRWeb (Feb. 22, 2022), https://www.prweb.com/releases/luna-foundation-guard-lfg-raises-1-billion-for-a-bitcoin-denominated-forex-reserve-for-terra-s-ust-stablecoin-829611467.html.  The Complaint "mentions" and quotes the press release, so the Court may consider it here.  *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012).

inject liquidity into the book and allow markets to consolidate again around new prices, when there are extreme price movements, which do happen every sometime [sic]." ¶ 87.

## III. DESPITE LFG'S AND THE JUMP DEFENDANTS' EFFORTS TO DEFEND THE PEG, UST COLLAPSES

The price of UST again began to deviate from its $1 peg on May 7, 2022. ¶ 91. As UST's value declined over the ensuing days, LFG transferred Bitcoin (52,189 Bitcoin with a market value of nearly $2 billion) to the Jump Defendants, who used the proceeds to purchase UST in an effort to defend the peg. ¶¶ 92, 94, 96–97. Despite these efforts, the Terra Ecosystem collapsed. ¶ 104.

## IV. THE SEC AND DOJ CHARGE TERRAFORM AND KWON, BUT NOT ANY DEFENDANT HERE

Following the Terra Ecosystem's collapse, the SEC sued Terraform and Kwon, and a jury found both liable for intentionally and recklessly defrauding purchasers of UST and Luna, among other civil offenses. ¶ 109; Ex. 2, Verdict, *SEC v. Terraform Labs Pte. Ltd.*, 1:23-cv-01346 (S.D.N.Y. Apr. 5, 2024), Dkt. 229. Terraform and Kwon then settled with the SEC, with Terraform required to pay approximately $4.5 billion. ¶¶ 2, 9, 123. Separately, the U.S. Department of Justice ("DOJ") charged Kwon with nine counts of criminal fraud, conspiracy, market manipulation, and money laundering, to which he pleaded guilty and was sentenced to fifteen years in prison. ¶¶ 2, 110. Seven days after the sentencing hearing, Plaintiff filed this suit.

The SEC investigated Defendant TMSL but chose not to include it (or any other Defendant here) in the enforcement action against Terraform and Kwon. ¶¶ 109–112. TMSL settled with the SEC for $123 million in December 2024, resolving allegations (without admission) that it acted as an unregistered statutory underwriter with respect to offers and sales of Luna and acted negligently during the 2021 depeg. ¶ 10; Ex. 3, TMSL, Securities Act of 1933 Release No. 11349,

6

SEC Administrative Proceeding File No. 3-22382 (Dec. 20, 2024).[6]  The SEC did not charge TMSL with intentional fraud, nor did TMSL's settlement reference any such conduct.  *Id.*

Facing escalating liabilities and costs, Terraform filed for bankruptcy on January 21, 2024.  ¶ 109.  The Bankruptcy Court appointed Plaintiff as the Plan Administrator to carry out and implement all provisions of the reorganization plan for Terraform.  ¶ 16.

## LEGAL STANDARD

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true but is not bound by legal characterizations assigned thereto.  *See O'Gorman v. City of Chicago*, 777 F.3d 885, 888–91 (7th Cir. 2015).  Under Rule 12(b)(1), dismissal is required if the Court lacks subject matter jurisdiction.  *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017).  Under Rule 12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face,'" such that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Claims "premised upon a course of fraudulent conduct" must satisfy Rule 9(b) regardless of whether fraud is a formal element of the claim, *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), and must "state with particularity the circumstances constituting fraud," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016).

## ARGUMENT

**I.      ALL CLAIMS AGAINST THE JUMP DEFENDANTS SHOULD BE DISMISSED ON GROUP PLEADING GROUNDS (1, 2, 4–17, 19, 21–25)[7]**

The claims against the eight Jump Defendants—defined collectively as "Jump" and

---

[6] The Court "may consider" the order because it is "subject to judicial notice" as a public SEC filing.  *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

[7] Numbers in Section headings refer to the count numbers in the Complaint.  For quoted material, unless otherwise noted, all emphasis is added and internal citations and quotation marks are omitted.

variously referred to in the Complaint as "Jump," "Jump Trading," "Jump Trading Group," "Jump Crypto," and "Jump Defendants," *e.g.*, ¶¶ 4–7, 31–32, 124, 151, 162, 243–247, 250–251, 257, 315, 321–324, 342–343, 357–358, 403–404—should be dismissed on group pleading grounds for failure to allege specific conduct by any specific entity. Even under Rule 8(a)'s notice-pleading standard, each defendant is entitled to know its specific conduct alleged to be wrongful, and a "complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). The standard is higher where, as with all claims against the Jump Defendants, a claim is "premised upon a course of fraudulent conduct" and thus subject to Rule 9(b).[8] *Borsellino*, 477 F.3d at 507. To satisfy Rule 9(b), a plaintiff must allege "who, what, when, where, and how" as to each defendant's "alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994). "[L]ump[ing] together multiple defendants" without "specify[ing] who was involved in what activity" does not suffice. *Id.* at 778. The PSLRA imposes a similarly stringent standard for Exchange Act claims, requiring a plaintiff to "state with particularity" the facts establishing scienter "with respect to each individual defendant" and forbidding group pleading in "multiple defendant cases." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 600–02 (7th Cir. 2019).

The Complaint violates these requirements at every turn. The overwhelming majority of its 493 paragraphs fail to identify which entity engaged in which alleged conduct. Specific

---

[8] ¶¶ 118–140, 316–338 (Counts 1 and 17 under Exchange Act § 10(b) and Rule 10b-5, premised on "devices and schemes to defraud"), ¶¶ 362–388 (Count 19 for market manipulation under the Exchange Act, premised on a "false or misleading appearance regarding … active trading"), ¶¶ 141–151 (Count 2 for aiding and abetting breach of fiduciary duty, premised on "fraudulent scheme"), ¶¶ 303–315, 477–485 (Counts 16 and 24 for unjust enrichment, premised on "fraudulent conduct and market manipulation" and "fraudulent scheme"), ¶¶ 410–459 (Counts 21 and 22 under CEA for market manipulation and aiding and abetting market manipulation, premised on "manipulative device, scheme, or artifice to defraud"), ¶¶ 460–476 (Count 23 under ICFA), ¶¶ 486–493 (Count 25 for fraudulent misrepresentation), ¶¶ 161–302 (Counts 4–15 for actual and constructive fraudulent transfer).

references to individual entities are rare and, in any event, fall well short of the mark. Three entities (Jump Financial, Jump Crypto Holdings, and JTLLC) are merely identified as "Defendant[s]" and never again referenced in any factual allegations. ¶¶ 21–32.[9] And the remaining five entities (TMSL, JD6, JCDP-7 QP, Jump Capital, and Jump Operations) are mentioned only in passing with no allegations about how each participated in any alleged wrongdoing.[10]

Further, in reciting its 25 counts, the Complaint defaults entirely to collective pleading against "Jump" or "all Defendants." *E.g.*, ¶¶ 118–151, 161–338, 362–388, 410–493. That is precisely the type of group pleading that Rule 8(a), Rule 9(b), and the PSLRA forbid. *See Atkins v. Hasan*, 2015 WL 3862724, at *2–3 (N.D. Ill. June 22, 2015) (Rule 8(a)); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (Rule 9(b)); *Cornielsen*, 916 F.3d at 600 (PSLRA).

The Complaint's allusion to a potential alter-ego theory does not cure this defect. *E.g.*, ¶¶ 25–26, 29–30. Under Delaware law,[11] "[v]eil piercing is a tough thing to plead and a tougher thing to get, and for good reason." *PXP Producing Co. LLC v. MitEnergy Upstream LLC*, 342 A.3d 402, 416–17 (Del. Ch. 2025). To allege veil-piercing, Plaintiff must plead facts showing that

---

[9] The Complaint attributes a February 2022 X thread about UST to "Jump Crypto," but pleads no facts tying the account to any specific Jump Defendant. ¶¶ 84, 131, 329, 351, 379, 398, 427, 452, 469. The Complaint alleges that "Jump Trading" received 52,189 Bitcoin from LFG in May 2022, but never specifies which specific Jump Defendant is alleged to have received those transfers. ¶¶ 166, 179, 192, 204, 212, 220, 232, 246, 260, 268, 281, 293, 310.

[10] TMSL appears only in connection with an SEC investigation and its $123-million settlement in December 2024. ¶¶ 112–116, 139, 392. JD6 and JCDP-7 QP are alleged to be counterparties to two January 2022 token sale agreements with LFG. ¶¶ 25–26, 83. Jump Capital allegedly "reached out" to Terraform in late 2019, appeared in an LFG resolution about buying Bitcoin "through Jump Capital," and supposedly "used LFG funds to attempt to restore the UST peg in May 2022." ¶¶ 28, 51, 83. Jump Operations merely "first explored a potential business relationship with Terraform in 2019." ¶ 27.

[11] Under the internal affairs doctrine, the law of the place of incorporation controls the corporate veil-piercing analysis. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016). Six Jump Defendants are Delaware companies and two are Cayman Islands companies. ¶¶ 21–29. Cayman veil-piercing law is "equally—if not more—stringent than … Delaware." *Glob. Gaming Phil., LLC v. Razon*, 2022 WL 836716, at *7 (S.D.N.Y. Mar. 21, 2022). For this motion, the Jump Defendants apply Delaware law, because Plaintiff's conclusory allegations fail under either standard.

the corporation, through its alter-ego, created a sham entity designed to defraud investors and creditors. *Eagle Air Transp., Inc. v. Nat'l Aerotech Aviation Del., Inc.,* 75 F. Supp. 3d 883, 896 (N.D. Ill. 2014). The corporate form may be disregarded only in exceptional cases, where the court finds an element of fraud as well as factors including "whether corporate formalities were observed; whether the controlling shareholder siphoned company funds; or whether, in general, the company simply functioned as a facade for the controlling shareholder." *Id.* (cleaned up).

Plaintiff's alter-ego allegations fall short. The Complaint offers nothing more than legal conclusions about "unity of interest and ownership" as to five Jump Defendants—JTLLC, JD6, JCDP-7 QP, Jump Operations, and Jump Capital—summarily stating that "Jump used these entities to commingle funds and assets across its business, shared corporate officers amongst them, failed to maintain arms-length relationships between them, and employed each one as a mere facade for Jump itself." ¶ 30. That argument is circular: "Jump" is defined as the collective of the Jump Defendants that Plaintiff argues "Jump" is using as a façade. Under that telling, "Jump" is both puppet and puppet master. More significantly, "[P]laintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence." *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *11 (Del. Ch. Dec. 30, 2010).

In sum, each claim against the Jump Defendants should be dismissed because the Complaint's pervasive group pleading violates Rule 8(a), Rule 9(b), and/or the PSLRA.

## II. PLAINTIFF'S FEDERAL AND STATE STATUTORY CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL (4–15, 17, 19, 21–23)

The Exchange Act, CEA, and Bankruptcy Code statutes underlying Plaintiff's federal statutory claims do not apply extraterritorially. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255, 265 (2010). The IUFTA and ICFA do not reach conduct that occurs outside of Illinois.

10

*See Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852–53 (Ill. 2005).  Because Plaintiff fails to plead domestic conduct for the federal claims or in-state conduct for the Illinois claims, those claims should be dismissed.  *See Stoyas v. Toshiba Corp.*, 896 F.3d 933, 952 (9th Cir. 2018) (dismissal proper where plaintiff did not "sufficiently allege" domestic Exchange Act violation).

A. **The Federal Securities, Commodities, and Bankruptcy Statutes Do Not Apply to Transactions Outside the United States, and Plaintiff Does Not Allege Domestic Transactions (10–15, 17, 19, 21–22)**

Federal statutes have only domestic application unless Congress clearly expresses a contrary intent.  *See Morrison*, 561 U.S. at 255.  A two-step analysis determines whether a claim is impermissibly extraterritorial.  The first step asks whether the statute "affirmatively and unmistakably" applies "to foreign conduct."  *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417–18 (2023).  If the answer is no, the second step asks "whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision."  *Id.* at 418.  The answer to that question turns on whether the "activity that matters" under the provision occurred in the United States.  *Id.* at 419.  Here, the federal statutes at issue do not unmistakably apply to foreign conduct, and Plaintiff's claims do not seek a permissible domestic application.

1. **Exchange Act and CEA Counts (17–22)**

The Exchange Act conveys no "clear indication of an extraterritorial application" and thus does not have extraterritorial application.  *Morrison*, 561 U.S. at 255, 262, 266–67.  The CEA provisions Plaintiff invokes are likewise "silent as to extraterritorial reach" and thus apply only domestically.  *Loginovskaya v. Batrachenko*, 764 F.3d 266, 271 (2d Cir. 2014).  Plaintiff must therefore "sufficiently allege a domestic violation" of each provision.  *Stoyas*, 896 F.3d at 952; *see also Loginovskaya*, 764 F.3d at 268.  To establish a domestic focus for the Exchange Act and CEA claims, Plaintiff "must allege facts indicating that irrevocable liability was incurred or that title was transferred within the United States."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677

11

F.3d 60, 62 (2d Cir. 2012) (Exchange Act); *see also Loginovskaya*, 764 F.3d at 273–74 (CEA).

The Complaint does not speak at all to the situs of the pertinent events: "contract formation, placement of purchase orders, passing of title, and the exchange of money." *Stoyas*, 896 F.3d at 949. In fact, the only reference to a trading venue in the Complaint—KuCoin—points abroad, as KuCoin is a foreign exchange. ¶ 65. Moreover, UST and Luna were created and issued by a Singaporean entity (Terraform Labs Pte. Ltd.). ¶¶ 20, 65.

That some (but not all) of the Jump Defendants and the Crypto Loss Claimants reside in the United States does not turn foreign transactions into domestic ones. Where trades occur on a foreign exchange, the location of the purchaser or seller is alone insufficient to establish a domestic transaction. *See Absolute Activist*, 677 F.3d at 68; *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 & n.33 (2d Cir. 2014) ("plac[ing] a buy order" from United States insufficient for domestic application of Exchange Act). Because Plaintiff does not allege a domestic transaction in UST or Luna, his Exchange Act and CEA claims fail.

### 2. Bankruptcy Code Fraudulent Transfer Counts (10–15)

"Nothing in the language of sections … 548 and 550 of the Bankruptcy Code suggests that Congress intended those provision[s] to apply to foreign transfers." *In re CIL Ltd.*, 582 B.R. 46, 84–85 (Bankr. S.D.N.Y. 2018). The "majority of cases" thus hold that Section 548 does not have extraterritorial application. *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020) (collecting cases). Accordingly, Plaintiff must plead that the challenged "initial transfer"[12] was "domestic." *In re Ampal-Am. Isr. Corp.*, 562 B.R. 601, 613–14 (Bankr. S.D.N.Y. 2017).

That analysis turns on several factors, including the parties' locations, where the transfers

---

[12] Counts 10, 11, 13, and 14 allege the Terraform-to-LFG transfer was the initial transfer, while counts 12 and 15 allege the LFG-to-"Jump Trading" transfer was the initial transfer.

originated and ended, the source of funds, and any contracts governing the transfer. *See Zetta*, 624 B.R. at 489–90. The Complaint offers nothing on those scores. While it identifies "Jump Trading" as either a transferee or, in the alternative, as the "immediate or mediate transferee of the initial transferee, LFG," ¶¶ 236–237, 250–251, 264, 277, 290, 301, it does not identify the source of funds (*e.g.*, the location of the sending or receiving bank account or cryptocurrency wallet) or where the transaction was processed (*e.g.*, the location of the servers).

In fact, the fraudulent transfer allegations can only be read to describe foreign conduct. The Terraform-to-LFG UST and Luna transfers from January–April 2022 involved Singaporean and British Virgin Islands transferors (Terraform Labs Pte. Ltd. and Terraform Labs Limited) and a Singaporean transferee (LFG). ¶¶ 20, 79. As to the May 2022 LFG-to-"Jump" (or "Jump Trading", as Plaintiff variously alleges) Bitcoin transfers, LFG is based in Singapore, ¶¶ 20, 253–265, 292–302, and the Complaint does not say whether "Jump" or "Jump Trading" refers to a particular defendant, *supra* § I, let alone plead that defendant's location.

### B. The IUFTA and ICFA Do Not Apply to Transactions Outside of Illinois, and Plaintiff Does Not Allege Illinois Transactions (4–9, 23)

The IUFTA and the ICFA do not apply to transfers or transactions outside of Illinois. *See Armada (Sing.) Pte. Ltd v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 757–58 (N.D. Ill. 2017) (IUFTA); *Avery*, 835 N.E.2d at 853 (ICFA). Plaintiff must therefore plead that the conduct underlying the IUFTA and ICFA claims—namely, the "disputed transaction[s]" or transfers— occurred "primarily and substantially" in Illinois. *Avery*, 835 N.E.2d at 854.

This requirement is not satisfied where, as here, a complaint either (i) says nothing about whether the disputed transaction occurred in Illinois (Counts 4–9) or (ii) makes conclusory allegations that the defendants "acted in Illinois … when they orchestrated and received" assets, where "the transactions at issue involved the transfer of assets between and among a number of

13

foreign entities" and the benefits were "reaped by" persons "not alleged to be citizens of Illinois." *Armada*, 244 F. Supp. 3d at 757; *see* ¶ 463. Just as Plaintiff fails to plead that any alleged transaction by the Crypto Loss Claimants or any fraudulent transfer occurred in the United States, *supra* § II.A., he also fails to allege that any such transaction or transfer occurred in Illinois.

## III. THE EXCHANGE ACT, CEA, AND ICFA CLAIMS ARE UNTIMELY (17, 19, 21–23)

The Exchange Act, CEA, and ICFA claims should be dismissed because "it is clear from the face of the … complaint that [they are] hopelessly time-barred." *LJM Partners, Ltd. v. Barclays Cap., Inc.*, 165 F.4th 552, 562 (7th Cir. 2026). The federal claims are subject to a two-year statute of limitations, *see* 28 U.S.C. § 1658(b)(1); 7 U.S.C. § 25(c), while the ICFA claim is subject to a three-year statute of limitations, *see* 815 ILCS 505/10a(e). Each limitations period "begins to run when the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646–48, 653 (2010) (Exchange Act); *see LJM Partners*, 165 F.4th at 563 (CEA);[13] *Horan v. Ford Motor Co.*, 2026 WL 395630, at *8 (N.D. Ill. Feb. 12, 2026) (ICFA). At a minimum, a reasonably diligent plaintiff would have discovered "all of the facts needed to make out a claim of fraud" once those facts "were in the public domain." *Premium Plus Partners*, 648 F.3d at 537 (emphasis omitted).

Plaintiff's Exchange Act, CEA, and ICFA claims were "hopelessly time-barred" when he filed this suit on December 18, 2025. *LJM Partners*, 165 F.4th at 562. A reasonably diligent plaintiff would have discovered the facts underlying those claims no later than June 17, 2022, when a different plaintiff filed a putative class action accusing Jump Crypto Holdings, JTLLC,

---

[13] For present purposes, the Jump Defendants assume that the Exchange Act discovery rule applies to the CEA claims, although the Seventh Circuit has suggested the CEA's limitations period begins earlier, when "the investor discovers that he has been injured," rather than when he learns the facts of each element of the claim. *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 536 (7th Cir. 2011).

and Terraform (among others) of securities fraud. *See* Ex. 4, Compl., *Patterson v. Jump Trading LLC*, 5:22-cv-03600 (N.D. Cal. June 17, 2022), Dkt. 1. The *Patterson* complaint alleged—and thus "made public"—the same facts and conduct that Plaintiff here alleged three-and-a-half years later.[14] *Landsberger v. Martek Biosciences Corp.*, 2010 WL 3038947, at \*4 (D. Md. July 30, 2010) (relying on prior "class action" to show that "events complained of were matters of public record"). Reuters also discussed the suit days after it was filed.[15] And one Crypto Loss Claimant here, Shing Yiu Ng, moved for appointment as lead plaintiff in *Patterson*. *Compare* Ex. 5, Ng. Mot. For Appointment as Lead Pl. & Approval of Lead Counsel, *Patterson v. Terraform Labs, Pte.*, No. 5:22-cv-03600 (N.D. Cal. Aug. 19, 2022), Dkt. 28, *with* Compl. App. A at 2.

Because *Patterson* put in the public domain the alleged facts underlying Plaintiff's Exchange Act, CEA, and ICFA claims, the limitations period expired for the federal claims on June 17, 2024, and the ICFA claim on June 17, 2025. Those claims thus are barred as untimely.

---

[14] *Compare* Ex. 4, Compl., *Patterson*, No. 5:22-cv-3600, Dkt. 1 ¶ 5 (alleging that Jump Crypto "promote[d] the stability of UST and misl[ed] investors into believing that … the Luna Foundation Guard's reserve pool would be sufficient to defend the peg"), ¶ 60 (alleging February 2022 announcement of LFG and citing press release discussing $1B private token "sales led by Jump Crypto and Three Arrows Capital"), ¶ 100 (challenging Kariya's "'mass exodus'" statement), ¶ 107 (noting Kariya's statement that the reserve "'further strengthen[ed] confidence in the peg'" under "'stressful conditions'"), ¶¶ 124–125 (in May 2022, the "death spiral began" and "structural vulnerabilities within the Terra ecosystem precipitated a massive selloff of both UST and Luna"), *with* ¶¶ 77–90 (alleging that "Kwon and Jump Form [LFG] to Further Mislead Investors"), ¶¶ 85–86 (noting Kariya's statement that the reserve would "'further strengthen confidence in the peg'"), ¶ 127 ("Jump continued to make false public statements touting the inherent stability of the Terraform ecosystem …."), ¶ 350 (challenging Kariya's "mass exodus" statement), ¶ 9 ("The May 2022 depeg turned into a 'death spiral' that decimated Terraform ….").

[15] *See* Ex. 6, Alison Frankel, *Collapse of Stablecoin TerraUSD Sparks Bold Scheme Liability Suit*, Reuters (June 21, 2022), https://www.reuters.com/legal/transactional/collapse-stablecoin-terrausd-sparks-bold-scheme-liability-suit-2022-06-21/. The Court may take judicial notice of this and all news articles and public releases submitted as exhibits for the fact that the information therein was publicly disclosed. *See United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015) ("We can properly take judicial notice of the Tribune articles attached to [the] motion to dismiss to conclude that the information contained in [the] complaint has previously been publicly disclosed and was in the public realm.").

IV.     **PLAINTIFF CANNOT SEEK CONTRIBUTION FOR TERRAFORM'S LIABILITY TO THE SEC (1)**

There is no "general right to contribution under federal law." *Musick, Peeler & Garrett v. Emp. Ins. of Wausau*, 508 U.S. 286, 290 (1993). Instead, "a federal contribution action is virtually always a creature of a specific statutory regime." *Guam v. United States*, 593 U.S. 310, 316 (2021). The Jump Defendants have not identified a single instance of a court, having been presented with the issue, recognizing a cause of action for contribution for liability incurred from an SEC enforcement action under Section 10(b) of the Exchange Act, and it would be contrary to established Supreme Court and Seventh Circuit precedent for this Court to be the first. Further, even if such a contribution claim existed in the abstract, Plaintiff's claim would still fail because (i) it is untimely and (ii) the Jump Defendants are not jointly liable for Terraform's violations.

A.      **There Is No Right of Action for Contribution for Defendants Found Liable in SEC Enforcement Actions**

"[P]laintiff has cited no authority [recognizing] a federal cause of action for contribution based on a fine paid to the SEC." *Pall v. KPMG, LLP*, 2006 WL 2800064, at *3 n.3 (D. Conn. Sept. 29, 2006). The Complaint cites *Musick*, ¶ 121, but nothing in that case establishes a contribution cause of action—rather, it shows that there is none. In *Musick*, a pre-PSLRA case, the Supreme Court recognized an implied right of contribution for defendants found liable under the Rule 10b-5 *implied* private right of action. 508 U.S. at 298. The Court reasoned that, because it had previously implied a private cause of action under Rule 10b-5, it had the authority to answer the "ancillary" question of how "to allocate" liability for such a claim. *Id*. at 292.

The Court contrasted the case with two others—*Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77 (1981), and *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981)— which declined to create an implied right of action for contribution. As the Court explained, *Northwest Airlines* and *Texas Industries* involved "*express*" "statutory

16

provisions that … creat[ed] the substantive damages liability for which contribution was sought." *Musick*, 508 U.S. at 290–91 (citing *Nw. Airlines*, 451 U.S. 77 (Equal Pay Act of 1963 and Title VII) and *Tex. Indus.*, 451 U.S. 630 (Sherman Act)). Unlike the implied right of action under Rule 10b-5, and like the rights of action at issue in *Northwest Airlines* and *Texas Industries*, SEC enforcement actions are specifically authorized by statute and governed by "express remedial provision[s] fashioned by Congress." *Id.* at 290–92. Accordingly, while Congress left it to the courts to shape the contours of Rule 10b-5's implied private right of action, *id*. at 293, Congress did not do so for SEC enforcement actions. Rather, it expressly defined the scope of liability for such actions by authorizing the SEC to seek injunctions, disgorgement, and civil penalties—and *not* setting forth any contribution right for defendants. *See* 15 U.S.C. § 78u(d)(3).

*Musick* forecloses an implied contribution right here, as does Seventh Circuit precedent, which imposes a "strong presumption … against the creation of such implied rights of action." *Chi. Tchrs. Union, Local 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 530 (7th Cir. 2025). To overcome this presumption, a statute must "display[] an intent to create … a private remedy." *Id.* at 529 (second omission in original).

Under settled interpretive principles, the Exchange Act does not reflect an intent to create a contribution remedy for defendants in SEC enforcement actions. "When Congress wished to provide" a contribution right, "it knew how to do so and did so expressly." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979). As *Musick* observed, Congress included contribution rights for two express private causes of action under the Exchange Act. 508 U.S. at 295 (citing 15 U.S.C. §§ 78i, 78r). But Congress "omit[ted]" such rights for SEC enforcement actions under the "same Act," and such "disparate … exclusion" must be viewed as "intentional[]." *Russello v. United States*, 464 U.S. 16, 23 (1983). Moreover, "the continuing existence of" the Exchange Act"—for

17

92 years and counting—"without amendments authorizing contribution" for liability incurred in SEC enforcement actions is significant. *Tex. Indus.*, 451 U.S. at 645. This is especially so because the PSLRA amended the Exchange Act to provide a contribution claim in a "private action," 15 U.S.C. § 78u-4(f)(8), but not for liability incurred in an SEC enforcement action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174–75 (2009). Moreover, Congress knows how to authorize contribution rights for liability incurred in federal enforcement actions, *see, e.g.*, 42 U.S.C. § 9613(f)(1) (contribution right for liability in "any civil action" enforcing CERCLA), and its choice not to do so for SEC enforcement actions should be given effect.

Furthermore, a contribution right would upend, not advance, the Exchange Act's statutory scheme. The purpose of an SEC Rule 10b-5 enforcement action is to deprive a defendant of "unjust enrichment," 15 U.S.C. § 78u(d)(3)(A)(ii)—not to allow a plaintiff to recover for a loss.[16] *Compare* 15 U.S.C. § 78u(d)(3)(A) *with* 15 U.S.C. §§ 78u-4(e) (measuring damages in private actions by plaintiffs' losses), (4)(f) (providing for joint and several liability in private actions). Permitting Plaintiff on behalf of Terraform to pursue contribution for its SEC enforcement liability would, in effect, enable Terraform to claw back some of its own "ill-gotten gains," undermining the "deterrence objectives of the securities laws." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

### B. Even if a Contribution Claim Were Available, Plaintiff's Claim Still Fails

Even if an implied cause of action for contribution for SEC enforcement liability were theoretically available, Plaintiff's claim would still fail for two independent reasons.

*First*, the claim is untimely. Courts do not assume "that Congress intended that there be no time limit on [implied] actions," but rather "'borrow' the most suitable statute or other rule of

---

[16] Here, the SEC obtained disgorgement from Terraform of net profits (including interest) of $4,053,828,306 and a civil penalty of $420,000,000 based upon Terraform's ill-gotten gains. *See* Ex. 7, Final Judgment, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. June 12, 2024), Dkt. 273.

timeliness" from another source. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). Following enactment of the PSLRA, contribution claims "for damages in any private action" are subject to a six-month statute of limitations. *See* 15 U.S.C. §§ 78u-4(f)(8), (9). This limitations period for "comparable" claims, including contribution claims, "end[s]" the inquiry. *Asdar Grp. v. Pillsbury, Madison and Sutro*, 99 F.3d 289, 293 (9th Cir. 1996). Because judgment in the SEC action was entered against Terraform on June 12, 2024, *see* ¶ 123; Ex. 7, Final Judgment (*Terraform*), Plaintiff needed to assert his contribution claim by December 12, 2024. He did not.

*Second*, the Jump Defendants do not share "joint liability" for Terraform's underlying "wrong," as required to state a contribution claim. *Musick*, 508 U.S. at 292. As shown below, *infra* § V.B., Plaintiff does not adequately plead that the Jump Defendants were jointly liable with Terraform under Section 10(b) of the Exchange Act or Rule 10b-5.

## V. THE EXCHANGE ACT CLAIMS FAIL (17, 19)

### A. Federal Securities Laws Do Not Apply Because Plaintiff Does Not Allege an Investment Contract Involving UST or Luna

Plaintiff's Exchange Act claims rest on the premise that the Crypto Loss Claimants' transactions in UST and Luna were transactions in securities. ¶ 320. That premise is wrong.

Because UST and Luna are not "stock[s]" or another instrument enumerated in the definition of "security," Plaintiff must plausibly allege that the transactions here were "investment contract[s]." 15 U.S.C. § 77b(a)(1). To do so, Plaintiff must allege, for each transaction, "[1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946). Whether a transaction in an "intangible digital asset[]" is an investment contract turns on "the economic reality of the particular transaction, based on the entire set of contracts, expectations, and understandings of the parties." *SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 44, 54 (D.D.C. 2024).

Plaintiff does not allege the necessary facts. He describes UST and Luna as "crypto asset securities," ¶ 412, ignoring that courts reject the proposition that a crypto asset "itself" is a "'security.'" *Binance*, 738 F. Supp. 3d at 44, 55–57 (SEC's use of phrase "crypto asset securities" to suggest that "crypto assets" were "securities" "muddied the issues before the Court [and] ignored the Supreme Court's directive");[17] *see also SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023) (digital token "is not in and of itself" a security); *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 281 (S.D.N.Y. 2024) ("tokens, in and of, themselves, are not securities").[18] Indeed, Judge Rakoff recognized this principle in the context of UST, holding that "UST on its own was not a security." *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 472 (S.D.N.Y. 2023) (*Terraform II*). Instead, whether a transaction in UST or Luna "constitutes an offer or sale of an investment contract would depend on the totality of circumstances and the economic reality of that specific contract, transaction, or scheme." *Ripple Labs*, 682 F. Supp. 3d at 328–29 & n.16 (blind bid-ask transactions on exchanges were not investment contracts). Plaintiff's failure to plead essential facts about when, where, or with whom any Crypto Loss Claimant transacted (among other critical facts) is fatal, as he makes no allegations from which this Court could conclude that the alleged transactions involved investment in a common enterprise based on the expectation of profits from the efforts of others. ¶ 320; *Howey*, 328 U.S. at 301.

Plaintiff may respond that two courts have held that certain UST and Luna transactions

---

[17] In response to the *Binance* court's order, the SEC apologized for its misleading use of the phrase "crypto asset securities" that Plaintiff deploys in the Complaint (¶¶ 412, 437). Ex. 8, Mem. in Supp. of Mot. for Leave to Am. Compl. at 24 n.6, *SEC v. Binance Holdings Ltd.*, No. 1:23-cv-01599 (D.D.C. Sept. 12, 2024), Dkt. 273-1. The SEC conceded it was "not referring to the crypto asset itself as the security," and noted it "regrets" any "confusion" its use of the phase "may have invited." *Id*.

[18] The current SEC chair has expressed the same view. *See* Ex. 9, Paul Atkins, Chairman, SEC, *The SEC's Approach to Digital Assets: Inside "Project Crypto"*, at 2 (Nov. 12, 2025), https://www.sec.gov/newsroom/speeches-statements/atkins-111225-secs-approach-digital-assets-inside-project-crypto ("I believe that most crypto tokens trading today are not themselves securities.").

were investment contracts. *See SEC v. Terraform Labs*, 684 F. Supp. 3d 170, 195–98 (S.D.N.Y. 2023) (*Terraform I*); *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710–11 (N.D. Cal. 2024). But Plaintiff pleads none of the facts underlying those courts' investment-contract analyses, and he cannot rely on other courts' opinions addressing differently pleaded complaints to overcome his own pleading deficiencies. That is especially so given that *Terraform* (and by extension *Patterson*, which relied on *Terraform*) cautioned that the *Howey* analysis can evolve over time and expressly grounded its holding that UST and LUNA are securities on the prevalence of the Anchor Protocol, a component of the Terra Ecosystem, at the time of the Terra Ecosystem's collapse in May 2022. *Terraform I*, 684 F. Supp. 3d at 194 ("The fact that, for example, the Anchor Protocol did not exist at the time UST and LUNA were first launched is therefore immaterial. A product that at one time is not a security may, as circumstances change, become an investment contract that is subject to SEC regulation."); *Patterson*, 710 F. Supp. 3d at 711 (citing *Terraform I*). Plaintiff here makes no such allegations, but instead only references the fact that the Anchor Protocol launched in March 2021 and enabled UST depositors to earn yield. ¶ 48. And, further, as to UST, *Patterson* and *Terraform I* are at odds with the SEC's subsequent recognition that certain stablecoins are not securities given that buyers do not purchase them "with a reasonable expectation of profit derived from" others' efforts.[19] Plaintiff's failure to plead an investment contract requires dismissal of the Exchange Act claims.

**B. In Any Event, Plaintiff Fails To Plead Section 10(b) Securities Fraud (17)**

"To state a claim for federal securities fraud, a complaint must allege (1) a material

---

[19] Ex. 10, SEC Div. of Corp. Fin., *Statement on Stablecoins* at 4 (April 4, 2025), https://www.sec.gov/ newsroom/speeches-statements/statement-stablecoins-040425 (reserve-backed stablecoins—*i.e.*, tokens backed by USD or another low-risk asset—"are not offered or sold as investment contracts"); Ex. 11, SEC & CFTC, *Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets*, Release Nos. 33-11412, 34-105020 at 23 (Mar. 17, 2026), https://www.sec.gov/files/rules/interp/2026/33-11412.pdf (affirming Corporation Finance guidance).

misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen*, 916 F.3d at 598. A complaint must plead each element with particularity under Rule 9(b) and satisfy the PSLRA's heightened pleading requirements. *Id.* at 598–99. The Complaint here fails to do so.

### 1. Plaintiff Lacks Standing To State a Section 10(b) Claim

Under "binding and well-settled" Seventh Circuit precedent, plaintiffs "lack standing to bring a § 10(b) suit based on any statements or conduct" that occurred "after" they purchased a security. *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *4–5 (N.D. Ill. Oct. 19, 2009) (citing *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1415–16 (7th Cir. 1992)). Regardless of whether this principle rests on Article III or prudential standing, Plaintiff violates it by failing to allege the specific date of *any* Crypto Loss Claimant's purchase, let alone any purchase after January 28, 2022—the date of the first challenged statement. ¶ 328. Instead, Plaintiff alleges "on information and belief" that the Crypto Loss Claimants "traded UST and/or Luna between May 23, 2021 and May 31, 2022." ¶ 19. That is not enough: Plaintiff cannot rely on "information and belief" here, because no "information asymmetries" prevented him from alleging the purchase dates underlying claims that were assigned to him. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948–49 (7th Cir. 2013) (rejecting information-and-belief allegations when "information should have been available" to plaintiff). Even setting aside this fatal flaw, Plaintiff alleges a date range that begins more than eight months before the first challenged statement, meaning that at least some of the Crypto Loss Claimants' purchases are non-actionable.

### 2. Plaintiff Does Not Plead Any False or Misleading Statement

Plaintiff alleges five purported false or misleading statements (the "Challenged

22

Statements"). Each is non-actionable puffery or opinion, and none is false or misleading:[20]

1. On January 28, 2022, Kariya posted on X: "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." After explaining the relationship between MIM (a stablecoin from another ecosystem) and UST, Kariya stated: "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M." ¶ 328; *see* Ex. 12, Kanav Kariya (@KanavKariya), X (Jan. 27, 2022), https://x.com/KanavKariya/status/1486930291927175170; Ex. 13, Kanav Kariya (@KanavKariya), X (Jan. 27, 2022), https://x.com/KanavKariya/status/1486930299711897605.

2. On February 22, 2022, the "Jump Crypto" X account posted: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin[.] The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility[.]" ¶ 329; *see* Ex. 14, Jump Crypto (@jump_), X (Feb. 22, 2022), https://x.com/jump_/status/1496184264530042885.

3. On March 1, 2022, Kariya stated on a podcast: "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime [sic]." ¶ 330.

4. On April 7, 2022, Kariya reposted a tweet from LFG that "[w]elcom[ed] $AVAX," another token, into LFG's reserve, and stated: "Alignment across ecosystems and a commitment to a multi chain future UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." ¶ 331; *see* Ex. 15, Kanav Kariya (@KanavKariya), X (Apr. 7, 2022), https://x.com/KanavKariya/status/1512119136649941002.

5. On May 1, 2022, Kariya reposted a third-party post discussing the ability to deposit UST into a liquidity auction and receive another asset, and opined: "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." ¶ 332; *see* Ex. 16, Kanav Kariya (@KanavKariya), X (May 1, 2022), https://x.com/KanavKariya/status/1520850062754070528.

---

[20] The Complaint quotes only excerpts of these statements, but because they are "reference[d]" in and integral to the Complaint, they are incorporated by reference and the Court may consider them in their entirety. *See Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020).

          a.       *The Challenged Statements Are Inactionable Puffery and/or Opinion Statements*

Puffery and opinion statements are not false or misleading for purposes of a federal securities fraud claim. Puffery includes: "(1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements." *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *7 (N.D. Ill. Mar. 30, 2022). "[N]o reasonable investor" would treat such statements of "vague corporate optimism" as "guarantees." *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *15 (N.D. Ill. Sept. 30, 2024). An opinion is generally inactionable if it expresses "a view, not a certainty" rather than a "determinate, verifiable statement" of fact. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–84 (2015). An opinion is actionable only if the plaintiff alleges with particularity that (1) the speaker did not "sincerely" believe it, (2) it contained "embedded statements of untrue facts," or (3) a reasonable investor would have understood it to convey "facts about" the speaker's "basis" for the opinion. *Id.* at 176, 184–88. Each Challenged Statement is inactionable puffery and/or opinion.

**Statement 1** reflects Kariya's "take" (*i.e.*, perspective) that it is "difficult to imagine" a mass exodus from MIM (another stablecoin) to UST and suggests there is "potential" for a hypothetical scenario to arise. ¶ 328. Statements about what someone "envision[s]" are classic puffery and opinion. *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *12 (E.D.N.Y. Sept. 30, 2022). Further, this statement expresses Kariya's belief that holders of another token would *not* sell that token to buy UST—which cannot possibly be construed as promoting UST.

**Statements 2 and 3**, which concern the announcement and purpose of the $1 billion LFG reserve, ¶¶ 329–330, describe the speaker's views of, and "vague" and "subjective" "optimistic rhetoric" about, LFG. *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015); *see also Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *23, *25

24

(E.D. Va. Mar. 24, 2021) (statement that company's services would "enable" clients to operate cost-effectively was inactionable because it did not "state … expectations with certainty"). Indeed, *Patterson* deemed similar statements from Kariya and the LFG press release inactionable "expressions of opinion." 710 F. Supp. 3d at 714 (LFG "can be used to help protect the peg of the UST stablecoin in stressful conditions" and "will strengthen confidence in the peg").

*Statement 4* describes another cryptocurrency as "high quality" and says that a UST-centric ecosystem with AVAX as a reserve asset is a "[w]in, win, win." ¶ 331. "These types of vague statements about industry leadership … and expressions of optimism are generally considered puffery and are not actionable." *Chew*, 2024 WL 4346522, at *10.

*Statement 5* expresses Kariya's "excite[ment] to support a great team" working on a "really interesting suite of liquidity primitives." ¶ 332. This kind of optimistic rhetoric and opinion language is inactionable, *see Van Noppen*, 136 F. Supp. 3d at 941 ("commitment to quality" and "raising the bar" are "[s]ubjective and [v]ague"), and does not suggest that the Terra Ecosystem would or could survive a market panic, as Plaintiff asserts, ¶ 332(a). Moreover, the statement is "so vague … that no reasonable investor could find [it] important to the total mix of information available." *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004).

Finally, the Complaint does not plead facts showing that the speakers did not sincerely believe these opinions or misled investors about their factual bases. *See Omnicare*, 575 U.S. at 187–88. Conclusory allegations that a defendant "acted with knowledge," ¶¶ 328–335 (alleging what speakers "knew" and that Jump "acted with scienter"), do not satisfy Rule 9(b) or the PSLRA. *See Premier Cap. Mgmt., L.L.C. v. Cohen*, 2003 WL 21960357, at *5 (N.D. Ill. Aug. 15, 2003).

b. *The Challenged Statements Were Not False or Misleading*

Even if one or more of the Challenged Statements expressed facts, no Jump Defendant "either made a false statement of material fact or failed to make a statement of material fact …

rendering the statements … misleading." *Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995).

*Statement 1* offers Kariya's view that it would be "difficult to imagine a sustained mass exodus" from MIM to UST (*i.e.*, market participants selling MIM and buying UST), says there would be a "potential for UST to be sold/burned" in the event of an exodus, and provides statistics on UST's supply. ¶ 328. This statement does not have anything to do with, let alone "relate directly" to, the information allegedly omitted: the purported instability of UST or the Jump Defendants' role in the May 2021 repeg. ¶ 328(a); *see Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1334 (7th Cir. 1995) (press releases that did not "relate[] directly to warranty costs" were not misleading for not disclosing rising warranty costs); *Patterson*, 710 F. Supp. 3d at 713–14 (dismissing claim based on Statement 1).[21] Plaintiff characterizes Kariya's words as a message that "UST was stable" and "the Terra Ecosystem is not vulnerable." ¶ 328(a). But as noted above, Kariya suggested purchasers *would not* flock to UST; there is no basis for reading such a statement as falsely touting the stability of UST's peg. Plaintiff may not state a claim based on an "illogical" or "implausible interpretation" that ignores Kariya's actual words and "omits the … context of the statement." *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1126 (N.D. Cal. 2020).

*Statements 2 and 3* state that LFG was established to, and did, hold $1B in Bitcoin (later more), and that the LFG reserve was "meant to take out these extreme spikes and inject liquidity into the book … when there are extreme price movements, which do happen every sometime [sic]." ¶¶ 329–330. Plaintiff does not deny that LFG held $1 billion in Bitcoin or allege that the characterization of LFG's purpose was false. Rather, he asserts that these statements were false or misleading because LFG was not sufficiently capitalized to ensure the stability of the peg.

---

[21] While, as noted, *Patterson* dismissed as inactionable statements regarding LFG's purpose similar to Statements 2 and 3, the only exact statement challenged by both the *Patterson* plaintiffs and Plaintiff here is Statement 1.

¶¶ 329(a), 330(a). But the statements do not speak to the adequacy of its capitalization. Moreover, Plaintiff's undercapitalization theory relies entirely on the hindsight notion that LFG's reserves were insufficient to prevent the depeg that later occurred, yet "hindsight" may not be used to show that Statements 2 and 3 were misleading when made in February and March 2022. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007).

***Statements 4 and 5*** suffer from similar problems. Statement 4 identifies AVAX, another token, "as a high quality reserve asset in the LFG," while Statement 5 describes current and potential features of the Terra Ecosystem, including its "interesting suite of liquidity primitives" and a "governance layer" as a "very natural next step." ¶¶ 331–332. Plaintiff does not adequately allege that any component of either statement was false when made. Instead, he recycles his allegation that the statements were misleading due to their omission of the Jump Defendants' role in the May 2021 repeg. *Id.* But the statements merely expressed excitement about Terra and its UST stablecoin, and thus did not trigger a duty to disclose facts about the repeg because such facts were not "necessary" to make the statements "clear and complete." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). And Plaintiff's reinterpretation of Statement 5 as a guarantee that Terra in fact had "adequate governance or liquidity in the event of a market panic," ¶ 332(a), is "implausible," particularly because Kariya said only that the governance layer was a "next step." *Align Tech., Inc.*, 485 F. Supp. 3d at 1126.

                c.      *The Jump Defendants Did Not Have a Standalone Duty To Disclose Their Role in the 2021 Repeg*

Section 10(b) and Rule 10b-5 do not "proscribe pure omissions" or "create an affirmative duty to disclose any and all material information." *Macquarie*, 601 U.S. at 264. They also do not impose liability for "keeping silent when someone else spoke." *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1052 (7th Cir. 2012). Yet Plaintiff asserts that "Jump's trading

in UST rendered it legally bound to disclose" its role in the May 2021 repeg. ¶ 326.

This argument is meritless. While a duty to disclose may arise from trading by market participants in certain circumstances where such participants stand in a fiduciary position to the issuer or other market participants, *see Fry v. UAL Corp.*, 84 F.3d 936, 938 (7th Cir. 1996); *In re Archegos 20A Litig.*, 156 F.4th 108, 117 (2d Cir. 2025), Plaintiff alleges no facts suggesting any Jump Defendant had any such fiduciary relationship here. *See Patterson*, 710 F. Supp. 3d at 717 (dismissing nondisclosure-based claim for lacking "specific allegations that Jump had such a duty"). Alleged omissions concerning the May 2021 repeg thus cannot sustain Plaintiff's claim.

### 3. Plaintiff Fails To Allege Facts Showing That the Jump Defendants Acted with Scienter

To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted" with the intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2)(A). A "strong" inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This is a "difficult hurdle," *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan ex rel. Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024), and Plaintiff's allegations come nowhere close to clearing it for several independent reasons.

*First*, Plaintiff disregards his obligation to plead scienter as to "*each individual defendant.*" *Cornielsen*, 916 F.3d at 602; *see supra*, § I.

*Second*, Plaintiff contends that the Jump Defendants were motivated to lie because they wanted to keep the value of UST and Luna higher for longer. ¶ 335. Such "generic" allegations of a profit motive do not suffice to plead scienter. *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012). Plaintiff's conclusory

28

assertions that the Jump Defendants "knew" contrary information when they spoke, *e.g.*, ¶¶ 328–332, 335, fare no better. *See Babin v. Shchekin*, 2017 WL 403568, at *9 (N.D. Ill. Jan. 30, 2017).

*Third*, a nonfraudulent inference "offers a better fit for the facts alleged" here. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021). Plaintiff posits that the Jump Defendants intentionally misled investors as to whether intervention may be necessary to maintain the peg. ¶¶ 326–327. The Challenged Statements themselves refute that theory, as they discuss the potential need for LFG to intervene to defend the peg. This "warning" is incompatible with an inference that the Jump Defendants intended to mislead investors into believing that the peg would restore itself without external intervention. *Zebra*, 8 F.4th at 596.

Plaintiff's submission that the Jump Defendants intentionally or recklessly misled investors about LFG's undercapitalization is just as counterintuitive. Plaintiff does not dispute that LFG held a "billion dollars of Bitcoin"—over seventeen times the amount of UST that Jump allegedly bought during the May 2021 depeg to "sav[e]" the Terra Ecosystem. ¶¶ 307, 331(b). Notwithstanding the "over nine-fold" increase in UST's market capitalization, ¶ 6, Plaintiff fails to plead facts suggesting that any Jump Defendant believed that LFG lacked sufficient funds to defend the peg. Plaintiff also pleads (that is, admits) that certain Jump Defendants purchased "several hundred million dollars' worth" of Luna from LFG, the full amount of which would not be unlocked (*i.e.*, could not be sold) for two years. ¶ 83. Plaintiff does not (and cannot) explain why any Jump Defendant "would opt for that strategy" of making a long-term investment in locked Luna if they knew or feared that LFG was not equipped to maintain the peg. *Zebra*, 8 F.4th at 596; *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (defendant would not "hid[e] Enron's vulnerability" while "continu[ing] to lend [it] billions").

### 4. Plaintiff Fails To Allege Facts Showing Reliance on the Jump Defendants' Statements

Although "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action," *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008), Plaintiff fails to sufficiently plead it. To start, "dates of purchase are essential" to a securities fraud claim because liability "must be premised on plaintiffs' reliance on misrepresentations in purchasing." *In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1393 (N.D. Ill. 1990). Because Plaintiff pleads no purchase dates at all, he cannot plead that any purchase was made in reliance on any particular alleged misrepresentation. *Supra* § V.B.1. This alone ends the inquiry.

Plaintiff's reliance theory also makes no sense. He asserts investors "continue[d] to believe that UST was stable and the algorithmic relationship with Luna was sufficient to maintain the peg" because of "Jump's public statements and omissions." ¶ 334. But the Challenged Statements make clear that the algorithm might not itself be sufficient to maintain the peg. *Supra* § V.B.2.

### 5. Plaintiff Fails To Plead Loss Causation

"To plead loss causation," a plaintiff "must allege that it was the very facts about which the defendant lied"—and not other forces—"which caused its injuries." *Tricontinental Indus., Ltd. v. PwC, LLP*, 475 F.3d 824, 842 (7th Cir. 2007). Plaintiff asserts that "Defendants' actions and statements led [the Crypto Loss Claimants] to believe that UST was a functional algorithmic stablecoin" and that they lost money "[w]hen the Terraform ecosystem crashed." ¶ 337. But his failed attempt to show *reliance* on alleged misrepresentations does not address the separate question of loss causation, *i.e.* whether the Jump Defendants' statements were "responsible for the drop in the [token's] value," *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007)—as he does not connect the Challenged Statements with the May 2022 Terra Ecosystem

30

collapse.[22]  To the extent Plaintiff theorizes that the Crypto Loss Claimants suffered a loss based on materialization of a risk the Jump Defendants' alleged misrepresentations concealed, not only are the purported misrepresentations unrelated to the allegedly concealed risk, *supra* § V.B.2., but the Complaint shows that no risk was concealed.  Plaintiff pleads that: (i) LFG was founded in late 2021 and "publicly touted as an independent entity created to help defend the UST peg in the future," ¶ 78; (ii) LFG "backstops the UST peg in times of severe volatility," ¶ 329; and (iii) LFG was "meant to take out these extreme spikes," ¶ 330.  The May 2022 depeg—occurring months after these statements—thus does not show "anything beyond the materializing of" a *disclosed* "risk."  *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685–86 (7th Cir. 1990).

## C. Plaintiff Fails To Plead Section 9(a) Securities Manipulation (19)

Plaintiff does not articulate which of the six Section 9(a) offenses the Jump Defendants allegedly violated, but no matter—the Complaint fails as to all six.  Each substantive offense requires particularized pleading of scienter, causation, and reliance, along with offense-specific elements.  *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1163–65, 1192 (5th Cir. 1982), *vacated on other grounds*, 460 U.S. 1007 (1983).  Plaintiff does not satisfy any element.

### 1. Plaintiff Fails To Plead Scienter

To plead scienter under Section 9(a), Plaintiff must allege willful manipulation, *Chemetron Corp.*, 682 F.2d at 1162—*i.e.*, an intent to create "artificially high or low prices" that "do not reflect the underlying conditions of supply and demand," *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 862 (7th Cir. 1995).  Allegations of a "strong inference" of scienter are "particularly

---

[22] Plaintiff's inability to make this connection is not surprising.  In another case Plaintiff brought on behalf of the Crypto Loss Claimants, he blames another trading firm, Jane Street, alleging that it "engaged in price manipulation" and "intentional or reckless shorting of UST" that "precipitated a steep sell off in UST—a sell off that ultimately led to the collapse of the Terra ecosystem."  *See* Ex. 17, Compl. ¶¶ 120, 318, 352, 389, *Snyder v. Jane St. Grp., LLC*, No. 1:26-cv-1504 (S.D.N.Y. Feb. 23, 2026), Dkt. 1.

important in manipulation claims," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99, 102 (2d Cir. 2007), as Section 9(a) "does not prohibit transactions simply because they raise or lower a security's sale price." *Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.*, 2008 WL 153542, at *15 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir. 2009).

Plaintiff's allegations fall short of creating such an inference. His manipulation theory rests on the Jump Defendants purchase of a large amount of UST in May 2021 when UST depegged. ¶¶ 369–370, 384. As *Patterson* recognized, those purchases "could reflect a benign business decision" if the Jump Defendants "truthfully believed [they were] purchasing the tokens below their real value." 710 F. Supp. 3d at 717. Plaintiff does not allege that the Jump Defendants did not believe UST was worth $1. Accordingly, the Complaint does nothing to establish a strong inference that the Jump Defendants engaged in "manipulation," as opposed to run-of-the-mill "arbitrage." *Sullivan & Long*, 47 F.3d at 862. That UST returned to its $1 peg and remained there for approximately a year (without more alleged manipulation), *see* ¶¶ 67, 91, is consistent with the inference that the Jump Defendants correctly believed UST was undervalued when it depegged.

### 2. Plaintiff Fails To Plead Causation, Reliance, and Other Elements

Plaintiff must allege "causation" and "reli[ance]" to state his claim. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011). Causation requires allegations that "the manipulated price influenced or was responsible for the purchaser's or seller's price." *Chemetron Corp.*, 682 F.2d at 1186. Plaintiff's failure to plead when the Crypto Loss Claimants purchased tokens or at what price dooms causation and reliance. *See Perry v. Eastman Kodak Co.*, 1991 WL 629728, at *7 (S.D. Ind. Apr. 22, 1991) (dismissing Section 9 claim that "suffer[ed] from the same causation and reliance problems that required dismissal of his Section 10(b) claims"), *aff'd*, 1992 WL 103695, at *7 (7th Cir. 1992); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 433 (S.D.N.Y. 2010) (dismissing Section 9(a) and 10(b) claims where plaintiffs failed to allege causation and reliance).

32

In addition to failing to meet elements common to all Section 9(a) offenses, Plaintiff does not plead with particularity facts sufficient to show the elements of any possible Section 9(a) claim.

***Intent to Induce Trade***.  "[A]ctual or apparent active trading" claims under Section 9(a)(2) and "false or misleading" statement claims under Section 9(a)(4) require particularized allegations that a defendant intentionally induced others to trade.  ¶ 364; 15 U.S.C. § 78i(a)(2), (a)(4).  Plaintiff musters nothing to plead this element beyond the conclusory allegation that "Jump" acted "for the purpose of inducing the purchase of UST by others," ¶ 364, which is insufficient.  *See Cohen*, 722 F. Supp. 2d at 424 (dismissing "conclusory allegations" of Section 9(a) market manipulation).

***False or Misleading Statements***.  Any claim based upon the Challenged Statements fails for the same reasons the Section 10(b) claim fails.  15 U.S.C. § 78i(a)(4); *supra* § V.B.2.

***Pegging, Fixing, or Stabilizing***.  Section 9(a)(6) prohibits "pegging, fixing, or stabilizing" the price of a security "in contravention" of applicable SEC regulations.  15 U.S.C. § 78i(a)(6).  Because Plaintiff does not identify the SEC regulation the Jump Defendants allegedly acted "in contravention" of, or how they purportedly violated it, he cannot state a Section 9(a)(6) claim.  *See Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 803 (2d Cir. 2002) (explaining that 15 U.S.C. § 78i(a) "allows price stabilization practices that the SEC does not prohibit" and does not "prohibit all price stabilization practices that the SEC does not specifically allow").[23]

## VI.    PLAINTIFF FAILS TO STATE A CEA CLAIM (21, 22)

Plaintiff's commodities manipulation claims (¶¶ 412, 414, 439) sound in fraud and thus are subject to Rule 9(b).  *LJM Partners, Ltd. v. Barclays Cap. Inc.*, 2023 WL 6311471, at *2, *12

---

[23] To the extent Plaintiff seeks to bring claims under Sections 9(a)(1) or 9(a)(5), they would similarly fail because he does not allege any wash trades or any facts to support an inference that the Jump Defendants received "consideration" for "induc[ing] the purchase of a[] security" by disseminating information about the future price of the security, as those subsections require.  15 U.S.C. § 78i(a)(1), (a)(5).

(N.D. Ill. Sept. 28, 2023), *aff'd*, 165 F.4th 552 (7th Cir. 2026).  They do not satisfy that standard.

### A.     Plaintiff Fails To Allege Commodity Manipulation Under Section 9(a)

To state a Section 9(a) claim, a plaintiff must allege facts showing that: "(1) the defendants possessed the ability to influence prices; (2) an artificial price existed; (3) the defendant[s] caused the artificial price; and (4) the defendant[s] specifically intended to cause the artificial price."  *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758, 764–65 (7th Cir. 2015).  The Complaint fails on every element.

### 1.     Plaintiff Does Not Allege the Ability To Influence Price

Plaintiff does not allege that the Jump Defendants had the ability to influence the price of UST.  At best, he claims that "Jump's" trading of UST and another crypto asset on "one cryptocurrency exchange" was "bound to have an effect on the price of UST—and [it] did."  ¶ 65. This speculative and conclusory allegation does not suffice to particularly plead an ability to influence price.  *See In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *6–7 (N.D. Ill. Feb. 9, 2012) (conclusory and irrelevant allegations that defendants had "ample ability to cause" artificial prices "fail[ed] to satisfy the first element").  Indeed, the Complaint makes clear that the entirety of the Jump Defendants' purchases during the May 2021 depeg amounted to less than three percent of UST in circulation at the time.  ¶ 5 (market capitalization of over 2 billion UST in May 2021), ¶ 307 ("Jump" bought 58.9 million UST during the May 2021 depeg).

### 2.     Plaintiff Does Not Allege an Artificial Price or That the Jump Defendants Caused an Artificial Price

To determine whether an artificial price exists, "courts look to whether the price is affected by a factor that is not a legitimate part of the economic pricing of the commodity."  *In re Rough Rice*, 2012 WL 473091, at *6.  This is a "difficult" standard to meet.  *CFTC v. Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018).  For example, there can be an artificially inflated price

when a market participant enters into uneconomic transactions to move the closing price of a commodity to artificial levels by purchasing commodities for the purpose of favorably affecting a relative derivatives position. *See In re Diplacido*, 2008 WL 4831204, at *6-*7, *31 (C.F.T.C. Nov. 5, 2008). Or, there can be an artificial price when a buyer intentionally purchased commodities it could not rationally desire. *See Ploss v. Kraft Foods, Inc.*, 197 F. Supp. 3d 1037, 1063 (N.D. Ill. 2016) (describing purchases as "commercially unfeasible"). "Unusual" market prices are insufficient. *In re Rough Rice*, 2012 WL 473091, at *6.

Plaintiff's boilerplate allegations fall far short, offering nothing to plead an artificial price beyond assertions that UST was "artificially restor[ed]," "artificially high," and "artificially impacted." ¶¶ 5, 417, 425. These "conclusory" allegations, without supporting "factual content," are insufficient. *Braman v. CME Grp., Inc.*, 149 F. Supp. 3d 874, 890 (N.D. Ill. 2015); *see also Ploss*, 197 F. Supp. 3d 1068 (rejecting claim for failure to allege "*factual* allegations, rather than conclusions … that there were artificial prices"). Alleging that "Jump's" UST purchases "impacted" UST's price does not move the needle, ¶¶ 65, 417, as changed prices do not show an *artificial* price, *see In re DiPlacido*, 2008 WL 4831204, at *30. Moreover, that UST was priced at or very close to $1 for the year before the May 2021 depeg, ¶¶ 3, 5, and that Plaintiff alleges no further disruptions for almost a full year after—without any alleged manipulative trading during those periods—belies any claim of artificiality. *Supra* § V.C.1.

### 3. Plaintiff Does Not Allege Intent To Cause an Artificial Price

Section 9(a) manipulation also requires specific intent to achieve the "artificial price," not "the mere intent to affect prices." *Wilson*, 2018 WL 6322024, at *14–15. Plaintiff fails to plead intent to cause an artificial price for the same reason he fails to plead scienter to support his Exchange Act manipulation claim: He offers no facts sufficient to support a theory that the Jump Defendants intended to create a price for UST that differed from what they "truthfully believed"

35

was its "real value." *Patterson*, 710 F. Supp. 3d at 717 (dismissing securities manipulation claim because "Jump's action—purchasing 'massive amounts' of UST … could reflect a benign business decision as opposed to manipulative or deceptive conduct"); *supra* § V.C.1. The Jump Defendants' purchases of UST for less than $1 were economically rational "business decision[s]," not indicative of an intent to create an artificial price. *Patterson*, 710 F. Supp. 3d at 717; *see also Wilson*, 2018 WL 6322024, at *20 (defendants' "legitimate economic rationale" precluded CEA claim). Plaintiff's allegations of profit motive, ¶¶ 418, 421, and purported omissions, ¶ 420, do not save his claim. The former is irrelevant because Plaintiff does not allege facts showing that the Jump Defendants did not genuinely value UST at $1; on the latter, and as discussed, Plaintiff does not sufficiently plead any duty to disclose. *Supra* § V.B.2.c.

## B. Plaintiff Fails To Allege Manipulative Contrivance Under Section 6

To state a Section 6 manipulative contrivance claim, a plaintiff must allege that the defendant "misled or cheated" the market through either representation or action. *Ploss*, 197 F. Supp. 3d at 1055 (citation modified). Plaintiff does not adequately allege either.

If Plaintiff's claim rests on alleged misstatements or omissions, it fails for the same reasons as his Exchange Act Section 10(b) claim. *See CFTC v. Oystacher*, 203 F. Supp. 3d 934, 950 (N.D. Ill. 2016) (describing CEA Section 6(c)(1) and Exchange Act Section 10(b) as "nearly identical"). A claim based on the Jump Defendants' actions likewise fails because Plaintiff does not adequately allege a manipulative act, nor specify which defendant(s) engaged in it. *See supra* §§ V.C., VI.A. (no manipulation), § I (group pleading).

## C. Plaintiff Fails To Allege Aiding and Abetting Market Manipulation Under Section 13

Unable to plead wrongdoing by any Jump Defendant, Plaintiff seeks to hold them liable for "aid[ing] and abett[ing] a manipulative device, scheme, or artifice to defraud." ¶ 441. Aiding-

36

and-abetting liability requires a plaintiff to "first demonstrate the components of a manipulation claim against a principal," and then to allege that the defendant: "(1) had knowledge of the principal's intent to commit a violation of the CEA … ; (2) had the intent to further that violation; and (3) committed some act in furtherance of" the principal's objective. *In re Dairy Farmers of Am.*, 801 F.3d at 765. Plaintiff fails to plead these elements with particularity.

To start, aside from threadbare recitation of the label "aided and abetted," Count 22 is identical to the substantive CEA claim (Count 21), and Plaintiff does not even allege *whom* the Jump Defendants allegedly aided and abetted. If Plaintiff means to suggest that the Jump Defendants aided and abetted a purported CEA violation by Terraform, that theory fails because Plaintiff does not allege what specific CEA violation Terraform committed,[24] or that the Jump Defendants *knowingly* aided the commission of such offense. *See Braman*, 149 F. Supp. 3d at 891.

The Complaint also does not adequately allege that the Jump Defendants took any action to further a CEA violation by Terraform or anybody else. This element is not satisfied by conduct merely "attenuated … with the principal violation," but requires an "affirmative act" taken with the "intent of facilitating the offense's commission." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 490 & n.9 (2023). The Complaint makes no such allegations, and Plaintiff cannot base liability on statements or actions that he does not adequately allege were improper. ¶¶ 426–432; *see Weber v. E.D.&F. Man Int'l, Inc.*, 1999 WL 35326, at *3 (N.D. Ill. Jan. 13, 1999) (statements not knowingly false or made for purpose of furthering fraud were not acts designed to further violation).

## VII. PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS SHOULD BE DISMISSED (4–15)

Plaintiff brings twelve facially inconsistent fraudulent transfer claims against the Jump

---

[24] Notably, while Terraform was charged by the SEC with federal securities violations, it was never charged by the CFTC with CEA violations.

Defendants (summarized in Appendix 1 hereto), all arising from the allegation that LFG transferred Bitcoin to Jump in May 2022 to defend the UST peg. For example:

- Some claims allege that Terraform-to-LFG transfers were the initial transfers ("Terraform-Based Claims," Counts 4–5, 7–8, 10–11, 13–14); others allege that the LFG-to-Jump transfer was the initial transfer ("LFG-Based Claims," Counts 6, 9, 12, 15).

- For the Terraform-Based Claims, Plaintiff brings the exact same claims on behalf of both the transferor and the creditors, even though only one could own the claims.

- For the LFG-Based Claims, Plaintiff brings federal bankruptcy law claims even though LFG was never in bankruptcy.

- Plaintiff even fails to allege that LFG had creditors, a prerequisite for any LFG-Based fraudulent transfer claim.

- Plaintiff simultaneously and inconsistently alleges that (i) Terraform and LFG were insolvent because UST and Luna were worthless and (ii) UST and Luna were valuable assets that Terraform fraudulently transferred for insufficient value.

Moreover, even if the factual allegations supporting these fraudulent transfer claims were true (they are not), the claims fail as a matter of law.[25]

### A. Plaintiff Lacks Standing To Bring Terraform-Based Claims on Behalf of the Crypto Loss Claimants and LFG-Based Claims (5, 6, 8, 9, 11, 12, 14, 15)

Plaintiff purports to have been assigned fraudulent transfer claims by the Crypto Loss Claimants and LFG, but he lacks standing because they had no standing to bring those claims. *See United States v. Am. Nat'l Bank & Tr. Co. of Chi.*, 443 F. Supp. 167, 174 (N.D. Ill. 1977).

---

[25] Throughout the fraudulent transfer counts, Plaintiff refers to "Jump" as the alleged transferee without specifying which of the eight distinct legal entities received the transfers. ¶¶ 188–302; *supra* at § I (describing Plaintiff's impermissible group pleading). Beyond the general prohibition on group pleading, a fraudulent transfer claim in particular that fails to sufficiently identify the transferee should be dismissed. *See In re Zohar III, Corp.*, 631 B.R. 133, 171 (Bankr. D. Del. 2021) ("More specificity is required for [fraudulent transfer] claims so that the particular Defendants are given fair notice."); *see also Desmond v. Tax Affiliation Servs. LLC*, 344 F. Supp. 3d 915, 927 (N.D. Ill. 2018) (dismissing fraudulent transfer claim without grounds for suspicion that defendants received transfers); *In re Life Fund 5.1 LLC*, 2010 WL 2650024, at *5 (Bankr. N.D. Ill. June 30, 2010) (dismissing "bald conclusion[s]" that failed to offer any facts supporting allegations that defendants benefited from initial transfer).

### 1. Terraform-Based Claims on Behalf of the Crypto Loss Claimants (5, 8, 11, 14)

Plaintiff cannot pursue the Terraform-Based claims on behalf of the Crypto Loss Claimants—alleged creditors of Terraform—because they had no power to assign those claims. Outside of bankruptcy, fraudulent transfer claims belong to creditors. *See Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708–09 (7th Cir. 1994). Once a bankruptcy is filed, creditors lose the power to bring such claims; instead, the estate obtains exclusive control to bring or assign them. *See id.*; *Ball v. Nationscredit Fin. Servs. Corp.*, 207 B.R. 869, 872 (Bankr. N.D. Ill. 1997). This principle "prevent[s] individual creditors from annexing assets of the estate to gain an advantage," *In re Schimmelpenninck*, 183 F.3d 347, 360 (5th Cir. 1999), and holds true for both state and federal fraudulent transfer claims, *see In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983); *In re Zwirn*, 362 B.R. 536, 541 (Bankr. S.D. Fla. 2007); *see also Mitsubishi Elec. Sales Am., Inc. v. Higgins*, 1988 WL 151580, at *3 (N.D. Ill. Nov. 10, 1988) (citing *In re MortgageAmerica* in dismissing claim for lack of standing).

Any fraudulent transfer claims that belonged to Terraform's creditors became property of the Terraform estate after Terraform entered bankruptcy on January 21, 2024. That included claims—which ground Counts 5, 8, 11, and 14—that may have once belonged to the Crypto Loss Claimants as Terraform creditors. Because the Crypto Loss Claimants lacked the power to assign fraudulent transfer claims to Plaintiff, he cannot now assert those claims on their behalf.

### 2. LFG-Based Claims (6, 9, 12, 15)

The LFG-Based Claims, all brought solely on behalf of LFG, fail for numerous reasons.

*First*, because LFG never filed for bankruptcy, it cannot bring a claim for its *own* alleged fraudulent transfers; instead, any fraudulent transfer claims would belong to LFG's *creditors*. *See Klingman v. Levinson*, 158 B.R. 109, 113 (N.D. Ill. 1993). That precludes LFG from avoiding its

39

own transfers under Section 548 of the Bankruptcy Code or the IUFTA. *See Klingman*, 158 B.R. at 113 n.2. LFG thus lacks standing to assert federal or state fraudulent transfer claims, and the same holds for Plaintiff as its purported assignee.

*Second*, LFG's not having filed for bankruptcy also means that no one (even creditors) could bring federal bankruptcy claims (Counts 11, 14). *See In re Lyons*, 130 B.R. 272, 276 (Bankr. N.D. Ill. 1991); *see also* 11 U.S.C. § 103(a) (Bankruptcy Code Chapter 5 applies only "in a case under chapter 7, 11, 12, or 13"). LFG is not and was never a debtor in bankruptcy, and therefore no one could bring claims under the Bankruptcy Code for initial transfers by LFG.

*Third*, Plaintiff does not plead that LFG had creditors who stood to benefit from avoiding a fraudulent transfer. Without such creditors, a fraudulent transfer claim cannot proceed. *See In re HH Liquidation, LLC*, 590 B.R. 211, 262 (Bankr. D. Del. 2018) ("Fraudulent transfer claims may not be brought where they offer no benefit to creditors of the transferor's estate."); *Whiteford Plastics Co. v. Chase Nat'l Bank*, 179 F.2d 582, 584 (2d Cir. 1950) ("It would be [a] mockery of justice to say that the alleged bankrupt … may avoid a transaction, valid to himself but voidable as to creditors, in the right of non-existing creditors."). Because Plaintiff does not identify any creditors of LFG at the time of the transfers, the LFG-Based fraudulent transfer claims fail.

### B. Plaintiff Fails To State Any Constructive Fraudulent Transfer Claim (7–9, 13–15)[26]

Even setting aside standing, the constructive fraudulent transfer claims fail on their merits. To avoid a transaction as constructively fraudulent, a plaintiff must show, among other things, that the debtor was insolvent at the time of the alleged transfer or was left with insufficient assets to

---

[26] In addition to not being adequately pled, the Complaint omits critical facts—particularly facts relating to (i) the contractual relationship between Terraform and LFG and (ii) the over-the-counter trading agreement that set terms for the LFG-to-Jump transfer—that show that Plaintiff's constructive fraudulent transfer claims are barred by Section 546 of the Bankruptcy Code.

pay its debts as a result of the transfer. *See* 740 ILCS 160/5(a)(2); 11 U.S.C. § 548(a)(1)(B); *Mathews v. Serafin*, 744 N.E.2d 934, 937 (Ill. App. 2001). Plaintiff's failure to adequately allege that Terraform or LFG were, or were rendered, insolvent is fatal to his claims.

"A complaint alleging a constructive fraud claim must plead facts from which an inference of insolvency can be drawn." *In re VitaHEAT Med., LLC*, 629 B.R. 250, 260–61 (Bankr. N.D. Ill. 2021); *see In re Life Fund 5.1 LLC*, 2010 WL 2650024, at *7 (Bankr. N.D. Ill. June 30, 2010) ("Conclusions are not enough."). The Bankruptcy Code and the IUFTA define insolvency using the "balance sheet" test, *i.e.*, whether an entity's liabilities exceed its assets. *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008); *see* 11 U.S.C. § 101(32); 740 ILCS 160/3(a); *In re Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013) (focusing on "what a willing buyer would [pay] for the debtor's entire package of assets and liabilities"). Under both, insolvency is "measured at the time the debtor transferred value or incurred an obligation." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648–50 (3d Cir. 1991). Alternatively, a plaintiff may show that the transferor was undercapitalized or unable to pay its bills as they came due. *See* 11 U.S.C. § 548(a)(1)(B)(ii)(II), (III); 740 ILCS 160/3(b). Undercapitalization refers to "the inability to generate sufficient profits to sustain operations." *In re Longview Aluminum, L.L.C.*, 2005 WL 3021173 at *6 (Bankr. N.D. Ill. July 14, 2005). Inadequate capitalization is measured by "reasonable foreseeability, which requires an objective assessment of the firm's financial projections." *Id*. Plaintiff's insolvency allegations as to both Terraform and LFG fail under these standards.

As to Terraform, Plaintiff's allegations that it "was insolvent, or was rendered insolvent," at the time of the Terraform-to-LFG transfers (January–April 2022) are wholly conclusory. ¶ 206; *see also* ¶¶ 207, 213–214, 271, 284. Plaintiff pleads no facts about Terraform's financial data or

balance sheet to support this conclusion—despite presumably having unique access to such information—asserting instead that it was insolvent because it "was unable to maintain the peg and avoid a death spiral in a depeg event on its own." ¶ 80. This reasoning forgets that solvency is assessed as of the date of the transfer; whether Terraform could survive a *potential future* depeg does not determine its solvency at the time of each of the transfers were made from January–April 2022—the relevant period for the alleged fraudulent transfers. The fact that "a firm failed" does not mean "it must have been inadequately capitalized." *In re SGK Ventures, LLC*, 2017 WL 2683686, at *12 (N.D. Ill. June 20, 2017). Moreover, any contention that Terraform was insolvent because UST was worthless at the time of the transfers is undermined by Plaintiff's own allegations that UST was trading at $1 and Luna at $77–87 at the time of the transfers. ¶¶ 79, 80.

Market indicators confirm the value of Terraform's primary business, as the market capitalization of UST and Luna "grew over nine-fold, to more than $18.5 billion, and Luna skyrocketed to more than $26 billion," from May 2021 to May 2022. ¶¶ 6, 103. Plaintiff also does not allege that Terraform failed to pay its debts in a timely manner from January–April 2022, and Terraform's survival for two years after the transfers (until its January 2024 bankruptcy filing) would disprove any such assertion. *See In re Joy Recovery Tech.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002) ("[C]ourts will not find that a company had unreasonably low capital if the company survives for an extended period after the subject transaction.").

Even if Plaintiff's woefully deficient insolvency allegations were credited, that would just underscore another problem with the Terraform-Based Claims: His insolvency theory rests on the premise that UST and Luna were worthless at the time of the transfers. If that theory were correct—that Terraform was insolvent because it could not maintain the peg, ¶ 80—then Terraform could not have received less than reasonably equivalent value for the worthless UST

42

and Luna it transferred.[27]  This inherent inconsistency fatally undermines his claims.

As to LFG, Plaintiff's allegations that "LFG was" or "became insolvent" due to transfers on May 8–9, 2022, are also wholly conclusory.  ¶ 262; *see also* ¶¶ 98, 222.  Plaintiff pleads no facts about LFG's financial data or balance sheet.  In fact, Plaintiff does not plead that LFG had any debts whatsoever—a prerequisite for insolvency.  And without alleging any debts, Plaintiff cannot plead that LFG did not pay debts in a timely manner at the time of the transfers.

### C.    Plaintiff Fails To State Any Actual Fraudulent Transfer Claim (4–6, 10–12)

To avoid a transaction as an actual fraudulent transfer, a plaintiff must prove that a transfer of the debtor's assets was made "with actual intent to hinder, delay, or defraud" the transferor's creditors.  740 ILCS 160/5(a)(1); 11 U.S.C. § 548(a)(1)(A).  The focus is on the transferor's intent at the time of the transfer.  *See In re Equip. Acquisition Res., Inc.*, 481 B.R. 422, 427–28 (Bankr. N.D. Ill. 2012).  Under state and federal law, a plaintiff may show actual fraudulent intent in two ways: (1) direct evidence of fraudulent intent; or (2) circumstantial evidence through the presence of "badges of fraud."  *Id*. at 431.  Under either path, Rule 9(b)'s heightened pleading standard applies.  *Supra* § I.  Plaintiff fails to satisfy this standard.[28]

### 1.    The Complaint Does Not Allege Direct Evidence of Fraudulent Intent

Direct evidence of fraudulent intent requires specific allegations that the transferor intended the transfer to hinder, delay, or defraud its creditors at the time the transfers were made.  *See In re Equip. Acquisition Res., Inc.*, 481 B.R. at 431.

As to Terraform, Plaintiff makes only conclusory allegations that Terraform and its

---

[27] On the flip side, Plaintiff admits that Terraform and LFG received the benefit of an attempt to defend the UST peg, as discussed below.  *See infra* § VII.C.2.

[28] As noted above, in attempting to establish Terraform's insolvency, Plaintiff alleges that UST and Luna were worthless.  But if that were true, UST and Luna were not assets, and so could not support an actual fraudulent transfer claim.  *See* 740 ILCS 160/5(a)(1); 11 U.S.C. § 548(a)(1)(A).

principals intended to defraud creditors. ¶¶ 166, 192.[29] That falls short of alleging with particularity the circumstances of the purported fraud needed to show that the specific transfers were fraudulent. *See In re Gluth Bros. Constr., Inc.*, 424 B.R. 368, 374–77 (Bankr. N.D. Ill. 2009). As to LFG, Plaintiff does not even allege that LFG had creditors, and offers only boilerplate allegations that LFG acted with an intent to defraud any creditors when it transferred Bitcoin to the Jump Defendants, utterly lacking the required details to allege intent. ¶¶ 192–193 ("Kwon and Kariya directed this transfer with actual intent to hinder, delay, or defraud creditors of LFG.").

Plaintiff's allegations confirm the transfers' alternative, non-fraudulent purpose: to defend the UST peg, which he admits was LFG's purpose. ¶¶ 77–78, 92. That legitimate business purpose disproves fraudulent intent because Plaintiff cannot simultaneously allege that (i) Terraform and the Jump Defendants "recognized the instability of the Terra ecosystem and the need to consider alternative means to maintain UST's peg," "ultimately [leading] to the creation of the [LFG]," ¶¶ 77–78, and (ii) "the main or only purpose of the transfer was to prevent a lawful creditor from collecting a debt," *Grede v. UBS Sec., LLC*, 303 F. Supp. 3d 638, 656 (N.D. Ill. 2018).

### 2. The Complaint Does Not Allege Circumstantial Evidence of Fraudulent Intent Through the Badges of Fraud

Plaintiff fails to allege facts about badges of fraud with particularity. *See In re Fairgrieves*, 426 B.R. 748, 758 (Bankr. N.D. Ill. 2010).[30] Neither a single badge standing alone, nor even the

---

[29] *See also* ¶ 164 (alleging Kwon made transfers to LFG "as a mechanism to put those funds beyond the reach of Terraform's creditors"), ¶ 170 (conclusory allegation that "Kwon had the actual intent to delay, hinder, or defraud the creditors of Terraform"), ¶ 197 (alleging "Kwon and Kariya had the actual intent to delay, hinder, or defraud creditors of Terraform and LFG"), ¶ 230 (alleging transfers were made "with the actual intent to hinder, delay, and/or defraud the Terraform creditors and in furtherance of the fraud being perpetrated by Kwon and Jump Trading").

[30] "The commonly recognized badges of fraud include '(1) whether the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (2) whether the debtor retained control of the asset; (3) whether the transfer was to a family member; (4) whether the transfer was prior to debtor incurring a substantial debt; (5) whether the transfer was substantially all of debtor's assets; (6) whether the debtor received consideration for the transfer; (7) whether the transfer was disclosed or concealed; (8) whether the

44

presence of all badges, is sufficient to establish fraudulent intent. *See In re Com. Loan Corp.*, 396 B.R. 730, 746 (N.D. Ill. 2008); *Lindholm v. Holtz*, 581 N.E.2d 860, 863–64 (Ill. App. 1991).

a.      <em>Terraform-Based Claims</em>

As to Terraform, Plaintiff merely regurgitates certain badges of fraud[31] without providing the required factual support. ¶¶ 79–80, 88–90, 165, 169, 178, 182, 191, 233, 247, 261.

**Badge 1—Insolvency**. Plaintiff's insolvency allegations are either conclusory or self-contradictory. *See supra* § VII.B.

**Badge 2—Retention of Control**. Plaintiff baldly asserts Kwon and Kariya "exercised de facto control over LFG." ¶ 89. But he also alleges that LFG was governed by a Governing Council of several individuals, ¶ 78, and describes LFG engaging in significant activity on its own behalf following the transfers, including converting the UST and Luna it received into a Bitcoin reserve and using that reserve to achieve its publicized mission of defending the UST peg, ¶ 81. *Compare DAN JV III, L.P. v. Touris*, 598 B.R. 430, 444 (N.D. Ill. 2019) (transferor retained control over transferred property "and was able to direct how [transferee] used the transferred property (*e.g.*, to pay [transferor's] expenses, to pay [transferor's] son, etc.)"), *with In re Tribune Co. Fraud. Conv. Litig.*, 2017 WL 82391, at *14 (S.D.N.Y. Jan. 6, 2017) (retention of control badge not established where transferor "conveyed the property … in an arm's length exchange for shares of cash" and, thus, "by definition, … did not maintain possession of the cash constituting the [] Transfers").

---

debtor made the transfer before or after being threatened with suit by creditors; and (9) whether the debtor absconded.'" *In re Equip. Acquisition Res., Inc.*, 481 B.R. at 431. Illinois law considers those nine, along with two others: (10) whether the transfer was to an insider; and (11) whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider. 740 ILCS 160/5(b).

[31] The Complaint does not even attempt allege seven badges as to Terraform: that the transfers were to family members (Badge 3); Terraform was sued or threatened with suit before the transfers (Badge 4); the transfers were substantially all of Terraform's assets (Badge 5); the transfers occurred shortly before or after a substantial debt was incurred (Badge 8); Terraform absconded (Badge 9); the transfers were to a Terraform insider (Badge 10); or Terraform transferred assets to a lienor who then transferred them to an insider (Badge 11).

45

*Badge 6—Consideration*. Plaintiff defeats this badge by alleging that LFG provided significant value to Terraform in exchange for the transferred assets. Specifically, LFG converted the UST and Luna it received from Terraform into a substantial Bitcoin reserve, strengthening the Terra Ecosystem to the benefit of Terraform. ¶¶ 78, 82. LFG then provided further value, in the form of critical market support, when it deployed the Bitcoin reserve in an attempt to defend the UST peg. ¶¶ 92–93, 97, 102–103.

*Badge 7—Concealment of Transfer and Assets*. Despite Plaintiff's conclusory allegations that "Kwon—through LFG—removed and/or concealed assets of Terraform," ¶¶ 169, 182, the transfers to LFG were public and widely publicized.[32] As Plaintiff acknowledges, LFG's creation, funding, and reserve-backing function was widely publicized and celebrated by the market,[33] refuting any inference that Terraform was attempting to conceal assets. *See In re ATIF, Inc.*, 160 F.4th 1124, 1141 (11th Cir. 2025) (transfer not concealed from transferor's creditors or the public where deeds for transferred property were publicly recorded).

    b.    *LFG-Based Claims*

As with Terraform, Plaintiff simply recites certain badges of fraud[34] as to LFG without

---

[32] *See, e.g.*, Ex. 18, Do Kwon (@stablekwon), X (Mar. 11, 2022), https://x.com/stablekwon/status/1502225674840555523 (describing transfer of $1.2 billion worth of UST from Terraform to LFG). The court may take judicial notice of this and other posts on X as "matters of public record." *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016); *see United States ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 722 (N.D. Ill. 2020) (taking judicial notice of blogs where there was no dispute that these materials were publicly available before the filing of the suit).

[33] *See, e.g.*, *id.*; ¶ 84 (acknowledging Jump Crypto's public February 22, 2022 tweet: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin"), ¶ 85 (quoting press release in which Kariya "touted UST's supposed stability, stating that '[t]he UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin[,] UST,' comparing the system to 'how many central banks hold reserves of foreign currencies'"), ¶ 87 (describing Kariya's March 1, 2022 podcast appearance where he explained "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve").

[34] The Complaint does not even attempt to allege seven badges as to LFG: that LFG retained control over the assets (Badge 2); the transfers were to family members (Badge 3); LFG was sued or threatened with suit before the transfers (Badge 4); the transfer was substantially all of LFG's assets (Badge 5); the transfers

providing factual support.  ¶¶ 8, 78, 89, 94, 97–99, 105, 222, 262, 296.

*Badge 1—Insolvency*.  Plaintiff does not even allege LFG had creditors and makes only conclusory allegations of LFG's insolvency.  *See supra* § VII.B.

*Badge 6—Consideration*.  Plaintiff's conclusion that the Jump Defendants provided no consideration to LFG is contradicted by his allegations of the Jump Defendants' significant efforts to defend the UST peg, consistent with LFG's mission.  ¶¶ 92–93, 97, 102–103.[35]

*Badge 7—Concealment of Transfer and Assets*.  Despite Plaintiff's conclusory allegations that the Jump Defendants attempted to conceal their receipt of transfers to support the UST peg, ¶ 105, the transfers were public, widely publicized,[36] and consistent with the very public purpose for which LFG was established, ¶¶ 7, 20.

*Badge 10—Transfer to an Insider*.  Plaintiff seeks to frame the Jump Defendants as LFG insiders by virtue of Kariya's role on the Governing Council.  But the Complaint does not allege that Kariya was appointed by or represented any Jump Defendant on the council.  And Plaintiff's attempts to paint certain Jump Defendants as controlling LFG are conclusory, ¶ 89 (alleging Kwon and Kariya "exercised de facto control over LFG"), lack any allegation of *fact* in support—such as whether the Governing Council had any powers (it did not)—and contradict Plaintiff's admission that LFG's governance included multiple individuals with diverse interests, ¶ 78.

### D.  Plaintiff's Bankruptcy Code Terraform-Based Claims Are Time-Barred (10, 11, 13, 14)

Only transfers that occur within two years of a bankruptcy filing may be avoided.  *See* 11

---

occurred shortly before or after a substantial debt was incurred (Badge 8); LFG absconded (Badge 9); or LFG transferred assets to a lienor who then transferred them to an insider (Badge 11).

[35] While the Jump Defendants must accept Plaintiff's allegations as true at this stage, were this case to survive dismissal, discovery would establish significant additional consideration.

[36] While it does not impact the insufficiency of Plaintiff's claim, as indicated above, additional facts that Plaintiff omitted from the Complaint establish even further consideration.

U.S.C. § 548(a)(1). Seventy percent of the alleged Terraform to LFG transfers—50 million Luna with a market value of nearly $4 billion—occurred on January 20, 2022, more than two years before Terraform's January 21, 2024 bankruptcy. ¶ 79(a); Ex. 19, Voluntary Pet., *In re Terraform Labs Pte. Ltd.*, No. 24-10070-BLS (Bankr. D. Del. Jan. 21, 2024), Dkt. 1. Any claims based on the January 20, 2022 initial transfers are thus barred. And Plaintiff nowhere alleges that the May 2022 transfers to "Jump"—which were in Bitcoin—stemmed from the remaining thirty percent of the initial Terraform-to-LFG transfers of a different kind of property (UST and Luna). Plaintiff thus fails to allege that "Jump" received any recoverable estate assets. *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 896 (Bankr. N.D. Ill. 2017) (dismissing fraudulent transfer claim because relevant assets were transferred outside two-year period).

## VIII. PLAINTIFF'S STATE LAW FRAUD CLAIMS FAIL FOR THE SAME REASONS AS THE FRAUD-BASED FEDERAL SECURITIES CLAIMS (23, 25)

The ICFA requires Plaintiff to plead: "(1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception." *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 748 (N.D. Ill. 2023). A fraudulent misrepresentation claim requires Plaintiff to plead a "(1) false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance." *Soules v. Gen. Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980).

Plaintiff's ICFA and fraudulent misrepresentation claims rest on the same false statements as the Section 10(b) claim in Count 17, ¶¶ 460–476, 486–493, and fail for the same reasons. As discussed *supra* § I, Plaintiff's fraud claims impermissibly rely on group pleading. Moreover, Plaintiff does not allege a deceptive or unfair practice; a false statement of material fact; intent to

48

induce the Crypto Loss Claimants to act (*i.e.*, scienter); reliance; or damage arising from the alleged fraud (*i.e.*, loss causation). *Supra* § V.B. Counts 23 and 25 thus fall along with Count 17.

## IX. PLAINTIFF'S REMAINING COMMON LAW CLAIMS FAIL (2, 16, 24)

### A. Aiding and Abetting Breach of Fiduciary Duty (2)

An Illinois aiding and abetting claim requires an underlying violation, the defendant's knowledge of that violation, and substantial assistance in its commission. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Even assuming the Complaint sufficiently pleads a breach of fiduciary duty by Kwon,[37] it does not adequately plead with particularity knowledge of, or substantial assistance to, any such breach by any Jump Defendant.

Plaintiff attempts to satisfy the knowledge element by alleging that all Defendants were involved in "virtually every major [Terraform] decision" and had unspecified "non-public information about the stability of Terraform's ecosystem." ¶¶ 149–150. But nowhere does Plaintiff allege what he must to sustain this claim—that any Jump Defendant had specific knowledge of the conduct Kwon was undertaking in breaching his fiduciary duty. That failure is fatal to the aiding and abetting claim. *See Praither v. Northbrook Bank & Tr. Co.*, 192 N.E.3d 747, 760–61 (Ill. App. 2021).

Plaintiff's substantial assistance allegations fare no better. The Complaint alleges that all Defendants aided Kwon's alleged breach by following his instructions, receiving funds, providing financing, and participating in misrepresentations about the Terra Ecosystem. ¶ 148. But nowhere

---

[37] It does not. Plaintiff asserts, in conclusory fashion, that Kwon breached his fiduciary duty by directing funds away from Terraform, recklessly expanding UST supply, and concealing the Jump Defendants' role in the 2021 repeg. ¶¶ 145–147. But he does not allege facts establishing an actual breach of fiduciary duty, including the existence of a duty, breach, causation, or harm. Absent such allegations, Plaintiff fails to plead the predicate (Kwon's fiduciary duty breach) to his aiding and abetting claim. *See Ostrolenk Faber LLP v. Genender Int'l Imps., Inc.*, 2013 WL 1289130, at *3 (Ill. App. 2013) (dismissing claim based on conclusory allegations that did not explain why alleged conduct breached fiduciary duty).

does the Complaint allege which Jump Defendant took which action, when it did so, or how any such act substantially assisted the breach of a fiduciary duty owed to Terraform. Even if Plaintiff's group allegations were credited, that any of the Jump Defendants "extend[ed] financing" or benefits to Terraform is insufficient to plead substantial assistance. *Delany v. Blunt, Ellis & Loewi*, 631 F. Supp. 175, 181 (N.D. Ill. 1986). And allegations that the Jump Defendants "join[ed] Kwon in misrepresenting" UST's stability, ¶ 148, fail for the same reasons Plaintiff's fraudulent misrepresentation claims fail. *See supra* §§ V.B., VIII.

### B.      Unjust Enrichment (16, 24)

Plaintiff's unjust enrichment claims fail for two independent reasons.

*First*, Plaintiff's conclusory allegations that the Jump Defendants received "ill-gotten gains" from "fraudulent conduct" and "knew or should have known of the fraudulent scheme," ¶¶ 308, 312, 314, 485, sound in fraud and fail to satisfy Rule 9(b). *See supra* §§ I, V, VI.

*Second*, where, as here, "the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *see also Ash v. PSP Distrib., LLC*, 226 N.E.3d 748, 757 (Ill. App. 2023) (same). The unjust enrichment claims merely refer back to the same "fraudulent conduct" and "fraudulent scheme" repeated throughout the Complaint, including those for fraudulent conveyance, securities fraud, market manipulation, ICFA violations, and fraudulent misrepresentation. ¶¶ 308, 314, 485. Because the unjust enrichment claims rest on the same deficient allegations as the fraud claims, the unjust enrichment claims fail as well.

### CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

50

Dated: March 23, 2026

Respectfully submitted,

*/s/ Gary Feinerman*

Gary Feinerman (ARDC No. 6206906)
Sean M. Berkowitz (ARDC No. 6209701)
Jack McNeily (ARDC No. 6332140)
LATHAM & WATKINS LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: gary.feinerman@lw.com
        sean.berkowitz@lw.com
        jack.mcneily@lw.com

Christopher Harris (*pro hac vice pending*)
Elizabeth A. Morris (*pro hac vice pending*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: christopher.harris@lw.com
        elizabeth.morris@lw.com

Richard Frohlichstein (*pro hac vice pending*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: (202) 637-2200
Email: richard.frohlichstein@lw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2026, I electronically filed the foregoing document with the Court via CM/ECF, which will automatically send notice and a copy of same to counsel of record via email.

/s/ *Gary Feinerman*
Gary Feinerman

52

**APPENDIX I**

Summary of Plaintiff's Fraudulent Transfer Allegations

| Count | Initial Transferor | Brought on Behalf of | Applicable Law | Alleged Fraud |
|---|---|---|---|---|
| 4 | Terraform | Terraform | Illinois | Actual Intent |
| 5 | Terraform | Crypto Loss Claimants | Illinois | Actual Intent |
| 6 | LFG | LFG | Illinois | Actual Intent |
| 7 | Terraform | Terraform | Illinois | Constructive |
| 8 | Terraform | Crypto Loss Claimants | Illinois | Constructive |
| 9 | LFG | LFG | Illinois | Constructive |
| 10 | Terraform | Terraform | Federal | Actual Intent |
| 11 | Terraform | Crypto Loss Claimants | Federal | Actual Intent |
| 12 | LFG | LFG | Federal | Actual Intent |
| 13 | Terraform | Terraform | Federal | Constructive |
| 14 | Terraform | Crypto Loss Claimants | Federal | Constructive |
| 15 | LFG | LFG | Federal | Constructive |