# EXHIBIT 9

Page Vault

| | |
|---|---|
| Document title: | SEC.gov \| The SEC's Approach to Digital Assets: Inside "Project Crypto" |
| Capture URL: | https://www.sec.gov/newsroom/speeches-statements/atkins-111225-secs-approach-digital-assets-inside-project-crypto |
| Page loaded at (UTC): | Wed, 18 Mar 2026 15:46:42 GMT |
| Capture timestamp (UTC): | Wed, 18 Mar 2026 15:47:38 GMT |
| Capture tool: | 10.79.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/142.0.7444.265 Safari/537.36 |
| Operating system: | Linux (Node 22.21.1) |
| PDF length: | 8 |
| Capture ID: | nEMELm7WhE14fAc5taQLTk |
| Display Name: | Omar.Quervalu |

SPEECH

# The SEC's Approach to Digital Assets: Inside "Project Crypto"

Paul S. Atkins, Chairman

Federal Reserve Bank of Philadelphia | Nov. 12, 2025

RESOURCES
- SEC Launches Project Crypto

Good morning, ladies and gentlemen. Thank you for that kind introduction and for the invitation to join you today as we continue the conversation about how America will lead the next era of financial innovation.

When I spoke recently about American leadership in the digital finance revolution, I described "Project Crypto" as our effort to match the energy of American innovators with a regulatory framework worthy of them. Today, I would like to outline the next step in that journey. At its core, this next step is about basic fairness and common sense as it relates to the application of the federal securities laws to crypto assets and related transactions.

In the coming months, I anticipate that the Commission will consider establishing a token taxonomy that is anchored in the longstanding *Howey* investment contract securities analysis, recognizing that there are limiting principles to our laws and regulations.

Much of what I will describe builds upon the pioneering work of the Crypto Task Force that Commissioner Hester Peirce leads. Commissioner Peirce has laid out a framework for coherent, transparent treatment of crypto assets under the federal securities laws, grounded in economic reality rather than in slogans or fear. Let me reiterate that I share her vision. I value her leadership, her hard work, and her perseverance in championing these issues over the years. She and I have a long history of working together. I am very pleased that she agreed to take this task on.

I will organize my remarks around three themes: first, the importance of a clear token taxonomy; second, how *Howey* applies in a way that recognizes the fact that investment contracts can come to an end; and third, what that could mean in practice for innovators, intermediaries, and investors.

Before I begin, I would also like to reiterate that while Commission staff diligently drafts amendments to our rules, I wholeheartedly support Congressional endeavors to codify a comprehensive crypto market structure framework into statute. What I envision aligns with legislation currently being considered by Congress and aims to complement, not replace, Congress's critical work. Commissioner Peirce and I have made it a priority to support Congressional efforts, and we will continue to do so.

It has been a pleasure working with Acting Chairman Pham, and I wish President Trump's nominee for CFTC Chairman, Mike Selig, a smooth and speedy confirmation. Having worked with Mike these past months, I know that we are both dedicated to helping Congress swiftly advance nonpartisan market structure legislation to President Trump's desk. There is no stronger tool to future-proof against rogue regulators than sound statutory language from Congress.

support Congressional efforts, and we will continue to do so.

It has been a pleasure working with Acting Chairman Pham, and I wish President Trump's nominee for CFTC Chairman, Mike Selig, a smooth and speedy confirmation. Having worked with Mike these past months, I know that we are both dedicated to helping Congress swiftly advance nonpartisan market structure legislation to President Trump's desk. There is no stronger tool to future-proof against rogue regulators than sound statutory language from Congress.

To make my compliance people happy, let me offer the usual disclaimer: my remarks reflect my own views as Chairman and do not necessarily represent the view of my fellow Commissioners or the Commission as a whole.

## A Decade of Uncertainty

If you are tired of hearing the question "Are crypto assets securities?", I very much sympathize. It is a confounding question because "crypto asset" is not a term defined in the federal securities laws. It is a technological description. It tells you something about how records are kept and value is transferred. But it says little about the legal rights attached to a particular instrument or about the economic reality of a particular transaction, which are key to determining whether something is a security.

I believe that most crypto tokens trading today are not themselves securities. Of course, it is possible that a particular token might have been sold as part of an investment contract in a securities offering. That is not a radical statement; it is a straightforward application of the securities laws. The statutes defining securities list familiar instruments like stocks, notes, bonds, and then add a more open-ended category: the "investment contract." That latter term describes a relationship between parties; it is not an unremovable label attached to an object. It also, unfortunately, was not defined by statute.

Investment contracts can be performed and they can expire. They do not last forever simply because the object of an investment contract continues to trade on a blockchain.

Yet over the last several years, too many have asserted the view that if a token was ever subject to an investment contract, it would forever be a security. This flawed view extends even further presuming that every subsequent trade, everywhere and always, is a securities transaction. I struggle to reconcile that view with the text of the law, with Supreme Court precedent, or with common sense.

Meanwhile, developers, exchanges, custodians, and investors have been trying to navigate in a fog, without SEC guidance, but obstruction. They see tokens that function as payment instruments, governance tools, collectibles, or access keys. They see hybrid designs that do not fit neatly into any existing box. And they see a stance that, for too long, has treated all of these tokens as if they were shares of common stock.

That perspective is not sustainable or practicable. It comes with substantial costs, yet little benefit. It is not fair to market participants or to investors, and it is not consistent with the law. It also invites a destructive race to move offshore. The reality is that if the United States insists on making every on-chain innovation run the through a securities-law minefield, those innovations will migrate to jurisdictions that are more willing to distinguish among different kinds of assets, and more willing to write down the rules in advance.

Instead, we are going to do what regulatory agencies are supposed to do. We are going to draw clear lines and explain them in clear terms.

## Core Principles of Project Crypto

Before I walk through how I view the securities laws as applied to crypto tokens and transactions, let me state two basic principles that guide my thinking.

First, that a stock is still a stock whether it is a paper certificate, an entry in a DTCC account, or represented by a token on a public blockchain. A bond does not stop being a bond because its payment streams are tracked using smart contracts. Securities, however represented, remain securities. That is the easy part.

First, that a stock is still a stock whether it is a paper certificate, an entry in a DTCC account, or represented by a token on a public blockchain. A bond does not stop being a bond because its payment streams are tracked using smart contracts. Securities, however represented, remain securities. That is the easy part.

Second, that economic reality trumps labels. Calling something a "token" or an "NFT" does not exempt it from the current securities laws if it in substance represents a claim on the profits of an enterprise and is offered with the sorts of promises based on the essential efforts of others. Conversely, the fact that a token was once a part of a capital-raising transaction does not magically convert that token into a stock of an operating company.

These principles are hardly novel. They are embedded in the Supreme Court's repeated insistence that we look to the "substance" of a transaction, not its "form," when deciding whether the securities laws apply. What is new is the scale and speed at which asset types evolve in these new markets. This pace requires us to be nimble in response to market participants' urgent requests for guidance.

## A Coherent Token Taxonomy

With that backdrop, let me outline my current thinking on the various categories of crypto assets, though please keep in mind that this list is not exhaustive. This framework follows months of roundtables, more than a hundred meetings with market participants, and hundreds of written submissions from the public.

- First, as contemplated in legislation currently before Congress, "digital commodities," or "network tokens," are, in my opinion, not securities. These crypto assets are intrinsically linked to and derive their value from a programmatic operation of a crypto system that is "functional" and "decentralized," rather than from the expectation of profits arising from the essential managerial efforts of others.
- Second, "digital collectibles", in my opinion, are not securities. These crypto assets are designed to be collected and/or used and may represent or convey rights to artwork, music, videos, trading cards, in-game items, or digital representations or references to internet memes, characters, current events, or trends. Purchasers of digital collectibles are not expecting profits from the essential managerial efforts of others.
- Third, "digital tools", in my opinion, are not securities. These crypto assets perform a practical function, such as a membership, ticket, credential, title instrument, or identity badge. Purchasers of digital tools are not expecting profits from the essential managerial efforts of others.
- Fourth, and finally, "tokenized securities" are and will continue to be securities. These crypto assets represent the ownership of a financial instrument enumerated in the definition of "security" that is maintained on a crypto network.

## Howey, Promises, and Endings

Now, while most crypto assets are not themselves securities, crypto assets can be part of or subject to an investment contract. These crypto assets are accompanied by certain representations or promises to undertake essential managerial efforts that satisfy the *Howey* test.

The *Howey* test, at its core, entails an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the essential managerial efforts of others. A purchaser's reasonable expectation of profits depends on the issuer's representations or promises to engage in essential managerial efforts.

In my view, these representations or promises must be explicit and unambiguous as to the essential managerial efforts to be undertaken by the issuer.

One must then ask, "how can a non-security crypto asset separate from an investment contract?" The simple yet profound answer: the issuer either fulfills the representations or promises, fails to satisfy them, or they otherwise terminate.

For context, in the heart of Florida's rolling hills — land that I know well from my own

In my view, these representations or promises must be explicit and unambiguous as to the essential managerial efforts to be undertaken by the issuer.

One must then ask, "how can a non-security crypto asset separate from an investment contract?" The simple yet profound answer: the issuer either fulfills the representations or promises, fails to satisfy them, or they otherwise terminate.

For context, in the heart of Florida's rolling hills — land that I know well from my own upbringing — stood the site of William J. Howey's citrus empire. In the early twentieth century, Howey purchased over 60,000 acres of largely untamed land to plant orange and grapefruit groves in the shadow of his mansion. His company sold tracts of the grove land to individual investors, and then offered to cultivate, harvest, and market the fruit on their behalf.

The Supreme Court examined Howey's arrangement and established the test that would define "investment contract" for generations.[1] But today, Howey's land tells a different story. The original mansion that he built in 1925, in Lake County, Florida, still stands a century later, hosting weddings and other gatherings, while the citrus groves that once surrounded it are largely gone, replaced by resort grounds, championship golf courses, and residential neighborhoods. It is a good retirement area. It is difficult to imagine anyone standing amid those fairways and cul-de-sacs today and concluding that they constitute a security. And yet, for years, we have watched this same test applied rigidly to digital assets that have undergone transformations just as profound, but still carry the label of their launch as if nothing had changed.

The soil surrounding Howey's mansion itself was never a security. It became subject to one through a particular arrangement — and ceased to be subject to one when that arrangement ended. Of course, all the while, the land remained the same even as the enterprises built upon it changed completely.

Commissioner Peirce has rightly observed that while a project's token launch might initially involve an investment contract, those promises may not remain forever. Networks mature. Code is shipped. Control disperses. The issuer's role diminishes or disappears. At some point, purchasers are no longer relying on the issuer's essential managerial efforts, and most tokens now trade without any reasonable expectation that a particular team is still at the helm. In short, a token is no more a security because it was once part of an investment contract transaction than a golf course is a security because it used to be part of a citrus grove investment scheme.

Once the investment contract can be understood to have run its course, or expires by its own terms, the token may continue to trade, but those trades are no longer "securities transactions" simply by virtue of the token's origin story.

As many of you know, I am a strong proponent of "super-apps" in finance that allow for the custody and trading of a variety of asset classes within a single regulatory license. I have asked Commission staff to prepare recommendations for the Commission to consider that would allow tokens tied to an investment contract to trade on non-SEC regulated platforms, including those intermediaries registered at the CFTC or through a state regulatory regime. While capital formation should continue to be overseen by the SEC, we should not hamstring innovation and investor choice by requiring the underlying assets to trade in one regulated environment versus another.

Importantly, this does not mean that fraud is suddenly acceptable or that the Commission's interest has waned. Anti-fraud provisions can still apply to misstatements and omissions made in connection with the sale of an investment contract, even when the underlying asset is not itself a security. Of course, to the extent the tokens are commodities in interstate commerce, the CFTC also has anti-fraud and anti-manipulation authority to pursue misconduct in the trading of these assets.

What it does mean is that we will align our rules and enforcement with the economic reality that investment contracts can end and networks can stand on their own.

## Regulation Crypto

In the coming months, as contemplated in legislation currently before Congress, I hope that the Commission will also consider a package of exemptions to create a tailored

## Regulation Crypto

In the coming months, as contemplated in legislation currently before Congress, I hope that the Commission will also consider a package of exemptions to create a tailored offering regime for crypto assets that are part of or subject to an investment contract.

I have asked the staff to prepare recommendations for the Commission's consideration that facilitate capital formation and accommodate innovation while, at the same time, ensuring investors are protected.

By streamlining this process, innovators in the blockchain space can focus their energies on development and user engagement rather than navigating a maze of regulatory uncertainty. Additionally, this approach would cultivate a more inclusive and dynamic ecosystem — one in which smaller and less resource-intensive projects are free to experiment and to thrive.

Of course, we will continue to work closely with our counterparts at the CFTC, with the banking regulators, and with Congress to ensure that non-security crypto assets have an appropriate regulatory regime. Our goal is not to expand the SEC's jurisdiction for its own sake, but to allow capital formation to flourish while ensuring that investors remain protected.

We will continue to listen. The Crypto Task Force and Division staff have already convened multiple roundtables and reviewed a vast body of written input. We will need more. We will need feedback from investors, from builders worried about shipping code, and from traditional financial institutions eager to participate in on-chain markets without running afoul of rules written for a paper-based era.

Finally, as I mentioned earlier, we will continue to support Congressional efforts to codify a sound market structure framework into statute. While the Commission can provide a rational view under current law, there will always be risk that a future Commission could reverse course. That is why fit-for-purpose legislation is so vital — and why I am pleased to support President Trump's goal of crypto market structure legislation by year-end.

## Integrity, Intelligibility, and the Rule of Law

Now, let me be clear about what this framework is not. It is not a promise of lax enforcement at the SEC. Fraud is fraud. While the SEC protects investors from securities fraud, the federal government has a host of other regulatory bodies well equipped to police and protect against illicit conduct. That said, if you raise money by promising to build a network, and then take the proceeds and disappear, you will be hearing from us, and we will pursue you to the full extent of the law.

This framework is a commitment to integrity and intelligibility. To the entrepreneur who wants to build here in America and is willing to comply with clear rules, we should offer more than a shrug, a threat, or a subpoena. To the investor trying to discern the difference between buying a tokenized share of stock and buying a collectible in a video game, we should offer more than a web of enforcement actions.

Most importantly, this framework is a commitment to humility about the SEC's own reach. Congress crafted the securities laws to address specific problems — situations in which people part with their money based on promises that depend on the honesty and the competence of others. They were not designed as a universal charter to regulate every novel form of value, digital or otherwise.

## Contracts, Freedom, and Responsibility

Let me end where Commissioner Peirce began her "New Paradigm" remarks in May of this year, with a reminder of our history.[2] She evoked the spirit of an American patriot who took a stand — at great personal risk and in fact, near death — for the principle that free people should not be governed by arbitrary decrees.

Contracts, Freedom, and Responsibility

Let me end where Commissioner Peirce began her "New Paradigm" remarks in May of this year, with a reminder of our history.[2] She evoked the spirit of an American patriot who took a stand — at great personal risk and in fact, near death — for the principle that free people should not be governed by arbitrary decrees.

Our work, thankfully, does not demand that kind of sacrifice. But the principle remains the same. In a free society, the rules that govern economic life should be knowable, reasoned, and appropriately constrained. When we stretch the securities laws beyond their proper scope, when we treat every innovation as presumptively suspect, we stray from that core principle. When we recognize the limits of our authority, when we acknowledge that investment contracts can end and networks can stand on their own merits, we honor it.

A reasonable Commission approach to crypto will not by itself decide the fate of the market — or of any particular project. Markets will do that. But it will help to ensure that the United States remains a place where people can experiment and learn, fail and succeed, under rules that are both firm and fair.

That is what Project Crypto is about. That is what the Commission should be about. And that is the commitment I make to you today as Chairman: we will not let fear of the future trap us in the past. And we will not forget that behind every token debate, there are real people — entrepreneurs striving to build solutions, workers striving to invest for the future, and Americans striving to share in the prosperity of this country. The Commission's role is to serve all three.

Thank you, and I look forward to continuing this conversation with you in the months ahead.

---

[1] *See SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-299 (1946).

[2] Hester Peirce, *New Paradigm: Remarks at SEC Speaks* (May 19, 2025), available at: https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-sec-speaks-051925-new-paradigm-remarks-sec-speaks

Last Reviewed or Updated: Jan. 5, 2026



Document title: SEC.gov | The SEC's Approach to Digital Assets: Inside "Project Crypto"
Capture URL: https://www.sec.gov/newsroom/speeches-statements/atkins-111225-secs-approach-digital-assets-inside-project-crypto
Capture timestamp (UTC): Wed, 18 Mar 2026 15:47:38 GMT

people should not be governed by arbitrary decrees.

Our work, thankfully, does not demand that kind of sacrifice. But the principle remains the same. In a free society, the rules that govern economic life should be knowable, reasoned, and appropriately constrained. When we stretch the securities laws beyond their proper scope, when we treat every innovation as presumptively suspect, we stray from that core principle. When we recognize the limits of our authority, when we acknowledge that investment contracts can end and networks can stand on their own merits, we honor it.

A reasonable Commission approach to crypto will not by itself decide the fate of the market — or of any particular project. Markets will do that. But it will help to ensure that the United States remains a place where people can experiment and learn, fail and succeed, under rules that are both firm and fair.

That is what Project Crypto is about. That is what the Commission should be about. And that is the commitment I make to you today as Chairman: we will not let fear of the future trap us in the past. And we will not forget that behind every token debate, there are real people — entrepreneurs striving to build solutions, workers striving to invest for the future, and Americans striving to share in the prosperity of this country. The Commission's role is to serve all three.

Thank you, and I look forward to continuing this conversation with you in the months ahead.

---

[1] *See SEC v. W. J. Howey Co.*, 328 U.S. 293, 298-299 (1946).

[2] Hester Peirce, *New Paradigm: Remarks at SEC Speaks* (May 19, 2025), available at: https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-sec-speaks-051925-new-paradigm-remarks-sec-speaks

Last Reviewed or Updated: Jan. 5, 2026

Return to top

**About the SEC**
Budget & Performance
Careers
Commission Votes
Contact
Contracts

**Transparency**
Accessibility & Disability
Artificial Intelligence
Cummings Notice
FOIA
Inspector General
No FEAR Act Data
Ombuds
SEC Excess Personal Property Guidance

**Websites**
Investor.gov
Related Sites
USA.gov

**Site Information**
Plain Writing
Privacy & Security
Site Map

**Stay connected. Sign up for email updates.**
Your email address
SIGN UP

U.S. Securities and Exchange Commission