# EXHIBIT 17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TODD R. SNYDER, AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JANE STREET GROUP, LLC; JANE STREET CAPITAL, LLC; BRYCE PRATT; ROBERT GRANIERI; AND MICHAEL HUANG,<br><br>Defendants. | CASE NO. 1:26-cv-1504<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Todd R. Snyder, as Plan Administrator for the jointly administered estates of Terraform Labs Pte. Ltd and Terraform Labs Limited and the Wind Down Trust established under the Second Amended Chapter 11 Plan of Liquidation entered in *In re Terraform Labs Pte. Ltd. et al.*, Case No. 24-10070 (Bankr. D. Del.) (the "Plaintiff"), and as assignee of claims from Luna Foundation Guard ("LFG") and the individuals listed in Exhibit A (the "Individual Victims"), by and through his undersigned counsel, alleges as follows against Jane Street Group, LLC and Jane Street Capital, LLC (together, "Jane Street"); and Bryce Pratt, Robert Granieri, and Michael Huang (the "Individual Jane Street Defendants"), together the "Jane Street Defendants" or "Defendants."

## INTRODUCTION

1. The promise of cryptocurrency is a trading system that is transparent, efficient, and accountable to stakeholders. In this case, however, Jane Street Capital and its traders exploited the public's participation in crypto markets and contributed to the collapse of Terraform's

cryptocurrency ecosystem. They did so by misappropriating confidential information and manipulating market prices. Insider trading stands as a timeless violation, condemned by statute, by precedent, and by fundamental principles of fair dealing. The Jane Street Defendants' violations here echo the worst abuses of traditional finance, now repackaged for the digital age.

2. Jane Street is one of the world's largest quantitative trading firms, and its trading revenue is more than double that of the world's largest hedge fund. Jane Street has touted that "[t]echnology is central to everything we do," but its misconduct in this case was decidedly low-tech. [redacted] Jane Street used [redacted] and other backchannel sources of non-public information to front-run trading that hastened the collapse of Terraform. Its abuse of material non-public information from insider [redacted] allowed Jane Street to unwind hundreds of millions of dollars in potential exposure at precisely the right time, mere hours before the Terraform ecosystem collapsed, [redacted]

3. Jane Street [redacted] on these trades—trades that would have been impossible without the inside information to which it had unique access. And when the scrutiny of Jane Street intensified after other investors, including thousands of individual investors, lost billions of dollars in the Terraform collapse, [redacted] Indeed,

since May 2022, Jane Street has not accessed the wallet that it used to execute the trades that contributed to Terraform's collapse.

4. The Jane Street Defendants' scheme was not a complicated one. They leveraged connections with Terraform insiders to learn material non-public information about Terraform—[redacted]—that gave Jane Street a massive advantage in the market. Using that insider information, Jane Street sold off its [redacted] UST at the opportune moment—on May 7, 2022—to maximize its own profits and avoid substantial losses. Within hours of Jane Street selling its UST holdings, UST was depegged from $1 and the entire Terraform ecosystem, including the UST and Luna cryptocurrencies, was in a death spiral. Jane Street did not stop there: using the confidential information it learned, [redacted]

5. This case is about settling accounts. It is about ensuring some measure of accountability in the wake of Terraform's collapse. The Plan Administrator was appointed by the Bankruptcy Court to pursue claims against those, like Jane Street and its traders and executives, who profited from, and contributed to, Terraform's death spiral. In this action, the Plan Administrator seeks all remedies available at law and equity against Jane Street and the Individual Jane Street Defendants for insider trading, fraud, and market manipulation. Pursuant to the mandate of the Bankruptcy Court, the Plan Administrator asks the Court to order Jane Street to disgorge the wrongful gains reaped through its misconduct—for the benefit of those who lost their investments in the Terraform collapse.

**JURISDICTION AND VENUE**

6. This Court has subject matter jurisdiction over Plaintiffs' claims under Sections 10(b) (15 U.S.C. § 78j) and 20A of the Exchange Act (15 U.S.C. § 78t-1), SEC Rule 10b-5 (17

C.F.R. § 240.10b-5), Section 6(c)(1) of the Commodity Exchange Act (7 U.S.C. §§ 9, 25), CFTC Rule 180.1 (17 CFR § 180.1) under 28 U.S.C. § 1331 as they are based on federal laws.

7. This Court has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367(a) because they arise out of the same case or controversy as Plaintiffs' claims based on federal law.

8. This Court has exclusive jurisdiction over Plaintiffs' Commodities Exchange Act claims under to 7 U.S.C. § 25(c).

9. Venue is proper in this Judicial District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Commodity Exchange Act (7 U.S.C. § 25(c)). Substantial acts in furtherance of the Jane Street Defendants' insider trading scheme and the effects of these unlawful activities have occurred in this Judicial District. Many of the acts charged herein occurred in substantial part in this Judicial District.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES TO THE ACTION

11. Plaintiff Todd R. Snyder is a resident of New York. He is the Plan Administrator for the Terraform Labs Wind-Down Trust (the "Wind Down Trust"). He was appointed under the Second Amended Plan of Reorganization for Terraform Labs Pte, Ltd., *et al.* (the "Plan"), as confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 20, 2024, which also established the Wind Down Trust. Under the Plan, all assets of Terraform Labs Pte. Ltd. and Terraform Labs Limited (together, "Terraform") were transferred to the Wind Down Trust, and from the effective date of the Plan on October 1, 2024, the Plan Administrator has the authority to carry out and implement all provisions of the Plan.

This authority includes: (a) running the claims reconciliation process; (b) making distributions required by the Plan; (c) maximizing the value of the assets of the Wind Down Trust and Terraform, including by bringing litigation on account of any causes of action held by Terraform or the Wind Down Trust; and (d) reviewing and compelling turnover of the property of Terraform or the Wind Down Trust. In short, Plaintiff is charged with monetizing any assets transferred to the Wind Down Trust and distributing such funds to creditors and has authority under the Plan to pursue compensation claims on behalf of injured creditors.

12. One of Plaintiff's principal responsibilities is to seek compensation on behalf of creditors who were harmed by the collapse of the Terraform ecosystem. The Plaintiff is empowered by order of the Bankruptcy Court to pursue claims against actors like the Jane Street Defendants who unlawfully profited from, and contributed to, the failure of Terraform. The Plaintiff will use recoveries secured in litigation against these Defendants to fund the compensation dedicated to creditors under the Plan.[1]

13. In this case, Plaintiff brings direct claims on behalf of Terraform, LFG, and certain individuals who lost their investment in Terraform's crypto tokens.

14. Terraform purchased UST and Luna contemporaneous with Jane Street's sale of UST on May 7, 2022. In particular:

- On May 7, 2022, Terraform purchased over 250 million UST.
- On May 8, 2022, Terraform purchased over 200 million UST.
- Between May 8 and May 10, 2022, Terraform purchased over 1.9 billion UST.
- Between May 8 and May 11, 2022, Terraform purchased over 90 million Luna.

[1] The Plan establishes the priority of creditors in any funds recovered by the Plan Administrator.

15. Plaintiff also brings claims that LFG has assigned to the Wind Down Trust. LFG was established as a Singaporean Public Company limited by Guarantee in 2021 by Terraform's co-founder, Do Kwon. LFG was created in late 2021 to serve as a reserve that could protect UST against a subsequent depeg.

16. LFG purchased UST and Luna contemporaneous with Jane Street's sale of UST on May 7, 2022. In particular:

- On May 8, 2022, LFG purchased over 50 million UST.
- Between May 7 and May 15, 2022, LFG and third parties acting on LFG's behalf used LFG assets to purchase additional UST.
- On May 7, 2022, LFG held approximately 700,000 UST and 1.7 million Luna. On May 16, 2022, those balances had ballooned to over 1.8 billion UST (an increase of more than 1.7 billion) and over 222 million Luna (an increase of more than 221 million).

17. Finally, Plaintiff also brings claims assigned to the Wind Down Trust by the Individual Victims. As part of the Bankruptcy Plan, the individuals who had invested in Terraform's crypto tokens and lost their investments with the Terraform collapse (known in the Plan as Crypto Loss Claimants) were allowed to assign to the Wind Down Trust their individual claims against third parties related to Terraform. The individuals who assigned their claims are defined herein as the Individual Victims and are listed on Exhibit A. Under the Plan, the terms of the assignments, and the Wind Down Trust Agreement, the Plan Administrator is authorized to pursue these claims that the Individual Victims assigned to the Wind Down Trust.

18. The Individual Victims traded UST and/or Luna between May 7, 2022 and May 31, 2022.

19. Defendant Jane Street Group, LLC is a trading firm in the financial services industry. Jane Street is a Delaware limited liability company with its principal place of business in New York, New York.

20. Defendant Jane Street Capital, LLC is a Jane Street entity with its principal place of business in New York, New York. Jane Street Capital, LLC is a registered brokerage firm with FINRA.

21. Individual Jane Street Defendant Robert Granieri is a co-founder of Jane Street, based in New York, New York. [redacted] Granieri then appropriated that material non-public information for the benefit of the Jane Street Defendants.

22. Individual Jane Street Defendant Bryce Pratt is a Jane Street employee based in New York, New York, who was directly involved in [redacted] Before working at Jane Street, Pratt worked at Terraform, and maintained close relationships with many employees of Terraform, including Terraform's head of research and other employees.

23. Individual Jane Street Defendant Michael Huang is a trader at Jane Street based in New York, New York, who was [redacted]

## FACTUAL ALLEGATIONS

### Cryptocurrency and the Use of the Blockchain

24. Cryptocurrency is a digital form of currency that uses cryptographic principles, like coded algorithms, to secure transactions. Most cryptocurrencies are maintained by a decentralized system, as opposed to a centralized authority like a bank.

25. One challenge with digital currency is preventing duplication, which would render the currency valueless. Traditional currencies employ anti-counterfeiting technologies like watermarks that make the currency difficult to duplicate, but these technologies do not have ready analogues in the digital environment. So cryptocurrencies rely on blockchain technology, a mechanism that allows for secure, traceable transfers of digital assets from one recipient to another.

26. Bitcoin, the first prominent digital asset, secured transactions through use of the "blockchain," a digital ledger system that tracks the ownership and transfer of every Bitcoin in existence. Bitcoin owners have a digital "address" where they receive Bitcoin. The Bitcoin blockchain publicly lists every address and the number of Bitcoin transactions associated with that address. As a result, anyone looking at the blockchain can see every Bitcoin transaction of each digital address. This transparency has enabled the secure exchange of Bitcoin because the blockchain allows for the identification (and thus prevention) of any duplication or transfer of a Bitcoin token to multiple people.

27. The blockchain is now a routine technology in cryptocurrency. Most cryptocurrency platforms rely on the blockchain to ensure that transactions are secure, transparent, and non-duplicable. A blockchain "protocol" is an algorithm that determines how a blockchain, or a specific feature of a blockchain, functions. A blockchain protocol can record smart contracts, which automatically execute the terms of a contract when certain triggering conditions are met.

28. Transferring cryptocurrency to another user is similar to transferring funds from one bank account to another. The owner transferring the crypto tokens must know the recipient's "public key," which creates an address akin to the account number of a conventional banking account. The transferor then has their own personal "private key" that acts as a PIN number, allowing them to access their funds and authorize a transfer between accounts.

29. The addresses used in the transfer are then publicly recorded on the blockchain. However, the names of the individuals or entities that own those addresses are not listed publicly.

30. Many cryptocurrency tokens can experience wide price fluctuations, causing volatility of the asset. Stablecoins are a type of cryptocurrency designed to combat such volatility. The key feature of a stablecoin is that it pegs its value to another asset, such as another coin or fiat currency like the U.S. dollar.

31. There are two main types of stablecoins—reserve-backed stablecoins and algorithmic stablecoins. A company issuing a reserve-backed stablecoin backs the stablecoin with a reserve of assets (generally cash, securities, or other crypto tokens), which is designed to maintain the stablecoin's price peg and ensure that holders can redeem their stablecoin for its established value.

32. A company issuing an algorithmic stablecoin, on the other hand, does not maintain reserves to back the value of the stablecoin. Rather, algorithmic stablecoins rely on an algorithm to maintain the price peg. Algorithms operate in various ways, either creating or burning tokens to maintain the peg, or offering various discounts for holders to burn the stablecoin in exchange for a secondary companion token.

**Terraform Creates and Markets UST as an Algorithmic Stablecoin**

33. Terraform was an open-source software development company specializing in blockchain technology.

34. Terraform's co-founder Do Kwon and others began developing the Terra network in 2018. Kwon and Terraform proposed a novel approach to avoid the price volatility that can plague cryptocurrencies. They detailed this approach in a whitepaper announcing the creation of the Terra Classic Blockchain and the Luna Classic token.[2]

35. On April 24, 2019, Terraform minted one billion Luna Classic ("Luna") tokens, the native token of the Terra Classic Blockchain. Terraform later issued TerraUSD ("UST"), a "stablecoin" whose value was intended to be equivalent—or pegged—to one U.S. dollar. Under the Terra protocol, Luna tokens were programmatically tradable with UST.

36. Despite UST and Luna being securities that were offered for sale to U.S. investors, they were never registered with the Securities & Exchange Commission. No valid exemption from the registration requirements applied.

37. As Terraform and its founders explained during UST's rollout to the market, the UST stablecoin was maintained by a computer algorithm. To maintain the UST's "peg" to the dollar, Luna and UST were connected via a mint-burn protocol. Under this protocol, a single UST could be exchanged and "burned" for one dollar's worth of Luna, and one dollar's worth of Luna could be exchanged to "mint" one UST. These rules theoretically incentivized holders of Luna to arbitrage between the two currencies, in turn maintaining the par value of UST.

38. For example, in the event the price for UST rose above a dollar—*i.e.*, above its "peg"—holders would be incentivized to swap a dollar's worth of Luna to "mint" and receive one UST, then valued above a dollar. With traders thus minting additional UST, supplies of UST would rise and accordingly create downward pressure on the price of UST, moving it toward its

---

[2] Kwon et al., *Terra Money: Stability and Adoption*, White Paper, https://assets.websitefiles.com/611153e7af981472d8da199c/618b02d13e938ae1f8ad1e45_Terra_White_paper.pdf.

target value of one dollar. On the other hand, in the event the price of UST dropped below a dollar, a holder would be incentivized to "burn" one UST, then valued below a dollar, to receive a dollar's worth of Luna. This activity would inevitably lower the supply of UST and create pressure to raise the price of UST back toward its "peg" value of a dollar.

39. In March 2021, Terraform also launched what it called the Anchor Protocol ("Anchor"). Anchor was a way for investors to "deposit"—or "stake"—their UST and earn a flat 20% interest rate. Terraform could then use the UST deposited through Anchor to loan out to borrowers.

40. The Terra blockchain protocol, UST, Luna, Anchor, and associated tokens and platforms formed the decentralized network of the "Terraform Ecosystem."

41. In May 2021, UST experienced a significant depeg event. In the context of a stablecoin, a "depeg" occurs when the price of the stablecoin begins materially to vary from the price of the underlying asset to which the coin's price is pegged. In the case of UST, a depeg would mean that one UST was no longer worth one U.S. dollar, and UST would no longer be "stable." For Terra, a sustained depeg posed a real-world test of its claim that its algorithm could support UST's peg even in a volatile environment. The results would impact Terraform and investors.

42. On May 19, 2021, the value of UST began to dip below one dollar. Unbeknownst to the market, a large trading firm intervened, purchasing large amounts of UST to artificially restore the peg outside of the arbitrage mechanism theoretically designed to serve this purpose. Within days of this depeg event, the price of UST recovered and the peg to the U.S. Dollar was restored.

43. In January 2022, Terraform announced the creation of the Luna Foundation Guard ("LFG"). LFG was publicly described as an independent entity created to help defend the UST peg. LFG would build reserves to support the UST peg amid volatile market conditions and would allocate resources to support the growth and development of the Terraform Ecosystem through grants.

44. Terraform contributed millions of Luna tokens worth over $5.5 billion to LFG. In the months that followed, LFG sold some of those Luna tokens to compile a significant reserve of Bitcoin, other stablecoins, and other assets, valued at over $3 billion in aggregate.

45. Despite these efforts, UST experienced a much more destabilizing depeg event in May 2022. After that, UST never recovered its $1 peg value.

**Jane Street's Involvement in the Crypto Market**

46. Jane Street is a quantitative trading firm founded in 1999. Since that time, it has grown to be a massively profitable operation, boasting over $10 billion in net trading revenue and nearly $6 billion in net profits in 2023. It did even better in 2024, bringing in nearly $20.5 billion in net trading revenue and nearly $13 billion in net profits. And in the first three quarters of 2025, Jane Street's net trading revenue jumped to over $24 billion.

47. Today, Jane Street is behind more than 10% of all equity trades in North America, and its trading revenue is more than double that of the world's largest hedge fund. And because Jane Street is a quantitative trading firm and not a hedge fund, it is exempted from detailed disclosure requirements, allowing Jane Street to avoid revealing its trading strategies and financial details.

48. In 2017, Jane Street made the leap into the then-nascent cryptocurrency market, and soon became an investor in the cryptocurrency industry. As an investor, Jane Street

participated in various cryptocurrency investment activities, including market making activities as well as Over-the-Counter ("OTC") trading.

**Jane Street and Terraform's Chats: [redacted]**

49. Jane Street eventually turned its attention to Terraform, with the potential for trading Terraform's primary tokens, UST and Luna, to garner significant returns.

50. In 2018, Jane Street first connected with Terraform and expressed interest in OTC trading. Terraform was open to "collaborate on [OTC] if Jane Street can give us good rates." Throughout the late months of 2018, conversations progressed and the parties ultimately completed the onboarding process, with Terraform completing Jane Street's questionnaire and going through Jane Street's KYC (Know Your Customer) checks. By November 2018, Jane Street was available to Terraform for OTC trading.

51. But Jane Street's trading in Terraform's tokens did not take off until February 2022, when Jane Street deployed Bryce Pratt to establish lines of communication with his former colleagues at Terraform. His employment history uniquely situated Pratt to seamlessly pass information from Terraform to Jane Street.

52. In the summer of 2021, Pratt took an internship at Terraform, where he worked as a software engineer. While there, Pratt developed close relationships with numerous Terraform employees, including Terraform's Head of Research and other employees.

53. Like all Terraform employees, Pratt was required to "comply with all Company regulations including the Code of Ethics." Terraform's Code of Ethics specifically contained an insider trading policy designed in part to prevent insiders from "providing MNPI to other persons who may trade Luna tokens on the basis of that information." The policy explicitly prohibits employees from "disclos[ing] any MNPI concerning the Companies or mak[ing] any recommendations or express[ing] opinions on the basis of MNPI as to trading in Luna tokens to

any persons or entities (including, but not limited to, family members, friends, social acquaintances, investors, external business partners)."

54. This policy went into effect on May 3, 2019, and all Terraform employees, directors, and officers were subject to this policy.

55. During Pratt's internship at Terraform, he communicated daily with Terraform's Head of Research, who was both a friend and mentor to Pratt.

56. Pratt and one of Terraform's employees similarly communicated frequently during his internship and developed a close friendship.

57. On multiple occasions during his internship with Terraform, Pratt referenced his future job at Jane Street. For instance, in one conversation, Pratt joked to a Terraform employee about Pratt's upcoming job with Jane Street and discussed the possibility of working together at Jane Street in the future. During a later conversation, another Terraform employee offered to introduce Pratt to his friends at Jane Street when Pratt started his full-time job.

58. Pratt maintained these relationships with his former Terraform colleagues after he finished at Terraform and started at Jane Street.

59. Several of Pratt's friends and acquaintances from his time as an intern continued to work at Terraform following Pratt's departure.

60. In September 2021, just months after his Terraform internship ended, Pratt started a position at Jane Street.

61. Given Jane Street's interest in cryptocurrency, Pratt leveraged the relationships he had developed at Terraform to feed material non-public information to Jane Street's crypto desk.

62. [redacted]

63. In February 2022, Jane Street employees internally [redacted] the article explained that LFG "has raised $1 billion through an over-the-counter sale of LUNA, the native token of the Terra blockchain." [redacted]

64. On information and belief, Pratt's sources for the information in his February 23 responses were his former colleagues at Terraform.

65. [redacted]

66. [redacted]

67. [redacted]

68. [redacted]

69. [redacted]

70. [redacted]—information that Jane Street and Pratt knew or reasonably should have known was meant to be kept confidential.

71. [redacted] On February 23, 2022, Pratt started an email chain to introduce Terraform's Head of Business Development to Saajid Moyen and Ian McGuinn, co-leaders of trading and business development for Jane Street's "DeFi" efforts.

72. In these emails, Pratt explained that Jane Street was "interested in opening up lines of communication regarding OTC and other forms of investment in Terra."

73. Based on Jane Street's earlier communications about OTC trading and this more recent dialogue, Terraform understood and expected that Jane Street would keep confidential their communications and the information Terraform provided.

74. Thanks to Pratt's introductions, the parties began regularly communicating. They first discussed the structure and scope of a potential Jane Street investment in Terraform, but Jane Street turned those communications into a back-channel source for material non-public information about Terraform.

75. [redacted]

76. Throughout February and March 2022, Terraform attempted to structure a deal that would allow Jane Street to purchase Luna at a discount, since the opportunity to participate in the first round of fundraising had already closed. During those negotiations, McGuinn expressed an interest in getting into the financing round of Luna. [redacted]

[redacted]

77. While Terraform and Jane Street negotiated, Pratt simultaneously used his knowledge of Terraform's innerworkings and his remaining connections to Terraform employees to give Jane Street an inside edge. [redacted]

78. [redacted]

79. [redacted]

[redacted]

80. Pratt continued to serve as Jane Street's conduit for information concerning Terraform and LFG. [redacted]

81. Pratt ran back to his sources at Terraform again just a few days later on March 25, 2022. [redacted]

82. [redacted]

83. [redacted]

84. In the meantime, Pratt's pattern of getting non-public information through his back-channel connections continued. [redacted]

85. [redacted]

86. [redacted] MEV stands for "maximal extractable value" and refers to profit extracted by manipulating transaction ordering in a blockchain.[3] When cryptocurrencies are traded on a blockchain, the trade is not immediate. Instead, pending transactions are temporarily publicly accessible in a waiting area, where they are sequenced to create a block that is then verified and added to the blockchain, finalizing the transaction. Those validating cryptocurrency transactions ("validators") can reorder and sequence transactions, creating windows to exploit arbitrage opportunities and price changes.

[3] Opeyemi Oluwatosin, *What is MEV (Maximal Extractable Value) in Crypto?*, Aug. 19, 2024, https://www.coingecko.com/learn/what-is-mev-maximal-extractable-value-crypto.

Sophisticated traders use complex algorithms and bots to monitor pending transactions and use that information to place their own trades while separately incentivizing validators to order their transactions in the most optimal priority, thus reaping "maximal extractable value." MEV can occur through different techniques, and [redacted]

87. At least as of May 7, 2022, Pratt had established a regular chain of communication with Terraform's Head of Research via the instant messaging service, Telegram.

88. Pratt and Terraform's Head of Research also had an explicit understanding that their conversations would be kept confidential, with Pratt sending information via Telegram with the request "don't share pls."

89. The communication line between Pratt and Terraform's Head of Research was a two-way street. On multiple occasions, the latter also requested information from Pratt about Jane Street, such as "[w]hat JS talking about." On these occasions, Pratt would provide Terraform's employee with a glimpse into Jane Street.

90. It is no surprise that Terraform's Head of Research was both providing and seeking information. By this point, he was actively seeking to be hired by Jane Street. Indeed, in late March 2022, Terraform's then-Head of Research interviewed for a position with Jane Street. During his interview, he spoke with several Jane Street employees involved in Jane Street's trades of UST and Luna.

91. [redacted]

92. [redacted]

93. [redacted]

94. [redacted]

95. [redacted]

96. [redacted]

97. [redacted]

98. [redacted]

99. [redacted]

**Jane Street Front-Runs a Second Depeg of UST**

100. [redacted]

101. [redacted]

102. [redacted]

103. By mid-April 2022, Terraform had announced two important initiatives for its ecosystem. First, starting on May 1, 2022, the interest rate on the Anchor protocol would decrease, gradually declining from the 20% rate to something ostensibly more sustainable. Second, Terraform, and its UST stablecoin, was going to be part of a new curve pool. A curve pool is a decentralized finance liquidity pool designed to enable efficient swapping of stablecoins. As of April 2022, the largest stablecoin pool was known as Curve3 or the 3pool, and it provided liquidity for UST and three other cryptocurrency stablecoins pegged to the U.S. dollar, namely USDC, USDT, and DAI. The 4pool, which would include UST, USDC, USDT, and FRAX, another stablecoin pegged to the U.S. Dollar, was expected to be operational in May and to become Terraform's preferred liquidity pool for UST.

104. [redacted]

[redacted]

105. [redacted]

106. [redacted]

107. [redacted]

108. [redacted]

[redacted]

109. [redacted]

110. Then, at 5:44 pm EST, in a move that was not publicly announced to the market, Terraform withdrew 150 million UST from the Curve 3pool. As Do Kwon subsequently told the market, in a May 8, 2022 post, Terraform had "removed 150M UST from Curve to get ready to deploy into 4pool next week."

111. [redacted]

112. [redacted]

113. [redacted]

114. At 5:53 pm EST, less than ten minutes after Terraform's withdrawal of 150 million UST from the 3pool, Jane Street made its largest single trade of UST, selling 85 million UST in one transaction. And it sold that UST in the Curve 3pool, marking its first and only sale of UST in that pool. [redacted]

115. [redacted]

116. [redacted] While Terraform had publicly announced the creation and anticipated launch of the Curve 4pool, the exact timing of activities associated with launching the Curve 4pool, including any withdrawals from the Curve 3pool, was not public knowledge.

117. [redacted]

118. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

119. [redacted]

120. [redacted] That 85 million trade was the largest single swap on the Curve 3pool and precipitated a steep sell off in UST—a sell off that ultimately led to the collapse of the Terra ecosystem.

121. [redacted]

**As UST's Value Collapsed, Jane Street Used Material Non-Public Information to Profit More**

122. Over the next two days—May 8 and 9, 2022—the volume of trading in UST nearly doubled and the value of UST declined sharply. [redacted]

123. [redacted]

124. By May 9, 2022, UST had lost its peg and was trading below $0.80. As UST's value declined, Terraform looked to stabilize the market and restore UST's peg to $1. Just as it had when UST experienced another temporary depeg in May 2021, Terraform surreptitiously enlisted the help of Jump Trading—unbeknownst to the market.

125. Well aware of Jump's efforts in May 2021 based on his prior tenure with Terraform, [redacted]

126. [redacted]

127. [redacted]

[redacted]

128. Jane Street initially expressed an interest in participating in a sweetheart deal. To do so, it turned to Pratt to leverage his connections inside Terraform. Pratt went right to the top, contacting Terraform's then-CEO Kwon to express Jane Street's interest in bidding on either Bitcoin or Luna, including potentially buying between $200 million and $500 million at steeply discounted prices.

129. On May 9, 2022, Pratt started a group message with Kwon (Terra), Huang (Jane Street), and Moyen (Jane Street). Pratt stated, "Hey @dokwon, just wanted to express our interest in bidding on either BTC or LUNA." Kwon responded that "Bill from Jump"—that is, Bill Disomma, Jump Trading's co-founder—should have reached out to Jane Street to discuss a fundraise for Terraform.

130. [redacted]

131. [redacted]

132. [redacted]

133. [redacted]

134. [redacted]

135. [redacted]

136. [redacted]

137. While the decline in value of UST and Luna was publicly available information, [redacted]

[redacted]—were not public information, as Granieri expressly noted. Terraform reasonably expected that Jane Street and Granieri would keep this sensitive information about its financial condition confidential.

138. Instead, just as before, Jane Street betrayed Terraform's confidences and capitalized on this material non-public information and pursued trades and investments to profit for itself. [redacted]

139. [redacted]

140. [redacted]

141. [redacted]

142. [redacted]

143. [redacted]

144. [redacted]

145. [redacted]

146. [redacted]

147. [redacted]

148. [redacted]

149. On May 12, 2022, the value of UST had plummeted further to $0.42. That same day, the value of Luna similarly declined, trading at $1.0629.

150. The next day, May 13, 2022, the UST collapse was complete. Its value dropped to less than $0.15. UST was fully depegged from the USD and it would not be restored.

151. On May 13, 2022, the value of Luna had nearly reached zero, trading at $ 0.001219.

152. [redacted]

153. [redacted]

[redacted]

154. UST was never restored to its $1 peg and the price of Luna never recovered.

155. After the Terraform ecosystem had collapsed and Jane Street had reaped substantial profits, [redacted]

156. [redacted]

**Jane Street Makes a "Killing" on Its UST Trades**

157. [redacted]

158. [redacted]

159. Jane Street is in the investment business, and it benefits from touting smart trades and investment strategies that resulted in a profit. Had Jane Street's trades been innocent and based purely on smart market modeling, Jane Street would have had some impressive statistics to show the market. [redacted]

[redacted] Jane Street knew it acquired these profits in a way that they wanted to bury from public disclosure.

160. But [redacted] could not quell the public's interest in these mysterious and massive wallet trades. By May 27, another public article (published by Nansen) referenced the Jane Street wallet. *See* Aurelie Barthere et al., *On-Chain Forensics: Demystifying TerraUSD De-Peg* (May 27, 2022) (https://www.nansen.ai/research/on-chain-forensics-demystifying-terrausd-de-peg) ("Nansen Report"). While the article itself does not list Jane Street by name, it details multiple wallets that were instrumental in the depeg, including the wallet that Jane Street was using for its trades. *Id.* [redacted]

161. [redacted]

162. [redacted]

[redacted]

163. In short: Jane Street used its connections with Terraform insiders to learn material non-public information about Terraform that gave it a massive advantage in the market. Using that information, [redacted] to maximize its own profits and avoid losses suffered by other investors who did not have this confidential information—and in so doing, helped cause the complete collapse of the Terraform ecosystem. As if that weren't enough, and despite its own traders' misgivings, Jane Street then used confidential information it learned [redacted]

## CAUSES OF ACTION

### COUNT ONE
### INSIDER TRADING
### PURSUANT TO 15 U.S.C. § 78t-1
### Violations of Section 20A of the Exchange Act
### (Plan Administrator on Behalf of Terraform) (Against All Defendants)

164. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

165. This claim is brought on behalf of Terraform, who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and was damaged by Defendants' trading on material non-public information.

166. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1. [redacted]

[redacted]

167. Congress enacted the Securities Act to regulate the offer and sale of securities. Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

168. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include an "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. *See* 15 U.S.C. § 77b(a)(1) (Securities Act Section 2(a)(1)). During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

169. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established

their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

170. [redacted]

171. ***First***, Defendants violated Section 20A by [redacted]

172. [redacted]

173. [redacted]

174. Terraform purchased UST contemporaneously with Jane Street's UST sales and was damaged by Defendants' unlawful trading on material non-public information.

175. ***Second***, Defendants violated Section 20A by [redacted]

176. [redacted]

[redacted]

177. [redacted]

178. Terraform purchased UST contemporaneously with Defendants between May 7 and May 31, 2022, and was damaged by Defendants' unlawful trading on material non-public information.

179. WHEREFORE Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78t-1, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

**COUNT TWO**
**INSIDER TRADING**
**PURSUANT TO 15 U.S.C. § 78t-1**
**Violations of Section 20A of the Exchange Act**
**(Plan Administrator on Behalf of LFG) (Against All Defendants)**

180. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

181. This claim is brought on behalf of LFG, who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and was damaged by Defendants' trading on material non-public information.

182. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1. [redacted]

[redacted]

183. Congress enacted the Securities Act to regulate the offer and sale of securities. Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

184. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include an "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. *See* 15 U.S.C. § 77b(a)(1) (Securities Act Section 2(a)(1)). During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

185. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established

their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

186. [redacted]

187. ***First***, Defendants violated Section 20A by [redacted]

188. [redacted]

189. [redacted]

190. LFG purchased UST contemporaneously with Jane Street's UST sales and was damaged by Defendants' unlawful trading on material non-public information.

191. ***Second***, Defendants violated Section 20A by [redacted]

192. [redacted]

[redacted]

193. [redacted]

194. LFG purchased UST contemporaneously with Defendants between May 7 and May 31, 2022, and was damaged by Defendants' unlawful trading on material non-public information.

195. WHEREFORE Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78t-1, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

**COUNT THREE**
**INSIDER TRADING**
**PURSUANT TO 15 U.S.C. § 78t-1**
**Violations of Section 20A of the Exchange Act**
**(Plan Administrator on Behalf of the Individual Victims) (Against All Defendants)**

196. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

197. This claim is brought on behalf of the Individual Victims who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and were damaged by Defendants' trading on material non-public information.

198. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 20A of the Exchange Act, 15 U.S.C. § 78t-1. [redacted]

199. Congress enacted the Securities Act to regulate the offer and sale of securities. Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

200. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include an "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. *See* 15 U.S.C. § 77b(a)(1) (Securities Act Section 2(a)(1)). During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

201. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one

that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

202. [redacted]

203. ***First***, Defendants violated Section 20A by [redacted]

204. [redacted]

205. [redacted]

206. The Individual Victims who purchased UST contemporaneously with Defendants were damaged by Defendants' unlawful trading on material non-public information.

207. ***Second***, Defendants violated Section 20A by [redacted]

208. [redacted]

[redacted]

209. [redacted]

210. The Individual Victims who purchased UST and Luna contemporaneously with Defendants between May 7 and May 31, 2022 were damaged by Defendants' unlawful trading on material non-public information.

211. WHEREFORE Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78t-1, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

**COUNT FOUR**
**SECURITIES EXCHANGE ACT SECTION 10(b) VIOLATION**
**(15 U.S.C. § 78j(b); 17 CFR § 240.10b-5)**
**(Plan Administrator on Behalf of Terraform) (Against all Defendants)**

212. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

213. This claim is brought on behalf of Terraform, who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and was damaged by Defendants' insider trading.

214. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 10(b) of the Securities Act, 15 U.S.C. § 78j, and § 240.10b-5 ("Rule 10b-5"). [redacted]

215. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

216. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

217. Jane Street knew that it had received material non-public information from Terraform either directly or through the intermediary Jump Trading.

218. [redacted]

219. [redacted]

220. [redacted]

221. [redacted]

222. Jane Street Defendants knew that Terraform reasonably expected the Jane Street Defendants to keep this material non-public information confidential.

223. [redacted]

224. The Jane Street Defendants knew that certain information they received from Terraform was both material and non-public. [redacted]

225. The Jane Street Defendants also knew, or should have known, that the confidential information was conveyed to the Jane Street Defendants in breach of a duty or similar obligation arising from a relationship of trust and confidence and for a personal benefit. [redacted]

[redacted]

226. [redacted]

227. [redacted]

228. [redacted]

229. [redacted]

230. Jump Trading, then acting on behalf of Terraform, had a temporary insider relationship with Terraform's shareholders as a result of Jump's verbal and written agreements with Terraform. Jump agreed to maintain the UST's peg to the U.S. dollar, that imposed on Jump a duty to Terraform's shareholders. Jump was not an ordinary investor—it worked alongside Terraform in a closer relationship than other arms-length investors did. Jump thus had access to information that others trading on the same products did not have.

231. [redacted]

232. [redacted]

233. Terraform and Jump reasonably expected this material non-public information to be kept confidential. [redacted]

234. [redacted]

235. [redacted]

236. [redacted]

237. Jane Street is liable to Plaintiff, acting on behalf of Terraform who purchased Luna and UST from May 7 to May 31, 2022, in the form of its actual damages proportionate to its liability for its Rule 10b-5 violations.

238. WHEREFORE, Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78j(b) and 17 CFR § 240.10b-5, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff actual damages and attorneys' fees.

**COUNT FIVE**
**SECURITIES EXCHANGE ACT SECTION 10(b) VIOLATION**
**(15 U.S.C. § 78j(b); 17 CFR § 240.10b-5)**
**(Plan Administrator on Behalf of LFG) (Against all Defendants)**

239. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

240. This claim is brought on behalf of LFG who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and was damaged by Defendants' insider trading.

241. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 10(b) of the Securities Act, 15 U.S.C. § 78j, and § 240.10b-5 ("Rule 10b-5"). [redacted]

242. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

243. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

244. Jane Street knew that it had received material non-public information from Terraform either directly or through the intermediary Jump Trading.

245. [redacted]

246. [redacted]

247. [redacted]

[redacted]

248. [redacted]

249. Jane Street Defendants knew that Terraform reasonably expected the Jane Street Defendants to keep this material non-public information confidential.

250. [redacted]

251. The Jane Street Defendants knew that certain information they received from Terraform was both material and non-public. [redacted]

252. The Jane Street Defendants also knew, or should have known, that the confidential information was conveyed to the Jane Street Defendants in breach of a duty or similar obligation arising from a relationship of trust and confidence and for a personal benefit. [redacted]

253. [redacted]

[redacted]

254. [redacted]

255. [redacted]

256. [redacted]

257. Jump Trading, then acting on behalf of Terraform, had a temporary insider relationship with Terraform's shareholders as a result of Jump's verbal and written agreements with Terraform. Jump agreed to maintain the UST's peg to the U.S. dollar, that imposed on Jump a duty to Terraform's shareholders. Jump was not an ordinary investor—it worked alongside Terraform in a closer relationship than other arms-length investors did. Jump thus had access to information that others trading on the same products did not have.

258. [redacted]

259. [redacted]

260. Terraform and Jump reasonably expected this material non-public information to be kept confidential. [redacted]

261. [redacted]

262. [redacted]

263. [redacted]

264. Jane Street is liable to Plaintiff, on behalf of LFG who purchased Luna and UST from May 7 to May 31, 2022, in the form of its actual damages proportionate to its liability for its Rule 10b-5 violations.

265. WHEREFORE, Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78j(b) and 17 CFR § 240.10b-5, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff actual damages and attorneys' fees.

**COUNT SIX**
**SECURITIES EXCHANGE ACT SECTION 10(b) VIOLATION**
**(15 U.S.C. § 78j(b); 17 CFR § 240.10b-5)**
**(Plan Administrator on Behalf of the Individual Victims) (Against all Defendants)**

266. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

267. This claim is brought on behalf of the Individual Victims who purchased UST or LUNA contemporaneously with Defendants' trading activity on and after May 7, 2022, and were damaged by Defendants' insider trading.

268. This claim is brought against Defendants Jane Street and the Individual Defendants under Section 10(b) of the Securities Act, 15 U.S.C. § 78j, and § 240.10b-5 ("Rule 10b-5"). [redacted]

269. A digital token or crypto asset is a crypto asset security if it meets the definition of a security, which the Securities Act defines to include "investment contract," *i.e.*, if it constitutes an investment of money, in a common enterprise, with a reasonable expectation of profit derived from the efforts of others. During the relevant period, Defendants received material non-public information about, and traded in, at least two crypto asset securities that meet this definition: UST and Luna.

270. Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. "Both the SEC and private litigants have brought several successful actions in this Circuit predicated on crypto-assets falling within the *Howey* definition of an 'investment contract.'" *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 287 (S.D.N.Y) (Failla, J.) (collecting cases). That is because novel or unique investment vehicles constitute investment

contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, crypto assets, and enterprises that exist only on the internet. *See SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 190 (S.D.N.Y. 2023) ("[T]he reach of the [Exchange] Act does not stop with the obvious and commonplace, but must extend to '[n]ovel, uncommon, or irregular devices, whatever they appear to be,' that are 'widely offered [and sold]' in a way that 'established their character' as a security."). As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946).

271. Jane Street knew that it had received material non-public information from Terraform either directly or through the intermediary Jump Trading.

272. [redacted]

273. [redacted]

274. [redacted]

275. [redacted]

276. Jane Street Defendants knew that Terraform reasonably expected the Jane Street Defendants to keep this material non-public information confidential.

277. [redacted]

278. The Jane Street Defendants knew that certain information they received from Terraform was both material and non-public. [redacted]

279. The Jane Street Defendants also knew, or should have known, that the confidential information was conveyed to the Jane Street Defendants in breach of a duty or similar obligation arising from a relationship of trust and confidence and for a personal benefit. [redacted]

280. [redacted]

281. [redacted]

282. [redacted]

283. [redacted]

284. Jump Trading, then acting on behalf of Terraform, had a temporary insider relationship with Terraform's shareholders as a result of Jump's verbal and written agreements with Terraform. Jump agreed to maintain the UST's peg to the U.S. dollar, that imposed on Jump a duty to Terraform's shareholders. Jump was not an ordinary investor—it worked alongside Terraform in a closer relationship than other arms-length investors did. Jump thus had access to information that others trading on the same products did not have.

285. [redacted]

286. Instead of assisting with that funding, however, Jane Street immediately turned around and traded in UST on the basis of material non-public information provided by Terraform and Jump, to its own benefit.

287. Terraform and Jump reasonably expected this material non-public information to be kept confidential. [redacted]

288. [redacted]

[redacted]

289. [redacted]

290. [redacted]

291. Jane Street is liable to Plaintiff, on behalf of the Individual Victims who purchased Luna and UST from May 7 to May 31, 2022, in the form of its actual damages proportionate to its liability for its Rule 10b-5 violations.

292. WHEREFORE, Plaintiff requests that the Court find that Defendants violated 15 U.S.C. § 78j(b) and 17 CFR § 240.10b-5, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff actual damages and attorneys' fees.

**COUNT SEVEN**
**Liability of Controlling Persons**
**EXCHANGE ACT**
**(Plan Administrator on Behalf of Terraform) (Against Defendants Jane Street and Robert Granieri)**

293. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

294. This claim is brought against Defendants Jane Street and Robert Granieri for violations of Section 20(a) of the Exchange Act, 15 U.S. Code § 78t.

295. Defendant Jane Street was the employer of, and exercised control over, the other Defendants. By virtue of its position as the corporation and employer of the other Defendants, Jane Street had awareness of and/or substantially participated in its employees' operations and trades. Jane Street had the power to influence and control, and did influence and control the decision making of its employees' trades and operations. Jane Street therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint. Jane Street was also provided with and/or had access to Defendants' trading plans, and/or company operations, and therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint.

296. Defendant Robert Granieri, by virtue of his position as co-founder of Jane Street, had awareness of and/or [redacted]

297. As set forth above, these Defendants violated Section 20(A) and Rule 10b-5 by their acts and omission alleged in this Complaint. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Terraform was damaged by

Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

298. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Section 20(a) of the Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

**COUNT EIGHT**
**Liability of Controlling Persons**
**EXCHANGE ACT**
**(Plan Administrator on Behalf of Behalf of LFG) (Against Defendants Jane Street and Robert Granieri)**

299. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

300. This claim is brought against Defendants Jane Street and Robert Granieri for violations of Section 20(a) of the Exchange Act, 15 U.S. Code § 78t.

301. Defendant Jane Street was the employer of, and exercised control over, the other Defendants. By virtue of its position as the corporation and employer of the other Defendants, Jane Street had awareness of and/or substantially participated in its employees' operations and trades. Jane Street had the power to influence and control, and did influence and control the decision making of its employees' trades and operations. Jane Street therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint. Jane Street was also provided with and/or had access to Defendants' trading plans, and/or company operations, and therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint.

302. Defendant Robert Granieri, by virtue of his position as co-founder of Jane Street, had awareness of and/or [redacted]

[redacted]

303. As set forth above, these Defendants violated Section 20(A) and Rule 10b-5 by their acts and omission alleged in this Complaint. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, LFG was damaged by Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

304. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Section 20(a) of the Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

**COUNT NINE**
**Liability of Controlling Persons**
**EXCHANGE ACT**
**(Plan Administrator on Behalf of the Individual Victims) (Against Defendants Jane Street and Robert Granieri)**

305. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

306. This claim is brought against Defendants Jane Street and Robert Granieri for violations of Section 20(a) of the Exchange Act, 15 U.S. Code § 78t.

307. Defendant Jane Street was the employer of, and exercised control over, the other Defendants. By virtue of its position as the corporation and employer of the other Defendants, Jane Street had awareness of and/or substantially participated in its employees' operations and trades. Jane Street had the power to influence and control, and did influence and control the decision making of its employees' trades and operations. Jane Street therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint. Jane Street was also provided with and/or had access to Defendants' trading plans, and/or company operations, and therefore had the ability to prevent the trades giving rise to the securities violation alleged in this Complaint.

308. Defendant Robert Granieri, by virtue of his position as co-founder of Jane Street, had awareness of and/or [redacted]

309. As set forth above, these Defendants violated Section 20(A) and Rule 10b-5 by their acts and omission alleged in this Complaint. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, the Individual Victims were damaged

by Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

310. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Section 20(a) of the Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

## COUNT TEN
## Market Manipulation
## COMMODITY EXCHANGE ACT
## (Plan Administrator on Behalf of Terraform) (Against all Defendants)

311. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

312. As set forth above, UST and Luna are crypto asset securities, and they are governed by the Securities Act. Should the Court find that cryptocurrency is not a Security, Plaintiff pleads in the alternative that the Court should then determine that cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

313. The CFTC has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities and are therefore subject as a commodity to applicable provisions of the [CEA] and Regulations."

314. Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

315. The CFTC promulgated Rule 180.1(a) which makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

316. [redacted]

317. [redacted]

318. Defendants also engaged in price manipulation. [redacted]

319. Terraform was damaged by Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

320. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Commodities Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

**COUNT ELEVEN**
**Market Manipulation**
**COMMODITY EXCHANGE ACT**
**(Plan Administrator on Behalf of LFG) (Against all Defendants)**

321. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

322. As set forth above, UST and Luna are crypto asset securities, and they are governed by the Securities Act. Should the Court find that cryptocurrency is not a Security, Plaintiff pleads in the alternative that the Court should then determine that cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

323. The CFTC has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities and are therefore subject as a commodity to applicable provisions of the [CEA] and Regulations."

324. Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

325. The CFTC promulgated Rule 180.1(a) which makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;

> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

326. [redacted]

327. [redacted]

328. Defendants also engaged in price manipulation. [redacted]

[redacted]

329. LFG was damaged by Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

330. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Commodities Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

**COUNT TWELVE**
**Market Manipulation**
**COMMODITY EXCHANGE ACT**
**(Plan Administrator on Behalf of the Individual Victims) (Against all Defendants)**

331. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

332. As set forth above, UST and Luna are crypto asset securities, and they are governed by the Securities Act. Should the Court find that cryptocurrency is not a Security, Plaintiff pleads in the alternative that the Court should then determine that cryptocurrencies are commodities within the definition of 7 U.S.C. § 1a.

333. The CFTC has found that "[b]itcoin and other virtual currencies are encompassed in the definition and properly defined as commodities and are therefore subject as a commodity to applicable provisions of the [CEA] and Regulations."

334. Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, make it unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of rules and regulations timely promulgated by the CFTC.

335. The CFTC promulgated Rule 180.1(a) which makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud;
>
> (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading;
>
> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person; or,
>
> (4) Deliver or cause to be delivered, or attempt to deliver or cause to be delivered, for transmission through the mails or interstate commerce, by any means of communication whatsoever, a false or misleading or inaccurate report concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce, knowing, or acting in reckless disregard of the fact that such report is false, misleading or inaccurate.

17 C.F.R. § 180.1(a).

336. [redacted]

337. [redacted]

338. Defendants also engaged in price manipulation. [redacted]

339. The Individual Victims were damaged by Defendants' market manipulation during and preceding the May 2022 depeg event, and this Court should order Defendants to compensate Plaintiff accordingly.

340. WHEREFORE Plaintiff requests that the Court find that Defendants violated the Commodities Exchange Act, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their manipulation of the market and trades supported by material non-public information.

**COUNT THIRTEEN**
**Aiding and Abetting Market Manipulation**
**COMMODITY EXCHANGE ACT**
**(Plan Administrator on Behalf of Terraform) (Against the Individual Jane Street Defendants)**

341. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

342. Plaintiff brings this Count against the Individual Jane Street Defendants under Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation.

343. Each of the Individual Jane Street Defendants willfully aided, abetted, counseled, induced, and/or procured violations of Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, and violations of CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a) regarding the intentional or reckless funding of UST, the intentional or reckless shorting of UST, and intentional or reckless price manipulation.

344. As described throughout the Complaint, each of the Individual Jane Street Defendants had knowledge of Jane Street's intention to commit a violation of the CEA, intended to further that violation, and committed an act in furtherance of the violation.

345. [redacted]

346. [redacted]

347. [redacted]

348. The Individual Jane Street Defendants' market manipulation during and preceding the May 2022 depeg directly and proximately caused Terraform irreparable harm.

349. WHEREFORE Plaintiff requests that the Court find that the Individual Jane Street Defendants violated Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable

CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation, enter judgments against the Individual Jane Street Defendants in favor of Plaintiff, and award Plaintiff such amount as the Court deems just and proper.

**COUNT FOURTEEN**
**Aiding and Abetting Market Manipulation**
**COMMODITY EXCHANGE ACT**
**(Plan Administrator on Behalf of LFG) (Against the Individual Jane Street Defendants)**

350. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

351. Plaintiff brings this Count against the Individual Jane Street Defendants under Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation.

352. Each of the Individual Jane Street Defendants willfully aided, abetted, counseled, induced, and/or procured violations of Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, and violations of CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a) regarding the intentional or reckless funding of UST, the intentional or reckless shorting of UST, and intentional or reckless price manipulation.

353. As described throughout the Complaint, each of the Individual Jane Street Defendants had knowledge of Jane Street's intention to commit a violation of the CEA, intended to further that violation, and committed an act in furtherance of the violation.

354. [redacted]

355. [redacted]”

356. [redacted]

357. The Individual Jane Street Defendants’ market manipulation during and preceding the May 2022 depeg directly and proximately caused LFG irreparable harm.

358. WHEREFORE Plaintiff requests that the Court find that the Individual Jane Street Defendants violated Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation, enter judgments against the Individual Jane Street Defendants in favor of Plaintiff, and award Plaintiff such amount as the Court deems just and proper.

**COUNT FIFTEEN**
**Aiding and Abetting Market Manipulation**
**COMMODITY EXCHANGE ACT**
**(Plan Administrator on Behalf of the Individual Victims) (Against the Individual Jane Street Defendants)**

359. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

360. Plaintiff brings this Count against the Individual Jane Street Defendants under Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation.

361. Each of the Individual Jane Street Defendants willfully aided, abetted, counseled, induced, and/or procured violations of Sections 6(c)(1) and 22 of the CEA, 7 U.S.C. §§ 9, 25, and violations of CFTC Rule 180.1(a), 17 C.F.R. § 180.1(a) regarding the intentional or reckless funding of UST, the intentional or reckless shorting of UST, and intentional or reckless price manipulation.

362. As described throughout the Complaint, each of the Individual Jane Street Defendants had knowledge of Jane Street's intention to commit a violation of the CEA, intended to further that violation, and committed an act in furtherance of the violation.

363. [redacted]

364. [redacted]

365. [redacted]

366. The Individual Jane Street Defendants' market manipulation during and preceding the May 2022 depeg directly and proximately caused the Individual Victims irreparable harm.

367. WHEREFORE Plaintiff requests that the Court find that the Individual Jane Street Defendants violated Section 13 and 25(a) of the CEA (7 U.S.C. §§ 13c, 25(a)) and applicable CFTC Regulations for aiding and abetting direct violations of the CEA and applicable CFTC Regulation, enter judgments against the Individual Jane Street Defendants in favor of Plaintiff, and award Plaintiff such amount as the Court deems just and proper.

**COUNT SIXTEEN**
**UNJUST ENRICHMENT**
**(Plan Administrator on Behalf of Terraform) (Against all Defendants)**

368. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

369. Under New York law, Jane Street was enriched at the expense of Terraform. Principles of equity require that Jane Street return the money or property to Plaintiff.

370. [redacted]

371. Jane Street's earnings on May 7 came directly at the expense of Terraform.

372. On and after May 8, Jane Street traders relied on material non-public information, including information about UST health and stability and LUNA fundraising efforts, to short sell LUNA and UST.

373. Jane Street's short selling earnings on and after May 8 came directly at the expense of Terraform.

374. Plaintiff was injured as a direct result of Defendants' unjust enrichment.

375. WHEREFORE, Plaintiff requests that the Court find that Defendants were unjustly enriched as a result of their actions, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

**COUNT SEVENTEEN**
**UNJUST ENRICHMENT**
**(Plan Administrator on Behalf of LFG) (Against all Defendants)**

376. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

377. Under New York law, Jane Street was enriched at the expense of LFG. Principles of equity require that Jane Street return the money or property to Plaintiff.

378. [redacted]

379. Jane Street's earnings on May 7 came directly at the expense of LFG.

380. On and after May 8, Jane Street traders relied on material non-public information, including information about UST health and stability and LUNA fundraising efforts, to short sell LUNA and UST.

381. Jane Street's short selling earnings on and after May 8 came directly at the expense of LFG.

382. Plaintiff was injured as a direct result of Defendants' unjust enrichment.

383. WHEREFORE, Plaintiff requests that the Court find that Defendants were unjustly enriched as a result of their actions, enter judgments against Defendants in favor of Plaintiff, and award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

**COUNT EIGHTEEN**
**UNJUST ENRICHMENT**
**(Plan Administrator on Behalf of the Individual Victims) (Against all Defendants)**

384. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

385. Under New York law, Jane Street was enriched at the expense of the Individual Victims. Principles of equity require that Jane Street return the money or property to Plaintiff.

386. [redacted]

387. Jane Street's earnings on May 7 came directly at the expense of the Terraform Wind-Down Trust individual bankruptcy claimants.

388. On and after May 8, Jane Street traders relied on material non-public information, including information about UST health and stability and LUNA fundraising efforts, to short sell LUNA and UST.

389. Jane Street's short selling earnings on and after May 8 came directly at the expense of the Individual Victims.

390. Plaintiff was injured as a direct result of Defendants' unjust enrichment.

391. WHEREFORE, Plaintiff requests that the Court find that Defendants were unjustly enriched as a result of their actions, enter judgments against Defendants in favor of Plaintiff, and

award Plaintiff the amount that Jane Street profited and the losses they avoided as a result of their trades supported by material non-public information.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a. Enter a judgment in favor of Plaintiff on all counts of this Complaint;

b. Enter a judgment holding Jane Street and the Individual Defendants liable for their violations;

a. Award Plaintiff money damages from Defendants, including compensatory damages, exemplary damages, treble damages, punitive damages, lost profits, lost business value, disgorgement, and attorneys' fees and costs, in an amount to be proven at trial;

b. Award Plaintiff pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

c. Award such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: February 23, 2026

Respectfully submitted,

*/s/ John P. Del Monaco*

John P. Del Monaco
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
john_delmonaco@kirkland.com

Michael F. Williams, P.C. (*pro hac forthcoming*)
Judson Brown, P.C. (*pro hac forthcoming*)
Sarah E. McVay (*pro hac forthcoming*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
mwilliams@kirkland.com
jdbrown@kirkland.com
sarah.mcvay@kirkland.com

Casey J. McGushin (*pro hac forthcoming*)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
casey.mcgushin@kirkland.com

*Counsel for Plaintiff Todd R. Snyder, as Plan Administrator for the Terraform Labs Pte. Ltd., et al., each Post Effective-Date Debtor, and the Wind Down Trust*