# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | |
|---|---|
| TODD R. SNYDER, AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST, <br><br> Plaintiff, <br><br> v. <br><br> JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LTD., JUMP FINANCIAL, LLC, J DIGITAL 6 CAYMAN LTD., JCDP-7 DIGITAL LTD., JUMP OPERATIONS, LLC, JUMP CAPITAL, LLC, KANAV KARIYA, WILLIAM DISOMMA, and XYZ COMPANIES 1-10, <br><br> Defendants. | Case No. 1:25-cv-15414 <br><br> District Judge Joan H. Lefkow <br><br> **AMENDED COMPLAINT** <br><br> JURY TRIAL DEMANDED |

Plaintiff Todd R. Snyder, as Plan Administrator for the jointly administered estates of Terraform Labs Pte. Ltd. and Terraform Labs Limited ("Terraform") and the Wind Down Trust established under the Second Amended Chapter 11 Plan of Liquidation approved in *In re Terraform Labs Pte. Ltd. et al.*, Case No. 24-10070 (Bankr. D. Del.) (the "Plaintiff"), and as assignee of claims from the individuals listed in **Exhibit A** (the "Individual Victims"), by and through his undersigned counsel, alleges as follows against Jump Trading, LLC, Jump Crypto Holdings, LLC, Jump Financial, LLC, J Digital 6 Cayman Ltd., JCDP-7 Digital Ltd., Jump Operations, LLC, Jump Capital, LLC, and Tai Mo Shan Ltd. (together, "Jump" or the "Jump Entity Defendants"); Kanav Kariya; William DiSomma; and XYZ Companies 1-10 (the "Individual Defendants," and together with Jump, the "Defendants").

## **INTRODUCTION**

1. Alongside Terraform and its co-founder, Do Kwon, Jump facilitated a fraudulent pump-and-dump scheme that resulted for Jump in one of the most profitable trades in financial history but also the largest cryptocurrency collapse to date. The figures are shocking: Jump made off with over $1.4 billion in profits—with little of its own capital on the line. Others were left holding the bag when Terraform collapsed and more than $45 billion evaporated in a matter of days in May 2022.

2. Terraform and Kwon have been held accountable for their roles in this massive fraud. In 2024, Terraform filed for bankruptcy and wound up its business. The United States Securities and Exchange Commission ("SEC") charged Terraform and Kwon with securities fraud, a jury found them liable, and they agreed to pay nearly $4.5 billion. Kwon was separately criminally indicted by the United States Department of Justice ("DOJ"), pleaded guilty in 2025, and is now serving a 15-year sentence in federal prison. He has also been indicted on criminal charges in South Korea.

3.      Recent enforcement actions against Terraform and Kwon laid bare Jump's central role in the fraud.  The SEC described Jump's "secret agreement" with Kwon to manipulate the relevant markets as "the centerpiece of the fraud" and "the heart" of the scheme.  At Kwon's sentencing hearing, United States District Court Judge Paul A. Engelmayer observed that it was **Jump** that facilitated the fraud by "secretly and artificially prop[ping] up" the price of Terraform's crypto tokens.  Without Jump's muscle, the fraud could never have succeeded.

4.      After the 2024 election but before the new administration took over, a Jump subsidiary settled with the SEC for a slap-on-the-wrist monetary penalty representing a small fraction of Jump's illicit profits.  This lawsuit is how Terraform's estate and the victims of Jump's predatory conduct will finally hold Jump responsible for its central role in one of the largest financial frauds ever.

* * *

5.      Terraform was founded as an open-source software development company specializing in blockchain technology.  Terraform traces its roots back to 2018 when Kwon, along with others, began developing the "Terra Ecosystem."

6.      Starting in 2021, Jump worked hand in glove with Terraform and Kwon to pump up the value of Terraform's native crypto token, LUNA, by manipulating the price of a related Terraform token, TerraUSD ("UST").

7.      LUNA was analogous to equity in the Terra Ecosystem and functioned like other digital assets, with its value fluctuating based on whether market participants wanted to invest in (or speculate on) the value of the Terra Ecosystem.

8.      UST was a "stablecoin."  Stablecoins are crypto tokens that track the value of fiat currencies or digital assets.  UST's value was pegged to $1.  In the world of digital assets,

stablecoins that reliably track the reference asset have various uses that drive demand and generate revenue for their issuers. Advocates tout stablecoins as ushering in an era of borderless capital markets and seamless cross-border business operations, in which frictions arising from the use of sovereign currencies fall away. To take just two examples, UST could be used to process transactions or loaned out in exchange for a return like an ordinary savings account.

9. To promote stability, many stablecoins are backed by reserves of the very asset to which they are pegged—for example, a USD-pegged stablecoin holding U.S. dollars or cash-equivalent instruments in reserve. UST was different. Rather than holding reserves of the U.S. dollar to which it was pegged, UST was convertible into LUNA, Terraform's native token representing equity in the Terra Ecosystem.

10. To maintain UST's $1 peg, Terraform designed an arbitrage mechanism referred to as the "Terra Protocol." Under the Terra Protocol, one UST could be exchanged for $1 worth of LUNA. In theory, this design meant that market participants would be incentivized through arbitrage opportunities to maintain UST's $1 peg without the need for reserves or third-party regulation. Terraform touted UST as an "algorithmic stablecoin" to set it apart from reserve-backed stablecoins, and, at the time UST was launched, the Terra Protocol was hyped as a novel solution to the problem of stablecoin volatility.

11. The Terra Ecosystem would expand—and LUNA would rise in value—only if demand for UST increased. And UST would only be in demand if the Terra Protocol worked as promised. So Terraform, using Jump as its muscle, spent years convincing market participants that the Terra Protocol was foolproof, that UST was a safe bet, and that LUNA was a smart investment in cutting-edge technology.

4

12.     But this was false.  Terraform knew that its arbitrage mechanism was fundamentally flawed, that UST's $1 peg did not hold, and that UST was not stable.  Terraform and Kwon were found civilly and criminally liable for fraud based on their false statements and omissions promoting UST and juicing the value of LUNA, and because of their fraudulent scheme to mislead the market into believing that the Terra Protocol worked as promised when in reality it required intentional market manipulation.

13.     Jump's role in the fraud was critical—and simple: when UST depegged in May 2021, Jump deployed its sophisticated traders and capital to surreptitiously manipulate the price of UST back to its $1 peg so that market participants would believe that the Terra Protocol worked even though it did not.  Afterward, Jump concealed its covert role in restoring the peg and continued to tout UST as a reliable stablecoin despite knowing that it was only a matter of time before the Terra Ecosystem imploded.  Simply put, Jump's market manipulation was essential to misleading market participants into believing that the Terra Protocol worked.

14.     Terraform's marketing strategy meant that UST was attractive precisely because it was supposedly stable.  Terraform's insistence that UST's peg was inherently stable due to the Terra Protocol, combined with another Terraform protocol that promised steady outsized returns for holders of UST, targeted the kinds of retail investors who could least afford to speculate on risky cryptocurrencies.  Everyday people invested their life savings because Terraform and Jump falsely led them to believe that UST had the low-risk profile of an interest-bearing savings account. That was untrue.

15.     Terraform and Jump's scheme worked.  At the time of the May 2021 depeg, the market capitalization of the Terra Ecosystem was just $8 billion.  Over the next year, investors

flooded into UST and LUNA. And by May 2022, the market capitalization of the Terra Ecosystem had ballooned, increasing over five-fold to $45 billion.

16. Jump profited enormously from its participation in the fraud. Jump held deeply in-the-money positions in LUNA pursuant to a surreptitious market-making relationship it had previously entered with Terraform. Jump's relationship with Terraform entitled it to purchase LUNA at $0.40 and then re-sell it into the market at the prevailing market price—sometimes over $100. In other words, as the Terra Ecosystem grew, Jump sold its LUNA into the very same market it was manipulating.

17. In May 2022, UST experienced another depeg. But this time, Jump was unable to restore UST to its $1 peg. Instead, UST permanently depegged, UST and LUNA were rendered worthless, Terraform collapsed, and nearly the entire $45 billion market capitalization of the Terra Ecosystem was wiped out in a matter of days.

18. And yet—despite Terraform's calamitous collapse—Jump pocketed billions. For its LUNA trades alone, Jump has already *admitted* that it realized over $1.4 billion in profits, all with precious little of its own capital at risk. A classic pump-and-dump.

19. It gets a lot worse. As Terraform was experiencing a "death spiral" and collapsing, Kwon directed over 52,000 Bitcoin to Jump that, at the time, was worth more than $1.5 billion (with a B). In theory, Jump was supposed to trade that Bitcoin to prop up the price of UST and restore its $1 peg. Jump has never disclosed how it deployed this Bitcoin or whether it did so in ways that further lined its own pockets at the expense of Terraform's investors. Jump subsequently returned 5,313 Bitcoin. But the remaining Bitcoin has not been fully accounted for—and would have been available to Terraform's estate had it not been sent to Jump in the midst of Terraform's collapse.

20. Jump thus victimized Terraform's creditors twice over. Jump first helped build the Terraform house of cards by secretly manipulating the market to give the false impression that UST's $1 peg would algorithmically hold, reaping eye-watering trading profits along the way. And then, just as the Terraform house of cards was collapsing, Jump looted Terraform-controlled Bitcoin, which today are worth roughly $4 billion.

21. The Plan Administrator was appointed by the Bankruptcy Court to pursue claims against those who, like Jump and its executives, caused and profited from Terraform's ruin. This case seeks to hold Jump accountable and to recoup the fruits of Jump's fraud, which the Plan Administrator would distribute to Terraform's creditors—namely, the investors who lost everything in Terraform's collapse.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over Plaintiff's claims under Sections 9, 10(b) and 20A of the Exchange Act (15 U.S.C. §§ 78i, 78j, 78t-1), Section 15 of the Securities Act (15 U.S.C. § 77o), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5), and the Bankruptcy Code under 28 U.S.C. § 1331 as they are based on federal laws.

23. This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a) because they arise out of the same case or controversy as Plaintiff's claims based on federal law.

24. Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) as a substantial portion of the events giving rise to these claims occurred in this judicial district.

## PARTIES TO THE ACTION

25. Plaintiff Todd R. Snyder is a resident of New York. He is the Plan Administrator for the Terraform Labs Wind Down Trust (the "Wind Down Trust"). He was appointed under the Second Amended Plan of Reorganization for Terraform Labs Pte. Ltd., *et al.* (the "Plan"), as

confirmed by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on September 20, 2024, which also established the Wind Down Trust. Under the Plan, all assets of Terraform Labs Pte. Ltd. and Terraform Labs Limited (together, "Terraform") were transferred to the Wind Down Trust, and from the effective date of the Plan on October 1, 2024, the Plan Administrator has the authority to carry out and implement all provisions of the Plan. This authority includes: (a) running the claims reconciliation process, including establishing a separate claims process for holders of "crypto loss claims" who were the victims of this fraudulent scheme; (b) making distributions required by the Plan, including to the holders of crypto loss claims; (c) maximizing the value of the assets of the Wind Down Trust and Terraform, including by bringing litigation on account of any causes of action held by Terraform or the Wind Down Trust; and (d) reviewing and compelling turnover of the property of Terraform Debtors or the Wind Down Trust. In short, Plaintiff was charged by the Bankruptcy Court and the Plan with monetizing any assets transferred to the Wind Down Trust and distributing such funds to creditors and has authority under the Plan to pursue compensation claims on behalf of injured creditors.

26. One of Plaintiff's principal responsibilities is to seek compensation on behalf of creditors who were harmed by the collapse of the Terra Ecosystem. Plaintiff is empowered by order of the Bankruptcy Court to pursue claims against actors like the Defendants who unlawfully profited from, and contributed to, the failure of Terraform. Plaintiff will use recoveries secured in litigation against these Defendants to fund the compensation dedicated to creditors under the Plan.[1]

27. As part of the Plan and the crypto loss claims approved by the Bankruptcy Court, thousands of Individual Victims assigned to the Wind Down Trust their individual claims against third parties related to Terraform. JTC (Cayman) Limited is a Cayman Island company and the

---

[1] The Plan establishes the priority of creditors in any funds recovered by the Plan Administrator.

Trustee of the Wind Down Trust. Under the Plan, the terms of the assignments, and the Wind Down Trust Agreement, Plaintiff is authorized to pursue these claims. The Individual Victims on whose behalf Plaintiff is pursuing claims in this action are listed on **Exhibit A**.

28. The Individual Victims contributed their claims to the Wind Down Trust between March 30, 2025 and April 22, 2026.

29. Defendant Jump Trading, LLC is a Delaware limited liability corporation with its principal place of business in Chicago, Illinois. Defendant DiSomma and Paul Gurinas founded Akami Trading LLC in 1999. In 2001, DiSomma and Gurinas changed Akami Trading's name to Jump Trading, LLC, and their trading platform evolved into the "Jump Trading Group" brand.

30. Jump Trading touts itself as a "leading data and research-driven trading firm that focuses on algorithmic and high frequency trading." Jump Trading began as a traditional proprietary trading firm but has become one of the most sophisticated cryptocurrency trading firms in the world.

31. Jump Trading officially launched "Jump Crypto" in 2021. "Jump Crypto" is the cryptocurrency division within the Jump Trading Group brand.

32. On information and belief, the sole member of Jump Trading, LLC is Jump Trading Holdings, LLC. Jump Trading Holdings, LLC is a Delaware limited liability corporation. The members of Jump Trading Holdings, LLC are Jump Financial, LLC, Jump Traders, LLC, and JEIV Partners LLC.

33. Defendant Jump Financial, LLC is a Delaware limited liability corporation with its principal place of business in Chicago, Illinois. Jump Financial, LLC is a corporate parent of Jump Trading, LLC.

9

34.     Jump Crypto Holdings, LLC is a limited liability company incorporated in Delaware with its principal place of business in Chicago, Illinois. Jump Crypto Holdings is the parent of Tai Mo Shan.

35.     Defendant Tai Mo Shan Limited is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands. Tai Mo Shan is a subsidiary of Jump Crypto Holdings LLC.

36.     Defendant J Digital 6 Cayman Ltd. is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands. J Digital 6 Cayman Ltd. is a Jump entity that entered into a $330 million token sale agreement with the LUNA Foundation Guard ("LFG") in January 2022.

37.     Defendant JCDP-7 Digital Ltd. is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands. JCDP-7 Digital Ltd. is a Jump entity that entered into a $20 million token sale agreement with LFG in January 2022.

38.     Jump Operations, LLC is a Delaware corporation with its principal place of business in Chicago, Illinois. Jump Operations, LLC first explored a potential business relationship with Terraform in 2019.

39.     Jump Capital, LLC is a Delaware corporation with its principal place of business in Chicago, Illinois. Jump Capital is a Jump entity that executed trades regarding LFG's reserve, and upon information and belief, was involved in the attempt to restore the UST peg in May 2022.

40.     Defendant Jump Trading, LLC has a unity of interest and ownership with Defendants J Digital 6 Cayman Ltd., JCDP-7 Digital Ltd., Jump Operations, LLC, and Jump Capital, LLC.

41.     Upon information and belief, and as described below, each of the Jump entities named as defendants in this action are maintained under the common ownership and control of the Jump Trading Group's co-founders. On information and belief, the Jump Entity Defendants commingled funds and failed to observe corporate separateness. Corporate officers and employees held themselves out as working on behalf of "Jump Trading" or "Jump Crypto" without distinguishing on which legal entity's behalf they acted at any given moment. And the various Jump Entity Defendants shared common resources such as facilities and management.

42.     Individual Defendant William DiSomma ("DiSomma") is a co-founder of the Jump Trading Group and a managing member of Jump Financial, LLC. On information and belief, Mr. DiSomma is domiciled in Illinois. According to an SEC whistleblower, DiSomma "ran the team" at "Jump Crypto," while Defendant Kanav Kariya was the public face. DiSomma approved Jump Crypto's deals, directed Jump Crypto's lead trader on trading strategies, and generally set the investment strategy for Jump Crypto.

43.     Individual Defendant Kanav Kariya ("Kariya") was the President of "Jump Crypto." He was a member of the Governing Council of LFG. On information and belief, Kariya was domiciled and physically located in Illinois when he undertook the activities described herein.

44.     Upon information and belief, yet to be identified Defendants XYZ Companies 1-10, through their agents, servants, and employees also engaged in the fraudulent conduct alleged herein. Defendants XYZ Companies are not presently known to the Plaintiff, and the Complaint will be amended to include the names of the actual defendants as such information becomes available.

11

## FACTUAL ALLEGATIONS

### Cryptocurrency and the Use of the Blockchain

45. Cryptocurrency is a digital form of currency that uses cryptographic principles to secure transactions. Most cryptocurrencies are maintained by a decentralized system, as opposed to a centralized authority like a bank.

46. One challenge with digital currency is preventing duplication, which would render the currency valueless. Traditional currencies employ anti-counterfeiting technologies like watermarks that make the currency difficult to duplicate. Cryptocurrencies rely on blockchain technology, a mechanism that facilitates secure, traceable transfers of digital assets from one recipient to another.

47. A blockchain is equivalent to a ledger where transactions of cryptocurrency are recorded. The blockchain's record of cryptocurrency transactions is both publicly available and unchangeable. A blockchain network is the blockchain ledger, along with everyone contributing to and using that ledger.

48. For example, Bitcoin, the first prominent digital asset, secures transactions through the use of a blockchain that tracks the ownership and transfer of every Bitcoin in existence. Bitcoin owners have a digital "address" where they receive Bitcoin. The Bitcoin blockchain publicly lists every address and the Bitcoin transactions associated with that address. Anyone looking at the blockchain can see every Bitcoin transaction. This transparency has enabled the secure exchange of Bitcoin because the blockchain allows for the identification (and thus prevention) of any duplication or transfer of a Bitcoin token to multiple people.

49. The use of a blockchain is now routine in cryptocurrency. Most cryptocurrency platforms rely on a blockchain to ensure that transactions are secure, transparent, and non-duplicable.

50.    A blockchain protocol is the set of rules that govern the operation of the blockchain. In addition to supporting the transactions described above, many blockchains allow for the creation and operation of additional protocols on the network that can perform different functions, including lending and borrowing cryptocurrency, creating new tokens, exchanging one cryptocurrency for another, and transferring a cryptocurrency from one blockchain to another.

51.    "Wallets" send or receive crypto tokens. Holders of wallets are issued two "keys": a "public" key and a "private" key. Public keys function like email addresses in that they facilitate the sending and receiving of digital assets. The private key associated with a wallet is a password akin to a key to a vault; it allows the holder to access and transfer the assets, and to prove ownership.

52.    The wallets used in a particular crypto transaction are publicly recorded on the blockchain. However, the identities of the individuals or entities that own or control those wallets are not listed publicly.

53.    Many cryptocurrency tokens can experience wide price fluctuations, causing volatility of the asset. Stablecoins are a type of cryptocurrency designed to combat such volatility. The valuable feature of a stablecoin is that, in theory, it pegs its value to another asset, such as another coin or fiat currency like the U.S. dollar.

54.    There are two main types of stablecoins—reserve-backed stablecoins and algorithmic stablecoins.

55.    A company issuing a reserve-backed stablecoin backs the stablecoin with a reserve of assets. Reserve assets are generally cash, highly liquid and safe assets such as U.S. Treasury securities, or other crypto tokens. The use of such reserves is intended to maintain the stablecoin's

price peg by ensuring that holders can redeem their stablecoin for its established value from the reserve.

56. A company issuing an algorithmic stablecoin, on the other hand, does not maintain reserves to back the value of the stablecoin. Rather, algorithmic stablecoins rely on incentives and arbitrage to maintain the price peg. So despite being called "algorithmic," these stablecoins simply rely on market participants to trade in ways that maintain the peg. Because no real reserves stand behind the coin, the structure depends on a continuous influx of new market participants willing to transact in the companion token at sustained valuations. So long as fresh demand keeps arriving, the peg appears to hold, but the moment that demand falters, there are no reserves to make earlier holders whole, and the losses fall on whoever is left holding the tokens.

**Terraform Creates and Markets UST as an "Algorithmic Stablecoin"**

57. Do Kwon and Daniel Shin co-founded Terraform in 2018. They began developing the "Terra Ecosystem" using blockchain technology.

58. Kwon was Terraform's Chief Executive Officer from 2020 through 2023. At all times relevant to this lawsuit, Kwon held approximately 92% of Terraform's equity. He maintained control over Terraform's assets and was subject to little oversight.

59. From inception, Terraform proposed to issue crypto tokens that would maintain 1:1 exchange rates with various fiat currencies through an arbitrage mechanism tied to a companion token. That arbitrage mechanism is known as the "Terra Protocol."

60. In April 2019, Terraform minted one billion LUNA tokens, the native token of the Terra Classic Blockchain. Initial Terraform investors received 188 million of the original supply of LUNA, with Terraform retaining the remainder.

61.     Following the launch of the Terra Classic Blockchain, users began to populate the network, develop and use applications on it, and acquire LUNA.  Over time, the Terra Ecosystem grew to encompass other protocols and cryptocurrencies.

62.     The value of LUNA derived from claims on transaction fees generated by the Terra Ecosystem and the rights to decide on the future development of the network; access to the services offered on the Terra Ecosystem; and investors speculating on LUNA's price.  As the Terra Ecosystem expanded through broader adoption, the value of LUNA increased.

63.     In 2019, Terraform issued TerraUSD (UST) as an algorithmic stablecoin pegged to $1.  Unlike other stablecoins like Tether, which is backed by non-crypto assets held in reserve, UST was linked to LUNA through the Terra Protocol in ways that incentivized traders to engage in arbitrage between UST and LUNA whenever UST deviated from its intended $1 peg.

64.     Under the Terra Protocol, a single UST could be exchanged and "burned" for $1 of LUNA, and $1 of LUNA could be exchanged to create (or "mint") one UST.  These rules—referred to as a "mint-burn protocol"—theoretically incentivized holders of LUNA to arbitrage between the two tokens, in turn maintaining UST's $1 peg.

65.     For example, in the event the price for UST rose above a dollar—*i.e.*, above its peg—holders would be incentivized to swap a dollar's worth of LUNA to "mint" and receive one UST, then valued above a dollar.  With traders thus minting additional UST, supplies of UST would rise and accordingly create downward pressure on the price of UST, moving it toward its target value of one dollar.  On the other hand, in the event the price of UST dropped below a dollar, a participant would be incentivized to "burn" one UST, then valued below a dollar, to receive a dollar's worth of LUNA.  The burned UST would be destroyed.  This activity would lower the supply of UST resulting in the value of UST returning to its $1 peg.

**Terraform and Jump Team Up**

66.     Shortly after its formation, Terraform crossed paths with executives of Jump Trading, a traditional proprietary trading firm headquartered in Chicago, Illinois.  At the time, Jump Trading was quickly (and profitably) moving into the crypto markets by leveraging its trading talent, capital, and technology expertise to trade crypto assets, build crypto infrastructure, and invest in crypto projects.

67.     Kwon met Tak Fujishima, a director at Jump Trading, at a conference in Singapore. In October 2019, Fujishima reached out to Kwon and mentioned that Jump "might be interested in partnering with you on Terra."  Fujishima and Kwon set up a call with Chicago-based Jump Trading employees to discuss a partnership, including Defendant Kariya (the head of "Jump Crypto") and Jeff Bezaire (a quantitative researcher).

68.     Jump knew that for the Terra Ecosystem to grow, there needed to be more liquidity in the markets for Terraform's tokens, including LUNA and UST.  But Terraform's management was inexperienced in secondary markets and trading operations.

69.     Jump, by contrast, specialized in high-frequency trading and was expanding into crypto markets.  Jump pitched Kwon on a relationship between Terraform and Jump that could provide much-needed liquidity and encourage wider adoption of Terraform's tokens, including UST and LUNA.

70.     Between 2019 and 2021, Terraform and Jump entered into a series of agreements pursuant to which Jump agreed to serve as a market-maker for UST and LUNA, which involved providing liquidity and serving as a willing counterparty to trades involving those crypto tokens.

71.     Market-making activities provide substantial benefits for a new crypto token. Market makers can increase liquidity for a token by standing ready to buy or sell in the market and can, through that increase in liquidity, assist the crypto token in gaining wider use and acceptance.

72.     In return, for providing market-making services, Jump received the option to purchase LUNA at strike prices far below market value.  The first Terraform-Jump agreement, entered in November 2019, entitled Jump to 30 million LUNA at strike prices ranging from $0.36 to $0.56 per token.  The parties entered another agreement, dated September 8, 2020, giving Jump the option to purchase an additional 65 million LUNA at strike prices fixed at $0.40 per LUNA if Jump satisfied conditions on trading volume and UST creation.  Those LUNA would be delivered to Jump over 12 to 24 months.

73.     Jump's agreements with Terraform incentivized Jump to support the Terra Ecosystem and to pump the value of LUNA—at least until its LUNA holdings vested and could be sold for profit.

74.     Referring to Jump's valuable LUNA options, Defendant William DiSomma wrote to Jump Trading's leadership in September 2020: "I asked [Defendant] Kanav [Kariya] to get me a chunky deal with this project . . . and he landed it.  This is a big notional deal. . . . 24 mil at strike of 40 cents which follows on current 9 mil notional.  If this project pops then we should eat" (*i.e.*, profit).  He added that Jump's "Team Illini" (a reference to Illinois) was "going much deeper with these projects where we have huge optionality."

75.     Later, throughout the spring of 2021 as Kariya and Kwon discussed Jump's partnership with Terraform, Kariya indicated that he was acting on DiSomma's instruction and would need DiSomma's approval for changes or new developments in the Terraform-Jump partnership.  For example, Kariya told Kwon in response to a proposal from Kwon: "Gotcha, ok yeah that seems reasonable.  I'll chat with Bill [DiSomma] in the morning and get back to you." In another exchange, in response to a request from Kwon, Kariya asked Kwon if Terraform could "front us [*i.e.*, Jump] some of the amount [of LUNA] we have unvested" because that "would be

really great." According to Kariya, that "[w]as Bill's only ask, so the more you can get us, the easier it is [to] pull goodwill gestures like this in the future."

76. Separate from the market-making agreements, Terraform and Jump also entered a secret "Gentleman's Agreement" providing that, among other things, Jump would deploy its capital and traders to defend UST's $1 peg. Kwon described this agreement as "essentially a don't-ask-don't-tell partnership . . . to help defend UST's peg." In an August 2020 email, Kariya told Kwon that, under their "Gentleman's Agreement," Jump "will support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg."

77. Jump's proposed "Gentleman's Agreement" aligned with Jump's incentives and competencies. If the Terra Protocol did not work, LUNA was effectively worthless. Jump was capable of deploying capital and sophisticated traders to surreptitiously manipulate the market for UST to protect the peg, propping up the Terra Ecosystem and ensuring that the value of LUNA (and Jump's profits) continued to climb.

78. In September 2020, after Jump entered these agreements with Terraform, Kariya touted the profitable relationship internally to his colleagues. He explained to the "Team Illini" Jump Trading listserv the Terraform-Jump partnership, Jump's incentives, and how Jump could increase the value of its LUNA holdings. Kariya wrote:

- "The use of these stablecoins [like UST] more broadly . . . increases the value of our LUNA position."

- "Where we [*i.e.*, Jump] come in is in making Terra stablecoins feel real. Stability mechanisms and protocols [*i.e.*, the Terra Protocol] are fun to debate and important to consider. But for most of crypto it's seeing it on exchanges everyday maintain its peg and be integrated into their favorite services. If we can continue to provide thick liquid markets in terra stablecoins across crypto, we have a pretty good shot at making this happen."

- "The more this feels like a real dollar to the crypto world, the more all of this works."

- "If all goes well, we'll be sitting on a pile of profits and money printing machine that spits out a continuous stream of widely adopted stablecoins."

79.     Kariya was right. Jump's agreements with Terraform ultimately enabled Jump to acquire millions of LUNA for pennies per token at a time when the market price ranged from approximately $40 to $116 per token, as shown below.



80.     Defendant DiSomma encouraged the Jump-Terraform partnership. During his initial discussions, Fujishima kept DiSomma abreast of his communications with Kwon and asked for DiSomma's approval to send a proposal on the terms of an initial agreement. DiSomma also discussed the "Terra Deal" with Kariya and others during a September 2020 internal Jump Trading call.

81.     Kwon wanted to announce Jump's engagement with Terraform publicly, but Jump insisted on confidentiality. For example, on January 13, 2020, Kwon emailed the few members of

"Terra's leading investor group to notify [them] of an important arrangement we've entered into with Jump Trading," and "*[a]t Jump's request*, we are keeping this arrangement strictly confidential." Only Terraform's top five investors were informed of the **contractual** market-making agreements with Jump, and, on information and belief, no outsiders were notified of the secret "Gentleman's Agreement" to maintain the peg.

82. Jump had reason to keep its role in the Terra Ecosystem a secret. If other market participants worried that UST could not maintain its peg under the Terra Protocol and instead depended on third-party manipulation, then they would be spooked, the main value proposition of the Terra Ecosystem would disappear, and Jump's LUNA positions would be rendered worthless.

83. On a personal level, Kwon and Kariya became very close, with Defendant DiSomma telling another Jump Trading executive that "I'm pretty sure that Kanav is now a confidant of Do (founder of Luna). Kanav is really pushing to Do what it means to be truly DeFi at this moment."

84. In February 2021, Kariya messaged Kwon that he might "have to get a dog named Terra by the end of this year too," and Kwon responded, "Name him Luna. Then it matches mine." Kwon told Kariya he "[h]oped you get carry from this," *i.e.*, made money. "Better than just making bill [DiSomma] slightly richer lol."

**Terraform Launches the Anchor Protocol**

85. In March 2021, Terraform launched "the Anchor Protocol," which it touted as a key feature of "the Terra money market," allowing UST holders to earn interest payments by depositing (or "staking") their tokens in a shared pool from which other users could borrow UST.

86. Terraform marketed Anchor as a safe investment that would generate outsized returns, thereby driving demand for UST, wider adoption of the Terra Ecosystem, and an increase

in the price of LUNA. A 2020 white paper prior to Anchor's launch described Terraform's work on the Anchor Protocol as "an attempt to give the main street investor a single, reliable, rate of return across all blockchains."

87. Anchor promised holders who staked their UST in Anchor a roughly 20% annual yield, which Kwon publicized as "by far the highest stablecoin yield in the market," with a "target" of "20% fixed APR."

88. On May 11, 2021, Terraform wrote in a promotional Tweet that Anchor would allow "third parties to seamlessly integrate 20% yield on $UST to expand stable savings opportunities to a greater audience."

89. Comparable stablecoin lending rates on other platforms stood at roughly 2–3% in early 2022, while Terraform's Anchor Protocol offered 19.5%.

90. Between 2021 and 2022, the amount of UST deposited (or staked) in Anchor expanded significantly, thereby driving demand for UST and increasing the price of LUNA. In the period shortly before the 2022 crash, over 60% of the entire supply of UST was staked in Anchor.

91. Investors were led to believe that Anchor was a safe bet. For example, one investor invested $400,000 in Anchor because he thought "investing in a stablecoin that is basically pegged to the dollar, meaning that it has no risk, will be safer for [him] to invest [his] money," and he also "went to the Anchor protocol, actually, to see how much money is invested in it, and [he] was surprised to see that at the time … it was $40 billion invested in Anchor protocol, which gave me an indication that, you know, people all around the world are confident in this project."

92. Another investor believed the Anchor Protocol "was basically fool proof," so he "exchanged every USD I had and bought LUNA and UST."

21

93. Jump had an incentive to see Anchor grow. If demand for UST increased due to the Anchor Protocol's promised returns, the value of LUNA would continue to rise—and Jump's options would be even more in the money, increasing Jump's profits.

94. Jump employees advised on the operations of the Anchor Protocol with the objective of expanding its use.

95. However, as operated, Anchor was unsustainable. The rate Anchor paid to those who staked their UST consistently exceeded the return it received from individuals who borrowed the staked UST. As a result, the protocol could not pay the interest due on the staked UST out of interest received from those who borrowed UST. The Anchor Protocol relied on Terraform to subsidize the lending and borrowing rates rather than legitimate business activity.

96. The Anchor Protocol's inflated yield was the principal draw for new users of the Terra Ecosystem. Most wallet addresses that used Anchor did so on their first day on Terraform, implying that users were signing up because of Anchor. But users drawn in by Anchor often did not migrate to other services provided by Terraform.

97. The Anchor Protocol's subsidy to those who staked their UST, paid in the protocol's own ANC token, was as high as 300% annualized at launch and stayed around 80% thereafter.

98. Between 20% and 60% of all Anchor loans were "exploiting loans"—borrowers immediately re-depositing the borrowed UST to capture the spread, with no underlying economic activity.

99. Beginning in December 2021, Anchor's outflows (interest paid to depositors) vastly exceeded its inflows (interest collected from borrowers), and the gap was filled by drawing down Terraform's own assets.

100.    In July 2021, Terraform had to top up the Anchor Protocol's yield reserve with $71 million.  And in February 2022, LFG transferred $485 million to the yield reserve for Terraform's Anchor Protocol.

101.    By April 2022, the daily Anchor subsidy had reached $6 million.

102.    Terraform subsidized the Anchor Protocol using money generated by rising LUNA prices rather than legitimate business activity.  Rising LUNA prices resulted from expansion of the Terra Ecosystem, which was itself driven by demand for UST to deposit (or "stake") in Anchor. Thus, returns paid to UST depositors in Anchor were funded by inflows that could only be generated by attracting new UST depositors.

103.    Terraform knew that it lacked legitimate business activities to sustain the Anchor Protocol.  For example, Kwon was held civilly and criminally liable for falsely stating that a payments platform called Chai used Terraform tokens and the Terra blockchain to process transactions.  That claimed real-world application for Terraform's tokens legitimized and bolstered the Terra Ecosystem.  But as SEC whistleblower complaints revealed, Chai did not actually use cryptocurrency or the Terra blockchain to process transactions.  Kwon went so far as to fabricate on-chain activity to mislead observers into believing that Terraform's tokens had real-world utility and commercial adoption when they did not.

**May 2021: UST Depegs and Jump Steps in to Manipulate the Market to Restore the Peg**

104.    By mid-May 2021, the market capitalization of the Terra Ecosystem was just over $8 billion.

105.    On May 19, 2021, UST experienced a significant depeg when the price of one UST dropped below $1.

106.    By May 23, 2021, UST dropped to approximately $0.90, well below its peg.

23

107. The substantial drop in UST's price in May 2021 resulted in the "burning" of large amounts of UST to "mint" LUNA, which put downward pressure on the price of both tokens and exposed a fundamental flaw in the Terra Protocol design that significantly limited its efficacy. Kwon had designed the Terra Protocol to impose increasingly large transaction fees when traders submitted a high volume of "burn" requests going in only one direction (*i.e.*, UST to LUNA). If UST's price dropped precipitously and traders sought to "burn" large volumes of UST, the higher transactions fees associated with significant "burning" meant traders received less than $1 worth of LUNA, reducing the incentive to use the arbitrage mechanism and rendering it ineffective. This inherent flaw had a direct impact on the value of both UST and LUNA.

108. It was thus apparent to Terraform by May 2021 that its algorithm was fundamentally flawed and incapable of restoring the peg naturally under ordinary market conditions. Instead of admitting these flaws and watching the Terra Ecosystem collapse, Kwon called on Jump to step in and defend the UST peg by deploying Jump's capital and sophisticated traders—just as their secret "Gentlemen's Agreement" contemplated.

109. At the time of the May 2021 depeg, Jump had already received tens of millions of LUNA and was entitled to receive over 60 million more at the forty-cent price that was driving substantial profits for Jump. If the peg did not hold, Terraform would likely collapse, Jump's holdings would be rendered worthless, and Jump would not receive over 60 million discounted LUNA it was still entitled to receive—or the profits it could generate.

110. DiSomma understood the significance of Jump's LUNA holdings. Because Jump Trading was a proprietary trading firm that used DiSomma's own money, DiSomma had a direct and sizeable personal interest in seeing the price of Jump's LUNA holdings increase.

111.    Jump was the perfect accomplice not only because its incentives aligned with Terraform's, but also because Jump had the trading expertise and capabilities, as well as capital, necessary to covertly manipulate the market to restore UST's $1 peg—expertise, capabilities, and capital that Terraform lacked.

112.    Kwon and Kariya were in near constant communication throughout the depeg—with Kwon asking Kariya and Jump to prop up UST.  The depeg started on May 19, 2021.  There were at least two calls from Kariya to Kwon on or about the night of May 21, two calls from Kariya to Kwon on the morning of May 23, and three calls from Kwon to Kariya on the afternoon of May 23.  According to another Terraform employee, at this time Kwon was "speaking to Jump about a solution" to the depeg.

113.    Kwon spoke with a Jump executive at 9:10am CT on May 23, 2021.  On information and belief, that executive was Kariya.

114.    Jump wanted to remove all roadblocks to it receiving—and profiting from—the over 60 million LUNA it was contractually entitled to receive in the future.  So Jump—and Kariya specifically—demanded that Terraform agree to drop the vesting conditions encumbering that LUNA before Jump would enter the market to restore UST's $1 peg.  Facing Terraform's collapse, Kwon agreed.

115.    Kariya reported back to DiSomma and the Jump team that Terraform had removed the vesting conditions.  That day, May 23, 2021, during an "Always On" company-wide Zoom meeting—so called because Jump kept the meeting open and running twenty-four hours a day, seven days a week—Kariya told DiSomma and other Jump employees that he "spoke to Do [Kwon], he's going to vest us."

25

116.     James Hunsaker, a Jump whistleblower who testified in the SEC trial, confirmed the terms of Jump's new deal with Terraform: "[T]he previous vesting conditions no longer applied, and if Jump helped with the depeg … the deal would be fulfilled."

117.     The removal of the vesting conditions meant that Jump could borrow—and ultimately purchase at rock-bottom prices substantially below market value—millions of LUNA with no performance requirements and for hundreds of millions of dollars in instant gains.

118.     DiSomma and other members of Jump Trading's leadership team later discussed on an internal messaging platform (Slack) Jump's successful re-trade of its vesting agreements in exchange for defending the peg.  For example, Dave Olsen, President of Jump Trading, responded to messages sent by DiSomma summarizing Jump's repeg efforts by linking Jump's manipulation of the price of UST directly to the vesting issue: "seems like the prop[osal] [to vest Jump] to Do was well timed.  Lots of wood to chop still, but feels like a good start."  DiSomma responded: "It's a good start."

119.     At 9:30am CT, twenty minutes after the Kwon-Kariya call, Jump entered the market, immediately buying 10 million UST in manual trades.  The price of UST, which had been in a nosedive, promptly rebounded.

120.     Meanwhile, DiSomma directed Jump's traders to adjust the parameters of Jump's trading models to make programmatic trades of UST designed specifically to restore UST's $1 peg.

121.     Following DiSomma's instructions, Jump's traders altered the models to be more aggressive during the May 2021 depeg and to put Jump in an "accumulating position," meaning that Jump bought more UST to drive UST's price back up to its $1 peg.

122. Later the day of May 23, 2021, Jump traders executed more manual trades of UST—*i.e.*, not programmatic trades dictated by Jump's models—again for the purpose of restoring the peg to $1.

123. One Jump employee recounted that, during the May 2021 depeg, DiSomma personally authorized Jump traders to spend up to $100 million "to support LUNA to prevent a death spiral." According to another former Terraform employee, Jump agreed to deploy up to $100–$200 million to bring UST back up to its $1 peg. Another Jump employee similarly stated: "Bill [DiSomma] approved us [Jump] spending up to $100M to support LUNA . . . We made the decision to heavily support LUNA and UST by significantly beefing up the bids." The goal was "preventing people from losing confidence in the LUNA and UST project"—*i.e.*, to deceive the market into believing that the Terra Protocol worked.

124. Jump's trading sent a signal to—and impacted—the market. For example, in one half-hour period on May 23, 2021, Jump's trading of Tether (a prominent reserve-backed stablecoin) and UST on one cryptocurrency exchange (KuCoin) accounted for nearly 45% of the average daily volume of the Tether/UST trading pair on that exchange.

125. Jump's trading activity to restore UST's $1 peg created an artificial price because it was not based on legitimate forces of supply and demand.

126. Jump was uniquely incentivized because of its agreements with Terraform giving Jump the right to purchase LUNA at deeply discounted strike prices. Jump's real profit motives were to protect the profits Jump would reap from the LUNA it held and the substantial amount of LUNA Jump was contractually scheduled to receive. On information and belief, no other market participants had such incentives.

27

127. Jump had historically served only as a market maker for UST. But during the May 2021 depeg, Jump suddenly changed its UST trading behavior in ways that, on information and belief, Jump had never done before. Jump switched to manual trading and changed the parameters of its trading models, putting itself in a large accumulating position. Jump's decision to abandon its traditional market maker role to accumulate UST during the May 2021 depeg was due to Jump's desire to manipulate the price of UST, not legitimate demand for UST driven by prevailing market forces.

128. Terraform effectively "bought" Jump's illegitimate trading activity by agreeing—in May 2021—to fully vest Jump's LUNA. If Jump's trading activity had been based on legitimate demand for UST and a belief that UST was mispriced, Terraform would not have had to effectively pay Jump to enter the market and trade to prop up the price of UST. In such a counterfactual, Jump would have been incentivized to purchase UST based on its own assessment that UST was mispriced. That Jump refrained from entering the market until it was vested by Terraform confirms that Jump did not subjectively believe that it would make money buying UST during the May 2021 depeg, and that its subsequent decision to trade significant quantities of UST and to accumulate a long position was based on something other than legitimate supply and demand.

129. Jump accumulated positions on centralized exchanges, meaning that other market participants were unable to see the full scope of Jump's trading conduct or understand that a single market participant was manipulating the price of UST. For example, market participants would have seen many orders and transactions signaling additional demand for, and upward price movement in, UST. But they would not have known that all those transactions were coordinated by a single buyer—Jump—or that they were done for the purpose of restoring the peg. Lacking

28

that information, market participants drew false conclusions about the legitimate supply and demand for UST, and the viability of the Terra Protocol that Terraform had touted.

130. After Jump successfully restored UST's $1 peg, DiSomma briefed Jump Trading executives about Jump's efforts to manipulate the price of UST to restore the $1 peg and some of Jump's tactics. For example, DiSomma wrote to David Heatley, Dave Olsen, Matt Schrecengost, and Paul Gurinas: "Needed to support UST directly on Kucoin (spun up a book stacker to sell KUCN.USDTUST, potentially 50MM)."

131. On information and belief, DiSomma's reference to "sp[inning] up a book stacker" referred to placing a significant volume of orders on KuCoin to purchase UST, primarily in exchange for Tether, another popular stablecoin. In the absence of sufficient market sell orders for UST, Jump's limit orders would accumulate on the order book, effectively increasing the bid depth visible to other market participants. A large accumulation of buy orders at a price close to $1 would have bolstered other market participants' confidence that UST's peg would be restored and place upward pressure on the price of UST.

132. While "book stacking" is not inherently wrongful, it is when used to signal false demand to the market. That is what happened here. Jump did not disclose to the market that it was being compensated to place these "bookstacker" orders and to restore UST's $1 peg. Nor did Jump disclose to the market that it stood to receive tens of millions of discounted LUNA tokens. In context, Jump's signaled demand was not legitimate. Other market participants could not have known that the "demand" signaled by Jump existed solely because Jump was seeking to manipulate the market price of UST and restore its $1 peg—but only after Terraform had agreed to drop the vesting conditions for the LUNA Jump would receive.

133. On information and belief, Jump used other tactics to manipulate the price of UST. For example, Jump purchased UST at prices that were higher than the prevailing market price, underscoring that Jump's trading conduct was intended only to manipulate the price of UST and not the result of legitimate demand—which would have caused Jump to seek to purchase UST at the lowest possible market price.

134. Jump also traded LUNA during the 2021 depeg, all while knowing (or expecting) that its manipulation of the price of UST would lead to a rebound in the price of LUNA. After Kwon promised Jump that Terraform would eliminate vesting conditions for LUNA on May 23, 2021, Jump began buying LUNA. Jump bought LUNA while the price was low and later sold LUNA when the price was higher. Between the Kwon-Kariya call at 9:10am CT on May 23 and the end of the day of May 26, Jump purchased 40.6 million LUNA and sold 40.7 million LUNA. On information and belief, Jump profited millions trading this LUNA during the May 2021 depeg.

135. By May 27, 2021, UST's peg was fully restored to $1 because of Jump's manipulative trading.

136. DiSomma later debriefed Jump's role in restoring UST's $1 peg with Jump traders "at length" during an "ops call" and expressed that he was "pleased" with how Jump Trading handled the May 2021 depeg.

137. And once UST's $1 peg was restored, DiSomma instructed Jump traders to carefully and covertly unwind Jump's UST position in ways that would not alert other market participants to Jump's role in restoring the peg or trigger another depeg.

138. Months later, DiSomma explained in another Slack message that "Terra's stablecoin (UST) *should* trade at 1:1 relative to USD, USDT, USDC, etc., and we try to keep it

<mark>pegged there by making markets in a synthetic (TI internal) USTUSDT market."</mark> DiSomma thus played a central role in directing and authorizing Jump's manipulative trading.

**Absent Jump's Market Manipulation, Terraform Would Have Collapsed in May 2021**

139. Jump's trading between May 23 and May 27, 2021 was intended to manipulate the price of UST to restore its $1 peg. And it was Jump's manipulative trading—not the Terra Protocol or legitimate supply and demand—that caused UST to regain its $1 peg.

140. Terraform tried but failed to prop up the price of UST and to restore its $1 peg. For example, in the approximately 40-minute window prior to Jump's intervention, Terraform was the largest purchaser of UST on KuCoin but still failed to restore the peg. Terraform's own trading team bought UST to defend the peg in May 2021, but its efforts were insufficient, so Kwon turned to Jump. If Terraform had been able to restore the peg on its own—either through its own trading or by relying on the Terra Protocol—it would not have agreed to remove the vesting conditions for Jump's LUNA.

141. It was only after Jump began trading around 9:30am CT on May 23, 2021 (which is 14:30 UTC, as reflected in the chart below) that the price of UST began to stabilize and return to the $1 peg:



142. Without Jump's manipulative trading to restore UST's $1 peg, the price of UST would have plummeted, the market would have learned that the Terra Protocol did not work and Terraform would have collapsed in May 2021—and Jump would have lost the "pile of profits" it would receive from its LUNA "money printing machine."

143. As the SEC's expert testified, "had it not been for Jump's trading, [] the peg would not have been restored" in May 2021. *See* **Exhibit B** at 1307:23–1308:1 ("Trial Testimony of Bruce Mizrach").

144. Terraform and Kwon confirmed that Jump's manipulative trading, not the Terra Protocol, restored UST's $1 peg. Kwon told Terraform's head of communications in no uncertain terms that "if [Jump] had not stepped in" to trade UST during the May 2021 depeg, "we might have been fucked."

145. In December 2024, the SEC and a Jump subsidiary (Defendant Tai Mo Shan), entered into a consent order stating that:

- Tai Mo Shan "engaged in a course of conduct in May 2021 that misled members of the investing public about the efficacy of Terraform's so-called 'algorithmic stablecoin,' UST, when it dropped in value from its $1 peg ('de-peg')."

- Tai Mo Shan "trad[ed] UST in a manner that deceived the market that Terraform's algorithmic mechanism was working as intended to stabilize UST's price at $1."

- Specifically, "[o]n May 23, 2021, the price of UST began to sharply fall below its $1 peg. At that time, Tai Mo Shan and Terraform entered into a verbal agreement whereby Terraform agreed to fully vest the remaining portion of LUNA that was owed to Tai Mo Shan pursuant to its loan agreements with Terraform."

146. The United States Attorney's Office for the Southern District of New York put it succinctly: "The peg was literally predicated on intentional market manipulation."

**Jump is Rewarded for its Central Role in the Fraud**

147. After Jump restored the peg, the parties memorialized their agreement that Terraform would lift the vesting conditions on the LUNA Jump was entitled to receive.

148. On July 21, 2021, Terraform and Jump entered a new agreement pursuant to which Terraform agreed to vest all 65 million LUNA and to deliver the remaining 61.2 million LUNA to Jump at regular monthly intervals over the following four years. The price that Jump would pay remained set at $0.40 per LUNA. Unlike the previous agreement, there were no conditions attached to these discounted LUNA. Jump could profit immediately by selling the LUNA into the market, so long as the price of LUNA remained over $0.40.

149. Following the May 2021 depeg, the market price of LUNA was approximately $5.50. The market price of LUNA skyrocketed to over $110 by April 2022.

150. Based on the parties' new agreement, Jump would receive 4.8 million LUNA on September 11, 2021, and then 1.2 million LUNA each month from October 2021 through August 2025.

151. Jump received the following deliveries of LUNA:

- On September 11, 2021, Jump received 4.8 million LUNA at a price of $0.40 per token.  On September 11, 2021, the volume weighted average price (VWAP) of LUNA was $39.75.  Jump would have realized a profit of $189 million if Jump had sold this LUNA at that price.

- On October 1, 2021, Jump received 1.2 million LUNA at a price of $0.40 per token.  On October 1, 2021, the VWAP of LUNA was $38.15.  Jump would have realized a profit of $45 million if Jump had sold this LUNA at that price.

- On November 2, 2021, Jump received 1.2 million LUNA at a price of $0.40 per token.  On November 2, 2021, the VWAP of LUNA was $44.34.  Jump would have realized a profit of $53 million if Jump had sold this LUNA at that price.

- On December 3, 2021, Jump received 1.2 million LUNA at a price of $0.40 per token.  On December 3, 2021, the VWAP of LUNA was $63.91.  Jump would have realized a profit of $76 million if Jump had sold this LUNA at that price.

- On January 4, 2022, Jump received 1.2 million LUNA at a price of $0.40 per token.  On January 4, 2022, the VWAP of LUNA was $86.74.  Jump would have realized a profit of $104 million if Jump had sold this LUNA at that price.

- On February 2, 2022, Jump received 1.2 million LUNA at a price of $0.40 per token.  On February 2, 2022, the VWAP of LUNA was $49.90.  Jump would have realized a profit of $59 million if Jump had sold this LUNA at that price.

- On March 2, 2022, Jump received 1.2 million LUNA at a price of $0.40 per token. On March 2, 2022, the VWAP of LUNA was $92.79.  Jump would have realized a profit of $111 million if Jump had sold this LUNA at that price.

- On April 1, 2022, Jump received 1.2 million LUNA at a price of $0.40 per token. On April 1, 2022, the VWAP of LUNA was $105.17.  Jump would have realized a profit of $126 million if Jump had sold this LUNA at that price.

- On May 4, 2022, Jump received 1.2 million LUNA at a price of $0.40 per token. On May 4, 2022, the VWAP of LUNA was $85.73.  Jump would have realized a profit of $102 million if Jump had sold this LUNA at that price.

152.    The table below summarizes Jump's receipt of LUNA between September 11, 2021 and May 4, 2022 and the associated potential profits, assuming that Jump sold the LUNA at the VWAP on the day of receipt:

34

| Date | LUNA VWAP | LUNA Price for Jump | LUNA Jump Received | Jump Profits if Sold at LUNA VWAP |
|---|---|---|---|---|
| 9/11/2021 | $39.75 | $0.40 | 4.8 million | $189 million |
| 10/1/2021 | $38.15 | $0.40 | 1.2 million | $45 million |
| 11/2/2021 | $44.34 | $0.40 | 1.2 million | $53 million |
| 12/3/2021 | $63.91 | $0.40 | 1.2 million | $76 million |
| 1/4/2022 | $86.74 | $0.40 | 1.2 million | $104 million |
| 2/2/2022 | $49.90 | $0.40 | 1.2 million | $59 million |
| 3/2/2022 | $92.79 | $0.40 | 1.2 million | $111 million |
| 4/1/2022 | $105.17 | $0.40 | 1.2 million | $126 million |
| 5/4/2022 | $85.73 | $0.40 | 1.2 million | $102 million |
| **Total** | | | **14.4 million** | **$865 million** |

153. Between June 2022 and August 2025, Jump was scheduled to receive an additional 46.8 million LUNA at a price of $0.40 per LUNA. The VWAP of LUNA on May 1, 2022 (just before Terraform collapsed) was $81.11. If Jump received all the remaining discounted LUNA it was scheduled to receive through August 2025 and sold it for $81.11 (the VWAP of LUNA on May 1, 2022), Jump would have realized a profit of more than $3.8 billion—even assuming ***no*** LUNA price increase from May 1, 2022 to August 2025.

154. Simply put, Jump stood to profit enormously from its illicit partnership with Terraform—but only if it could keep the Terra Ecosystem afloat long enough to receive and sell the LUNA it would receive through August 2025 under the amended agreement.

**Jump and Terraform Conceal Jump's Role in Restoring the Peg**

155. To unwitting market participants, the May 2021 depeg was the perfect test. If UST's peg to $1 could be restored through natural market forces—and not covert manipulation by a participant in a fraudulent scheme—then the Terra Protocol would have worked, validating UST as an algorithmic stablecoin. Terraform and Jump, therefore, were incentivized to hide Jump's role in restoring UST's $1 peg.

156. After all, if Jump's actions became public, market participants would understand that the Terra Protocol did not work as promised and that UST and LUNA had a significantly

higher risk of experiencing a "death spiral" than previously believed—and the Terra Ecosystem would contract, if not collapse altogether.

157. To avoid this outcome, Jump and Terraform concealed Jump's role in reestablishing the peg.

158. Terraform's head of communications testified in the SEC trial that he asked Kwon if Terra could mention Jump's role in the recovery of the peg in public communications, but Kwon said no. This executive only later learned the extent of Jump's involvement in the May 2021 depeg; he had not known how Jump deployed capital or how much of an impact it had. Nor had he known that Jump was receiving compensation for its actions during the depeg.

159. Instead of disclosing Jump's role in restoring the $1 UST peg, Terraform and Kwon falsely insisted that the algorithm had worked to automatically restore the peg. For example:

- On May 24, 2021, Terraform posted on Twitter: "The peg is gradually normalizing again and will continue to do so as volatility subsides. . . . The drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense of a stress test in live conditions as can ever be expected. We just experienced a black swan. Despite sharp dislocations the on-chain swap spread is mending. UST peg is normalizing, and UST's role as a centerpiece of demand for the Terra ecosystem has not changed buttressing the growth of the Terra economy as the system bounces back from distress."

- Also on May 24, 2021, Terraform reinforced the narrative that the algorithm had worked: "Terra is designed with explicit, real-time levers . . . that traditional banking models cannot match. . . . Algorithmic, calibrated adjustments of economic parameters are more effective than faxes and suits in meetings."

- On May 29, 2021, Kwon was asked on a podcast whether it was "accurate" that "there was no particular special action taken . . . by the Terra team, or even the community, in order . . . for UST to recover its peg." Kwon did not disclose that Jump had manipulated the price of UST to restore its $1 peg. He instead doubled down on the effectiveness of the Terra Protocol and disclaimed coordinated intervention, saying: "We've never had a stress test of this magnitude. And I think what we've proved is that the Terra Protocol indeed does need a lot of, what has been up to now, purely theoretical assumptions. And that it can survive black swan events, and then sort of, sort of, you know

36

total death spiral of all these different assets and economies all at once. So I think that's been good[.]"

- On June 9, 2021, Terraform's head of communications wrote in an article that Terraform had defended the peg "indirectly via arbitrage incentives," and the Terra Protocol had "valiantly" handled the market volatility in May 2021.

- On October 4, 2021, Kwon was asked in a YouTube interview whether "Terraform Labs participates at all in market making to keep UST at peg," and Kwon responded, "we don't really do much of that anymore." Despite the arrangement with Jump, Kwon said "there's like a number of large market makers that participate in stabilizing the peg of UST. Most of them – I don't think any of them have a contractual relationship with us. It's just something that they do because they feel like they can make money out of it."

- On March 1, 2022, Kwon discussed the May 2021 depeg on a Twitter talk show and said "it took a few days for the slippage cost to naturally heal back to spot … *the protocol automatically self-heals* the exchange rate back to whatever the spot price is being quoted by the oracle. *So that's why it took several days for the peg to recover.*" (emphases added).

- Even a year after the depeg, the Terraform head of communications reiterated that, in May 2021, "Terra absorbed what many critics called a 'Death Spiral' or 'Black Swan' in a 75% drawdown in the LUNA price, with *the UST peg recovering naturally via the protocol's mechanics and free market dynamics.* … It's hard to imagine a more significant volatility event than what occurred during that period in such a young stage of the Terra protocol, and Terra passed the test." (emphasis added).

160. Kwon also belittled critics of the Terra Protocol in online commentary despite knowing that it had failed in May 2021, necessitating Jump's intervention to restore UST's $1 peg. For example, on July 1, 2021, when a British economist questioned the Terra Ecosystem, Kwon responded on Twitter: "I don't debate the poor on Twitter, and sorry I don't have any change on me for her at the moment." And on March 11, 2022, Kwon posted on Twitter: "If there is any confusion left at this point, we will keep growing reserves until it becomes mathematically impossible for idiots to claim depeg risk for $UST."

161. After the May 2021 depeg, Jump promoted the Terra Ecosystem, the Terra Protocol, and UST—even though Jump knew that Terraform's central value proposition, the

algorithmic stablecoin, was incapable of functioning as promised and therefore a ticking time bomb. Jump specifically promoted Terraform's algorithmic approach to stablecoins as "the most elegant solution for creating a highly scalable and more decentralized stablecoin" while concealing its own role in restoring the peg. For example:

- On September 14, 2021, Kariya tweeted: "It's been a real pleasure working with [Kwon] and the Terra team over the last couple of years. A + folks." Kariya did not disclose that its "work" with Terraform included manipulating the market for UST to restore its $1 peg.

- On October 11, 2021, Jump employees based in Chicago, Illinois published an article on behalf of "Jump Capital" titled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market." Jump's article trumpeted Terraform and UST: "We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin." After describing stablecoins and their uses, Jump defined fiat-backed, crypto-collateralized (*i.e.*, digital-asset-backed), and "algorithmically stabilized" stablecoins. Even though Jump knew that UST's algorithm did not work, Jump advocated "algorithmically stabilized" stablecoins—specifically, UST—as preferable to fiat-backed or crypto-collateralized stablecoins. According to Jump, UST and Terraform would be one of the "winners in the stablecoin space." The article did not disclose Jump's role in restoring UST's $1 peg during the May 2021 depeg, Jump's agreements with Terraform, or Jump's financial motivation for pumping the Terra Ecosystem.

- On January 28, 2022, in a multi-part tweet series, Kariya continued to prop up the Terra Protocol. He tweeted: "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on LUNA price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."

- On April 7, 2022, Kariya again publicly celebrated the Terra Ecosystem by tweeting: "Alignment across ecosystems and a commitment to a multi chain future. UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win."

- On May 1, 2022, Kariya promoted Terraform again. He tweeted: "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows. The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space."

162.    DiSomma understood the importance of these public statements to market participants and sought out ways to shape public opinion to bolster the value of Jump's LUNA positions.  For example, a reporter at CoinDesk reached out to Jump regarding media opportunities, including with Terraform.  Another Jump executive said to DiSomma: "Having an indirect marketing arm that is writing about stuff we care about feels like a very interesting opportunity to me."  DiSomma responded: "Yep—I spoke with peter and we going to work on nudges."  Before the interview with CoinDesk, DiSomma wrote: "This LUNA project is super hot right now.  We should get Kanav on with us as Kanav championed this thing the whole way."

163.    Jump's executives thus intentionally promoted UST, LUNA, and the Terra Ecosystem to other market participants despite knowing that its value proposition—the Terra Protocol—was fundamentally flawed.  And Jump elected to put out public statements concerning the effectiveness of the Terra Protocol (and UST's $1 peg) without disclosing its own essential role in restoring the peg in May 2021—all to boost its own long positions in LUNA.

**Investors Flock to the Terra Ecosystem Because of Jump's Fraudulent Scheme**

164.    Market participants and outside observers interpreted the May 2021 depeg and subsequent repeg as evidence that the algorithm worked.  For example:



165.     To the extent that observers had previously been skeptical of algorithmic stablecoins, Terraform and Jump now had a real-world example to trumpet as "evidence" that UST would "automatically" maintain its $1 peg.  There could be no better marketing for the Terra Ecosystem.  But it was all false.  Terraform had indeed experienced a real-world "stress test"— and failed.  Jump stepped in to doctor the results and to mislead the market into believing that Terraform had passed with flying colors—and it did so to bolster the value of its own trading positions and line its pockets with billions of dollars in profits at the expense of the people it deceived.

166.     Jump's secret manipulation of the price of UST to restore the $1 peg, along with representations made by Terraform and Jump touting UST as "stable" without disclosing Jump's role in restoring the peg, caused investors (including the Individual Victims) to purchase UST and LUNA.

167.     Many investors bought UST because they believed the Terra Protocol worked and that UST's peg was stable.  They would not have invested in UST or LUNA had they known a third party rather than the algorithm had restored the peg.  For example:

- When the May 2021 depeg happened, one investor testified at the SEC trial that he "assumed that it was the algorithm that enabled [UST] to restore itself back to $1." He saw no public information before he invested about a third party being brought in to restore UST's peg. It would "[a]bsolutely" have been "important to [him]" to "ha[ve] known that a third party had been brought in to help restabilize the peg." And he "would not have invested . . . if [he] knew" that "the representations about the algorithm were not true."

- Another investor—who worked for a sophisticated investment firm—believed that "the peg returned to a dollar because of the arbitrage mechanism that had been widely marketed." He "believe[d] in the stability of the mechanism" for "[a]mong other reasons, that [UST] had maintained its peg. And when it seemed to lose some of the peg, the ecosystem and the arbitrage mechanism had seemed to regain the peg pretty quickly. So we saw it as a stress test." This investor was not "aware whether a third party had stepped in and purchased significant amounts of UST to stabilize its price." No one told this investor "that Jump had intervened and purchased tens of millions of UST to help restore the UST to $1 in May of 2021," but "that [is] something [he] would have wanted to know" before investing because "it was not supposed to be one major institution that would come in and backstop the peg." For this investor, it was "important to the investment recommendation that the peg mechanism function properly" and "he would not have recommended" an "investment in LUNA if [he] believed that the peg did not function properly."

- Yet another investor "saw that UST had depegged from the dollar around May of 2021 but then it pegged back very quickly, after which made [him] think that this is normal for stablecoins." He took "the recovery of the peg, as a sign that UST's peg was stable and reliable." This investor "had no idea" that, "when [he] invested that a third party had intervened in May 2021 to purchase large amounts of UST in an effort to help restore UST's peg to $1." And this is "of course" "information [he] would have wanted to know prior to investing" "[b]ecause if [he] had known that the depeg that happened in 2021 was restored through anything else other than the algorithm itself, [he] wouldn't have invested in UST."

168. The many investors who relied on the false picture painted by Jump's manipulative trading and subsequent cover up sustained losses attributable to Jump's fraud when Terraform collapsed.

### The LUNA Foundation Guard

169. After the May 2021 depeg, Terraform (through Kwon) and Jump (through Kariya) worked together to establish a public-facing mechanism that they could market as a hedge against

41

future depegs. Like Terraform and Jump's many statements touting the Terra Ecosystem and UST, the purpose of this public-facing mechanism was yet again to falsely reassure the market as to UST's viability as a stablecoin. The LUNA Foundation Guard ("LFG") was the result of these conversations.

170. LFG, formally founded in Singapore in late 2021, was publicly touted as an independent entity created to help defend the UST peg in the future. In describing LFG to the public, Kwon represented that it would be controlled by the "Governing Council," which consisted of Kwon, Kariya, and several other individuals initially named to the Council. Kwon stated in a public forum on February 8, 2022, that "[t]he reason we've set up LFG is to decentralize decision making processes in the Terra ecosystem, and having multiple directors (all building on the Terra ecosystem) make the decision instead of one person is an important step in that direction."

171. In reality, LFG was not independent from Terraform. LFG, and the public statements about its supposed "independence," were just a continuation of the fraudulent scheme to pump the value of LUNA by convincing the market that the Terra Protocol worked, that UST would maintain its $1 peg as a result of the Terra Protocol, and the Terra Ecosystem was a stable, safe bet.

172. Although Kwon and Kariya touted LFG's independence, LFG was merely an extension of Terraform:

- LFG was governed by a two-person Board of Directors. The two directors were Kwon and a Singaporean business consultant. The consultant was appointed solely to satisfy a local Singapore registration requirement and exercised no independent discretion or authority. Kwon was the only person on the Board who in fact made decisions.

- The so-called Governing Council had no governing power. The Council was established on or about January 10, 2022 as a non-director subcommittee whose authority was limited to advising and giving recommendations and to performing such acts as the Directors deemed necessary.

42

- Kwon publicly claimed that LFG's reserves were held in a "multisig" wallet controlled by the Governing Council. That was false. Terraform employees who reported solely to Kwon held the keys to LFG's crypto wallets and, consistent with the crypto principle that "who controls the keys" controls the asset, Terraform retained control over LFG's assets and how it deployed them.

- At one point in January 2022, a Terraform lawyer said: "the intermingling of LFG and TFL [*i.e.*, Terraform] funds is not good. . . . It's one thing to sell or buy as LFG it is another to send LFG money to TFL to do it."

173. Between LFG's creation and May 2022, LFG was funded entirely through tokens that Kwon moved over from Terraform's own holdings. For example:

- On January 21, 2022, Terraform transferred to LFG 50 million LUNA with a contemporaneous market value of about $3.85 billion.

- On March 7, 2022, Terraform transferred to LFG 12 million LUNA with a contemporaneous market value of approximately $950 million.

- On April 13, 2022, Terraform transferred to LFG 10 million LUNA, with a contemporaneous market value of about $850 million, and 10 million UST.

174. In total, Kwon moved more than $5.5 billion of Terraform's assets to LFG.

175. After moving Terraform's LUNA over to LFG, Kwon caused LFG to sell the LUNA in exchange for other crypto assets such as Bitcoin that could, in theory, be used to "stabilize" the peg, if necessary.

176. Aside from falsely touting LFG's supposed "independence," Jump did its part to mislead the market into believing that UST was a viable stablecoin by indicating that LFG would step in as a "backstop" in times of "severe volatility." Jump continued to conceal its own role as the secret "backstop" during the May 2021 depeg. For example:

- On February 22, 2022, a series of tweets from the account of "Jump Crypto" stated: "We're happy to announce that we are leading the LUNA Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin…The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility."

- In a press release accompanying the February 22, 2022, announcement, Kariya touted UST's supposed stability, stating that "[t]he UST Forex Reserve further

- strengthens confidence in the peg of the market's leading decentralized stablecoin[,] UST," comparing the system to "how many central banks hold reserves of foreign currencies."

- Also on February 22, 2022, Kariya, well known by that point in the crypto space as the President of Jump Crypto, used his personal social media account @KanavKariya to respond to Jump's announcement and tweet: "$1B to absorb liquidity crunches[.]  All contractions in the economy have caused reflexive movement (by design).  Allowing for a big chunk of withdrawals in short span through different means can be really impactful[.]  LFG has a broad mandate, and we're excited to support it."

- On March 1, 2022, Kariya and Kwon were guests on the podcast, "The Ship Show," where Kariya explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size.  And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

177.    Terraform's and Jump's false promotion of LFG worked.  Investors believed that LFG was a viable backstop for UST.  Far from undermining investors' belief in UST by propping up LFG, Terraform and Jump caused investors to believe, as one investor put it, "that the establishment of a further reserve would add more faith and confidence in the protocol."

**2021-2022: Jump Profits from Trading LUNA**

178.    Between May 2021 and May 2022, the market capitalization of UST and LUNA rose by $37 billion, or 80%.  LUNA reached a high price of $116 in April 2022.  Jump was still receiving LUNA at a strike price of $0.40.

179.    Jump profited from trading LUNA between May 2021 and May 2022 at a time when Jump—but not other investors—knew that its covert manipulation (not the Terra Protocol) caused UST to repeg in May 2021.

180.    Jump represented to the SEC that it profited at least $1.425 billion from selling discounted LUNA during this period.

181. As separately reported by an SEC expert: "Counsel for Jump have represented that Jump made a realized profit on all trading of LUNA of $1.425 billion as of July 31, 2022, much of it through the sale of LUNA tokens acquired in the two agreements with Terraform."

182. On information and belief, Jump received additional profits through market-making and other activities related to the Terra Ecosystem that it would not have received absent its participation in the fraudulent scheme.

### May 2022: UST Depegs and Jump Loots Terraform as it Collapses

183. On May 7, 2022, UST experienced another significant depeg. That day, the price of UST dropped to $0.987 and bounced between that price and $1.

184. By this point, the market capitalization of LUNA was $26.5 billion, and for UST it was $18.7 billion. Defending the peg would require significantly more capital than what Jump deployed in 2021.

185. But around this time, Kwon was still dismissing critics. He posted on Twitter: "Anon, you could listen to CT influensooors about UST depegging for the 69th time Or you could remember they're all now poor, and go for a run instead."

186. The price of UST continued to drift further from $1 and, late on May 7, Kwon and Kariya decided that it was time to deploy the LFG reserve funds.

187. Kwon told LFG's Governing Council, including Kariya, "its time we need to deploy Bitcoin to defend UST peg." According to Kwon, "we don't want the depeg situation to persist during a time when markets are falling hard. Kanav and I discussed over the phone, and we think its a good idea that we move a 500M clip of bitcoin to walk back the UST peg."

188. Kwon did not need the Governing Council's approval to move LFG's money; Terraform held the keys to LFG's wallets, and Kwon directed the Terraform team when and how to deploy the assets in LFG's wallets.

189.	Kwon and Kariya also decided that Terraform would transfer a sizeable portion of LFG reserve Bitcoin to Jump, ostensibly so that Jump could deploy the Bitcoin to defend the peg.

190.	In preparation for the transfer, Kariya asked Kwon: "will we need lfg multisig for settlement?"  Kwon responded, "no we will not," further underscoring that Terraform and Kwon controlled LFG's wallets, and the assets they contained, and would not require any other authorization to move the Bitcoin.

191.	At Kwon's direction, Terraform employees caused 52,189 Bitcoin to be transferred from LFG's wallets to Jump, in two transactions.  These transfers occurred on May 8, 2022 at 10:45 PM CT and on May 9, 2022 at 1:42 PM CT.

192.	Also late on May 9, Terraform traders moved LFG's remaining ~28,000 Bitcoin from LFG to Terraform.  LFG had no actual employees or operations, so its assets were sent to Terraform for its traders to deploy in defense of the peg.

193.	At the time the Bitcoin was transferred to Jump, it had a market value of approximately $1.5 billion

194.	At the time Terraform employees transferred the Bitcoin to Jump, Terraform was in the midst of a run on the bank (or "death spiral") that meant imminent, near-certain collapse. The Terra Ecosystem rested on the viability of UST as a stablecoin and the value of LUNA; if these assets were worthless, then Terraform was worthless.

195.	In theory, Jump was expected to deploy the 52,189 Bitcoin it received from LFG to defend UST's $1 peg.  Kwon tried to induce everyday investors to keep their money in the Terra Ecosystem.  On May 9, 2022, at 1:36 PM CT, Kwon posted on Twitter: "Deploying more capital—steady lads."

46

196. But after their experience with the 2021 depeg, Kwon and Jump knew—or at minimum should have known—that LFG had insufficient funds to re-establish the peg. The UST market cap had grown over nine-fold between the May 2021 and May 2022 depegs—due directly to Jump's and Kwon's actions—and therefore substantially more capital was needed to re-establish the peg. Without a continuous and escalating infusion of capital that Terraform did not possess, the Terra Ecosystem could not sustain itself.

197. It is unclear what Jump did with the 52,189 Bitcoin it received in May 2022. Jump has never fully accounted for its trading activity. What is clear is that, at some point during the chaos of the May 2022 depeg, Jump ceased trying to defend the peg. Jump's continued silence as to how it deployed approximately $1.5 billion of Bitcoin it received, combined with Jump's perverse incentive to trade out of its own free-falling positions in UST, raises the possibility that Jump traded in ways that lined its own pockets at the expense of Terraform and other holders of UST and LUNA.

198. Jump apparently moved all the Bitcoin onto a single centralized exchange, Okcoin, also known as OKX. Jump's decision to move all the Bitcoin to a single, less liquid exchange raised red flags internally at Terraform.

199. As Jump began trading, a Terraform trader told a colleague that Jump's trading strategy would not be effective to defend the peg, saying it would be a "stupid" approach and "not the best idea." Terraform employees discussed how "we" (*i.e.*, Terraform) "spent 1.5bil" and "while doing so Jump did not help much." Wondering "i dont know how they spent 1bil," the Terraform trader speculated that Jump was using "market buys" to trade the Bitcoin for UST— *i.e.*, paying the prevailing market price for UST as that price plummeted.

200. Another trading firm confirmed in real time its belief that it "seems like" Jump moved the Bitcoin to an exchange called OKX: "1.5B in ur BTC just got move to okx." Notably, the use of "ur BTC" by this trading firm when speaking to Terraform employees underscored that market participants understood LFG's Bitcoin to be Terraform's.

201. In the midst of the depeg, Kariya and other Jump executives suggested other ideas to Kwon for defending the peg. One was to marshal other trading firms involved in crypto to raise additional funds for Terraform. Far from a price-agnostic market maker, Jump was doing everything possible to salvage this fraudulent scheme, hoping to keep Terraform alive long enough to make even more profits from selling its heavily discounted LUNA tokens at inflated prices to the unwitting investing public.

202. DiSomma spearheaded the outreach efforts, contacting leaders at various other crypto-trading firms to seek bailout funding for Terra. The goal was to raise further funds to purchase—and continue to artificially inflate the price of—UST, and to further the fraud that Jump was already perpetuating on the market.

203. These efforts only further harmed the Terra Ecosystem and worsened the depeg. Certain firms that Jump and DiSomma contacted were themselves aggressive, quant-focused trading firms, which, on information and belief, turned around and used that information to trade against UST and LUNA and hasten their downfall.

204. Although UST temporarily rebounded to $0.94 on May 10, that recovery was short-lived, and UST never again regained its $1 peg. By the afternoon of May 10, UST collapsed to $0.70, and then plunged to $0.27 on May 11. The UST price continued to swing until falling precipitously to under $0.10 on May 12. At the same time, the LUNA price fell by over 99% from $65 at the beginning of May 8 to below $0.10 by May 12. By May 13, 2022, exchanges were de-

listing LUNA.  The charts below (reflecting Central Standard Time) depict the price of UST and LUNA during this period.



49



205.     Market participants were misled by Jump's successful market manipulation in May 2021 to believe that the peg would be restored "automatically" in May 2022, thereby exacerbating their losses.  This was especially true for less sophisticated retail investors.  As larger investors were dumping their UST in May 2022, smaller investors who relied on Jump's fraud held onto their UST believing that the peg would automatically be restored.  Instead, they lost even more money.

206.     For example, when one investor saw the peg was beginning to slip, "[t]he first thing that came to [his] mind is that that's probably the same that happened the year before and it's going to peg back to the dollar very quickly."  He thus "kept on holding to [his] UST for a few more days."  He ultimately lost a $400,000 investment that he had planned to use for his kids' education.

207. Ultimately, $45 billion in market capitalization was wiped out in a matter of days. From May 7 through May 13, 2022, UST lost its peg and traded well below $1. Trading volume surged across major exchanges. At the same time, liquidity deteriorated. The drop in UST prices also resulted in lower LUNA prices as market participants lost confidence in the Terra Ecosystem. This reinforced downward pressure on both tokens.

208. When the Terra Ecosystem collapsed, thousands of investors, including the Individual Victims, lost their investments in UST and LUNA.



209. Even after the collapse, Jump was still touting the Terra Protocol without disclosing its role in manipulating the market in May 2021. On June 3, 2022, Jump Crypto published an article on its website titled "The Depegging of UST." Jump continued to suggest that "UST was designed to maintain its peg through the on-chain mint and burn mechanism, a virtual automatic market maker (vAMM)" and that "[t]his mechanism was constructed so that volatility and UST

price dislocations could be smoothed out with UST and LUNA supply expansions or contractions via on-chain arbitrageurs."

**Jump Tries to Cover Up Its Involvement**

210. At some point during the May 2022 depeg, Jump stopped trying to restore the peg. Thereafter, Jump and its executives attempted to minimize and conceal their relationship with Terraform and their role in the fraudulent scheme.

211. On May 11, Jump transferred 1,515,689,462 UST to Terraform wallets. In other words, when Jump sent UST back "to LFG" after ostensibly using LFG's Bitcoin to defend the peg, it did not send UST to LFG wallets. Instead, Jump sent the UST to Terraform wallets.

212. Jump never identified how it acquired that UST, whether those UST came from its own UST holdings, whether it deployed the Bitcoin in market transactions at all, or whether, instead, it pocketed the remaining 47,000 Bitcoin for itself. In any event, the UST that Jump sent back to Terraform was worthless by that point.

213. Thereafter, in a series of five transactions, Jump returned 5,000 Bitcoin—but it was sent to Terraform wallets too.

214. On May 16, 2022, Jump separately returned 313 Bitcoin to LFG wallets.

215. After the May 2022 depeg, Kariya sent multiple Telegram chats to the LFG Governing Council to minimize Jump's role. For example:

- On May 13, 2022, Kariya told Kwon via a Telegram conversation with the LFG Governing Council: "Please don't communicate the nature of the trades/papering without running language here by Marc and our GC."

- On May 15, 2022, Kariya proposed edits to statements about Jump's involvement to insist that Jump was never acting "as an agent of [LFG]," but rather was trading over the counter with LFG. In other words, Jump tried to falsely portray itself as nothing more than a counterparty to LFG making arms-length transactions as opposed to a central player in Terraform's collapse.

- On May 21, 2022, Kariya similarly revised a proposed public statement, stating: "Hey Do, we [Jump] did one OTC [over-the-counter] trade with the LFG trading BTC [Bitcoin] for UST, we did not act as an agent for the LFG in executing any trades on its behalf." He then stated: "After discussing with counsel, think it would be best for all lfg related communication to flow through legal counsel."

216. By doctoring public statements about its role, Kariya and Jump continued to mislead the public, painting Jump as a bystander when, in reality, Jump played a central role in the fraudulent scheme, fueling Terraform's growth before its eventual collapse.

**Terraform and Kwon Incur Billions in Liability But Jump Escapes Accountability**

217. After a jury trial, Terraform and Kwon were held liable in an SEC enforcement action for, among other things, engaging in unregistered offers and sales of securities and committing various forms of securities fraud.

218. The Department of Justice subsequently indicted Kwon, charging him with nine counts of fraud, conspiracy, market manipulation, and money laundering.

219. In both the SEC and DOJ enforcement actions, Jump's market manipulation and subsequent cover up formed the backbone of the fraudulent scheme. The Government described Jump's illicit agreement with Terraform to manipulate the price of UST to restore the peg and misstatements and omissions regarding the viability of the Terra Protocol as the "centerpiece" of the fraud.

220. Kwon's own guilty plea and personal letter submitted in conjunction with his sentencing memorandum underscored that Terraform and Kwon could not have committed the fraud for which they were held liable without Jump's knowing participation.

221. In the civil case, the SEC obtained a jury verdict that Terraform and Kwon had violated, among other statutes, Section 10b-5. The SEC asserted that Terraform and Kwon misled investors to believe that the Terra Ecosystem was more stable than it was, including by partnering

53

with Jump to manipulate the market for UST while representing publicly that UST's $1 peg held because the Terra Protocol worked as promised.

222.    In connection with its investigation, the SEC deposed both Kariya and DiSomma. Both invoked their Fifth Amendment rights hundreds of times rather than answer a single substantive question posed by the SEC.  At trial, the jury was instructed that Kariya and DiSomma were not testifying because they had invoked their Fifth Amendment rights.

223.    Terraform and Kwon are subject to a roughly $4.5 billion judgment to the SEC.

224.    In a separate investigation, the SEC alleged that Defendant Tai Mo Shan, a Jump subsidiary, acted as a statutory underwriter with respect to certain offers and sales of LUNA, a crypto asset that Terraform offered and sold as a security, in violation of Sections 5(a) and (c) of the Securities Act.

225.    The SEC also alleged that Tai Mo Shan violated Section 17(a)(3) of the Securities Act, which makes it unlawful for any person to engage in "any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser" in the offer or sale of a security.

226.    The SEC alleged that Tai Mo Shan began purchasing UST to manipulate its price, ultimately entering into a formal agreement with Terraform on July 21, 2021, in exchange for monthly installments of unlocked LUNA starting in September 2021.

227.    The SEC concluded that Tai Mo Shan engaged in a course of conduct that deceived investors about the efficacy of Terraform and LUNA's arbitrage mechanism.  Although the investing public would have seen UST's price increasing, investors would not have been aware of the extent of UST demand coming specifically from Tai Mo Shan's purchases.

228. In December 2024, Tai Mo Shan entered a $123 million settlement with the SEC, agreeing to pay over $74 million in disgorgement and $36 million in civil penalties. The settlement made clear that Tai Mo Shan was privy to, and misused, significant internal information about Terraform that other investors lacked access to.

229. Tai Mo Shan's settlement with the SEC was a small fraction of the amount that Terraform faced for the same chain of events and a small fraction of Jump's total profits from its wrongdoing. And the rest of the Jump entities and individuals involved in the fraudulent scheme faced no repercussions for their actions.

230. On January 21, 2024, Terraform filed for bankruptcy.

231. Jump has walked away with little more than a slap on the wrist despite its central role in one of the largest financial frauds in history. While Terraform is now in the process of winding down its estate and paying out its creditors, Jump has continued to operate and trade as usual, with the benefit of its huge returns from its role in the Terraform fraud.

## UST and LUNA Are "Securities" Under the Exchange Act

232. Under the Exchange Act, one type of "security" is an "investment contract," defined as (i) an investment of money (ii) in a common enterprise (iii) with profits to be derived solely from the efforts of others.

233. Terraform encouraged purchases of UST and LUNA by promising returns based on strategies deployed by Terraform management. Through means such as social media, blog posts, and marketing materials, Terraform and Kwon promoted UST and LUNA as an investment opportunity, stating that profits for purchasers of UST and LUNA would result from increased usage of the Terraform blockchain driven by Terraform management's entrepreneurial efforts and a combination of investing and engineering experience.

55

234. LUNA was a "security." Terraform sold LUNA directly to institutional investors who expected to profit from the efforts of Terraform's management based on Terraform's representations and promises. Terraform sold discounted LUNA pursuant to sales agreements that expressly contemplated Terraform's development of a secondary market that could be used profitably by investors to re-sell their LUNA.

235. Terraform management indicated that funds generated from sales of LUNA would be fed back into the Terraform blockchain to generate additional profits for holders of LUNA. Terraform and Kwon pooled the proceeds of LUNA purchases together and promised that further investment through these purchases would benefit all LUNA holders. Thus, the fortunes of LUNA purchasers were tied to one another, and each depended on the success of Terraform's efforts and strategy and the Terra Ecosystem as a whole.

236. Terraform told investors that LUNA was akin to stock: Terraform employee Jeff Kuan stated in a 2021 public interview that "investing in Terra means buying LUNA, which is the equity in our co."

237. Kwon also publicly touted LUNA as an investment opportunity, writing: "$Luna value is actionable—it grows as the [Terraform] ecosystem grows." Kwon encouraged holders of LUNA to "[s]it back and watch me kick ass." In other words, Kwon told investors in LUNA that they would profit from his efforts.

238. UST was a "security." Beginning in March 2021, investors in UST were able to access the Anchor Protocol. The Anchor Protocol permitted depositors of UST to lend their UST to borrowers. Accrued interest was pro-rata distributed to all depositors. Profits from the Anchor Protocol were thus paid out in proportion to the amount of UST an investor deposited. Terraform touted UST as a stable investment with a high yield resulting from the efforts of Terraform

management to grow the Terra Ecosystem. Kwon publicized that depositing UST in the Anchor Protocol would generate for investors "by far the highest stablecoin yield in the market," with a "target" of "20% fixed APR."

239. By May 2022, there were approximately 18.5 billion tokens of UST, 14 billion of which had been deposited in the Anchor Protocol.

240. Institutional and retail investors alike invested in UST and LUNA by buying and selling these tokens on centralized and decentralized exchanges. In doing so, they reasonably relied on Terraform's public statements that UST and LUNA would generate profits based on management's efforts.

241. Terraform encouraged the use of exchanges so that investors could buy and sell UST and LUNA. For example, in a December 2018 fundraising update, Terraform co-founder Daniel Shin wrote that Terraform had "begun exchange listing discussions given token listing is a precondition for [the] Terra/Luna ecosystem to operate." Terraform also leveraged its agreement with Jump to "improve liquidity of LUNA in secondary trading markets" to grow adoption of UST and LUNA.

242. The price of LUNA increased from under $1.00 in January 2021 to over $115 in April 2022, before plummeting to under a penny in May 2022.

**Jump Intentionally Conceals Its Involvement In The Fraud**

243. Jump strategically chose its methods of communication with Terraform throughout the 2021 and 2022 depegs in an effort to conceal its involvement in the fraud.

244. In February 2021, over a year after Kariya first connected with Kwon on Telegram (a messaging app), Kariya pushed their communications to Signal—a messaging app known for

57

its encryption and a feature that allows users to set messages to automatically disappear at a chosen frequency (*i.e.*, monthly, weekly, or even daily).

245. Once Kariya initiated a conversation on Signal, Kariya asked Kwon to "move our chats here [on Signal] going forward" because "Compliance"—*i.e.*, Jump's Compliance Department—"feels much mor [sic] comfortable here [on Signal] with the disappearing chats."

246. In an effort to ensure that all of Kariya's important conversation with Terraform were on Signal, Kariya asked Kwon: "Does CJ [Han, Terraform's CFO] have Signal do you know? We've been strongly pushed to move all conversations here."

247. A couple weeks later, in March of 2021, Kariya and Jump's Compliance Department doubled down, explaining to Kwon: "Compliance really stepping up the heat on moving over to Signal. I pinged CJ about it too."

248. During these conversations in February and March 2021, Kariya deleted multiple messages throughout his Signal chats with Kwon—another feature of the encrypted app.

249. On March 23, 2021, Kariya set Signal chats to disappear weekly, meaning every week all of his messages from the week before would automatically disappear. As a result, the only conversations retained for months between Kariya and Kwon on Signal are records of phone calls.

250. Despite having access to other communication platforms during this time, Kariya would repeatedly push Kwon back to Signal. For example, just a week after setting his disappearing feature on Signal, Kariya messaged Kwon on Telegram saying, "Giving you a bump here in case you aren't getting the Signal messages[.]" Kariya did not provide any details regarding the substance of his messages on Telegram.

251. Just as Kariya intended, his Telegram messages with Kwon throughout 2021 rarely contained substantive discussions, yet Kariya repeatedly directed Kwon to "check signal."

252. Kariya's Signal messages continued to delete weekly, until May 10, 2022—during the midst of the second depeg. At this point in time, recognizing the implications of the discussions they were having, Kariya adjusted his disappearing setting on Signal to delete messages *daily*.

253. This was not the first time Jump made an effort to conceal its involvement with the fraud. For example, Kwon wanted to announce Jump's engagement with Terraform publicly, but Jump insisted on confidentiality. Kariya specifically asked Kwon to keep the agreements between Terraform and Jump "strictly confidential."

### Jump Made False and Misleading Statements

254. On October 11, 2021, Jump Crypto executives Peter Johnson (Chicago-based) and Shanav Mehta published an article on Jump Capital's website called "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market." Under the heading "Which Stablecoin(s) Will Be the Winner(s)?," the article described UST as "[t]he most prominent example" of an "[a]lgorithmically stabilized" stablecoin. It called UST "the most elegant solution for creating a highly scalable and more decentralized stablecoin."

- This article was false and misleading. It suggested to the public that UST was a stable asset maintained by an algorithm, even though the Jump Defendants knew it was not and that UST had regained its peg in May 2021 only because of Jump's actions. In other words, UST was in fact not an "algorithmically stabilized" stablecoin, which Jump knew. It was false and misleading for Jump to state that UST was an "example" of an algorithmically stabilized stablecoin and that it was a "solution for creating a highly scalable and more decentralized stablecoin."

- On information and belief, at least one Individual Victim purchased UST after Defendants made this false and misleading statement.

255. On January 28, 2022, in a multi-part tweet series, Kariya, then the head of Jump Crypto, tweeted: "There's a lot of confusion and panic on the MIM and UST today. Hoping this

59

thread can provide a clear unemotional take on the situation." Kariya continued "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on LUNA price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M. … A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple of days and not impactful to prospects of the projects. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA." By referring to the "potential for UST to be sold/burned and provide some downward pressure on LUNA price," Kariya was referring to the algorithm that was supposed to maintain UST's $1 peg.

- This statement was false and misleading. Kariya told the public that UST was a stable asset maintained by an algorithm, even though he knew it was not and that UST had regained its peg in May 2021 only because of Jump's actions. Kariya misled the public to believe that "there is potential for UST to be sold/burned and provide some downward pressure on LUNA price"—*i.e.*, that the Terra Protocol could work to maintain prices—when he knew that was false.

- Kariya made this statement in his role as head of Jump Crypto.

- On information and belief, at least one Individual Victim purchased UST after Defendants made this false and misleading statement.

256. On February 22, 2022, a series of tweets from the account of "Jump Crypto" promoted UST, stating: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin … The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility." A press release accompanying the announcement further promoted UST.

- This statement was false and misleading. Jump Crypto suggested that UST would become an even more stable asset with the creation of the LFG reserve because that reserve would "backstop[] the UST peg in times of severe volatility." But Jump knew that UST was not a stable asset maintained by an algorithm because the peg had been restored previously only because of Jump's actions. When Jump chose to speak about what could backstop the UST peg in times of severe volatility, they assumed the burden to tell the whole truth, not a

60

half truth. Instead, Jump continued to conceal the critical fact that Jump's actions are what previously backstopped the peg.

- On information and belief, at least one Individual Victim purchased UST after Defendants made this false and misleading statement.

257. On March 1, 2022, Kariya appeared on Jump Crypto's podcast, "The Ship Show," with Kwon. When discussing the May 2021 depeg, Kwon said that "the protocol automatically self-heals" and "that's why it took several days for the peg to recover." Neither Kwon nor Kariya said that the peg had recovered because of Jump's trading actions. Defendant Kariya also explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime."

- This statement was false and misleading. Kariya suggested that the LFG reserve meant UST was a stable asset. But Kariya and the Jump Entity Defendants knew that UST was not a stable asset maintained by an algorithm because the peg had been restored previously only because of Jump's actions. When Kariya chose to speak about what happens during extreme price movements, he could not omit the critical information that Jump's actions are what previously restored the peg during the extreme price movement of May 2021.

- Kariya made this statement in his role as head of Jump Crypto.

- On information and belief, at least one Individual Victim purchased UST after Defendants made this false and misleading statement.

258. On April 7, 2022, Kariya tweeted, "Alignment across ecosystems and a commitment to a multi chain future[.] UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win."

- This statement was false and misleading. Kariya suggested that the LFG reserve meant UST was a stable asset. But Kariya and the Jump Entity

Defendants knew that UST was not a stable asset maintained by an algorithm because the peg had been restored previously only because of Jump's actions.

- Kariya made this statement in his role as head of Jump Crypto.

- On information and belief, at least one Individual Victim purchased UST after Defendants made this false and misleading statement.

**UST and LUNA Were Traded in an Efficient Market**

259.    UST and LUNA were traded in an efficient market because their prices reflected publicly available information.

260.    Not only could holders burn $1 of LUNA to mint one UST token, but a person could also purchase UST and LUNA on multiple secondary markets, such as Binance, Coinbase, and KuCoin. Trading information (such as price and daily trading value) was available on widely viewed crypto-market analysis websites, such as CoinDesk and The Block.

261.    Between May 2021 and May 2022, UST and LUNA experienced large daily trading volumes of millions of tokens. There was significant analyst coverage of the UST and LUNA market, including on specialized crypto-market analysis websites and more general forums like Twitter and Reddit.

262.    UST also had market makers, including Jump, who participated in the market as both buyers and sellers.

263.    Accordingly, the price of LUNA and UST, the latter of which was supposed to remain pegged to the dollar, changed quickly to reflect new information in the marketplace. This was the principal basis for the algorithm that Terraform claimed would maintain the $1 peg. That new information was at its core about UST's price: when it dipped below or rose above $1, traders would take immediate advantage of the arbitrage opportunity to swap between one UST token and $1 of LUNA.

264. Thus, the Terraform market quickly reflected new information related to the price of UST and LUNA, demonstrating the efficiency of the markets for UST and LUNA.

**The LUNA Foundation Guard Was a Mere Extension of Terraform and Kwon**

265. Kwon publicly touted LFG as an "independent" entity, but that representation was false. As the United States Attorney's Office for the Southern District of New York stated: "Kwon . . . made false statements touting LFG's independence. . . . In actuality, Kwon controlled and operated LFG as an arm of Terraform."

266. On January 10, 2022, Terraform and LFG entered into a Master Services Agreement pursuant to which Terraform agreed indefinitely to provide "all accounting, finance, and tax-related operations and responsibilities" of LFG in exchange for a single payment of $10,000. This agreement, and its terms, were not at arm's length. Kwon signed the agreement on behalf of LFG.

267. LFG had no employees of its own.

268. Three Terraform employees—its CFO and two traders—held the keys to LFG's crypto wallets.

269. Kwon and Terraform employees treated LFG's funds as interchangeable with Terraform's funds. For example, Terraform's traders accessed LFG's assets for the purpose of trading them without permission from anyone except Kwon.

270. Kwon and Terraform employees caused LFG to deploy approximately 80,000 Bitcoin to defend the peg in May 2022. The Governing Council provided little to no oversight.

271. During the May 2022 depeg, Terraform employees discussed that a third party referred to Jump trading with LFG's Bitcoin as Jump trading with "ur" (*i.e.*, Terraform's) "Bitcoin." And Terraform employees said that "we" (*i.e.*, Terraform) deployed the Bitcoin

transferred from LFG to Jump. Terraform employees and market participants all considered LFG's Bitcoin to be *de facto* Terraform's Bitcoin.

272. Jump also treated LFG as an arm of Terraform, including, for example, by returning UST and Bitcoin to Terraform rather than LFG.

273. At least one Governing Council member expressed concern with Kwon's unilateral actions during May 2022, writing to Kwon and the rest of the Governing Council on a group message: "I think it's important to highlight that most of these [LFG] transactions were executed without a vote." Kwon responded only, "not sure if it's the best time to throw me under the bus."

274. After the May 2022 collapse, Kwon caused LFG's and Terraform's assets to be commingled in a single trading account and then directed after-the-fact accounting entries that re-attributed Terraform's prior trading losses to LFG, without Governing Council approval. The purpose of these actions was to maximize the amount of net trading losses attributed to LFG and minimize the amount of net trading losses attributed to Terraform. Kwon then transferred approximately 12,000 Bitcoin—over $300 million—from what remained of LFG's reserves to Terraform under the label of "reimbursement" for earlier "spending" on LFG's behalf.

**Relevant Conduct and Transactions Occurred in the United States and Illinois**

275. Jump Trading is headquartered in Chicago, Illinois, and maintains significant trading operations there.

276. Jump's fraudulent pump-and-dump scheme emanated from Chicago, Illinois.

277. On information and belief, DiSomma lives in Illinois and physically works at Jump's headquarters located in Chicago, Illinois.

278. On information and belief, as explained herein, DiSomma directed Jump's manipulative trading of UST and LUNA while physically located in Chicago, Illinois.

64

279.    Defendant Kariya was the leader of Jump Crypto and an architect of Jump's secret "Gentleman's Agreement" with Terraform.  On information and belief, Kariya was physically located in Chicago, Illinois at the time he proposed and caused Jump to enter the "Gentleman's Agreement" with Terraform, when speaking with Kwon during the May 2021 depeg, and when publishing materially misleading statements about Terraform and UST to U.S.-based and Illinois-based investors.

280.    Kariya involved other Chicago-based Jump executives and employees in Jump's secret "Gentleman's Agreement" with Terraform.  For example, Kariya sent an email to the "Team Illini" (a reference to Illinois) Jump Trading Listserv explaining Jump's partnership with Terraform, Jump's incentives, and how Jump could increase the value of its LUNA holdings.

281.    On information and belief, traders acting as agents of Jump directed and executed trades of crypto assets (including LUNA and UST) in furtherance of Jump's fraudulent scheme while physically located in Chicago, Illinois.  For example:

- Thomas Nagy, Jump's Head of Operations for Digital Assets, working from Jump's offices at 600 W. Chicago Avenue, 6th Floor, Chicago, Illinois 60654, coordinated the delivery and transfer of LUNA tokens.  In emails dated December 2, 2021, January 3, 2022, March 31, 2022, and May 3, 2022, Nagy directed LUNA deliveries from Terraform, including requesting delivery of the "January tranche" of LUNA and arranging deliveries of 1.2 million LUNA.

- On or about October 1, 2021, Thomas Nagy, Jump's Head of Operations for Digital Assets, working from Jump's offices at 600 W. Chicago Avenue, 6th Floor, Chicago, Illinois 60654, communicated to Terraform that it could reuse Jump's previously provided LUNA wallet address for the delivery of 1.2 million LUNA scheduled for October 1, 2021.

- Will Nawrocki, working from Jump's offices at 600 W. Chicago Avenue, 6th Floor, Chicago, Illinois 60654, coordinated the delivery and transfer of LUNA tokens from Terraform.  In emails dated February 1, 2022, and March 1, 2022, Nawrocki directed LUNA deliveries from Terraform, requesting delivery of the "February tranche" and "March tranche" of LUNA.  In emails dated February 2, 2022, and March 2, 2022, Nawrocki confirmed receipt of LUNA deliveries.

282. On information and belief, while physically located in Chicago, Illinois, traders and other employees acting as agents of Jump controlled and accessed crypto wallets used to trade UST and LUNA in furtherance of Jump's fraudulent scheme.

283. Transactions involving UST and LUNA occurred on the Terraform blockchain, centralized exchanges, and decentralized exchanges.

284. Jump's traders used centralized exchanges to trade UST and LUNA in furtherance of Jump's fraudulent scheme.

285. To access centralized exchanges, on information and belief, Jump's agents entered the exchanges' terms of service while physically located in Chicago, Illinois.

286. Jump's transactions in UST and LUNA on certain centralized exchanges occurred in the United States. For example:

287. Jump traded UST on **Binance.US** pursuant to Binance.US's Terms of Service. Transactions on Binance.US occurred within the United States:

- Binance.US represents that it "is a licensed and regulated U.S. crypto exchange committed to serving customers with integrity, in accordance with U.S. rules and regulations." Binance.US conducts MSB activities across the United States, including in Illinois.

- On information and belief, Binance.US maintains servers located in the United States, and transactions in UST were matched on U.S.-based servers. Binance.US's matching engine and wallet technologies are operated by BAM Trading Services based in Miami, Florida.

288. Jump traded UST and LUNA on **Binance** pursuant to Binance's Terms of Service. Transactions on Binance occurred within the United States:

- On information and belief, Binance maintains servers located in the United States, and transactions in UST were matched on U.S.-based servers.

- Binance's terms of service prohibit its customers from using a virtual private network (or "VPN") to modify (or "spoof") their locations when accessing Binance services. However, in 2023 the U.S. Treasury Department's Financial Crimes Enforcement Network found that Binance circumvented its own

66

policies by encouraging U.S. customers to use VPNs to "give the false impression that the user was located in a different jurisdiction, even though Binance would know that the user was, in fact, located in the United States." Individuals physically located in the United States commonly transacted on Binance.

289. Jump traded UST and LUNA on **Gemini** pursuant to Gemini's Terms of Service.

Transactions on Gemini occurred within the United States:

- Gemini is located in New York, and employs people across the United States, including in Tempe, Arizona, and San Francisco, California.

- In 2015, New York State Department of Financial Services granted a charter under New York Banking Law to Gemini Trust Company, LLC, describing it as a Bitcoin exchange based in New York City.

- On information and belief, Gemini relies on infrastructure physically located in the United States to operate its exchange. Gemini's primary trading platform and network point of presence is located in a data center in Secaucus, New Jersey.

290. Jump traded UST and LUNA on **Coinbase** pursuant to Coinbase's User Agreement. Transactions on Coinbase occurred within the United States:

- Coinbase is incorporated in, and is a citizen of, Texas. Its principal place of business is in San Francisco, California.

- On information and belief, Coinbase relies on infrastructure physically located in the United States to operate its derivatives exchange. Coinbase's trading platform operates from servers in Chicago, Illinois and Secaucus, New Jersey.

- Coinbase is also hosted on computer servers and data centers provided by Amazon Web Services ("AWS"), a cloud computing firm located in the United States. Coinbase's spot exchange is hosted on AWS's US-EAST-1 region. Servers and physical infrastructure for US-EAST-1 are located in Northern Virginia.

291. Jump traded UST and LUNA on **Kraken** pursuant to Kraken's Terms of Service.

Transactions on Kraken occurred within the United States:

- During the relevant period, Kraken was incorporated in, and a citizen of, Delaware. Its principal place of business was in San Francisco, California. Kraken subsequently relocated to Wyoming in 2025.

- In 2020, Kraken announced Wyoming approval of a Special Purpose Depository Institution (SPDI), allowing Kraken to be "the first digital asset company in U.S. history to receive a bank charter recognized under federal and state law, and will be the first regulated, U.S. bank to provide comprehensive deposit-taking, custody and fiduciary services for digital assets."

- Kraken is also hosted on computer servers and data centers provided by AWS, which is located in the United States. Kraken's servers are hosted on AWS's US-WEST-2 region. Servers and physical infrastructure for US-WEST-2 are located in Oregon.

292. Jump's traders used decentralized exchanges to trade UST and LUNA in furtherance of Jump's fraudulent scheme.

293. The Terra blockchain operates like a digital record-keeping system. It is maintained by a network of computers (called "validators") spread across multiple locations that are typically in data centers and servers around the world. These validators are randomly assigned to blockchain transactions. On information and belief, many of the validators for the Terraform blockchain were located in the United States (and in Illinois). For example:

- On information and belief, the owner of at least one Terraform validator ("LUX Blockchain Validators") was headquartered in Illinois.

- Another Terraform validator ("Bi23 Labs") publicizes that it uses a data center located in the United States for its primary validation node and/or backup validation node.

- A third Terraform validator ("BTC.Secure Inc.") is a United States corporation legally registered in the state of Delaware that provided Terraform staking services and described itself as being located in the United States.

294. During the relevant time, UST and LUNA were bought and sold by Individual Victims located all over the world, including some in the United States (and in Illinois). On information and belief, the Individual Victims bought and sold UST and LUNA between the May 2021 depeg and the Terra Ecosystem's collapse.

295. When the Terra Ecosystem collapsed, Individual Victims located in the United States (and in Illinois) were wiped out.

68

296. On information and belief, some of the Individual Victims entered terms of service for centralized exchanges and transacted in UST and LUNA while physically located in the United States, including Illinois.

297. On information and belief, some of the Individual Victims controlled crypto wallets used to transact in UST and LUNA while physically located in the United States, including Illinois.

298. Jump directed its fraudulent scheme and misstatements to investors located in the United States, including Illinois.

299. As Terraform was in the midst of a catastrophic "death spiral," Kwon directed Terraform employees to transfer 52,189 Bitcoin to wallets controlled by Jump agents who, on information and belief, were physically located in Chicago, Illinois. Simon Johansen, a Jump employee located in Chicago, Illinois, instructed Kwon to send these Bitcoin transfers from LFG to a specific Jump wallet. On information and belief, Johansen was one of the individuals who controlled the Jump wallet that received Bitcoin from LFG during the May 2022 depeg. Johansen confirmed with Kwon that Jump received the Bitcoin in the identified wallet. Later, Johansen sent settlement details to Terraform and Kwon detailing various transfers. Johansen undertook these activities while located in Chicago, Illinois.

300. On information and belief, the 52,189 Bitcoin transferred to Jump directly benefitted individuals and entities associated with Jump who were physically located in the United States, including Illinois, and controlled the wallets that received and traded the Bitcoin.

### Jump's Convoluted Corporate Structure

301. Jump Trading LLC evolved into what Jump itself refers to as "the Jump Trading Group." The Jump Trading Group is "a brand referring to [a] collection of affiliated entities."

302. According to Jump, the Jump Trading Group is "a group of entities under common ownership."

69

303. Entities within the Jump Trading Group conduct proprietary trading and investment activities across traditional financial and cryptocurrency markets using, on information and belief, capital provided by DiSomma.

304. In 2021, amid the rise of cryptocurrency as a popular and tradeable asset class, Jump announced what it referred to as a new "division" under the "Jump Trading Group" brand: "Jump Crypto." Jump externally touted Jump Crypto as a "dedicated team of talent and resources focused on the growth and development of blockchain ecosystems and cryptocurrencies."

305. Jump Trading's external branding of "Jump Trading" and "Jump Crypto" obscures a convoluted web of nominally discrete but functionally intertwined corporate entities that are under the common ownership of Defendant DiSomma and other owners of what Jump refers to as the "Jump Trading Group."

306. The "Jump Trading Group's" capital, personnel, and other resources are commingled across the Jump entities, making it impossible for an external observer to determine on which Jump entity's behalf agents of "Jump Trading" or "Jump Crypto" were acting at any given moment.

307. Individuals holding themselves out as agents of "Jump Trading" and "Jump Crypto" negotiated agreements for, and authorized transactions on behalf of, the Jump entities. For example:

- Jump Trading Director Tak Fujishima, signed a Token Sale Agreement with LFG on behalf of JCDP-7 Digital Ltd. and another token purchase agreement with Terraform for J Digital 6 Cayman Ltd.

- Matthew Hinerfeld, a lawyer at Jump Trading, signed a Loan Agreement for Tai Mo Shan Limited. Tai Mo Shan Limited, the borrower, was listed as having a Chicago address—600 W Chicago Avenue #825 Chicago, Illinois 60654.

- Employees associated with Jump Trading caused entity JCDP-7 Digital Ltd. to transfer assets to LFG.

- Employees associated with Jump Capital represented investments by JCDP-7 Digital Ltd. and J Digital 6 Cayman Ltd. as "our investments" and indicated that a $300 million pot of money should be split "280/20" between the two entities.

- Employees associated with Jump Trading signed off on a transaction that nominally benefited J Digital 6 Cayman Ltd.

- Employees associated with Jump Trading transmitted an agreement to a third-party investment target that identified J Digital 6 Cayman Ltd. as "Jump."

308.   The Jump entities similarly affiliated themselves with "Jump Trading" and "Jump Crypto" when dealing with external parties.  For example:

- Defendant J Digital 6 Cayman Ltd. listed a "Jump Trading" email address in at least one transaction with Terraform.

- Defendant Tai Mo Shan listed a "Jump Trading" email address in a certification form from Gemini, a crypto asset trading platform.

- Defendant Tai Mo Shan elected to receive legal notices at Jump's Chicago headquarters despite nominally being a Cayman Islands-based entity.

## CAUSES OF ACTION

### COUNT ONE
**Aiding and Abetting Breach of Fiduciary Duty**
**(Plan Administrator on Behalf of Terraform)**
**(Against all Defendants)**

309.   Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

310.   During the relevant period, Kwon was Terraform's co-founder and CEO.

311.   During the relevant period, Kwon controlled Terraform.

312.   Kwon owed fiduciary duties to Terraform.

313.   Defendants were aware of the existence of Kwon's fiduciary duties.

314.   Kwon breached his fiduciary duties, including his duties of loyalty and good faith, to Terraform through several actions, including by causing Terraform to commit fraud.

71

315. As particularized above, Defendants knowingly participated in and provided substantial assistance to Kwon's breaches of fiduciary duties. For example:

- Defendants participated in the fraudulent pump-and-dump scheme for which Kwon was ultimately held civilly and criminally liable;

- Defendants conspired with Kwon to misappropriate LFG's Bitcoin to further the fraud in violation of Kwon's duties to Terraform;

- Defendants endorsed Kwon's false and misleading public statements, making Kwon's misstatements more effective in misleading market participants; and

- Defendants advised Kwon on ways to grow the Terra Ecosystem while concealing risks from everyday investors.

316. Defendants' actual knowledge came from: (a) its knowledge of and direct involvement in virtually every major decision made by Kwon in the operation of Terraform and LFG from May 2021 through May 2022; and (b) non-public information about the stability of the Terra Ecosystem.

317. As a direct and proximate result of Defendants' assistance to Kwon in breaching his fiduciary duties to Terraform, Terraform has been damaged and continues to suffer damages.

**COUNT TWO**
**Claim for Contribution for Section 10(b) and SEC Rule 10b-5 Liability**
**(Plan Administrator on Behalf of Terraform)**
**(Against all Defendants)**

318. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

319. Section 10(b) of the Exchange Act makes it unlawful for "any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). And

72

SEC Rule 10b-5 prohibits "employ[ing] any device, scheme, or artifice to defraud," the making of an "untrue statement of a material fact or . . . [omission of] . . . a material fact necessary . . . to make the statements made . . . not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

320.     A claim for contribution allows a defendant who has been found liable for a 10b-5 violation to recover a portion of the damages awarded against him from another party who was not held liable for those damages but nevertheless played a part in causing the harm. *See Musick, Peeler, & Garrett v. Emps. Ins. of Wausau*, 508 U.S. 286, 288 (1991).

321.     In 2023, the SEC brought a 10b-5 claim against Terraform.

322.     Defendants' actions during the 2021 depeg were central to the SEC's allegations that Terraform engaged in a fraudulent scheme by maintaining the price of UST through Defendants' large-scale trading and not through the Terra Protocol and then misled investors by saying that the Terra Protocol had worked.

323.     Defendants were part and parcel to that fraudulent scheme.

324.     For trial, the SEC retained an expert to "assess what role Jump and its affiliates played in restoring the peg of UST to one U.S. dollar in May of 2021." **Exhibit B** at 1307:4-8. The SEC's expert testified that "had it not been for Jump's trading, that the peg would not have been restored, and that UST's price would have come very close to zero." *Id.* at 1307:23–1308:1.

325.     A jury found Terraform liable for violating Section 10(b) and SEC Rule 10b-5.

326.     A court entered judgment against Terraform on the SEC's claims for $4.5 billion.

327.     Had Defendants not artificially restored UST's peg in May 2021, Terraform's SEC judgment would have been substantially smaller. Almost all of the SEC's disgorgement

73

calculation was based on Terraform's sales of UST to investors between June 2021 and May 2022 and LFG's sales of UST and LUNA. Those sales would not have been possible if Defendants had not restored the peg in May 2021.

328.     As explained in Count Three below and incorporated by reference herein, Defendants violated Section 10(b) and SEC Rule 10b-5. Defendants also developed and implemented the fraudulent scheme for which Terraform was found liable. Defendants also caused the harms for which Terraform was found liable.

329.     As a result of their improper conduct, Defendants realized improper gains and have not been held to account. Only Tai Mo Shan, one Jump subsidiary, has been required to pay for its role in the scheme. And Defendants extracted billions of dollars more from the Terra Ecosystem than the $123 million that Tai Mo Shan paid.

330.     Defendants are liable for contribution for their share of the 10b-5 judgment entered against Terraform.

**COUNT THREE**
**Section 10(b) and SEC Rule 10b-5**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

331.     Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

332.     Plaintiff brings this claim for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

333.     Section 10(b) of the Exchange Act makes it unlawful for "any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary

74

or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). And SEC Rule 10b-5 prohibits "employ[ing] any device, scheme, or artifice to defraud," the making of an "untrue statement of a material fact or . . . [omission of] . . . a material fact necessary . . . to make the statements made . . . not misleading," and "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

334.    UST and LUNA are securities within the meaning of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

335.    UST and LUNA were traded in an efficient market.

336.    Defendants employed a device, scheme, or artifice to defraud and engaged in acts which operated as a fraud. As particularized above, Defendants developed and implemented a scheme to artificially keep the Terra Ecosystem alive, including by artificially maintaining UST's $1 peg through trading, concealing its role in the depeg, and supporting LFG as another illusion that the Terra Ecosystem was stable.

337.    Defendants committed deceptive or manipulative acts, as particularized above. Those deceptive or manipulative acts include:

- Defendants made a series of trades during the May 2021 depeg to artificially restore UST to its $1 peg.

- Defendants obtained the removal of the vesting conditions in exchange for artificially restoring UST to its $1 peg.

- Kariya helped design the scheme to have the Jump Entity Defendants secretly trade to restore the peg. He negotiated the removal of the vesting conditions in exchange for the Jump Entity Defendants' trading to restore the peg. And Kariya personally encouraged investors to consider the Terra Ecosystem as a stable investment.

- DiSomma directed the Jump Entity Defendants' trading activities to restore the peg, including instructing Jump traders to adjust the parameters for their trades to restore the peg.

75

- Defendants insisted that the full extent of their relationship with Terraform be kept secret.

- Defendants publicly touted UST and LUNA as stable investments, while knowing the algorithm did not work.

- Defendants helped create LFG to further the Terra Ecosystem and bolster the illusion that it was stable.

338. Defendants' deceptive or manipulative acts were in furtherance of the scheme to defraud.

339. Defendants' deceptive or manipulative acts were in connection with the purchase or sale of the securities UST and LUNA.

340. As particularized above, Defendants also made false and misleading statements that were material. Defendants publicly touted that the Terra Ecosystem was a stable investment, while knowing that the Terra Protocol did not work to maintain UST's $1 peg and instead Defendants' secret intervention is what restored the peg. There is a substantial likelihood that the disclosure of Defendants' omitted facts would have been viewed by a reasonable investor as having significantly altered the total mix of information available about UST and LUNA.

341. Defendants acted with scienter. Defendants had a motive to engage in the scheme to defraud. Defendants had significant LUNA holdings and options to purchase millions more in the future. But Defendants did not restore UST's peg merely to save existing LUNA holdings. Kariya, acting for the Jump Entity Defendants, designed the scheme so that the contractual vesting conditions would be removed if they helped restore the peg, unlocking millions of LUNA at below-market strike prices. Only once that secret agreement had been reached did Defendants engage in trades to artificially restore the peg. Defendants then traded with the purpose of artificially restoring the peg, as evidenced by their trading conduct. Defendants did not believe that UST was worth $1. DiSomma instructed Jump traders on how to trade to restore the peg, including by

76

adjusting the typical parameters and engaging in manual trades. Defendants sometimes purchased UST above the market price. And Defendants structured the trades off-chain, which avoided public detection. Defendants insisted that their role in restoring the peg be kept secret. Despite knowing that their actions had restored UST's peg, Defendants continued to publicly tout the Terra Ecosystem as a stable asset maintained by the Terra Protocol, underscoring their intentional fraud.

342. The Individual Victims had justifiable reliance. Investors, including the Individual Victims, purchased tokens based on their reliance on the stability created by the algorithmic relationship between UST and LUNA. The Individual Victims would not have made the same investment decisions had they known that the Terra Protocol did not work to maintain UST's peg and instead Defendants engaged in a secret and fraudulent scheme to maintain UST's peg and also made false and misleading statements.

343. Because UST and LUNA were traded in an efficient market, the truth of Defendants' deceptive conduct would have been incorporated into the price of UST and LUNA had it been disclosed. Defendants' deceptive conduct caused a fraud on the market by artificially inflating UST's price, and investors, including the Individual Victims, relied on the market price.

344. Defendants' actions caused the Individual Victims to buy UST tokens believing them to be a stable asset maintained by the Terra Protocol. Had Defendants not intervened to restore the peg in May 2021, the Terra Ecosystem would have collapsed. Had Defendants disclosed their intervention to restore the peg, the Individual Victims would not have purchased UST or LUNA, or would have been willing to pay a different price. Had Defendants not made false and misleading statements, the Individual Victims would not have purchased UST or LUNA, or would have been willing to pay a different price.

345. As a result of Defendants' fraudulent conduct, the Individual Victims suffered damages in connection with their purchases of UST and LUNA. Defendants' fraudulent conduct artificially inflated the prices of the Terra Ecosystem by misleading the investing public to believe the Terra Protocol worked. The Terra Ecosystem crashed when the peg could not be sustained by the Terra Protocol. When the Terra Ecosystem crashed, UST lost its value, and investors in those tokens sustained significant losses.

**COUNT FOUR**
**Control Person Liability under Section 20(a)**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against DiSomma and Kariya)**

346. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

347. Section 20(a) of the Exchange Act imposes liability when there is a violation of the securities law by a "controlled person," the defendant controlled that primary violator, and the defendant was culpable in the controlled person's fraud. 15 U.S.C. § 78t(a).

348. As explained in Count Three and incorporated by reference herein, the Jump Entity Defendants violated Section 10(b) and SEC Rule 10b-5.

349. Defendants DiSomma and Kariya had control of a primary violator—the Jump Entity Defendants. They had both the general control over the operations of the Jump Entity Defendants and the ability to control the specific activities related to the Jump Entity Defendants' 10b-5 violations.

350. Kariya was the head of Jump Crypto and was directly responsible for making several false statements. Kariya directed the strategy for Jump Crypto. During the May 2021 depeg, he worked with Kwon to design the fraudulent scheme, through which Jump would secretly trade to restore UST's peg. Kariya also worked on the formation of LFG.

78

351. DiSomma implemented the fraudulent scheme. He directed traders at Jump on how to artificially inflate the price of UST during the May 2021 depeg and how to unwind Jump's position without causing another depeg.

352. Kariya and DiSomma both had the power to direct Jump's activities, including on a day-to-day basis, and in fact exercised that power.

353. As a result of Kariya's and DiSomma's control over the Jump Entity Defendants, the Individual Victims suffered damages in connection with their purchases of UST and LUNA.

354. Kariya and DiSomma are jointly and severally liable for Defendants' 10b-5 violations.

**COUNT FIVE**
**Section 9 of the Exchange Act**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

355. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

356. Plaintiff brings this claim for violations of Section 9 of the Securities Exchange Act, which is intended to deter manipulative tactics regarding the exchange of securities. It prohibits the use of interstate commerce for manipulative trading conduct. Under the statute, it is unlawful to engage in a series of transactions that creates "actual or apparent active trading" or raises or lowers prices "for the purpose of inducing the purchase or sale of a security by others," knowingly creating "a false or misleading appearance of active trading" in a non-government security, or knowingly spreading false information about a security to raise or depress its price and thereby induce others to purchase the security. It is unlawful to purchase or sell a non-government security to peg, fix, or stabilize the price of the security in violation of the SEC's rules and regulations. 15 U.S.C. § 78i(a).

357.    Liability for a Section 9 violation attaches to anyone who willfully participates in a manipulation scheme or prohibited activity under the Act.

358.    Section 9(f) of the Securities Exchange Act of 1934 provides individuals with an express private right of action for securities price manipulation.

359.    UST and LUNA are securities within the meaning of the Securities Exchange Act, 15 U.S.C. § 78c(a)(10).

360.    UST and LUNA were traded in an efficient market.

361.    Defendants manipulated the price of UST to restore its $1 peg so that market participants would believe that the Terra Protocol worked even though it did not.  UST would not have regained its peg absent Defendants' intervention.

362.    During the May 2021 depeg, Defendants purchased UST to restore UST's peg while also creating the false appearance that the algorithm had restored the peg.

363.    On at least one occasion, Defendants paid over the prevailing market price for UST to manipulate its price higher to restore the $1 peg.

364.    Defendants used manipulative trading strategies to signal false demand to the market to manipulate the price of UST to restore UST's $1 peg.

365.    UST traded at an artificial price because of Defendants' trading conduct.

366.    Defendants' trading conduct injected false information into the market.  For example, Defendants' trades were not the result of legitimate supply and demand.  Instead, Defendants bought UST for the illegitimate purpose of *secretly* restoring UST's $1 peg without alerting other market participants to the true scope of the peg's instability.  And Defendants extracted payment for trading to restore the peg through the removal of the vesting conditions. The signal that Defendants' trading conduct sent to the market was therefore knowingly false.

80

367. Defendants induced market participants to enter the market for UST and LUNA based on their false belief that the Terra Protocol worked and that UST's peg was stable.

368. As particularized herein, Defendants acted with scienter. They had the intent to create artificial prices that do not reflect the underlying conditions of supply and demand. Defendants had motive and opportunity to manipulate the market for UST and in fact manipulated the market for UST. And Defendants subsequently misled the market about their role in restoring UST's $1 peg.

369. The Individual Victims had justifiable reliance. Investors, including the Individual Victims, purchased tokens based on their reliance on the stability created by the algorithmic relationship between UST and LUNA. The Individual Victims would not have made the same investment decisions or paid the same prices had they known that the Terra Protocol did not work to maintain UST's peg and instead Defendants engaged in a secret and fraudulent scheme to manipulate the price of UST.

370. Because UST and LUNA were traded in an efficient market, the truth of Defendants' deceptive conduct would have been incorporated into the price of UST and LUNA had it been disclosed. Defendants' deceptive conduct caused a fraud on the market by artificially inflating UST's price, and investors, including the Individual Victims, relied on the market price.

371. The scope of Defendants' involvement in manipulating the market for UST was not revealed until after December 18, 2023. This claim was brought within two years of the discovery of the facts that constituted the violation.

372. As a result of Defendants' market manipulation, the Individual Victims suffered damages in connection with their purchases of UST and LUNA because they purchased UST and

81

LUNA at artificially inflated prices caused by Defendants. When the Terra Ecosystem crashed, UST lost its value, and investors in those tokens sustained significant losses.

373. As a result of its market manipulation, Defendants achieved improper gains. Plaintiff, on behalf of the Individual Victims, is entitled to the disgorgement of Defendants' ill-gotten gains.

## COUNT SIX
### Common Law Fraud
### (Plan Administrator on Behalf of Individual Victims)
### (Against all Defendants)

374. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

375. Under Illinois law, a defendant is liable for common law fraud if he (1) made a false statement of material fact; (2) knew the statement was false; (3) intended that the statement induce the plaintiff to act; (4) the plaintiff relied on the statement; and (5) damages resulted from that reliance.

376. Defendants committed fraudulent acts as particularized herein, including market manipulation and material fraudulent misstatements and omissions.

377. Defendants engaged in market manipulation and made material fraudulent misstatements and omissions with the intent that investors, including the Individual Victims, rely on the deception.

378. Defendants acted knowingly with motive and opportunity to engage in the fraudulent market manipulation and misrepresentations scheme alleged herein.

379. Investors justifiably relied on the false information injected into the market by Defendants when they purchased UST and LUNA. For example, Defendants' fraudulent scheme, misstatements, and omissions caused the Individual Victims to buy UST believing that the Terra

82

Protocol functioned as promised.  Had Defendants not intervened to restore the peg in May 2021, the price of LUNA would not have skyrocketed between May 2021 and May 2022, and purchasers of UST and LUNA after May 2021 would not have been damaged by Defendants.

380.    As a result of Defendants' fraudulent conduct, the Individual Victims suffered damages in connection with their purchases of UST and LUNA when the Terra Ecosystem collapsed.

**COUNT SEVEN**
**Violation of Illinois Consumer Fraud Act**
**Under 815 Ill. Comp. Stat. § 505/2**
**(Plan Administrator on Behalf of Individual Victims)**
**(Against all Defendants)**

381.    Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

382.    The Illinois Consumer Fraud Act provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

383.    The Illinois Consumer Fraud Act thus prohibits deceptive or unfair acts or practices, when the defendant intended that the plaintiff rely on the deceptive or unfair act or practice, and the unfair or deceptive act "occurred during a course of conduct involving trade or commerce." *Chandler v. Am. Gen. Fin., Inc.*, 768 N.E.2d 60, 65 (Ill. App. Ct. 2002).

384.    Defendants committed deceptive or unfair acts as particularized herein, including market manipulation and material fraudulent misstatements and omissions.

385.    Defendants' deception occurred during a course of conduct involving trade or commerce.

386.    The circumstances giving rise to the relevant fraudulent conduct and transactions arose primarily and substantially in Illinois.  The Jump Trading Group and its affiliates are headquartered in Chicago, Illinois.  On information and belief, DiSomma and Kariya, along with other Chicago-based Jump employees, directed and facilitated Jump's manipulative trading and misleading statements and omissions while physically located in Illinois.

387.    Defendants engaged in market manipulation and made material fraudulent misstatements and omissions with the intent that investors, including the Individual Victims, rely on the deception.

388.    Defendants acted knowingly, including with motive and opportunity to engage in the fraudulent market manipulation and misrepresentations scheme alleged herein.

389.    Investors relied on the false information injected into the market by Defendants when they purchased UST and LUNA.  For example, Defendants' fraudulent scheme, misstatements, and omissions caused the Individual Victims to buy UST believing that the Terra Protocol functioned as promised.  Had Defendants not intervened to restore the peg in May 2021, the price of LUNA would not have skyrocketed between May 2021 and May 2022, and purchasers of UST and LUNA after May 2021 would not have been damaged by Defendants.

390.    As a result of Defendants' fraudulent conduct, the Individual Victims suffered damages in connection with their purchases of UST and LUNA when the Terra Ecosystem collapsed.

84

**COUNT EIGHT**
**Unjust Enrichment**
**(Plan Administrator on Behalf of Terraform and Individual Victims)**
**(Against all Defendants)**

391.    Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

392.    Defendants obtained benefits from Terraform and the Individual Victims through wrongful conduct, including manipulation of the market to restore UST's peg.  Defendants made hundreds of millions, if not billions, of dollars in profits at the expense of Terraform and its creditors, including the Individual Victims.

393.    After the 2021 depeg, Defendants received discounted LUNA worth millions of dollars to facilitate Jump manipulating the price of UST.  After the 2021 depeg, Defendants were rewarded for their participation in the fraudulent scheme by, for example, having the vesting conditions on the discounted LUNA removed.  Defendants then profited by trading LUNA on the open market at inflated prices resulting from Defendants' market manipulation.

394.    Defendants also profited from the trades they made during the May 2021 depeg in their attempts to restore the peg.

395.    Defendants also received profits from their market-making activities for trades of Terraform's tokens, including UST and LUNA, that Defendants executed during the May 2021 depeg and after.  Those market-making fees were ill-gotten gains that Defendants received only because they engaged in fraudulent conduct and market manipulation.

396.    Additionally, Terraform conferred a benefit on Defendants when Terraform employees, acting at Kwon's direction, transferred 52,189 Bitcoin from LFG's wallets to Jump in May 2022.  On information and belief, Defendants traded that Bitcoin in ways that lined their own pockets at the expense of Terraform and its investors.

397. Defendants bear more fault than Terraform. Terraform relied on Defendants to deploy their traders and capital to manipulate the market to restore UST's $1 peg. Without Defendants' participation, the fraud would have failed in May 2021 because Terraform was unable to restore the peg on its own and relied on Defendants to do so.

398. Defendants voluntarily accepted and retained these benefits conferred to the detriment of Terraform and its creditors, including the Individual Victims, the latter of which purchased UST in reliance on the Terra Protocol maintaining the peg.

399. No contract governs this dispute.

400. It is inherently unfair and inequitable, violating fundamental principles of justice, equity, and good conscience, that funds rightfully belonging to Terraform's creditors—the investors who were defrauded by Defendants' scheme—are retained by and used to benefit Defendants rather than being returned to the Wind Down Trust for the benefit of Terraform's creditors.

### COUNT NINE
**Violation of Section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act**
**740 Ill. Comp. Stat. § 160/5(a)(1)**
**(Actual Fraudulent Transfer)**
**(Plan Administrator on Behalf of Terraform and Individual Victims)**
**(Against all Defendants)**

401. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

402. Pursuant to Sections 544(b)(1) and 1107(a) of the Bankruptcy Code and the Plan, the Plan Administrator has standing under the Illinois Uniform Fraudulent Transfer Act ("IUFTA") to "avoid any transfer of property of the debtor or any obligation incurred by the debtor" "that is voidable under applicable law by a creditor holding an unsecured claim that is

allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

403. On information and belief, Bitcoin transferred to Jump by Terraform employees, acting at Kwon's direction, from LFG wallets in May 2022 was transferred to wallets owned and controlled by individuals physically located in Chicago, Illinois. Chicago-based Jump employees directed and facilitated the transfer.

404. Under Section 8 of the IUFTA, a creditor may obtain (among other things) avoidance of a fraudulent transfer to the extent necessary to satisfy the creditor's claim, appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or any other relief the circumstances may require. 740 ILCS § 160/8 (a)(1), (3)(B)-(C).

405. Under Section 5 of the IUFTA's actual fraud provision, "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay or defraud any creditor of the debtor . . . ."

406. Kwon used his and Terraform's control of LFG, LFG's wallets, and LFG's assets to unilaterally transfer 52,189 Bitcoin held by LFG to Defendants when Terraform was collapsing in May 2022. Kwon and Terraform directed this transfer with actual intent to hinder, delay, or defraud the creditors of Terraform. These transfers constituted actual fraudulent transfers of the debtor's property under the Illinois Uniform Fraudulent Transfer Act. 740 ILCS § 160/5(a)(1).

407. As a result of the SEC's successful enforcement action, on June 12, 2024, United States District Court Judge for the Southern District of New York Jed S. Rakoff entered a judgment directing Kwon to use his control over LFG's assets to transfer LFG's remaining crypto assets to

87

the estate. Specifically, Judge Rakoff ordered that Kwon "transfer[] to the Terraform bankruptcy estate . . . all crypto assets of the Luna Foundation Guard," and for those assets to be used "to satisfy the disgorgement amount and prejudgment interest with any remaining assets applied to the civil penalty amount." These assets entered the estate and were paid out to Terraform's creditors.

408. The 52,189 Bitcoin that Terraform employees, acting at Kwon's direction, transferred to Defendants in May 2022 was *de facto* property of the debtor. Among other reasons, LFG was an alter ego of Terraform. Kwon and three Terraform employees maintained control over LFG's wallets and corresponding reserves and deployed them for Terraform's own purposes.

409. Had the Bitcoin remained in LFG's wallets instead of being transferred to Defendants, the Bitcoin would have been part of the Terraform estate, including pursuant to Judge Rakoff's order filed in 2024 directing Kwon to transfer LFG's remaining crypto assets to the estate. These assets would thus have been available to repay the debtor's creditors had Jump not received them in the midst of Terraform's collapse.

410. Because the May 2022 transfers of 52,189 Bitcoin to Defendants were fraudulent under Section 5(a)(1) of the IUFTA, the Plan Administrator may avoid the transfers pursuant to Section 8(a) of the IUFTA.

411. As a direct and proximate result of the fraudulent transfers, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, the claims of investors who were defrauded by the pump-and-dump scheme.

88

412.    Terraform filed for Chapter 11 Bankruptcy on January 21, 2024.  The May 2022 fraudulent transfers occurred within the five-year statutory lookback period.

**COUNT TEN**
**Violation of Sections 5(a)(2) and 6(a) of the Illinois Uniform Fraudulent Transfer Act**
**740 Ill. Comp. Stat. §§ 160/5(a)(2), 160/6(a)**
**(Constructive Fraudulent Transfer)**
**(Plan Administrator on Behalf of Terraform and Individual Victims)**
**(Against all Defendants)**

413.    Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

414.    Pursuant to Sections 544(b)(1) and 1107(a) of the Bankruptcy Code and the Plan, the Plan Administrator has standing under the IUFTA to "avoid any transfer of property of the debtor or any obligation incurred by the debtor" "that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."

415.    On information and belief, Bitcoin transferred to Jump by Terraform employees, acting at Kwon's direction, from LFG wallets in May 2022 was transferred to wallets owned and controlled by individuals physically located in Chicago, Illinois.  Chicago-based Jump employees directed and facilitated the transfer.

416.    Under Section 8 of the IUFTA, a creditor may obtain (among other things) avoidance of a fraudulent transfer to the extent necessary to satisfy the creditor's claim, appointment of a receiver to take charge of the asset transferred or of other property of the transferee, or any other relief the circumstances may require.  740 ILCS §§ 160/8 (a)(1), (3)(B)-(C).

417.    Under Section 5 of the IUFTA's constructive fraud provision, "(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose

89

before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

. . .

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction from which the remaining assets of the debtor were unreasonably small in relation to the business or transaction: or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

418. Under Section 6(a) of IUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer … without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

419. Kwon used his and Terraform's control of LFG, LFG's wallets, and LFG's assets to unilaterally transfer 52,189 Bitcoin held by LFG to Defendants when Terraform was collapsing in May 2022.

420. The transfers to Defendants were made without Terraform receiving reasonably equivalent value.

421. Terraform was insolvent at the time of the May 2022 transfer, or became insolvent as a result of the transfer. The fraud underlying the Terra Ecosystem had already occurred; the bank run on UST was already underway and accelerating; and the algorithm had been exposed as

90

incapable of restoring the peg. Thus, at the time of the transfer, no reasonable and informed buyer would pay a positive price to assume Terraform's assets and liabilities.

422. Terraform was experiencing a "death spiral" and therefore was insolvent, was rendered insolvent, or faced near-certain insolvency at the time of this transfer. The fraud underlying the Terra Ecosystem had already occurred; the bank run on UST was already underway and accelerating; and the algorithm had been exposed as incapable of restoring the peg. Thus, the transfers occurred when Terraform's remaining assets were unreasonably small in relation to the business transaction(s) and when Terraform intended to incur or believed, or reasonably should have believed, that Terraform would incur debts beyond its abilities to pay the Terraform creditors.

423. The transfers constituted constructive fraudulent transfers of Terraform's property under the IUFTA. 740 ILCS §§ 160/5(a)(2), 160/6(a).

424. As a result of the SEC's successful enforcement action, on June 12, 2024, United States District Court Judge for the Southern District of New York Jed S. Rakoff entered a judgment directing Kwon to use his control over LFG's assets to transfer LFG's remaining crypto assets to the estate. Specifically, Judge Rakoff ordered that Kwon "transfer[] to the Terraform bankruptcy estate . . . all crypto assets of the Luna Foundation Guard," and for those assets to be used "to satisfy the disgorgement amount and prejudgment interest with any remaining assets applied to the civil penalty amount."

425. The 52,189 Bitcoin that Terraform employees, acting at Kwon's direction, transferred to Defendants in May 2022 was *de facto* property of the debtor. Among other reasons, LFG was an alter ego of Terraform. Kwon and three Terraform employees maintained control over LFG's wallets and corresponding reserves and deployed them for Terraform's own purposes.

91

426.     Had the Bitcoin remained in LFG's wallets instead of being transferred to Defendants, the Bitcoin would have been part of the Terraform estate, including pursuant to Judge Rakoff's order filed in 2024 directing Kwon to transfer LFG's remaining crypto assets to the estate. These assets would thus have been available to repay the debtor's creditors had Jump not received them in the midst of Terraform's collapse.

427.     Because the May 2022 transfers of 52,189 Bitcoin to Defendants were fraudulent under Sections 5(a)(2) and 6(a) of the IUFTA, the Plan Administrator may avoid the transfers pursuant to Section 8(a) of the IUFTA.

428.     As a direct and proximate result of the fraudulent transfers, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, the claims of investors who were defrauded by the pump-and-dump scheme.

429.     Terraform filed for Chapter 11 Bankruptcy on January 21, 2024.  The May 2022 fraudulent transfers occurred within the five-year statutory lookback period.

**COUNT ELEVEN**
**Violation of 11 U.S.C. § 548(a)(1)(A)**
**(Actual Fraudulent Transfer)**
**(Plan Administrator on Behalf of Terraform and Individual Victims)**
**(Against all Defendants)**

430.     Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

431.     Pursuant to Section 548 of the Bankruptcy Code's actual fraud provision and the Plan, the Plan Administrator "may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition [on January 21, 2024], if the debtor voluntarily or

involuntarily—(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . ." *See also* 11 U.S.C. § 1107(a).

432. On information and belief, Bitcoin transferred to Jump by Terraform employees, acting at Kwon's direction, from LFG wallets in May 2022 was transferred to wallets owned and controlled by individuals physically located in Chicago, Illinois. Chicago-based Jump employees directed and facilitated the transfer.

433. Kwon used his and Terraform's control of LFG, LFG's wallets, and LFG's assets to unilaterally transfer 52,189 Bitcoin held by LFG to Defendants when Terraform was collapsing in May 2022. Kwon and Terraform directed this transfer with actual intent to hinder, delay, or defraud the creditors of Terraform. These transfers constituted actual fraudulent transfers of the debtor's property under the Bankruptcy Code.

434. As a result of the SEC's successful enforcement action, on June 12, 2024, United States District Court Judge for the Southern District of New York Jed S. Rakoff entered a judgment directing Kwon to use his control over LFG's assets to transfer LFG's remaining crypto assets to the estate. Specifically, Judge Rakoff ordered that Kwon "transfer[] to the Terraform bankruptcy estate . . . all crypto assets of the Luna Foundation Guard," and for those assets to be used "to satisfy the disgorgement amount and prejudgment interest with any remaining assets applied to the civil penalty amount."

435. The 52,189 Bitcoin that Terraform employees, acting at Kwon's direction, transferred to Defendants in May 2022 was *de facto* property of the debtor. Among other reasons, LFG was an alter ego of Terraform. Kwon and three Terraform employees maintained control over LFG's wallets and corresponding reserves and deployed them for Terraform's own purposes.

436. Had the Bitcoin remained in LFG's wallets instead of being transferred to Defendants, the Bitcoin would have been part of the Terraform estate pursuant to Judge Rakoff's order filed in 2024 directing Kwon to transfer LFG's remaining crypto assets to the estate. These assets would thus have been available to repay the debtor's creditors had Jump not received them in the midst of Terraform's collapse.

437. As a direct and proximate result of the fraudulent transfers, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, the claims of investors who were defrauded by the pump-and-dump scheme.

438. Terraform filed for Chapter 11 Bankruptcy on January 21, 2024. The May 2022 fraudulent transfers occurred within the two-year statutory lookback period.

439. Because the May 2022 transfers of 52,189 Bitcoin to Defendants were fraudulent under the Bankruptcy Code, the Plan Administrator may avoid the transfers and recover the fraudulent transfers (*i.e.*, the Bitcoin) or their present-day value under section 550(a) of the Bankruptcy Code.

440. Terraform filed for Chapter 11 Bankruptcy on January 21, 2024. The May 2022 fraudulent transfers occurred within the two-year statutory lookback period.

**COUNT TWELVE**
**Violation of 11 U.S.C. § 548(a)(1)(B)**
**(Constructive Fraudulent Transfer)**
**(Plan Administrator on Behalf of Terraform and Individual Victims)**
**(Against all Defendants)**

441. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

94

442.     Pursuant to Section 548 of the Bankruptcy Code's constructive fraud provision and the Plan, the Plan Administrator "may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition [on January 21, 2024], if the debtor voluntarily or involuntarily—

(B)

(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

> (I)     was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

> (II)    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]

> (III)   intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; . . ."

*See also* 11 U.S.C. § 1107(a).

443.     On information and belief, Bitcoin transferred to Jump by Terraform employees, acting at Kwon's direction, from LFG wallets in May 2022 was transferred to wallets owned and controlled by individuals physically located in Chicago, Illinois.  Chicago-based Jump employees directed and facilitated the transfer.

444. Kwon used his control of LFG, LFG's wallets, and LFG's assets to unilaterally transfer 52,189 Bitcoin held by LFG to Defendants when Terraform was collapsing in May 2022. These transfers constituted constructive fraudulent transfers of Terraform's property under the Bankruptcy Code.

445. The transfers to Defendants were made without Terraform receiving reasonably equivalent value.

446. Terraform was experiencing a "death spiral" and therefore was insolvent, was rendered insolvent, or faced near-certain insolvency at the time of this transfer. The fraud underlying the Terra Ecosystem had already occurred; the bank run on UST was already underway and accelerating; and the algorithm had been exposed as incapable of restoring the peg. Thus, the transfers occurred when Terraform's remaining assets were unreasonably small in relation to the business transaction(s) and when Terraform intended to incur or believed, or reasonably should have believed, that Terraform would incur debts beyond its abilities to pay the Terraform creditors.

447. As a result of the SEC's successful enforcement action, on June 12, 2024, United States District Court Judge for the Southern District of New York Jed S. Rakoff entered a judgment directing Kwon to use his control over LFG's assets to transfer LFG's remaining crypto assets to the estate. Specifically, Judge Rakoff ordered that Kwon "transfer[] to the Terraform bankruptcy estate . . . all crypto assets of the Luna Foundation Guard," and for those assets to be used "to satisfy the disgorgement amount and prejudgment interest with any remaining assets applied to the civil penalty amount."

448. The 52,189 Bitcoin that Terraform employees, acting at Kwon's direction, transferred to Defendants in May 2022 was *de facto* property of the debtor. Among other reasons,

96

LFG was an alter ego of Terraform. Kwon and three Terraform employees maintained control over LFG's wallets and corresponding reserves and deployed them for Terraform's own purposes.

449. Had the Bitcoin remained in LFG's wallets instead of being transferred to Defendants, the Bitcoin would have been part of Terraform estate, including pursuant to Judge Rakoff's order filed in 2024 directing Kwon to transfer LFG's remaining crypto assets to the estate. These assets would thus have been available to repay the debtor's creditors had Jump not received them in the midst of Terraform's collapse.

450. As a direct and proximate result of the fraudulent transfers, the assets of Terraform, and, consequently, the Wind Down Trust have been diminished by not less than hundreds of millions of dollars, and the remaining assets of the Wind Down Trust are insufficient to pay the Trust's debts and liabilities, including, the claims of investors who were defrauded by the pump-and-dump scheme.

451. Terraform filed for Chapter 11 Bankruptcy on January 21, 2024. The May 2022 fraudulent transfers occurred within the two-year statutory lookback period.

452. Because the May 2022 transfers of 52,189 Bitcoin to Defendants were fraudulent under the Bankruptcy Code, the Plan Administrator may avoid the transfers and recover the fraudulent transfers (*i.e.*, the Bitcoin) or their present-day value under Section 550(a) of the Bankruptcy Code.

453. Terraform filed for Chapter 11 Bankruptcy on January 21, 2024. The May 2022 fraudulent transfers occurred within the two-year statutory lookback period.

## COUNT THIRTEEN
### Section 15 of the Securities Act of 1933
### (Plan Administrator on Behalf of Individual Victims)
### (Against DiSomma and Kariya)

454. Plaintiff incorporates by reference each of the paragraphs set forth in this amended complaint as though fully alleged herein.

455. Section 15 of the Securities Act, 15 U.S.C. § 77o, allows private plaintiffs to file a suit against persons in control over primary violators of Section 12 of the Securities Act. The "control person" can be held jointly and severally with, and to the same extent as, the controlled person. Under Rule 405 of the Securities Act, 17 C.F.R. § 230.405, "control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."

456. Defendants violated Sections 5 and 12(a)(1) of the Securities Act. As particularized above, UST and LUNA are securities within the meaning of the Securities Act. Terraform offered and sold LUNA to the Jump Entity Defendants at deeply discounted prices. Defendants acquired LUNA from Terraform with a view to distribution, as evidenced by the fact that, upon receiving tranches of LUNA, the Jump Entity Defendants sold those tokens into the secondary market at prices far exceeding the discounted acquisition price. Defendants therefore acted as statutory underwriters within the meaning of Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11), because they acquired LUNA from Terraform, an issuer, with a view to the distribution thereof.

457. Defendants' offers and sales of LUNA were made through the use of interstate commerce. As particularized above, the Jump Entity Defendants traded LUNA on centralized exchanges located in and operating within the United States, including Binance.US, Coinbase, Gemini, and Kraken, all of which relied on servers and infrastructure physically located in the United States. On information and belief, the Jump Entity Defendants entered terms of service

98

and accessed these exchanges, including to execute trades, while physically located in Chicago, Illinois.

458.     Tai Mo Shan, a Jump subsidiary and a named Defendant, separately settled with the SEC for $123 million based, in part, on the SEC's finding that Tai Mo Shan acted as a statutory underwriter with respect to certain offers and sales of LUNA in violation of Sections 5(a) and (c) of the Securities Act.  The SEC's findings with respect to Tai Mo Shan confirm that the Jump Entity Defendants engaged in the unregistered offer and sale of LUNA as statutory underwriters.

459.     Between May 2021 and May 2022, Defendants assisted Kwon in substantially growing the amount of UST outstanding both on an absolute basis and relative to the amount of LUNA outstanding.  These actions made the peg and the Terra Ecosystem substantially more unstable, and Defendants were or should have been aware of this.  Nonetheless, Defendants continued to make false public statements touting the inherent stability of the Terra Ecosystem without disclosing this increased risk.  Defendants thus actively solicited investors through this deceptive conduct.

460.     Defendants knowingly engaged in the collusive scheme with the intent that others would purchase or sell UST and LUNA to their benefit.

461.     Defendants promoted the purchasing of unregistered securities.

462.     DiSomma and Kariya had control of the primary violator—the Jump Entity Defendants.  They had both general control over the operations of the Jump Entity Defendants and the ability to control the specific activities related to the Jump Entity Defendants' Sections 5 and 12 violations.

463.     Kariya was the head of Jump Crypto and was directly responsible for making several false statements.  Kariya directed the strategy for Jump Crypto.  During the May 2021

99

depeg, he worked with Kwon to design the fraudulent scheme, through which Jump would secretly trade to restore UST's peg. Kariya also worked on the formation of LFG.

464. DiSomma implemented the fraudulent scheme. He directed traders at Jump on how to artificially inflate the price of UST during the May 2021 depeg and how to unwind Jump's position without causing another depeg.

465. Both Kariya and DiSomma were culpable for the Jump Entity Defendants' conduct that induced individuals to purchase unregistered securities through interstate commerce. They each had the power and influence and exercised the same to cause the unlawful offer and sale of unregistered securities.

466. As a result of Kariya's and DiSomma's control over the Jump Entity Defendants, the Individual Victims suffered damages in connection with their purchases of UST and LUNA.

467. DiSomma and Kariya are jointly and severally liable for the Jump Entity Defendants' Sections 5 and 12 violations.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

a.     Enter a judgment in favor of Plaintiff on all counts of this Complaint;

b.     Enter a judgment holding the Jump Entity Defendants and the Individual Defendants liable for their violations;

c.     Award Plaintiff money damages from Defendants, including compensatory damages, exemplary damages, treble damages, punitive damages, lost profits, lost business value, disgorgement, and attorneys' fees and costs, in an amount to be proven at trial;

d.     Enter an order imposing a constructive trust on the Bitcoin that Defendants received in May 2022, and on their proceeds and traceable products, in favor of Plaintiff;

e.      Enter an order avoiding the fraudulent transfers and directing Defendants, at Plaintiff's election, to return the transferred Bitcoin or to satisfy a money judgment in the amount of the Bitcoin's value as of the date of the transfers or the date of the money judgment, whichever is higher;

f.      Award Plaintiff pre-judgment interest, post-judgment interest, and costs of Court, to the extent permitted by law; and

g.      Award such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

101

Dated: May 1, 2026

Respectfully submitted,

*/s/ Casey J. McGushin*

Michael F. Williams, P.C. (*pro hac vice*)
Judson D. Brown, P.C. (*pro hac vice*)
Caroline Milner (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
mwilliams@kirkland.com
jdbrown@kirkland.com
caroline.milner@kirkland.com

Casey J. McGushin (ARDC No. 6313465)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
casey.mcgushin@kirkland.com

Sara Shaw Tatum (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
Three Brickell City Centre
98 S.E. 7th Street, Suite 700
Miami, FL 33131
Telephone: (305) 432-5600
Facsimile: (305) 432-5601
sara.tatum@kirkland.com

*Counsel for Plaintiff Todd R. Snyder, as Plan Administrator for the Terraform Labs Pte. Ltd., et al., each Post-Effective Date Debtor, and the Wind Down Trust*

102

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 1, 2026, I electronically filed a true and correct copy of the foregoing document using the United States District Court for the Northern District of Illinois's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ Casey J. McGushin

Casey J. McGushin (ARDC No. 6313465)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
casey.mcgushin@kirkland.com

*Counsel for Plaintiff Todd R. Snyder, as Plan Administrator for the Terraform Labs Pte. Ltd., et al., each Post-Effective Date Debtor, and the Wind Down Trust*