# EXHIBIT B

O42ASEC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

                    Plaintiff,

            v.                          23 Civ. 1346 (JSR)

TERRAFORM LABS PTE LTD. , et
al.

                    Defendants

------------------------------x
                                   New York, N.Y.
                                   April 2, 2024
                                   9:32 a.m.

Before:

                    HON. JED S. RAKOFF

                                   District Judge
                                   -and a Jury-


                         APPEARANCES


UNITED STATES SECURITIES AND EXCHANGE COMMISSION
      Attorneys for Plaintiff
By:   JAMES P. CONNOR
      DEVON STAREN
      CARINA CUELLAR
      LAURA E. MEEHAN
      CHRISTOPHER J. CARNEY
      ROGER LANDSMAN


                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

But the point is you may feel that the reason they're invoking the Fifth in this case is because the answers that they would give would be supportive of the SEC's position or irrelevant, and that's a choice that you would have to make. You may decide you don't have enough information to even draw an adverse inference. And in each case, you'd need to look at who's invoking the Fifth, what their position was, and the evidence you have heard and whether you think an adverse inference follows from the invocation of the Fifth or not.

So it's a highly individualized and highly discretionary call on your part, but you can, if you wish, draw an adverse inference. As I say, I'll give you more detailed instructions on this later.

MS. CUELLAR: Your Honor, we have one more for Mr. Kariya.

THE COURT: Go ahead.

MS. CUELLAR: Stipulation regarding Kanav Kariya's invocation of his rights under the Fifth Amendment to the Constitution of the United States.

Kanav Kariya is the president of Jump Crypto. He has held that position since September 2021. Jump Crypto is part of the Jump Trading Group, which is a diversified financial firm headquartered in Chicago, Illinois. Prior to becoming the president of Jump Crypto, Mr. Kariya served as Jump Trading's director of strategic initiatives, digital investments. He

held that position from September 2020 until September 2021.

From July 2018 until September 2020, Mr. Kariya was the quantitative researcher at Jump Trading. Prior to that, Mr. Kariya was an undergraduate at the University of Illinois at Urbana–Champaign, earning his bachelor of science in computer engineering degree in June 2018.

Mr. Kariya's attorneys have advised the parties that if Mr. Kariya were called to testify at trial, Mr. Kariya would invoke his Fifth Amendment rights and decline to answer questions posed by the parties about the claims asserted in this case.

THE COURT: I'm sorry. Same situation. Go ahead.

MS. CUELLAR: Apologies, your Honor.

We then have two exhibits related to Mr. Kariya we've not yet admitted.

THE COURT: Go ahead.

MS. CUELLAR: The first one, the parties stipulate that Plaintiff's Exhibit 259B is a video communication between Kanav Kariya and Do Kwon as reflected from the phone of Kanav Kariya.

At this time, we move to admit, your Honor, Plaintiff's Exhibit 259B and request permission to play it for the jury.

THE COURT: Yes. I'm sorry.

MR. PELLEGRINO: Just one moment, your Honor. First

of all, I think it's 258B.

MS. CUELLAR: Oh, apologies.

MR. PELLEGRINO: 258B. And secondly, that is subject to a stipulation, and we would like the opportunity to explain the stipulation to the Court but can do that later. We don't have an objection, but would like the opportunity just to explain it.

THE COURT: Sure. We'll take that up at the next break.

MR. PELLEGRINO: Thank you, your Honor.

THE COURT: Received. And go ahead.

(Plaintiff's Exhibit 258B received in evidence)

(Audio played)

THE COURT: Yeah.

MR. PELLEGRINO: The volume should not be played, your Honor.

THE COURT: The volume should not be played, and the exhibit is 90 degrees off. So so far this has not been a useful exercise.

MS. CUELLAR: Apologies, your Honor.

THE COURT: Yes. I don't know that — is there something you particularly want to focus the jury's attention? Because you're running through it, it doesn't — it is in evidence, but, nevertheless, I don't see the point of running through it.

MS. CUELLAR: Yes, your Honor. We can pause it at this time.

We'd move to admit 258A, which we understand there's no objection to. It's a screenshot of the video, and that is what we'd like to focus on.

THE COURT: Received.

(Plaintiff's Exhibit 258A received in evidence)

MS. CUELLAR: Thank you, your Honor.

If you could please display for the jury, Mr. Haywood, 258A. Thank you, your Honor.

THE COURT: Call your next witness.

MR. CARNEY: Thank you, your Honor.

THE DEPUTY CLERK: Please take the witness stand.

BRUCE MIZRACH,
    called as a witness by the Plaintiff,
    having been duly sworn, testified as follows:

THE COURT: Counsel.

MR. CARNEY: Thank you, your Honor.

Before I proceed, once again, this witness has a set of demonstratives that we provided to the other side that we'd like to display to the jury.

THE COURT: Yes.

MR. CARNEY: Thank you.

DIRECT EXAMINATION
BY MR. CARNEY:

O42HSec2                    Mizrach – Direct

Q.  Professor Mizrach ——

THE COURT:  I want to remind the jury these demonstratives are not themselves evidence.  These are just aids to following his testimony.

Go ahead.

MR. CARNEY:  Thank you, your Honor.

Q.  Good morning, Mr. Mizrach.

What is your current position?

A.  I'm a tenured full professor of economics at Rutgers University.

Q.  Can you maybe pull the microphone a little bit closer to you.

A.  I'm sorry.  Tenured full professor of economics at Rutgers University.

Q.  Which Rutgers campus do you teach?

A.  In New Brunswick, New Jersey.

Q.  How long have you had this position?

A.  I arrived at Rutgers in 1995 and have been there since.

Q.  Have you taught at other universities?

A.  I have.

Q.  Which ones?

A.  I've taught at Boston College.  I've taught at the Wharton School of the University of Pennsylvania.  I've taught at Rutgers as well.  That would be my third academic posting.  Oh, and sorry, I was also at the Stern School of Business here in

---

O42HSec2                    Mizrach – Direct

New York.

Q.  What university is the Stern School of Business affiliated with?

A.  It's the business school at New York University.

Q.  And, professor, where did you attend college?

A.  I went to Tufts University.

Q.  And did you earn a degree there?

A.  I did.  I got a bachelor's degree in history and economics.

Q.  Did you receive any honors in college?

A.  I did.  My degree was awarded summa cum laude, and I was also elected to an honor society called Phi Beta Kappa.

Q.  After college did you attend graduate school?

A.  I did.

Q.  Where did you attend graduate school?

A.  The University of Pennsylvania.

Q.  And did you obtain a degree from the University of Pennsylvania?

A.  Yes.  I got my Ph.D. in economics in 1987.

Q.  All right.  Dr. Mizrach, I'd like to walk you through your career starting from the time you earned your Ph.D. at the University of Pennsylvania until you arrived at Rutgers in 1995.

Where were you first employed after receiving your Ph.D.?

A.  I was first employed at Boston College.

---

O42HSec2                    Mizrach – Direct

Q.  And what was your position there?

A.  I was an assistant professor of economics.

Q.  And what years were you at Boston College, professor?

A.  1987 to 1990.

Q.  What'd you teach at Boston College?

A.  I taught graduate and undergraduate classes in macroeconomics.

Q.  After Boston College, where did you go?

A.  Then I went —— came to the Wharton School at the University of Pennsylvania.

Q.  What was your position at Wharton?

A.  I was a visiting assistant professor.

Q.  And what years were you at Wharton?

A.  1990 to 1992.

Q.  And what did you teach there?

A.  Financial economics.

Q.  And where were you employed next?

A.  My next job was at the Federal Reserve Bank here in New York.

Q.  And what was your position at the Federal Reserve Bank?

A.  I was an economist and then later a senior economist.

Q.  And so what years were you at the Federal Reserve Bank of New York?

A.  1990 to 1992.

Q.  Was that '92 to '94?

---

O42HSec2                    Mizrach – Direct

A.  Yes, I'm sorry.  I —— yes, 1992 to 1994 was the last job I had before I joined Rutgers.

Q.  Did you join Rutgers after leaving the Federal Reserve Bank?

A.  I did.

Q.  And what year was that?

A.  1995.

Q.  And what are some of the classes that you teach at Rutgers?

A.  At Rutgers I've taught graduate and undergraduate classes in macroeconomics and financial economics, and I also taught graduate classes in time series analysis.

Q.  All right.  I'd like to shift now and talk a little bit about the type of work that you do as a professor.

Do you specialize in anything?

A.  Yes, I specialize in financial economics.

Q.  Is there a particular subspecialty in the field of financial economics that you specialize in?

A.  Yes.  I work in an area called market microstructure.

Q.  And can you tell us what you mean when you say you work in the field called market microstructure?

A.  Market microstructure is the field within financial economics where you study the trading mechanisms, how financial instruments are exchanged, and the trading platforms on which they can be bought and sold.

Q.  And what are some of the instruments that you study?

O42HSec2                    Mizrach - Direct

A. I've studied stocks. I've studied bonds, both treasury bonds and corporate bonds. I've studied the energy markets and carbon markets and also the crypto markets as well.

Q. A little while ago in your answer you mentioned markets and platforms. What are some of the markets and platforms that these instruments you study are traded?

A. For example, stocks are traded on stock exchanges like the New York Stock Exchange here in Manhattan. Most bonds are traded on an electronic platform called BrokerTec, which I've written a paper about. And there still are assets being traded in — on trading floors where people are shouting and yelling at one another trying to determine what the price is.

Q. OK. So you've just described that you studied trading of these financial instruments on different platforms. Is there an area of focus within that study?

A. Yes. I think the primary thing that's of concern to people who study market microstructure are the costs associated with trading, and one of the costs that people tend not to think about is what's known as the price impact, understanding how trading might actually raise the price or lower the price of the asset that you're trying to buy or sell.

Q. OK. Can you just give us a brief description of what you mean by cost arising from price impact.

A. Well, if one of us was to try to purchase a small amount of stock on — a broker, we were buying ten shares, that likely

O42HSec2                    Mizrach - Direct

wouldn't have a very big effect on the price. In fact, I'd be confident in saying it wouldn't move the price at all. But it might be very different if you wanted to buy 100,000 shares or a million shares as large and institutional trading firms do, and those firms have to account for the fact that their own trading activity might be moving the price away from where they would like to acquire the shares.

Q. OK. And we're going to get into the specifics of what you've done in this case, but as a general matter, did your work in this case involve determining the price impact from trading?

A. Yes, it did.

Q. Besides price impact, do you focus on any other transaction costs associated with trading?

A. Yes, there are transaction costs in almost every step of financial transactions. People still sometimes pay brokerage commissions. People also pay something called the bid-ask spread, which is the difference in the buy and sell prices. And there often are fees just simply to utilize a particular platform.

Q. And what tools do you use as an economist to determine the price impact associated with trading financial instruments?

A. I've commonly used a standard tool within the market microstructure literature called a vector autoregression, and there's a tool that accompanies the vector autoregression

O42HSec2                    Mizrach - Direct

that's called an impulse response function. And I utilize those tools in the study of all the markets that I've talked about to assess what price impact might be.

Q. And did you use those tools to conduct your analyses in this matter?

A. I did.

Q. All right. Professor, have you published any articles in the field of market microstructure?

A. I have.

Q. And are you familiar with the professional and academic literature in the field of market microstructure?

A. I am.

Q. Focusing on the articles that you've published, what markets have your articles analyzed?

A. I've published analyses of the stock market, the treasury bond market, the corporate bond market, energy markets, carbon markets, and also recently the crypto markets.

Q. And how many publications have you written?

A. Approximately 70.

Q. Have your articles been what's known as peer reviewed?

A. Almost all of them. Around 90 percent.

Q. Can you describe for us what it means for an article to be peer reviewed?

A. Yes. It's a difficult process in which a professor sends out an article to a journal. The journal assigns referees who

O42HSec2                    Mizrach - Direct

are peers, people that are also experts in the literature, and they provide sometimes very detailed comments or suggestions for improvement. And before your paper can be published in one of these peer-reviewed journals, it has to first get past all the referees and the editor of the journal as well. So it's a lengthy process.

Q. Have you published any papers related to crypto assets?

A. I have.

Q. Can you just very briefly describe those papers.

A. Yes. I've published two papers. One is a paper looking at the effect of trading in Bitcoin and Ether, two crypto assets on centralized exchange platforms, and then I've also recently published a paper on the Ethereum blockchain. And Ethereum went through a major transition in 2022 in which the validation method for transactions was changed. It changed to a new method that made it much easier and much cheaper.

Q. And did either of those two crypto asset papers you just mentioned, did either of them use the vector autoregression or the impulse response function tools that you just mentioned a little while ago?

A. Yes. The first paper that looks at Bitcoin and Ether trading on the centralized exchanges use — uses exactly the same tools that I've used to — for analysis in this case.

Q. Do you have any papers related to crypto assets that you're working on that are not yet published?

O42HSec2                    Mizrach − Direct

A. Yes, I have a paper that looks at all of the stablecoins that resided on this Ethereum network that I've talked about, and there are more than 60 of them. And I study the survivorship, how many of them are likely to remain trading, study their transactions costs and also study their trading on centralized exchanges.
Q. And did your work in this matter involve stablecoins?
A. It did.
Q. And we'll get into it a little bit deeper later, but can you just briefly tell us what stablecoins are.
A. Stablecoins are crypto assets that are intended to remain stable or pegged to a particular asset, most often the U.S. dollar, but there are other kinds.
      MR. CARNEY: Your Honor, I note the time. It's nearly 11:00, so if this would be an appropriate time, this would be a good time for me as well. But, obviously, if it's a good time for your Honor, then . . .
      THE COURT: How much more do you have on direct?
      MR. CARNEY: On, direct, I have quite a bit.
      THE COURT: All right. We'll give the jury their 15-minute morning break.
      MR. CARNEY: Thank you, your Honor.
      (Jury excused)
      (Continued on next page)

---

O42HSec2                    Mizrach − Direct

      (Jury not present)
      THE COURT: All right. Please be seated. I'm going to handle another matter downstairs, then since we're taking the 15-minute break now. See you in 15 minutes.
      (Recess)
      THE COURT: Get the witness on the stand and bring in the jury.
      I mentioned to the jury electronic exhibits. My law clerk says you guys actually have hard copies we can send to the jury, and that's even better, so they don't have to scrounge around. I'll correct that when we have a chance.
      (Continued on next page)

---

O42HSec2                    Mizrach − Direct

      (Jury present)
      THE COURT: Please be seated.
      Go ahead, counsel.
      MR. CARNEY: Thank you, your Honor.
BY MR. CARNEY:
Q. Professor, when we left off, we were going through your background and qualifications. Have you traded financial instruments personally in your own account?
A. I have.
Q. And did you publish a paper outlining strategies you'd used in trading on your own account?
A. I did.
Q. Can you just briefly describe that paper.
A. That paper also used this tool that I mentioned before our break called the vector autoregression, and it tried to predict the next few ticks on NASDAQ stocks.
Q. Professor, once again, could you pull the microphone a little closer.
A. Sorry.
Q. Have you done any consulting work for clients?
A. I have.
Q. And do you have a consulting firm?
A. Yes, it's called the Nonlinear Analysis Group.
Q. And what does the Nonlinear Analysis Group do?
A. It provides trading strategy development, both code and

---

O42HSec2                    Mizrach − Direct

implementation, to a variety of different clients and trading firms.
Q. And can you just briefly give us an example of some clients that the firm represents or works with.
A. Yes. I've worked with Goldman Sachs here in New York, I've also worked AllianceBernstein, and I also worked with a hedge fund called Cypher Capital.
Q. Do you do any consulting for financial regulators?
A. I do.
Q. Can you briefly describe that.
A. Yes. I have from 2016 to 2020, I worked at the U.S. Department of Treasury's Office of Financial Research. I've worked — as a mentioned when I was talking about my work experience, I've worked at the Federal Reserve Bank of New York and continue to do consulting for them, as well as the Federal Reserve Bank of St. Louis. And I also work with the financial industry regulatory authority, an ongoing relationship since 2015.
Q. Have you ever served as an expert in a court case or other type of litigation before?
A. Yes. This is my ninth case.
Q. And could you just please give us an example of a case where you've served as an expert that's sort of relevant to the work you're doing in this case.
A. Yes. I was retained as an expert in the 9/11 attacks which

O42HSec2      Mizrach - Direct

impacted Cantor Fitzgerald. They were the U.S. treasury trading company that was on the upper floors of the Trade Center, and their trading operations were, obviously, interrupted by the attacks. And I was asked to look at trading records and assess what the damage to their business had been.

Q. And so, professor, aside from the World Trade Center cases, did any of the other matters in which you've served as an expert involve analyzing trading records?

A. They did.

Q. How many of them?

A. All but two. So seven of the nine cases in total, including this one, have involved looking at trading records.

Q. So besides the one you mentioned, what type of trading was involved in those other cases?

A. So I think, in total, there were three matters that involved the U.S. treasury market. So a case — another case involving Cantor Fitzgerald, another involving Tullett Prebon. I recently worked on a case for Brevan Howard, which is a hedge fund based in the UK. There, I was analyzing commodity trading records. I have also worked recently also on a stock trading case with a hedge fund called Serenity Capital.

Q. All right. I'm going to shift topics now a little bit, professor.

Do you work with blockchain data?

A. I do.

---

O42HSec2      Mizrach - Direct

Q. How often?

A. Daily.

Q. And can you briefly describe what a blockchain is.

A. A blockchain is a ledger, so a place where things are recorded. But what makes blockchains a bit different than a ledger that we might keep our own notes in, and so on, is that it's a distributed ledger. And that means that that ledger gets publicized across the platform, and all the participants in that network are able to see all of the transactions and all of the wallets once it's distributed.

Q. And what kind of instruments are traded on blockchains?

A. Crypto assets.

Q. Are stablecoins traded on blockchains?

A. Yes, they are.

Q. Have you studied the trading of crypto assets on blockchains?

A. I have.

Q. Have you also studied the trading of crypto assets outside of blockchains?

A. I have. I've looked at trading also on centralized exchanges that are off of the blockchain.

Q. And could you just give us just a brief overview of the work that you've done studying the trading of crypto assets on blockchains and off of blockchains.

A. So on the blockchain, I've studied the costs and —— and

---

O42HSec2      Mizrach - Direct

size of the networks, and so on, of people exchanging assets directly, which they can do on the blockchain, and seeing the size of those networks and how big they are. And then, in turn, there's a far larger volume typically traded off — off the blockchain on these centralized exchanges. And in my paper with Saketh Aleti, we've looked at the trading on four different centralized exchanges and also the Chicago Mercantile Futures Exchange.

Q. What's an example of a centralized exchange?

A. A centralized exchange is KuCoin. KuCoin is one that's important, I think, in this case.

Q. And how are able to obtain transaction information from the blockchains and centralized exchanges?

A. These exchanges provide public data feeds to people that might be interested in trading or analyzing the data.

Q. So are you collecting data yourself directly from blockchains and centralized exchanges?

A. I do.

Q. And did you prepare a demonstrative that has a picture of the setup you used to collect this data?

A. Yes, I did.

MR. CARNEY: Mr. Haywood, if we could please put up Mizrach Demonstrative 1.

Q. And could you just quickly tell us what's shown here.

A. This is just a portion of my data center, and there's three

---

O42HSec2      Mizrach - Direct

computers depicted in this picture and then a number of towers which contain hard drives. And these are connected 24/7 to the Internet and stream the data from the centralized exchanges that we've been talking about.

Q. And when did you initially set up this setup you've got here?

A. The first part of the data center was funded by a grant from the Office of National Intelligence, which had been looking at stock market trading in the U.S., and — but we've continued to build it over the years. And this is, again, as I mentioned, only a portion of the data center.

MR. CARNEY: And we could take that down. Thank you.

Q. Professor, through your education and training that you've described, have you gained experience in analyzing trading data?

A. Yes, I have.

Q. And approximately how many years of experience would you say you have analyzing trading data?

A. I started in 1997 when I was doing the work to start my own trading strategy.

Q. How many years of experience do you have analyzing crypto trading data?

A. I've been working almost exclusively on crypto for the last five years.

Q. Are you familiar with the concept of a liquidity provider?

A. I am.

Q. And can you just briefly describe what a liquidity provider is.

A. A liquidity provider is a market participant on one of the platforms that's typically willing to both buy and sell the asset at different prices.

Q. And do you have experience analyzing trading by liquidity providers?

A. Yes, it's a central question in my market microstructure. You need to know where the liquidity in the market is being provided.

Q. Professor Mizrach, were you hired by the SEC to serve as an expert witness in this case?

A. I was.

Q. And approximately when were you retained by the SEC, hired by the SEC?

A. September of 2022.

Q. And how much is the SEC paying you in this matter?

A. I'm paid $750 an hour for my analytical work, and right now, as I'm testifying or in my deposition, I was paid a thousand dollars an hour.

Q. And does the amount you were paid depend at all on the outcome of this case?

A. No.

Q. And what type of expertise, generally, what field, were you

asked to provide in this case?

A. I was asked to provide a market microstructure analysis of the Terra blockchain and the role that Jump had played in it.

Q. OK. And so what specifically did the SEC ask you to analyze with respect to trading of crypto assets in this case?

A. I was asked to assess what role Jump and its affiliates played in restoring the peg of UST to one U.S. dollar in May of 2021.

Q. And what is UST? Can you remind us.

A. UST is the stablecoin that's on the Terra blockchain, and it was meant to be pegged to one U.S. dollar.

Q. And so to put some sort of context around the question that the SEC asked you, can you please tell us what happened with respect to the value of UST in May of 2021.

A. Beginning around May 19, 2021, UST began to fall well below the value of $1, and it was eventually restored by the end of the month. And the question for me was to determine had Jump played a role in restoring that peg?

Q. And so when analyzing Jump's trading in May 2021, what did you focus on?

A. I focused on their trading on centralized exchanges where they had made large purchases of UST.

Q. And what conclusion did you reach?

A. My conclusion is that had it not been for Jump's trading, that the peg would not have been restored, and that UST's price

would have come very close to zero.

Q. All right. Before we get into the sort of meat of your analysis, let's — I think you have some background information you want to provide.

Did you prepare a demonstrative showing different types of trading platforms?

A. I did.

Q. And can we please look at Mizrach Demonstrative Exhibit 2.

Professor, could you just briefly describe for us what is shown on Demonstrative Exhibit 2.

A. It just illustrates, I think, the way in which or different venues in which different types of financial instruments can be traded. So stocks like Procter & Gamble or Apple can trade on the New York Stock Exchange here in New York or the NASDAQ stock exchange as well. It also reminds us that crypto assets, like Bitcoin or Ethereum, can be exchanged directly on those blockchains. But, importantly, as we move to the right of the lower part of that exhibit, we see that there's important off-blockchain activity that goes on on centralized exchanges like KuCoin.

Q. And do you see study the price impact from trading in these markets?

A. I do.

Q. Professor, are you familiar with the concept of a limit order book?

A. I am.

Q. And what is a limit order book?

A. A limit order book represents a trader's desire to sell, and it's a specification both of the price that they're willing to sell at and also the quantity that they would like to buy or sell. It's on both sides, buying and selling.

Q. And do you use limit order books to analyze price impact?

A. I do.

Q. All right. So, obviously, within this term limit order book is the words "limit order." Can you explain to us what a limit order is.

A. Well, the limit reflects the two parts of the order. First, there is a price limit. You're only willing to buy or sell at this price. And then there's a quantity limit saying, well, I'm not willing to sell you or buy an unlimited amount. I only want to buy this amount. So the limit refers both to the price and the quantity.

Q. And, professor, did you prepare a demonstrative showing what a limit order book looks like?

A. I did.

MR. CARNEY: Could we please put up Demonstrative Exhibit 3.

Q. I think this demonstrative you prepared is one that is animated. So if you can just walk us through your demonstrative and indicate when you'd like to move on.

A. OK. I will do that.

So we first started with just one half or one side of the limit order book, and there are two sellers here, one at a price of 99 cents wants to sell a quantity of 100 units. I'll say shares. I think that that's fine. And then there's a Seller 2 who wants to sell at a slightly higher price of $1 and also 100 units.

I think now we can bring in the other side of the limit order book, please.

So we now have in green the bid side. These are the offers to buy the stock. So we see a price of 95 cents for Buyer 1 who wants to buy 100, and then we also see a price of .94, a little bit below Buyer 1, also for 100 units or 100 shares.

Now, the key thing I think to first understand is that trades do not automatically occur. Trades occur when there is a matching in the limit order book. Right now this particular book does not have any matches. The best bid is at 95 cents. The best offer is at 99 cents, and there is no matching of those orders. So this order book would stay with no matched orders as the demonstrative indicates.

I think we can go ahead one more, please.

So another thing that's going to be important when I talk about my vector autoregression is this notion of the mid-quote. And like a lot of other financial terminology, it's

really just masking what's a simple concept. So in our sample limit order book in this demonstrative, Buyer 1 is at 95 cents, Seller 1 is at 99 cents, and the mid-quote is the midpoint between those. We just take 95 cents and 99 cents, divide by two, and the mid-quote in this example order book at 9:15 is 97 cents. I'll just say that's going to be one of the inputs in my statistical analysis of Jump's trading.

Q. Are you ready to move on to the next?

A. I am. I'm ready to move on. I think it might be a good idea to actually see a trade, and so this step of the demonstrative shows new buyers and sellers arrive. Seller 3 arrives willing to sell at 97 cents and a quantity of 100, and there's a corresponding Buyer 3 at 97 cents who wants to buy exactly the same quantity. And this order book will then generate its first trade. Buyer 3 and Seller 3 will match, and we'll see a trade recorded in that exchange at the 97 cents where their buy and sell orders meet.

I think we can go on now.

So now we introduce an additional seller into the book. And just note that the 97 cents that was at the bid side, the green side, and the 97 cents that was at the red side has now erased, been erased from the limit order book. They're satisfied, hey, I got a good trade, and they've now vanished from the limit order book.

This next step here at 9:45 then brings in a new buyer

and seller with matching trade intentions. But what's important here is that Seller 4 wants to sell a bit more than Buyer 1 wants to buy. So Buyer 1 only wants 100 shares. Seller 4 wants to sell 200. So we're going to see a partial execution here. So Seller 4 will be able to sell 100 of their shares to Buyer 1, and notice then Buyer 1 gets zeroed out. So his quantity no now goes to zero because his has been satisfied, but the seller remains, Seller 4 remains, at the top of the right-hand side of the book because he or she still has 100 more shares that they want to.

Sell. So we can now advance and take Buyer 1 out of the limit order book, but notice that Seller 4 is still there. Seller 4 still has the hundred that they want to sell, and so we're now going to recalculate the mid-quote. Just like we did when we had it at 95 by 99 cents, the mid-quote here is now the midpoint between .94 and .95, and that's .945 once we divide both that sum by two.

We also have from this something that is a pretty hard concept, I think, to understand, which is, well, what is a price impact? Well, we have an initial estimate of price impact right here in this limit order book. The decision by Seller 4 to sell the hundred units has lowered the mid-quote. It was previously at 97 cents; it's now at 94.5 cents. So we have a 2 1/2 cent market impact by the decision by Seller 4 to arrive at those 200 shares.

Q. And, professor, a little while ago you mentioned that, as I understood it, a liquidity provider both buys and sells a particular financial instrument in question. Did I get that right?

A. That's correct, they're on both sides of the market.

Q. OK. So could a liquidity provider have an impact on price?

A. Yes, they could.

Q. How so?

A. So we're back now at 9:45 again. We went back one slide just for a brief moment. Let's just contemplate a situation in which Buyer 1 doesn't want to buy just 100 but, in fact, wants to buy 300, OK? So Buyer 3 — Buyer 1 has a larger amount that they're willing to purchase. Seller 4 now arrives with their 200 shares. They sell all 200 to Buyer 1, but notice, after that happens, Seller 4 now vanishes from the limit order book. His trade is fulfilled, his order is filled. And Buyer 1 is now remaining back at the top of the limit order book with an additional hundred shares at 95 cents.

So where is the mid-quote in this situation where Buyer 1 was willing to be a larger liquidity supplier? The mid-quote remains exactly where it started at the beginning, and now the price impact of Seller 4's trade is zero.

Q. Thank you. We're going to shift topics for a second.

So you talked earlier that crypto assets are traded on different platforms, is that right?

A. That's correct.

Q. And did you prepare a demonstrative showing the different platforms where crypto assets can be traded?

A. I did.

MR. CARNEY: And could we, Mr. Haywood, please put up Mizrach Demonstrative 4.

Q. And can you just walk us through what's shown on this demonstrative, please, professor.

A. On the left-hand side, we're looking at direct exchange on the blockchain, and this could be any. It could be Terra or Ethereum or Bitcoin. And traders, people on these blockchains, have wallets, and they're just electronic versions of the wallets that we carry. And if Trader A, for example, makes his wallet known to Trader B, they can exchange assets back and forth directly with one another on the blockchain.

On the right-hand side, though, we consider the activity, then, that happens once these assets are migrated off of the blockchain to centralized exchanges, again, something like KuCoin. And off the blockchain, then, Trader A and Trader B meet through their trade intentions like we saw in the limit order book, and then there is a software on the centralized exchange, on the platform where orders are presented, and then that software is going to match orders in the way that we just saw in the previous limit order book. But, importantly, it's not on the blockchain, it's off.

Q. OK. And you've mentioned a couple of times KuCoin as an example, but, just generally, these centralized exchanges, who's operating them? Are they companies? Are they something else?

A. They're private companies, generally looking for profit by providing trading services.

MR. CARNEY: All right. We can take this one down, I think. Thank you.

Q. We talked about this briefly before, but just to sort of situate ourselves again, can you remind us, just real quickly, what is a stablecoin?

A. A stablecoin's a crypto asset that tries to maintain a stable value against another asset, typically the dollar, U.S. dollar.

Q. Are there different types of stablecoins?

A. There are.

Q. What are the different types of stablecoins?

A. Well, some stablecoins are backed directly by assets, typically liquid assets like U.S. treasuries or even bank deposits, but then there are other stablecoins like UST that are stabilized through computer code or an algorithm. And those two — those are the two major types of stablecoins.

Q. So just to be clear, what type of stablecoin is UST considered?

A. UST is an algorithmically stabilized stablecoin that

utilizes a swap mechanism on the blockchain.

Q. Are you, professor, familiar with the Terraform blockchain?

A. I am.

Q. Did you analyze the Terraform blockchain in this matter?

A. I did.

Q. Were certain tokens created by Terraform Labs on the Terra blockchain?

A. Yes.

Q. And can you tell us the tokens that Terraform created on the Terra blockchain that you analyzed in this matter?

A. I studied the stablecoin UST and then I also studied another token called Luna.

Q. Could Luna and UST tokens be purchased and sold on the Terra blockchain?

A. Yes, they could.

Q. How?

A. Well, there was the possibility for direct transfer to people who could exchange assets directly, right on the blockchain, and then there was also a swap mechanism where they could exchange UST and Luna.

Q. So besides these on-chain transfers and purchases that you talked about, where else could Luna and UST be purchased and sold?

A. They could be purchased on these centralized exchanges off of the blockchain.

Q. And you've mentioned it a few times, but are you familiar with the swap mechanism on the Terraform blockchain?

A. I am.

Q. And did Terraform ever publish anything describing the details of how this swap algorithm was supposed to work?

A. Yes. Do Kwon and other employees at Terraform published a white paper that described the way in which they envisioned that the swap mechanism would function.

Q. Is that paper something that you reviewed in connection with your work here?

A. I did.

Q. Professor, did you prepare a demonstrative showing how the swap mechanism was supposed to work if UST were not pegged at $1?

A. I did.

MR. CARNEY: Could we please pull up Mizrach Demonstrative Exhibit 5A.

Q. And, professor, could you just walk us through your demonstrative.

A. Yes. The swap mechanism functioned and hoped to stabilize UST by providing the promise that you could always take one UST and transfer it through the swap mechanism for $1 worth of Luna. So the demonstrative, the exhibit, now contemplates what would have happened if UST had started to move below its peg, move down to 98 cents instead of a dollar. Well, at least

Case 1:25-cv-15414 Document #: 56-2 Filed: 05/01/26 Page 10 of 33 PageID #:1446

O42HSec2                         Mizrach - Direct

theoretically this might create a profitable trading opportunity. Some person or firm could purchase a UST on one of the centralized exchanges like KuCoin at a discount to $1, and then they would have to take the UST purchased on the centralized exchange and then migrate it back onto the blockchain. And this is just the first step in a three-step arbitrage.

Q. And can we go to the second step.

A. So in the second step, the UST that was purchased on the centralized exchange is returned back to the Terra blockchain, and then the — this trader could place the UST into the Terra blockchain and get what was promised at the top, which was they were promised then to receive $1 worth of Luna in return.

Now, importantly, what would happen in this step is that the UST would be burned, it would be destroyed, literally erased from the blockchain, and $1 worth of Luna tokens would be minted.

Q. What happens in step three?

A. Well, step three of this multistep arbitrage is to take your dollar's worth of Luna that you got from the swap mechanism — and understand, Luna's a volatile asset. It's worth $1 right now, but it might not be worth $1 in a few minutes or a few hours. So to complete this arbitrage, get your profit, you have to migrate the Luna asset back off the blockchain to a centralized exchange. It could be KuCoin or it

---

O42HSec2                         Mizrach - Direct

could another. You didn't have to do it at the same exchange. There was no obligation. And then finally you would get, at least theoretically, one U.S. dollar for the 98 cents that you originally purchased at.

Q. This example you just walked us through is if UST were trading below a dollar, is that right?

A. That's correct.

Q. Could something similar occur if UST was trading above a dollar?

A. Yes. It would involve taking all the steps in reverse where you'd begin with a Luna purchase and then try to get some discounted UST.

Q. And the answer — when you're walking through your demonstrative here, you mentioned a few times the word "arbitrage." Could you just at a high level explain to us what arbitrage means.

A. An arbitrage is a sequence of trades like this exhibit depicts in which you can quickly transform a riskless asset, like a U.S. dollar, into a greater stake. So this three-step arbitrage transforms very quickly, at least theoretically, 98 cents into $1, and that's what we call in economics an arbitrage, a riskless short-term profit.

Q. Is the swap mechanism that you walked us through in your demonstrative an example of arbitrage?

A. It is.

---

O42HSec2                         Mizrach - Direct

Q. Professor, was the swap mechanism supposed to help UST stay pegged to a dollar?

A. It was.

Q. And how was that supposed to work?

A. Well, the primary mechanism to support UST relates to the minting and burning that's going on within the swap mechanism. So the hope was that if you brought some UST into the swap mechanism and you reduced the supply, by reducing the supply, hopefully, this would help to increase or raise the price of UST.

Q. Were there fees associated with using the Terra swap mechanism?

A. Yes, there were.

Q. And just generally speaking, normal circumstances, how much were the fees?

A. The fees were typically a half a percent.

Q. Did those fees change?

A. They did. The fees by design would rise when this market swap module would get more congested. It's very similar to the congestion pricing that has been proposed to try to keep more cars out of Manhattan. So busy times of the day, we're going to make it expensive for cars to come into Manhattan, both in New Jersey and even in — it's even within Manhattan they're going to charge you to come into Lower Manhattan, and the same thing was true then of the swap mechanism. If people were

---

O42HSec2                         Mizrach - Direct

starting to try to bring a lot of UST to burn or vice versa, the fees for using the swap mechanism would go up and would interfere with this arbitrage.

Q. And that structure you just outlined, was that built into the swap mechanism by Terraform?

A. Yes, it was a feature. It was meant to discourage people from trying to manipulate prices off the blockchain, off and on the blockchain.

Q. And does this example of the swap mechanism that you've shown us here take into account swap fees?

A. This first arbitrage in this exhibit does not contain any swap fees.

Q. So could your swap mechanism example shown in this demonstrative be unprofitable if fees were taken into account?

A. Yes, fees could make the arbitrage trade unprofitable.

Q. And did you, professor, prepare a demonstrative that took into account swap fees within the swap mechanism?

A. I did.

MR. CARNEY: All right. If we could please put up Mizrach Demonstrative Exhibit 5B.

Q. It looks similar to the one you just showed us, so you don't have to walk us through the whole example. But can you explain how the swap mechanism could be unprofitable.

A. Yes. I think we can just focus on step two in the diagram.

So remember previously when there were no fees, you

Case 1:25-cv-15414 Document #: 56-2 Filed: 05/01/26 Page 12 of 33 PageID #:1448

brought your UST and you got $1 worth of Luna, but if we had a swap fee of 3 percent, you don't get $1 worth of Luna, you only get 97 cents. If you then complete the arbitrage, your profit of 2 cents in the previous case where there were no fees has now vanished, and, in fact, you've just paid a transaction cost that has not made the arbitrage profitable.

Q. And are there other fees that are not captured in your demonstrative here?

A. Yes, there are.

Q. What are those types of fees?

A. Well, in trading of financial instruments, there are fees at almost every step, and that's true even in this arbitrage. You would pay a fee to participate on the centralized exchange. So there would be transaction fees associated with that. You would then pay a fee to transfer your assets off of the centralized exchange back onto the blockchain. And notice again everything that you did in step one you have to redo in step three. You have to remigrate your asset off of the blockchain back to the centralized exchange, pay those fees, and then finally pay a centralized exchange fee again in the end before you can realize your profit.

Q. And, professor, in order to know if the swap mechanism arbitrage was profitable, would one have to account for all those fees you just described?

A. Yes.

Q. I think earlier you testified that the swap mechanism was supposed to help UST stay pegged to a dollar, is that right?

A. That's correct.

Q. And so you just walked us through an example of the swap mechanism being unprofitable because of fees.

If the swap mechanism was unprofitable, like it was in your example, as an economist, do you think it would provide the necessary economic incentive for people to use the swap mechanism to help restore the UST peg to a dollar?

A. The idea was that you could support UST by bringing it to the swap mechanism and then burning it, but people are not going to be incentivized, they're not going to see a profit, in bringing UST to the swap mechanism if they know that it's a losing trade.

MR. CARNEY: OK. We could take this demonstrative down. Thank you, sir.

Q. Professor, are you familiar with the Anchor protocol?

A. I am.

Q. Just at a high level, what is the Anchor protocol?

A. It was a Terra blockchain deposit program which enabled holders of USTs to earn interest rates of approximately 20 percent.

Q. Are you aware of how much UST was deposited into the Anchor protocol from March to May 2021, just yes or no?

A. I am, yes.

Q. OK. And how are you aware?

A. I analyzed those transfers on the Terra blockchain.

Q. And so, based on your analysis, how much UST was deposited into the Anchor protocol from March to May of 2021?

A. By May of 2021, approximately 300 million UST had been deposited in Anchor.

MR. CARNEY: If we could please display Mizrach Demonstrative 6.

Q. Professor, is this a chart that you prepared?

A. It is.

Q. Can you just describe for us what you're showing in your chart.

A. I am — I am showing the deposits between March 17 and May 18, 2021, into the Anchor protocol.

Q. And what happened with respect to those deposits?

A. The Anchor protocol was very popular, and people began to, in a short period of time, rapidly deposit a lot of UST into the protocol.

MR. CARNEY: And we could take that down. Thank you.

Q. Professor, you mentioned earlier that you were asked by the SEC to determine whether Jump played any role in restoring the UST peg to $1. What is Jump or Jump Trading LLC?

A. Jump is a proprietary trading firm, and that's just a way of saying that they were risking their own capital to try to make a profit.

Q. Did Jump Trading buy UST during the time period that was the subject of the opinions, of your opinions, in this matter?

A. They did.

Q. As part of your work in this case, did you look at Jump's incentives to restore the UST peg to $1?

A. I did.

Q. And what information did you consider in determining Jump's incentives?

A. I studied agreements between Jump and Terraform to receive Luna tokens.

Q. All right. Professor, I'm going to show you what's been already admitted in evidence as Plaintiff's Exhibit 60.

Are you familiar with this document, professor?

A. I am.

Q. And what is this document?

A. This document is an agreement between Terra and Jump to receive up to 65 million Luna tokens, and the purchase price for those Luna was 40 cents. And in return, Jump was expected to meet certain liquidity conditions with regard to trading and creation of Terra stablecoins.

Q. And do you know when Jump began receiving Luna under the second agreement, yes or no?

A. I do.

Q. And how do you know that?

A. I can see the transfers on the Terra blockchain, and

O42HSec2                    Mizrach – Direct

there's also emails between Jump and Terraform that confirm the arrival of the tokens from this agreement.

Q. And do you know if this agreement was the first agreement between Jump and Terraform, or was it a subsequent agreement?

A. It was — it was the second agreement between those two parties.

Q. When did Jump begin receiving Luna that it was entitled to acquire under this second agreement?

A. I believe in January of 2021.

Q. And do you know how much it received?

A. By April of 2021, so between January and April of 2021, they had received approximately 3.5 million of the 65 million.

Q. I'm going to show you what's been marked as Mizrach Demonstrative Exhibit 7.

        If we could please pull that up.

        What are you showing here on this chart, professor?

A. So this chart shows, first, the price of Luna tokens in U.S. dollars covering the period from September 1, 2020, to May 19, 2021.

        It also shows in the brown line just to depict the event, the launch of the Anchor protocol, and it shows how the Luna price was rising quite substantially leading into the launch of Anchor in March — on March 17.

        And then, finally, the bottom line is just something to remember that we saw in the contract that was just

O42HSec2                    Mizrach – Direct

displayed, which was Jump was allowed to acquire the Luna at 40 cents. And as you can see, well after — anytime basically after March of 2021, the 40-cent purchase price was at a substantial discount to the market price of Luna.

        (Continued on next page)

O42ASEC3                    Mizrach – Direct

BY MR. CARNEY:

Q. Okay. And I just want to back up one second, Professor. I think you said this when you were describing the -- you gave us an overview of Jump's agreement to acquire Luna, but just so the record is clear, were there any conditions that Jump had to meet to receive the Luna under that agreement?

A. Yes, there were conditions that required Jump to trade and create a certain number of Luna token -- of Terraform tokens.

Q. So what was the approximate price of Luna on May 19, 2021?

A. Approximately 15 U.S. dollars.

Q. And as of May 19, 2021, had Jump received any additional Luna under the second agreement besides the 3.5 million that you mentioned?

A. No, they still had approximately 60 million additional tokens that were to be delivered.

Q. And can you remind us at what price they were entitled to acquire those at?

A. Yes, the 40 cent red line, which is indicated as a strike price. That just means a price at which they were allowed to acquire the tokens.

Q. So if I understand you correctly, the red line is the price at which Jump could acquire the Luna?

A. Correct.

Q. And the blue line is the price at which Luna was actually selling for at that time in the market?

O42ASEC3                    Mizrach – Direct

A. Correct.

Q. All right. We can take this down, please.

        Professor, I want to turn your attention to the events that happened in May 2021. Can you please just give us an overview of what happened with respect to UST's value in May of 2021?

A. Beginning around May 19th, the value of UST began to fall well below $1.

Q. And so what if anything happened to the price of Luna after UST began to fall off the dollar?

A. Luna prices were also falling.

Q. And, again, I don't want to be repetitive, but did you say earlier that the swap algorithm was supposed to help restore the value of UST to a dollar?

A. Yes, that's correct.

Q. All right. And did you, Professor, analyze the response of investors while the price of UST was falling in May of 2021?

A. I did.

Q. And what was happening in the market?

A. The price of UST, again, beginning around May 19th or so, had started to fall well below $1, and the price of Luna was falling as well, down from the $15 that we just saw on the exhibit that just got taken down.

Q. And did you create a demonstrative showing redemptions from the Anchor protocol in May of 2021?

A. I did.

MR. CARNEY: Can we please pull up Mizrach Demonstrative Exhibit 8.

Q. So first of all, just for context, could you just remind everyone how the Anchor protocol related to UST?

A. Yes. The Anchor protocol was a place where investors could deposit their UST and earn yields that were approaching 20 percent.

Q. And so what does your chart here, Mizrach Demonstrative Exhibit 8, show?

A. This particular chart shows you in red and green bars additions to the Anchor protocol, and then also subtractions, people removing. And what we see is that on May 19th, when the price of UST began to decline well below $1, that there are nearly $30 million of redemptions, and that 30 million would have represented roughly 10 percent of the total amount deposited in the Anchor protocol at that time, all withdrawn in a single day.

Q. Okay. So I'm going to ask you, Professor, to just break this down for us a little bit.

So on a number of days we see green bars. What does a green bar represent on your demonstrative?

A. So green bars are people placing on net money into the protocol. There's always money going in and out. And these are just representing the net transfers. So when you see the

large green bar on the 18th, you see on net that people were contributing about 8 million that day to the protocol. It then shows on the following day, that on net, almost 30 million was withdrawn.

Q. And just so the record is clear, when you say that on the one day 8 million went in, the other day -- what was the number you said?

A. Almost 30 million.

Q. Almost 30 million went out. 8 million of what, 30 million of what?

A. These are UST that are being deposited into the Anchor protocol.

Q. All right. Professor, I'm going to show you what has been marked as Plaintiff's Exhibit 194, and this is just to display to the witness, please.

And at a high level, without describing any of the substance, can you just tell us what this chart shows?

A. It shows the net swaps of UST for Luna into the market swap mechanism on the Terra blockchain.

Q. And, Professor, did you put this chart together yourself?

A. I did.

Q. And what is the source of the data you used to put this chart together?

A. The terra blockchain.

MR. CARNEY: Your Honor, at this time I would move for

the admission of Plaintiff's Exhibit 194.

THE COURT: Any objection?

MR. HENKIN: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 194 received in evidence).

MR. CARNEY: Thank you. We can now display it.

Q. Professor, can you describe for us what's shown in your chart in Plaintiff's Exhibit 194?

A. Yes. The swap module enabled folks to swap in both directions. You could swap UST for Luna you could swap Luna for UST. This particular table is netting those out, saying, well, was there more swapping of Luna for UST, or as you can see in all the days in this particular chart there was more swapping of UST for Luna.

So it's netting out the swaps in both directions and showing that for the days of May 23rd, May24th, and May 25th, that there were large amounts of swapping in the direction of burning UST and minting Luna.

Q. Okay. Professor, let's use May 24, 2021, as an example. What does it mean in your chart when it says that the amount of net swaps of UST for Luna was 40.62 on that day?

A. So this is a net amount, and just in principle, it could reflect that, for example, 50 million had been swapped of UST for Luna, 10 million had been swapped Luna for UST. The 50 minus the 10 is going to give us a net of 40 of swaps of UST

for Luna.

Q. And so just to be clear, the unit of measurement here is in millions?

A. That's correct.

Q. And you mentioned before that there were fees associated with using the swap mechanism. Just for context, could you remind us of the approximate amount of the fees?

A. The fees were typically around a half a percent. The mechanism was designed to handle up to 20 million at 2 percent. And on these three days, May 23rd, May 24th, and May 25th, we're seeing net swaps that are far in excess of the capacity of the swap mechanism.

Q. So what happens when it goes above that 20 million-dollar mark you just mentioned?

A. Well, this is an example, again, of where the congestion pricing comes in, which is that if the amount that people are trying to swap is in excess of the capacity of the swap mechanism, it starts to raise the swap fees to discourage people from using it. Just like we raise the tolls to discourage people from driving their cars when it's really busy here in Manhattan.

Q. So what did you find with respect to whether UST for Luna swaps exceeded this 20 million-dollar threshold after the initial depeg you described on May 19, 2021?

A. So the chart is depicting three consecutive days, May 23rd,

May 24th, and May 25th, in which that -- in which the net swap succeeded the 20 million capacity of the mechanism.

Q. And how did those swap volumes on those days impact the swap fees?

A. Well, as there was more and more demand to swap in one particular direction, the costs of trading of, in this case, swapping UST for Luna went up, and they went well above the half percent or 2 percent to much, much higher rates of fees.

MR. CARNEY: Okay. If we could please just show to the witness Plaintiff's Exhibit 196.

Q. And, Professor, just at a high level, what is this chart that is shown here?

A. So I'm looking in this particular chart at the market swap fees, over the range that we saw in the table from May 21st until the end of May 28th.

Q. So before you get into the substance of it, did you prepare this chart?

A. Yes, I prepared the chart.

Q. And what was the source of data you used in preparing Plaintiff's Exhibit 196?

A. The swap fees are captured on the terra blockchain.

Q. And is this chart an accurate description of the swap fees during that time?

A. It is.

MR. CARNEY: Your Honor, I would move for the

admission of Plaintiff's Exhibit 196.

MR. HENKIN: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 196 received in evidence)

MR. CARNEY: Thank you, your Honor.

Q. What does this chart show, Professor, with respect to the swap fees during the May 21st to May 29th, 2021 period that you mentioned?

A. It shows that swap fees were substantially above the half percent, which was typical. And then by May 23rd, substantially above the 2 percent once the swapping began to exceed the capacity of the mechanism. And we even see, these are hourly medians, those are just simply where 50 percent of the fees were higher than that, and 50 percent of the fees were lower.

So just looking, for example, on May 23rd, you can see that the fees are approaching in their median at roughly 8 percent. So 50 percent of traders were paying more than 8 percent. 50 percent were paying less. And we can see that the capacity of the mechanism continued to be strained beyond May 23rd, and there's actually a period on May 25th in which the median swap fees rise above 10 percent.

Q. And so, Professor, what does this tell you, this analysis of yours, about whether the swap mechanism was profitable or not during the time period from May 23rd to May 25th?

A. The swap mechanism, the logic behind the swap mechanism was to encourage traders to do the arbitrage trade that we talked about on my example. So that meant acquiring UST at a discount, swapping, and then swapping the Luna in turn for dollars. This particular chart is showing us that the fees of doing that, and this is just one portion of the fees, were sufficiently high to discourage people from making the arbitrage. They would have been paying more in fees than they would have been gaining in their increased value from UST.

Q. So in your opinion could the swap mechanism have restored the peg with the fees so high?

A. It could not.

Q. You mentioned earlier that it was your conclusion in this case, and we're going to get into this in detail a little bit more, is that Jump -- without Jump Trading, the peg, UST peg wouldn't have been restored to $1. Let me ask you about that opinion though.

Was the Jump trading that you believe restored the peg happening through the swap mechanism?

A. No, it was not.

Q. Where was the Jump trading happening?

A. The Jump trading that I found restored the peg was going on on centralized exchanges like KuCoin.

Q. Are you familiar with something called Jump proposition 90?

A. I am.

Q. Just at a high level, what was Jump proposition 90?

A. Proposition 90 was a proposal that was made to the terra blockchain community to enlarge the swap mechanism. Jump had done research and knew that there were limits to the swap mechanism, and they had proposed on May 23rd, on the day of these events, to enlarge the size of the swap mechanism.

Q. You said they made the proposal on May 23, 2021?

A. That's correct.

Q. Was proposition 90 in effect when you say Jump's trading restored the peg?

A. It was not. The proposition 90 occurs only after the peg had been restored -- is passed by the community only after the peg has been restored.

Q. So did proposition 90 in your opinion have anything to do with helping to restore the peg on May 23, 2021?

MR. HENKIN: Objection. Outside the scope of the opinion.

MR. CARNEY: May I have a side bar, your Honor.

THE COURT: All right.

(Continued on next page)

O42ASEC3                    Mizrach – Direct

(At sidebar)

MR. CARNEY:  Your Honor, in his report he discusses the failure of the swap mechanism.

MR. PELLEGRINO:  Slow down.

MR. CARNEY:  I'm sorry.  I was trying to make up for the reporter.

THE COURT:  Go ahead.

MR. CARNEY:  He discusses the failure of the swap mechanism.  The swap mechanism was not working.  He discusses Jump's effort to permit this proposition 90.  And I think it's fairly -- and I have to go back and look at the report, but I think it's fairly implicit in his report that his opinion in this case is that it was Jump's trading off-chain on the exchanges that restored --

THE COURT:  Well, you've already brought that out.  The specific question is the question was about proposition 90.  If it's in the report, he can testify.  If it's not, he can't.

MR. CARNEY:  So, your Honor, I cannot honestly say right now that I know that that specific statement was in the report, but the foundations for it were.

THE COURT:  I understand what you're saying but that's not -- as I've already indicated, many times I hold people to exactly what's in their report.  So sustained.

(Continued on next page)

---

O42ASEC3                    Mizrach – Direct

(In open court; jury present)

BY MR. CARNEY:

Q.  Professor, I apologize if I just asked you this, but just to reorient ourselves, the trading that you believe Jump used to restore the peg, did that occur through the swap mechanism or through some other means?

A.  The trading was on centralized exchanges off of the Terra blockchain.

Q.  All right.  I'm going to now ask you to take a look at Plaintiff's Exhibit 192.  And this is hopefully just displayed to the witness.

Can you just at a high level describe what's shown on this chart?

A.  It's showing the price of Luna tokens in U.S. dollars between May 19th and May 27th, 2021.

Q.  And what is the source of data you used in preparing Plaintiff's Exhibit 192?

A.  It was from a centralized exchange called FTX.

Q.  And did you prepare this chart?

A.  I did.

Q.  Is it an accurate description of the price of Luna during the period from May 19th to May 27th, 2021?

A.  It is.

MR. CARNEY:  Your Honor, at this time I would move for the admission of Plaintiff's Exhibit 192?

---

O42ASEC3                    Mizrach – Direct

MR. HENKIN:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 192 received in evidence)

BY MR. CARNEY:

Q.  Professor, what was the price of Luna on May 19, 2021?

A.  Approximately 15 U.S. dollars.

Q.  And what was the price of Luna on May 23, 2021?

A.  Approximately $4.

Q.  And you had mentioned earlier that Jump was still entitled to acquire an additional amount of Luna under the second agreement.  How much, can you remind us, was Jump still entitled to acquire?

A.  More than 60 million.

Q.  So how much did the value of the approximately 60 million Luna that Jump was still entitled to acquire under the second agreement decline between May 19th and May 23rd, 2021?

MR. HENKIN:  Objection.  We might need a side bar on this.

THE COURT:  Okay.

(Continued on next page)

---

O42ASEC3                    Mizrach – Direct

(At sidebar)

MR. HENKIN:  Your Honor, it's essentially the same objection.  That opinion isn't in his report.  He wasn't asked that question.

MR. CARNEY:  Your Honor, first of all, it's not an opinion.  It's arithmetic in his report.  He discusses that Jump still had the right to acquire a 60 million.  The chart that was just --

THE COURT:  The objection is overruled.

(Continued on next page)

O42ASEC3                    Mizrach - Direct

(In open court; jury present)

BY MR. CARNEY:

Q. Professor, I'm going to ask that question again, how much did the value of the approximately 60 million Luna that Jump was still entitled to acquire under the second agreement decline between May 19th and May 23rd, 2021?

A. Just using a round figure of 60 million, when prices on May 19th were at $15, the 60 million is worth 900 million, and four days later on May 23rd, with the price at $4, that 60 million is now only worth 240. And the difference between those is a 660 million-dollar difference.

Q. And we can take this one down. Thank you.

Professor, you testified previously that you reviewed Jump's trading records; is that right?

A. I did.

Q. And so now I want to turn your focus to Jump's trading in May of 2021. Did Jump trade in UST during that time?

A. It did.

Q. From May 23rd through May 27th, 2021, where did Jump trade UST?

A. Jump traded in approximately 12 UST payers on a number of different centralized exchanges, including KuCoin.

Q. Did Jump trade at all on the Terra blockchain?

A. It did.

Q. Where was most of Jump's trading in UST focused during the

---

O42ASEC3                    Mizrach - Direct

time period from May 23rd to May 27th, 2021?

A. It was focused off the blockchain on the centralized exchanges.

Q. And were there any particular trading -- first of all, what's a trading pair?

A. So UST could be converted on centralized exchanges into a bunch of different assets. So you could transform UST into Tether, which was another stablecoin. You could also transfer UST into Bitcoin, and those were among the two payers that I studied for this matter.

Q. And so during this May 23rd to May 27th, 2021 time period, what were the two most active trading pairs that Jump was trading in?

A. They were the two that I just mentioned, the Tether UST payer and the Bitcoin UST payer were the most active for Jump.

Q. And, professor, I'm going to show you what's been marked -- and this will just be displayed to the witness at this time, Plaintiff's Exhibit 199. And can you just at a high level tell us what this shows?

A. We're looking at Jump's daily cumulative and net trading in the Tether UST payer on KuCoin.

Q. And, professor, did you prepare this chart yourself?

A. I did.

Q. And what is the source of the data you used in preparing Plaintiff's Exhibit 199?

---

O42ASEC3                    Mizrach - Direct

A. It's from Jump's trading records.

Q. And is this chart an accurate description of Jump's trading of UST on KuCoin in May 2021?

A. It is.

MR. CARNEY: Your Honor, I would move for the admission of Plaintiff's Exhibit 199.

MR. HENKIN: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 199 received in evidence)

MR. CARNEY: Thank you, your Honor.

Q. Professor, what does this chart show with respect to Jump's trading in UST on KuCoin from May 1st through May 19th, 2021?

A. So the first part is showing their cumulative position, either in red, when that cumulative position was negative, or in turn in green, as you can see beginning on roughly May 21st, where their cumulative position, meaning their net purchases were now positive and they had bought more UST rather than Tether.

And then we can track what's happening each individual day by looking at the -- it looks on my screen like a black line. It might be blue. But in any case, the line that's not a bar is one that's showing what's happening each day. So we can see what was their daily net position, and then we're just simply summing up those daily nets to get the red or green bars that represent their cumulative position.

---

O42ASEC3                    Mizrach - Direct

Q. And so I want to focus your attention on sort of the -- maybe we'll call it the first two-thirds of the chart where there's little red lines and they're small.

What does this chart show with respects to Jump's trading and UST on KuCoin during that period, which looks to be May 1, 2021, to May 19, 2021?

A. It shows that Jump was primarily acting in the first roughly two-thirds of this chart as a market maker or liquidity provider, both buying and selling roughly equal amounts of UST.

Q. And can you remind us of what a market maker is?

A. Well, a market maker is simply someone who wants to both buy and sell a particular asset, but the market maker tries to keep a relatively flat position. They don't want to accumulate a lot or wind up very short. And so they try to balance over a period of days or hours even to try to keep their position approximately at zero.

Q. And what are the dates of the big sort of green lines in your chart?

A. The big green lines begin on May 23rd, and this is when Jump changes their trading posture from being a market maker to being more of a directional trader, making a decision to actually become a large purchaser of UST.

Q. And what does that mean, a directional trader?

A. So we sometimes use these terms in finance to distinguish between people that want to maintain a relatively flat or

O42ASEC3                          Mizrach - Direct

stable position and buy and sell in equal amounts.  Those folks we call liquidity providers or sometimes market makers.  So they're there on both sides, but trying to stay roughly at zero.

But then a directional trader is someone who begins to accumulate a position in one direction, and, again, this takes them well away from the zero line.  And as you can see after May 23rd, Jump continues to accumulate and become a large net purchaser approaching 40 million by the end of the month of UST.

Q.  In that end of the month period, was Jump still engaging in the market making that you mentioned earlier?

A.  Yes.  There's market making that's going on, but this is netting out the combination of their market making activities and their directional trades, and it says that the trading posture has shifted.  They still are doing some market making, but on balance, they're ending each day with more UST.

Q.  And what is the significance of that fact to your analysis?

A.  It tells me that Jump was using trading on centralized exchanges to try to support and restore the peg.

Q.  I'm going to show you now, Professor, what's been marked as Plaintiff's Exhibit 197.

And could you just at a high level describe to us what's shown in this chart?

A.  These are Jump's net purchases in the same pair, Tether UST

O42ASEC3                          Mizrach - Direct

on KuCoin, but just focusing on May 23rd.

Q.  And did you prepare this chart?

A.  I did.

Q.  And what is the source of data you used in preparing this chart in Plaintiff's Exhibit 197?

A.  It's again from Jump's trading records.

Q.  Is it an accurate reflection of Jump's trading of Tether UST on KuCoin on May 23, 2021?

A.  It is.

MR. CARNEY:  Your Honor, I would move for the admission of Plaintiff's Exhibit 197.

MR. HENKIN:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 197 received in evidence)

MR. CARNEY:  And if we could please display that now.  Thank you, your Honor.

Q.  Professor, can you tell us what your analysis of Jump's trading records showed about Jump's trading on May 23, 2021, on KuCoin in the Tether UST pair?

A.  Yes.  It shows me that for up until 1430, and the times here -- I'm sorry, I'll use military time.  1430 is 2:30 p.m.  And we're using Greenwich Mean Time, that's the time actually in London where the prime meridian is.  And the reason we do that is because these are 24-hour markets and you have to have some reference point, so we tend to use the meridian time, the

O42ASEC3                          Mizrach - Direct

Greenwich Mean Time.

So at 1430 in Greenwich time over in England, about five hours ahead of Chicago, we see that there's a surprising change in Jump's trading posture to purchase just in one half hour approximately 10 million UST, and that net purchase at that time between -- in that half hour, was the equivalent of what Jump had traded typically on two entire days.

So two entire days of trading are now concentrated in just one half hour of the trading day on May 23rd.

Q.  And was this trading happening on-chain or off-chain?

A.  This is again on KuCoin, that centralized exchange that's off the Terra blockchain.

Q.  So that large period of trading that you mentioned, where is that reflected on this chart?

A.  So the -- I think the thing that's hard to miss is the large green bar.  And so, again, green means, as it did in the prior chart, net purchases.  So they become a large net purchaser in that half an hour and make net purchases of more than 10 million UST.  In fact, during this particular timeframe, Jump only purchases.  They don't sell UST.

Q.  And was there another time period on that day when Jump made large purchases of UST?

A.  Yes.  There are large purchases also at the end of the day.  And so you'll see two more green bars that represent I think 23 to 24 to midnight GMT, where again, Jump makes large net

O42ASEC3                          Mizrach - Direct

purchases in this particular trading pair.

MR. CARNEY:  Thank you.  Could we please display for the witness Plaintiff's Exhibit 193.

Q.  And can you just at a high level tell us what Plaintiff's Exhibit 193 is, Professor?

A.  It's showing us the change in price of UST with respect to U.S. dollars in the period from May 19th to May 27th.

Q.  And did you prepare this chart?

A.  I did.

Q.  And what is the source of the data that you used for this chart?

A.  One portion of it is just simply a feed directly from the KuCoin exchange that was obtained from Jump.  And the second part is using some data that I capture on my own data center.

Q.  And is this chart an accurate summary of the UST depreciation with respect to U.S. dollars in the time period reflected on the chart?

A.  It is.

MR. CARNEY:  Your Honor, at this time I would move for the admission of Plaintiff's Exhibit 193.

MR. HENKIN:  No objection.

THE COURT:  Received.

(Plaintiff's Exhibit 193 received in evidence)

MR. CARNEY:  Thank you, your Honor.

If we could please display it to the jury.

Q. Professor, what does this chart show about the price of UST during the time period you mentioned?

A. So in the early part of the graph you begin to see the depeg, the decline in UST's value relative to the dollar. It's falling below 98 cents as you can see on May 19th.

As we move forward, we also then begin to see the really large decline in UST's price on May 23rd, and the price I believe trades just a little bit below 93 cents at that particular point in time on May 23rd. And then as you move on from May 23rd, you see the restoration of the peg.

MR. CARNEY: And we can please take this down now. Thank you.

Q. Can you remind us again what the question that the SEC posed to you regarding Jump's trading?

A. I was asked to determine what if any role Jump had played in restoring the peg of UST to $1.

Q. And I think you previewed this earlier, but did you form an opinion on this issue?

A. I did.

Q. And, again, what is your opinion on that issue?

A. My opinion is that Jump's trading on the centralized exchanges on KuCoin in the Tether UST pair and also in Bitcoin was a critical component in restoring the peg of UST to $1.

Q. And what specific markets did you analyze Jump's trading in to form this opinion?

A. I looked at their trading on the KuCoin exchange and the Tether UST pair, and also in the Bitcoin UST pair.

Q. And did you focus on a particular time period to form your opinion in this matter?

A. I did. I focused on May 23, 2021.

Q. And why did you focus on May 23, 2021?

A. May 23, 2021 is the period in the chart that we had just taken away where we see the peg begins to move away from its bottom. So my view is that the peg would have probably been permanently lost if it had not been for Jump's trading on May 23rd.

Q. And can you describe the type of analysis that you conducted regarding the trading on May 23, 2021?

A. Yes. When we began our discussion together, I was talking about a tool that I use frequently in my work, as do other microstructure economists, called a vector autoregression.

Q. And what did your analysis using that tool show regarding the impact that Jump's trading had on the price of UST in the Tether UST pair on KuCoin on May 23, 2021?

A. My analysis using the VAR and impulse response function was that Jump's trading raised the price of the Tether UST pair by 95 cents, and in the case of the Bitcoin UST pair by 55 cents.

Q. Okay. And how did you employ this vector autoregression model in your calculation of Jump's impact on the price?

A. The vector autoregression takes inputs from the market and

from Jump's trading activity, and it then tells me the effect of their trading. I then take that model that shows us the effect of Jump's trading, and then use the impulse response to remove the Jump trading and ask where the price would have been had they not made these net purchases.

Q. And in your response that you just gave you mentioned the term "inputs." What were the inputs to your model?

A. The inputs were first the mid quote. If you recall, that's just the difference between the best bid price and the best offer price, just the midpoint between those two.

And then the second input is whether or not Jump is a buyer or seller in a particular trade.

Q. And where did the data that you used in this vector autoregression model come from?

A. It was all obtained from Jump. Jump provided me the mid quote prices, or I should say the best bid and offer prices from KuCoin in the two pairs I analyzed. And Jump's trading records identified for me each transaction and whether or not they were a buyer or seller of UST in those transactions.

Q. So just let me follow up on that. How do you know whether Jump was a buyer or seller in a particular transaction?

A. It's provided in the trading records that Jump produced.

Q. And, Professor, did you prepare a demonstrative showing how you used these statistical tools you just described to conduct your analysis?

A. I did.

MR. CARNEY: Could we please put up I think this is Mizrach Demonstrative Exhibit 9a.

Q. And, Professor, could you walk us through your demonstrative.

A. Yes. This just contains a diagram of the way in which an economist might estimate price impact. So one typically starts with the mid quotes, again, just taking the best bid price and the best offer price, taking the average of that, and then you combine that with the trades that are taking place in the market. And we're assigning a plus one when Jump is buying the UST, and then we're assigning a minus one when Jump is selling the UST. From that, you estimate the statistical model called the VAR. And then the VAR is the input into this impulse response function in which you can assess and isolate the effect of, in this case, Jump's trading on the price.

Q. And did you take into account the quantities of UST traded in each of these trades that received a plus one or a minus one as you described it?

A. I did.

Q. How so?

A. Well, if we think back to our order books that we displayed a bit earlier --

Q. And I'll pause for a second. Could we please pull up Mizrach Demonstrative Exhibit 3 then, would that be helpful?

O42ASEC3                    Mizrach - Direct

A. That would, sir.

So just to refresh everyone's memory, including mine, about this example. We had a situation in which seller four arrived wanting to sell 200 shares at 95 cents. That seller matched with buyer one. And when that happened, there was a price impact. We would see the price move down to a lower price on the bid as a result of this.

Now, imagine the scenario -- and this is I think the scenario that occurred with Jump Trading. Imagine a scenario in which buyer one is actually willing to buy a much larger quality. So, for example, 300 units rather than the 100 that are displayed. So what would happen in this instance? Well, seller four would arrive. They would not remove buyer one from the order book. Buyer one would still be there with a remaining quantity of 100 shares, and seller four would now be the one who vanishes from the limit order book. So where are we after all that's done? Well, after all that's done we're back to the order book we started with, with a bid price of 95 cents and a sell price of 99 cents, a mid quote of 97.5 cents.

So, in this instance, the decision of buyer one to be a large liquidity provider of the asset of the financial instrument, they prevented the price from having the market impact of two and a half cents, and the market impact is now zero.

Q. Professor, is the approach that you took to buys and sells

O42ASEC3                    Mizrach - Direct

in your model consistent with academic literature on the subject?

A. Yes. I've published many peer-reviewed articles using these techniques in a wide variety of different markets, including crypto.

Q. And you also -- you have mentioned a few times the impulse response function tool that you used. Could you just at a very high level in simple terms explain what the impulse response function does?

A. Yes. It enables us to hold other market factors constant, put them in the background for a moment and isolate the effect of just one particular input to the trading process.

Q. And how did you use the impulse response function for your analysis here?

A. In this particular matter, the impulse response was used to analyze what would have happened if Jump had, instead of becoming a net buyer of UST, had simply remained a market maker keeping a relatively flat position in the asset.

Q. So what did your impulse response function do with respect to Jump's net purchases that you talked about earlier?

A. So I remove all of Jump's net purchases in the two asset pairs, and ask where the price would have been had Jump not contributed that net trading amount.

MR. CARNEY: And if we can put up Mizrach Demonstrative Exhibit 9b.

O42ASEC3                    Mizrach - Direct

Q. Is this a demonstrative you prepared showing how the impulse response function works?

A. Yes. What the exhibit is helping us to remember is that we're holding factors, other factors constant. And holding those factors constant, we then do what economists call a shock, and what we would just call a change, a change in the market.

And the change in the market on May 23rd was Jump's decision to become not a market maker with a relatively flat position in UST, but to become a large acquirer, a large net purchaser of UST. And so the IRF enables us to do the exercise of saying what would have happened had they not in this case purchased 15 million net of Tether -- of UST in the Tether market, and 3.5 million net in the Bitcoin UST pair.

Q. And what did the impulse response function predict regarding the price of UST had Jump done what you just described and just traded as a market maker?

A. So my analysis in the Tether UST pair says it would have been as much as 95 cents lower. And in the case of the Bitcoin UST pair, the price would have been as much as 55 cents lower.

Q. What was the lowest price that UST traded at during that time period?

A. As we saw in the exhibit that I had shown you about the evolution of UST prices, it traded just slightly below 93 cents.

O42ASEC3                    Mizrach - Direct

Q. So, Professor, how could it be that Jump's purchases effected the price by 95 cents if UST never traded below 93 cents?

A. Well, statistical models sometimes generate conclusions that are not logical. And what do I mean by that in this instance? Well, something very, very unexpected happened. Beginning at 1430, Jump pushes through two days worth of trading volume in a half an hour. And what happens to statistical models, when something unique or unexpected has happened, is that it generates a lot of uncertainty. I don't know, is there going to be another 10 million-dollar borrow that follows it, or is there going to be another 5 million, or are they going to go back to just being a market maker?

That uncertainty is reflected by, in these statistical estimates, the possibility that the price could go below zero, but I think we all know logically that selling would have stopped in UST at the price of zero, there would have been no reason to continue to sell UST if you were getting nothing in return.

THE COURT: Counsel, how much more do you have?

MR. CARNEY: I will finish before 1:00, your Honor.

THE COURT: Okay. You've answered my question.

MR. CARNEY: Thank you, your Honor.

Q. So let's finish up then. We have 13 minutes, Professor. Could a member of the public in May 2021 have seen

O42ASEC3                          Mizrach - Direct

that Jump was buying large amounts of UST off-chain?

A.  No.

Q.  Why not?

A.  That information is not available to the public from the centralized exchange.  We don't know who is trading with whom on those exchanges.  We can only typically find that out if we get confidential records.

Q.  Could a member of the public in May of 2021 have seen that -- putting aside Jump, that a single entity was buying large amounts of UST off-chain?

A.  There wouldn't be any way to know the number of entities that were buying that quantity.  Wouldn't have known whether it was one or dozens.

Q.  Professor Mizrach, are you aware that defendants have hired an expert from the University of California to critique your model and opinions here?

A.  Yes, I'm aware.

Q.  And have you reviewed his critiques?

A.  I have.

Q.  All right.  And, first of all, big picture, and this is a Professor by the name of Terrance Hendershott; is that right?

A.  That's correct.

Q.  First of all, at a high level, do you agree with any of his critiques of your model?

A.  No.

---

O42ASEC3                          Mizrach - Direct

Q.  I want to -- why not?

A.  I'd start with by saying that Professor Hendershott has not introduced his own model.  He hasn't provided any statistical analysis other than to critique in some form mine.  And I've reviewed all of the comments that he made and provided a rebuttal report showing where I think that his criticisms just simply don't apply to the inferences that I've made in this case.

Q.  Professor, was one of the criticisms that Professor Hendershott makes of your model that you don't account for trade size?

A.  That's correct.

Q.  Do you agree with that criticism?

A.  I don't.

Q.  Why not?

A.  Well, as we discussed in the limit order book example, the mid quote reflects the size in which people are willing to trade.  And so if a person was willing to provide a large amount of liquidity or trade in larger size, it's going to be captured by the fact that the mid quote isn't going to move unless a really, really big trade comes along.  So the quantities are captured by the quotes as they enter and leave the limit order book.

        And, secondly, and this is just purely fundamental, every time that Jump is buying, somebody else is selling, so...

---

O42ASEC3                          Mizrach - Direct

Q.  Is one of Professor Hendershott's other criticisms of your model that it doesn't account for the trading of other entities besides Jump?

A.  Yeah.  So the trading of others is captured by the fact as I think I was trying to say before, that every time Jump trades and makes a purchase of UST, there had to have been somebody else in the market that was selling it to them.  So we see the selling intentions and Jump's purchases of those sales in the data.

Q.  And was one of Professor Hendershott's criticisms of your model that it just didn't make sense because it showed negative prices for UST?

A.  Yes.  We briefly touched on this before that when you have a statistical model and the statistical model all of a sudden confronts some data that looks very, very different than what had happened before, it sometimes generates uncertain outcomes that we can use our -- you don't need a PhD in economics to know that the price is not going to go below zero.

Q.  And was another criticism of Professor Hendershott of your model that you failed to break up Jump's trading between what's known as passive and active trading?

A.  I'm aware of the criticism.

Q.  So, first of all, very quickly, what is a passive trade and an active trade?

A.  We could go back to our limit order books to think about

---

O42ASEC3                          Mizrach - Direct

that a bit.  Typically, there's someone who crosses to one side or the other of the order book to initiate the trade, and we call that the aggressive side.  The side that then receives that order is called the passive side, and I think that was not an appropriate way to think about Jump's trading here because Jump's intention was not to maximize the price movement of UST.  It was simply to maintain and restore the peg.

Q.  So do you agree with Professor Hendershott's criticism that you should have divided Jump's trading between passive and active trades?

A.  No.  My analysis of the literature and also my own trading experience suggests that a trading firm that was trying to support a peg, trying to keep a price from falling below a certain level, would use a mix of both active and passive trading in order to try to support that peg.  And so I utilized something that then was clearly defined in the data that we had:  Was Jump a buyer or seller?  And using that information, could determine when Jump was supporting the peg.

Q.  And I asked you about this criticism by Professor Hendershott a little earlier, but I want to make sure the record is clear on this.

        Did you account for trade size in your model?

A.  The trade sizes are reflected in what happens to the mid quote.  So large trades will move the mid quote more than smaller trades.  And the trade sizes handled by how much of the

O42ASEC3                    Mizrach - Direct

limit order book of the orders that are there are removed by a particular trade of a particular size. And as logic would tell you, a larger trade is going to remove more levels of the limit order book and a smaller one less. So the mid quote, which is one of the two inputs to the VAR, is capturing the effective trade size.

Q. Couple more questions, Professor.

In your opinion, was Terraform's on-chain swap mechanism functioning to restore the peg in May of 2021?

A. It was not.

Q. And why not?

A. The swap fees that we've talked about made the kind of trading that would have been required to restore the peg through the swap mechanism. Those fees made it unprofitable for folks to try to use the swap mechanism as an arbitrage to restore UST.

Q. Okay. Final question, Professor.

What is your opinion on the impact of Jump's off-chain trading on the restoration of the UST peg in May of 2021?

A. Without the Jump trading that I've analyzed in the Tether UST pair and the Bitcoin UST pair, my conclusion is that the price would have been very, very close to zero, and it's likely that the peg would have never been restored.

MR. CARNEY: No further questions, your Honor.

THE COURT: All right. So that's a good opportunity

---

O42ASEC3                    Mizrach - Direct

(Jury not present)

THE COURT: I will have my law clerk hand to the parties my rulings on the deposition of Evgeny Gaevoy.

Now, as you know, we have an abbreviated schedule tomorrow because I'm sitting on the Second Circuit in the morning. So we will start 12:30, but I'm going to tell the jury and recommending to you as well that you have your lunch before then because we won't take a lunch break. We'll go from 12:30 to 3:30 with a mid afternoon break of 15 minutes.

So this is the SEC's last witness?

MR. CARNEY: Yes, your Honor.

THE COURT: All right. So either we'll end this afternoon or sometime tomorrow.

Who is the first witness for the defense?

MR. PELLEGRINO: Chris Amani, your Honor.

THE COURT: Okay. And after that?

MR. PELLEGRINO: Zion Schum.

THE COURT: Okay. What I'm trying to figure out is -- and this is not binding, but just in a ballpark way, when you think you'll rest. Do you want to think about that over lunch?

MR. PELLEGRINO: Let us discuss that, but I'll give you one more witness, your Honor. After Mr. Schum would be Matt Cantieri. That is the individual we mentioned is appearing by video, so we would also need to make those arrangements with the Court.

---

O42ASEC3                    Mizrach - Direct

to go to lunch. So, ladies and gentlemen, we'll see you at 2:00.

(Continued on next page)

---

O42ASEC3                    Mizrach - Direct

THE COURT: Okay. The reason I'm asking is because we told the jury two weeks. And I think counsel on both sides have been reasonable in how they've handled witnesses. Part of the problem is my own schedule, which has led to shorter days than I had hoped. But I think we need to flag for them what the schedule is, the remaining schedule is. So just think about that and we'll talk about it after lunch.

MR. PELLEGRINO: Sounds good, your Honor. Thank you.

MR. FERRARA: Your Honor, there might be one other way. We had mentioned earlier there might be one other way to streamline things.

We noticed in your Honor's rules that for civil cases you allow rebuttal only if there are two or more defense closings. We would be prepared to waive our closing and have just the SEC closing and then the Terraform Labs closing, and that which we think is in accord with your Honor's rules and which we think would streamline things even further.

THE COURT: Well, I'm perfectly happy to hear argument on all that, and obviously you need to know sooner rather than later. But I think the -- that rule was really designed in part to flag my normal practice. It's not an absolute for every single situation. So we need to discuss a little bit what the situation is here. But that's an interesting possibility.

You wanted to say something about this?

MR. CARNEY:  Your Honor, and obviously your Honor knows better than anyone, but it was our understanding that your Honor's rule was more tied to whether the government was the litigant in the --

THE COURT:  Well, part of this, this all developed -- this is more legislative procedure than you need to know.  In New York State Court, the most common practice in private civil actions is to have the defendant sum up first and the plaintiff sum up second on the theory that the plaintiff has the burden of proof.  I have always thought that was very unhelpful to the jury because they need to hear first what the basic case is about as the plaintiffs believe it to be and then -- but I didn't, in most of those cases, I didn't think rebuttal was necessary except when there were multiple defendants.  And so that was the basic arch in the rule.

Because the SEC has had this unfortunate practice until recently of trying to try most of its cases in-house, I haven't had occasion to really think this through in a government civil kind of situation.  But on the other hand, I think there's some appeal to what defense counsel has just raised, so certainly going to contemplate that seriously.  So but we need to get this resolved clearly in the next day or so because we will have summations.  What I really want to know from my standpoint is are we going to have summations on Friday or Monday?

AFTERNOON SESSION
2:00 p.m.

(In open court; jury not present)

THE COURT:  Please be seated.

So in terms of scheduling, anything further that defense counsel had?

MR. PELLEGRINO:  Yes, your Honor.  We've had a chance to talk.  The first two witnesses perhaps provide the most uncertainty.  What we're estimating right now is we would probably rest around Thursday afternoon or latish Thursday, and then I think, your Honor ——

THE COURT:  We're only going to 3:30 on Thursday.

MR. PELLEGRINO:  3:30.

I think the parties' cases-in-chief would be completed by then.  I'm not sure what the Court has planned for the charge conference and things of that nature.

THE COURT:  OK.  That's what I need to know.  Let me think about it, and we'll have —— you can plan on summations either being Friday or Monday, but I'll let you know.  Obviously, I'll have a better sense tomorrow.

The witness can come on up, and let's bring in the jury.

And I'd like to know by tomorrow how long each side wants for summation under either of the alternatives, either no summation from Do Kwon and no rebuttal from the SEC or the

MR. PELLEGRINO:  Your Honor, on that, not holding us to it, we have been discussing with the SEC and I think we're probably going to be able to land this by Thursday.  At the latest summations Friday is what we're thinking right now.

THE COURT:  Okay.  I need to know that in part because I have scheduled some other matters for Friday, but if we were going to have summations, I would cancel those or move those to very late in the day.  So to be continued.  Okay?

MR. FERRARA:  May we put in a short letter on it, your Honor, on the summations point?

THE COURT:  Sure.

MR. CARNEY:  And, your Honor, it was probably obvious what our position was, but just so the record is clear, the SEC would love if we could help establish a new precedent that in SEC civil cases, the SEC is afforded the opportunity to offer a rebuttal closing no matter how many defense closings there are.

THE COURT:  Okay.  Well, as soon as the Supreme Court in *Jarkesy* tells you that you can't have any in-house cases, we'll take that under consideration.

MR. CARNEY:  Thank you.

(Lunch recess)

other alternative.  We could maybe have 15-minute summations on Thursday evening and get it all done with.  Maybe not.

(Continued on next page)

O42HSec4                    Mizrach - Cross

(Jury present)

THE COURT:  Please be seated.

Before we continue, ladies and gentlemen, I just wanted to mention, so I don't forget it later, tomorrow the higher court — my bosses are what's called the Second Circuit Court of Appeals.  It sits across the road here in the different courthouse.  And in a moment of weakness, they've asked me to sit with them as an appellate judge tomorrow morning.  So since they're my bosses, how can I say no?

So the result is we will have a special schedule tomorrow.  We will start at 12:30, but you should have your lunch before you come, and then we'll go from 12:30 to 3:30 with a short break in the middle of the afternoon.

So you should not worry.  We're still very much on schedule.  So don't worry about that, but I do want you to know.  So tomorrow we'll start at 12:30, but after your lunch.

OK.  Counsel.

BRUCE MIZRACH, resumed.

CROSS-EXAMINATION

BY MR. HENKIN:

Q.  Good afternoon, Professor Mizrach.  I'm Douglas Henkin.  I represent Terraform Labs.

Is it correct that you and I have met only once before, at your deposition?

A.  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O42HSec4                    Mizrach - Cross

Q.  I wanted to ask — start out with some questions.

During your direct testimony, you testified that you got data from Jump, and I just want to make sure I understand what you meant by that.

Am I correct in understanding that the SEC subpoenaed information from Jump and then provided that to you, not that you got anything directly from Jump?

A.  My understanding is it came under subpoena to the SEC and then to me.

Q.  And then to you.

Then can we pull up — Mr. Aquino, can we pull up Professor Mizrach's Demonstrative 6 that has been shown to the jury.

Professor, I just wanted to check to see whether there might have been some mistakes in this demonstrative exhibit.  So if you look at the footer, it says "Source: SEC," and it's got a long number, "for the strike prices and date of first agreement.  Terra blockchain for delivery date."

I don't see anything about that on the chart.  Is that an erroneous footer?

A.  The part that's correct is just that the data are from the Terra blockchain.

Q.  And it also refers to aUST supply and aUST deposits, but isn't it true with Anchor you deposit UST and get aUST back?

A.  Correct.  So this is just reflecting the amount of UST that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O42HSec4                    Mizrach - Cross

has been transformed into aUST.

Q.  So it shouldn't say aUST anywhere on the chart, should it?

A.  I don't agree.  It's clear these are deposits of UST that have been placed in the Anchor protocol.

Q.  You think aUST and UST are the same things?

A.  I do not.

Q.  Now, you said during direct that your opinion is that without Jump's trading the UST peg wouldn't have been restored to a dollar, correct?

A.  That's correct.

Q.  For purposes of your analysis, the SEC told you to assume that Terraform and Jump had an agreement for Jump to restore the peg, right?

A.  They didn't tell me.  I verified that the agreement existed.

Q.  So you never said in your report that I have been informed by counsel that Terra and Jump entered an agreement in which Jump agreed that it would purchase UST to support the peg?

A.  And I then saw the documents that provided the conditions of those agreements.

Q.  So you weren't — you were first informed about that by the SEC?

A.  That's correct.

Q.  You don't have any personal knowledge about Jump's goals in trading UST, is that right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O42HSec4                    Mizrach - Cross

A.  No.

Q.  And, in particular, you don't know what Jump's goals were in entering into the original Luna loan agreement that you discussed on your direct, correct?

A.  No.

Q.  And putting aside what you assumed, you don't know — strike that.

You don't know why Jump engaged in any specific UST trades in May 2021, correct?

A.  I know that they had an incentive to restore the peg.

Q.  That's not the question I asked.

You don't know why Jump engaged in any specific UST trades in May 2021, yes or no?

A.  The trading was intended to restore the peg, so, yes, I do.

Q.  But that's your conclusion.  You're not testifying as to Jump's knowledge?

A.  No, I have no knowledge other than that they were buying a lot of UST.

Q.  And one of your assumptions is that when the price of UST got as low as it did on May 23, 2021, no one other than Jump would have stepped in as a buyer, right?

A.  That's not my assumption.

Q.  So you acknowledge that other buyers could have stepped in?

A.  I know that other buyers didn't step in.

Q.  And when you say you know that other buyers didn't step in,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O42HSec4                     Mizrach – Cross

you're only referring to the half-hour time period that you discussed with Mr. Carney?

A. No, there's also a period later in the day where Jump is — is the majority purchaser of UST.

Q. It's correct that you didn't look to see whether the market as a whole viewed UST as likely to repeg and traded with that goal in mind?

A. You'd have to be more specific about which markets and which trades.

Q. In working — in developing Exhibit 1, which is your VAR model in your expert report, did you search for any public information that might have indicated that the market viewed UST as likely to repeg?

A. That information is not an input into the VAR.

Q. And more specifically, is it correct that your model only includes Jump's UST trades on May 23, 2021?

A. That's one part. It also includes the quotes, which represent the limit orders of other traders.

Q. And you only looked at Jump trades on May 23, not on any other days, correct?

A. That's not true.

Q. Where in your report and the opinion that you reflect — the opinion that you testified to do you take into consideration days after May 23, 2021?

A. In my report there's documentation of, if I remember, more

---

O42HSec4                     Mizrach – Cross

than 60 million purchases of UST across a longer time period than May 23.

Q. There were other purchasers buying UST during that time period, right?

A. Can you say which time period you're referring to.

Q. May 23 to May 25, 2021.

A. There were other purchasers of UST, yes.

Q. And some of them bought UST at prices lower than Jump purchased, correct?

A. I — I don't know that.

Q. It's true, isn't it, that the price of UST dropped after the half-hour of Jump trades that you focused on in your direct testimony?

A. It — it dropped after the purchases had started to drive the price up, yes.

Q. It dropped after Jump — it dropped when Jump was no longer trading?

A. That's correct.

Q. And it went back up while Jump wasn't trading yet, isn't that also correct?

A. Jump is not making directional trades in that time frame, but they are — they are making trades.

Q. Because the SEC asked you to focus on the effect of Jump's trades, you didn't incorporate all other market trades of UST on May 23, 2021, into your model, isn't that correct?

---

O42HSec4                     Mizrach – Cross

A. I have used the orders, which represent the trading intentions of the entire market, and then Jump's trades.

Q. So all the other trades, in your mind, were incorporated into what you call the mid-quote?

A. The other trading intentions were incorporated into the mid-quote.

Q. So it's your view that the mid-quote captures the trading intentions of the rest of the market, right?

A. That's correct.

Q. And so trading by others is captured in the mid-quote?

A. Yes, it is.

Q. And you say that trading that's specifically trading intentions of other traders are captured in the mid-quote, right?

A. That's correct.

Q. But not Jump's trading intentions; those aren't captured in the mid-quote?

A. No. Jump could be trading — could be present on the mid-quote and be receiving the trading intentions of others.

Q. So it's your view that all information that might affect your analysis, including possibly Jump's trades, is reflected in the mid-quote?

A. No. Jump's trades are separate — separate input, and the mid-quote reflects the trading intentions of others, of Jump and non-Jump participants.

---

O42HSec4                     Mizrach – Cross

Q. You testified on direct that UST began to depeg from a dollar around May 19 — on May 19, correct?

A. That's correct.

Q. And do you agree that the price of other cryptocurrency tokens dropped around the same time?

A. I — as I recall, both Bitcoin and Ether prices were also falling around the same time.

Q. Specifically with respect to Bitcoin, the price of Bitcoin fell more than 20 percent between May 18 and May 24?

MR. CARNEY: Objection, your Honor. Beyond the scope.

THE COURT: Overruled. You may have recross — or redirect, if you wish.

A. So I don't have the specific percentages in my head right at the moment, but I do know that Bitcoin and Ether prices were falling around that time.

Q. So you don't have any reason to disagree that the price of Ethereum over that period of time fell 35 percent, for example?

THE COURT: Sustained.

Q. You agree that the general consensus is that there was one cause of the decline in price of all of the various cryptocurrency tokens during this period of time, correct?

MR. CARNEY: Objection. Vague.

THE COURT: Sustained.

Q. Would you agree with the statement that some observers speculated that the depeg of UST was caused by China's

crackdown on banks' use of digital assets on May 19, 2021?

A. I've read those comments and seen them in the literature.

Q. And is it fair to say that it wasn't just UST whose price was unstable during May 2021?

A. There — as we've discussed, there were other crypto assets that were also declining in price.

Q. Is it fair to say that when markets are unstable, it's common for trading firms to use human beings to make trades as opposed to algorithms?

A. It would depend upon the firm and depend upon the time.

Q. Would you agree with the statement that manual trading is a common technique employed when markets are unstable?

A. No, it's not just instability.

MR. HENKIN: Can we show the witness D-1939, page 20.

Q. Professor, does this refresh your recollection that you stated that a common — that manual trading is a common technique employed when markets are unstable?

A. And when the data are outside of what's called the training set of the algorithms that had been in use prior to that.

Q. Did you use the phrase "training set" in the report, in either of the reports that you submitted in this case?

A. I don't believe the word is in my report.

MR. HENKIN: Your Honor, move to strike the portion of the witness' testimony where he referred to training sets.

THE COURT: Overruled.

MR. HENKIN: Can you bring up, Mr. Aquino, PX 199, please, but only for the witness. Or, actually, this is in evidence, so the jury can see it as well. I'm sorry.

Q. Professor Mizrach, I wanted to ask you some questions about this exhibit and, specifically, the horizontal line. So we're not focusing on the bars.

A. OK.

Q. I think what you said in your direct is that the horizontal line represents the trading that's going on as opposed to the accumulated position, is that correct?

A. If we're referring to the line that has the legend daily net, is that what you're referring to?

Q. The daily net, yes.

A. The daily net shows their position on the day, that's right.

Q. OK. And so am I correct in reading this that by May 28, Jump's daily net was about the same as it was prior to May 23?

A. On May 28, the daily net is at zero, which would have been approximately the same daily net on May 22.

Q. And so if you look at the 29th, the 30th, and the 31st, the daily nets on those days are consistent with the daily net in the period prior to May 23, correct?

A. They're positive on the 29th, 30th, and 31st, whereas there are many days prior where they're negative.

Q. But, for example, on May 16, which you didn't discuss

during your direct, it's positive, right?

A. That's correct.

Q. Now, you talked during your direct about Jump's — the price impact of Jump's trading was due to its net UST purchases of 15.16 million UST on May 23, 2021, is that right?

A. That's with reference to the tether UST pair, that's right.

Q. Right. I'm excluding the Bitcoin.

A. Right.

Q. OK. And that position, the 15.16 million UST position, that was built through the operation of what you called the bookstacker program, is that right?

A. The net position takes into account all of Jump's trades.

Q. Is it not your opinion that most of the position was formed using the bookstacker program guided by manual trading?

A. Bookstacker was used for a lot of the directional trading on May 23, yes.

Q. And would you agree that bookstacker was not purchasing UST continuously between May 23 and May 25?

A. Not continuously, no.

Q. And would you agree that book — that the first bookstacker purchase occurred at 9:30 Central Time — so I'll leave it to you to convert that to GMT — on May 23, 2021?

A. That's, I believe, the first bookstacker trade on May 23. I'm not sure if it's the first bookstacker trade ever.

Q. Fair enough. What I meant was the first one on May 23.

A. I believe that's the first use of bookstacker is at — it's 1430 GMT, so add five hours to the Central Time.

Q. And your model didn't look at the price of UST before that time — so I'm going to go with GMT — before 1430 GMT?

A. No, the model is estimated over the trading activity for the entire day.

Q. What happened to the price of UST in the 30 minutes prior to 1430 GMT?

A. The price, as I recall, was falling heading into this 1430, or 9:30 Central Time.

Q. Let's talk about different types of trades.

Toward the end of your direct testimony, you started talking with Mr. Carney about active and passive trades. Do you recall that?

A. Yes, I do.

Q. You would agree with me that passive buy trades can have a different price impact than active buy trades, right?

A. They could.

Q. And because that's an empirical question, price impact can be measured by analyzing data, right?

A. It is done by analyzing data.

Q. And your model doesn't differentiate between passive and active trades, right?

A. It does not. It simply looks at when Jump is either a buyer or a seller of UST.

O42HSec4                    Mizrach – Cross

Q. Dr. Mizrach, if someone has the intention that Apple stock will go to a million dollars and buys one share of stock with that intention, does that goal make — does that intention make the price more likely to hit a million dollars, in your opinion?

A. I believe if you entered an order into the market right now to buy one share at $1 million, it would execute, but it will price much lower.

Q. I'm sorry?

A. Is that me?

THE COURT: No. Go ahead.

A. I was saying that if you entered an order of that price of a million dollars, which is — I think we all know is much lower than where Apple's currently trading, the order would execute, but at the best price that's available on the order book.

Q. But that wasn't my question.

My question is does the intention, no matter what price the order is entered at, make the likelihood of the price hitting a million dollars more or less likely?

A. So it is possible that displaying more liquidity in the order book could influence price, yes.

MR. HENKIN: Mr. Aquino, could you put up PX 194 and 196 next to each other, please. These are both in evidence, so we're going to display them to everyone.

O42HSec4                    Mizrach – Cross

Q. Professor, you talked about both of these exhibits with Mr. Carney, and I want to just make sure that I understand how this works.

On the left we've got PX 194, and that shows the actual usage of the mint-burn mechanism, is that right?

A. It's the net usage of the mint-burn mechanism.

Q. So the net usage?

A. Yes.

Q. So net the usage of the mint-burn mechanism increases from May 21 to May 24 and then decreases from May 24 to May 27, is that right?

A. There's actually some of the highest fees do — do go into May 25 as well.

Q. I wasn't asking you about the fees yet. I was just asking about the actual usage in PX 194.

A. I'm sorry. I lost the question.

Q. OK. So let me go back to just the left side of the screen.

So we're looking — so on the left is PX 194. What that shows is that the net usage of the mint-burn mechanism increased from May 21 through May 24, reached its peak on May 24, and then decreased from May 24 through May 27, right?

A. No, because as you can see, there's a slight increase on May 27.

Q. But that number is still lower than it was on the 24th?

A. 11.07 is lower than the 40 million on May 24.

O42HSec4                    Mizrach – Cross

Q. And on the right-hand side, so that's PX 196, that's showing the swap fees. That's what I think you were — you were anticipating a question. That shows what the swap fees were during the same period of time?

A. Correct.

Q. So if we focus on May 23 through the 25th, you've got, if I'm doing my math right, about $97 million — 97 million UST net use of the mint-burn mechanism?

A. So you're adding up the net swap totals for May 23, May 24, and May 25?

Q. Correct.

A. And what did you ask me, what the total was?

Q. Is that about 97 million?

A. That seems about right, yeah.

Q. OK. And that's all happening while the fees, while the swap fees, were between 4 percent and 10 percent?

A. So the data here are reporting hourly medians, so there are going to be 50 percent of the fees that are going to be lower than the points that you see in the blue line. So I can't comment on which trader received which specific fees without sourcing the blockchain.

Q. But what we do know is that some of the traders within these groups transacted using the mint-burn mechanism at the fees — at the swap feeds that are shown on the right-hand side of the screen in PX 196, right?

O42HSec4                    Mizrach – Cross

A. Correct, 50 percent paid that level or more.

Q. OK. So if we just focus on PX 194, the left side, more UST was swapped while fees were higher or at their highest than when they were lower, isn't that right?

A. You have the causality backwards. The fees are higher because more was being swapped.

Q. No, no, no, no. I'm just asking — I wasn't making a causality question.

I'm just asking, when the trades happened, did they happen when the swap fees were at their highest?

A. There definitely were people using the swap mechanism in periods where the swap fees were quite high, as shown in the right-hand graph.

Q. OK. Thank you.

So when you're evaluating the profitability of the mint-burn mechanism, there's really three components, right? There's whatever the purchase — whatever someone pays for UST, there's the swap fee, and there's the proceeds from selling the Luna. That was part of one of your demonstratives, right?

A. Yes, but I also mentioned as part of the direct that there were other fees associated with that arbitrage.

Q. But aren't those effectively included in — so, for example, whatever fees are incurred in purchasing UST are factored into the purchase price and whatever fees are incurred in selling Luna are factored into the sales price, right?

O42HSec4      Mizrach – Cross

A. That's not the way the fees work on all centralized exchanges. It might not be reflected in the price that you pay.

Q. So would you agree with me that if somebody could purchase UST for 92 cents and swap it for a dollar of Luna, putting aside the transaction fee issues, even if the swap fee was 5 cents, that trade would still be profitable?

A. In the start of your example, what was the acquisition cost of the UST?

Q. 92 cents.

A. I would — in order to answer your question, I would have to know, again, a number of other transaction costs which you've not included.

Q. But it could be profitable depending upon what those other costs were?

A. Yes, it could be profitable.

Q. OK. And so you would agree that a high swap fee in and of itself doesn't preclude traders from using the swap mechanism and still profiting, correct?

A. There's nothing that precludes anyone from using the swap mechanism. The fees are reasonably transparent, and you can decide whether or not to pay the fee.

Q. And as part of deciding whether or not to pay the fee, you could also decide when to sell the UST; in other words, you could wait for the swap fee to come down?

---

O42HSec4      Mizrach – Cross

A. Yes, yes, you could time — try to time your transactions in the swap mechanism to get lower swap fees.

Q. And you agree, don't you, that Jump and other traders used the swap mechanism on May 23?

A. They did.

Q. OK. And you were aware, in coming to your opinion, that Jump was using the mint-burn mechanism, correct?

A. I was aware.

Q. Are you aware that Jump swapped 14.7 million UST through the mint-burn mechanism on May 23?

A. I don't know that exact figure, but I know that they did utilize — had utilized the swap mechanism on May 23.

Q. And it's your position, isn't it, that Jump's bookstacker trading was not profitable?

A. I don't have an opinion on a particular trading strategy. I have an opinion about what their net purchases did to support the price of UST.

Q. So you don't recall stating that — you don't recall responding to Professor Hendershott by saying "he explained that since he calculated that Jump's trading in bookstacker was profitable (which is not correct)," you don't recall making that statement in your reply report?

A. I analyzed Professor Hendershott's value-weighted average price calculation for Jump's acquisition through bookstacker and thought that the number was computed incorrectly and had

---

O42HSec4      Mizrach – Cross

ignored certain important fees.

Q. So does that mean that you believe — does that mean that you have an opinion regarding whether bookstacker traded — whether Jump's bookstacker trading was or wasn't profitable?

A. My opinion is that I don't believe that Professor Hendershott has calculated accurately the profit of that trade.

Q. Have you ever seen any evidence of the profitability of Jump's trading during the May 2021 depeg?

A. I have not.

Q. Did you ask the SEC for any documents relating to the profitability of Jump's trading during the May 2021 depeg?

A. I did not. I did not see any documents.

MR. CARNEY: Objection, your Honor. Vague as to which Jump's trading we're talking about.

THE COURT: All right. Please clarify.

MR. HENKIN: Your Honor, I think we can clarify this with the next exhibit that I was going to show the witness.

THE COURT: OK.

MR. HENKIN: Would you, Mr. Aquino, put D-1262 up for just the witness and the Court and the SEC's attorneys.

Your Honor, we may want a sidebar about this.

THE COURT: OK.

(Continued on next page)

---

O42HSec4      Mizrach – Cross

(At sidebar)

MR. HENKIN: This is an abundance of caution, your Honor. This is the document that the SEC produced about a month, three or four weeks before trial, which is an internal Jump email. We have a declaration authenticating it as a business record, but I wanted to do this outside the hearing of the jury because we're going to move the admission of this document.

MR. CARNEY: Oh, thanks.

THE COURT: Let me see the document.

MR. HENKIN: It's on the screen, sorry, and it's the bottom part.

THE COURT: All I see now is the heading.

MR. CARNEY: Your Honor —

THE COURT: You have to blow it up. Oh, here we go. All right. So have you seen this document?

MR. CARNEY: Yes, your Honor. This document is one that came up in —

THE COURT: I can't hear you.

MR. CARNEY: I'm sorry, your Honor. This document came up in a separate SEC investigation and was brought to our attention as your Honor —

THE COURT: Is there objection to its admission is the question?

MR. CARNEY: Our objection would be that this witness

O42HSec4                     Mizrach – Cross

has never seen this document before and ——

MR. HENKIN:  But I ——

MR. CARNEY:  And expert discovery ended a long time ago.  He's not seen this or offered anything on it.

MR. HENKIN:  But that's the point, your Honor, he hasn't seen it.  My question is going to be whether it changes his opinion.  I'm entitled to pose that hypothetical.  And it wasn't available during the regular discovery period.

THE COURT:  Wait.  What is the question that you propose to put to the witness about this exhibit?

MR. HENKIN:  If, after looking at the way Jump described the profitability of its own trades internally, his view changes.

MR. CARNEY:  And, your Honor, our —— sorry.

MR. HENKIN:  So these ——

THE COURT:  The question, first, is you say this is not hearsay because?

MR. HENKIN:  It's a business record.  It's a Jump business record, and we know it's a Jump business record.

THE COURT:  I'm skeptical that a number of things that have been put into evidence in this case, most without objection, are really business records.  The fact that it's maintained in the business is not sufficient.  It's one of the elements, but not sufficient.  A business record is typically something that records contemporaneous events.  This is a

---

O42HSec4                     Mizrach – Cross

backward-looking document that gives an opinion about something that happened some time ago.

MR. HENKIN:  It is.  And in that context, it's for somebody's compensation review, describing what happened during the entire year and presenting their views regarding that.  And frankly, we're not offering it for the truth.  We're offering it for the fact that it was said.

MR. CARNEY:  Your Honor, if I may respond?

THE COURT:  Yes.

MR. CARNEY:  When we gave them this document, they requested, your Honor, the opportunity to depose the individuals involved in this document.  They never took those depositions.  Had they done so, we likely would have presented this to the expert, given him the chance to understand this document in context.  Instead, he's being asked on the fly to review this document with no context, not knowing who these individuals are, and to offer an opinion based on a document that he has not had a chance to study.

THE COURT:  Well, the fact that on cross-examination someone is confronted with a document that they have not reviewed is classic cross-examination.  I don't see that that's an objection.  But I'm not so sure about its admissibility.  I think they can show it to him, and for his eyes only, and ask him if it changes his opinion, but I'm skeptical that it's admissible.

---

O42HSec4                     Mizrach – Cross

MR. HENKIN:  And subject to connection, your Honor.

THE COURT:  Well ——

MR. HENKIN:  We have other evidence that relates to it.

THE COURT:  That may be, but it does not strike me as a business record for the reasons I've already articulated.  Let's take a look at the business record exception.  Hold on.

So the business record exception is Rule 803(6), records of regularly conducted activity:

"A record of an act, event, condition, opinion, or diagnosis if (a) the record was made at or near the time by or from information transmitted by someone with knowledge; (b) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling; (c) making of the record was a regular practice of that activity; (d) testimony of a custodian" —— you've satisfied that —— "and (e) the opponent does not show the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.

While I think it's a closer call, I think maybe it does come in as a business record.

MR. HENKIN:  Thank you, your Honor.

MR. CARNEY:  Your Honor, if I can address a related issue, then.  In his report, Dr. Mizrach relied on a record from Jump that said that Jump made 1.4 billion in profits from

---

O42HSec4                     Mizrach – Cross

the Luna under these agreements.  Our understanding is that he wants to show this document to the witness to suggest that it's the $1.5 million profit in this ——

THE COURT:  What is it that you want to show?  What's the part of this document —— because there is a lot of this document that's irrelevant, what's the part you want?

MR. HENKIN:  The only part of the —— the only part is this sentence at the top, 1.5 million.  I mean, I'll have him read the rest for context, obviously, but —— and then what Mr. Carney is bringing up is a separate issue that will be dealt with by the expert separately, I think.

THE COURT:  Well, you can certainly introduce the other document on redirect.

MR. CARNEY:  Well, my intention would be, on redirect, to ask him if he reviewed, see the ——

THE COURT:  Whatever you want to do, but for now it's in.

MR. HENKIN:  Thank you.

MR. CARNEY:  Thank you, your Honor.

(Continued on next page)

O42HSec4                    Mizrach - Cross

(In open court; jurors present)

MR. HENKIN: With your permission, your Honor, may I publish it to the jury?

THE COURT: What's the number again?

MR. HENKIN: It's D-1262.

THE COURT: Received.

(Defendants' Exhibit 1262 received in evidence)

MR. HENKIN: Thank you.

And would you focus, Mr. Aquino, please, on the defending Luna paragraph that starts at the bottom.

BY MR. HENKIN:

Q. Professor Mizrach, would you just read that paragraph to yourself and let me know when you're done.

A. I've finished reading, but I have many questions.

Q. OK. My first question, Professor Mizrach, is have you seen this document prior to today?

A. I don't think so.

Q. OK. My second question is do you see the sentence that says: "I then brought liqs into play to take off some of the buys we had made supporting Luna, which generated a profit of $1.5 million"?

Do you see that sentence?

A. I see the sentence.

Q. Does that change the opinion that you offered that the mint-burn mechanism was not profitable during May 2021?

O42HSec4                    Mizrach - Cross

A. The statement, as I read it, certainly this part that you've cut out, is not telling me anything about time frame other than earlier in the year.

Q. Is it your view — do you understand this paragraph to be discussing May 2021?

A. It would be hard to say that about a document I haven't read.

MR. HENKIN: OK. We can take this down. Thank you.

Q. In your report and in your direct examination, you talked about a $65 million Luna position. And you were, I believe, talking about the Luna loan agreement or the various versions of it.

MR. CARNEY: Objection. Mischaracterizes.

THE COURT: Well, why don't you start again. I'm not seeing the question yet.

Q. When you were talking about 65 million Lunas, were you referring to the 65 million Lunas covered by the Luna loan agreement that was originally entered into in 2020 and then amended twice in 2021?

A. There was an agreement for Jump to be able to purchase Luna at 40 cents, assuming they met certain liquidity conditions.

Q. And did you consider that six of the parts of that loan had already begun to vest before May 2021 and that Jump had already started receiving Luna under that agreement prior to May 2021?

A. Jump had received 3.5 million of the 65 million by May of

O42HSec4                    Mizrach - Cross

2021.

Q. And when you talk about vesting in the context of that loan agreement, what does that term mean?

A. I would defer to the many attorneys in the room as to how vesting applies in this particular agreement.

Q. Did you interpret it as meaning that Jump had satisfied the conditions for receiving each part of the Luna loan?

A. I know that Jump had met sufficient conditions for 3.5 million Luna to be delivered by May of 2021.

Q. In coming to the opinions that you've offered to the Court, did you consider how much Luna Jump would have been entitled to receive and when if all of the vesting conditions had been deemed satisfied on May 23, 2021?

A. Yes, I considered that.

Q. Where is that in the report, either of the reports that you filed?

A. If the 60 million that was still to be delivered had already been satisfied by Jump's trading activity, meaning they had met all the tranche conditions, then it's 60 million that is still to be delivered at the time of May 2021.

Q. And are you offering the opinion that that would have been subject to immediate delivery as of May 23, 2021?

A. No, it was not subject to immediate delivery.

Q. Did the total amount of Luna that Jump was entitled to under the Luna loan agreement change after the May 23, 2021,

O42HSec4                    Mizrach - Redirect

depeg?

A. No, it remained at 65 million total.

MR. HENKIN: Thank you. No further questions at this time.

THE COURT: Anything else?

MR. CARNEY: Brief redirect, your Honor.

REDIRECT EXAMINATION

BY MR. CARNEY:

Q. Hello, Professor Mizrach.

At the start of cross-examination, Mr. Henkin had asked you whether you were aware of agreements between Terraform and Jump. Do you recall that?

A. I do.

Q. All right. Are the agreements that — and I just want to make sure I understand your testimony from direct.

Are the agreements that you've seen and that you've reviewed in conjunction with your report the Luna loan agreements?

A. That's correct.

Q. And Mr. Henkin had asked you about an assumption from counsel that was given to you as part of your report. Do you recall that?

A. Yes.

Q. And were you given an assumption from counsel about a, what I'll call, secret agreement between Jump and Terraform to help

O42HSec4                    Mizrach - Redirect

restore the peg?

A. Yes, I — I had heard testimony from — that the SEC had such evidence.

Q. Mr. Henkin had asked you — if we could please pull up Plaintiff's Exhibit 199.

Mr. Henkin had asked you some questions about the sort of black line that runs across this exhibit. Do you recall that?

A. I do. I do recall.

Q. Can you remind us what that black line represents.

A. It represents Jump's daily net purchases or net sales of UST in the tethered pair on KuCoin.

Q. What does a daily net mean?

A. Well, each day there's buying and selling going on in the market, and the black line is helping us to keep track of what happened each day. And the other bars are telling us about the accumulation of that.

Q. And you anticipated my next question.

So what did the green bars on that chart represent?

A. The green bars are just adding up each day's net and showing where Jump's cumulative position in UST was at various points in time through the end of the month.

MR. CARNEY: And we can take that down. Thanks.

Q. Mr. Henkin asked you about whether passive buy trades can have a different price than active buys. Do you recall that?

---

O42HSec4                    Mizrach - Redirect

A. I do.

Q. And he asked you whether your model accounts for a difference between active and passive buys. Do you recall that?

A. Yes, I recall it.

Q. Why doesn't your model account for a difference between active and passive buys?

A. Because Jump's intent, as I understand it, was to try to restore the peg, and restoring the peg would use a mix of both active and passive trades, and so for that reason, what was consequential for my analysis was knowing when was Jump buying and when was Jump selling and netting that out and then removing that net buying from the market.

Q. And Mr. Henkin had asked you a question about the swap fee mechanism where he told you to, for purposes of his hypothetical, put aside transaction fees. Do you recall that?

A. I do.

Q. As an economist who specializes in market microstructure, do you feel that it's reasonable to put aside transaction fees when calculating whether the swap mechanism was effective or not?

A. No, it's a central question in market microstructure. You have to know all of the fees that are associated with all the trades that might be part of an arbitrage, and of course, most importantly, what would be the impact on the price if you tried

---

O42HSec4                    Mizrach - Redirect

to buy more than one share of Apple, instead were buying 100 or 500,000.

Q. OK. I'm going to ask you about — if we could please pull up Defendants' 1262.

And I'm going to ask, Mr. Haywood, could you please highlight the first sentence in the bullet under defending Luna.

Dr. Mizrach, could you please read that first sentence into the record.

A. Sure.

"Earlier in the year when Luna sold off down to around $5 and UST was trading at a big discount, Bill approved us spending up to $100 million to support Luna to prevent a death spiral."

Q. Is that sentence consistent with the opinions that you've offered in this matter?

A. It is.

MR. CARNEY: No further questions, your Honor.

THE COURT: Anything else?

MR. HENKIN: No, your Honor.

THE COURT: Thank you very much. You may step down.

(Witness excused)

THE COURT: Does the SEC rest?

MR. CONNOR: Your Honor, we have a couple of housekeeping items that he'd like to address and — we've

---

O42HSec4                    Mizrach - Redirect

discussed these with defense counsel — move in a couple of exhibits by stipulation.

THE COURT: Well, let's hear it. Let's do it now.

MR. CONNOR: Yes. The first is PX 171. The second is PX 222. The next two are PX 259.

THE COURT: All right. Let's take them one at a time. Go ahead, start again.

MR. CONNOR: PX 171 we offer into evidence.

MR. PELLEGRINO: No objection, your Honor.

THE COURT: Received.

(Plaintiff's Exhibit 171 received in evidence)

MR. CONNOR: PX 222 we offer into evidence.

MR. PELLEGRINO: No objection.

THE COURT: Received.

(Plaintiff's Exhibit 222 received in evidence)

MR. CONNOR: PX 259 we offer into evidence.

MR. PELLEGRINO: Can we view the whole document, please.

MR. CONNOR: And just for context, this was the one where we were reading Mr. Kwon's testimony and I said the depo exhibit instead of the trial exhibit, so it's just a clarification.

MR. PELLEGRINO: So this is already in?

MR. CONNOR: Yeah.

MR. PELLEGRINO: This is a correction to the —

MR. CONNOR: Yeah.

MR. PELLEGRINO: Then let's just do it that way.

THE COURT: And then just —— All right. So it will be received as a corrected version of something that was previously received.

MR. PELLEGRINO: That's correct, a different number. The deposition number was previously stated. This is the actual exhibit number.

THE COURT: OK.

(Plaintiff's Exhibit 259 received in evidence)

MR. CONNOR: The same issue for PX 262.

MR. PELLEGRINO: So no objection with the same caveat, your Honor.

THE COURT: Very good received.

(Plaintiff's Exhibit 262 received in evidence)

THE COURT: When you folks prepare the index for the jury, you'll make the proper notations.

MR. PELLEGRINO: We'll cross-reference it, your Honor, yes. Thank you.

MR. CONNOR: There was one exhibit that was marked as 59B, and it was just marked as 59. So it should be marked as 59B instead of 59.

MR. PELLEGRINO: OK. Let's just have a look at that, please. No objection.

THE COURT: Received.

(Plaintiff's Exhibit 59B received in evidence)

MR. CONNOR: And then, your Honor, we have two one-sentence stipulations that I would like to read into the record.

THE COURT: Go ahead.

MR. CONNOR: The first stipulation is that ——

THE COURT: I would even allow you two sentences.

MR. CONNOR: Is that TFL, meaning Terraform Labs, engaged in open-market transactions involving Luna tokens on Bitfinex, Binance, KuCoin, QBoy, OKX, Bithumb, Coinone, Gate.io, MXC, and Terraswap.

THE COURT: OK.

MR. CONNOR: And the second stipulation agreed by the parties is Mr. Kwon states he had discussions with Kanav Kariya regarding efforts to restore the $1 UST peg.

Your Honor, I promise the final issue is one quick disputed matter that I would ask for permission to approach at a sidebar on one exhibit.

THE COURT: Yes.

MR. CONNOR: I apologize. I've been informed there is no objection. We would offer that into evidence.

THE COURT: What's the number?

MR. CONNOR: PX 68.

THE COURT: Received.

(Plaintiff's Exhibit 68 received in evidence)

MR. CONNOR: The final thing we'd like to do, your Honor, is read two exhibits that were admitted into evidence, including PX 68, to the jury.

THE COURT: Go ahead.

MR. CONNOR: We'll start with PX 140 which has been admitted into evidence.

MR. PELLEGRINO: I'm sorry. We're reading?

MR. CONNOR: Yes.

MR. PELLEGRINO: Could we show the whole document, please.

MR. CONNOR: Sure. PX 140, starting at 50, and I want to start on —— at 8:59. Can you highlight that. This is Do Kwon.

"I can just create fake transactions that look real, which will generate fees, and we can wind that down as Chai grows."

Daniel Shin: "Wouldn't people find out it's fake? Why not just do what others do and give out inflation of Terra, of Luna or Terra?"

This is Do Kwon: "Because for the latter, that breaks our stability mechanism and would require a hard fork to take out later, which gets harder and harder as we get more widely integrated."

Daniel Shin: "Right."

Daniel Shin: "OK."

Do Kwon: "All the power to those who can profits fake, because I will try my best to make it indiscernible. I won't tell if you won't."

Daniel Shin: "Haha."

Daniel Shin: "Well, let's test it in small scale and see what happens."

Do Kwon says: "OK."

And then we'd like to show for the jury ——

THE COURT: By the way, this is of no concern to the jury, but just for counsel, now that I hear that and see it in context, I don't think it's a 404(b). I think it comes in on the case-in-chief.

MR. CONNOR: Thank you, your Honor.

And PX 68 we'd like to show to the jury.

MR. FERRARA: Your Honor, no problem to this exhibit coming in. But on 403 grounds, there will be an opportunity to do this. Just to keep things moving, we'd object to reading the exhibit.

THE COURT: Duly noted. Go ahead.

MR. CONNOR: Yes, I'd like to —— on May 24, I'd like to focus on Bill DiSomma's statements, No. 2 on 5/23/2021.

And it's stated: "Needed to support UST directly on KuCoin, spun up bookstacker to sell KuCoin USD/UST, potentially 50 million."

And then I'd like to go to the last page.

MR. PELLEGRINO:  Your Honor, may I interject?  Under the rule of completeness, I would ask that he read the next bullet point.

THE COURT:  OK.

MR. CONNOR:  "DDOS attack on the Terra on-chain facility."

And then the final thing I'd like to read is the last bullet point, which states:  "Did we get him to vest us?"

THE COURT:  All right.

MR. CONNOR:  And just for — I've just been reminded by my counsel it wasn't clear who the "he" was, so I'd just like to read the other sentences.

It says:  "Yep, seems like the" —

MR. PELLEGRINO:  Again, excuse me, may we put that up for them to see, please, your Honor?

THE COURT:  Yes.

MR. CONNOR:  It says:  "Yep seems like the prop to Do was well timed.  Lots of wood to chop still, but still feels like a good start.  That's how you're seeing it?"

Answer:  "We're bracing for another sell storm.  It's a good start."

Answer:  "Did we get him to vest us?"

And with that, your Honor, the SEC rests its case-in-chief.

THE COURT:  OK.  Counsel come to the sidebar.

(Continued on next page)

(At sidebar)

THE COURT:  So any motions from the defense?

MR. CALIFANO:  Yes, your Honor, government — excuse me, your Honor, the defendants move under Rule 50 for, obviously, a judgment as a matter of law.  We don't believe that the SEC's established a legally sufficient evidentiary basis for a jury to find for the SEC on either claim.

We believe it has not proven that any of the alleged false statements in the pretrial order were actually false or misleading or materially false or misleading or were made with scienter.  The SEC has merely focused on general concepts, such as the UST was described as stable, the UST's stability was a sure thing, that mint-burn would always be sufficient to recover the peg, and that there were losses.

They seek to prove the falsity of the statements by what they omit, which is the alleged secret agreement.  They failed to prove the statements were false and misleading in light of the defendants' disclosures, the open discussion and general understanding of the community, especially of the death spiral risk.

The SEC has not proven any of the alleged false statements in the pretrial order regarding Chai, either that they were false or misleading or materially so or made with scienter, and a reasonable jury would not have a legally sufficient evidentiary basis to find falsity.  And while the

merchants were paid in fiat, as the defendants have said from the outset, Chai used the blockchain to process and settle transactions.  The SEC has not put forth witnesses with personal knowledge that contradicts that evidence.  So we ask that the Court rule for the defendants.

THE COURT:  I've considered the motion, and I will state for the record I anticipated what defense counsel would say.  So I'm not just ruling from the hip, so to speak, but the motion is denied.

So you have your first witness ready to go?

MR. PELLEGRINO:  We do, your Honor.

THE COURT:  Great.

MR. CONNOR:  Are we going to 3:30 today?

THE COURT:  Pardon?

MR. CONNOR:  Are we going to 3:30?

THE COURT:  3:30, yeah.

(Continued on next page)