**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TODD R. SNYDER AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST,<br><br>Plaintiff,<br><br>vs.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LIMITED, JUMP FINANCIAL, LLC, J DIGITAL 6 CAYMAN LTD., JCDP-7 DIGITAL LTD., JUMP OPERATIONS, LLC, JUMP CAPITAL, LLC, KANAV KARIYA, WILLIAM DISOMMA, AND XYZ COMPANIES 1-10,<br><br>Defendants. | Case No. 1:25-cv-15414<br><br>District Judge Joan H. Lefkow |

**JUMP DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

Gary Feinerman (ARDC No. 6206906)
Sean M. Berkowitz (ARDC No. 6209701)
Jack McNeily (ARDC No. 6332140)
LATHAM & WATKINS LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: gary.feinerman@lw.com
sean.berkowitz@lw.com
jack.mcneily@lw.com

Richard Frohlichstein (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: 202.637.2200
Email: richard.frohlichstein@lw.com

Christopher Harris (*pro hac vice*)
Elizabeth A. Morris (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Email: christopher.harris@lw.com
elizabeth.morris@lw.com

# TABLE OF CONTENTS


Page

INTRODUCTION ....................1

BACKGROUND ....................3

I. THE TERRA ECOSYSTEM AND THE UST STABLECOIN ....................3

II. TERRAFORM ESTABLISHES LFG TO HELP PROTECT UST'S PEG....................4

III. DESPITE EFFORTS TO DEFEND THE PEG, UST COLLAPSES ....................4

IV. THE SEC AND DOJ CHARGE TERRAFORM AND KWON, BUT NOT ANY DEFENDANT HERE ....................5

V. PROCEDURAL BACKGROUND....................5

LEGAL STANDARD....................6

ARGUMENT ....................6

I. ALL CLAIMS AGAINST THE JUMP DEFENDANTS SHOULD BE DISMISSED FOR IMPERMISSIBLE GROUP PLEADING (COUNTS 1–3, 5–12) ....................6

A. Plaintiff's Group Pleading Requires Dismissal of All Claims Against the Jump Defendants Under Rule 8(a), Rule 9(b), and the PSLRA ....................7

B. Plaintiff's Deficient Alter-Ego Allegations Cannot Cure His Group Pleading....................8

II. PLAINTIFF'S FEDERAL AND STATE STATUTORY CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL (COUNTS 3, 5, 7, 9–12) ....................10

A. The Exchange Act Does Not Apply to Transactions Outside the United States, and Plaintiff Does Not Allege Domestic Transactions (Counts 3, 5) ....................11

1. Section 10(b) (Count 3) ....................11

2. Section 9 (Count 5) ....................13

B. The Bankruptcy Code Fraudulent Transfer Claims Are Impermissibly Extraterritorial (Counts 9–12)....................14

C. The IUFTA and ICFA Do Not Apply to Transactions Outside of Illinois, and Plaintiff Does Not Allege Illinois Transactions (Counts 7, 9–10) ....................16

III. THE EXCHANGE ACT AND ICFA CLAIMS ARE UNTIMELY (COUNTS 3, 5, 7) ....17

IV. PLAINTIFF CANNOT SEEK CONTRIBUTION FOR TERRAFORM'S LIABILITY TO THE SEC (COUNT 2) ....19

A. There Is No Right of Action for Contribution for Liability Incurred in SEC Enforcement Actions ....19

B. Even If a Contribution Claim Were Available, Plaintiff's Claim Still Fails ....22

V. PLAINTIFF'S EXCHANGE ACT CLAIMS FAIL (COUNTS 3, 5) ....22

A. Plaintiff Cannot Bring Exchange Act Claims as Assignee ....23

B. Plaintiff Cannot Bring Exchange Act Claims Based on Post-Purchase Statements and Conduct ....23

C. The Federal Securities Laws Do Not Apply Because Plaintiff Does Not Allege an Investment Contract Involving UST or LUNA ....24

D. Plaintiff Fails To Plead Federal Securities Fraud Through Misstatements or Omissions ....28

1. Plaintiff Fails To Plead Any Actionable False or Misleading Statements ....28

2. Plaintiff Fails To Plead Scienter ....33

3. Plaintiff Fails To Plead Reliance ....35

4. Plaintiff Fails To Plead Loss Causation ....38

E. Plaintiff Fails To Plead Federal Securities Fraud Through a Deceptive or Manipulative Scheme Under Rule 10b-5 ....39

1. Plaintiff Fails To Plead Any Deceptive or Manipulative Acts ....39

2. Plaintiff Fails To Plead Scienter ....42

3. Plaintiff Fails To Plead Reliance ....45

4. Plaintiff Fails To Plead Loss Causation ....45

F. Plaintiff Fails To Plead Market Manipulation Under Section 9(a) ....46

1. Plaintiff Fails To Plead a Manipulative Act That Violates Section 9(a) ....46

2. Plaintiff Fails To Plead a Willful and Intentional Violation ....................47

3. Plaintiff Fails To Plead Reliance and Loss Causation ....................47

VI. PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FAIL (COUNTS 9–12) ....................48

A. Plaintiff Cannot Bring Fraudulent Transfer Claims on Behalf of Crypto Loss Claimants (Counts 9–12) ....................48

B. Plaintiff Fails To Adequately Allege That LFG and Terraform Were Alter Egos, and Thus That LFG's May 2022 Transfers of Its Bitcoin to the Jump Defendants Were Transfers of Terraform's Property (Counts 9–12) ....................49

1. Plaintiff Is Estopped From Arguing LFG Was Terraform's Alter Ego ....................49

2. Plaintiff Does Not Adequately Allege That LFG and Terraform Were Alter Egos Under Governing Singapore Law ....................51

3. LFG's Bitcoin Would Still Not Be Terraform's Property Even If LFG Were Terraform's Alter Ego ....................54

C. Plaintiff Fails To Plead the Elements of a Fraudulent Transfer Claim (Counts 9–12) ....................55

1. Plaintiff Fails To State an Actual Fraudulent Transfer (Counts 9, 11) ....................55

2. Plaintiff Fails To State a Constructive Fraudulent Transfer (Counts 10, 12) ....................57

a. Terraform Received Reasonably Equivalent Value ....................57

b. Plaintiff Fails To Adequately Allege Terraform's Insolvency at the Time LFG Transferred Bitcoin to the Jump Defendants ....................59

D. The Fraudulent Transfer Claims Fail Because Jump Was a Good Faith Transferee (Counts 9–12) ....................60

VII. PLAINTIFF'S STATE LAW FRAUD CLAIMS FAIL FOR THE SAME REASONS AS THE FRAUD-BASED FEDERAL SECURITIES CLAIMS (COUNTS 6, 7) ....................61

VIII. PLAINTIFF'S REMAINING COMMON LAW CLAIMS FAIL (COUNTS 1, 8) ....................62

A. Aiding and Abetting Breach of Fiduciary Duty (Count 1) ....................62

B. Unjust Enrichment (Count 8) ....................65

CONCLUSION....................................................................................................................65

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
600 U.S. 412 (2023) ........ 11, 13

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
677 F.3d 60 (2d Cir. 2012) ........ 11

*Adelphia Recovery Tr. v. Goldman, Sachs & Co.*,
748 F.3d 110 (2d Cir. 2014) ........ 51

*Anderson v. Abbott Lab'ys*,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001) ........ 32

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*,
99 F.4th 928 (7th Cir. 2024) ........ 33

*Armada (Sing.) Pte Ltd v. Amcol Int'l Corp.*,
244 F. Supp. 3d 750 (N.D. Ill. 2017) ........ 16

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) ........ 59

*Ash v. PSP Distrib., LLC*,
226 N.E.3d 748 (Ill. App. 2023) ........ 65

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6

*Atkins v. Hasan*,
2015 WL 3862724 (N.D. Ill. June 22, 2015) ........ 8

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007) ........ 42, 43, 47

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) ........ 16

*Azad v. Jenner*,
2025 WL 1718273 (C.D. Cal. May 9, 2025) ........ 12

*B.E.L.T., Inc. v. Wachovia Corp.*,
403 F.3d 474 (7th Cir. 2005) ........ 56

*Bank of Am., N.A. v. Knight*,
725 F.3d 815 (7th Cir. 2013) .......... 7

*Barber v. Golden Seed Co.*,
129 F.3d 382 (7th Cir. 1997) .......... 57

*Bastian v. Petren Res. Corp.*,
892 F.2d 680 (7th Cir. 1990) .......... 39

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) .......... 23, 27

*Borsellino v. Goldman Sachs Grp., Inc.*,
477 F.3d 502 (7th Cir. 2007) .......... 6, 7

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) .......... 30

*Bridge v. New Holland Logansport, Inc.*,
815 F.3d 356 (7th Cir. 2016) .......... 9

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .......... 36, 37

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022) .......... 28

*Chemetron Corp. v. Bus. Funds, Inc.*,
682 F.2d 1149 (5th Cir. 1982) .......... 46, 47

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) .......... 28, 33

*Chi. Tchrs. Union, Local 1 v. Educators for Excellence, Inc.*,
159 F.4th 524 (7th Cir. 2025) .......... 19

*Chiarella v. United States*,
445 U.S. 222 (1980) .......... 41

*Cincinnati Life Ins. Co. v. Beyrer*,
722 F.3d 939 (7th Cir. 2013) .......... 12, 24, 65

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) .......... 11

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) .......... 34, 35

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) .......... 65

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010).......... 45, 47

*Collins v. Vill. of Palatine*,
875 F.3d 839 (7th Cir. 2017) .......... 17

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .......... 7, 8, 28, 34

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) .......... 34, 35

*DelCostello v. Int'l Bhd. of Teamsters*,
462 U.S. 151 (1983).......... 22

*Demarco v. LaPay*,
2009 WL 3855704 (D. Utah Nov. 17, 2009) .......... 26

*DG BF, LLC v. Ray*,
2021 WL 776742 (Del. Ch. Mar. 1, 2021).......... 9, 10

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).......... 45

*EBG Holdings, LLC v. Vredezicht's Gravenhage, 109 B.V.*,
2008 WL 4057745 (Del. Ch. Sept. 2, 2008) .......... 10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).......... 36

*Fosnight v. Jones*,
41 F.4th 916 (7th Cir. 2022) .......... 10

*Friedman v. Salomon/Smith Barney, Inc.*,
313 F.3d 796 (2d Cir. 2002).......... 47

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) .......... 29

*FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*,
146 S. Ct. 1546 (2026).......... 20, 21

*Galligan v. Adtalem Glob. Educ. Inc.*,
2019 WL 423356 (N.D. Ill. Feb. 4, 2019) .......... 16

*Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*,
41 F.4th 71 (2d Cir. 2022) ........................................................................................ 46

*Geinko v. Padda*,
2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ............................................................... 42

*GFL Advantage Fund, Ltd. v. Colkitt*,
272 F.3d 189 (3d Cir. 2001)........................................................................................ 41

*Glob. Cash Network, Inc. v. Worldpay, US, Inc.*,
148 F. Supp. 3d 716 (N.D. Ill. 2015) .......................................................................... 62

*Glob. Gaming Phil., LLC v. Razon*,
2022 WL 836716 (S.D.N.Y. Mar. 21, 2022) ................................................................. 9

*Grede v. UBS Secs., LLC*,
303 F. Supp. 3d 638 (N.D. Ill. 2018) .......................................................................... 56

*Greenberg v. Boettcher & Co.*,
755 F. Supp. 776 (N.D. Ill. 1991) ........................................................................... 35, 36

*Grochocinski v. Mayer Brown Rowe & Maw, LLP*,
719 F.3d 785 (7th Cir. 2013) ...................................................................................... 50

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009)...................................................................................................... 21

*Guam v. United States*,
593 U.S. 310 (2021)...................................................................................................... 19

*Heabeart v. Coinbase Inc.*,
2026 WL 1250578 (S.D.N.Y. May 7, 2026) ............................................................... 31

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*,
2022 WL 1642221 (N.D. Ill. May 24, 2022) ......................................................... 28, 33

*Hefferman v. Bass*,
467 F.3d 596 (7th Cir. 2006) ...................................................................................... 62

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...................................................................................... 32

*Holland v. CryptoZoo Inc.*,
2025 WL 2492970 (W.D. Tex. Aug. 14, 2025), *report and recommendation adopted*, 2025 WL 3028689 (W.D. Tex. Oct. 29, 2025) ...................................................... 36

*Horan v. Ford Motor Co.*,
824 F. Supp. 3d 716 (N.D. Ill. 2026) .................................................................... 17, 18

*Hunter v. Elanco Animal Health Inc.*,
2022 WL 3445173 (S.D. Ind. Aug. 17, 2022) ............................................................ 29

*In re 4100 W. Grand LLC*,
481 B.R. 444 (Bankr. N.D. Ill. 2012) ......................................................................... 57

*In re Ampal-Am. Isr. Corp.*,
562 B.R. 601 (Bankr. S.D.N.Y. 2017)......................................................................... 14

*In re Apollo Steel Co.*,
1994 WL 713697 (Bankr. N.D. Ill. Dec. 19, 1994) .................................................... 58

*In re Carbaat*,
357 B.R. 553 (Bankr. N.D. Cal. 2006) ....................................................................... 59

*In re Career Educ. Corp. Sec. Litig.*,
2006 WL 999988 (N.D. Ill. Mar. 28, 2006)................................................................. 23

*In re Chomakos*,
69 F.3d 769 (6th Cir. 1995) ........................................................................................ 58

*In re CIL Ltd.*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other grounds*, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018)............................................. 14

*In re DuMouchelle*,
663 B.R. 349 (E.D. Mich. 2024)................................................................................... 55

*In re Edgewater Med. Ctr.*,
373 B.R. 845 (Bankr. N.D. Ill. 2007) ................................................................... 56, 57

*In re Fairfield Sentry Ltd.*,
147 F.4th 136 (2d Cir. 2025) ....................................................................................... 15

*In re Fairgrieves*,
426 B.R. 748 (Bankr. N.D. Ill. 2010) ................................................................... 57, 60

*In re Foxmeyer Corp.*,
290 B.R. 229 (Bankr. D. Del. 2003) ........................................................................... 10

*In re Gluth Bros. Constr., Inc.*,
424 B.R. 368 (Bankr. N.D. Ill. 2009) ............................................................. 55, 57, 60

*In re Hannover Corp.*,
310 F.3d 796 (5th Cir. 2002) ....................................................................................... 61

*In re Howland*,
674 F. App'x 482 (6th Cir. 2017) .......... 55

*In re Image Worldwide, Ltd.*,
139 F.3d 574 (7th Cir. 1998) .......... 57

*In re JP Morgan Chase Sec. Litig.*,
363 F. Supp. 2d 595 (S.D.N.Y. 2005) .......... 35

*In re JPMorgan Chase & Co. Sec. Litig.*,
2007 WL 4531794 (N.D. Ill. Dec. 18, 2007) .......... 34

*In re Jumer's Castle Lodge, Inc.*,
338 B.R. 344 (Bankr. C.D. Ill. 2006) .......... 57

*In re Life Fund 5.1 LLC*,
2010 WL 2650024 (Bankr. N.D. Ill. June 30, 2010) .......... 60

*In re Lyons*,
130 B.R. 272 (Bankr. N.D. Ill. 1991) .......... 49

*In re Morris Commc'ns NC, Inc.*,
914 F.2d 458 (4th Cir. 1990) .......... 58

*In re MortgageAmerica Corp.*,
714 F.2d 1266 (5th Cir. 1983) .......... 49

*In re Pawlak*,
483 B.R. 169 (Bankr. W.D. Wis. 2012) .......... 59

*In re Picard*,
917 F.3d 85 (2d Cir. 2019) .......... 15

*In re Rough Rice Commodity Litig.*,
2012 WL 473091 (N.D. Ill. Feb. 9, 2012) .......... 42

*In re Settlers' Hous. Serv., Inc.*,
514 B.R. 258 (Bankr. N.D. Ill. 2014) .......... 62, 63

*In re VitaHEAT Med., LLC*,
629 B.R. 250 (Bankr. N.D. Ill. 2021) .......... 60

*In re VMS Sec. Litig.*,
752 F. Supp. 1373 (N.D. Ill. 1990) .......... 35

*In re Walgreens Boots All. Sec. Litig.*,
2026 WL 25948 (N.D. Ill. Jan. 5, 2026) .......... 29

*In re Zetta Jet USA, Inc.*,
624 B.R. 461 (Bankr. C.D. Cal. 2020)........................................................................ 14, 15

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
2025 WL 976120 (N.D. Ill. Mar. 31, 2025)................................................................ 42

*Klein v. Walgreens Boots All., Inc.*,
2026 WL 1296126 (N.D. Ill. May 12, 2026) .............................................................. 18

*Lachmund v. ADM Inv. Servs.*,
191 F.3d 777 (7th Cir. 1999) ...................................................................................... 40

*Landsberger v. Martek Biosciences Corp.*,
2010 WL 3038947 (D. Md. July 30, 2010)................................................................. 18

*Levy v. Markal Sales Corp.*,
643 N.E.2d 1206 (Ill. App. 1994) ............................................................................... 62

*LJM Partners, Ltd. v. Barclays Cap. Inc.*,
2023 WL 6311471 (N.D. Ill. Sept. 28, 2023), *aff'd*, 165 F.4th 552 (7th Cir.
2026) ............................................................................................................................ 18

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
601 U.S. 257 (2024)...................................................................................................... 29

*Mathews v. Serafin*,
744 N.E.2d 934 (Ill. App. 2001) ................................................................................. 57

*McCarthy v. PaineWebber, Inc.*,
618 F. Supp. 933 (N.D. Ill. 1985) ............................................................................... 18

*Mellon Bank, N.A. v. Metro Comm'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)......................................................................................... 60

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)...................................................................................................... 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
547 U.S. 71 (2006)........................................................................................................ 23

*MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*,
232 F. Supp. 3d 558 (S.D.N.Y. 2017).......................................................................... 51

*Mitsubishi Elec. Sales Am., Inc. v. Higgins*,
1988 WL 151580 (N.D. Ill. Nov. 10, 1988) ................................................................ 49

*Morrison v. Nat'l Austl. Bank Ltd.*,
561 U.S. 247 (2010)........................................................................................... 11, 12, 13

*Muir v. Playtex Prods., LLC*,
983 F. Supp. 2d 980 (N.D. Ill. 2013) ........ 33

*Musick, Peeler & Garrett v. Emp. Ins. of Wausau*,
508 U.S. 286 (1993) ........ 19, 20, 21, 22

*Nat'l Tax Credit Partners, L.P. v. Havlik*,
20 F.3d 705 (7th Cir. 1994) ........ 49

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........ 50

*Newtyn Partners, LP v. Alliance Data Sys. Corp.*,
165 F.4th 947 (6th Cir. 2026) ........ 29, 32

*Nw. Airlines, Inc. v. Transp. Workers Union of Am.*,
451 U.S. 77 (1981) ........ 20

*O'Gorman v. City of Chicago*,
777 F.3d 885 (7th Cir. 2015) ........ 6

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........ 29

*Pall v. KPMG, LLP*,
2006 WL 2800064 (D. Conn. Sept. 29, 2006) ........ 19

*Patterson v. Jump Trading LLC*,
710 F. Supp. 3d 692 (N.D. Cal. 2024) ........ passim

*Perry v. Eastman Kodak Co.*,
1991 WL 629728 (S.D. Ind. Apr. 22, 1991), *aff'd*, 1992 WL 103695 (7th Cir. 1992) ........ 47

*Peterson v. Colony Am. Fin. Lender, LLC*,
634 B.R. 1010 (Bankr. N.D. Ill. 2021) ........ 9

*Peterson v. McGladrey & Pullen, LLP*,
676 F.3d 594 (7th Cir. 2012) ........ 64

*Peterson v. TTS Granite Inc. (In re Mack Indus., Ltd.)*,
622 B.R. 887 (Bankr. N.D. Ill. 2020) ........ 58

*Peterson v. Winston & Strawn, LLP*,
2012 WL 4892758 (N.D. Ill. Oct. 10, 2012), *aff'd*, 729 F.3d 750 (7th Cir. 2013) ........ 64

*Pierrelouis v. Gogo, Inc.*,
414 F. Supp. 3d 1164 (N.D. Ill. 2019) .......... 31

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) .......... 36

*Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
679 F.3d 952 (7th Cir. 2012) .......... 43

*Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*,
2021 WL 1439680 (E.D. Va. Mar. 24, 2021) .......... 31

*Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*,
648 F.3d 533 (7th Cir. 2011) .......... 17

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) .......... 13

*Pugh v. Trib. Co.*,
521 F.3d 686 (7th Cir. 2008) .......... 34

*Roadzen, Inc. v. Meteora Cap. Partners, L.P.*,
2026 WL 1983435 (S.D.N.Y. July 9, 2026) .......... 40

*Robinson v. DeVry Educ. Grp., Inc.*,
2018 WL 828050 (N.D. Ill. Feb. 12, 2018) .......... 16, 17

*Rockies Fund, Inc. v. SEC*,
428 F.3d 1088 (D.C. Cir. 2005) .......... 47

*Roots P'ship v. Lands' End, Inc.*,
965 F.2d 1411 (7th Cir. 1992) .......... 23, 38

*Rubinstein v. Gonzalez*,
2016 WL 1213931 (N.D. Ill. Mar. 29, 2016) .......... 29

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) .......... 39

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015) .......... 36, 37, 38

*Searls v. Glasser*,
64 F.3d 1061 (7th Cir. 1995) .......... 28

*Sears v. Likens*,
912 F.2d 889 (7th Cir. 1990) .......... 8

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) .................................................................. 30, 32

*SEC v. Binance Holdings Ltd.*,
738 F. Supp. 3d 20 (D.D.C. 2024) ............................................................ 24, 25, 26, 27

*SEC v. Coinbase, Inc.*,
726 F. Supp. 3d 260 (S.D.N.Y. 2024)........................................................................ 24

*SEC v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ........................................................................................ 42

*SEC v. Ripple Labs, Inc.*,
682 F. Supp. 3d 308 (S.D.N.Y. 2023).................................................... 24, 25, 26, 27

*SEC v. Terraform Labs Pte. Ltd.*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023)........................................................................ 27

*SEC v. Terraform Labs Pte. Ltd.*,
708 F. Supp. 3d 450 (S.D.N.Y. 2023)........................................................................ 24

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946).................................................................................................... 25

*Semande v. Estes*,
871 N.E.2d 268 (Ill. App. 2007) ................................................................................ 51

*Simgood Pte Ltd v MLC Shipbuilding Sdn Bhd and others*
[2016] 1 SLR 1129...................................................................................................... 53

*Smith v. Ayres*,
977 F.2d 946 (5th Cir. 1992) ..................................................................................... 23

*Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.*,
2008 WL 153542 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir.
2009) ............................................................................................................ 34, 43, 46

*Stenger v. R.H. Love Galleries, Inc.*,
741 F.2d 144 (7th Cir. 1984) ..................................................................................... 25

*Stoneridge Inv. Partners v. Scientific-Atlanta*,
552 U.S. 148 (2008).................................................................................................... 39

*Stoyas v. Toshiba Corp.*,
896 F.3d 933 (9th Cir. 2018) ..................................................................................... 10

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ..................................................................................... 32

*Sullivan & Long, Inc. v. Scattered Corp.*,
47 F.3d 857 (7th Cir. 1995) ........................................................................................ 39, 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)......................................................................................................... 33

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)................................................................................................... 20, 21

*Timoria LLC v. Anis*,
346 A.3d 1166 (Del. Ch. 2025)........................................................................................ 15

*Tricontinental Indus., Ltd. v. PwC, LLP*,
475 F.3d 824 (7th Cir. 2007) ........................................................................................... 38

*United States ex rel. John v. Hastert*,
82 F. Supp. 3d 750 (N.D. Ill. 2015) ................................................................................. 18

*United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
836 F.3d 770 (7th Cir. 2016) ............................................................................................. 6

*United States v. Am. Nat'l Bank & Tr. Co. of Chi.*,
443 F. Supp. 167 (N.D. Ill. 1977) .................................................................................... 49

*Value Recapture Partners LLC v. Boeing Co.*,
2026 WL 445504 (N.D. Ill. Feb. 17, 2026) ..................................................................... 23

*Van Noppen v. InnerWorkings, Inc.*,
136 F. Supp. 3d 922 (N.D. Ill. 2015) ............................................................................... 31

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
20 F.3d 771 (7th Cir. 1994) ............................................................................................... 7

*Wang v. Yin*,
2016 WL 9503739 (S.D. Cal. Nov. 7, 2016) ................................................................... 20

*Wenske v. Blue Bell Creameries, Inc.*,
2018 WL 5994971 (Del. Ch. Nov. 13, 2018) ............................................................... 9, 10

*WesternGeco LLC v. ION Geophysical Corp.*,
585 U.S. 407 (2018)......................................................................................................... 13

*Wyse v. Metro. Com. Bank*,
2025 WL 2208161 (S.D.N.Y. Aug. 4, 2025)............................................................ 12, 24, 35

*Yeftich v. Navistar, Inc.*,
722 F.3d 911 (7th Cir. 2013) ........................................................................................... 18

*Zapata Gulf Marine Corp. v. P.R. Mar. Shipping Auth.*,
731 F. Supp. 747 (E.D. La. 1990) ........ 51

*Zerger v. Midway Games, Inc.*,
2009 WL 3380653 (N.D. Ill. Oct. 19, 2009) ........ 23

**STATUTES**

11 U.S.C. § 103(a) ........ 49

11 U.S.C. § 1122 ........ 51

11 U.S.C. § 1123(a)(1) ........ 51

11 U.S.C. § 1123(a)(3) ........ 51

11 U.S.C. § 1123(a)(4) ........ 51

11 U.S.C. § 1126 ........ 51

11 U.S.C. § 1129(a)(1) ........ 51

11 U.S.C. § 1129(a)(2) ........ 51

11 U.S.C. § 544(b)(1) ........ 54

11 U.S.C. § 548(a)(1) ........ 54

11 U.S.C. § 548(a)(1)(A) ........ 55

11 U.S.C. § 548(a)(1)(B) ........ 57

11 U.S.C. § 548(c) ........ 60

15 U.S.C. § 77b(a)(1) ........ 24

15 U.S.C. § 78aa(b) ........ 13

15 U.S.C. § 78i(a) ........ 47

15 U.S.C. § 78i(a)(1) ........ 13, 14

15 U.S.C. § 78i(a)(2) ........ 13, 14

15 U.S.C. § 78i(a)(6) ........ 13, 14

15 U.S.C. § 78i(f) ........ 13, 23, 47

15 U.S.C. § 78r ........ 21

15 U.S.C. § 78u(d)(3) .......... 20

15 U.S.C. § 78u(d)(3)(A) .......... 21

15 U.S.C. § 78u(d)(3)(A)(ii) .......... 21

15 U.S.C. § 78u-4(b)(2) .......... 34

15 U.S.C. § 78u-4(b)(2)(A) .......... 33

15 U.S.C. § 78u-4(e) .......... 21

15 U.S.C. § 78u-4(f)(7) .......... 22

15 U.S.C. § 78u-4(f)(8) .......... 21, 22

15 U.S.C. § 78u-4(f)(9) .......... 22

28 U.S.C. § 1658(b)(1) .......... 17

740 ILCS 160/5(a) .......... 54

740 ILCS 160/5(a)(1) .......... 55

740 ILCS 160/5(a)(2) .......... 57

740 ILCS 160/9(a) .......... 60

740 ILCS 160/9(d) .......... 60

815 ILCS 505/10a(e) .......... 17

**RULES**

Fed. R. Bankr. P. 3017 .......... 51

Fed. R. Civ. P. 12(b)(6) .......... 1, 6, 17

Fed. R. Civ. P. 44.1 .......... 52

**OTHER AUTHORITIES**

Jump Trading, LLC Filings, SEC,
https://www.sec.gov/edgar/browse/?CIK=0001127998 .......... 10

Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Jump Defendants move to dismiss the Amended Complaint ("AC") (Dkt. 56) with prejudice.[1]

## INTRODUCTION

In the AC, Plaintiff Todd Snyder, administrator for the bankruptcy estates of Terraform Labs Pte. Ltd. and Terraform Labs Limited (together, "Terraform"), renews his effort to shift the cost and blame for a multi-billion-dollar fraud committed by Terraform and its founder, Do Kwon. In June 2024, Terraform was assessed a $4.5 billion judgment in a Securities and Exchange Commission ("SEC") enforcement action arising from the collapse of its cryptocurrency ecosystem (the "Terra Ecosystem"). Kwon later was sentenced to fifteen years in federal prison.

Plaintiff's latest effort to pass the buck for Terraform's liability to the SEC and its creditors suffers from the same fundamental problems as his first attempt. Plaintiff brings thirteen claims on behalf of the fraudster (Terraform) and certain Terraform victims who are its purported creditors ("Crypto Loss Claimants"). All claims against the Jump Defendants fail on multiple grounds. They rely on impermissible group pleading; Plaintiff cannot sue eight distinct entities but seek to hold them collectively responsible by referring to them as "Jump" throughout the AC without pleading what any Defendant did, let alone with the required particularity. *See* § I. The federal and Illinois statutory claims fail because the AC does not allege, respectively, domestic or Illinois-centered transactions within those statutes' territorial reach. *See* § II. Plaintiff's contribution, Securities Exchange Act ("Exchange Act"), and Illinois Consumer Fraud Act ("ICFA") claims are untimely by months or even years. *See* § III. And beyond these cross-cutting flaws, Plaintiff's

---

[1] "Jump Defendants" are Jump Trading, LLC ("JTLLC"); Jump Crypto Holdings LLC ("Jump Crypto Holdings"); Tai Mo Shan Limited ("TMSL"); Jump Financial, LLC ("Jump Financial"); J Digital 6 Cayman Ltd. ("JD6"); JCDP-7 Digital Ltd. ("JCDP-7"); Jump Operations, LLC ("Jump Operations"); and Jump Capital LLC ("Jump Capital"). AC at 2. The two other defendants are Kanav Kariya (former President of Jump Crypto) and William DiSomma (co-founder of Jump Trading Group). AC ¶¶ 31–32.

claims fail because he does not adequately plead their requisite elements.

*First*, his contribution claim on behalf of Terraform to offset the $4.5 billion judgment it owes the SEC (Count 2) has never been recognized by any court presented with the issue. That is because the statutory text, along with controlling precedent, foreclose the claim. *See* § IV.

*Second*, the Exchange Act claims (Counts 3, 5) fail several times over. To start, Plaintiff cannot bring claims purportedly assigned by Crypto Loss Claimants, and he fails to plead a securities transaction to purchase TerraUSD ("UST") or LUNA. Even if he had, Plaintiff still does not allege the dates and prices of Crypto Loss Claimants' purchases as required to plead the elements, including reliance and loss causation, of those claims. And although Plaintiff newly alleges a fraudulent scheme theory alongside his recycled misstatements theory, both fail for lack of any deceptive act or false or misleading statement. They also fail because Plaintiff does not plead that any Jump Defendant acted with the requisite scienter. *See* § V.

*Third*, Plaintiff unveils a brand-new basis for his fraudulent transfer claims under the Bankruptcy Code and the Illinois Uniform Fraudulent Transfer Act ("IUFTA") (Counts 9–12): Luna Foundation Guard ("LFG") was Terraform's alter ego and its Bitcoin transfers to the Jump Defendants are thus void. This theory is estopped, inadequately pleaded, and fails under Singapore law, which governs any attempt to pierce LFG's corporate veil. And on the merits, Plaintiff fails to plead several elements of his actual and constructive fraudulent transfer claims. *See* § VI.

*Fourth*, Plaintiff's aiding and abetting breach of fiduciary duty, ICFA, and common law claims (Counts 1, 6–8) are deficient for many of the same reasons as the federal claims, and further because the AC does not adequately plead facts showing additional elements specific to each of those claims. The aiding and abetting claim further fails under the *in pari delicto* defense, which bars Terraform from recovering for an alleged fraud in which it took part. *See* § VIII.

# BACKGROUND[2]

## I. THE TERRA ECOSYSTEM AND THE UST STABLECOIN

Terraform and Do Kwon, Terraform's co-founder and 92% owner, developed the Terra Ecosystem—a decentralized cryptocurrency network that included the Terra blockchain and various digital assets. AC ¶¶ 5, 57–58, 60–63. Two such digital assets were LUNA, the Terra blockchain's native token, and UST, a "stablecoin" designed to maintain a value equal to (or "pegged" to) another asset. AC ¶¶ 60, 63.

UST was an "algorithmic" stablecoin, relying on market participants to trade in ways that maintained its $1 peg. AC ¶¶ 54–56, 63. Terraform intended for the peg to be sustained by a "mint-burn" arbitrage mechanism—the "Terra Protocol"—designed to control UST's supply. AC ¶¶ 59, 63–65. If UST traded above $1, participants were incentivized to swap $1 of LUNA to "mint" one UST, sell it above $1, and profit from the difference, increasing UST supply and putting downward pressure on its price. AC ¶ 65. Conversely, if UST traded below $1, participants could buy and "burn" one UST in exchange for $1 of LUNA, sell that LUNA for $1, and profit from the difference, decreasing UST supply and putting upward pressure on its price. AC ¶ 65. This design contemplated—as a feature, not a bug—that UST would deviate from its peg and that the Terra Protocol would incentivize market participants to drive UST back to $1. AC ¶¶ 64–65.

To bolster its ecosystem, Terraform sought to increase LUNA's liquidity and UST's adoption by engaging with trading firms, including the Jump Defendants. AC ¶¶ 66–69, 71.[3] Between 2019 and 2021, the Jump Defendants entered into loan agreements with Terraform under

---

[2]The Jump Defendants accept the AC's well-pleaded factual allegations only for purposes of this motion.

[3]Throughout this motion, the Jump Defendants recount Plaintiff's generalized and impermissibly group pleaded allegations, *infra* Argument § I, that *all* of the Jump Defendants engaged in the alleged conduct. But the Jump Defendants dispute the AC's characterizations that each entity was involved in the conduct alleged and note the AC offers no well-pleaded facts to establish the truth of those characterizations.

which they received LUNA subject to delivery and performance conditions. AC ¶¶ 70, 72.

In May 2021, UST "depeg[ged]" when its value materially deviated below its $1 peg. AC ¶ 105. During the depeg, the Jump Defendants purchased UST at prices below $1. AC ¶ 119. Within ten days, UST returned to its peg. AC ¶ 135. In July 2021, following discussions that occurred during the depeg, Terraform and the Jump Defendants amended their loan agreement to allow the Jump Defendants to borrow LUNA free from the performance conditions but on an extended schedule with monthly deliveries through August 2025. AC ¶¶ 148, 150.

## II. TERRAFORM ESTABLISHES LFG TO HELP PROTECT UST'S PEG

After the May 2021 depeg, Terraform sought to establish a reserve of assets to be deployed in the event of future depegs. AC ¶¶ 169–170. The result was the creation of LFG, a non-profit Singaporean entity under Kwon's *de facto* control. AC ¶¶ 170–172. LFG would help defend UST's peg in times of stress by deploying reserve assets to facilitate UST trading. AC ¶ 170. Defendant Kariya, then-President of Jump Crypto, supported this effort, including by sitting on LFG's "Governing Council" along with Kwon and others. AC ¶¶ 43, 170.

From January to April 2022, Terraform funded LFG with LUNA and UST transfers. AC ¶ 173. LFG converted those holdings into other crypto assets, principally Bitcoin, to create its reserve. AC ¶ 175. As part of that funding, certain Jump Defendants sold Bitcoin to LFG for $350 million of locked LUNA. AC ¶¶ 36–37; *infra* § V.D.2. And the Jump Defendants and Kariya publicly supported LFG's reserve as a backstop to defend UST's peg in the event market participants' use of the mint-burn mechanism alone was not maintaining it. AC ¶¶ 176, 256–257.

## III. DESPITE EFFORTS TO DEFEND THE PEG, UST COLLAPSES

The price of UST again began to deviate materially below $1 on May 7, 2022. AC ¶ 183. As UST's value declined, LFG transferred 52,189 Bitcoin, with a market value of approximately $1.5 billion, to the Jump Defendants, which they used to buy UST. AC ¶¶ 19, 189, 191, 193, 195.

Then, between May 11 and 16, 2022, the Jump Defendants returned 1,515,689,462 UST and 5,313 Bitcoin. AC ¶¶ 19, 211, 213–214. Despite these efforts, the Terra Ecosystem collapsed. AC ¶¶ 204, 207.

## IV. THE SEC AND DOJ CHARGE TERRAFORM AND KWON, BUT NOT ANY DEFENDANT HERE

Following the collapse, the SEC sued Terraform and Kwon, and a jury found both liable for intentionally and recklessly defrauding UST and LUNA purchasers. AC ¶¶ 217, 221; Ex. 1, Verdict, *SEC v. Terraform Labs Pte. Ltd.*, 1:23-cv-01346 (S.D.N.Y. Apr. 5, 2024), Dkt. 229. Terraform and Kwon then settled the damages phase of that proceeding with the SEC, with Terraform required to pay about $4.5 billion. AC ¶¶ 2, 223. Separately, DOJ charged Kwon with criminal fraud, conspiracy, market manipulation, and money laundering, to which he pleaded guilty and was sentenced to fifteen years imprisonment. AC ¶¶ 2, 218.

The SEC investigated TMSL but did not include it (or any other Defendant here) in its action against Terraform and Kwon. AC ¶ 224. TMSL later settled with the SEC for $123 million in December 2024, resolving allegations (without admission) that it offered and sold an unregistered security—LUNA—and acted negligently during the 2021 depeg. AC ¶¶ 224, 228; Ex. 2, TMSL, Release No. 11349, SEC Admin. Proceeding File No. 3-22382 (Dec. 20, 2024) ("TMSL Order"). The SEC did not charge TMSL with any violation that Plaintiff alleges here; all charges sounded in strict liability and negligence under Securities Act Sections 5 and 17(a)(3). AC ¶¶ 224–225; Ex. 2.

Facing escalating liabilities, Terraform filed for bankruptcy on January 21, 2024, and Plaintiff was appointed Plan Administrator of Terraform's reorganization plan. AC ¶¶ 25–26, 230.

## V. PROCEDURAL BACKGROUND

Seven days after Kwon's sentencing, Plaintiff filed this suit on behalf of not only

Terraform, but also Crypto Loss Claimants, who allegedly bought and sold LUNA and UST, AC ¶ 294, and purportedly assigned their claims to the Wind Down Trust, AC ¶ 27. The Jump Defendants and DiSomma moved to dismiss the original complaint. Dkts. 45, 46. Instead of opposing the motion, Plaintiff filed the AC. Dkt. 56. Some portions of the AC change little or nothing from the original complaint, while others represent substantial, yet futile, departures.

## LEGAL STANDARD

On a motion to dismiss, the Court accepts all well-pleaded factual allegations as true but is not bound by legal characterizations assigned thereto. *See O'Gorman v. City of Chicago*, 777 F.3d 885, 888–91 (7th Cir. 2015). Under Rule 12(b)(6), "a complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face,'" such that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Claims "premised upon a course of fraudulent conduct" must satisfy Rule 9(b) regardless of whether fraud is a formal element of the claim, *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007), and must "state with particularity the circumstances constituting fraud," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016).

## ARGUMENT

### I. ALL CLAIMS AGAINST THE JUMP DEFENDANTS SHOULD BE DISMISSED FOR IMPERMISSIBLE GROUP PLEADING (COUNTS 1–3, 5–12)[4]

The AC's reliance on group pleading requires dismissal of all claims against the Jump Defendants. *First*, the AC fails to allege the specific conduct giving rise to each Jump Defendant's liability, as Rule 8(a), Rule 9(b), and the PSLRA require. *Second*, Plaintiff's alter-ego theory

[4] For quoted material, all emphasis is added and all internal citations and quotation marks are omitted, unless otherwise noted.

provides no basis to lump all eight Jump Defendants into a single entity, is inadequately pleaded, and cannot salvage the AC's group-pleading defects.

### A. Plaintiff's Group Pleading Requires Dismissal of All Claims Against the Jump Defendants Under Rule 8(a), Rule 9(b), and the PSLRA

The claims against each Jump Defendant[5] rely on group pleading that fails to allege specific conduct giving rise to liability against any specific entity. Even under Rule 8(a)'s notice-pleading standard, a "complaint based on a theory of collective responsibility must be dismissed." *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). The standard is higher where, as with all claims against the Jump Defendants, a claim is "premised upon a course of fraudulent conduct" and thus subject to Rule 9(b). *Borsellino*, 477 F.3d at 507. To satisfy Rule 9(b), a plaintiff must specifically allege the "who, what, when, where, and how" of *each* defendant's "alleged participation in the fraud." *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994). "[L]ump[ing] together multiple defendants" without "specify[ing] who was involved in what activity" does not suffice. *Id.* at 778. Plaintiff's Exchange Act claims (Counts 2, 3, and 5) are further subject to the even more stringent PSLRA standard, requiring a plaintiff to "state with particularity" the facts establishing scienter "with respect to *each individual defendant*" and forbidding group pleading in "multiple defendant cases." *Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 600–02 (7th Cir. 2019) (emphasis in original).

The AC fails each standard. Across 467 paragraphs, it overwhelmingly attributes conduct to the Jump Defendants as an undifferentiated group.[6] Where individual entities are specified, the

---

[5]The AC collectively defines the Jump Defendants as "Jump" and "Jump Entity Defendants." AC at 2. The AC refers to "Jump Trading," "Jump Trading Group," "Jump Crypto," and "Jump Entity Defendants" without defining those terms or otherwise indicating the entity(ies) to which they refer. *E.g.*, AC ¶¶ 1, 3–4, 13–21, 29–33, 41–42, 66–70, 76–79, 81–82, 108, 114, 132, 157, 210–214, 257, 298, 303–306.

[6]*E.g.*, AC ¶¶ 73 ("Jump's agreements with Terraform incentivized Jump to support the Terra Ecosystem and to pump the value of LUNA"), 76–79 (referring to "Jump's" agreements with Terraform), 108 ("Kwon

allegations remain generic and conclusory. Three entities (Jump Financial, Jump Crypto Holdings, and Jump Operations) appear only in the "Parties to the Action" section, with no substantive conduct alleged. *E.g.*, AC ¶¶ 32–35, 38, 40, 42. The five others (JTLLC, JD6, JCDP-7, Jump Capital, and TMSL) surface in only a handful of paragraphs, none alleging actionable conduct. *E.g.*, AC ¶¶ 32–37, 39–40, 145, 161, 224–229, 254, 301, 307–308, 458.[7] Rule 8(a), Rule 9(b), and the PSLRA forbid such group pleading. *See Atkins v. Hasan*, 2015 WL 3862724, at *2–3 (N.D. Ill. June 22, 2015); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *Cornielsen*, 916 F.3d at 600. That defect warrants dismissal of all claims against the Jump Defendants.

### B. Plaintiff's Deficient Alter-Ego Allegations Cannot Cure His Group Pleading

Plaintiff adds a new section in his AC ("Jump's Convoluted Corporate Structure") in an effort to excuse group pleading by alleging that the Jump Defendants are alter egos of each other. AC ¶¶ 301–308. This attempted workaround fails.

As an initial matter, Plaintiff's own allegations belie his assertion that the Jump

called on Jump to step in … by deploying Jump's capital"), 151–152 ("Jump received" certain deliveries of LUNA), 179–182 ("Jump profited" from LUNA trades), 211–214 ("Jump transferred … UST to Terraform wallets" on multiple occasions), 309–345, 355–453 (counts against "All Defendants").

[7] These passing references to particular entities are no substitute for defendant-specific allegations that bear on the alleged unlawful conduct. As to JTLLC, the only allegation beyond "Parties to the Action" is a useless observation that JTLLC "evolved into what Jump itself refers to as the 'Jump Trading Group.' … '[a] collection of affiliated entities.'" AC ¶ 301. As to JD6 and JCDP-7, Plaintiff alleges only that a "Jump Trading" director signed token sale agreements on their behalf, that "[e]mployees associated with Jump Capital" referred to those entities' investments as "our investments," that "[e]mployees associated with Jump Trading signed off" on a transaction benefitting JD6, and that JD6 used a "Jump Trading" email address. AC ¶¶ 307–308. These allegations concern only Plaintiff's deficient alter-ego theory, addressed *infra* § I.B—not any substantive misconduct. As to Jump Capital, Plaintiff alleges only that its employees published an article on stablecoins, AC ¶¶ 161, 254, and referred to investments by JCDP-7 and JD6 as "our investments," AC ¶ 307. Publishing a market commentary article and referring to affiliated entities' investments do not constitute actionable misconduct. *See infra* § V.D.1 (Plaintiff fails to adequately allege that this article was a false or misleading statement). As to TMSL, Plaintiff largely recites information about the SEC's investigation, which resulted in a consent order. AC ¶¶ 145, 224–229, 329, 458; *see supra* p. 5. Plaintiff's reliance on the SEC investigation and settlement does not plead any claim against TMSL with particularity. *See infra* § V.E.1. Plaintiff's remaining allegations against TMSL go only to his alter-ego theory. *See* AC ¶¶ 307 (alleging a "Jump Trading" lawyer signed a loan agreement for TMSL), 308 (alleging TMSL used a "Jump Trading" email address).

Defendants' corporate structure "mak[es] it impossible for an external observer" to sort out the separate entities. AC ¶ 306. To the contrary, Plaintiff identifies particular Jump Defendant entities that entered into specific agreements, transactions, and transfers. *E.g.*, AC ¶ 307 (describing token purchase agreement and transfer by JCDP-7 and loan agreement executed by TMSL). This occasional specificity underscores the insufficiency of the AC's generic allegations elsewhere and fatally undermines the notion that Plaintiff cannot distinguish among defendant entities.

In any event, Plaintiff's proffered "external observer" standard is not the law. Under Delaware law,[8] "courts will disregard the corporate form only in the exceptional case." *Peterson v. Colony Am. Fin. Lender, LLC*, 634 B.R. 1010, 1025 (Bankr. N.D. Ill. 2021). To satisfy this high bar, a plaintiff must plead that the "corporate structure" itself "cause[d] fraud or similar injustice" and "exist[ed] for no other purpose than as a vehicle for fraud." *DG BF, LLC v. Ray*, 2021 WL 776742, at *26 (Del. Ch. Mar. 1, 2021). Plaintiff's allegations do not meet this standard.

Plaintiff's "information and belief" allegations of "unity of interest and ownership," common "facilities and management," and "commingled" funds, AC ¶¶ 40–42, 306, fall short for two reasons. *First*, unity of interest and ownership and common facilities and management are commonplace corporate features that do not on their own support "disregard[ing] the separateness" of entities. *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5–7 (Del. Ch. Nov. 13, 2018) (100% ownership and shared officers and directors insufficient); *see also Peterson*, 634 B.R. at 1026–27 (same). *Second*, Plaintiff's "conclusory" statements "on information and belief" do

[8]The law of the state where an entity is organized controls the corporate veil-piercing analysis. *See Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 364 (7th Cir. 2016). Five Jump Defendants are Delaware companies and three are Cayman Islands companies. AC ¶¶ 29, 32–39. Cayman veil-piercing law is "equally—if not more—stringent than … Delaware." *Glob. Gaming Phil., LLC v. Razon*, 2022 WL 836716, at *7 (S.D.N.Y. Mar. 21, 2022). For this motion, the Jump Defendants apply Delaware law, as Plaintiff's conclusory allegations fail under either standard.

not justify "disregard[ing] separate legal existence." *DG BF, LLC*, 2021 WL 776742, at *27.[9]

Compounding the shortcomings of Plaintiff's theory, the AC lacks well-pled allegations of fraud that resulted from "inequitable use of the corporate form itself as a sham, and not from the underlying claim." *EBG Holdings, LLC v. Vredezicht's Gravenhage, 109 B.V.*, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008). Plaintiff's assertions that the Jump Defendants are liable for fraud "do[] not supply the necessary fraud or injustice" to pierce the corporate veil; he must have suffered harm from the alleged abuse of the corporate form. *In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003).[10]

All claims against the Jump Defendants should be dismissed for improper group pleading.

## II. PLAINTIFF'S FEDERAL AND STATE STATUTORY CLAIMS ARE IMPERMISSIBLY EXTRATERRITORIAL (COUNTS 3, 5, 7, 9–12)

Plaintiff's statutory claims are impermissibly extraterritorial. The Exchange Act and Bankruptcy Code provisions underlying Plaintiff's claims do not apply outside the United States, and the IUFTA and ICFA provisions do not reach transactions that occur outside of Illinois. Because Plaintiff fails to "sufficiently allege" transactions within these statutes' territorial reach, those claims should be dismissed. *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 952 (9th Cir. 2018).

---

[9]This is particularly so given there are public facts about certain Jump Defendants' ownership and operations available that Plaintiff could have investigated but apparently did not. For example, as an SEC-regulated broker-dealer, JTLLC publicly files annual reports, which reflect its adequate capital and observation of corporate formalities. *See* Jump Trading, LLC Filings, SEC, https://www.sec.gov/edgar/browse/?CIK=0001127998; *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) (SEC filings judicially noticeable as a "matter[] of public record" from "sources whose accuracy cannot reasonably be questioned").

[10]To the extent Plaintiff also asserts an agency theory, AC ¶¶ 306–307 (alleging individuals "holding themselves out as agents of 'Jump Trading' and 'Jump Crypto'" negotiated agreements and authorized transactions), that effort fails for the same reasons. "Agency in the sense of complete domination and control is synonymous with 'alter ego,' 'instrumentality,' 'piercing the corporate veil,' and 'disregarding the corporate entity.' Litigants cannot, simply by substituting the label 'agency' in place of 'alter ego,' also change the substantive law." *Wenske*, 2018 WL 5994971, at *5 n.36.

### A. The Exchange Act Does Not Apply to Transactions Outside the United States, and Plaintiff Does Not Allege Domestic Transactions (Counts 3, 5)

Plaintiff's claims under Sections 10(b) and 9 of the Exchange Act concern UST and LUNA transactions by Crypto Loss Claimants. AC ¶¶ 331–345, 355–373. Federal statutes apply only domestically unless Congress clearly expresses a contrary intent. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010). A two-step analysis determines whether a claim is impermissibly extraterritorial. The first step asks whether the statute "affirmatively and unmistakably" applies "to foreign conduct." *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 417–18 (2023). If the answer is no, the second step asks "whether the suit seeks a (permissible) domestic or (impermissible) foreign application of the provision." *Id.* at 418. The answer to that question turns on whether the "activity that matters" under the statute's "focus" occurred in the United States. *Id.* at 419.

#### 1. Section 10(b) (Count 3)

Section 10(b) does not apply extraterritorially, and Plaintiff does not plead a domestic violation of its prohibitions. *Morrison*, 561 U.S. at 265. Section 10(b) "focus[es]" on "purchases and sales of securities in the United States." *Id.* at 266. A purchase or sale of a security "occurs" at the place where a "purchaser incurred irrevocable liability … to take and pay for a security," a "seller incurred irrevocable liability … to deliver a security," or title passed between the transacting parties. *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012). Facts about "the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money" occurring within the United States support an inference of a domestic purchase. *Id.* at 70. But simply pleading "a purchaser's" United States "citizenship or residency" or "place[ment of] a buy order in the United States" does not suffice. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 181 (2d Cir. 2014).

Here, Plaintiff fails to plead that irrevocable liability was incurred in the United States for any relevant transaction. The AC does not allege any of the requisite details for any Crypto Loss Claimant's transactions. Plaintiff does not identify any counterparty to any Claimant's contract to purchase UST or LUNA, the exchange on which any Claimant transacted, where that exchange was located, or how title was passed to any Claimant. Plaintiff thus "fails to allege facts establishing how the transactions" by any Crypto Loss Claimant "in this case" were domestic. *Azad v. Jenner*, 2025 WL 1718273, at *4 (C.D. Cal. May 9, 2025).

In an effort to cure these flaws, Plaintiff alleges, "on information and belief," that "some" unidentified Crypto Loss Claimants entered terms of service for centralized exchanges and transacted in UST and LUNA while physically located in the United States. AC ¶ 296. These allegations are deficient: they do not establish where any Claimant incurred irrevocable liability for or passed title to UST or LUNA. Even if these allegations were relevant, "information and belief" allegations are impermissible unless facts cannot reasonably be learned through pre-filing investigation. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948–49 (7th Cir. 2013). The relevant transactional information here "should have been available" to Plaintiff as the Crypto Loss Claimants' purported assignee. *Id.*[11] A "Plan Administrator cannot assert factual ignorance," as assignors are "effectively his clients" and he had "access to the claimants who assigned him their claims." *Wyse v. Metro. Com. Bank*, 2025 WL 2208161, at *9 (S.D.N.Y. Aug. 4, 2025).

Plaintiff's allegations about the Jump Defendants' activities in Chicago, *see* AC ¶¶ 278–279, 281, 299, are irrelevant. The Exchange Act focuses on "purchases and sales of securities in the United States," not "the place where the deception originated." *Morrison*, 561 U.S. at 266.

---

[11] The Jump Defendants demonstrate *infra* §§ V.A, VI.A that Crypto Loss Claimants' purported assignment of their Exchange Act and fraudulent transfer claims to Plaintiff is invalid.

### 2. Section 9 (Count 5)

Plaintiff also fails to plead a domestic violation of Section 9. Section 9 contains no clear expression of extraterritorial application.[12] *See Morrison*, 561 U.S. at 255. To plead a permissible domestic application, a plaintiff must allege facts to satisfy domestic application of both (1) Section 9(f)'s private right of action and (2) Section 9(a)'s substantive prohibitions, which "work[] in tandem" and "must be assessed in concert." *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414–15 (2018); *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 105 (2d Cir. 2019) (private plaintiff must plead "domestic transaction" and "domestic … *conduct* by Defendants that" violated the Commodity Exchange Act). Plaintiff pleads no such facts.

Section 9(f) allows "any person who shall purchase or sell any security at a price which was affected by" a violation of its substantive prohibitions and who suffers injury to sue "[a]ny person who willfully participates" in that violation. 15 U.S.C. § 78i(f). To invoke Section 9(f)'s private remedy, Plaintiff must plead a domestic purchase or sale by each Crypto Loss Claimant. *See Morrison*, 561 U.S. at 267–68. Because, as discussed above, Plaintiff does not allege that any Claimant's purchase or sale was domestic, he cannot bring a Section 9(f) claim.

Nor does Plaintiff plead a domestic violation of Section 9(a), which focuses on manipulative trading conduct, 15 U.S.C. §§ 78i(a) (1), (2), (6), or manipulative communications, *id.* §§ 78i(a)(3), (4), (5), with respect to a security's price. Plaintiff must therefore plead that "*conduct relevant to*" Section 9's "*focus*"—*i.e.*, manipulative trading—"occurred in [the] United States." *Abitron*, 600 U.S. at 418. He does not. His theory that the Jump Defendants "used

[12]The Exchange Act's structure confirms Section 9's lack of extraterritorial reach in private actions. In 2010, Congress amended the Exchange Act to authorize SEC actions based on extraterritorial violations. *See* 15 U.S.C. § 78aa(b). But Congress made no similar change to private actions under Section 9(f). 15 U.S.C. § 78i(f). This underscores "that Congress knows how to give a statute explicit extraterritorial effect—and how to limit that effect to particular applications." *Morrison*, 561 U.S. at 265 n.8.

manipulative trading strategies" and "injected false information into the market" is premised on trading during the May 2021 depeg. AC ¶¶ 361–367. But Plaintiff alleges manipulative trading only on KuCoin. AC ¶¶ 124, 130–131. Critically, and unlike other exchanges he references, AC ¶¶ 287–291, Plaintiff does not allege that KuCoin is a U.S. exchange or that it maintained servers in the United States. And while the AC alleges that "Jump" traded on certain U.S.-based exchanges "in furtherance of" its broader scheme, AC ¶ 284, it does not allege any manipulative trades on those exchanges. *See* 15 U.S.C. §§ 78i(a)(1), (2), (6). Plaintiff thus fails to plead that any manipulative conduct occurred within Section 9(a)'s territorial reach.

### B. The Bankruptcy Code Fraudulent Transfer Claims Are Impermissibly Extraterritorial (Counts 9–12)

Plaintiff alleges that LFG's transfer of Bitcoin to the Jump Defendants in May 2022 was a fraudulent transfer under Sections 544 and 548 of the Bankruptcy Code. AC ¶¶ 406, 419, 433, 444. "Nothing in the language of sections 544, 548 and 550 of the Bankruptcy Code suggests that Congress intended those provisions to apply to foreign transfers." *In re CIL Ltd.*, 582 B.R. 46, 84–85 (Bankr. S.D.N.Y. 2018), *amended on reconsideration on other grounds*, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018). The "majority of cases" thus hold that these provisions do not apply extraterritorially. *In re Zetta Jet USA, Inc.*, 624 B.R. 461, 476 (Bankr. C.D. Cal. 2020) (collecting cases). Accordingly, Plaintiff must plead that the challenged "initial transfer" was "domestic" for any of the four fraudulent transfer claims—pleaded under Section 544 (Counts 9 and 10) or Section 548 (Counts 11 and 12)—to survive. *In re Ampal-Am. Isr. Corp.*, 562 B.R. 601, 613–614 (Bankr. S.D.N.Y. 2017).[13]

---

[13]Plaintiff derives authority to bring his IUFTA claims from Bankruptcy Code Section 544. AC ¶¶ 402, 414. As explained here and *infra* § II.B, Plaintiff fails to plead conduct within the United States as required by Section 544 or conduct within Illinois as required by the IUFTA.

The fraudulent transfer provisions "focus … on the debtor's act of transferring property from the United States." *In re Picard*, 917 F.3d 85, 99 (2d Cir. 2019). Accordingly, the "relevant conduct … is the debtor's fraudulent *transfer* of property, not the transferee's *receipt* of property." *Id.* at 100. Thus, "a transfer by a foreign debtor from a foreign bank account would be a foreign transfer." *In re Fairfield Sentry Ltd.*, 147 F.4th 136, 159 n.8 (2d Cir. 2025).

The AC fails to allege that LFG's *transfer* of Bitcoin occurred domestically. As to the transferor, the AC alleges that the transfer was made by a foreign debtor, either LFG,[14] *see* AC ¶ 191 (transfer "from LFG's wallets"), or, under Plaintiff's new alter ego theory, Terraform,[15] *see* AC ¶ 408 ("LFG was an alter ego of Terraform"). As to the account, the AC nowhere alleges that Bitcoin was transferred from domestic accounts, and instead alleges that it was transferred from accounts controlled by Terraform's employees. AC ¶¶ 172 ("Terraform employees who reported solely to Kwon held the keys to LFG's crypto wallets."), 268 (similar).[16] The May 2022 transfer of Bitcoin was thus an extraterritorial "transfer by a foreign debtor from a foreign … account" that is beyond the fraudulent transfer provisions' reach. *Fairfield Sentry*, 147 F.4th at 159 n.8.

Plaintiff also asserts that Bitcoin was transferred *to* "wallets controlled by Jump agents who, on information and belief, were physically located in Chicago, Illinois." AC ¶ 299. But that is "irrelevant" because avoidance statutes focus on the location of the "initial transfer," not the "location of th[e] account" that received the transfer. *Zetta Jet*, 624 B.R. at 496. And even if receipt were relevant, Plaintiff fails to differentiate among Jump Defendants, which include both

---

[14]*See* AC ¶ 170 ("LFG, formally founded in Singapore").

[15]"Terraform" refers to Singapore and British Virgin Islands entities. Ex. 3, Amended Disclosure Statement at 16, 19, *In re Terraform Labs Pte. Ltd.*, Case No. 24-10070 (Bankr. D. Del. Aug. 8, 2024) ("Chapter 11 Cases"), Dkt. 569; AC ¶ 25 (defining "Terraform").

[16]Like other intangible assets, cryptocurrency is deemed to be located where its owner is domiciled. *See Timoria LLC v. Anis*, 346 A.3d 1166, 1180–81 (Del. Ch. 2025) (citing cases).

domestic and foreign entities. AC ¶¶ 29–39.

### C. The IUFTA and ICFA Do Not Apply to Transactions Outside of Illinois, and Plaintiff Does Not Allege Illinois Transactions (Counts 7, 9–10)

The IUFTA and the ICFA apply only to transfers or transactions that occur "primarily and substantially" in Illinois. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852–53 (Ill. 2005) (ICFA); *Armada (Sing.) Pte Ltd v. Amcol Int'l Corp.*, 244 F. Supp. 3d 750, 757–58 (N.D. Ill. 2017) (IUFTA). Plaintiff does not plead a violation of either statute in Illinois.

For IUFTA claims, courts consider the location of the transferor, the transferee, and individuals who assisted with the transactions. *Armada*, 244 F. Supp. 3d at 757–58. Where the challenged transactions "involved the transfer of assets between and among a number of foreign entities," a "general assertion that the defendants acted in Illinois … when they orchestrated and received (or received the benefit) of fraudulently transferred property" does not suffice. *Id.* at 757. Here, the alleged fraudulent transfer "was issued by" a foreign entity (Terraform or LFG). *Id.* at 758; *see supra* § II.B. But rather than plead that any Jump Defendant—let alone a Jump Defendant in Illinois—received fraudulently transferred property, Plaintiff asserts that Bitcoin was transferred "to wallets owned and controlled by individuals physically located in … Illinois" and that "Chicago-based Jump employees directed and facilitated the transfer." AC ¶¶ 299, 403, 432. Such "general assertion[s]" about where Jump Defendants "orchestrated" or "received the benefit" of the challenged transfers are insufficient. *Armada*, 244 F. Supp. 3d at 757.

Plaintiff's ICFA claim fares no better. Alleging a defendant administered business in Illinois or led "a scheme to defraud from Illinois headquarters" does not establish that the "disputed transactions occurred primarily and substantially in Illinois." *Robinson v. DeVry Educ. Grp., Inc.*, 2018 WL 828050, at *4 (N.D. Ill. Feb. 12, 2018); *Galligan v. Adtalem Glob. Educ. Inc.*, 2019 WL 423356, at *6 (N.D. Ill. Feb. 4, 2019) (Lefkow, J.) (similar). Instead, a plaintiff must allege he

"received misrepresentations and acted upon them" in Illinois. *Robinson*, 2018 WL 828050, at *4. Plaintiff's allegations that "Jump Trading Group and its affiliates are headquartered" in, and that the alleged deception was "directed and facilitated" from, Illinois are thus inadequate. AC ¶ 386.

## III. THE EXCHANGE ACT AND ICFA CLAIMS ARE UNTIMELY (COUNTS 3, 5, 7)

Plaintiff's Exchange Act claims are untimely under their two-year limitations period, *see* 28 U.S.C. § 1658(b)(1), and the ICFA claim is untimely under its three-year limitations period, *see* 815 ILCS 505/10a(e). Each limitations period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have discover[ed] the facts constituting the violation." *Merck & Co. v. Reynolds*, 559 U.S. 633, 646–48, 653 (2010) (Exchange Act) (alteration in original); *Horan v. Ford Motor Co.*, 824 F. Supp. 3d 716, 731 (N.D. Ill. 2026) (ICFA). At a minimum, a reasonably diligent plaintiff would have discovered "all of the facts needed to make out a claim of fraud" once those alleged facts "were in the public domain." *Premium Plus Partners, L.P. v. Goldman, Sachs & Co.*, 648 F.3d 533, 536 (7th Cir. 2011) (emphasis omitted).

A reasonably diligent plaintiff would have discovered the facts underlying the Exchange Act and ICFA claims no later than June 17, 2022, when a different plaintiff filed a putative class action accusing various Jump Defendants and Terraform (among others) of securities fraud relating to the Terra Ecosystem collapse. *See* Ex. 4, Compl., *Patterson v. Terraform Labs, Pte. Ltd.*, No. 5:22-cv-03600 (N.D. Cal. June 17, 2022), Dkt. 1.[17] The *Patterson* complaint "made public" the same facts and conduct Plaintiff here alleged three-and-a-half years later.[18]

---

[17] "[J]udicial notice of public court documents is appropriate when ruling on a Rule 12(b)(6) motion to dismiss." *Collins v. Vill. of Palatine*, 875 F.3d 839, 842 (7th Cir. 2017) (dismissal on limitations grounds).

[18] *Compare* Ex. 4, *Patterson* Compl. ¶¶ 5 (Jump Crypto "promote[d] the stability of UST and misl[ed] investors into believing … [LFG]'s reserve pool would be sufficient to defend the peg"), 60 (citing February 2022 announcement of LFG discussing $1B private token sales "led by Jump Crypto and Three Arrows Capital"), 100 (challenging Kariya's "mass exodus" statement), 107 (noting Kariya's statement that the reserve "further strengthen[ed] confidence in the peg"), 124–125 (in May 2022, the "death spiral

*Landsberger v. Martek Biosciences Corp.*, 2010 WL 3038947, at *4 (D. Md. July 30, 2010) (prior class action showed that "events complained of were matters of public record"). Reuters also discussed the *Patterson* suit days after it was filed.[19] *Klein v. Walgreens Boots All., Inc.*, 2026 WL 1296126, at *5 (N.D. Ill. May 12, 2026) (Lefkow, J.) ("NPR article" reporting on public filing "put investors on inquiry notice"). And one Crypto Loss Claimant sought appointment as lead plaintiff in *Patterson* in August 2022. *Compare* Ex. 6, Ng. Mot. For Appt. as Lead Pl., *Patterson*, No. 5:22-cv-03600 (N.D. Cal. Aug. 19, 2022), Dkt. 28, *with* AC Ex. A at 11.

Plaintiff's allegation that "[t]he scope of Defendants' involvement in manipulating the market for UST was not revealed until after December 18, 2023" does not salvage these claims. AC ¶ 371. *First*, for the clock to start, a plaintiff need not know "the full particulars" of the wrong, *McCarthy v. PaineWebber, Inc.*, 618 F. Supp. 933, 937 (N.D. Ill. 1985), including "*who* caused" the injury, *LJM Partners, Ltd. v. Barclays Cap. Inc.*, 2023 WL 6311471, at *10 (N.D. Ill. Sept. 28, 2023), *aff'd*, 165 F.4th 552 (7th Cir. 2026). *Second*, Plaintiff alleges no facts supporting that allegation, instead plucking December 18, 2023 out of thin air because it falls exactly two years before he filed this suit. Plaintiff cannot skate past his pleading obligations with such a conclusory assertion. *See Horan*, 824 F. Supp. 3d at 723 (citing *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013)). Because *Patterson* (among other cases and news articles) put in the public domain the alleged facts underlying Plaintiff's Exchange Act and ICFA claims on June 17, 2022, the limitations period expired for the Exchange Act claims on June 17, 2024, and the ICFA claim on

---

began"), *with* AC ¶¶ 177 ("Terraform's and Jump's false promotion of LFG" caused investors to believe "LFG was a viable backstop for UST"), 176 (citing February 2022 LFG announcement), 255 (challenging "mass exodus" statement), 194 ("Terraform was in the midst of a run on the bank (or 'death spiral')").

[19] *See* Ex. 5, Alison Frankel, *Collapse of Stablecoin TerraUSD Sparks Bold Scheme Liability Suit*, Reuters (June 21, 2022), https://www.reuters.com/legal/transactional/collapse-stablecoin-terrausd-sparks-boldscheme-liability-suit-2022-06-21/. The Court may take judicial notice of this and all news articles and public releases submitted as exhibits for the fact that the information therein was publicly disclosed. *See United States ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015).

June 17, 2025, at the latest. Those claims thus are untimely.

## IV. PLAINTIFF CANNOT SEEK CONTRIBUTION FOR TERRAFORM'S LIABILITY TO THE SEC (COUNT 2)

Plaintiff asserts that the Jump Defendants are liable for contribution for a share of Terraform's $4.5 billion judgment in the SEC enforcement action. AC ¶ 330. There is no "general right to contribution under federal law." *Musick, Peeler & Garrett v. Emp. Ins. of Wausau*, 508 U.S. 286, 290 (1993). Instead, "a federal contribution action is virtually always a creature of a specific statutory regime." *Guam v. United States*, 593 U.S. 310, 316 (2021). The Jump Defendants have not identified a single instance of a court, having considered the issue, recognizing a contribution cause of action for liability incurred in an SEC enforcement action under Section 10(b) of the Exchange Act—and it would be contrary to settled precedent for this Court to be the first. Further, even if such a claim existed, it would fail here because (i) it is untimely and (ii) the Jump Defendants are not jointly liable for Terraform's violations.

### A. There Is No Right of Action for Contribution for Liability Incurred in SEC Enforcement Actions

Controlling precedent imposes a "strong presumption … against the creation of … implied rights of action." *Chi. Tchrs. Union, Local 1 v. Educators for Excellence, Inc.*, 159 F.4th 524, 530 (7th Cir. 2025). To overcome this presumption, a statute must "display[] an intent to create … a private remedy." *Id.* at 529 (second omission in original). Nothing in the Exchange Act reflects an intent to create a contribution remedy for defendants in SEC enforcement actions.

"[P]laintiff has cited no authority [recognizing] a federal cause of action for contribution based on a fine paid to the SEC." *Pall v. KPMG, LLP*, 2006 WL 2800064, at *3 n.3 (D. Conn. Sept. 29, 2006). The AC (¶ 320) cites *Musick*, but nothing in that case establishes the contribution cause of action brought here—rather, it shows there is none. In *Musick*, a pre-PSLRA case, the Supreme Court recognized an implied right of contribution for defendants found liable under the

Rule 10b-5 *implied* private right of action. 508 U.S. at 298. Because the Court had previously implied a right of action under Rule 10b-5, it had the authority to answer the "ancillary" question of how "to allocate" liability for such a claim. *Id.* at 292. In so holding, the Court distinguished *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77 (1981), and *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), which declined to create an implied right of action for contribution. As the Court explained, those two cases involved "*express*" "statutory provisions that … creat[ed] the substantive damages liability for which contribution was sought," making an implied contribution action inappropriate. *Musick*, 508 U.S. at 290–91 (citing *Nw. Airlines*, 451 U.S. at 91, 97 (Equal Pay Act of 1963 and Title VII), and *Tex. Indus.*, 451 U.S. at 638, 642 (Sherman Act)).

Unlike the implied right of action under Rule 10b-5, and like the express rights of action in *Northwest Airlines* and *Texas Industries*, SEC enforcement actions are specifically authorized by statute and governed by "express remedial provision[s] fashioned by Congress." *Id.* at 290–92. Thus, while Congress left it to the courts to shape the contours of Rule 10b-5's implied right of action, *id.* at 293, it did not do so for SEC enforcement actions. Rather, Congress expressly defined the scope of liability for such actions by authorizing the SEC to seek injunctions, disgorgement, and civil penalties—and *not* including any contribution right for defendants. *See* 15 U.S.C. § 78u(d)(3). "Congress's decision to create a comprehensive agency enforcement scheme" without a contribution right defeats Plaintiff's attempt to imply one. *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd.*, 146 S. Ct. 1546, 1554–55 (2026); *cf. Wang v. Yin*, 2016 WL 9503739, at *3 (S.D. Cal. Nov. 7, 2016) (citing *Musick*, and holding that DOJ's statutory authority to criminally enforce Rule 10b-5 precludes an implied cause of action for contribution).

Statutory context confirms that contribution is unavailable. As *Musick* observed, Congress

included contribution rights for two express private causes of action under the Exchange Act. 508 U.S. at 295 (citing 15 U.S.C. §§ 78i, 78r). The "explicit[]" contribution remedies in those other Exchange Act provisions counsel against "conclud[ing] that Congress implicitly created" such rights for SEC enforcement actions. *FS Credit*, 146 S. Ct. at 1555. Moreover, "the continuing existence of" the Exchange Act—for 92 years—"without amendments authorizing contribution" for liability incurred in SEC enforcement actions is significant. *Tex. Indus.*, 451 U.S. at 645. This is especially so because the PSLRA amended the Exchange Act to provide a contribution claim for liability incurred in a "private action," 15 U.S.C. § 78u-4(f)(8), but not for liability incurred in an SEC enforcement action. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174–75 (2009).

A contribution right would also upend the Exchange Act's statutory scheme. The SEC enforces Rule 10b-5 to deprive a defendant of "unjust enrichment," 15 U.S.C. § 78u(d)(3)(A)(ii), not to allow a plaintiff to recover for a loss.[20] *Compare* 15 U.S.C. § 78u(d)(3)(A), *with* 15 U.S.C. §§ 78u-4(e) (measuring damages in private actions by plaintiffs' losses), 78u-4(f) (providing for joint and several liability in private actions). Plaintiff admits that "[a]lmost all of the SEC's disgorgement calculation was based on Terraform's [own] sales of UST to investors." AC ¶ 327. Permitting Plaintiff to seek contribution for Terraform's disgorgement liability would, in effect, enable Terraform to claw back its own "ill-gotten gains," thereby undermining the "deterrence objectives of the securities laws." *SEC v. Wang*, 944 F.2d 80, 85 (2d Cir. 1991).

Moreover, permitting a contribution claim based on an SEC enforcement action would undermine the SEC's ability to effectively pursue its enforcement priorities, particularly in matters where the SEC pursues multiple parties. Plaintiff's contribution claim against TMSL proves the

---

[20]Here, the SEC obtained disgorgement from Terraform of its net profits (including interest) of $4,053,828,306 and a civil penalty of $420,000,000 based upon its ill-gotten gains. *See* Ex. 7, Final Judgment, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346 (S.D.N.Y. June 12, 2024), Dkt. 273.

point. If Plaintiff's contribution claim were valid, it would have been irrational for TMSL, or any respondent in an SEC investigation in a similar position, to settle with the SEC with no protection against a follow-on contribution claim. Ex. 2, TMSL Order.[21]

### B. Even If a Contribution Claim Were Available, Plaintiff's Claim Still Fails

Even if an implied cause of action for contribution for SEC enforcement liability were theoretically available, Plaintiff's claim still would fail for two independent reasons.

*First*, the claim is untimely. Courts "borrow the most suitable statute or other rule of timeliness" from another source for implied causes of action. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983). PSLRA contribution claims "for damages in any private action" are subject to a six-month statute of limitations beginning on the entry of a final, nonappealable judgment. 15 U.S.C. §§ 78u-4(f)(8), (9). The judgment in the SEC action was entered against Terraform on June 12, 2024, *see* AC ¶ 447; Ex. 7, Final Judgment (*Terraform*), meaning Plaintiff needed to assert his contribution claim by December 12, 2024.

*Second*, a contribution arises only when parties share "joint liability" for a "wrong" to the plaintiff. *Musick*, 508 U.S. at 292. The Jump Defendants do not share "joint liability" for Terraform's underlying wrong. As shown *infra* §§ V.D–E, Plaintiff does not adequately plead that the Jump Defendants are liable under Section 10(b) or Rule 10b-5, let alone that they are jointly liable for the distinct conduct the SEC alleged as to Terraform.

## V. PLAINTIFF'S EXCHANGE ACT CLAIMS FAIL (COUNTS 3, 5)

Plaintiff's Exchange Act claims fail for several additional reasons. *First*, Plaintiff may not bring Exchange Act claims on behalf of Crypto Loss Claimants. *Second*, Plaintiff does not

---

[21] Notably, Plaintiff seeks relief that would be unavailable in "any private action" under Rule 10b-5, where a defendant "who settles … [is] discharged from all claims for contribution brought by other persons." 15 U.S.C. § 78u-4(f)(7).

plausibly allege that any Claimant purchased LUNA or UST as an investment contract. *Third*, Plaintiff fails to adequately allege facts supporting several elements of his claims.

### A. Plaintiff Cannot Bring Exchange Act Claims as Assignee

The implied private remedy for a violation of Section 10(b) and Rule 10b-5 is "limited to purchasers and sellers" of securities. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 80 (2006). Section 9 claims are also limited to "any person who shall purchase or sell any security" at a price affected by the violation. 15 U.S.C. § 78i(f); *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 735–36 (1975).

Plaintiff is not a purchaser or seller of UST or LUNA; rather, as noted, he seeks to assert, as alleged assignee, the claims of individual Crypto Loss Claimants. AC ¶ 27. *Blue Chip*'s purchaser-seller requirement is not satisfied where the claimant is a purported assignee rather than the actual seller or purchaser. *See Smith v. Ayres*, 977 F.2d 946, 950–51 (5th Cir. 1992). Here, resolving Plaintiff's claims on behalf of 8,000 alleged purchasers scattered throughout the globe would require the type of "third-party discovery" process that *Blue Chip* squarely rejected. *Value Recapture Partners LLC v. Boeing Co.*, 2026 WL 445504, at *6–7 (N.D. Ill. Feb. 17, 2026) (dismissing claim because plaintiff-assignee had never purchased or sold the securities at issue).

### B. Plaintiff Cannot Bring Exchange Act Claims Based on Post-Purchase Statements and Conduct

Along with Plaintiff's inability to bring claims as an assignee, "binding and well-settled" precedent holds that plaintiffs may not bring Exchange Act claims "based on any statements or conduct" that occurred after they purchased a security. *Zerger v. Midway Games, Inc.*, 2009 WL 3380653, at *4–5 (N.D. Ill. Oct. 19, 2009) (citing *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992)); *In re Career Educ. Corp. Sec. Litig.*, 2006 WL 999988, at *2 (N.D. Ill. Mar. 28, 2006) (Lefkow, J.) (dismissing Exchange Act claims based on post-purchase statements).

Plaintiff violated this principle by failing to allege the specific date of any Crypto Loss Claimant's purchase of UST or LUNA.

Plaintiff alleges "on information and belief" that Claimants "bought and sold UST and LUNA between the May 2021 depeg and the Terra Ecosystem's collapse," and that "at least one" unidentified Claimant purchased UST or LUNA after each challenged statement was made. AC ¶¶ 254–258, 294. But, as noted, "information and belief" allegations are permitted only if the facts "are not accessible to the plaintiff." *Beyrer*, 722 F.3d at 948–49. Here, no "information asymmetries … prevent[ed]" Plaintiff from alleging the dates of purchases underlying the claims purportedly assigned to him. *Id.* Nor can he satisfy Rule 9(b) by arguing that "at least one" Claimant purchased UST or LUNA after the challenged statements. This is not a class action, so Plaintiff cannot treat as "homogenous" the over 8,000 Crypto Loss Claimants "whose claims are brought on an individual (non-class) basis." *Wyse*, 2025 WL 2208161, at *17.

### C. The Federal Securities Laws Do Not Apply Because Plaintiff Does Not Allege an Investment Contract Involving UST or LUNA

Plaintiff's conclusory assertions that UST and LUNA each were "a 'security'" fail. AC ¶¶ 234, 238. A crypto asset itself is not inherently a security. *SEC v. Binance Holdings Ltd.*, 738 F. Supp. 3d 20, 43–44 (D.D.C. 2024) (SEC's conclusory assertion that "crypto assets" were "securities" "ignored the Supreme Court's directive"); *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 472 (S.D.N.Y. 2023) ("UST on its own was not a security."); *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 324 (S.D.N.Y. 2023) (digital token "is not in and of itself" a security); *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 281 (S.D.N.Y. 2024) (similar).

Instead, Plaintiff must plead that each Crypto Loss Claimant purchased LUNA or UST as an "investment contract," 15 U.S.C. § 77b(a)(1), by alleging that such purchases were (1) an investment of money (2) in a common enterprise (3) based on a third party's promises or

representations to undertake essential managerial efforts that would reasonably lead a Claimant to expect to derive profits. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *Ripple*, 682 F. Supp. 3d at 324–26. Whether a transaction in an "intangible digital asset[]" is an investment contract depends on "the economic reality of the particular transaction, based on the entire set of contracts, expectations, and understandings of the parties." *Binance*, 738 F. Supp. 3d at 44, 54. Plaintiff peppers the AC with allegations of what Terraform told "institutional" and "retail" "investors" about UST and LUNA, but alleges nothing about when, where, why, or with whom Crypto Loss Claimants supposedly transacted. AC ¶¶ 232–242. Plaintiff thus cannot show that transactions "in this case" were investment contracts. *Howey*, 328 U.S. at 299.

Indeed, other allegations show that UST and LUNA flunk the *Howey* test. Plaintiff acknowledges secondary markets for UST and LUNA. AC ¶¶ 234, 260, 296. Purchasing UST or LUNA from a third party in a secondary market transaction is not investing in a common enterprise because proceeds from secondary-market purchases are not "pool[ed]" by the issuer or investment manager. *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984). Similarly, a secondary-market purchaser "could not reasonably expect" that Terraform "would use the capital it received from its sales to improve the [Terraform] ecosystem and thereby increase the price" of UST or LUNA because a secondary-market purchaser does "not know to whom or what it was paying its money." *Ripple*, 682 F. Supp. 3d at 329. And no reasonable secondary-market purchaser would expect profits "from [Terraform's] efforts (as opposed to other factors, such as general cryptocurrency market trends)." *Id.*; *see also Binance*, 738 F. Supp. 3d at 57.

Plaintiff's allegations about statements from Terraform and Kwon do not overcome these pleading failures. Plaintiff alleges that Terraform personnel publicly stated that "investing in Terra means buying LUNA, which is the equity in our co." AC ¶ 236. Tellingly, Plaintiff omits that

this statement concerns "VCs investing in Terra."[22] Terraform's sales of LUNA to raise venture capital funding prior to April 2021 have no bearing on the "economic reality" of transactions by Claimants, who bought unspecified tokens at unspecified times through unspecified means. *Ripple*, 682 F. Supp. 3d at 324, 328–29 (contrasting contractual sales to "sophisticated individuals and entities" with "digital-asset exchange[]" sales to "public buyers" in blind bid-ask transactions).

Plaintiff also alleges that Kwon told investors that LUNA's "value is actionable" and that purchasers could "[s]it back and watch me kick ass." AC ¶ 237. This is a vague boast, not a representation about a business plan "upon which a purchaser can reasonably rely." *Demarco v. LaPay*, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009) ("marketing and advertising hooks do not change the character of the transaction"). As the SEC recognizes, investment contracts typically rest on "explicit and unambiguous" representations regarding "essential managerial efforts" related to a crypto asset.[23] Plaintiff points to no such statement here.

Plaintiff's theory that "UST was a security" is wrong. UST was designed so "its value would remain constant," which is antithetical to the notion of profit. *Binance*, 738 F. Supp. 3d at 60. Recognizing that buyers do not buy stablecoins "with a reasonable expectation of profit derived from" others' efforts, the SEC opined that certain stablecoins are not securities.[24]

Attempting to cure that defect, Plaintiff alleges that UST holders were "able to access the Anchor Protocol" and receive its "yield" on UST deposits. AC ¶¶ 238–239. The SEC tried a

---

[22]Ex. 8, Gains Associates, *Terraform Labs (LUNA) – Telegram AMA – March 15*, Medium (Apr. 18, 2021), https://medium.com/gains-associates/terraform-labs-luna-telegram-ama-march-15-7fbbcbd4f1f2.

[23]Ex. 9, *Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets* ("*Crypto Assets*"), 91 Fed. Reg. 13714, 13721 (Mar. 23, 2026).

[24]Ex. 10, SEC Div. of Corp. Fin., *Statement on Stablecoins* at 4 (Apr. 4, 2025), https://www.sec.gov/newsroom/speeches-statements/statement-stablecoins-040425 (reserve-backed stablecoins "are not offered or sold as investment contracts"); Ex. 9, *Crypto Assets*, 91 Fed. Reg. 13714, 13721 (affirming Corporation Finance guidance).

similar tactic in *Binance*, and the court correctly rejected it. *Binance* held that the SEC failed to plead that BUSD, a stablecoin, was an investment contract despite its allegation that "Binance 'marketed BUSD's profit-earning potential'" through savings and staking "programs available to BUSD purchasers." 738 F. Supp. 3d at 60–61. Because the SEC did not plead that "a package involving any reward program [was] the" investment contract, the "availab[ility]" of such programs was irrelevant. *Id.* at 60–61 & n.21.

Here, too, Plaintiff does not allege that UST and the Anchor Protocol together constitute an investment contract, but rather insists that individual Crypto Loss Claimants purchased UST itself as a security. AC ¶ 334. And even if Plaintiff were to argue that the alleged investment contract consists of UST *plus* use of the Anchor Protocol, he still states no claim because he does not allege that any Claimant purchased that investment contract by both buying UST *and* depositing it on the Anchor Protocol. *See Blue Chip Stamps*, 421 U.S. at 733–37.

Two non-binding decisions holding that UST and LUNA transactions were investment contracts—*SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 192–94 (S.D.N.Y. 2023) ("*Terraform I*"), and *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 710–11 (N.D. Cal. 2024)—are wrongly decided outliers. These cases' refusal to distinguish "between" transactions "based on their manner of sale," *Terraform I*, 684 F. Supp. 3d at 197, runs contrary to the correct, transaction-specific approach, *see, e.g.*, *Binance*, 738 F. Supp. 3d at 54 (rejecting *Terraform* because it did not consider "the economic reality of the particular transaction"); *Ripple*, 682 F. Supp. 3d at 324–31 (distinguishing between types of sales to different investors). And even if this Court agreed with the logic of these cases, Plaintiff's allegations here are materially different, given that he alleges no specific facts about the Crypto Loss Claimant transactions at issue.

Plaintiff's failure to plead an investment contract forecloses his Exchange Act claims.

### D. Plaintiff Fails To Plead Federal Securities Fraud Through Misstatements or Omissions

To state a claim under Section 10(b) and Rule 10b-5(b), Plaintiff "must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Cornielsen*, 916 F.3d at 598. This claim is subject to Rule 9(b)'s and the PSLRA's heightened pleading standards. *Id.* at 598–99. Plaintiff does not meet these standards.

#### 1. Plaintiff Fails To Plead Any Actionable False or Misleading Statements

Plaintiff fails to plead particularized facts showing that any Jump Defendant "either made a false statement of material fact or failed to make a statement of material fact … rendering the statements … misleading." *Searls v. Glasser*, 64 F.3d 1061, 1065 (7th Cir. 1995). A statement is false or misleading if it "create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *15 (N.D. Ill. May 24, 2022). Three specific applications of this general principle are relevant here.

*First*, puffery is not false or misleading under the federal securities laws. Puffery includes: "(1) indefinite predictions of growth; (2) optimistic rhetoric and hype; (3) subjective statements; and (4) vague statements." *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *7 (N.D. Ill. Mar. 30, 2022). "[N]o reasonable investor" would treat expressions of "vague corporate optimism" as "guarantees." *Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *15 (N.D. Ill. Sept. 30, 2024).

*Second*, an opinion, which expresses "a view, not a certainty," is actionable only if the plaintiff alleges with particularity that (1) the speaker did not "sincerely" believe it, (2) it contained "embedded statements" of untrue facts, or (3) a reasonable investor would have understood it to

convey untrue "facts about" the speaker's "basis" for the opinion. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183–88 (2015).

*Third*, an omission is misleading only if it "renders affirmative statements made misleading." *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 265 (2024). A statement that touches on a topic thus need not "reveal all facts" about the topic, *In re Walgreens Boots All. Sec. Litig.*, 2026 WL 25948, at *11 (N.D. Ill. Jan. 5, 2026), even if an investor would "*want* to know" those facts, *Rubinstein v. Gonzalez*, 2016 WL 1213931, at *8–9 (N.D. Ill. Mar. 29, 2016) (emphasis in original). Rather, "the omitted facts must have a reasonably close fit to what defendants disclosed." *Newtyn Partners, LP v. Alliance Data Sys. Corp.*, 165 F.4th 947, 963 (6th Cir. 2026).

None of the five purportedly false or misleading statements (the "Challenged Statements") are sufficiently pleaded as false or misleading in violation of Section 10(b) and Rule 10b-5(b).[25]

- **Statement 1**: On October 11, 2021, Peter Johnson and Shanav Mehta, alleged "Jump Crypto Executives," published an article that said: "We believe there will be several winners in the stablecoin space …. We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin." The article also defined "algorithmically stabilized" stablecoins, which "use an algorithmic monetary policy, often featuring a second floating value token, to keep the stablecoin value stable," and identified "Terra" as the "most prominent example." Ex. 11 at 6, Peter Johnson & Shanav Mehta, *Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market*, Jump Capital (Oct. 11, 2021); AC ¶ 254.

This statement expresses the speakers' "belie[f]" and "excite[ment]." Ex. 11 at 6. Each component is classic opinion and puffery. *See Hunter v. Elanco Animal Health Inc.*, 2022 WL 3445173, at *20 n.9 (S.D. Ind. Aug. 17, 2022) ("we're excited for the continued potential in this portfolio of products" is puffery). *Patterson* held as much with respect to this precise statement,

[25]The AC quotes only excerpts of the Challenged Statements, but because they are "reference[d]" in and integral to the AC, the Court may consider them in their entirety. *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020).

dismissing it as "not capable of objective verification." *Patterson*, 710 F. Supp. 3d at 713.

Plaintiff suggests the Jump Defendants "knew," and misleadingly omitted, that UST was not "algorithmically stabilized." AC ¶ 254. But he fails to provide any specific allegations as to how describing UST as an algorithmically stabilized stablecoin—*i.e.*, a stablecoin "which use[]s an algorithmic monetary policy, often featuring a second floating value token," Ex. 11—was false. Indeed, the AC itself describes UST in the same way, showing this description was accurate. AC ¶¶ 63–65. Describing UST as "algorithmic" did not imply the absence of human intervention; rather, it conveyed the opposite, for, as Plaintiff acknowledges, such "stablecoins simply rely on market participants to trade in ways that maintain the peg." AC ¶ 56.

- **Statement 2**: On January 28, 2022, Kariya posted on X: "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation." After explaining the relationship between MIM (a stablecoin from another ecosystem) and UST, Kariya stated: "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on Luna price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M. A $450M contraction of the economy (assuming a highly conservative 50% don't find the UST useful anymore) should be manageable over a couple of days and not impactful to prospects of the projects. Crazily enough, on this 'bearish' day, there has been a net burn of LUNA." AC ¶ 255; Ex. 12, Kanav Kariya (@KanavKariya), X (Jan. 28, 2022), https://x.com/KanavKariya/status/1486930291927175170.

This "take" is expressly an inactionable opinion. AC ¶ 255. And Plaintiff does not allege "in more than conclusory fashion" that Kariya did not "actually hold[] [his] … stated belief" about the mint-burn mechanism. *Boykin v. K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022).

Nor does Plaintiff plead that Kariya's discussion contained factual inaccuracies. Instead, Plaintiff concocts the supposedly implied messages that "UST was stable" and "the Terra Protocol could work to maintain prices" and asserts those implications were false. AC ¶ 255. But Plaintiff cannot state a claim based on an "illogical" or "implausible interpretation" that ignores Kariya's actual words and "omits the … context." *SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d

1113, 1126 (N.D. Cal. 2020). Indeed, Kariya suggested that purchasers would *not* flock to UST, and he discussed the "potential" of "some" pressure on LUNA; there is no reasonable basis for reading that statement as falsely touting the stability of UST's peg. *See Heabeart v. Coinbase Inc.*, 2026 WL 1250578, at *5 (S.D.N.Y. May 7, 2026) (dismissing Exchange Act claim based on statement that token was "intended to represent" LUNA, which did not "guarantee that [token would] always track LUNA's price").

- **<u>Statement 3</u>**: On February 22, 2022, the "Jump Crypto" X account posted: "We're happy to announce that we are leading the Luna Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin[.] The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility[.]" AC ¶ 256; Ex. 13, Jump Crypto (@jump_), X (Feb. 22, 2022), https://x.com/jump_/status/1496184264530042885.

- **<u>Statement 4</u>**: On March 1, 2022, Kariya stated on a podcast: "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size. And it's basically meant to take out these extreme spikes and inject liquidity into the book and allow markets to consolidate again around the new prices, when there are extreme price movements, which do happen every sometime [sic]." AC ¶ 257.

These statements about the LFG reserve amount to nothing more than "optimistic rhetoric." *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 940 (N.D. Ill. 2015); *see also Plymouth Cnty. Ret. Sys. v. Evolent Health, Inc.*, 2021 WL 1439680, at *23, *25 (E.D. Va. Mar. 24, 2021) (statement that company's services would "enable" clients to operate cost-effectively did not "state … expectations with certainty" and was thus nonactionable). Indeed, *Patterson* deemed similar statements about how the reserve "can be used to help protect the peg" and "will strengthen confidence in the peg" to be inactionable "expressions of opinion." 710 F. Supp. 3d at 714.[26]

---

[26]In challenging Statement 3, Plaintiff claims that "[a] press release accompanying the announcement [of the LFG token sale] further promoted UST." AC ¶ 256. This vague reference to another statement without explaining *why* the statement was false or misleading does not satisfy Rule 9(b) or the PSLRA. *See Pierrelouis v. Gogo, Inc.*, 414 F. Supp. 3d 1164, 1171 (N.D. Ill. 2019). In any event, as *Patterson* explained, the statement in the press release—"[t]he UST Forex Reserve further strengthens confidence in the peg of

Plaintiff does not seriously contest the stated facts about the LFG reserve, but instead contends that these statements' "suggest[ion]" that UST was a stable asset because of LFG's reserve was false because "Jump's actions," not "an algorithm," restored the peg. AC ¶¶ 256–257. Here again, Plaintiff attacks an implausible reading of the statements. *SEB Inv. Mgmt.*, 485 F. Supp. 3d at 1126. Far from suggesting the algorithm *alone* could maintain the peg, these statements *acknowledge* that an external reserve may be necessary to address "severe volatility" and "extreme price movements." AC ¶¶ 256–257. Nor did the Jump Defendants offer a guarantee about unknown future events, as LFG's failure to successfully backstop the peg in May 2022 does not render Statements 3 (February) and 4 (March) false when made. *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759–60 (7th Cir. 2007) (no "fraud by hindsight").

Plaintiff also alleges that these statements were misleading absent disclosure of "Jump's" alleged trading during the May 2021 depeg. But Plaintiff cannot show that omitting reference to the May 2021 trading rendered a statement in March 2022 about "inject[ing] liquidity" "so incomplete as to be misleading." *Anderson v. Abbott Lab'ys*, 140 F. Supp. 2d 894, 903 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Lab'ys*, 269 F.3d 806 (7th Cir. 2001). While market participants "might care about" the Jump Defendants' prior trading, *id.*, the Jump Defendants' high-level observations about ecosystem volatility nearly a year later "cannot be misleading" because they "operate[d] on [a] different 'level[] of generality'" from the undisclosed details, *Newtyn Partners, LP*, 165 F.4th at 963; *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1334 (7th Cir. 1995) (dismissing claim based on statements that did not "relate[] directly to" facts that were allegedly misleadingly omitted).

- **<u>Statement 5</u>**: On April 7, 2022, Kariya reposted a tweet from LFG that "[w]elcom[ed] $AVAX," another token, into the LFG reserve, and stated: "Alignment across ecosystems

---

the market's leading decentralized stablecoin," AC ¶ 176—"concern[s] expressions of opinion, as opposed to knowingly false statements of fact," and is therefore inactionable. 710 F. Supp. 3d at 714.

> and a commitment to a multi chain future UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." AC ¶ 258; Ex. 14, Kanav Kariya (@KanavKariya), X (Apr. 7, 2022), https://x.com/KanavKariya/status/1512119136649941002.

Calling an asset "high quality" is inactionable puffery, *Muir v. Playtex Prods., LLC*, 983 F. Supp. 2d 980, 989 (N.D. Ill. 2013), and the phrase "win, win, win" merely expresses "optimism," *Chew*, 2024 WL 4346522, at *10. Because this puffing statement contains no false statement of fact, Plaintiff attempts to turn it into a misleading omission by arguing that it "suggested" that "the LFG reserve meant UST was a stable asset." AC ¶ 258. But this statement does not comment on, let alone guarantee, UST's stability. In fact, the existence of a reserve is an acknowledgment that UST's stability, far from being guaranteed, required extrinsic support. Plaintiff fails to plead that this statement "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity*, 2022 WL 1642221, at *15.

Because Plaintiff does not plead that any challenged statement was actionably false or misleading, his claim under Section 10(b) and Rule 10b-5(b) should be dismissed.

### 2. Plaintiff Fails To Plead Scienter

To plead scienter, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted" with the intent to deceive, manipulate, or defraud. 15 U.S.C. § 78u-4(b)(2)(A). A "strong" inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). This is a "difficult hurdle," *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024), and the AC does not clear it for several independent reasons.

*First*, Plaintiff disregards his obligation to plead scienter as to "each individual defendant,"

a requirement with "particular relevance … in securities fraud cases," by making no scienter allegation as to any single Jump Defendant. *Cornielsen*, 916 F.3d at 601.

*Second*, Plaintiff contends that the Jump Defendants (as a collective) were motivated to lie because they "had significant LUNA holdings and options to purchase millions more in the future." AC ¶ 341; *see also* AC ¶¶ 73, 109, 114. But financial motive alone is not "sufficient" to establish scienter. *In re JPMorgan Chase & Co. Sec. Litig.*, 2007 WL 4531794, at *8 (N.D. Ill. Dec. 18, 2007). If it were, "then Congress' intent in establishing heightened pleading requirements … would be effectively vitiated for … it is the desire of pecuniary gain that underlies most every business transaction." *Stark Trading & Shepherd Inv. Int'l, Ltd. v. Falconbridge Ltd.*, 2008 WL 153542, at *11 (E.D. Wis. Jan. 14, 2008), *aff'd*, 552 F.3d 568 (7th Cir. 2009); *see also Davis v. SPSS, Inc.*, 385 F. Supp. 2d 697, 714 (N.D. Ill. 2005) (similar). That the Jump Defendants stood to profit from LUNA holdings thus does not create a strong inference of scienter. *See Pugh v. Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008) (rejecting argument "that stock sales, exercise of options, and receipt of bonuses … create a strong inference of scienter").

Plaintiff's allegations about what "Defendants" knew fare no better. Plaintiff claims that "Defendants continued to publicly tout the Terra Ecosystem as a stable asset maintained by the Terra Protocol" despite "knowing" that their May 2021 actions restored UST's peg. AC ¶ 341; *see also* AC ¶¶ 254–258. But Plaintiff fails to explain, let alone "state with particularity," 15 U.S.C. § 78u-4(b)(2), how the Jump Defendants supposedly knew their trading in fact restored the peg in the multibillion-dollar UST market or, even if they did, how knowledge of that fact amounted to knowledge that UST was not stable in the months that followed.

*Third*, a nonfraudulent inference "offers a better fit for the facts alleged" here. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 596 (7th Cir. 2021). Plaintiff

alleges that JD6 and JCDP-7 purchased $330 million and $20 million worth of LUNA, respectively, from LFG *after* the May 2021 depeg. AC ¶¶ 36–37. But he does not and could not explain why Jump Defendants "would opt for that strategy" of making a post-repeg investment in LUNA if they knew or feared that UST or the Terra Ecosystem was likely to collapse. *Zebra*, 8 F.4th at 596; *see In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) (defendant would not "hid[e] Enron's vulnerability" while "continu[ing] to lend [it] billions").

That is especially so because it was a long-term illiquid investment; the tokens would be locked when delivered and unlock over a period of years, a fact Plaintiff alleged in the original complaint but dropped from the AC. Dkt. 1 ¶ 83; *see Orgone Cap. III, LLC v. Daubenspeck*, 912 F.3d 1039, 1048 (7th Cir. 2019) ("[A] party may offer earlier versions of its opponent's pleadings as evidence of the facts therein."). Plus, the Jump Defendants disclosed their understanding of the risks affecting the Terra Ecosystem, including that UST's peg may need support. *See* AC ¶¶ 256–257. Thus, the more compelling inference is that the Jump Defendants believed in the Terra Ecosystem, continued to purchase LUNA to gain greater exposure to it, and disclosed the peg may need support—not fraudulent intent. *Davis*, 385 F. Supp. 2d at 714.

**3. Plaintiff Fails To Plead Reliance**

Plaintiff fails to sufficiently plead reliance. To start, he does not plead "particularized factual allegations"—as Rule 9(b) requires—that any Crypto Loss Claimant "actually relied on" any Challenged Statement. *Wyse*, 2025 WL 2208161, at *14, *16. He does not adequately allege "dates of purchase," *supra* § V.B; *In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1393 (N.D. Ill. 1990), let alone that Claimants "received or read" the statements, *Greenberg v. Boettcher & Co.*, 755 F. Supp. 776, 781 (N.D. Ill. 1991); *see also Wyse*, 2025 WL 2208161, at *15.

Plaintiff's failure to plead purchase dates also forecloses his ability to invoke the fraud-on-the-market presumption of reliance, which applies only if "the relevant transaction took

place between the time the misrepresentations were made and the time the truth was revealed." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 811 (2011). Absent factual allegations about when Claimants purchased UST or LUNA, Plaintiff cannot make that showing.

The fraud-on-the-market presumption is also unavailable because Plaintiff does not "specifically plead facts" showing that the market for UST or LUNA was "well-developed and efficient." *Greenberg*, 755 F. Supp. at 781–82; *see Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1068 n.15 (N.D. Ill. 2016). In evaluating market efficiency, courts consider: (1) the securities' average trading volume, (2) analyst coverage, (3) the existence of market makers, and (4) "empirical facts showing a causal connection between unexpected corporate events or financial releases and immediate response in the stock price." *Greenberg*, 755 F. Supp. at 782 (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286–87 (D.N.J. 1989)).

Causal nexus is "the foundation for the fraud on the market theory." *ScripsAmerica, Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1256 (C.D. Cal. 2015). Plaintiff must plead facts that the "market price responds to *most* new, material news." *Id.* But he pleads no causal connection between *any* new material news and price changes, let alone that UST and LUNA price responded to *most* material news.

Unlike the typical Rule 10b-5 case, which alleges corrective disclosures and corresponding price declines to show "a cause and effect relationship," *id.*, Plaintiff relies solely on a bald assertion that "the price of LUNA and UST … changed quickly to reflect new information in the marketplace," AC ¶¶ 263–264. This "conclusory statement [is] unsupported by factual allegations" and insufficient to establish market efficiency. *Greenberg*, 755 F. Supp. at 782; *see also Holland v. CryptoZoo Inc.*, 2025 WL 2492970, at *30 (W.D. Tex. Aug. 14, 2025) (plaintiffs cannot "slap four words on a page ('fraud-on-the-market') and call it a day"), *report and*

*recommendation adopted*, 2025 WL 3028689 (W.D. Tex. Oct. 29, 2025). Indeed, the AC elsewhere undermines Plaintiff's causal nexus argument. He acknowledges that stablecoins can be "volatil[e]" and that "cryptocurrency tokens can experience wide price fluctuations." AC ¶¶ 10, 53. But "high volatility" and price fluctuations are "not indicative of an efficient market." *ScripsAmerica, Inc.*, 119 F. Supp. 3d at 1256–57.

Plaintiff's trading volume allegations fare no better. "[A]verage weekly trading" volume indicates efficiency because "an actively traded market … implies a likelihood that many investors are executing trades on … newly available … corporate information." *Id.* at 1253. Here, Plaintiff merely asserts that "UST and LUNA experienced large daily trading volumes of millions of tokens." AC ¶ 261. This "conclusory" assertion of adequate trading volume without any comparison of that volume to the asset's overall supply is insufficient. *ScripsAmerica, Inc.*, 119 F. Supp. 3d at 1253–54.

Nor does Plaintiff satisfactorily allege the existence of market makers and arbitrageurs. Instead, by Plaintiff's own account, Terraform solicited Jump's involvement because the ecosystem "needed to be more liquid[]" and to "encourage wider adoption of Terraform's tokens." AC ¶¶ 68–69; *see also* AC ¶ 241. Plaintiff's allegation of a single market maker—"Jump"—is not enough. *See Cammer*, 711 F. Supp. at 1293 (noting that "[t]en market makers … would justify a substantial presumption" of efficiency and "five … would justify a more modest presumption").

Finally, Plaintiff does not allege the requisite analyst coverage of UST or LUNA. His assertions that "[t]rading information" was available online, AC ¶ 260, and that "analyst coverage" existed "on specialized crypto-market analysis websites and more general forums like Twitter and Reddit," AC ¶ 261, do not allege analyst coverage with any particularity. Further, Twitter and Reddit posters are not substitutes for "investment professionals[] who would … make buy/sell

recommendations" typically cited in support of market efficiency arguments. *ScripsAmerica, Inc.*, 119 F. Supp. 3d at 1254.

All relevant factors weigh against a finding of market efficiency, which precludes Plaintiff from relying on the fraud-on-the-market presumption. *Id.* at 1258 (dismissing claims where only one factor weighed in favor of market efficiency).

**4. Plaintiff Fails To Plead Loss Causation**

Two independent defects doom Plaintiff's effort to plead loss causation. *First*, post-purchase statements cannot "affect[] the price at which plaintiff actually purchased," and therefore cannot cause a plaintiff's losses. *Roots P'ship*, 965 F.2d at 1420. Plaintiff's failure to plead post-statement purchase dates, *see supra* § V.B, defeats any loss causation argument.

*Second*, Plaintiff does not allege "that it was the very facts about which the defendant lied"—and not other forces—that caused Crypto Loss Claimants' injuries. *Tricontinental Indus., Ltd. v. PwC, LLP*, 475 F.3d 824, 842 (7th Cir. 2007). Plaintiff alleges that "Defendants' actions caused [Claimants] to buy UST tokens believing them to be a stable asset maintained by the Terra Protocol," that the "Terra Ecosystem crashed when the peg could not be sustained by the Terra Protocol," and that "UST lost its value, and investors in those tokens sustained significant losses." AC ¶¶ 344–345. In other words, Plaintiff alleges that the Jump Defendants concealed a known risk—the instability of the peg, or that the algorithm alone could not sustain the peg—and such a risk materialized when the peg collapsed in May 2022.

This makes no sense. The AC itself shows no risk was concealed, pleading: (i) LFG was founded in late 2021 and "touted as an independent entity created to help defend the UST peg in the future," AC ¶ 170; (ii) LFG "backstops the UST peg in times of severe volatility," AC ¶ 176; and (iii) LFG was "meant to take out these extreme spikes," AC ¶ 176. The May 2022 depeg—occurring months after these statements—thus does not show "anything beyond the materializing

of" a *disclosed* risk. *Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685–86 (7th Cir. 1990).

### E. Plaintiff Fails To Plead Federal Securities Fraud Through a Deceptive or Manipulative Scheme Under Rule 10b-5

Apparently recognizing the shortcomings of his misstatement theory, Plaintiff advances in the AC a new scheme liability theory based on alleged deceptive or manipulative conduct. Specifically, he alleges that the Jump Defendants violated Section 10(b) and Rule 10b-5(a) and (c) through "a scheme to artificially keep the Terra Ecosystem alive" consisting of trading UST and publicly supporting the Terra Ecosystem. AC ¶¶ 336–337. At bottom, Plaintiff describes a trading firm seeking and generating profits through bona fide trading, not deception or manipulation.

The elements of a scheme liability claim under Section 10(b) and Rule 10b-5(a) and (c) mirror the elements of a Rule 10b-5(b) claim, except that a plaintiff must also allege deceptive or manipulative *conduct* beyond misstatements or omissions. *See Stoneridge Inv. Partners v. Scientific-Atlanta*, 552 U.S. 148, 157–58 (2008). Plaintiff fails to satisfy this burden.

#### 1. Plaintiff Fails To Plead Any Deceptive or Manipulative Acts

Plaintiff contends that the Jump Defendants manipulated the market for UST and LUNA through the acts of buying UST to "restore" the peg in May 2021, "tout[ing] UST and LUNA as stable investments," and "creat[ing]" LFG. AC ¶ 337. None of these alleged acts is deceptive or manipulative. "The essence of" market manipulation "is creating 'a false impression of supply or demand.'" *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 864–65 (7th Cir. 1995). Most often, market manipulation occurs where market participants engage in inherently deceptive trading practices such as making wash trades, coordinating matched order trading, or otherwise rigging prices. *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476 (1977).

Plaintiff admits the Jump Defendants did not engage in these practices or any other "inherently wrongful" activity. AC ¶ 132. Rather, he alleges the Jump Defendants' "trading

activity" was deceptive because it was undertaken to "restore UST's $1 peg" and earned them a profit. AC ¶¶ 125, 134, 137. But the only conduct Plaintiff points to is that the Jump Defendants bought UST at its then-prevailing market price and sold it profitably at higher prices up to UST's fair value of $1. That is "not market manipulation." *Sullivan & Long*, 47 F.3d at 862; *see also Roadzen, Inc. v. Meteora Cap. Partners, L.P.*, 2026 WL 1983435, at *8 (S.D.N.Y. July 9, 2026) ("[T]rading, in and of itself, does not constitute market manipulation." (alteration in original)). No doubt recognizing this, Plaintiff attempts to recast this legitimate, profit-seeking trading as market manipulation, but that effort rests on flawed premises.

*First*, Plaintiff's allegations regarding the manner of the Jump Defendants' trading do not support his manipulation theory. Plaintiff alleges that the Jump Defendants "plac[ed] a significant volume" of limit orders to buy UST at prices below $1 on KuCoin, adding "depth" to the demand for UST. AC ¶¶ 130–131. But "stacking" an exchange's order book with bids for UST is consistent with a desire to buy UST for less than $1, not with creating "false" demand. AC ¶ 132.

Plaintiff also alleges "[o]n information and belief" that the Jump Defendants "purchased UST at prices that were higher than the prevailing market price." AC ¶ 133. This assertion is definitionally impossible given "his allegation elsewhere" that the Jump Defendants purchased on centralized exchanges. *Lachmund v. ADM Inv. Servs.*, 191 F.3d 777, 788–89 & n.16 (7th Cir. 1999); *see* AC ¶ 129. On a centralized exchange, it is not possible to buy at prices "higher than the prevailing market price." A "market order" to buy an asset will be "executed immediately" "at the best available price," and a "limit order to buy … at a specific price or better" will be executed, if at all, at the best available price at or below the price of the limit order.[27] In either

[27] Ex. 15, SEC Office of Investor Education & Advocacy, *Trading Basics*, https://www.sec.gov/investor/alerts/trading101basics.pdf.

scenario, the trade executed will necessarily be *at* the prevailing market price—*i.e.*, the price dictated by market supply and demand. To the extent Plaintiff means to allege that the Jump Defendants placed bid limit orders at prices above the most recent execution price during the May 2021 depeg, such order types are entirely consistent with a desire to buy UST at prices below $1 and would execute only at the lowest price any platform participant was willing to sell.[28]

*Second*, Plaintiff alleges that the Jump Defendants' trading was manipulative because it caused the "prompt[] rebound[]" of UST's price. AC ¶¶ 119, 139–143. But "legitimate trading activities … permissibly may influence prices." *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 205 (3d Cir. 2001). Moreover, Plaintiff offers no particularized support for his conclusory allegation that the Jump Defendants could have been, let alone were, the but-for cause of artificial price movements in a multibillion-dollar market, particularly when an AC exhibit acknowledges "other purchasers of UST" between "May 23 to May 25, 2021." Dkt. 56-2 at 1375:3–7. Further, UST remained at its $1 peg for nearly a year after the May 2021 depeg, *see* AC ¶¶ 135, 183, and Plaintiff does not allege the Jump Defendants engaged in manipulative conduct during that period, indicating $1 was UST's fair value, not an artificial price.

*Third*, Plaintiff alleges that the Jump Defendants' trading was manipulative because they "did not disclose" agreements with Terraform to purchase discounted LUNA. AC ¶ 132. This theory seeks to impose a duty to disclose where none exists. "[S]ilence in connection with the purchase … of securities" constitutes fraud only when the purchaser has "a duty to disclose arising from a relationship of trust and confidence between parties to a transaction." *Chiarella v. United States*, 445 U.S. 222, 230 (1980). The Jump Defendants had no duty to tell "the market as a whole" about economic benefits they derived from private transactions. *Id.* at 231. Indeed, considering

[28]Plaintiff does not allege that the Jump Defendants ever purchased, or offered to purchase, UST above $1.

essentially identical allegations, *Patterson* recognized that JTLLC did not have "any duty to disclose" its purported "role in the re-peg." 710 F. Supp. 3d at 716–17.

*Fourth*, Plaintiff tries to plead manipulation by invoking the SEC's findings in its Cease-and-Desist Order with TMSL. AC ¶¶ 145, 224–229. But the Order states that TMSL settled "without admitting" the findings asserted therein under a negligence standard. Ex. 2 at 1–2, TMSL Order. Also, where, as here, a "consent judgment between a federal agency and a private corporation … is not the result of an actual adjudication of any of the issues," a private plaintiff cannot use that judgment to advance "subsequent litigation." *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *4 (N.D. Ill. Feb. 9, 2012). "[M]erely stating that 'the SEC alleges' certain additional facts" does not satisfy Rule 11's "non-delegable" duty or the PSLRA's pleading requirements. *Geinko v. Padda*, 2002 WL 276236, at *6 (N.D. Ill. Feb. 27, 2002).

*Fifth*, Plaintiff asserts that the Challenged Statements were manipulative acts. AC ¶¶ 254–258, 337. But Plaintiff cannot "repackage [his] misstatement claims as scheme liability claims." *SEC v. Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022). And because his statement-based claim fails, *see supra* § V.D, so does this aspect of his scheme-based claim. *See KBC Asset Mgmt. NV v. Discover Fin. Servs.*, 2025 WL 976120, at *29 (N.D. Ill. Mar. 31, 2025).

**2. Plaintiff Fails To Plead Scienter**

Plaintiff's scheme liability claim must also satisfy the PSLRA's demanding scienter standard. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 101–02 (2d Cir. 2007). Scienter is "particularly important" in the context of alleged market manipulation because a defendant's state of mind may distinguish "legitimate trading from improper manipulation." *Id.* at 102.

Plaintiff's allegations that the Jump Defendants bought UST to restore the $1 peg do not establish intent to deceive the market. As *Patterson* explained, the Jump Defendants' May 2021 purchases "could reflect a benign business decision" if they "truthfully believed [they were]

purchasing the tokens below their real value." 710 F. Supp. 3d at 717. This holding makes sense, as the far more compelling inference is that the Jump Defendants' purchases of UST at prices below $1 in May 2021 reflect a motive to pursue profit, not to manipulate. *See Stark Trading*, 2008 WL 153542, at *11; *supra* § V.D.2. The AC supports this innocent inference, alleging that DiSomma believed the value of UST to be $1. AC ¶ 138 (alleging DiSomma stated UST "*should* trade at 1:1 relative to" other stablecoins pegged to the U.S. dollar) (emphasis in original).

Plaintiff asserts that the Jump Defendants' "real profit motives" were to take advantage of the removal of vesting conditions for Terraform's loan of LUNA tokens. AC ¶¶ 126, 128. That assertion rests on the unwarranted assumption that because the Jump Defendants renegotiated the vesting schedule, they did not really believe UST was worth $1. But two things can be true at once: the Jump Defendants saw opportunities for profit with UST *and* to improve the terms of their loan agreement. That describes a "mutually beneficial" arrangement for the Jump Defendants and Terraform, *ATSI*, 493 F.3d at 104, or, at most, an aggressive attempt to extract profits. In any event, a desire to negotiate better terms and increase profits is consistent with the fundamental nature of a business and is thus "too generic" to support scienter. *Plumbers & Pipefitters Loc. Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 956 (7th Cir. 2012).

Moreover, Plaintiff's allegations about the vesting schedule and LFG contradict his sweeping assertion that the Jump Defendants co-orchestrated a "pump-and-dump scheme" in May 2021. AC ¶¶ 1, 18. The modified loan agreement extended the vesting schedule, providing that the Jump Defendants would receive tranches of LUNA "through August *2025*," three years longer than the prior delivery schedule and more than four years after they made their allegedly manipulative purchases of UST. AC ¶¶ 150, 72 (describing earlier agreement to deliver LUNA "over 12 to 24 months"). And the Jump Defendants increased LFG's reserve assets by exchanging

Bitcoin for LUNA that could not be sold in the near term and acknowledged the need for external support when "extreme price movements" occur. AC ¶ 176. Cementing long-term relationships and making long-term illiquid investments would make no sense if, as Plaintiff contends, the Jump Defendants knew the UST peg and the Terra Ecosystem could collapse at any moment.

Plaintiff also suggests that the Jump Defendants' trading after the May 2021 repeg was designed to avoid "alert[ing] other market participants to Jump's role in restoring the peg or trigger[ing] another depeg." AC ¶ 137. But "unwind[ing]" a long position, AC ¶ 137, is precisely how a trader monetizes purchases it made at prices below the asset's value. It is the "sell high" component of the classic tenet of trading to "buy low and sell high." And "carefully" unwinding a position, AC ¶ 137, is simply a way to avoid flooding the market with supply, which could lead to the unprofitable trading of any asset. Plaintiff's attempt to impugn a desire to *avoid* destabilizing trades rings hollow; after all, he currently is suing another trading firm (Jane Street Group) for the same losses he claims here because that trading firm allegedly "precipitated a steep sell off in UST" and a permanent depeg. Ex. 16, Compl. ¶¶ 120, 318, 352, 389, *Snyder v. Jane St. Grp., LLC*, No. 1:26-cv-1504 (S.D.N.Y. Feb. 23, 2026), Dkt. 1 ("Jane Street Compl."). Moreover, the Jump Defendants' public statements undercut any inference that they tried to create an "illusion that the Terra Ecosystem was stable." AC ¶ 336. Before, during, and after the May 2021 depeg, "JumpTrading" authored detailed posts on Terra's Research Forum regarding the peg's potential vulnerability and proposed ways to "help protect the system."[29] These cautionary statements are

[29] Ex. 17, JumpTrading, *Terra on-chain liquidity parameters*, Terra's Research Forum (Jan. 20, 2021), https://classic-agora.terra.money/t/terra-on-chain-liquidity-parameters/305; *see also* Ex. 18, *JumpTrading, Liquidity Parameters – 2*, Terra's Research Forum (May 21, 2021), https://classic-agora.terra.money/t/liquidity-parameters-2/1175 (describing changes to protocol that could provide a "line of defense … in the event of an attack"); Ex. 19, JumpTrading, "Liquidity Parameters – 3" Terra's Research Forum (Jan. 29, 2022), https://classic-agora.terra.money/t/liquidity-parameters-3/3895 (given "changes in the UST ecosystem, the on-chain liquidity parameters should be updated to preserve stability").

incompatible with a compelling inference of scienter.

In short, Plaintiff describes a trading firm seeking profit, not manipulative intent.

**3. Plaintiff Fails To Plead Reliance**

To plead reliance, Plaintiff must allege that the Jump Defendants' supposedly manipulative acts "influenced" Crypto Loss Claimants' "conduct" in purchasing UST and LUNA. *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 433 (S.D.N.Y. 2010). According to Plaintiff, Claimants relied on "the stability created by the algorithmic relationship between UST and LUNA" in purchasing those tokens. AC ¶ 342. This conclusory assertion, seemingly intended to apply to each Claimant, does not even begin to "tie" Claimants' "actions to anything the" Jump Defendants "purportedly did." *Cohen*, 722 F. Supp. 2d at 433. Indeed, because Plaintiff does not adequately plead when a single Claimant bought or sold UST, he cannot show that any—let alone each—was influenced by the Jump Defendants' alleged manipulative trading in May 2021. *See supra* § V.D.3. And Plaintiff cannot sidestep his failure to plead direct reliance by invoking the fraud-on-the-market presumption. *See supra* § V.D.3.

**4. Plaintiff Fails To Plead Loss Causation**

To plead loss causation, Plaintiff must show that Crypto Loss Claimants suffered losses because of the Jump Defendants' alleged manipulative acts rather than due to "changed economic circumstances" or "other events." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005). Plaintiff says the Jump Defendants' acts caused Crypto Loss Claimants to buy UST and LUNA at "artificially inflated" prices. AC ¶ 345. But without basic details about the timing of Claimants' transactions, this theory cannot succeed. *See supra* § V.B.

Further, because the Jump Defendants' alleged manipulative trading occurred in May 2021 and Plaintiff alleges "[o]n information and belief" that Claimants' trading happened at unspecified times "between the May 2021 depeg and the Terra Ecosystem's collapse" in May 2022, AC ¶ 294,

Plaintiff's theory of loss causation requires the extraordinary and unsupported logical leap that any artificial effect on UST's price lingered for up to a year after the alleged manipulation ended. *See Gamma Traders - I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71, 80 (2d Cir. 2022) ("conclusory statement[]" that manipulation "caused prices to be artificial throughout the Class Period" insufficient for Commodity Exchange Act claim). That theory is especially non-viable given the extensive, intervening trading activity and LFG's announcement publicly reiterating the risk that the peg could need external support. *See supra* §§ V.D.4, V.E.1. Indeed, Plaintiff's suit against Jane Street Group alleges that Jane Street's trading "precipitated" the depeg that "ultimately led to the collapse of the Terra ecosystem." Ex. 16, Jane Street Compl. ¶ 120.

**F. Plaintiff Fails To Plead Market Manipulation Under Section 9(a)**

A private claim for manipulation under Section 9(a) is similar to, but "more difficult to" plead than, a scheme liability claim under Rule 10b-5(a) and (c). *Chemetron Corp. v. Bus. Funds, Inc.*, 682 F.2d 1149, 1165 (5th Cir. 1982). To state a Section 9(a) manipulation claim, Plaintiff must plead (1) a manipulative act in violation of Section 9(a); (2) carried out willfully and with specific intent; (3) for the purpose of inducing the security's sale or purchase by others; (4) that was relied on; and (5) affected the security's purchase or sale price. *See Stark Trading*, 2008 WL 153542, at *15. Plaintiff fails at each turn.

**1. Plaintiff Fails To Plead a Manipulative Act That Violates Section 9(a)**

Plaintiff alleges that the Jump Defendants "signal[led] false demand to the market" by purchasing UST during the May 2021 depeg, creating an "artificial price" of $1. AC ¶¶ 356, 362, 364–366. As noted, Plaintiff fails to plead that any Jump Defendant engaged in any manipulative transactions or injected false information into the market. *See supra* § V.E.1. By buying UST at prices below $1 on the open market, they "accumulate[d] a long position." AC ¶ 128. That is not "inherently manipulative," but rather consistent with their profit-seeking motivation to purchase

UST below perceived fair value. *ATSI*, 493 F.3d at 101; *see Cohen*, 722 F. Supp. 2d at 424–25.

Although Plaintiff also gestures at Section 9(a)(6)'s prohibition on pegging, fixing, or stabilizing prices in violation of SEC rules and regulations, AC ¶ 356, he does not, as required, allege a violation of any other rule or regulation regarding such activities. *See Friedman v. Salomon/Smith Barney, Inc.*, 313 F.3d 796, 803 (2d Cir. 2002) (explaining that 15 U.S.C. § 78i(a) "allows price stabilization practices that the SEC does not prohibit" and does not "prohibit[] all price stabilization practices that the SEC does not specifically allow").

### 2. Plaintiff Fails To Plead a Willful and Intentional Violation

The second and third elements require Plaintiff to plead that each Jump Defendant "willfully participate[d]" in the violation, 15 U.S.C. § 78i(f), with specific intent to "mislead[]" others or "induc[e]" trading in a security, *id.* § 78i(a)(1)–(5). This specific-intent requirement is even more stringent than Section 10(b)'s demanding scienter requirement. *See Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005) ("Whereas Section 9(a)(1) requires a showing of specific intent, Rule 10b-5 generally requires only 'extreme recklessness.'"). Because Plaintiff fails to plead scienter under Section 10(b), *see supra* §§ V.D.2, V.E.2, he necessarily fails to plead willfulness under Section 9(a). Nor do his allegations satisfy Section 9(a)'s "distinct and more specific requirement" to plead intent to mislead or to induce others to trade. *Chemetron*, 682 F.2d at 1162. Plaintiff's allegations are consistent with the Jump Defendants having a desire to buy UST at prices below $1, no matter how other market participants behaved.

### 3. Plaintiff Fails To Plead Reliance and Loss Causation

Section 9(a)'s reliance and loss causation requirements mirror those under Section 10(b). *See Perry v. Eastman Kodak Co.*, 1991 WL 629728, at *7 (S.D. Ind. Apr. 22, 1991), *aff'd*, 1992 WL 103695 (7th Cir. 1992). Thus, as with Plaintiff's Section 10(b) claim, *see supra* §§ V.D.3–4, V.E.3–4, the AC's failure to plead when or at what price Crypto Loss Claimants purchased tokens

dooms causation and reliance for his Section 9(a) claim.

## VI. PLAINTIFF'S FRAUDULENT TRANSFER CLAIMS FAIL (COUNTS 9–12)

The original complaint brought two sets of fraudulent transfer claims: (i) on behalf of Terraform and Crypto Loss Claimants, where the initial transfers were Terraform's transfers to LFG from January to April 2022; and (ii) on behalf of LFG, where the initial transfers were LFG's transfers of Bitcoin to the Jump Defendants in May 2022. Dkt. 1 ¶¶ 236–237. Both had fatal flaws based on timing, the alleged transferor, and the allegedly injured creditors. Dkt. 46 at 37–48.

The AC attempts to obscure those flaws by melding the two sets of claims. It targets only the second set—LFG's May 2022 transfers of Bitcoin to the Jump Defendants—but calls them transfers of *Terraform's* property (not LFG's) and brings them on behalf of Terraform and Crypto Loss Claimants (not LFG) based on the new theory that Terraform and LFG were alter egos because Kwon controlled both entities. AC ¶¶ 265–274.

Dismissal is warranted for four reasons. *First*, Plaintiff's claims on behalf of Crypto Loss Claimants fail because they had no fraudulent transfer claims to assign to Plaintiff. *Second*, Plaintiff's alter ego arguments fail because (i) estoppel bars him from pursuing his new alter ego theory, as it is inconsistent with Terraform's representations in the Chapter 11 Cases; (ii) Plaintiff's allegations do not support an alter ego finding under applicable Singapore law; and (iii) the remedy that Singapore law theoretically would supply does not support Plaintiff's fraudulent transfer claims. *Third*, the AC fails to plausibly allege a constructive or actual-intent fraudulent transfer. And *fourth*, Bankruptcy Code defenses bar these claims regardless.

### A. Plaintiff Cannot Bring Fraudulent Transfer Claims on Behalf of Crypto Loss Claimants (Counts 9–12)

Plaintiff purports to bring his fraudulent transfer claims not only on behalf of the Debtors, but also on behalf of Crypto Loss Claimants. AC ¶¶ 27, 28, 411, 428, 437, 450. But

Crypto Loss Claimants had no ability to bring those claims, and thus could not assign them to Plaintiff. *See United States v. Am. Nat'l Bank & Tr. Co. of Chi.*, 443 F. Supp. 167, 174 (N.D. Ill. 1977). Once a bankruptcy is filed, the bankruptcy estate obtains exclusive control to bring or assign fraudulent transfer claims. *See Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708–09 (7th Cir. 1994).[30] Because Crypto Loss Claimants had no claims to bring, they could not assign them to Plaintiff, who in turn cannot assert them.

### B. Plaintiff Fails To Adequately Allege That LFG and Terraform Were Alter Egos, and Thus That LFG's May 2022 Transfers of Its Bitcoin to the Jump Defendants Were Transfers of Terraform's Property (Counts 9–12)

Plaintiff's fraudulent transfer claims rest on his new theory that LFG and Terraform were alter egos, and thus that LFG's May 2022 transfer of Bitcoin to the Jump Defendants was actually a transfer of Terraform's property.[31] For this theory to survive, Plaintiff must adequately allege that: (1) Terraform is not estopped from pursuing this theory; (2) LFG and Terraform in fact were alter egos; and (3) LFG's and Terraform's alter ego status would mean that LFG's assets were actually Terraform's. AC ¶¶ 408, 425, 435, 448. Plaintiff's theory fails at each step.

#### 1. Plaintiff Is Estopped From Arguing LFG Was Terraform's Alter Ego

Judicial estoppel prevents Plaintiff from even asserting that LFG was an alter ego of Terraform, as Terraform consistently and successfully pressed the opposite position throughout its Chapter 11 Cases. The judicial estoppel doctrine "protect[s] the integrity of the judicial process by preventing parties from deliberately changing positions according to the exigencies of the

---

[30]This principle governs both state and federal fraudulent transfer claims. *See In re MortgageAmerica Corp.*, 714 F.2d 1266, 1275 (5th Cir. 1983); *see also Mitsubishi Elec. Sales Am., Inc. v. Higgins*, 1988 WL 151580, at *3 (N.D. Ill. Nov. 10, 1988).

[31]Plaintiff does not allege that Crypto Loss Claimants were LFG's creditors or even that LFG had creditors. Moreover, LFG did not file for bankruptcy, so even if they were LFG's creditors, they could not bring federal bankruptcy claims. *In re Lyons*, 130 B.R. 272, 276 (Bankr. N.D. Ill. 1991); *see also* 11 U.S.C. § 103(a) (Bankruptcy Code Chapter 5 applies only "in a case under chapter 7, 11, 12, or 13").

moment." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001). Three "considerations" guide the analysis: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 795 (7th Cir. 2013) (applying judicial estoppel to bankruptcy trustee). All three support estoppel here.

As to the first, Plaintiff's position in this suit contradicts Terraform's repeated representations in the Chapter 11 Cases that it and LFG were separate and distinct entities:

- Terraform described LFG as a separate entity from Terraform in multiple filings. Ex. 20, *Terraform* Dkt. 18 at 27 ("LFG does not sit within the Debtor's corporate structure"); Ex. 3, *Terraform* Dkt. 569 at 44 (referring to discovery requests on the Debtors and "other entities, such as LFG");

- Terraform's Schedule of Assets and Liabilities listed its contracts with LFG—a representation that treats LFG as an independent counterparty, not an alter ego. Ex. 21, *Terraform* Dkt. 514 at 38;

- Terraform listed LFG in its creditor matrix, recognizing LFG as an outside creditor holding claims against the Terraform estate. Ex. 22, *Terraform* Dkt. 420;

- Terraform's bar date notice for filing claims referred only to claims against Terraform, not against LFG. Ex. 23, *Terraform* Dkt. 444; and

- Terraform never sought substantive consolidation of LFG. Ex. 24, *Terraform* Dkt. 734.

As to the second and third considerations, Terraform persuaded the Bankruptcy Court to treat LFG as an entity separate from Terraform, which means that allowing Plaintiff to pull an about-face here would confer on him an unfair advantage. After all, Plaintiff's present suit against the Jump Defendants relies on the Chapter 11 Plan, Ex. 25, *Terraform* Dkt. 717, which would have been unconfirmable for several reasons had Terraform and LFG truly been alter egos:

- Creditors must receive notice of a proposed Chapter 11 Plan, *see* Fed. R. Bankr. P. 3017, but LFG's creditors received no such notice, Ex. 26, *Terraform* Dkt. 466 at 6;

- Creditors must receive an opportunity to vote in Terraform's bankruptcy, *see* 11 U.S.C. § 1126, but LFG's creditors were not permitted to vote, Ex. 3, *Terraform* Dkt. 569;

- The plan must designate classes of claims, *see* 11 U.S.C. §§ 1122, 1123(a)(1), 1129(a)(1)–(2), but the Chapter 11 Plan does not place claims against LFG in any class; and

- The plan must specify the treatment of impaired classes of claims and such treatment must be the same as other claims in the same class, *see* 11 U.S.C. §§ 1123(a)(3)–(4), 1129(a)(1)–(2), but the Chapter 11 Plan does not provide any treatment (much less any recovery) for any of LFG's creditors.

Because Terraform treated LFG as a separate entity through Chapter 11, Terraform is judicially estopped from now asserting that LFG was an alter ego whose assets and liabilities belong to the debtor. And because Terraform is estopped, so too is Plaintiff, who as Plan Administrator steps into Terraform's shoes and has no more rights than Terraform. *See Zapata Gulf Marine Corp. v. P.R. Mar. Shipping Auth.*, 731 F. Supp. 747, 748 (E.D. La. 1990) (plaintiff-assignee judicially estopped from asserting alter ego theory where its assignor had taken contrary position in ICC proceedings); *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP*, 232 F. Supp. 3d 558, 573 (S.D.N.Y. 2017) ("The plan administrator … must stand 'in [debtor's] shoes' when asserting [debtor's] claims.").

In sum, because Terraform "strategic[ally] den[ied]" in the Chapter 11 Cases that it and LFG were alter egos, Plaintiff cannot make a "subsequent claim to [LFG's] assets in a different proceeding." *Adelphia Recovery Tr. v. Goldman, Sachs & Co.*, 748 F.3d 110, 118–19 (2d Cir. 2014) (litigation trust estopped from reversing the debtor's position on account ownership).

### 2. Plaintiff Does Not Adequately Allege That LFG and Terraform Were Alter Egos Under Governing Singapore Law

Piercing LFG's corporate veil—as Plaintiff seeks to do in deeming LFG's Bitcoin to have belonged to Terraform—requires finding that LFG was Terraform's alter ego. *See Semande v.*

*Estes*, 871 N.E.2d 268, 271 (Ill. App. 2007). Even setting aside estoppel, Plaintiff's effort fails.

Under the Illinois internal affairs doctrine, veil-piercing claims are governed by the law of the state of incorporation of the entity whose veil is sought to be pierced. *See supra* § I.B. Because LFG was incorporated in Singapore, AC ¶ 170, Singapore law governs the alter ego analysis.

Singapore law forecloses Plaintiff's attempt to pierce the corporate veil. Under Singapore law, the "fundamental principle" that companies are separate legal personalities with distinct rights and obligations is the "[b]edrock of company law." Declaration of Allister Brendan Tan Yu Kuan ("Decl."), filed contemporaneously herewith, ¶ 8.[32] Veil piercing under Singapore law is thus an "exceptional exercise." *Id.* ¶ 9.

Here, Plaintiff presses "horizontal" veil piercing, *i.e.*, piercing between two companies (Terraform and LFG) where neither owns the other but instead are alleged to be under common control (by Kwon). AC ¶ 265. Singapore law rejects horizontal veil piercing based on this type of "common control" allegation. Decl. ¶ 13. The operation of a group of companies under common control, even if interconnected and even if created for the very purpose of limiting liability, does not justify piercing the veil between them. *Id.* ¶¶ 14–17. Nor does the use of assets held by one commonly controlled corporation to fulfill the corporate interests of another commonly controlled corporation justify veil piercing. *Id.* ¶ 18. Singapore courts decline to pierce the veil between affiliates based on these factors. *Id.* ¶ 20.

These principles reveal four fatal flaws in Plaintiff's alter ego theory. *First*, as noted, the theory is based on Kwon's alleged control of both LFG and Terraform, not Terraform's control of LFG. AC ¶¶ 188–192. According to Plaintiff, Kwon—not Terraform—controlled how LFG

[32] Mr. Tan has nearly twenty years' experience as a solicitor, the last eleven of which have been as a member of the Singapore bar, and he specializes in corporate and commercial matters. Decl. ¶ 2. His declaration is appropriately considered under Federal Rule of Civil Procedure 44.1.

carried out its business. AC ¶¶ 188, 265–266, 274. Indeed, Plaintiff alleges that "Kwon controlled and operated LFG as an arm of Terraform," AC ¶ 265, and "caused LFG's and Terraform's assets to be commingled in a single trading account," AC ¶ 274.[33] And even where alleging that Terraform employees utilized LFG assets, Plaintiff acknowledges that "Kwon directed the Terraform team when and how to deploy the assets in LFG's wallets." AC ¶ 188. There is thus no basis under Singapore law to treat LFG as Terraform's alter ego. Decl. ¶ 31.

*Second*, even if Plaintiff alleged that Terraform—not Kwon—controlled LFG, those allegations would remain insufficient under Singapore law. *Id.* ¶¶ 15–17. Plaintiff alleges that Kwon served on the board of LFG and co-founded Terraform, AC ¶ 172, but an overlap in the management of two companies does not suffice to pierce the veil. Decl. ¶¶ 15–17 (citing *Simgood Pte Ltd v MLC Shipbuilding Sdn Bhd and others* [2016] 1 SLR 1129 at [195]). Plaintiff also alleges that Terraform employees held the keys to LFG's crypto wallets, that Terraform shared employees with LFG, and that LFG was treated as an "arm" of Terraform. AC ¶¶ 172, 267, 269, 272. But such allegations of control, or that employees of one entity provided services for another, likewise do not provide a basis for veil piercing under Singapore law. Decl. ¶ 29.

*Third*, the alleged use of LFG's assets to benefit Terraform, AC ¶ 189, does not alter the analysis because Plaintiff admits that LFG existed to defend the UST peg, AC ¶ 170, and thus LFG's use of its Bitcoin supported its express corporate purpose, regardless of whether it *also* supported Terraform's. Decl. ¶¶ 18–20. Moreover, the use of a company's assets to benefit an affiliate does not support veil piercing under Singapore law. *Id.*

*Fourth*, other facts alleged in the AC confirm that Terraform and LFG were not alter egos.

---

[33]Judge Rakoff's June 12, 2024 order in the SEC's enforcement action—which the AC cites—confirms that it was *Kwon*, not Terraform, who controlled LFG. AC ¶ 407 ("Jed S. Rakoff entered a judgment directing Kwon to use his control over LFG's assets ….").

Plaintiff acknowledges that Terraform and LFG entered into a Service Agreement in which Terraform agreed to provide all accounting, finance, and tax-related operations and responsibilities for LFG. AC ¶ 266. But if LFG were indeed Terraform's alter ego, the Service Agreement would have been unnecessary. Decl. ¶ 26.[34] Furthermore, Plaintiff admits that LFG had a second director, Ching Mia Kuang, who under Singapore law also owed fiduciary duties to LFG, such that Kwon was not the only person on the board who made decisions. Decl. ¶ 28. And even if Ching violated his fiduciary duties, that would not support punishing LFG by piercing its veil. *Id.*

Because he relies solely on allegations of common control and shared resources—which Singapore law expressly rejects as bases for veil piercing—Plaintiff fails to allege the exceptional circumstances necessary to justify disregarding the separate legal personalities of Terraform and LFG under Singapore law, which defeats his new alter ego theory.

### 3. LFG's Bitcoin Would Still Not Be Terraform's Property Even If LFG Were Terraform's Alter Ego

Even if Plaintiff were not estopped, and even if he adequately alleged that LFG were Terraform's alter ego, Terraform still would not be deemed to own LFG's assets under Singapore law. A fraudulent transfer claim exists only if "an interest of the debtor in property" was transferred. 11 U.S.C. §§ 548(a)(1), 544(b)(1); *see also* 740 ILCS 160/5(a) (defining "transfer[s]" as transfers of "assets," defined in turn as "property of the debtor"). Thus, Plaintiff must plausibly allege that Terraform had an actual property interest in LFG's Bitcoin.

He cannot. Singapore law holds that one company's assets may not be appropriated by another company—even if they are alter egos—through veil piercing. Decl. ¶¶ 32–36 (citing *Goh*

[34]Although Plaintiff alleges that the Service Agreement was not arm's-length because it was signed by Kwon on behalf of LFG, AC ¶ 266, Plaintiff does not claim the contract is void, and contracts are not invalidated under Singapore law simply because they are between affiliates. Decl. ¶ 22. Indeed, such shared service agreements are common corporate mechanisms. *Id.* ¶ 26.

*Chan Peng and others v Beyonics Technology Ltd and another* [2017] 2 SLR 592 at [60]). While veil piercing under Singapore law imposes the controlled entity's *liabilities* upon the controlling entity, it does not let the controlling entity take the controlled company's *assets*. Decl. ¶¶ 32–37. That is, alter ego is not an offensive doctrine—a "controlling" entity cannot assert that it controls another entity in an effort to take that entity's assets. The Bitcoin that LFG transferred to the Jump Defendants was an asset that would not become Terraform's property under Singapore law even if Terraform were a "controlling entity." *Id.* ¶ 37. And under U.S. law, where, as here, the governing veil piercing law "does not transform the alter ego's property into the property of the debtor, but rather simply allows a creditor to pursue the alter ego under a vicarious liability theory, the trustee has not stated a [fraudulent transfer] claim." *In re Howland*, 674 F. App'x 482, 487 (6th Cir. 2017); *see also In re DuMouchelle*, 663 B.R. 349, 355–56 (E.D. Mich. 2024).

Accordingly, Plaintiff's fraudulent transfer claims fail for this reason as well.

### C. Plaintiff Fails To Plead the Elements of a Fraudulent Transfer Claim (Counts 9–12)

#### 1. Plaintiff Fails To State an Actual Fraudulent Transfer (Counts 9, 11)

As to the actual fraudulent transfer claims, Plaintiff fails to allege facts with particularity that, if true, would show that Terraform caused LFG to transfer LFG's Bitcoin to the Jump Defendants "with actual intent to hinder, delay, or defraud" Terraform's creditors. 740 ILCS 160/5(a)(1); 11 U.S.C. § 548(a)(1)(A); *see In re Gluth Bros. Constr., Inc.*, 424 B.R. 368, 374–77 (Bankr. N.D. Ill. 2009). Plaintiff's conclusory allegations simply parrot the governing standard. AC ¶¶ 406, 433 ("Kwon and Terraform directed this transfer with actual intent to hinder, delay, or defraud creditors of Terraform."); AC ¶¶ 171–172 (LFG was used as an "extension of Terraform" to defraud creditors). Such bald allegations are insufficient. *See In re Gluth Bros.*, 424 B.R. at 377 (allegation that "transfers were made 'with knowledge that the transfer would hinder, delay,

or defraud the creditors' recovery'" was insufficient); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 478 (7th Cir. 2005) (affirming dismissal where Trustee's general allegation of fraudulent behavior did not adequately allege intent to hinder, delay, or defraud creditors).

In fact, these conclusory allegations are belied by Plaintiff's acknowledgment that LFG's fundamental purpose was to deploy assets from its reserve to help defend the UST peg. AC ¶¶ 170, 175–176, 257. Thus, LFG's transfer of Bitcoin to the Jump Defendants to facilitate Jump's purchases of UST during an ongoing substantial de-pegging event of UST is not evidence of fraudulent intent; rather, it is exactly the type of activity LFG was established to do. *See In re Edgewater Med. Ctr.*, 373 B.R. 845, 856 (Bankr. N.D. Ill. 2007) (no fraudulent intent where transfers were necessary for the debtor's ordinary course operations).

Nor does Plaintiff plead any plausible motive for Terraform and its principals to defraud its creditors. The "paradigmatic cases of actual fraud" are when a debtor or its principals transfer assets to benefit them or those close to them, at the expense of creditors. *Grede v. UBS Secs., LLC*, 303 F. Supp. 3d 638, 670 (N.D. Ill. 2018). But Plaintiff nowhere alleges any benefit to Kwon, Terraform, or any of its other principals arising from LFG's transfers of Bitcoin to the Jump Defendants. Instead, Plaintiff concedes the alternative, non-fraudulent reason that the transfers were designed to help Terraform defend the UST peg. AC ¶¶ 140, 189. Plaintiff cannot plausibly allege that (i) Terraform and the Jump Defendants created LFG to "defend the UST peg in the future," AC ¶¶ 169–170, (ii) that the transfers were made during a major de-pegging event to facilitate the purchase of UST, AC ¶¶ 187–191, and yet (iii) "the main or only purpose of the transfer[s] was to prevent a lawful creditor from collecting a debt." *Grede*, 303 F. Supp. 3d at 656.

Absent direct evidence of fraud, a plaintiff can allege circumstantial evidence of fraudulent intent through "badges of fraud." Here, however, the Court need not conduct a badges analysis

because a legitimate purpose for LFG's transfers of Bitcoin to the Jump Defendants renders badges of fraud irrelevant. *See In re Edgewater Med. Ctr.*, 373 B.R. at 856. Moreover, Plaintiff does not even claim he is relying on any badges; he alleges no facts whatsoever regarding six badges;[35] and for the remaining five, he fails to allege facts with sufficient particularity to raise an inference of fraud.[36] *See In re Fairgrieves*, 426 B.R. 748, 758 (Bankr. N.D. Ill. 2010).

**2. Plaintiff Fails To State a Constructive Fraudulent Transfer (Counts 10, 12)**

As to the constructive fraudulent transfer claims, Plaintiff fails to allege facts to show the requisite elements, *i.e.*, that Terraform—assuming it was LFG's alter ego—(i) received less than reasonably equivalent value in exchange for the transfer and (ii) was insolvent at the time of the transfer. *See* 740 ILCS 160/5(a)(2); 11 U.S.C. § 548(a)(1)(B); *Mathews v. Serafin*, 744 N.E.2d 934, 937 (Ill. App. 2001); *In re 4100 W. Grand LLC*, 481 B.R. 444, 454 (Bankr. N.D. Ill. 2012).

a. *Terraform Received Reasonably Equivalent Value*

As to reasonably equivalent value, there is no "fixed mathematical formula" or a requirement of "dollar-for-dollar" equivalence. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). And the analysis considers "indirect benefits" as well as "direct benefits" to the debtor. *In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (Bankr. C.D. Ill. 2006) (citing *In re*

[35]Those are that LFG retained control over the assets (Badge 2); LFG was sued or threatened with suit before the transfers (Badge 4); the transfer was substantially all of LFG's assets (Badge 5); LFG absconded (Badge 6); the transfers occurred shortly before or after a substantial debt was incurred (Badge 10); or LFG transferred assets to a lienor who then transferred them to an insider (Badge 11). *See In re Gluth Bros.*, 424 B.R. at 375.

[36]Plaintiff seeks to frame the Jump Defendants as LFG insiders (Badge 1) by virtue of Kariya's role on the Governing Council, but Plaintiff admits the "so-called Governing Council had no governing power," AC ¶ 172; Plaintiff's allegations contradict concealment of the assets or the transfer of those assets (Badge 3 and Badge 7) given his admission that it was public knowledge that LFG held the assets and that they would be deployed as needed to stabilize the peg, and the Jump Defendants were publicly involved in supporting LFG and discussed activities aimed at defending the peg, AC ¶¶ 176, 195, 202; Plaintiff's allegations establish that Terraform did receive consideration (Badge 8) (*see infra* § VI.C.2.a); and Plaintiff's insolvency allegations (Badge 9) are either conclusory or self-contradictory (*see infra* § VI.C.2.b).

*Image Worldwide, Ltd.*, 139 F.3d 574, 578 (7th Cir. 1998)). Moreover, value must be assessed "as of the date of the transfer," not in hindsight. *Peterson v. TTS Granite Inc. (In re Mack Indus., Ltd.)*, 622 B.R. 887, 893 (Bankr. N.D. Ill. 2020).

Under Plaintiff's allegations, LFG and the Jump Defendants formed an agreement by which LFG would transfer 52,189 Bitcoin to the Jump Defendants, the Jump Defendants would trade that Bitcoin for UST to defend UST's peg, and the Jump Defendants would return the UST to LFG. AC ¶¶ 19, 191, 193, 212. According to Plaintiff, "Jump was expected to deploy the 52,189 Bitcoin it received from LFG to defend UST's $1 peg." AC ¶ 195. Plaintiff therefore admits that, under the agreement, LFG would receive the same market value but in UST rather than Bitcoin, *plus* the indirect benefit of defending the peg. The alternative explanation—that two corporate entities made gratuitous gifts to one another in close temporal proximity for no reason—is implausible. And an agreement to receive the market equivalent of a transferred asset is reasonably equivalent value. *See In re Apollo Steel Co.*, 1994 WL 713697, at *6 (Bankr. N.D. Ill. Dec. 19, 1994) (looking to value "at the time the agreement was consummated" to determine whether there was reasonably equivalent value); *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990) ("[n]either subsequent depreciation in nor appreciation in value" of the consideration affects the reasonably equivalent value determination); *cf. In re Chomakos*, 69 F.3d 769, 771 (6th Cir. 1995) (gambling losses could not be avoided as a fraudulent transfer because "the contractual right to a payoff if the market happens to move the right way at the right time constitutes a value reasonably equivalent to the money at risk").

Although the agreement itself demonstrates reasonably equivalent value, the results confirm this. LFG transferred 52,189 Bitcoin worth approximately $1.5 billion to the Jump Defendants. AC ¶¶ 191, 193. In exchange, Terraform (which under Plaintiff's alter ego theory is

the same as LFG) received 1,515,689,462 UST and 5,313 Bitcoin. AC ¶¶ 211, 213–214. Using end of day pricing, which understates the value of what was received,[37] the returned Bitcoin was worth $158,127,518.96,[38] and the UST was worth $1,214,274,908.52,[39] which totals $1,372,402,427.48, or 91% of the value of the transferred Bitcoin. "The law does not demand that a plaintiff receive an amount equal to the fair market value of the asset it transfers; the consideration must only be *reasonably equivalent*." *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 364 (S.D. Tex. 2008) (emphasis in original); *see In re Pawlak*, 483 B.R. 169, 183 (Bankr. W.D. Wis. 2012) ("The exchange need not involve exact equality in value; it is enough for there to be 'rough' proximity."). Considering the totality of the circumstances, 91% of fair market value was reasonably equivalent. *See ASARCO LLC*, 396 B.R. at 364 (transfer worth 85%–90% of fair market value was reasonably equivalent, despite difference in value of at least $83 million); *In re Carbaat*, 357 B.R. 553, 561 (Bankr. N.D. Cal. 2006) ("70 percent of the value transferred" would be "reasonabl[y] equivalent").

b. *Plaintiff Fails To Adequately Allege Terraform's Insolvency at the Time LFG Transferred Bitcoin to the Jump Defendants*

Plaintiff also fails to plausibly allege that Terraform was insolvent "at the time the debtor

---

[37]Indeed, using the highest price that day (rather than the closing price), the value returned would be approximately 97%. Ex. 27, *Bitcoin USD Price Historical Data*, Yahoo!Finance, https://finance.yahoo.com/quote/BTC-USD/history.

[38]Plaintiff alleges the Jump Defendants returned 5,000 Bitcoin in five transactions on May 11, 2022, or "[t]hereafter" and 313 Bitcoin on May 16, 2022. AC ¶¶ 211–213. From May 11 to 16, 2022, the average closing price of Bitcoin was $29,756.09. Ex. 27, *Bitcoin USD Price Historical Data*, Yahoo!Finance, https://finance.yahoo.com/quote/BTC-USD/history. The 5,000 Bitcoin Terraform received were worth approximately $148,780,425. On May 16, 2022, Bitcoin closed at $29,862.92. *Id.*; *see also* Ex. 28, *Historical Snapshot – 16 May 2022*, CoinMarketCap, https://coinmarketcap.com/historical/20220516/. The 313 Bitcoin LFG received were worth $9,347,093.96.

[39]Plaintiff alleges that the Jump Defendants transferred 1,515,689,462 UST on May 11, 2022. AC ¶ 211. The closing price of UST that day was $0.801137. Ex. 29, *TerraClassicUSD USD Historical Data*, Yahoo!Finance, https://finance.yahoo.com/quote/USTC-USD/history; Ex. 30, *Historical Snapshot – 11 May 2022*, CoinMarketCap, https://coinmarketcap.com/historical/20220511/ (listing UST price as $0.8011).

transferred value or incurred an obligation." *Mellon Bank, N.A. v. Metro Comm'ns, Inc.*, 945 F.2d 635, 648–50 (3d Cir. 1991). Indeed, Plaintiff alleges no facts showing that Terraform's liabilities exceeded its assets at the relevant times. Terraform—again assuming that LFG and Terraform were alter egos—held well over $2 billion in assets.[40] Yet Plaintiff nowhere alleges what Terraform's liabilities were at the time of the Bitcoin transfer, and so fails to adequately allege that Terraform's liabilities exceeded its assets. Absent such an allegation, Plaintiff cannot establish that Terraform was insolvent or rendered insolvent by the Bitcoin transfer. *See In re Fairgrieves*, 426 B.R. at 758 (dismissing fraudulent discharge claim where plaintiff failed to allege "the company's liabilities exceed[ed] its assets"); *In re VitaHEAT Med., LLC*, 629 B.R. 250, 261 (Bankr. N.D. Ill. 2021) ("[A] complaint alleging a constructive fraud claim 'must plead facts from which an inference of insolvency can be drawn.'").

Plaintiff's conclusory assertions that Terraform was in a "death spiral" and UST was in the midst of a bank run on May 8–9, AC ¶¶ 194, 422, 446, fail to satisfy his burden of alleging facts showing insolvency. *See In re Life Fund 5.1 LLC*, 2010 WL 2650024, at *7 (Bankr. N.D. Ill. June 30, 2010) (complaint "must plead facts in support [of insolvency]"). That is especially so given his admission that UST's price was still near $1 at the time of the transfers, AC ¶ 204—the opposite of what one would expect if Terraform was insolvent and in a "death spiral."

**D. The Fraudulent Transfer Claims Fail Because Jump Was a Good Faith Transferee (Counts 9–12)**

Even if a fraudulent transfer occurs, a transferee can avoid liability to the extent it gave value to the debtor and acted in good faith. *See* 11 U.S.C. § 548(c); 740 ILCS 160/9(a), (d); *In re*

[40] Focusing on the transferred assets, it held approximately $1.5 billion in Bitcoin at the time of the transfer, and it received $1,372,402,427.48 (in the form of UST and returned Bitcoin) in that transfer. *See supra* § VI.C.2.a. In addition, Terraform held approximately another 28,000 Bitcoin, worth approximately $848.2 million. AC ¶¶ 191–192.

*Gluth Bros.*, 424 B.R. at 374 (describing federal defenses as applicable to IUFTA claims). A transferee acts in good faith where it has no way of knowing that a debtor is insolvent or has fraudulent intent. *See In re Hannover Corp.*, 310 F.3d 796, 800 (5th Cir. 2002). Plaintiff does not allege that the Jump Defendants were aware (or even suspected) that Terraform was insolvent. Even if Plaintiff alleges that the Jump Defendants "knew" or "should have known" in May 2022 that LFG had insufficient funds to defend the peg and that "the Terra Ecosystem could not sustain itself," AC ¶ 196, that is different from knowledge that the ecosystem operator is insolvent; indeed, Terraform owned over $800 million in Bitcoin alone. As to intent, Plaintiff acknowledges that the Jump Defendants accepted Bitcoin from LFG to deploy in defense of the peg (*i.e.*, LFG's purpose). AC ¶¶ 189, 195. Because the AC demonstrates that the Jump Defendants acted in good faith and provided value to LFG, the Jump Defendants are entitled to the good faith defense.

## VII. PLAINTIFF'S STATE LAW FRAUD CLAIMS FAIL FOR THE SAME REASONS AS THE FRAUD-BASED FEDERAL SECURITIES CLAIMS (COUNTS 6, 7)

Plaintiff's state law fraud claims rest on the same alleged false statements as his federal securities fraud claims, AC ¶¶ 374–390, and fail for the same reasons. The ICFA requires Plaintiff to plead: "(1) a deceptive act or practice, (2) an intent for the consumer to rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage that was (5) proximately caused by the deception." *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 748 (N.D. Ill. 2023). Common law fraud requires him to plead: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996). As discussed *supra* § V, Plaintiff does not allege a deceptive act or practice; a false statement of material fact; intent to induce Crypto

Loss Claimants to act (*i.e.*, scienter); reliance; or damage arising from the alleged fraud (*i.e.*, loss causation). Counts 6 and 7 thus fall along with Count 3.

## VIII. PLAINTIFF'S REMAINING COMMON LAW CLAIMS FAIL (COUNTS 1, 8)

### A. Aiding and Abetting Breach of Fiduciary Duty (Count 1)

An aiding and abetting claim requires an underlying violation, the defendant's knowledge of that violation, and substantial assistance in its commission. *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Plaintiff alleges the Jump Defendants aided and abetted Kwon's breach of fiduciary duty in four ways. AC ¶ 315. His claim fails for two reasons.

*First*, he does not plead the required elements with particularity. None of his four theories shows that the Jump Defendants "knowingly assisted the fiduciary … in [his] breach of duty." *Glob. Cash Network, Inc. v. Worldpay, US, Inc.*, 148 F. Supp. 3d 716, 724 (N.D. Ill. 2015).

***Fraudulent Pump-and-Dump.*** Plaintiff alleges the Jump Defendants "participated in the fraudulent pump-and-dump scheme for which Kwon was ultimately held civilly and criminally liable." AC ¶ 315. This claim fails out of the gate because Plaintiff does not state a claim against the Jump Defendants for participating in a "pump-and-dump" scheme. *See supra* § V.E. But even if he had stated such a claim, his aiding and abetting claim fails because he does not allege facts showing that the Jump Defendants *knowingly* and *substantially* assisted Kwon's breach of fiduciary duty to Terraform. *See In re Settlers' Hous. Serv., Inc.*, 514 B.R. 258, 279 (Bankr. N.D. Ill. 2014) (involvement in and benefit from alleged scheme does not satisfy substantial assistance).

***Misappropriation.*** Plaintiff next asserts that the Jump Defendants "conspired with Kwon to misappropriate LFG's Bitcoin to further the fraud in violation of Kwon's duties to Terraform." AC ¶ 315. But Plaintiff nowhere pleads that Kwon "use[d] corporate assets to further his own goals" or explains what he means by "misappropriate LFG's bitcoin." *Levy v. Markal Sales Corp.*, 643 N.E.2d 1206, 1217 (Ill. App. 1994). To the extent Plaintiff refers to the Jump Defendants'

sale of Bitcoin to purchase UST, *e.g.*, AC ¶ 195, Plaintiff pleads no facts showing that the transfers from LFG to Jump Defendants were for Kwon's benefit, as opposed to LFG's or Terraform's, or that, even if they were, that the Jump Defendants knew that fact at the time.

***Endorsement of Kwon's Statements.*** Plaintiff next contends that the Jump Defendants "endorsed Kwon's false and misleading public statements, making Kwon's misstatements more effective in misleading market participants." AC ¶ 315. But as to the statements by "Terraform and Kwon," AC ¶ 159, the AC nowhere alleges facts to show that the Jump Defendants "endorsed" those statements or how such endorsement would constitute substantial assistance.

***Growing the Ecosystem.*** Finally, Plaintiff contends that the Jump Defendants "advised Kwon on ways to grow the Terra Ecosystem while concealing risks from everyday investors." AC ¶ 315. The AC offers no well-pled allegations of any advice that the Jump Defendants provided to Kwon, nor any facts connecting the Jump Defendants' alleged advice to any breach of fiduciary duty by Kwon. And setting aside that Plaintiff fails to plead any duty to disclose or "concealment" by the Jump Defendants, *see supra* § V.E.1, these conclusory assertions concern the Jump Defendants' conduct toward "*everyday investors,*" not Kwon or Terraform.

Nor do Plaintiff's conclusory allegations that the Jump Defendants had "knowledge of and direct involvement in virtually every major decision made by Kwon" and "non-public information about the stability of the Terra Ecosystem," AC ¶ 316, cure Plaintiff's pleading failure. These broad statements do not identify a particular breach, or substantial assistance in that breach, by the Jump Defendants. Similarly, "knowledge" of Kwon's activities does not establish substantial assistance in them. *See In re Settlers' Hous. Serv., Inc.*, 514 B.R. at 279 (knowledge of breach and "role as part of the overall or tortious activity" does not constitute substantial assistance).

*Second*, Plaintiff's aiding and abetting claim independently fails because the AC pleads

directly into the "*in pari delicto* [defense]—the idea that, when the plaintiff is as culpable as the defendant, if not more so, the law will let the losses rest where they fell." *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012). Under that doctrine, "a participant in a fraud cannot claim to be a victim of its own fraud." *Id.*

For starters, the AC's allegation that Terraform "commit[ted] fraud" is the cornerstone of its aiding and abetting claim. AC ¶ 314. By Plaintiff's own account, Terraform participated in all the conduct that the Jump Defendants purportedly aided and abetted and "is thus equal in culpability" to them. *Peterson v. Winston & Strawn, LLP*, 2012 WL 4892758, at *5 (N.D. Ill. Oct. 10, 2012), *aff'd*, 729 F.3d 750 (7th Cir. 2013). For example, Terraform participated in the "false statements and omissions promoting UST and juicing the value of LUNA," AC ¶ 12 (*i.e.*, pump-and-dump and misstatements theories); Terraform and Kwon "controlled LFG's wallets" used in the May 2022 transfers, AC ¶ 190 (*i.e.*, misappropriation theory); and Terraform "marketed Anchor as a safe investment that would generate outsized returns, thereby driving demand for UST, wider adoption of the Terra Ecosystem, and an increase in the price of Luna," AC ¶ 86 (*i.e.*, growing the ecosystem while concealing risks).

Further, even if Plaintiff had not pleaded fraud by Terraform itself, all of Kwon's alleged conduct is attributed to Terraform for the purpose of the *in pari delicto* defense. "Fraud by corporate managers is imputed to the corporation where managers are not stealing from the company—that is, from its current stockholders—but instead are turning the company into an engine of theft against outsiders." *Peterson*, 676 F.3d at 599. Plaintiff does not allege that Kwon stole from Terraform; rather, his conduct was directed at preserving UST's peg, growing the Terra Ecosystem, and maintaining market confidence in Terraform's tokens. *See, e.g.*, AC ¶¶ 15, 76, 108, 159, 175. For a time, that conduct was allegedly successful in its aims, as Terraform received

significant benefits, including an increase in "market capitalization of the Terra Ecosystem" from $8 billion to over $45 billion. AC ¶ 15. Accordingly, all of Kwon's actions that purportedly breached his duty to Terraform may be attributed to it for the purpose of the *in pari delicto* doctrine.

**B. Unjust Enrichment (Count 8)**

Plaintiff's unjust enrichment claim fails for two independent reasons. *First*, Plaintiff's conclusory allegations that the Jump Defendants "were rewarded for their participation in the fraudulent scheme" when they received "ill-gotten gains" from "fraudulent conduct," AC ¶¶ 393, 395, sound in fraud and fail to satisfy Rule 9(b). *See supra* §§ I, V; *Beyrer*, 722 F.3d at 950 (Rule 9(b) applies when unjust enrichment claim derives from alleged fraudulent conduct).

*Second*, where, as here, a "claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *see also Ash v. PSP Distrib., LLC*, 226 N.E.3d 748, 757 (Ill. App. 2023) (same). Because the unjust enrichment claim rests on the same deficient allegations as the fraud claims, the unjust enrichment claim fails along with them.

**CONCLUSION**

For the foregoing reasons, the AC should be dismissed with prejudice.

Dated: August 19, 2026

Respectfully submitted,

*/s/ Gary Feinerman*
Gary Feinerman (ARDC No. 6206906)
Sean M. Berkowitz (ARDC No. 6209701)
Jack McNeily (ARDC No. 6332140)
LATHAM & WATKINS LLP
330 North Wabash Street, Suite 2800
Chicago, IL 60611
Telephone: 312.876.7700
Facsimile: 312.993.9767
Email: gary.feinerman@lw.com
sean.berkowitz@lw.com
jack.mcneily@lw.com

Christopher Harris (*pro hac vice*)
Elizabeth A. Morris (*pro hac vice*)
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: 212.906.1200
Email: christopher.harris@lw.com
elizabeth.morris@lw.com

Richard Frohlichstein (*pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: 202.637.2200
Email: richard.frohlichstein@lw.com

*Attorneys for Defendants Jump Trading, LLC, Jump Crypto Holdings LLC, Jump Financial, LLC, J Digital 6 Cayman Ltd., Jump Operations, LLC, Jump Capital LLC, JCDP-7 Digital Ltd., and Tai Mo Shan Limited*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 19, 2026, I electronically filed the foregoing document with the Court via CM/ECF, which will automatically send notice and a copy of same to counsel of record via email.

/s/ *Gary Feinerman*
Gary Feinerman