# EXHIBIT 10

PageVault

| | |
|---|---|
| Document title: | SEC.gov \| Statement on Stablecoins |
| Capture URL: | https://www.sec.gov/newsroom/speeches-statements/statement-stablecoins-040425 |
| Page loaded at (UTC): | Thu, 13 Aug 2026 19:41:53 GMT |
| Capture timestamp (UTC): | Thu, 13 Aug 2026 19:41:56 GMT |
| Capture tool: | 11.2.8 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) @page-vault/browser/11.2.8 Chrome/148.0.7778.280 Safari/537.36 |
| Operating system: | Linux (Node 24.18.0) |
| PDF length: | 7 |
| Capture ID: | awHe35sTfK6PPzgu2sM8LJ |
| Display Name: | Omar.Quervalu |

STATEMENT

# Statement on Stablecoins

## Division of Corporation Finance

April 4, 2025

**Introduction**

As part of an effort to provide greater clarity on the application of the federal securities laws to crypto assets,[1] the Division of Corporation Finance is providing its views[2] on certain types of crypto assets commonly referred to as "stablecoins." Specifically, this statement addresses stablecoins that are designed to maintain a stable value relative to the United States Dollar, or "USD," on a one-for-one basis, can be redeemed for USD on a one-for-one basis (*i.e.*, one stablecoin to one USD), and are backed by assets held in a reserve that are considered low-risk and readily liquid with a USD-value that meets or exceeds the redemption value of the stablecoins in circulation. As discussed below, we refer to the types of stablecoins addressed by this statement as "Covered Stablecoins."

**Stablecoins Generally**

A stablecoin is a type of crypto asset designed to maintain a stable value relative to a reference asset, such as USD or another fiat currency, or a commodity like gold, or a pool or basket of assets. Stablecoins generally are designed to track the value of the reference asset on a one-for-one basis. Stablecoins may use different methods to maintain a stable value. In some cases, stablecoins maintain a stable value by being backed by assets held in a reserve. In other cases, stablecoins are designed to use mechanisms other than reserves to maintain a stable value, such as using algorithms that increase or decrease the supply of stablecoins in response to demand.[3] The risks associated with stablecoins vary significantly depending on multiple factors, including their stability mechanisms and the maintenance of a reserve (if applicable). Stablecoin issuers generally offer and sell stablecoins at a price corresponding to that of the reference asset on a one-for-one basis. For example, if the stablecoin references USD, the issuer will offer and sell one stablecoin for one USD. Stablecoins can be issued and traded in fractions, and in such case the stablecoins maintain the one-for-one reference (*i.e.*, 0.5 stablecoin represents $0.50 USD). The issuer generally uses the assets held in the reserve to fund stablecoin redemptions (*i.e.*, the delivery of the stablecoin in exchange for the reference asset on a one-for-one basis).

**Division's View on Covered Stablecoins**[4]

It is the Division's view that the offer and sale of Covered Stablecoins, in the manner and under the circumstances described in this statement, do not involve the offer and sale of securities within the meaning of Section 2(a)(1) of the Securities Act of 1933 (the "Securities Act") or Section 3(a)(10) of the Securities Exchange Act of 1934 (the "Exchange Act").[5] Accordingly, persons involved in the process of "minting" (or creating) and redeeming Covered Stablecoins do not need to register those transactions with the Commission under the Securities Act or fall within one of the Securities Act's exemptions from registration.

**Characteristics of Covered Stablecoins**

Covered Stablecoins are crypto assets designed and marketed for use as a means of making payments, transmitting money, or storing value. They are designed to maintain a stable value relative to USD and are backed by USD and/or other assets that are considered low-risk and readily liquid so as to allow a Covered Stablecoin issuer to honor redemptions on demand.[6] These assets are held in a reserve with a USD-value that meets or exceeds the redemption value of the Covered Stablecoins in circulation. A Covered Stablecoin issuer mints and redeems Covered Stablecoins on a one-for-one basis with USD at any time and in unlimited quantities. In other words, a Covered Stablecoin issuer always stands ready to mint a Covered Stablecoin for one USD (or the relevant fraction) and redeem a Covered Stablecoin for one USD (or the relevant fraction), and there is no limitation on the amount of Covered Stablecoins that the issuer mints or redeems. Through this fixed-price, unlimited mint-redeem structure, the market price of a Covered Stablecoin is likely to remain stable relative to USD.

Covered Stablecoins are minted by the issuer and offered and sold by the issuer or designated intermediaries. In some cases, any holder may be eligible to mint or redeem a Covered Stablecoin directly with the issuer on a one-for-one basis corresponding to the value of USD. In other cases, only designated intermediaries may be eligible to mint or redeem a Covered Stablecoin directly with the issuer on a one-for-one basis corresponding to the value of USD. In the latter case, holders other than a designated intermediary cannot mint or redeem the Covered Stablecoin directly with the issuer and can purchase and sell the Covered Stablecoin only through secondary market transactions, which could include transactions with designated intermediaries.

this fixed-price, unlimited mint-redeem structure, the market price of a Covered Stablecoin is likely to remain stable relative to USD.

Covered Stablecoins are minted by the issuer and offered and sold by the issuer or designated intermediaries. In some cases, any holder may be eligible to mint or redeem a Covered Stablecoin directly with the issuer on a one-for-one basis corresponding to the value of USD. In other cases, only designated intermediaries may be eligible to mint or redeem a Covered Stablecoin directly with the issuer on a one-for-one basis corresponding to the value of USD. In the latter case, holders other than a designated intermediary cannot mint or redeem the Covered Stablecoin directly with the issuer and can purchase and sell the Covered Stablecoin only through secondary market transactions, which could include transactions with designated intermediaries.

The market price of a Covered Stablecoin on secondary markets can fluctuate from its redemption price. The fixed-price, unlimited mint-redeem structure of a Covered Stablecoin provides opportunities for designated intermediaries or other holders that are eligible to directly mint and redeem with a Covered Stablecoin issuer to engage in arbitrage to keep the market price stable relative to the redemption price. For example, if the market price is more than the redemption price, such parties will mint Covered Stablecoins directly with the issuer and sell them into the market, and the increased supply is likely to cause the market price to decrease and correlate closer to the redemption price. Alternatively, if the market price is less than the redemption price, such parties will purchase Covered Stablecoins in the secondary market and redeem them directly with the issuer, and the decreased supply is likely to cause the market price to increase and correlate closer to the redemption price.

**Marketing of Covered Stablecoins**[7]

Covered Stablecoins are marketed solely for use in commerce, as a means of making payments, transmitting money, and/or storing value, and not as investments. Marketers sometimes highlight that Covered Stablecoins provide a stable, quick, dependable, and accessible means of making payments, transmitting money, and/or storing value. Marketers also may liken Covered Stablecoins to a "digital dollar." Marketers also sometimes state that a Covered Stablecoin:

- is designed to have a stable value relative or corresponding to USD (*e.g.*, one Covered Stablecoin to one USD);
- does not entitle a Covered Stablecoin holder to the right to receive any interest, profit, or other returns;
- does not reflect any investment or other ownership interest in the Covered Stablecoin issuer or any other third party;
- does not afford a Covered Stablecoin holder any governance rights with respect to the Covered Stablecoin issuer or the Covered Stablecoin; and/or
- does not provide a Covered Stablecoin holder with any financial benefit or loss based on the Covered Stablecoin issuer or any third party's financial performance.

As discussed below, we believe that marketing Covered Stablecoins in these ways are indicia that Covered Stablecoins are not offered or sold as securities.

**The Reserve**

Covered Stablecoin issuers use the proceeds from sales of Covered Stablecoins to acquire assets that are then held in a pooled account, called a "Reserve." The assets held in the Reserve consist of USD and/or other assets that are considered low-risk and readily liquid so as to allow a Covered Stablecoin issuer to honor all redemptions on demand.[8] At all times, the assets held in the Reserve back the amount of outstanding Covered Stablecoins on at least a one-for-one basis. The assets held in the Reserve are only used to pay redemptions, although the issuer may realize earnings on the assets held in the Reserve. While the assets held in the Reserve may be sold to redeem Covered Stablecoins, they are segregated from and not comingled with the assets of the Covered Stablecoin issuer or any third party. Moreover, the assets held in the Reserve are: (1) not used by the Covered Stablecoin issuer for operational or general business purposes; (2) not otherwise lent, pledged, or rehypothecated for any reason; and (3) held in a manner designed not to subject them to claims of third parties. To this end, a Covered Stablecoin issuer does not use the assets held in the Reserve to engage in trading, speculation, or discretionary investment strategies. While earnings on these assets, such as interest, may be used by a Covered Stablecoin issuer at its discretion, no such earnings are paid to Covered Stablecoin holders. In some cases, the Covered Stablecoin issuer publishes a "proof of reserves," which the issuer uses as a verification method or audit to demonstrate that the Covered Stablecoin is backed by sufficient Reserves.

**Legal Discussion**

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act each defines the term "security" by providing a list of various financial instruments, including "stock," "note," and "evidence of indebtedness." Because Covered Stablecoins share some characteristics with a note or other debt instrument, we analyze them under the test set forth in *Reves v. Ernst & Young*.[9] As discussed below, we also analyze them under the test set forth in *SEC v. W.J. Howey Co.*[10]

<u>*Reves* Analysis</u>

In *Reves*, the U. S. Supreme Court held that, because "note" is one of the instruments listed in the Securities Act's and Exchange Act's definition of "security," there is a presumption that a note is a security.[11] That presumption may be rebutted by showing that the note strongly resembles one of the several types of notes issued in connection with typical commercial transactions and, accordingly, are properly excepted from the definition of security.[12] This so-called "family resemblance" test considers four factors.

1. <u>Motivations of Seller and Buyer.</u> This factor considers the motivations that would prompt a reasonable seller and buyer to enter into the transaction.
2. <u>Plan of Distribution of the Instrument.</u> This factor asks whether the note is an instrument in which there is "common trading for speculation or investment."
3. <u>Reasonable Expectations of the Investing Public.</u> This factor inquires whether the investing public would reasonably expect the note to be a security subject to the federal securities laws.

speculation or investment."

3. Reasonable Expectations of the Investing Public. This factor inquires whether the investing public would reasonably expect the note to be a security subject to the federal securities laws.
4. Risk-Reducing Features. This factor asks whether there is some feature of the note, such as the existence of another regulatory scheme, which significantly reduces the risk of the instrument, thereby rendering application of the Securities Act and Exchange Act unnecessary.[13]

Federal courts apply the *Reves* test holistically, as a balancing test, where no single factor is to be considered on its own to determine whether the note is a security or non-security.[14]

*Motivations of Seller and Buyer*

If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security. If, however, the note is exchanged in order to advance a commercial or consumer purpose, the note is not likely to be considered a security.[15] As discussed above, buyers purchase Covered Stablecoins for their stability and attendant use in commercial transactions or as a store of value. Because Covered Stablecoins do not pay or guarantee to pay interest or otherwise convey any rights to payments or assets except upon redemption for USD on a one-for-one basis, the buyer is not motivated to purchase and own the Covered Stablecoin for profit.[16] A Covered Stablecoin issuer uses the proceeds from sales to fund a Reserve, and though it may use the earnings on the Reserve to support its business, Covered Stablecoins are issued and purchased for commercial rather than investment purposes.[17]

*Plan of Distribution of the Instrument*

The Supreme Court in *Reves* explained that this factor considers whether there is "common trading for speculation or investment." This factor is satisfied when the instruments are "offered and sold to a broad segment of the public," which is the case with Covered Stablecoins.[18] However, the Covered Stablecoin's price stability design helps ensure that any secondary market trading is not for speculation or investment. While arbitrage opportunities could exist in the secondary market if a Covered Stablecoin's market price fluctuates from its redemption price, those opportunities are minimized where the Covered Stablecoin issuer honors redemptions on demand and mints and redeems Covered Stablecoins on a one-for-one basis with USD at any time.

*Reasonable Expectations of the Investing Public*

This factor involves an examination of how the instruments are marketed and sold. In *Reves* itself, the Court recognized that "[t]he advertisements for the notes here characterized them as 'investments,' ... and there were no countervailing factors that would have led a reasonable person to question this characterization."[19] As stated above, Covered Stablecoins are not marketed as investments; rather, they are marketed as a stable, quick, reliable and accessible means of transferring value, or storing value and not for potential profit or as investments.

*Risk-Reducing Features*

Among the risk-reducing features recognized under this factor include whether the notes are collateralized or insured or are subject to "another regulatory scheme [that] significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary."[20] Covered Stablecoin issuers maintain a Reserve designed to satisfy fully their redemption obligations,[21] which consists of USD and/or other assets that are considered low-risk and readily liquid so as to allow a Covered Stablecoin issuer to honor all redemptions on demand.

Therefore, on balance, it is the Division's view that Covered Stablecoins are not securities under *Reves* because: (1) sellers use the proceeds to fund a Reserve and buyers are not motivated by an expected return on their funds; (2) Covered Stablecoins are distributed in a manner that does not encourage trading for speculation or investment; (3) a reasonable buyer would likely expect that Covered Stablecoins are not investments; and (4) the availability of a Reserve adequately funded to fully satisfy redemptions on demand is a risk-reducing feature of Covered Stablecoins. In short, the offer and sale of Covered Stablecoins is to advance a commercial or consumer purpose.

*Howey* Analysis

In the event a Covered Stablecoin is not viewed as a note or other debt instrument, and considering that it is not any of the other financial instruments that are specifically enumerated in the definition of "security," we conduct further analysis of the offer and sale of Covered Stablecoins under the "investment contract" test set forth in *Howey*. The "*Howey* test" is used to analyze arrangements or instruments not listed in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act based on their "economic realities."[22]

In evaluating the economic realities of a transaction, the test is whether there is an investment of money in a common enterprise premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.[23] Since *Howey*, the Supreme Court has contrasted the motivations of investors – those who are attracted to a scheme by the "prospects of a return on their investment"[24] – with the motivations of consumers – those who are "motivated by a desire to use or consume the item purchased."[25] While the federal securities laws apply to transactions in investments, they do not apply to consumer transactions.[26]

As discussed above, buyers do not purchase Covered Stablecoins with a reasonable expectation of profit derived from the entrepreneurial or managerial efforts of others because these instruments are not marketed as investments or with any emphasis on the potential for profit.[27] Rather, buyers are motivated to use or consume Covered Stablecoins as so-called "digital dollars" in the same way one would use USD. Accordingly, it is the Division's view that Covered Stablecoins are not offered or sold as investment contracts.

For further information, please contact the Division's Office of Chief Counsel by submitting a web-based request form at https://www.sec.gov/forms/corp_fin_interpretive.

or managerial efforts of others because these instruments are not marketed as investments or with any emphasis on the potential for profit. [27] Rather, buyers are motivated to use or consume Covered Stablecoins as so-called "digital dollars" in the same way he or she would use USD. Accordingly, it is the Division's view that Covered Stablecoins are not offered or sold as investment contracts.

For further information, please contact the Division's Office of Chief Counsel by submitting a web-based request form at https://www.sec.gov/forms/corp_fin_interpretive.

---

[1] For purposes of this statement, a "crypto asset" is an asset that is generated, issued, and/or transferred using a blockchain or similar distributed ledger technology network, including, but not limited to, assets known as "tokens," "digital assets," "virtual currencies," and "coins," and that relies on cryptographic protocols. In addition, for purposes of this statement, an "issuer" refers to an issuer or an affiliate of the issuer.

[2] This statement represents the views of the staff of the Division of Corporation Finance (the "Division"). It is not a rule, regulation, guidance, or statement of the U.S. Securities and Exchange Commission ("Commission"), and the Commission has neither approved nor disapproved its content. This statement, like all staff statements, has no legal force or effect: it does not alter or amend applicable law, and it creates no new or additional obligations for any person.

[3] Stablecoins that use algorithms rather than relying on assets held in a reserve typically are referred to as "algorithmic stablecoins."

[4] The Division expresses a view only as to Covered Stablecoins described in this statement. We do not express a view regarding the application of the federal securities laws to any other types of stablecoins, including those that are intended to track the value of reference assets other than USD, such as non-USD fiat currencies, commodities, other crypto assets, or those with alternative stability mechanisms like algorithmic stablecoins. We also do not express a view regarding stablecoins that are intended to track the value of USD and can be redeemed for assets other than USD. Further, we do not express a view regarding the application of the federal securities laws to "yield-bearing stablecoins," which are stablecoins providing holders with yield, interest or other passive income, whether in the form of regular payments or rewards, or in the form of "re-basing," which is a mechanism that automatically adjusts the total supply of the stablecoins.

[5] The Division's view is not dispositive of whether any stablecoin, including a Covered Stablecoin, is offered or sold as a security. A definitive determination requires analyzing the facts relating to the specific stablecoin and the circumstances surrounding its offer and sale. Where facts vary from those presented in this statement, the Division's view as to whether the specific stablecoin is offered or sold as a security may be different.

[6] Examples of such low-risk, readily-liquid assets include USD cash equivalents, demand deposits with banks or other financial institutions, U.S. Treasury securities, and/or money market funds registered under Section 8(a) of the Investment Company Act of 1940, and do not include precious metals or other crypto assets.

[7] As discussed below under "Legal Discussion," in assessing whether issuers or promoters offered or sold securities, federal courts examine the marketing methods employed.

[8] Some Covered Stablecoin issuers may be subject to regulation under state law, and such regulation may prescribe the permissible assets that may be held in a Reserve.

[9] 494 U.S. 56 (1990). Federal courts apply the *Reves* test to notes as well as to other instruments with debt characteristics. *See, e.g., In re Tucker Freight Lines, Inc.*, 789 F. Supp. 884, 885 (W.D. Mich. 1991) (The Court's "method [in *Reves*] seems applicable to all debt instruments, including evidences of indebtedness."). As Covered Stablecoin issuers create an obligation to honor redemption requests, the Covered Stablecoin may be viewed as a debt of the issuer. While a Covered Stablecoin does not exhibit all the attributes of a typical note (*e.g.*, there is no term, stated rate of interest payable, etc.), we nevertheless want to clarify that it is the Division's view that the offer and sale of a Covered Stablecoin is not the offer and sale of a security in the event the Covered Stablecoin may be deemed to be a note or other evidence of indebtedness.

[10] 328 U.S. 293 (1946). Federal courts undertake both *Reves* and *Howey* analyses where facts warrant it. *See, e.g., Banco Espanol de Credito v. Security Pacific Nat'l Bank*, 763 F. Supp. 36 (2nd Cir 1991) (in which the court assessed loan participations at issue under both the *Reves* and *Howey* tests).

[11] *Reves*, 494 U.S. at 64-66.

[12] *Id.* at 65. These non-security notes are: (1) notes delivered in connection with consumer financing; (2) a note secured by a home mortgage; (3) short term notes secured by a lien on a small business or its assets; (4) notes evidencing a "character" loan to a bank customer; (5) short term notes secured by an assignment of accounts receivable; (6) notes which simply formalize an open-account debt incurred in the ordinary course of business; and (7) notes evidencing loans by commercial banks for current operations.

[13] *Id.* at 66-67.

[14] *See, e.g., SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 537 (9th Cir. 2002) ("Failure to satisfy one of the factors is not dispositive; they are considered as a whole.").

[15] *Reves* at 60; *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

[16] We believe that, under these circumstances, the motivations of the buyer are to be given greater weight. *See, e.g., id.* at 813 (where the court found that, under the circumstances, including that buyers "sought to invest funds in secure, conservative investments," notes would be considered securities regardless of the motivations of the sellers).

[14] *See, e.g.*, *SEC v. J.T. Wallenbrock & Assocs.*, 313 F.3d 532, 537 (9th Cir. 2002) ("Failure to satisfy one of the factors is not dispositive; they are considered as a whole.").

[15] *Reves* at 60; *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

[16] We believe that, under these circumstances, the motivations of the buyer are to be given greater weight. *See, e.g., id.* at 813 (where the court found that, under the circumstances, including that buyers "sought to invest funds in secure, conservative investments," notes would be considered securities regardless of the motivations of the sellers).

[17] For example, a Covered Stablecoin issuer typically offers Covered Stablecoins as stored value or prepaid access products in compliance with applicable state money transmitter laws.

[18] *Reves*, 494 U.S. at 68.

[19] *Id.* at 68-69.

[20] *Id.* at 61. In *Reves*, the Court found no risk-reducing factor because the notes were "uncollateralized and uninsured" and "would escape federal regulation entirely if the [Securities Act and Exchange Act] did not apply to them." *Id.* at 69. *See also Pollack*, 27 F.3d at 814 (observing in connection with the analysis of the fourth *Reves* factor that the "amended complaint specifically alleges that the mortgage participations were 'not secured' and were 'uncollateralized'").

[21] The extent to which the Reserve is or is not subject to the claims of the issuer's creditors may impact whether there are sufficient risk-reducing features under *Reves*. For example, there likely are sufficient risk-reducing features where a stablecoin issuer holds the Reserve funds in a bankruptcy-remote account or entity for the sole benefit of Covered Stablecoin holders.

[22] *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985), in which the U.S. Supreme Court suggested that the proper test for determining whether a particular instrument that is not clearly within the definition of "stock" as set forth in Section 2(a)(1) of the Securities Act, or that otherwise is of an unusual nature, is the economic realities test set forth in *Howey*. In analyzing whether an instrument is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[23] *Forman*, 421 U.S. at 852.

[24] *Howey*, 328 U.S. at 300 ("Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment.").

[25] *Forman*, 421 U.S. at 852-53.

[26] *Id.* at 853.

[27] *See, e.g., SEC v. Edwards*, 540 U.S. 389, 392 (2004) (examining statements made by the promoter "[i]n its marketing materials and on its website" to determine whether promoter offered and sold investment contracts); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) ("Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case.").

Last Reviewed or Updated: April 4, 2025

Return to top

**About the SEC**

Budget & Performance

Careers

Commission Votes

Contact

Contracts

**Transparency**

Accessibility & Disability

Artificial Intelligence

FOIA

Inspector General

No FEAR Act Data

Ombuds

SEC Excess Personal Property Guidance

**Websites**

Investor.gov

Related Sites

USA.gov

**Site Information**

Plain Writing

Privacy & Security

Site Map

**Stay connected. Sign up for email updates.**

Your email address

SIGN UP

U.S. Securities and Exchange Commission

[14] *See, e.g., SEC v. J.I. Wallenbrock & Assocs.*, 313 F.3d 532, 537 (9th Cir. 2002) ("Failure to satisfy one of the factors is not dispositive; they are considered as a whole.")

[15] *Reves* at 60; *Pollack v. Laidlaw Holdings, Inc.*, 27 F.3d 808, 812 (2d Cir. 1994).

[16] We believe that, under these circumstances, the motivations of the buyer are to be given greater weight. *See, e.g., id.* at 813 (where the court found that, under the circumstances, including that buyers "sought to invest funds in secure, conservative investments," notes would be considered securities regardless of the motivations of the sellers).

[17] For example, a Covered Stablecoin issuer typically offers Covered Stablecoins as stored value or prepaid access products in compliance with applicable state money transmitter laws.

[18] *Reves*, 494 U.S. at 68.

[19] *Id.* at 68-69.

[20] *Id.* at 61. In *Reves*, the Court found no risk-reducing factor because the notes were "uncollateralized and uninsured" and "would escape federal regulation entirely if the [Securities Act and Exchange Act] did not apply to them." *Id.* at 69. *See also Pollack*, 27 F.3d at 814 (observing in connection with the analysis of the fourth *Reves* factor that the "amended complaint specifically alleges that the mortgage participations were 'not secured' and were 'uncollateralized'").

[21] The extent to which the Reserve is or is not subject to the claims of the issuer's creditors may impact whether there are sufficient risk-reducing features under *Reves*. For example, there likely are sufficient risk-reducing features where a stablecoin issuer holds the Reserve funds in a bankruptcy-remote account or entity for the sole benefit of Covered Stablecoin holders.

[22] *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 689 (1985), in which the U.S. Supreme Court suggested that the proper test for determining whether a particular instrument that is not clearly within the definition of "stock" as set forth in Section 2(a)(1) of the Securities Act, or that otherwise is of an unusual nature, is the economic realities test set forth in *Howey*. In analyzing whether an instrument is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[23] *Forman*, 421 U.S. at 852.

[24] *Howey*, 328 U.S. at 300 ("Such persons have no desire to occupy the land or to develop it themselves; they are attracted solely by the prospects of a return on their investment.").

[25] *Forman*, 421 U.S. at 852-53.

[26] *Id.* at 853.

[27] *See, e.g., SEC v. Edwards*, 540 U.S. 389, 392 (2004) (examining statements made by the promoter "[i]n its marketing materials and on its website" to determine whether promoter offered and sold investment contracts); *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980) ("Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case.").

Last Reviewed or Updated: April 4, 2025

Return to top

**About the SEC**

Budget & Performance

Careers

Commission Votes

Contact

Contracts

**Transparency**

Accessibility & Disability

Artificial Intelligence

FOIA

Inspector General

No FEAR Act Data

Ombuds

SEC Excess Personal Property Guidance

**Websites**

Investor.gov

Related Sites

USA.gov

**Site Information**

Plain Writing

Privacy & Security

Site Map

**Stay connected. Sign up for email updates.**

Your email address

SIGN UP

U.S. Securities and Exchange Commission