**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| TODD R. SNYDER, AS PLAN ADMINISTRATOR FOR THE TERRAFORM LABS PTE. LTD., ET AL., EACH POST-EFFECTIVE DATE DEBTOR, AND THE WIND DOWN TRUST,<br><br>Plaintiff,<br><br>v.<br><br>JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LTD., JUMP FINANCIAL, LLC, J DIGITAL 6 CAYMAN LTD., JCDP-7 DIGITAL LTD., JUMP OPERATIONS, LLC, JUMP CAPITAL, LLC, KANAV KARIYA, WILLIAM DISOMMA, and XYZ COMPANIES 1-10,<br><br>Defendants. | No. 1:25-cv-15414<br><br>Honorable Joan H. Lefkow |

**KANAV KARIYA'S MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

RELEVANT ALLEGATIONS ........ 1

ARGUMENT ........ 5

I. Plaintiff does not allege that Kariya engaged in any conduct that violated the Securities Exchange Act (Count 3). ........ 5

A. Plaintiff does not identify a misleading statement made by Kariya. ........ 6

B. Plaintiff does not allege deceptive conduct by Kariya. ........ 12

1. Kariya's alleged role in connection with others' trading was not deceptive and could not have induced anyone's reliance. ........ 13

2. Kariya is not alleged to have committed any other deceptive act. ........ 15

C. Kariya did not participate in any trading, so Plaintiff's Securities Exchange Act Section 9 Claim fails (Count 5). ........ 16

II. Kariya is not alleged to have controlled any entity that violated the Securities Exchange Act (Count 4). ........ 17

III. Kariya did not act with scienter. ........ 19

IV. The ICFA and common-law-fraud claims fail against Kariya (Counts 6 and 7) ........ 20

V. The Securities Act unregistered securities/control person claim is time-barred and fails on the merits (Count 13). ........ 21

VI. Plaintiff does not state any contribution, fraudulent transfer, unjust enrichment, or aiding and abetting breach of fiduciary duty claims against Kariya (Counts 1-2, 8-12) ........ 23

VII. Plaintiff cannot carry his burden to demonstrate personal jurisdiction through effective service of process. ........ 24

CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases**

*Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*,
860 F.3d 489 (7th Cir. 2017) .......... 1

*AnchorBank, FSB v. Hofer*,
649 F.3d 610 (7th Cir. 2011) .......... 19

*Bonded Fin. Servs., Inc. v. Eur. Am. Bank*,
838 F.2d 890 (7th Cir. 1988) .......... 28

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) .......... 10, 13

*Cardenas v. City of Chicago*,
646 F.3d 1001 (7th Cir. 2011) .......... 29

*Castaneda v. Amazon.com, Inc.*,
679 F. Supp. 3d 739 (N.D. Ill. 2023) .......... 24

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) .......... 13, 14

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (1996) .......... 24

*Cornielsen v. Infinium Cap. Mgmt., LLC*,
916 F.3d 589 (7th Cir. 2019) .......... 22

*Donohoe v. Consol. Operating & Prod. Corp.*,
30 F.3d 907 (7th Cir. 1994) .......... 20, 25

*Ezell v. Lexington Ins. Co.*,
926 F.3d 48 (1st Cir. 2019) .......... 17, 23

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) .......... 1

*Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*,
675 F.3d 1047 (7th Cir. 2012) .......... 7

*Glazewski v. Coronet Ins. Co.*,
108 Ill. 2d 243, 483 N.E.2d 1263 (1985) .......... 24

*Herm v. Stafford*,
663 F.2d 669 (6th Cir. 1981)....26

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
545 N.E.2d 672 (Ill. 1989)....29

*In re Canopy Fin., Inc.*,
2015 WL 3505010 (N.D. Ill. June 2, 2015)....28

*In re Concepts Am., Inc.*,
No. 14 B 34232, 2018 WL 1174900
(Bankr. N.D. Ill. Mar. 1, 2018)....28

*In re Glob. Cord Blood Corp. Sec. Litig.*,
820 F. Supp. 3d 221 (S.D.N.Y. 2026)....15

*In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*,
702 F. Supp. 3d 692 (N.D. Ill. 2023)....29

*In re Laverdure*,
399 B.R. 310 (Bankr. N.D. Ill. 2008)....25

*In re Parmalat Sec. Litig.*,
376 F. Supp. 2d 472 (S.D.N.Y. 2005)....16

*In re Ripple Labs, Inc. Litig.*,
No. 24-7599, 2026 WL 206301
(9th Cir. Jan. 27, 2026)....27

*In re Soybean Futures Litig.*,
892 F. Supp. 1025 (N.D. Ill. 1995)....24

*In re Violin Memory Sec. Litig.*,
No. 13-CV-5486, 2014 WL 5525946,
(N.D. Cal. Oct. 31, 2014)....27

*In re VMS Sec. Litig.*,
752 F. Supp. 1373 (N.D. Ill. 1990)....26

*In re: Petrobras Sec. Litig.*,
152 F. Supp. 3d 186 (S.D.N.Y. 2016)....26

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)....7

*Kangol LLC v. Hangzhou Chuanyue Silk Imp. & Exp. Co. Ltd.*,
177 F.4th 793 (7th Cir. 2026) ....29

*KBC Asset Mgmt. NV v. Discover Fin. Servs.*,
No. 23-CV-06788, 2025 WL 976120 (N.D. Ill. Mar. 31, 2025) ....17

*Last Atlantis Cap. LLC v. AGS Specialist Partners*,
819 F. Supp. 2d 708 (N.D. Ill. 2010) ....6

*Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*,
391 F. Supp. 3d 816 (N.D. Ill. 2019) ....31

*Magnuson v. Window Rock Residential Recovery Fund, L.P.*,
No. 22 CV 1010, 2024 WL 5040836, (N.D. Ill. Dec. 9, 2024) ....21

*Marc Dev., Inc. v. Wolin*,
904 F. Supp. 777 (N.D. Ill. 1995) ....24

*McLernon v. Source Int'l, Inc.*,
701 F. Supp. 1422 (E.D. Wis. 1988) ....26

*Nelson v. Great Lakes Educ. Loan Servs., Inc.*,
928 F.3d 639 (7th Cir. 2019) ....25

*Noco Co. v. CF Grp. SZKMS Co.*,
571 F. Supp. 3d 862 (N.D. Ohio 2021) ....30

*Nolfi v. Ohio Kentucky Oil Corp.*,
675 F.3d 538 (6th Cir. 2012) ....26

*P. Stolz Fam. P'ship L.P. v. Daum*,
355 F.3d 92 (2d Cir. 2004) ....26

*Patterson v. Jump Trading LLC*,
710 F. Supp. 3d 692 (N.D. Cal. 2024) ....13

*Patterson v. Jump Trading, LLC*,
No. 5:22-CV-03600-PCP, 2026 WL 2605224 (N.D. Cal. Sept. 2, 2026) ....passim

*Pembroke Pines Firefighters & Police Officers Pension Fund v. Abbott Lab'ys*,
No. 22-CV-4661, 2026 WL 2137943 (N.D. Ill. July 24, 2026) ....passim

*Pino v. Cardone Cap., LLC*,
55 F.4th 1253 (9th Cir. 2022) ....27

*Pinter v. Dahl*,
486 U.S. 622 (1988) ....27

*Pugh v. Trib. Co.*,
521 F.3d 686 (7th Cir. 2008) ....14, 15, 16

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
338 F.3d 773 (7th Cir. 2003) ....29

*Rockies Fund, Inc. v. SEC*,
428 F.3d 1088 (D.C. Cir. 2005) ....23

*SEC v. Daifotis*,
No. C 11-00137 WHA, 2011 WL 2183314,
(N.D. Cal. June 6, 2011) ....15

*SEC v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) ....17

*SEC v. Terraform Labs Pte. Ltd.*,
684 F. Supp. 3d 170 (S.D.N.Y. 2023) ....5

*SEC v. Terraform Labs Pte. Ltd.*, *et al.*,
No. 23-cv-1346 (JSR) (S.D.N.Y. 2023) ....3

*Simpson v. AOL Time Warner Inc.*,
452 F.3d 1040, 1048, 1050 (9th Cir. 2006),
*vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008) .... 13, 15

*Slowinski v. BlueTriton Brands, Inc.*,
744 F. Supp. 3d 867 (N.D. Ill. 2024) ....24

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008) .... 14, 16

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ....23

*Vergara v. City of Chicago*,
939 F.3d 882 (7th Cir. 2019) ....25

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020). ....28

*Zekman v. Direct Am. Marketers, Inc.*,
695 N.E.2d 853 (Ill. 1998)....25

**Statutes**

15 U.S.C. § 77e....21

15 U.S.C. § 77l....21

15 U.S.C. § 77m....22

15 U.S.C. § 77t....17

15 U.S.C. § 78i(a)....16

15 U.S.C. § 78i(f)....16

15 U.S.C. § 78j (Section 10(b))....passim

15 U.S.C. § 78t(e)....16

15 U.S.C. § 78u-4(b)(1)....6

Illinois Consumer Fraud Act....20, 21

Private Securities Litigation Reform Act....5

**Rules**

Fed. R. Civ. P. 9(b)....5

Fed. R. Civ. P. 12(b)(2)....1

Fed. R. Civ. P. 12(b)(5)....1

Fed. R. Civ. P. 12(b)(6)....1

Fed. R. Civ. P. 12(h)(1)....24

**Treaties**

Conv. Done at the Hague art. 10(a), Nov. 15, 1965, 20 U.S.T. 361....24

**Regulations**

17 C.F.R. § 240.10b-5....5, 6, 12, 16

Pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(2), and 12(b)(5), Kanav Kariya moves to dismiss the Amended Complaint (the "AC"), ECF No. 55, for lack of personal jurisdiction and improper service of process, and, in the alternative, for failure to state a claim, with prejudice.

## INTRODUCTION

Attempting to blame Kanav Kariya for the fraud of Do Kwon and his company, Terraform, Plaintiff—the Terraform estates' administrator—sets out on a twisting path full of obstacles he cannot surmount. The path ultimately leads him to a target of Kwon's deceit, not a participant in it. Once the Court properly isolates from the 467-paragraph AC the few actual statements and the few non-public actions the AC attributes to Kariya—and discards its pervasive group pleading and gauzy conclusions about Kariya's role that are unsupported by specific, particularized allegations of fact—it becomes clear that Kariya did not deceive anyone, certainly not knowingly so. Kariya did not control any "Jump Entity Defendant[]" and did not participate in any of the trading activity alleged (however implausibly) to have manipulated the market. The most compelling inference from the AC is that Kariya believed what Kwon said, including about the Luna Foundation Guard reserve that Kariya believed stood ready to support the UST peg should its mint-burn mechanism falter. On top of that, Kariya was not properly served, and many of the claims against him are time-barred.

## RELEVANT ALLEGATIONS[1]

Kariya worked at "Jump Crypto," a "division" under the "Jump Trading Group" "brand," which he joined after graduating college in 2018. AC ¶¶ 42, 304; AC Ex. B at 1287:2-6. Three years out of college when the alleged events commenced, Kariya did not "r[u]n the team" at Jump Crypto, "approve[]" its "deals," or set its investment strategy. *See* AC ¶¶ 42-43. He was just the division's

---

[1] Kariya accepts the well-pleaded allegations in the AC as true only for purposes of this motion. The Court may also consider the AC's attachments, documents it incorporates by reference, and judicially noticeable documents. *E.g.*, *Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 n.2 (7th Cir. 2017). Full documents, including "transcripts," that contain cited statements are properly considered on a motion to dismiss in a securities fraud case. *Fryman v. Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 894 (N.D. Ill. 2020).

"public face." *Id.* ¶ 42. He helped develop business for the Jump Defendants by appearing on social media and podcasts to become "well known . . . in the crypto space." *See, e.g.*, *id.* ¶¶ 67, 161, 176.

As the public face, Kariya, along with others at the Jump Defendants, participated in discussions with Do Kwon about a market-making partnership between the Jump Defendants and Kwon's then-prominent crypto startup Terraform. *See id.* ¶¶ 5, 59-63, 67. Kwon and Terraform had developed a stablecoin, UST, whose peg to the US dollar was maintained by a mint-burn arbitrage mechanism. *Id.* ¶¶ 2, 6, 10. According to Plaintiff, at the request and "instruction" of a co-founder of the Jump Defendants, Kariya worked on negotiations with Terraform. *Id.* ¶¶ 74-75. Kariya needed (and in fact sought) "approval for changes or new developments in the Terraform-Jump partnership." *Id.* ¶ 75. The partnership allegedly included the Jump Defendants' agreement to "deploy . . . capital and traders to defend UST's $1 peg" if necessary. *Id.* ¶ 76. Plaintiff alleges that, in May 2021, as UST deviated from its peg, Kwon and Kariya discussed a modification to the "Terraform-Jump" arrangement to remove certain vesting conditions on LUNA tokens Terraform was to deliver to the Jump Defendants. *Id.* ¶¶ 72, 112-17. Kariya reported that development to the co-founder and others at the Jump Defendants. *Id.* ¶ 115.

That was the end of Kariya's alleged role in the May 2021 de-peg episode. After Kariya's report, Plaintiff alleges that the Jump Defendants' traders (which did not include Kariya) traded in a way that allegedly helped restore UST's peg to $1, a course of events in which Kariya is not alleged to have participated. *Id.* ¶¶ 115-38. According to Plaintiff, this trading sent a false demand signal to the market. *Id.* ¶¶ 124-25. It was not until after all of this had occurred that Kariya gained the title "President" of the Jump Crypto division, in "September 2021." AC Ex. B at 1286:21; AC ¶ 43.

"After the May 2021 depeg," Plaintiff alleges that Terraform announced and funded a significant development for UST: the mint-burn mechanism did not stand alone. Terraform publicly established the Luna Foundation Guard ("LFG") "in late 2021" to hold a reserve of assets that could

be deployed to "stabilize" UST if a sustained de-peg put pressure on the mint-burn mechanism. *Id.* ¶¶ 169-75. Kwon held sole control over the reserve's finances, and funded it with $5.5 billion worth of crypto assets, including Bitcoin. *Id.* ¶¶ 172-75. After the LFG's founding, Kariya was named to one of the seats on the LFG's "so-called Governing Council." The Council was purely ceremonial; it "had no governing power" and no access to or control over the reserve funds. *See id.* ¶¶ 170, 172.

After Terraform implemented a multibillion-dollar reserve to supplement the mint-burn mechanism's ability to maintain the peg, Kariya made three statements. Two were about the reserve. On March 1, 2022, he said on a podcast that the LFG reserve held "a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve" and had "plans to increase its reserve size." *Id.* ¶ 257; Ex. 2 at 28, 35:49.[2] The reserve existed to step in "when there are extreme price movements, which do happen every sometime." *Id.* Kariya asked Kwon to "correct" him if he had said anything incorrect about the LFG reserve Kwon had created; Kwon assured him he had not. Then, on April 27, 2022, in response to an LFG tweet announcing the addition of AVAX tokens to the reserve alongside its Bitcoin, Kariya tweeted: "Alignment across ecosystems and a commitment to a multi chain future[.] UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." AC ¶ 258; Jump Mot. Ex. 14.

Elsewhere, on January 28, 2022, Kariya engaged with the public on Twitter to "understand what [he] got wrong" about developments in the crypto markets. *Id.* ¶ 255; Ex. 1. He invited the public to "fire away" at a "take" he offered about the interplay between a de-pegging of the stablecoin MIM and a potential resulting "sustained mass exodus to"—not away from—"UST." In the unlikely event that happened, Kariya opined, there "is potential for UST to be sold/burned and provide some downward pressure on the LUNA price," which "should be manageable over a couple days." AC

---

[2] Decl. of Douglas W. Henkin, Exhibit 61, *SEC v. Terraform Labs Pte. Ltd.*, *et al.*, No. 23-cv-1346 (JSR) (S.D.N.Y. 2023).

¶ 255. The thread did not discuss the stability of UST's peg to the dollar.

Consistent with Kariya's publicly expressed belief that the LFG reserve stood ready to backstop the UST peg should the mint-burn falter, when UST began again to deviate in May 2022, Kwon began to deploy the reserve assets, and informed Kariya and others on the powerless Governing Council of this decision. *Id.* ¶¶ 187-88, 190. Kwon said he had discussed the "idea" of deployment with Kariya, but how to use the LFG's assets was entirely up to Kwon, and his May 2022 actions with the assets were "unilateral." *Id.* ¶¶ 187-88, 273. Kwon directed $1.5 billion in Bitcoin to be transferred from LFG to the Jump Defendants for use in support of the peg and sent additional LFG Bitcoin meant for peg-support deployment to Terraform. *Id.* ¶¶ 191-93, 195. The Jump Defendants' alleged trading activities with the reserve Bitcoin did not succeed in maintaining the peg, and neither, apparently, did anything Terraform may have done with the additional reserve assets it received. The price of both UST and LUNA dropped to near zero. *Id.* ¶¶ 197-204. The Amended Complaint does not account for the remaining assets in the reserve not alleged to have been transferred to the Jump Defendants, but federal prosecutors charged Kwon with "misappropriating hundreds of millions of dollars in assets from the LFG," specifically "12,000 bitcoin worth over $300 million," and then laundering these funds. Superseding Indictment at ¶ 2(b), *United States v. Do Hyeong Kwon*, No. 1:23-cr-00151 (S.D.N.Y. Jan. 2, 2025), ECF No. 10.[3] Despite publicly claiming otherwise, Kwon did "*not* spen[d] these funds to defend UST's peg." *Id.* ¶ 50 (emphasis in original).

Kwon was indicted on fraud and other charges stemming from the Terraform collapse, pleaded guilty, and received a fifteen-year prison sentence.[4] AC ¶¶ 2, 218. The SEC successfully sued

[3] *See Patterson v. Jump Trading, LLC*, No. 5:22-CV-03600-PCP, 2026 WL 2605224, at *18 n.10 (N.D. Cal. Sept. 2, 2026) (taking judicial notice of the *Kwon* Superseding Indictment on motion to dismiss in similar case); *see also* AC ¶¶ 2 (referencing the indictment), 146, 256 (quoting prosecution statements regarding *Kwon* case).

[4] Both criminal prosecutors and the SEC charged Kwon with false claims "that the Terra blockchain was being used to process billions of dollars in financial transactions for the Korean payment-processing application Chai." *Kwon* Superseding Indictment ¶ 2(d); *SEC v. Terraform Labs Pte. Ltd.*, 684 F. Supp. 3d 170, 184 (S.D.N.Y. 2023). Neither Kariya nor any other Defendant is alleged to have had anything to do with that.

both Kwon and Terraform but did not see fit to include Kariya in the suit. *See id.* ¶¶ 217, 221.

## ARGUMENT

Kariya adopts the Rule 12(b)(6), Rule 9(b), and Private Securities Litigation Reform Act ("PSLRA") legal standards set forth in the Jump Defendants' Motion to Dismiss ("Jump Mot."), ECF No. 94 (including at 6, 7, 8, 42). The Amended Complaint fails each standard.

### I. Plaintiff does not allege that Kariya engaged in any conduct that violated the Securities Exchange Act (Count 3).

The Exchange Act claims against Kariya fail for the same reasons they fail against the Jump Defendants and Defendant DiSomma, and Kariya adopts their arguments on these points, which apply with equal force to the allegations against Kariya.[5] Jump Mot. at 6-14; 17-19; 22-47; Defendant DiSomma's Motion to Dismiss ("DiSomma Mot.") at 5-10, ECF No. 93. Beyond those reasons, the securities fraud claims are particularly deficient as against Kariya.

Count Three attempts two distinct claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5: a Rule 10b-5(b) misleading statements claim and a Rule 10b-5(a) and Rule 10b-5(c) "scheme" claim. AC ¶¶ 333, 340. The former requires allegations of "a material misrepresentation or omission"; the latter is "different" and requires allegations that the individual defendant engaged in conduct "that created a false appearance of fact in furtherance of the scheme." *Pembroke Pines Firefighters & Police Officers Pension Fund v. Abbott Lab'ys*, No. 22-CV-4661, 2026 WL 2137943, at *19, 20, 55 (N.D. Ill. July 24, 2026); *Last Atlantis Cap. LLC v. AGS Specialist Partners*, 819 F. Supp. 2d 708,

[5] The untimeliness of the Exchange Act (and ICFA) claims is plain as to Kariya. The June 17, 2022 *Patterson* Complaint discussed Kariya extensively, detailed his alleged position on the LFG Governing Council and his alleged title as President of "Jump Crypto," and detailed his statements, including the Twitter thread alleged to be misleading at ¶ 255 of the AC here and a statement about the LFG repeated at ¶ 176 of the AC. Complaint ¶¶ 42, 100, 107-08, 112-14, 178(d), *Patterson v. Terraform Labs, Pte. Ltd. et al.*, No. 5:22-cv-03600 (N.D. Cal. June 17, 2022), ECF No. 1; *compare also Patterson* Complaint ¶ 120 (detailing LFG announcement that the LFG had added AVAX tokens to the reserve), *with* AC ¶ 258 (attempting claim based on Kariya statement that AVAX was in the reserve). And Kariya's other Twitter or podcast statements alleged in the AC were, of course, public when they were made before June 17, 2022.

713 (N.D. Ill. 2010). Each claim also requires "a connection with the purchase or sale of a security, reliance; economic loss; and loss causation." *Pembroke*, 2026 WL 2137943, at *19. Because Kariya did not make any misleading statements or engage in any conduct that could have created a false appearance of fact to anybody, Count 3 fails to state a claim under any subpart of Rule 10b-5.

**A. Plaintiff does not identify a misleading statement made by Kariya.**

Plaintiff attributes only three of the challenged statements to Kariya, none of which can support a claim.[6] AC ¶¶ 254-58; *see* 15 U.S.C. § 78u-4 (b)(1); Jump Mot. at 28-33 (setting forth standards applicable to misleading statements, puffery, and opinions).

***Ship Show Podcast.*** Kariya disclosed the very risk Plaintiff says he concealed—that intervention outside the mint-burn mechanism might be necessary to maintain the UST peg. After Kwon explained "how UST maintains peg" with reference only to the mint-burn mechanism ("purely algorithmic"), Kariya interceded to explain that periods of "extreme price movements, which do happen every sometime," could make it necessary for external intervention outside of the mint-burn mechanism to "inject liquidity" to maintain the peg. It is "extremely useful to have a reserve that can step in." AC ¶ 257; Ex. 2 at 27-28, 34:47-35:49.

In a non-sequitur, Plaintiff contends that Kariya was "suggest[ing] that *the LFG reserve* meant UST was a stable asset," which Plaintiff says was misleading because Kariya "knew that UST was not a stable asset *maintained by an algorithm*." AC ¶ 257 (emphasis added). But that's just it. Kariya's statement did not suggest UST's stability was maintained solely by an algorithm; he instead expressly acknowledged the possible necessity of a non-algorithmic source of peg maintenance—external intervention by the LFG. That the peg, per the AC, had been "*previously* restored" only because of

[6] Plaintiff cannot state a claim against Kariya based on statements attributed to Kwon or to others at the Jump Defendants. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-44, 166 (2011); AC ¶¶ 254, 256, 257; *Fulton Cnty. Emps. Ret. Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1051-52 (7th Cir. 2012) (MGIC had no duty to correct statements made by another corporation's executives during an MGIC-hosted conference call).

"Jump's actions," *id.* (emphasis added), wasn't relevant to Kariya's description of the *current* state of affairs, in which the LFG stood ready to restore the peg if necessary, with no intervention from any Jump-Defendant-affiliated entity or anyone like it needed. As the Court in *Patterson* explained in holding inactionable a similar Kariya statement about how the LFG reserve "can be used to help protect the peg of the UST stablecoin in stressful conditions," Plaintiff has not explained "why, in a statement that already acknowledges the potential instability of UST, Kariya was further obligated to explain that a depegging event had already occurred." *Patterson*, 2026 WL 2605224 at *7.[7]

In fact, it *was true* that, as Kariya said, "LFG holds a billion dollars of Bitcoin" and "also has plans to increase its reserve size." AC ¶ 257. By the time of Kariya's March 1, 2022 podcast statement, the LFG reserve held well more than a billion dollars—as of January 21, 2022, it held assets worth "about $3.85 billion." *Id.* ¶¶ 173, 257. And after the podcast, LFG increased its size through acquisitions worth "approximately $950 million" and "about $850 million," plus "10 million UST," for a grand LFG capitalization total of "more than $5.5 billion." *Id.* ¶¶ 173-74.

There is no allegation that Kariya knew or had reason to believe that the LFG backstop would not suffice to support the peg in times of volatility. *See Pembroke*, 2026 WL 2137943, at *39. To the contrary, up through the very end and well after his March podcast statement, Kariya was a true believer. When UST began to de-peg in May 2022, Kariya sought "deploy[ment] of the LFG reserve funds" to support the peg, and asked Kwon whether the "lfg multisig" would be needed to deploy them—not the acts of a man who didn't believe the reserve stood ready to ensure that UST remained pegged. *See* AC ¶¶ 186, 190, 257. Plaintiff alleges that the LFG held more than enough to support the

[7] Suppose a boater once encountered stormy seas, capsized, and needed to be rescued by the Coast Guard. For the next voyage, the person arranges to have a private helicopter fly right behind the boat, with a private rescue team ready to go. A statement that "the new helicopter rescue support team is meant to allow rescue in the event of stormy seas, which do happen every sometime" would not be misleading for failure to mention that pre-helicopter, it had been necessary for the Coast Guard to play this role.

peg: $5.5 billion, 12.2% of the then-alleged total market capitalization of the Terra Ecosystem. *Id.* ¶¶ 173-174, 184 ($45.2 billion, comprising $26.5 billion LUNA and $18.7 billion UST).[8]

In fact, Kwon *did* deploy substantial reserve assets to support the peg: he transferred $1.5 billion of LFG Bitcoin to the Jump Defendants for use in defense of the peg. *Id.* ¶¶ 191, 193. The AC suggests that the Jump Defendants' method of deploying these assets onto a single exchange was "not the best idea" for effectively supporting the peg and ultimately did not work. *Id.* ¶¶ 198-200. But it does not allege that Kariya had any reason to *anticipate* that the reserve would not be effectively deployed. Nor does it explain what Kwon did with $4 billion of remaining reserve assets, or why, contrary to Kariya's expressed expectation, he didn't fully deploy those to restore the peg.[9] *See* AC ¶¶ 173-74. The AC certainly doesn't plead that when Kariya spoke on March 1, 2022, he had any reason to think the massive reserve assets could not or would not be deployed to support the peg, or that Kwon allegedly would later embezzle substantial reserve funds. *Kwon* Superseding Indictment ¶¶ 2(b), 50; *Pembroke*, 2026 WL 2137943, at *32 ("There is no fraud by hindsight. . . . A statement true when made does not become fraudulent because things unexpectedly go wrong.") (citation modified).

Kariya had no visibility into or control over LFG assets. *See* AC ¶¶ 172, 188-190. The only role Plaintiff attributes to Kariya is that he was one of "several" individuals who sat on LFG's "Governing Council," which "had no governing power." *Id.* ¶¶ 170-172. LFG was controlled solely

---

[8] Plaintiff suggests that the Jump Defendants' "experience with the 2021 depeg" should have instructed them as to the volume of funds necessary "to re-establish the peg." AC ¶ 196. In 2021, certain Jump Defendants planned to inject at most 2.5% of then-existing Terra market capitalization, so by Plaintiff's logic no one had any reason to believe that the 12.2%-of-market-cap LFG reserve was unprepared to suffice in 2022. *Id.* ¶¶ 107 ($8 billion Terra market capitalization in 2021), 123 (no more than $200 million allegedly available/spent to support the peg in 2021).

[9] The LFG held "more than $5.5 billion" in assets. AC ¶¶ 173-174. Later, the AC mentions only roughly $2.4 billion of these (the 52,189 Bitcoin transferred to the Jump Defendants, worth $1.5 billion, and roughly 28,000 Bitcoin "remaining" with LFG after that transfer, which on May 9, 2022 were worth approximately $868.6 million; these Bitcoin went from LFG to Terraform). *Id.* ¶¶ 191-193; Yahoo! Finance, *Bitcoin USD Price*, https://finance.yahoo.com/quote/BTC-USD/history/?period1=1652054400&period2=1652140800 [https://perma.cc/S4JT-Q27Q]. The AC does not specify what Terraform did with the 28,000 Bitcoin, AC ¶ 192, but even assuming it deployed them, the AC still leaves $3.1 billion in reserve assets unaccounted for.

by Kwon. *Id.* "Kwon did not need the Governing Council's approval to move LFG's money," and he acted "unilateral[ly]" with respect to the May 2022 de-peg reserve deployment. *Id.* ¶¶ 188, 270, 273. Indeed, on the podcast, right after the statements quoted in ¶ 257, Kariya asked Kwon to "correct" him if anything he "characterize[d]" about Kwon's reserve was not "exactly just right." Ex. 2 at 28, 35:49. Kwon assured Kariya that his explanation was "perfect." *Id.* at 29, at 37:53. Plaintiff's own allegations confirm that Kariya "actually h[e]ld[]" the "beliefs" and opinions he expressed on the podcast. *Boykin v. K12, Inc.*, 54 F.4th 175, 184 (4th Cir. 2022).

***AVAX Statement.*** Plaintiff rewrites the Tweet described in ¶ 258 as a "suggest[ion] that the LFG reserve meant UST was a stable asset," which Plaintiff says was misleading because Kariya "knew that UST was not a stable asset maintained by an algorithm." AC ¶ 258. That is the same non-sequitur advanced against the podcast statement; plus, that plainly is not what the tweet says: "Alignment across ecosystems and a commitment to a multi chain future[.] UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG. Win, win, win." *Id.* The tweet does not call any asset "stable" or suggest that UST's peg was maintained solely by an algorithm; if anything, in mentioning the LFG reserve, it makes clear that the algorithm alone may not suffice. Plaintiff does not allege that the LFG reserve did not contain AVAX or that AVAX was not "high quality" (an expression of opinion in any event). And as discussed above, as far as Kariya is alleged to have understood, the LFG's multibillion-dollar reserve was a *new* backstop source of non-algorithmic peg support, so the alleged fact that "the peg had been restored previously only because of" a different source of non-algorithmic support, "Jump," was irrelevant. *Id.* Moreover, Kariya's "[w]in, win, win" "cheerleading" is just the sort of "lofty, jargony, shiny-happy-people business-speak" that "doesn't come close to providing the basis for a claim." *Pembroke*, 2026 WL 2137943, at *40.

***MIM Thread.*** The Twitter thread excerpted at ¶ 255 did not comment on the peg or price stability of UST, but rather on two points unrelated to the issues Plaintiff says rendered it misleading.

*First*, the thread discussed a program in which investors could borrow MIM—a non-Terra stablecoin not referenced elsewhere in the AC—against aUST (a distinct token also not mentioned elsewhere in the AC), leaving them "with a long UST, short MIM position earning 100%+ APY via Anchor." Ex. 1. Kariya explains that investors in this situation might be incentivized to unwind their position "if [the] MIM peg falls under stress," which would leave them "with UST instead of MIM." *Id.* This would "put[] upward pressure" on MIM, moving MIM back up toward its peg. *Id.* But for investors to unwind in this manner would mean "giving up their 100%+ APY yield," so certain investors might wait before unwinding (and thereby pushing MIM back up toward its peg); therefore, "we 'could' see a continued MIM depegging for a bit." *Id.* In Kariya's opinion, it was "tough to imagine" that certain investors would "take a hit" (unwinding so they have "UST instead of MIM" and thereby giving up on the Anchor yield) just because of "ideological concerns" (i.e., the desire to push MIM back up toward its peg). *See id.* "[G]iven the circumstances," Kariya opines, "[i]t's difficult to imagine a sustained mass exodus ***to*** UST." *Id.* (emphasis added). In other words, it is hard to imagine investors unwinding their borrowing positions, leaving them with more UST and less MIM.

This was a discussion of the potential for investors to obtain *more* UST—a rise in demand that would cause "upward price movement in UST," AC ¶ 129—in spite of a de-peg *of MIM*. But the risk Plaintiff alleges the statement covered up, the one that materialized in 2021 and again in May 2022, was a mass exodus *from* UST that sent UST's price "dropp[ing] precipitously" and was allegedly staved off in 2021 by the Jump Defendants' injection into the market of "demand" for UST. *Id.* ¶ 107 (a large UST price drop triggers a large volume of single-direction requests to burn UST, increasing transaction fees and thereby diminishing the incentive to burn further UST, rendering the mint-burn ineffective). *Id.* ¶ 132. The same sort of selloff occurred in May 2022 when "investors were dumping their UST." *Id.* ¶ 205. Kariya was opining on the prospects for an influx in UST demand (and therefore a rise in UST price); he wasn't commenting one way or the other on the efficacy of the UST peg "algorithm"

or on the allegedly concealed risk of a significant *drop* in UST price that would lead to increased transaction fees for UST burn requests, thereby hampering the mint-burn mechanism. *Id.* ¶¶ 107, 255.

*Second*, Kariya opined that in the "difficult to imagine" event of a UST demand spike, "there is potential" for "some downward pressure on LUNA price" as a result of UST being sold or burned. Ex. 1. Suggesting that "a couple days[']" effect on the LUNA price as a knock-on effect of a flight *to* UST "should be manageable" has nothing to do with the risks posed by a flight *away* from UST of the sort that happened in May 2021 and 2022. All Kariya discusses is a potential effect on *LUNA's* price, and he does not say anything to suggest, as Plaintiff imagines, that "the Terra Protocol could" or should "work to maintain" the price of *LUNA*. *See* AC ¶ 255. The AC does not allege that the purpose of the allegedly faulty UST peg was to maintain a constant value in the LUNA price, as opposed to UST's price vis a vis the dollar. *Id.* ¶ 242 ("The price of LUNA increased from under $1.00 in January 2021 to over $115 in April 2022 . . . .").[10] So the thread says nothing about whether the "algorithm . . . could work to maintain" the only "price[]" it was supposed to maintain, that of UST. *Id.* ¶ 255.

As the *Patterson* court put it when holding for a second time that the plaintiffs there could not state a claim based on this very same thread, "Plaintiffs fail to meaningfully address why a discussion about investors in other tokens likely not choosing to purchase UST somehow connects to their underlying theory of fraud." *Patterson*, 2026 WL 2605224 at *7; *Patterson v. Jump Trading LLC*, 710 F. Supp. 3d 692, 713-14 (N.D. Cal. 2024). Bringing up the 2021 re-peg in this context not only was not necessary to render the statements non-misleading, *Pembroke*, 2026 WL 2137943 at *32, it would have been so beside the point as not to make sense. And of course, Kariya's entire "take" about "potential" developments he thought were "difficult to imagine" was inactionable opinion; there is no non-conclusory allegation that Kariya did not hold his stated beliefs. *Boykin*, 54 F.4th at 184. To top it all

[10] Certainly, there is no suggestion in the thread that UST's peg was supported solely "by an algorithm," AC ¶ 255; at the time of this January 28, 2022, thread, the LFG had already been formed as an alternative source of peg support and funded with assets worth $2.85 billion. *Id.* ¶¶ 170, 173.

off, Kariya presented his opinions not as facts but as theories subject to criticism. "The primary reason" Kariya offered his "take" was to "understand what I got wrong"; and he invited readers to poke holes in his theory: "Please fire away." Ex. 1.

**B. Plaintiff does not allege deceptive conduct by Kariya.**

A claim for scheme liability under Rule 10b-5(a) and (c) requires an allegation that the defendant *personally* "commit[ted] a manipulative or deceptive act" in furtherance of a scheme to defraud. *See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 166, 177, 191 (1994). That allegation must rest on "the defendant's own conduct"—not the conduct of others involved in an alleged scheme—"viewed alone for whether it had the purpose and effect of creating a false appearance of fact." *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040, 1048, 1050 (9th Cir. 2006), *vacated on other grounds*, 519 F.3d 1041 (9th Cir. 2008). This "primary violator" requirement ensures that a scheme claim does not end-run around the rule that a private plaintiff may not sue one who merely aids or abets the deceptive conduct of another. *See Cent. Bank*, 511 U.S. at 177, 191-92. Nor can a private plaintiff plead the reliance element if the defendant's own "deceptive acts . . . were not disclosed to the investing public." *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 160-61, 166-77 (2008); *Pugh v. Trib. Co.*, 521 F.3d 686, 697 (7th Cir. 2008). Simply put, an investor cannot rely on deceptive conduct of which it is not aware.[11]

In addition to the failures to plead each element discussed in the Jump Defendants and DiSomma motions, the AC fails to plead both the primary violator and reliance elements of its Rule 10b-5(a) and (c) scheme claim against Kariya because it does not allege that he personally committed any deceptive act, much less one that any investor could have perceived and relied on.

[11] There can be no fraud-on-the-market presumption of reliance for a defendant whose "deceptive acts were not communicated to the public." *Stoneridge*, 552 U.S. at 159.

### 1. Kariya's alleged role in connection with others' trading was not deceptive and could not have induced anyone's reliance.

The "deceptive or manipulative acts" allegedly committed in furtherance of the scheme principally relate to the heart of the scheme as alleged: the alleged trading in response to the 2021 de-peg. The trading is what allegedly sent a false demand signal to the market. AC ¶¶ 123-24, 337.

Of course, these acts cannot ground a claim against Kariya, because they are not Kariya's acts. Nowhere in the AC is Kariya alleged to have participated in the trading. He is not alleged to have set the trading strategy, to have "adjusted" trading models, to have "directed" or "authorized" trading, or to have provided traders with "instructions." *Id.* ¶¶ 42, 120-21, 123, 130-132, 136, 138. Kariya was not even among the "executives" "briefed" about the Jump Defendants' alleged trading efforts. *Id.* ¶ 130.[12]

At very most, Kariya is alleged to have played a *non-public* role that *facilitated* the trading *of others*: negotiating a confidential agreement to accelerate the vesting of the Jump Defendants' LUNA from Terraform, a deal of which "no outsiders were notified." *Id.* ¶¶ 81, 337, 341; *see also id.* ¶¶ 112-115. Non-public, behind-the-scenes "participat[ion]" in, "facilitate[ion]" of, or "assistance" of a scheme is not actionable in a private suit. *See Stoneridge*, 552 U.S. at 156, 162-63; *Pugh*, 521 F.3d at 697; *In re Glob. Cord Blood Corp. Sec. Litig.*, 820 F. Supp. 3d 221, 255 (S.D.N.Y. 2026). Kariya reported the private deal to others who worked for the Jump Defendants, who "in exchange" for Terraform's vesting pursued the allegedly deceptive trading course without any involvement from Kariya. AC ¶¶ 115-38, 337. There is no allegation that the vesting agreement between Terraform and the Jump Defendants was *itself* unlawful, or that the deal itself was a sham transaction that sent a false signal to anybody. *Cf. SEC v. Daifotis*, No. C 11-00137 WHA, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011); *Simpson*, 452 F.3d at 1048, 1050 ("Participation in a legitimate transaction, which does not have a deceptive purpose or effect, would not allow for a primary violation even if the defendant knew or intended that another

[12] As explained in the Jump Defendants' and DiSomma's briefs, the trading was not manipulative in any event.

party would . . . effectuate a fraud."). Because Kariya's own alleged conduct was not a deceptive act, he is not a primary violator as a matter of law.

By the same token, no investor could have relied on Kariya's alleged conduct in negotiating with Terraform, because Plaintiff directly alleges Kariya's acts "were not disclosed to the investing public." *Stoneridge*, 552 U.S. at 161. Where, as here, investors "don't allege that they knew about" a defendant's alleged "bad acts," and "[i]n fact" allege "the opposite," they cannot plead the reliance element against that defendant. *Pembroke*, 2026 WL 2137943, at *56; *Pugh*, 521 F.3d at 696.

That holds true even if the alleged deceptive trading of others "was a natural and expected consequence of" Kariya's alleged non-public negotiation of the vesting (there is no allegation that it was). *See Stoneridge*, 552 U.S. at 160-61. It holds true even if Kariya "intended" that others would engage in the allegedly manipulative trading that followed (there is no allegation that he did). *See Pugh*, 521 F.3d at 697. It holds true even if Kariya "deliberately engaged in the [alleged] underlying fraud" (there is no allegation that he did), because he did not personally engage in the actions alleged to have been perceived by and to have deceived the trading public. *See Pugh*, 521 F.3d at 696.

And it would hold true even if Kariya "helped design" a scheme pursuant to which others allegedly misled the market. AC ¶ 337. Such allegations, which are not plausibly or particularly pleaded here, would approach at most an inactionable aiding/abetting theory. Even the alleged "'mastermind' of[ an alleged] scheme to defraud" cannot be liable if "investors were" not "ever informed of" his own alleged acts in furtherance of the scheme. *Pugh*, 521 F.3d at 696-697; *see In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 505 (S.D.N.Y. 2005) (claim sounded in aiding/abetting where defendants "at worst" "designed and entered into the transactions knowing or even intending that" other parties would use them to commit fraud). In any event, the conclusory assertion that Kariya "helped design" the scheme does not withstand other specific allegations in the AC. *See Ezell v. Lexington Ins. Co.*, 926 F.3d 48, 51 n.2 (1st Cir. 2019). Kariya is not alleged to have had any role in the trading at the heart of

the alleged scheme and, even with respect to the role Plaintiff does attribute to him—non-public negotiations with Terraform—Plaintiff alleges that he was "acting on" the "instruction" of a superior, was communicating the "ask" of that superior, and that he had to talk to that superior before agreeing to a Terraform proposal. AC ¶¶ 42, 75-76. Congress did not extend to private plaintiffs a right of action against a person alleged at worst to be a mere facilitator. The SEC can pursue aiders/abettors, but chose not to pursue any claim against Kariya. Congress did not allow Plaintiff to usurp that choice.

**2. Kariya is not alleged to have committed any other deceptive act.**

Plaintiff alleges two remaining deceptive or manipulative acts. First, he alleges that "Kariya personally encouraged investors to consider the Terra Ecosystem a stable investment." *Id.* ¶ 337. As discussed above, Kariya's statements were not misleading so cannot have been deceptive acts in furtherance of any scheme. *See KBC Asset Mgmt. NV v. Discover Fin. Servs.*, No. 23-CV-06788, 2025 WL 976120, at *29 n.12 (N.D. Ill. Mar. 31, 2025). In any event, "misstatements and omissions alone are not enough for scheme liability"; "something extra" in the nature of personal deceptive conduct in furtherance of the scheme is required. *See SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022).

Second, Plaintiff alleges that "Defendants" (not Kariya specifically) "helped create LFG to further the Terra Ecosystem and bolster the illusion that it was stable." AC ¶ 337. Consistent with this improper group pleading, there are no non-conclusory allegations that Kariya played any role in creating the LFG. The LFG was created ("founded") "in Singapore in late 2021." *Id.* ¶ 170. Kariya was "named" to one seat on LFG's powerless Governing Council, which was not "established" until "on or about January 10, 2022," well *after* LFG was created. *Id.* ¶¶ 169, 170, 172. Nor was the LFG an "illusion"; it was a multi-billion-dollar reserve that, as far as Kariya knew, stood ready to support the peg. Again, if Kwon, the party in sole control of the reserve, *id.* ¶¶ 171-72, somehow failed to deploy its assets effectively (or embezzled them), that cannot be blamed on Kariya, who just like investors relied on Kwon's statements. Plaintiff's final Hail Mary is a conclusory assertion that "Kwon and

Kariya touted LFG's independence," *id.* ¶ 172, but the AC does not and cannot identify any Kariya statement so touting; all it can do is quote *Kwon* calling the LFG "independent," *id.* ¶¶ 170, 265.

### C. Kariya did not participate in any trading, so Plaintiff's Securities Exchange Act Section 9 Claim fails (Count 5).

By its express terms, the private right of action for Section 9 claims extends only to a defendant who "willfully participates in any act or transaction in violation of" Section 9. 15 U.S.C. § 78i(f). Congress extended *the SEC's* Section 9 right of action, but not the private right of action, to include aiding and abetting. 15 U.S.C. § 78t(e). Nor does scheme liability, a concept derived from the text of Rule 10b-5(a) and (c) and therefore applicable only to Section 10(b) claims, *see Pembroke*, 2026 WL 2137943, at *49, apply to a Section 9 claim.

Plaintiff attempts to plead a violation of Section 9(a), and a Section 9(a) violation requires "a series of transactions in a security"—that is, trading. *See AnchorBank*, *FSB v. Hofer*, 649 F.3d 610, 616-17 (7th Cir. 2011); AC ¶ 356 (stating that Section 9(a) "prohibits the use of interstate commerce for manipulative trading conduct" and citing subsections (a)(1), (a)(2), and (a)(6) of 15 U.S.C. § 78i(a); the text of each requires transactions in or orders for securities). Unsurprisingly, Plaintiff alleges that group-pleaded "Defendants" violated Section 9(a) *by trading* UST. AC ¶¶ 361-66. But Kariya did not participate in any trading. So he did not "willfully participate[] in any act or transaction in violation of" Section 9(a) and therefore is not "liable." 15 U.S.C. § 78i(f).

Plaintiff also glances at Section 9(a)(4), which prohibits knowingly misleading statements "for the purpose of inducing the purchase or sale of a security." 15 U.S.C. § 78i(a)(4). But that subsection, too, applies only to those who participate in the exchange of the security at issue: it applies only "[i]f" one is "a dealer, broker, security-based swap dealer, major security-based swap participant, or other person selling or offering for sale or purchasing or offering to purchase the security." *Id.* Plaintiff does

not allege that Kariya was any such thing, or that he personally offered or sold UST to anyone. In all events, as explained above, Kariya did not make any false or misleading statements.

## II. Kariya is not alleged to have controlled any entity that violated the Securities Exchange Act (Count 4).

Plaintiff's control person theory of liability for Kariya fares no better.[13] To be a control person vicariously liable under Section 20(a), the defendant (1) "needs to have *actually* exercised general control over the operations of the wrongdoer," and (2) "must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911-12 (7th Cir. 1994) (emphasis in original) (citation modified). Plaintiff falters at each step.[14]

Nothing in the Complaint supports any inference that Kariya had and "*actually* exercised" general control over the operations of the "Jump Entity Defendants," which the AC defines to mean a group of eight different corporate entities that allegedly operate under the "Jump Trading Group" brand, founded by two persons other than Kariya in 1999—when Kariya was a toddler in his native India. AC at 1, ¶¶ 29, 305. Each of those entities, including Jump Crypto Holdings, LLC, are alleged to be "under the common ownership and control of" those two Jump Trading Group "co-founders," not under the control of Kariya. *Id.* ¶ 41. Kariya is not alleged to have held a director or officer position at any of these eight entities, including Jump Crypto Holdings, LLC.

Kariya held the title of "President" of "'Jump Crypto'"—not one of the corporate-entity "Jump Entity Defendants" but a "division within the Jump Trading Group brand." *Id.* ¶¶ 43, 31, 304. An allegation that an individual held a high-level executive title or position does not state a control-person claim; a plaintiff must allege "more." *Magnuson v. Window Rock Residential Recovery Fund, L.P.*,

---

[13] Plaintiff brings his control person claim only with respect to the Jump Defendants' alleged Section 10(b) violations, not with respect to any Section 9 violation. AC ¶ 349. In any event, for the same reasons set forth here, Kariya did not control the Jump Defendants with respect to any Section 9 violation.

[14] Nor does he plead an underlying primary violation.

No. 22 CV 1010, 2024 WL 5040836, at *5 (N.D. Ill. Dec. 9, 2024). But Plaintiff alleges less. For starters, Kariya gained the title of President only in "September 2021," not until *after* the vesting negotiations with Kwon and the May 2021 re-peg trading. AC Ex. B at 1286:21. Even then, Kariya was President in name only. Kariya was merely "the public face" of the "'Jump Crypto'" division; someone else allegedly "'ran the team' . . . approved Jump Crypto's deals, directed Jump Crypto's lead trader [who was not Kariya] on trading strategies, and generally set the investment strategy for Jump Crypto." AC ¶ 42. Plaintiff's specific allegations directly refute his later, conclusory allegation under Count Four that Kariya "directed the strategy for Jump Crypto." *Id.* ¶ 350. Kariya was so far from control of the operations that he was not even included on the distribution of "executives" who were updated about the alleged May 2021 trading. *Id.* ¶ 130.

Nor is Kariya alleged to have had the ability to control the specific activity at issue—the Jump Defendants' trading in response to the de-peg. Plaintiff's blow-by-blow account attributing the strategy, direction, and implementation of the trading to others directly refutes his later conclusory claim that Kariya "worked with Kwon to design the fraudulent scheme[] through which Jump would secretly trade to restore UST's peg." *Compare id.* ¶¶ 42, 120-21, 123, 130-32, 136-38, *with id.* ¶ 350.

The only role Plaintiff attributes to Kariya is interfacing with Kwon about the vesting deal. It is difficult to fathom how conversations with a non-Jump-Defendant employee could establish control over any Jump Defendant, but this much is clear: even when negotiating with Kwon, Kariya (who was not yet "President" of the division) was not controlling or influencing anyone at any Jump Defendant but rather acting as a subordinate. According to Plaintiff, one of Kariya's superiors "asked" him "to get" a deal with Terraform. *Id.* ¶ 74. Kariya was not a decisionmaker in the negotiations; he "indicated" to Kwon "that he was acting on [his superior's] instruction and would need [his superior's] approval for changes or new developments in the Terraform-Jump partnership," *id.* ¶ 75—a category that would include the vesting modification alleged to have precipitated the at-issue trading. Thus, Kariya allegedly

communicated to Kwon the "ask" of his superior, and when Kwon made a proposal, Kariya did not have authority to agree for any Jump Defendant: he had to consult internally "and get back to" Kwon. *Id.* When Kwon agreed to the accelerated vesting, Plaintiff alleges "Kariya reported back to" his superior. *Id.* ¶ 115.

Finally, Plaintiff throws in the allegation that Kariya "worked on the formation of LFG," *id.* ¶ 350, but the allegation that Kariya held a ceremonial role on the "no governing power" Governing Council of an entity controlled by Kwon does not support any inference that Kariya had control over any Jump entity. *Id.* ¶¶ 172, 408. Nor does Plaintiff's allegation that Kariya made false statements say anything to suggest he controlled others at any Jump Defendant, in the making of statements not attributed to Kariya or otherwise. *Id.* ¶ 350.

## III. Kariya did not act with scienter.

Under the PSLRA, a plaintiff must plead a strong inference of scienter as to "*each individual defendant.*" *See Cornielsen v. Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 602 (7th Cir. 2019) (emphasis in original). The only Kariya-specific scienter allegation is that he "designed the scheme so that the contractual vesting conditions would be removed if [the Jump Entity Defendants] helped restore the peg." AC ¶¶ 341, 368. But Plaintiff's own specific allegations belie the vague characterization that Kariya was some kind of architect of any scheme. When Kariya dealt with Kwon in the course of "acting for" his employer, Kariya was acting at the direction and subject to the approval of a superior. *Id.* ¶¶ 74-75, 115, 341; *see Ezell*, 926 F.3d at 51 n.2. Nor does the AC allege that Kariya had a personal stake in any profits from the alleged violations.

Beyond that, Plaintiff relies on "Defendants[']" structuring and pricing of trades—conduct in which Kariya did not participate, so which can't support scienter for Section 10(b) or the "specific intent" necessary to make out a "willful[]" Section 9 violation. AC ¶¶ 341, 357, 368. *See Rockies Fund, Inc. v. SEC*, 428 F.3d 1088, 1093 (D.C. Cir. 2005). Plaintiff makes much of Kariya's purported effort

to "minimize" the Jump Defendants' involvement in the May 2022 LFG reserve deployment, but those allegations merely reflect Kariya's effort to ensure accuracy by involving counsel in the review of communications. AC ¶ 215 ("After discussing with counsel . . . ."). Similarly, when Kariya used Signal, Plaintiff alleges he did so because "Jump's Compliance Department" "strongly pushed" him to back in March 2021. *Id.* ¶¶ 245-247. And Kariya took care to ensure that nobody would overread or misconstrue the opinions he offered, inviting readers of his MIM thread to "fire away" at what he "got wrong." Ex. 1. For his podcast statement about Kwon's LFG reserve, he openly relied on Kwon to "correct" him based on Kwon's superior visibility into the LFG if he had said anything that was not "exactly just right." Ex. 2 at 28, 35:49; 29, 37:53.

Far more "cogent" and "compelling" than any inference of "intent to deceive, manipulate, or defraud" are the inferences that Kariya: (1) was an optimist who engaged in open-forum, theoretical discussion about opinions on possibilities for novel crypto assets; (2) was a subordinate employee seeking to do his job to help his employer make reasonable business decisions while following advice from legal and compliance; and (3) was deceived by Kwon, just like the investors in whose shoes Plaintiff purports to stand. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314, 324 (2007).

## IV. The ICFA and common-law-fraud claims fail against Kariya (Counts 6 and 7).

For the reasons discussed above and in the Jump Defendants' brief (at 61), Plaintiff fails to plead any element of his common-law-fraud and ICFA claims (and the ICFA claim is untimely). Kariya's statements were not misleading, and to the extent Plaintiff attempts to bring an ICFA claim based on trading conduct, AC ¶ 387, Kariya did not participate in trading. His alleged role in the Jump Defendants' vesting deal with Kwon was non-public, so cannot satisfy the deceptive act or intent-to-induce-reliance elements of an ICFA claim. *Castaneda v. Amazon.com, Inc.*, 679 F. Supp. 3d 739, 748 (N.D. Ill. 2023) (deceptive act must be "likely to deceive a reasonable customer" and probable to mislead "a significant portion of the general consuming public"). Like Exchange Act Section 10(b) in

a private action, ICFA Section 2 does not extend to secondary or aiding/abetting liability.[15] *In re Laverdure*, 399 B.R. 310, 314 (Bankr. N.D. Ill. 2008) (citing *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 859 (Ill. 1998)).

## V. The Securities Act unregistered securities/control person claim is time-barred and fails on the merits (Count 13).

Plaintiff's attempt to hold Kariya liable as a control person for "the Jump Entity Defendants[']" alleged sale/offer of unregistered securities in violation of Sections 5 and 12(a)(1) of the Securities Act fails for the same reasons the Exchange Act control person claim fails (like that claim, the alleged primary violation consists of alleged Jump Defendant buying/selling/trading activities in which Kariya played no role and over which he had no control). AC ¶¶ 456-59; *see Donohoe*, 30 F.3d at 911.

Additionally, the AC "set[s] forth everything necessary" to conclude that Count 13 is time-barred twice over, once by the statute of limitations and again by the statute of repose.[16] *Vergara v. City of Chicago*, 939 F.3d 882, 886 (7th Cir. 2019) (citation omitted). Each ran well before Plaintiff first sued Kariya on December 18, 2025. ECF No. 1. The statute of limitations runs "one year after the

---

[15] Plaintiff also references "market manipulation" in the common-law-fraud count, AC ¶ 376, but any attempt to bring a fraud claim based on conduct other than statements fails because the first element of fraud is "a false statement of material fact." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (1996); *Slowinski v. BlueTriton Brands, Inc.*, 744 F. Supp. 3d 867, 884 (N.D. Ill. 2024) ("a common-law fraud claim can go nowhere without a plausible allegation of a false or deceptive statement") (citation modified). Plaintiff does not allege that the trading "amount[ed] to a false statement of fact," *Marc Dev., Inc. v. Wolin*, 904 F. Supp. 777, 792 (N.D. Ill. 1995), such as a representation that the traded tokens were "valid" or "backed by cash or a margin account," *Glazewski v. Coronet Ins. Co.*, 483 N.E.2d 1263, 1266 (Ill. 1985). Even if the trading activity could be actionable as fraud, Kariya did not trade and his non-public vesting-negotiation role could not have induced reliance. *See In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1060 (N.D. Ill. 1995) (specific individual reliance required for common-law fraud; there is no fraud-on-the-market presumption). Nor does Plaintiff allege Kariya was in any relationship with any investor that imposed any duty to speak. *See Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 649 (7th Cir. 2019).

[16] Indeed, the Court in *Patterson* recently dismissed as time-barred a similar unregistered sales claim against Kariya (and DiSomma) brought almost two years before Plaintiff in this case sued Kariya. *Patterson*, 2026 WL 2605224, at *21. The argument set forth here applies with equal force to Defendant DiSomma.

violation"—the sale of an unregistered security—and is not subject to any discovery rule.[17] 15 U.S.C. § 77m; *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 553 (6th Cir. 2012); *McLernon v. Source Int'l, Inc.*, 701 F. Supp. 1422, 1427 (E.D. Wis. 1988). The Jump Entity Defendants allegedly distributed UST "[b]etween May 2021 and May 2022." AC ¶ 459. The same is true of the alleged LUNA distributions, which ended by the May 2022 crash. Jump Mot. Ex. 2 ¶ 1 (SEC Consent Order relied on in AC ¶ 458 referred to Tai Mo Shan sales of LUNA "[f]rom January 2021 to May 2022")[18]; *see also* AC ¶¶ 134, 151-52, 179-80, 204-05, 208, 242, 390, 456. Accordingly, the one-year statute of limitations on the latest of the alleged sales ran by May 2023, over two-and-a-half years before Plaintiff filed suit.

Moreover, Count 13 is independently subject to a statute of repose that runs "three years after the security was bona fide offered to the public"—that is, the date the security was *first* offered to the public. 15 U.S.C. § 77m; *see In re VMS Sec. Litig.*, 752 F. Supp. 1373, 1384 (N.D. Ill. 1990); *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 100-06 (2d Cir. 2004); *In re Ripple Labs, Inc. Litig.*, No. 24-7599, 2026 WL 206301, at *1-2 (9th Cir. Jan. 27, 2026); *see Patterson*, 2026 WL 2605224 at *18. LUNA was first offered to investors in April 2019, AC ¶ 60, and UST was likewise first issued "[i]n 2019," *id.* ¶ 63. Jump Defendants entered agreements "to serve as a market-maker for UST and LUNA" beginning in November 2019. *Id.* ¶¶ 70, 72, 127. The three-year repose period expired at latest by November 2022.[19]

Finally, Count 13 fails on the merits because Terraform, not any Jump Defendant, issued and sold UST and LUNA. *Id.* ¶¶ 60, 63. No Jump Defendant entity was a "seller" alleged to have actively participated in negotiations with a purchaser, successfully solicited an individual to purchase a token, or "urge[d] or persuade[d]" an individual to purchase. *See In re Violin Memory Sec. Litig.*, No. 13-CV-

[17] The control person claim takes the same limitations and repose period as the primary violation. *See Herm v. Stafford*, 663 F.2d 669, 679 (6th Cir. 1981); *In re: Petrobras Sec. Litig.*, 152 F. Supp. 3d 186, 199 (S.D.N.Y. 2016).

[18] There is no allegation that Kariya had control specifically over Tai Mo Shan Limited (or any other "Jump Entity Defendant").

[19] Even if the repose period ran from the last sale alleged in the Amended Complaint, any claim would have expired in May 2025, three years after the last alleged sale in May 2022.

5486, 2014 WL 5525946, at *18 (N.D. Cal. Oct. 31, 2014) (citation omitted) (citing Thomas Lee Hazen, The Law of Securities Regulation § 7.6[1] (5th ed. 2006)); *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *see Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1258 (9th Cir. 2022). Indeed, the AC does not include a Securities Act primary violation count against any Jump Defendant. In the absence of primary liability (under limitations, repose, or on the merits), the control person claim fails. *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 673 (N.D. Ill. 2020).

## VI. Plaintiff does not state any contribution, fraudulent transfer, unjust enrichment, or aiding and abetting breach of fiduciary duty claims against Kariya (Counts 1-2, 8-12).

These claims fail for the reasons explained in the Jump Defendants and DiSomma briefs, which apply equally to Kariya. Jump. Mot. at 6-10; 19-22; 48-60; 62-65; DiSomma Mot. at 5, 10-13, 14-15. A few specific points as to Kariya:

- ***Fraudulent transfer:*** The AC does not allege Kariya received, benefitted from, or had "dominion over," any transferred funds. *Bonded Fin. Servs., Inc. v. Eur. Am. Bank*, 838 F.2d 890, 893, 895 (7th Cir. 1988); AC ¶¶ 299-300 ("Jump" received the Bitcoin); DiSomma Mot. at 10-11. Nor was Kariya involved in making the transfers; they came "from LFG," over whose finances Kwon had unilateral control. *Compare* AC ¶ 189 (stating without particularized allegation that "Kwon and Kariya . . . decided that Terraform would transfer . . . ."), *with id.* ¶¶ 406 ("Kwon and Terraform directed this transfer"), 273 (Kwon's "unilateral" LFG de-peg transfers), 170-72, 188. Nor is Kariya alleged to have played a role in any Jump Defendants' use of the allegedly transferred Bitcoin, or to have held any intent to hinder, delay or defraud Terraform creditors. *Id.* ¶¶ 193-200, 406; *see In re Concepts Am., Inc.*, No. 14 B 34232, 2018 WL 1174900, at *12 (Bankr. N.D. Ill. Mar. 1, 2018) ("Overwhelmingly, courts have concluded that parties cannot be liable for a fraudulent transfer if all they have done is participate in it.") (citation modified).

- ***Aiding and abetting:*** Kariya was not involved in the "unilateral" Kwon LFG Bitcoin transfer underlying these claims. *Id.* ¶¶ 273, 315. Nor is there any particularized allegation that Kariya "endorsed" any of Kwon's statements, *id.* ¶ 315; indeed, when on a podcast Kwon allegedly suggested the peg would "self-heal[]," Kariya's own comments clarified that external assistance from the reserve might be needed. Ex. 2 at 28, 35:49; 34, 49:32. Further, Kariya is not alleged to have had actual knowledge or inside insight into any Kwon breach of fiduciary duty to Terraform; Kariya's communications with Kwon concerned his role in helping Jump negotiate an arms-length transaction with counterparty Terraform, and the LFG Governing Council seat gave Kariya no insight into LFG's operations, which Kwon solely controlled. *E.g.*, AC ¶¶ 112-15, 172, 273; *In re Canopy Fin., Inc.*, 2015 WL 3505010, at *7 (N.D. Ill. June 2, 2015).

- ***Unjust enrichment:*** Kariya is not personally alleged to have received any benefit. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989); *see* AC ¶¶ 393-96

(impermissibly using the group-pleaded "Defendants" to obscure that the listed benefits all inured to the Jump Defendants, not Kariya personally), 110 (alleging that another individual, but not Kariya, held a personal interest in the Jump Defendants' profits); DiSomma Mot. at 14-15.

## VII. Plaintiff cannot carry his burden to demonstrate personal jurisdiction through effective service of process.[20]

Since November 2024, well before Plaintiff commenced this action, Kariya has resided in his home country of India. Ex. 3 ¶¶ 5, 8; Aviv Decl. ECF Nos. 85-3, 104 ¶¶ 6, 8. Therefore, the Hague Service Convention applies, and it "sets out the permitted methods of service and excludes all others." *Kangol LLC v. Hangzhou Chuanyue Silk Imp. & Exp. Co. Ltd.*, 177 F.4th 793, 799-800 (7th Cir. 2026). Like China (the state at issue in *Kangol*), India has formally objected to service under Article 10 of the Convention, including service by postal channels under Article 10(a).[21] The Convention and Federal Rule of Civil Procedure 4(f)(3) therefore prohibit the email-to-counsel method through which Plaintiff attempted to serve Kariya. *Kangol*, 177 F.4th at 800, 801; ECF No. 87.[22]

The Convention's exception for cases in which the defendant's "address" is "not known" does not apply. *Kangol*, 177 F.4th at 799 (quoting 20 U.S.T. at 362). Months before Plaintiff filed his motion for alternative service, he identified the specific apartment in Mumbai where Kariya in fact resides. Aviv Decl. ¶¶ 6, 8, 10; Ex. 3 ¶ 5. Kariya owns this two-floor duplex, Ex. 3 ¶ 5, which Plaintiff correctly calls "Kariya's family residence." ECF No. 85, at 3. Plaintiff's investigators visited Kariya's residence

---

[20] *Cardenas v. City of Chicago*, 646 F.3d 1001, 1005 (7th Cir. 2011). The Court may consider evidence outside the pleadings on the service issue. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003). Where, as here, a defendant submits a declaration in support of a motion to dismiss for lack of personal jurisdiction, the court accepts as true the declaration's facts that do not conflict with the complaint or evidence the plaintiff submits, and for any conflicts between complaint and declaration, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *See In re Hair Relaxer Mktg. Sales Pracs. & Prods. Liab. Litig.*, 702 F. Supp. 3d 692, 707 (N.D. Ill. 2023).

[21] Hague Conf. on Priv. Int'l Law, Declaration/Reservation/Notification, https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=984&disp=resdn [https://perma.cc/X58V-WCT3].

[22] *Kangol* postdates and abrogates the district court cases Plaintiff relied on to suggest the contrary in his motion for alternative service. ECF No. 85 at 7-8. The Court granted the alternative service motion one day after it was filed. Kariya did not have an opportunity to present the full story to the Court, and does so here, in his first Rule 12 motion, as Rule 12(h)(1) requires.

once, on January 19, 2026, and found it under renovation. Aviv Decl. ¶ 8. The building's guard confirmed that the Kariyas owned the units and that Kariya himself had been there. Aviv Decl. ¶ 10.[23]

Plaintiff's suggestion that despite these confirmations he did not "know" Kariya's "address" assumes that a plaintiff need not follow the Convention unless he achieves an ironclad and impracticable level of epistemic certainty that a defendant resides at an identified foreign address. ECF No. 85 at 5-8. That's not what the Convention contemplates. *See Noco Co. v. CF Grp. SZKMS Co.*, 571 F. Supp. 3d 862, 871 (N.D. Ohio 2021) (successfully delivering a package to an address meant the address was known, even though the plaintiff could not be sure the defendant received the package there because there were multiple addresses associated with the defendant). Nor may a plaintiff manufacture the exception and avoid the Convention by "clos[ing] [his] eyes to the obvious." *Luxottica Grp. S.p.A. v. P'ships & Unincorporated Ass'ns Identified on Schedule "A"*, 391 F. Supp. 3d 816, 822 (N.D. Ill. 2019). That is what Plaintiff did here: he found Kariya's address in India, his investigator happened to visit it on a date it was under renovation, and Plaintiff took advantage of that coincidence to argue that he did not know where Kariya resided.

**CONCLUSION**

For those reasons, the Court should dismiss the First Amended Complaint against Kariya with prejudice.

Dated: September 28, 2026 Respectfully submitted,

[23] Kariya has not been on some "globetrotting and evasive" campaign to evade service. ECF No. 85 at 8 (citation omitted). He is not a citizen of the United States, does not have permanent resident status here, and does not reside here. Ex. 3 ¶¶ 4-7. He returned home to India before this lawsuit was filed. Ex. 3. ¶ 8.

*/s/ Michael Frisch*

Michael Frisch (Bar No. 6296533)
CROKE FAIRCHILD DUARTE & BERES LLC
222 N. LaSalle St., Suite 500
Chicago, Illinois 60601
Telephone: (847) 530-7419
mfrisch@crokefairchild.com

Aitan D. Goelman (*pro hac vice*)
R. Miles Clark (*pro hac vice*)
Christopher R. MacColl (*pro hac vice*)
J. Benjamin Jernigan (*pro hac vice*)
ZUCKERMAN SPAEDER LLP
2100 L Street NW, Suite 400
Washington, DC 20037
Telephone: (202) 778-1800
agoelman@zuckerman.com
mclark@zuckerman.com
cmaccoll@zuckerman.com
bjernigan@zuckerman.com

*Attorneys for Defendant Kanav Kariya*

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2026, I caused the foregoing documents to be electronically filed with the Court via CM/ECF, which will automatically send notice and a copy of same to counsel of record via email.

/s/ *Michael Frisch*
Michael Frisch